Dillon E. Jackson WSBA #1539
Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Telephone:    (206) 447-4400
Facsimile No.:    (206) 447-9700

G. Larry Engel (*pro hac admission pending*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:    (415) 268-7000
Facsimile No.:    (415) 268-7522

Proposed Counsel for
AMERICANWEST BANCORPORATION

## UNITED STATES BANKRUPTCY COURT

## EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Case No.    10-06097-PCW-11 |
| AMERICANWEST BANCORPORATION, | Chapter 11 |
| Debtor. | **MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.B.R. 6004-1 (I) APPROVING (A) BIDDING PROCEDURES AND (B) THE FORM AND MANNER OF NOTICE OF (i) THE SALE OF CERTAIN ASSETS AND (ii) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS, AND GRANTING RELATED RELIEF; (II) AUTHORIZING AND APPROVING (A) THE SALE OF CERTAIN ASSETS AND (B) THE ASSUMPTION AND ASSIGNMENT OF CERTAIN EXECUTORY CONTRACTS; AND (III) WAIVING THE 14-DAY STAY OF FED. R. BANKR. P. 6004(h) AND 6006(d)** |

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.B.R. 6004-1

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ................................................................................ iii

PRELIMINARY STATEMENT .......................................................................... 2

JURISDICTION ................................................................................................... 5

BACKGROUND ................................................................................................... 6

    A.    General Background ................................................................... 6

    B.    Factors Leading to the Sale ..................................................... 10

    C.    The Company's Efforts to Recapitalize .................................. 11

    D.    State and Federal Regulatory Actions ..................................... 15

    E.    The Company's Compliance Efforts and the Ongoing TruPS Problem ................................................................................. 19

    F.    Entry into the APA ................................................................. 21

    G.    Discussions with the Regulators ............................................. 22

    H.    The Need for an Expedited Sale Process ................................ 22

    I.    The DIP Loan ......................................................................... 27

RELIEF REQUESTED ....................................................................................... 27

SALE OF ASSETS .............................................................................................. 30

    A.    Terms and Conditions of the APA .......................................... 30

    B.    Bidding Procedures ................................................................. 33

    C.    Proposed Procedures for the Assumption and Assignment of Certain Executory Contracts ................................................... 37

    D.    Notice Procedures ................................................................... 41

ARGUMENT ....................................................................................................... 42

    A.    The Shares and the Other Purchased Assets are Property of AWBC's Bankruptcy Estate ................................................... 42

    B.    The Sale Should be Approved as Fair, Reasonable, and in the Best Interest of Creditors ....................................................... 43

        2.    There is a Valid Business Justification and Good Business Reason to Support the Sale. ................................... 44

        3.    The Sale is in Good Faith and Thus the Purchaser or the Successful Bidder Should be Afforded the Protections of 11 U.S.C. § 363(m) ............................................................. 46

        4.    The Purchase Price is Fair and Reasonable ............................ 48

        5.    Adequate and Reasonable Notice Has Been Provided ............ 49

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1- i

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

dc-620201

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 2 of 66

C.   The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale of the Estate's Assets Free and Clear of Liens, Claims, and Encumbrances ....................................................50

D.   The Purchaser or the Successful Bidder Will Provide Adequate Assurances of Future Performance under the 365 Contracts to Satisfy the Requirements Imposed by Bankruptcy Code Sections 365(b)(1) and 365(f)(2)....................................................50

E.   The Proposed Bidding Protections are Reasonable and Necessary to Preserve the Sale Process and Enhance the Value of AWBC's Estate ....................................................52

F.   This Court Should Waive the Fourteen-Day Stay Period Imposed by Bankruptcy Rules 6004(h) and 6006(d) ....................55

NOTICE ....................................................56

CONCLUSION ....................................................58

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1- ii

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

# TABLE OF AUTHORITIES

**Page(s)**

C<small>ASES</small>

*240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P.*
   *(In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653 (9th Cir. B.A.P. 1996)........44

*Arnold & Baker Farms v. U.S.*
   *(In re Arnold & Baker Farms)*, 85 F.3d 1415 (9th Cir. 1996) ...........................48

*Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.)*,
   181 F.3d 527 (3d Cir. 1999) ................................................................55

*Comm. Of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*,
   722 F.2d 1063 (2d Cir. 1983) ........................................................44, 45

*Deak & Co., Inc. v. Ir. R.M.P. Soedjono (In re Deak & Co., Inc.)*,
   63 B.R. 422 (Bankr. S.D.N.Y. 1986)................................................43

*Fearing v. Seror (In re Fearing)*,
   143 Fed. Appx. 744 (9th Cir. 2005)................................................44

*Hays v. Cummins (In re Cummins)*,
   166 B.R. 338 (Bankr. W.D. Ark. 1994)................................................43

*In re Abbotts Dairies of Pa., Inc.*,
   788 F.2d 143 (3d Cir. 1986) ......................................................44, 47, 48

*In re Am. West Airlines, Inc.*,
   166 B.R. 908 (Bankr. D. Ariz. 1994)................................................54

*In re Apex Oil Co.*,
   92 B.R. 847 (Bankr. E.D. Mo. 1988)................................................47

*In re Curlew Valley Assocs.*,
   14 B.R. 506 (Bankr. D. Utah 1981)................................................46

*In re Gulf States Steel, Inc. of Ala.*,
   285 B.R. 497 (Bankr. N.D. Ala. 2002)........................................46, 49

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R.
6004-1- iii

dc-620201

F<small>OSTER</small> P<small>EPPER</small> PLLC
1111 T<small>HIRD</small> A<small>VENUE</small>, S<small>UITE</small> 3400
S<small>EATTLE</small>, W<small>ASHINGTON</small> 98101-3299
P<small>HONE</small> (206) 447-4400  F<small>AX</small> (206) 447-9700

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 4 of 66

*In re Hupp Indus., Inc.*,
140 B.R. 191 (Bankr. N.D. Ohio 1992).............................................................54

*In re S. Biotech., Inc.*,
37 B.R. 318 (Bankr. M.D. Fla. 1983)...............................................................46

*In re S.N.A. Nut Co.*,
186 B.R. 98 (Bankr. N.D. Ill. 1995)..................................................53, 54, 55

*In re Wilde Horse Enters., Inc.*,
136 B.R. 830 (Bankr. C.D. Cal. 1991).............................................................44

*Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re Cont'l Air Lines, Inc.)*,
780 F.2d 1223 (5th Cir. 1986).........................................................................45

*Murray v. Marres (In re Murray)*,
147 B.R. 688 (Bankr. E.D. Va. 1992)...............................................................43

*Quintex Entm't, Inc. v. Quintex Entm't, Inc. (In re Quintex Entm't, Inc.)*,
950 F.2d 1492 (9th Cir. 1991)..........................................................................43

*T.C. Investors v. Joseph (In re M Capital Corp.)*,
290 B.R. 743 (B.A.P. 9th Cir. 2003)...............................................................47

*Thomas v. Namba (In re Thomas)*,
287 B.R. 782 (B.A.P. 9th Cir. 2002)...............................................................47

*Travelers Ins. Co. v. Plaza Family P'Ship (In re Plaza Family P'Ship)*,
95 B.R. 166 (Bankr. E.D. Cal. 1989)...............................................................44

*United States v. Ken Int'l Co.*,
184 B.R. 102 (D. Nev. 1995)...........................................................................43

*Walter v. Sunwest Bank (In re Walter)*,
83 B.R. 14 (B.A.P. 9th Cir. 1988)..............................................................2, 45

*Weingarten Nostat, Inc. v. Serv. Merch. Co., Inc.*,
396 F.3d 737 (6th Cir. 2005)...........................................................................43

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1- iv

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

**STATUTES**

11 U.S.C.

§ 102..................................................................................28
§ 105..................................................................................29
§ 105(a).............................................................................1,5
§ 363............................................................................passim
§363(b).............................................................1, 5, 43, 45
§363(f)..........................................................................29, 50
§ 363(m)..........................................................29, 46, 47, 48
§ 363(n)............................................................................29
§ 365................................................................1, 5, 39, 51
§ 365(a)............................................................................51
§ 365(b)............................................................................41
§ 365(b)(1)....................................................................51, 52
§ 365(c)(1)........................................................................39
§ 365(f)(2)....................................................................51, 52
§ 365(f)(2)(B)...................................................................52
§ 541..................................................................................43
§ 541(a)........................................................................42, 43
§ 1107(a) and 1108 ...........................................................10

28 U.S.C.

§ 157....................................................................................5
§ 157(b)...............................................................................5
§ 157(b)(2)(M)....................................................................43
§ 1334..................................................................................5
§ 1408..................................................................................5
§ 1409..................................................................................5

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1-  v

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

**OTHER AUTHORITIES**

FEDERAL RULES OF BANKRUPTCY PROCEDURE

Rule 2002 ...................................................................................1, 5, 28
Rule 2002(d) ............................................................................42
Rule 2002(l) .............................................................................42
RULE 6004 .......................................................................1, 5, 28, 43
Rule 6004-1 ...............................................................................5
RULE 6004(f)(1) .......................................................................43, 44
RULE 6004(h) .................................................................2, 28, 55, 56
RULE 6006 ...............................................................................5
RULE 6006(d) .................................................................2, 28, 55, 56
Rule 9014 ...................................................................1, 5, 28

Robert Barba, *Capitol Bancorp Latest Victim of Stubborn Debtholders*,
*American Banker*, October 21, 2010 ...................................................14

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1- vi

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 7 of 66

## <u>TABLE OF EXHIBITS</u>

| <u>Exhibit</u> | <u>Document</u> |
| --- | --- |
| A | Asset Purchase Agreement, dated as of October 27, 2010, by and between AWBC and the Purchaser |
| B | Order Approving the Bidding Procedures (the "Bidding Procedures Order") |
| C | Order Authorizing and Approving Sale (the "Sale Order") |
| D | Assignment Notice |
| E | Notice of Sale |
| F | Publication Notice |
| G | Bidding Procedures |

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1-  vii

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

AmericanWest Bancorporation ("AWBC"), hereby submits this motion (this "Motion")[1] seeking the entry of orders, pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365; FED. R. BANKR. P. 2002, 6004, 6006, and 9014; and L.B.R. 6004-1:

    (I)    Approving

        (A)    the proposed bidding procedures set forth herein (the "Bidding Procedures") for the proposed sale of Shares and the Other Purchased Assets, and approving the Contemplated Transactions (collectively, the "Sale");[2]

        (B)    certain bidding protections described herein, including the Minimum Overbid. the Bidding Increments, as defined below, and the Stalking-Horse Bidder Fee in the event that SKBHC Hawks Nest Acquisition Corp. (the "Purchaser") is not the Successful Bidder, as described below, at the Sale (the "Bidding Protections"); and

        (C)    the form and manner of

            (i)    the notice that will be filed with this Court and served

---

[1] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the Asset Purchase Agreement, dated as of October 27, 2010 by and between AWBC and the Purchaser (the "APA") attached hereto as Exhibit A.

[2] AWBC seeks separate Court approval for the DIP Loan, described in the APA and herein, through its concurrently filed *Motion for Entry of Interim and Final Orders (I) Authorizing AWBC to Obtain Postpetition Financing on a Senior Secured, Superpriority Basis, (II) Authorizing the Use of Cash Collateral, and (III) Scheduling a Final Hearing*.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1- 1

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

dc-620201

1   on all creditors and parties-in-interest regarding the
2   Sale and related Sale Hearing (as defined hereinafter)
3   (the "<u>Notice of Sale</u>"); and

4   (ii)   the notice of assumption and assignment of certain
5   executory contracts (the "<u>Assignment Notice</u>"), and
6   granting related relief, including scheduling a hearing
7   on an expedited basis at which this Court will consider
8   approval of the Sale (the "<u>Sale Hearing</u>");

9   (II)   Authorizing and approving

10   (A)   the Sale, free and clear of all Encumbrances, to the
11   Purchaser or to the Successful Bidder (as defined in the
12   Bidding Procedures); and

13   (B)   the assumption by AWBC and assignment to the Bank of the
14   365 Contracts; and

15   (III)   Waiving the fourteen-day stay imposed by Bankruptcy Rules
16   6004(h) and 6006(d).

17   In support of this Motion, AWBC respectfully represents as follows:

18   **PRELIMINARY STATEMENT**

19   1.     By this Motion, AWBC seeks to obtain approval of the Sale of its
20   most significant asset—100% equity ownership in its bank subsidiary,
21   AmericanWest Bank (the "<u>Bank</u>") together with the Other Purchased Assets.
22   Currently, the Bank employs 540 individuals who serve over 77,000 customers
23   across Eastern Washington, Northern Idaho, and Utah.  Over the past two years,
24   the Bank has fallen victim to the current financial crisis and has incurred
25   significant losses, which have seriously depleted its capital.  As explained in more
26   detail below, the Bank has been in default for more than six months of a regulatory

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   2

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1   directive to raise capital.  Failure to recapitalize the Bank presents risk of seizure

2   and closure at any time.

3       2.      Despite AWBC's strenuous efforts to raise capital on behalf of the

4   Bank and comply with applicable regulatory requirements, AWBC has not been

5   successful thus far.  Beginning early in 2008, AWBC undertook extensive efforts

6   to raise capital on behalf of Bank. Over 95 potential investors and 34 strategic

7   partners were contacted.  Those efforts were thwarted, in part, because of a

8   difficult obstacle inherent in its capital structure.  AWBC previously issued junior

9   subordinated debentures to four statutory trusts, which in turn issued securities

10  commonly known as Trust Preferred Securities or "TruPS."  The TruPS were

11  eventually collateralized into complicated structures of collateralized debt

12  obligations ("CDOs").  These CDOs issued securities in several tranches with

13  complex payment and priority terms.  Any new investor in AWBC faced the

14  prospect of seeing the first $40 million of its capital being used to enhance the

15  standing of the TruPS.  Accordingly, AWBC sought a restructuring of the TruPS

16  that would enhance the chances of attracting new capital.

17      3.      Unfortunately, these efforts were of no avail, in part because of the

18  way in which the TruPS are held.  In these structures, the ultimate TruPS holders

19  cannot easily be identified, which has made it impossible, as a practical matter, to

20  coordinate an out-of-court restructuring with such holders.

21      4.      Unable to attract capital for the Bank through investments in AWBC,

22  the Bank proceeded to seek a direct capital investment.  However, the amount of

23  capital needed to adequately recapitalize the Bank for regulatory purposes would

24  have diluted AWBC's ownership down to a fraction of the shares of the Bank.  In

25  this situation, such a transaction would likely constitute a "sale of substantially all

26

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  3

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1  of AWBC's assets" requiring (essentially unattainable) approval by the TruPS

2  holders and by a majority of AWBC's common stockholders.

3      5.      As a result of continued deterioration in the Bank's asset quality and

4  the continued inability to recapitalize the Bank, AWBC became insolvent by the

5  second quarter of 2010.  This significantly impeded the Company's[3] ability to raise

6  further capital because, in addition to the concern investors had with the inability

7  to restructure the TruPS, any new capital investment would in some part be

8  absorbed by the pre-existing equity shortfall, resulting in the immediate dilution of

9  any investor's new capital contribution.

10     6.      Consequently, AWBC has concluded that the only way to recapitalize

11 the Bank (avoiding the risk of its seizure by regulators), and thereby preserve value

12 for AWBC and its stakeholders is to conduct a Sale of the Bank pursuant to

13 Section 363 of the Bankruptcy Code.  Through the bankruptcy process, AWBC

14 will be able to recapitalize the Bank, and the value obtained in connection with the

15 Sale will be preserved for AWBC's creditors, including the holders of the TruPS

16 obligations.  Furthermore, AWBC has obtained a commitment from one dedicated

17 investor with the requisite regulatory approvals and capital commitments to

18 accomplish a transaction of this magnitude.  Specifically, the Purchaser is prepared

19 to proceed with a transaction which would recapitalize the Bank with the amount

20 needed to satisfy regulatory requirements—up to $200 million—and concurrently

21 to acquire the Bank from AWBC for $6,500,000—a commitment most investors

22 could not make on the shortened time frame applicable to this case due to

23 regulatory pressures.

24

25     [3] Unless otherwise indicated, references herein to the "Company"

26 collectively refer to AWBC and the Bank.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   4

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

7.      These timing constraints have also led AWBC to request an expedited schedule for approving the Sale and related Bidding Procedures (defined below). Specifically, AWBC requests a scheduling conference within one business day after this Chapter 11 filing (the "Scheduling Conference") to approve proposed hearings and deadlines outlined in the *Emergency Motion for Order Setting Hearing Dates* filed concurrently with this Motion.  Immediately after the Scheduling Conference, AWBC plans to send all parties in interest a notice explaining the relevant dates related to the Sale and Bidding Procedures as approved by this Court.  The most significant proposed dates, subject to this Court's calendar, include the following: (i) Friday, November 5, 2010 as the hearing date for approval of the first day motions and the Bidding Procedures; (ii) Friday, November 12, 2010 as the hearing date for approval of the DIP Loan which will provide necessary financing for the Chapter 11 process; and (iii) Friday, December 10, 2010 as the hearing date for the Sale Hearing (each term defined below).

**JURISDICTION**

8.      This Court has jurisdiction to consider this matter pursuant to 28 U.S.C. §§ 157 and 1334.  This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue is proper before this Court pursuant to 28 U.S.C. §§ 1408 and 1409.  The statutory predicates for the relief herein are Bankruptcy Code §§ 105(a), 363(b), and 365; Rules 2002, 6004, 6006, and 9014 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules"); and Rule 6004-1 of the Local Rules for the United States Bankruptcy Court of the Eastern District of Washington (the "Local Rules").

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  5

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

# BACKGROUND

## A.    General Background

9.    Founded in 1983, AWBC, headquartered in Spokane, Washington, is a Washington corporation registered as a bank holding company under the Bank Holding Company Act of 1956.  AWBC is the direct or indirect corporate parent of two non-debtor subsidiaries:  the Bank, a Washington state chartered bank that is insured by the FDIC and wholly-owned by AWBC; and AmericanWest Holdings, Inc., a Washington corporation that is wholly-owned by the Bank.  The Bank operates in Eastern and Central Washington and Northern Idaho, and in Utah where it conducts business under the tradename of "Far West Bank."

10.    AWBC functions as a holding company for the Bank, which is its primary asset.  The Bank gathers deposits and provides loans to approximately 77,000 customers across the Inland Northwest through branches located primarily in Spokane, Yakima, Walla Walla, and the Tri-Cities area.  The Bank serves customers in a total of 58 branches, including a branch in Salt Lake City, Utah, and branches in suburban and rural communities in Eastern and Central Washington, Northern Idaho, and Utah.  As of October 28, 2010 (the "Petition Date"), the Company collectively had approximately 540 employees across its 58 branches and two support facilities.

11.    The Bank offers agricultural loan products and commercial loan products to hundreds of farmers and small businesses across its market areas in Washington, Idaho and Utah.  The Bank offers a variety of deposit accounts to both consumer and business customers, including checking accounts, money market demand accounts, and savings accounts.  Numerous services also provide the Bank's consumer and business customers with convenient bank access, including ACH origination, remote check capture (i.e., on-site imaging and

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  6

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

electronic processing of checks), sweep accounts, and currency services. The Bank also generates non-interest income by offering both consumer and business credit cards and merchant bankcard services through arrangements with third party providers.

12. The Bank and AWBC are highly regulated institutions. The principal regulators of the Bank are the FDIC and the Washington Department of Financial Institutions (the "DFI"). The principal regulators of AWBC are the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of San Francisco. Unless context otherwise requires, references herein to the "Regulators" collectively refer to these four state and federal regulatory agencies.

13. ***The Bank's Capital Structure and AWBC's TruPS.*** AWBC's 100% equity ownership in the Bank totals 429,000 issued and outstanding shares of common stock of the Bank, no par value (the "Shares"). No other shares of capital stock of the Bank are issued or outstanding. All of the Shares are beneficially owned and held by AWBC, have been duly authorized and validly issued, are fully paid and nonassessable, have been issued in full compliance with all applicable securities laws and other applicable legal requirements, and are free and clear of any and all Encumbrances.

14. As of September 30, 2010, AWBC had outstanding unsecured indebtedness totaling approximately $47.2 million,[4] consisting of: (a) four outstanding issuances of junior subordinated debentures issued to four statutory trusts (the "Trusts") that in turn issued their preferred securities, commonly known

---

[4] This total includes the $6.0 million of accrued deferred interest relating to the issuance of TruPS. Such interest, however, has not been capitalized and is not included in the principal balance of $41.2 million described herein.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   7

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

as "TruPS," to investors; and (b) approximately $3,600 in trade debt.  AWBC's principal amount of junior subordinated debt was approximately $41.2 million, which backs exactly $40 million of TruPS issued to investors.[5]  The accrued interest on the junior subordinated debentures totaled $6.0 million, payment of which has been deferred since September 2008 in accordance with the declarations of trust governing the subordinated indentures.  Wilmington Trust Company acts as trustee of two of the Trusts and U.S. Bank acts as trustee of the other two Trusts.

15.    As detailed more specifically in the *Declaration of Patrick J. Rusnak, Chief Executive Officer of AmericanWest Bancorporation, in Support of Chapter 11 Petition and First Day Pleadings* filed contemporaneously herewith (the "Rusnak Declaration"), each of the four TruPS issuances, corresponding to AWBC's junior subordinated debentures, was sold as a block into a separate limited liability company (each a "PreTSL").[6]  Each PreTSL issued several tranches, or priorities, of notes (e.g., Class A-1 Senior Notes, Class A-2 Senior Notes, Mezzanine Notes, and Subordinated Notes) to numerous institutional and accredited individual investors through offerings exempt from securities

---

[5] The excess amount of the debentures over the amount of the TruPS represents the common equity of the Trusts, which is held by AWBC.  The common equity interest has no economic value.

[6] "PreTS[SM]" is a registered service mark, derived from "Preferred Term Securities," another term for trust preferred securities.  "PreTSL" is the common shorthand for each of the limited liability companies that has issued TruPS collateralized by AWBC's junior subordinated debentures, with each such company having a name in the form of "Preferred Term Securities [__] Limited" with the "[__]" representing the Roman numeral designating the specific entity.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   8

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

registration. Each PreTSL's notes are collateralized with the TruPS held by that PreTSL, along with TruPS and debt obligations of other entities. The PreTSLs are unmanaged, pooled CDOs, with Bank of New York Mellon ("BNYM") acting as CDO trustee (the "CDO Trustee") under the indenture applicable to each PreTSL. BNYM has limited authority to make decisions with respect to the CDOs and the collateralized assets. Direct ownership of the notes issued by the CDOs is widely dispersed, and identifying the ultimate investors is extremely difficult.

16. **_The Company's Objective._** As described below, the Bank has been subject to significant regulatory action by the Regulators for over two years. If AWBC is unable to recapitalize the Bank promptly, it faces possible seizure of the Bank by the DFI and appointment of the FDIC as receiver. Based on the ratio of asset size to loss to the FDIC's deposit insurance fund for all bank failures during 2010, a receivership for the Bank could result in a $330 million dollar loss to the FDIC's Deposit Insurance Fund—resulting in a total loss for AWBC and its creditors.

17. AWBC has commenced this Chapter 11 case as the only plausible mechanism to recapitalize the Bank while protecting, to the greatest extent possible, AWBC's creditors. By commencing this Chapter 11 case, AWBC hopes to sell its 100% equity ownership in the Bank and Other Purchased Assets on an expedited basis, concurrently with the recapitalization of the Bank by the Purchaser in order to comply with regulatory requirements.

18. Absent a sale of the Shares and the Other Purchased Assets to a sufficiently capitalized and qualified bank or bank holding company concurrent with a significant capital infusion by the Purchaser, the Bank will not meet the Regulators' capital requirements and will not be financially viable on an ongoing basis. The Purchaser presents the Bank with a solution to this dilemma—a

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  9

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

proposed acquirer with the requisite financial resources to acquire and recapitalize the Bank and with the regulatory posture to obtain regulatory approval for the transaction (having been approved on October 26, 2010 by the Federal Reserve Board to become a bank holding company).

19.     Any course of action other than a sale of the Shares and the Other Purchased Assets will preclude the return of any value to the creditors or shareholders of AWBC, and would have adverse consequences for the Bank's customers, communities and employees.  An expedited sale of the Shares and the Other Purchased Assets at the best possible price, with the Purchaser's commitment to concurrently recapitalize the Bank, is therefore the only feasible way to establish the Bank as a viable institution on an ongoing basis and protect, to the greatest extent possible, AWBC's creditors and other stakeholders.

20.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code, AWBC continues in the management and possession of its property as a debtor-in-possession.  No trustee or examiner has been appointed in this case, and no official committee has been appointed or designated.  Additional facts regarding the Company, including its business operations, assets and liabilities, and the events leading to the filing of this Chapter 11 case, are set forth below and in the Rusnak Declaration.

**B.      Factors Leading to the Sale**

21.     The current financial and credit crisis—resulting in approximately 250 nationwide bank failures since 2008[7]—has significantly hampered the Bank's

---

[7] Twenty-five banks failed and were taken over by the FDIC in 2008, while 140 failed in 2009.  Over 130 banks have failed thus far in 2010.  *See* http://www.fdic.gov/bank/individual/failed/banklist.html

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   10

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 18 of 66

1    business and ability to meet certain state and federal regulatory requirements for

2    capital, profitability and credit quality.  Beginning approximately three years ago,

3    effects from the housing crisis, including tumbling home prices, soaring loan

4    defaults, and high unemployment rates, began to take their toll on the Bank's, and

5    ultimately the Company's, financial condition.

6            **C.    The Company's Efforts to Recapitalize**

7            22.    Beginning in 2007, the Company's management initiated efforts to

8    deal with asset quality problems in its loan portfolio, reduce expenses, build capital

9    reserves, and take other appropriate actions to return the Bank to profitability and

10   reduce its risk profile.  However, in early 2008 it became clear to the Company's

11   management and Board of Directors that additional capital would be required to

12   address the Bank's financial problems.

13           23.    Beginning in 2008 and continuing to the present, the Company has

14   undertaken significant efforts to raise additional capital, including efforts to sell

15   Bank assets, or to sell AWBC or the Bank to another financial institution.

16   AWBC's multi-phased marketing effort is summarized as follows:

17           (a)    In March of 2008, the Company engaged Sandler O'Neill & Partners,

18                  L.P. ("Sandler"), a recognized investment banking firm with particular

19                  experience with respect to financial institutions, to advise and assist the

20                  Company in raising additional capital.

21           (b)    Starting in the first quarter of 2008, the Company focused on a

22                  number of methods for raising capital for AWBC (with the goal of AWBC

23                  contributing the funds to the Bank to increase the Bank's capital).

24           (c)    During the fourth quarter of 2008 the Company submitted an

25                  application to the U.S. Department of the Treasury (the "Treasury") and the

26                  FDIC to issue $57 million of preferred stock under the newly enacted TARP

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  11

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

1 Capital Purchase Program.[8]  At the request of the FDIC, the Company's
2 application stipulated that the Treasury's approval could be conditioned on a
3 private equity co-investment of $57 million.  The Company and Sandler had
4 significant discussions with potential investors, and had informal
5 commitments for $35 million in private equity co-investment, but could not
6 obtain commitments for the full $57 million in private equity, as required by
7 the federal regulators, prior to the deadline for processing final TARP
8 applications.  Subsequently, on April 28, 2009, at the strong
9 recommendation of the FDIC, the Company submitted a letter to the FDIC
10 withdrawing its TARP application.

11 (d)    Through the end of 2008 and continuing into 2010, the Company
12 continued extensive efforts to improve the Bank's regulatory capital levels,
13 through raising additional capital at AWBC and through a sale of clusters of
14 branches.[9]

---

[8] On October 3, 2008, Congress enacted the Emergency Economic
Stabilization Act of 2008 (introduced as the Troubled Asset Relief Program or
"TARP").  Generally, under the TARP Capital Purchase Program, the U.S.
Department of the Treasury is authorized to purchase assets and equity from
qualifying financial institutions as a means of strengthening the financial sector.
*See generally* http://www.federalreserve.gov/bankinforeg/tarpinfo.htm.

[9] The FDIC informed the Bank that the FDIC would not consider approval
of any sale of branches unless the sale were part of an overall transaction (i.e.,
including additional capital) that would return the Bank to satisfactory regulatory
capital levels.  As a result, the Bank ceased efforts to market branches to other
parties.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   12

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

1    (e)     In February 2010, in addition to the Company's engagement of

2    Sandler, the Company retained Cappello Capital Corp. ("Cappello"), known

3    for its corporate finance advisory expertise, as a second financial advisor.

4    Cappello was retained to focus mainly on attracting investors that did not

5    traditionally invest in the financial industry. Together, the Company,

6    Sandler and Cappello continued a sustained and targeted strategy to explore

7    strategic alternatives and obtain the approximately $100 million or more in

8    private capital commitments estimated necessary to return the Bank to a

9    condition that would satisfy the requirements of the FDIC and the DFI.

10   (f)     In the second quarter of 2010, it became abundantly clear that

11   potential investors were not willing to invest directly in AWBC if it meant

12   their investment would stand behind the full amount of principal and interest

13   due on AWBC's junior subordinated indentures related to the TruPS.

14   Therefore, the Company and Sandler continued investigation of the

15   feasibility of a discounted tender offer for the TruPS that they had initiated

16   early in 2009.

17   (g)     In 2010, the Company's management contacted the CDO Trustee,

18   Sandler, and Hexagon Securities, a financial advisor with experience dealing

19   with TruPS issues, to determine the process for a discounted tender offer and

20   the likelihood of success. Based on such discussions and public information

21   regarding other financial institutions' unsuccessful attempts at discounted

22   tender offers, it became clear that the CDO Trustee would not approve a

23   discounted tender offer without the written approval of 100% of the ultimate

24   TruPS holders, i.e., all holders of the respective CDO's notes. Receiving

25   that level of approval would be an insurmountable obstacle for several

26   reasons: (1) it is extremely difficult to identify the TruPS holders in order to

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   13

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

solict approvals, (2) approval would be required from the holders of junior priority notes who would receive nothing in payment based on a discounted tender offer, and therefore have no incentive to approve, and (3) the position taken by certain aggressive investors to adamantly reject discounts and payment at anything other than face value.[10]

(h)     Addressing the difficulties surrounding a discounted tender offer for the TruPS, Hexagon Securities advised that AWBC proceed with a discounted tender offer, and if it could obtain approval of 75% of the TruPS holders, it should then file a declaratory action suit against the CDO Trustee to force it to accept the discounted tender offer based on that level of acceptance.  However, this process would take at least a year, well beyond the FDIC's deadline for the Bank to raise capital, and there was no assurance of success.

(i)     The Company next investigated the feasibility for private investors to invest directly at the Bank level, so that their investment would not stand behind the full weight of the junior subordinated debentures.  However, significant issues involving shareholder approval[11] and potential claims by

---

[10] *See* Robert Barba, *Capitol Bancorp Latest Victim of Stubborn Debtholders*, *American Banker*, October 21, 2010.

[11] Investment in the Bank at the necessary level would likely constitute a sale of substantially all of AWBC's assets, which would require prior shareholder approval and approval of the Regulators and, most likely, the Federal Reserve Bank of San Francisco.  Such investment would also cause such dilution of AWBC's ownership interest in the Bank that it would render AWBC insolvent,

(Footnote continues on next page.)

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   14

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

1  the CDO Trustee (on behalf of the TruPS holders) that the Bank or the

2  investors would have assumed the obligations of the junior subordinated

3  debentures made this approach unattractive to investors.

4      24.    From 2008 through the second quarter of 2010, the Company

5  considered a number of investment strategies to achieve a successful capital raise.

6  During this period, the Company and Sandler contacted approximately 100 parties,

7  executing confidentiality agreements with 67 of such parties.  As it identified new

8  potential investment strategies, the Company and Sandler re-contacted qualified

9  parties who had previously expressed interest in a transaction with the Company.

10  However, by the second quarter of 2010, it was clear that, although there was

11  significant investor interest in the Bank because of its solid core deposit franchise,

12  no investor was willing to engage in any of the transaction structures discussed

13  above.  Regardless of the Company's position on the feasibility of any particular

14  mechanism, if there was no investor willingness to proceed, the mechanism would

15  not work.

16      **D.    State and Federal Regulatory Actions**

17      25.    The Company's inability heretofore to raise additional capital has

18  been a major cause of increased scrutiny and action by the Regulators and creates

19  significant risk that the Bank will be seized if not recapitalized on an expedited

20  time frame consistent with the transactions described herein.  A recapitalization of

21  the Bank is critical if the Bank is to be restored to financial viability on an ongoing

22  basis.

23

24  (Footnote continued from previous page.)

25  such that AWBC's shareholders would lower the value of their investment and

26  therefore have no incentive to approve the transaction.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  15

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

26.     As a result of the Bank's announcement that it had ceased to be "well-capitalized" as of June 30, 2008, the DFI conducted an off-site interim examination of the Bank's financial health.  This led to the first of a series of increasingly serious enforcement actions against the Bank or AWBC by the FDIC, DFI, and the Federal Reserve Bank of San Francisco ("FRB"), which regulates AWBC as a bank holding company.  First, the DFI issued a Supervisory Directive against the Bank effective August 8, 2008 (the "DFI Directive").  The DFI Directive required the Bank to provide periodic liquidity and credit quality reports, update the DFI regarding the status of liquidity planning and previously announced capital raising initiatives, notify the DFI about significant changes in management and financial condition, retain a permanent Chief Executive Officer, and seek prior written consent of the DFI before paying dividends.[12]

27.     Second, on February 2, 2009, the FDIC issued a Prompt Corrective Action Notification (the "PCA Notification") to the Bank. The PCA Notification was issued under the Prompt Correction Action provisions of the FDIA and FDIC regulations.  The FDIA and FDIC regulations identify five capital categories for banking institutions—well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized.  The PCA Notification formally advised the Bank that it was significantly undercapitalized, which is the next-to-lowest capital category.  As such, the Bank was required to submit a capital restoration plan (the "Capital Restoration Plan") and it became subject to a wide range of restrictions relating to its senior management team,

---

[12] On September 17, 2009, the DFI notified the Bank that the DFI Directive was being rescinded, as it had been effectively superseded by the PCA Directive discussed in paragraph 20.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   16

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

management compensation, dividends, loan loss reserves, reductions in troubled assets, liquidity, asset growth, and other aspects of its business. In response to the PCA Notification, the Bank submitted its Capital Restoration Plan to the FDIC on March 20, 2009, which the Bank subsequently amended on July 2, 2009. That Capital Restoration Plan was rejected.

28. Third, on May 8, 2009, the Bank entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (the "Stipulation") with the FDIC and the DFI. Pursuant to the Stipulation, the FDIC and the DFI issued an Order to Cease and Desist (the "Order") against the Bank on May 11, 2009. The Order required, among other things, that the Bank take actions necessary to return to the "well-capitalized" category by September 9, 2009.

29. Fourth, on September 15, 2009, AWBC entered into a Written Agreement (the "Written Agreement") with the FRB, imposing on AWBC restrictions and requirements substantially similar to those contained in the PCA Notification and the Order, including the obligation to submit a capital restoration plan.

30. Fifth, on February 26, 2010, the Bank received a Prompt Corrective Action Directive (the "PCA Directive") from the FDIC. The PCA Directive directed the Bank to recapitalize within 30 days of receipt, and reiterated various requirements previously imposed on the Bank by the Order.

31. Taken together, the Order and the PCA Directive required the Bank, among other things, to recapitalize or accept an offer to be acquired by or combine with another financial institution by March 28, 2010.

32. Although the Company's management has undertaken all actions within its power to comply with all aspects of the PCA Notification, the Order, the Written Agreement, and the PCA Directive (collectively, the "Regulatory

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   17

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1 Orders"), the Company has, to date, been unable to comply with their most
2 important terms—the recapitalization or sale of the Bank. Full satisfaction of the
3 Regulatory Orders will depend on raising a significant amount of additional
4 capital. A recapitalization of the Bank is the only path for restoring the Bank to
5 financial viability on an ongoing basis.

6      33. The Bank continues to remain in the significantly undercapitalized
7 capital category. Any undercapitalized banking institution, and particularly one
8 that has failed to comply with an order to recapitalize, is subject to a wide variety
9 of enforcement remedies by the FDIC, including seizure by the DFI and placement
10 in an FDIC receivership. If this occurs, past experience uniformly points to an
11 unhappy set of results: the shareholders' investment in the banking institution
12 immediately will be wiped out (with the creditors of the shareholders being
13 adversely affected as well), the institution will be sold or liquidated at a substantial
14 loss to the FDIC's deposit insurance fund, many of the institution's employees will
15 lose their jobs, customers with deposits in excess of FDIC insurance limits are at
16 risk of losing that portion of their deposits, borrowers may be deprived of needed
17 financing, and the communities served by the institution will be adversely
18 impacted by its loss.

19      34. Following the seizure, the FDIC, as receiver, may bring civil actions
20 against directors, officers, parent companies, and third parties in an effort to
21 recover losses for the receivership estate. The FDIC also can exercise other
22 enforcement remedies which, depending upon the circumstances, may include the
23 imposition of severe civil money penalties against the institution, its parent
24 companies, officers, directors, employees, and other institution affiliated parties;
25 removal of directors, officers, and other institution affiliated parties from
26 participating in the affairs of the institution (or, indeed, participating in the affairs

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  18

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 26 of 66

of any other insured depository institution and certain government agencies); or terminating the institution's FDIC insurance.

35.     During the current financial crises, very few, if any, banking institutions that have received prompt corrective action directives have been able to avoid seizure and FDIC receivership and loss of the shareholders' complete investment.  A review of prompt corrective action directives issued since January 2009 in the FDIC's Western Region—in which the Bank is included—indicates that 26 of the 30 banks that received such directives were ultimately seized by the FDIC.  On average, the time between the deadline for compliance with a prompt corrective action directive and the seizure of the institution was only 68 days.  The Bank has already gone over 240 days since it failed to comply with the PCA Directive's capital raising requirement.  The period of time that the Bank has continued to exist, when contrasted with the experience of other banking institutions in the Western Region, is unique.  The experience of these other banks demonstrates that no banking institution that is significantly undercapitalized could reasonably expect to remain open for such a period of time.

E.     **The Company's Compliance Efforts and the Ongoing TruPS Problem**

36.     In an effort to comply with the Regulatory Orders and restore the Bank to viability, the Company undertook the efforts described above to address the TruPS obstacle and attract potential investors.  However, as mentioned above, it is abundantly clear that, as a practical matter, (a) no investor is willing to satisfy the $47.2 million[13] in junior subordinated debt related to the TruPS, (b) a discount of the TruPS obligations through a discounted tender offer—to the extent it would

---

[13] This amount includes principal and accrued interest as of September 30, 2010.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  19

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

even be obtainable—cannot be achieved within the Regulators' timeframe, and that, regardless of the time required, no investor is willing to commit to a transaction involving a discounted tender offer for the TruPS, (c) AWBC was insolvent as of the second quarter of 2010, and (d) an investment directly at the Bank level outside of bankruptcy also presents an insurmountable obstacle in attracting investors. While the Company does not wish to provoke any disputes with the holders of the TruPS, it simply cannot afford to continue seeking any recapitalization solution that has a remote possibility of success. Continued delay in this regard would further erode the franchise value of the Bank and the therefore value to AWBC and its creditors. It also damages prospects for the Bank's rescue and negatively impacts the many customers, employees, and affected communities who rely on the Bank.

37. In its continuing efforts to identify a viable mechanism for a capital raise, in April and May of 2010 the Company began to investigate the recapitalization of the Bank through a section 363 sale of the Bank to one or more investors as part of the bankruptcy of AWBC, followed by an injection of capital by the new owners into the Bank to restore the Bank to required levels of regulatory capital.

38. As it investigated this possibility, the Company and Sandler again contacted qualified investors, who had earlier expressed interest in the Company, to discuss this approach, and also conducted discussions with newly identified potential investors. During the efforts to remarket the Bank under the newly proposed section 363 sale structure, the Company contacted fourteen different parties, including four parties who had been in prior discussions with the Company, and confidentiality agreements were executed by ten new potential investors.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  20

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

10-06097-PCW11   Doc 2   Filed 10/28/10   Entered 10/28/10 02:02:18   Pg 28 of 66

39.     In June 2010, the Company began negotiating a stalking horse bid with a potential purchaser.  However, the potential purchaser could not obtain the requisite financing for the transaction, and negotiations did not result in a definitive agreement.

40.     The Company is well aware of the numerous obstacles involved in raising capital in today's economic environment.  Notwithstanding the Company's unrelenting efforts over the last two years, no interested parties other than the Purchaser have been willing or able to commit to what is expected by the Regulators.  The Bank is currently under a variety of Regulatory Orders, and, absent a Sale, cannot under any conceivable circumstances be restored to financial viability.

**F.      Entry into the APA**

41.     Following its comprehensive marketing efforts, after 30 months of strategic analysis and negotiations, including discussions with the Regulators and the FRB, the Company, in consultation with Sandler, identified the Purchaser's bid for the Shares and the Other Purchased Assets as the only viable way to accomplish the necessary recapitalization of the Bank and to protect the interests of AWBC's creditors.  After extensive negotiations regarding the terms and conditions thereof, AWBC and the Purchaser have agreed, in principle, to the key terms of the Sale, and have executed the APA, which remains subject to this Court's approval.

42.     If effectuated, the Sale will recapitalize the Bank, ensure the Bank's regulatory compliance, maximize the value available for AWBC's creditors, preserve hundreds of jobs, and save the FDIC many millions of dollars, while simultaneously allowing the Bank to continue serving the needs of thousands of individuals and businesses in the Bank's market areas.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   21

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 29 of 66

### G. Discussions with the Regulators

43.     During the months preceding this Chapter 11 filing, the Company's management has engaged in numerous detailed discussions and in-person meetings with the Regulators to keep them apprised of its recapitalization efforts.  Many of these conversations focused on the requirements of the Regulators for approval of a sale and recapitalization of the Bank, and whether the FDIC and DFI would defer regulatory action long enough to allow recapitalization to proceed.  Generally, throughout the process, the Regulators have remained supportive of the Company's recapitalization efforts.  Within the last three months, the Company introduced to the Regulators, in a number of meetings, the prospect of a Section 363 bankruptcy sale as the potential key to overcome the obstacles that the Company had encountered in its recapitalization efforts.  Shortly thereafter, the Purchaser emerged as a potential party to such a transaction, and thereafter both representatives of the Purchaser and management of the Company explored in depth with the Regulators the proposed transaction, including the bankruptcy sale process that is the subject of this Motion.

44.     As the transaction will require regulatory approval, the Regulators will need to evaluate the regulatory applications that Purchaser contemplates submitting within a matter of days before passing on the transaction.  However, the Regulators have not objected to this bankruptcy filing or otherwise to the path on which the Company has embarked to secure adequate capital for the Bank.

### H. The Need for an Expedited Sale Process

45.     The Sale is the only viable option that effectively addresses the Company's financial situation.  Given the Bank's significantly undercapitalized condition, the Sale must be effectuated expeditiously to avoid a potential customer

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   22

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 30 of 66

crisis and preserve going concern value for all stakeholders, including creditors, employees, and the communities served by the Bank.[14]

46.     First, as a result of the Company's required public announcement of this bankruptcy filing, there is significant risk of customer confusion.[15] Notwithstanding the fact that at least 97% of the Bank's customer deposits are fully protected by FDIC insurance, during any prolonged period of uncertainty customers may become concerned and may look elsewhere for banking services.

47.     Throughout, the Company and the Purchaser have kept the Regulators and the FRB fully informed of the pending Sale and related bankruptcy process. As part of the Company's ongoing discussions with the FDIC, the FDIC has advised AWBC that it does not object to the Sale.  Nevertheless, the FDIC will remain sensitive to the situation and has made it clear to AWBC that a prolonged process could put the Bank at jeopardy, and that it reserves the right to act promptly.  In particular, the Regulators cannot be expected to permit the Bank to operate with its current level of depleted capital for any length of time.

48.     Second, a non-expedited process allowing for a longer auction period would lend little to no net value to AWBC's estate, and could indeed prove futile. With the marketing process ongoing for over 30 months already, the Company

---

[14] Simultaneously with the filing of this Motion, AWBC has sought the entry of the proposed *Order Setting Hearing Dates* for purposes of this Court's expedited consideration of the Sale.

[15] Indeed, this precise scenario happened to IndyMac.  Depositors withdrew a total of $1.3 billion after certain third-party statements sparked widespread panic. Reuters' News, *U.S. seizes IndyMac as financial troubles spread*, July 12, 2008, *available at* http://www.reuters.com/article/idUSWA000014120080712.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   23

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

believes that every party that reasonably could be expected to have the interest and capacity to consummate a transaction to purchase or recapitalize the Bank is aware of the Company's marketing efforts. In order to be a successful bidder, a potential investor would need sufficient funds to recapitalize the Bank to required regulatory levels, and be able to obtain regulatory approvals to acquire the Bank within the currently available time frame. At present, all other qualified potential investors who have expressed interest in the Bank have stopped pursuing the opportunity. The Company has made extensive financial and operational information available to potential investors, through the Company's virtual data room,[16] that has provided ample opportunity to prospective investors to conduct significant levels of due diligence, with full cooperation by the Company. Therefore, potential bidders who may re-emerge and participate in the bidding process should have little need for further time to make and submit an Initial Overbid (as defined below).

49. There is no solution outside of a section 363 sale in bankruptcy that can be expected to timely address the Bank's significantly undercapitalized status. The universe of potential investors who have or could obtain timely regulatory approval is very small. The universe of potential investors who either have regulatory approvals in hand or who could obtain them quickly is finite and identifiable, and most, if not all, of these entities have already investigated and declined to be a part of the Company's recapitalization efforts (including the

---

[16] The Company maintains an on-line data room, hosted by Bowne Group, Inc., that the Company has populated with electronic copies of pertinent financial and operational information, including information specifically requested by potential investors.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  24

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

bankruptcy and section 363 sale approach). During this marketing period, only the Purchaser has remained actively interested, spending over $1 million in expenses in connection with diligence and negotiations with AWBC. Also during this period, the Purchaser made it clear to the Company that without the prospect of a Stalking-Horse Bidder Fee to reimburse such expenses, the Purchaser would not have continued its efforts either.[17]

50.     Therefore, an expedited process designed to consummate the Sale within 30-45 days, while also providing an opportunity for bidders to participate and demonstrate their likelihood of regulatory approvals, achieves the overarching objectives of the Company: recapitalizing the Bank as required by the Regulators and FRB and preserving the Bank's going concern for the benefit of its stakeholders.

51.     Third, the most important reason for an expedited sale process is to minimize the risk that the Regulators seize the Bank. Although the Regulators have not objected to the Sale process, they also remain poised to seize and close the Bank in the event the Bank is in jeopardy and they will not tolerate its operation for any length of time at its current inadequate level of capital. The seizure and closure of the Bank could result in the loss of hundreds of jobs across the Inland Northwest. If customers begin to withdraw their deposits, the FDIC could be forced to act quickly. In that event, value would be irretrievably and

---

[17] For this reason, the APA notes that the Stalking-Horse Bidder Fee was an integral part of the negotiations surrounding the APA, and in the absence of the Company's obligation to pay the Stalking-Horse Bidder Fee, the Purchaser would not have entered into the APA, nor would the Purchaser be obligated to proceed to Closing.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  25

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

1  needlessly lost, harming everyone who depends on the Bank—including thousands
2  of loyal customers and employees—and creating a significant and unnecessary loss
3  to the FDIC's deposit insurance fund. The longer the Regulators and the FRB
4  must wait for the consummation of a sale and recapitalization of the Bank, the
5  greater the risk of significant deposit withdrawals and the resulting risk of swift
6  action by the FDIC and DFI.

7      52.    An expedited sale process avoids these serious negative
8  consequences. The Bank has done everything appropriate within its power to
9  address the Regulators' and FRB's concerns. Nevertheless, the Bank needs to
10  achieve recapitalization on an expedited basis. In order to maintain maximum
11  value, reassure the Regulators that forbearance is appropriate, and garner the
12  Regulators' and FRB's continued support for the Sale, it is imperative that the
13  Company act quickly to consummate the Sale and recapitalization of the Bank.

14      53.    The Company acknowledges that final regulatory approval may take
15  time, and may not occur prior to the court's approval of the Sale. The Regulators
16  will need to review specific and detailed business and recapitalization plans,
17  including the role of senior management, new directors, and other key employees.
18  However, the Company and its financial advisors believe, and we believe that the
19  Regulators concur, that an announcement by the Company that the Sale has been
20  approved by this Court, pending only regulatory approval, will significantly or
21  completely alleviate the risk of customer confusion and concern, and the attendant
22  risk of significant withdrawals. However, a prolonged period of uncertainty could
23  put the Regulators' review—and therefore the Sale—in jeopardy.

24      54.    Further to the proposed procedures and timeline and in the *Emergency
25  Motion for Order Setting Hearing Dates* filed contemporaneously herewith, the
26  Sale represents the best opportunity to recapitalize the Bank and thereby preserve

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   26

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

the value of AWBC's assets for the benefit of all stakeholders. The Sale is the only viable and timely alternative.

## I.     The DIP Loan

55.     In order to help reduce the risk of adverse supervisory action before a sale of the Shares and the Other Purchased Assets can be consummated, AWBC has negotiated a debtor-in-possession loan arrangement (the "DIP Loan") with Purchaser and an affiliate of Purchaser (collectively, the "DIP Lender") for working capital necessary to fund AWBC's Chapter 11 case. A motion seeking approval of the DIP Loan has been filed contemporaneously with this motion. Among other features, the DIP Loan includes certain safeguards for the DIP Lender's protection as a debtor-in-possession lender, since as a lender it bears the full risk of any decline in the value of the Shares and the Other Purchased Assets that would serve as its collateral.

56.     Upon receiving this Court's approval of the DIP Loan, the DIP Lender would lend AWBC up to a total of $2 million needed to satisfy the working capital requirements of AWBC. This influx of funds will help address the Regulators' and FRB's concern about the ability of AWBC to meets its obligations on an interim basis in connection with the proposed sale process.

## RELIEF REQUESTED

57.     Immediately prior to the commencement of this case, AWBC executed the APA for the sale of the Shares and the Other Purchased Assets to the Purchaser. The Sale is subject to approval by this Court and additional competitive bidding pursuant to the Bidding Procedures. By this Motion, AWBC seeks entry of two orders as follows:

   (a)     "Bidding Procedures Order" (substantially in the form annexed hereto as Exhibit B):

      (i)     Approving the Bidding Procedures;

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  27

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

(ii) Approving the Bidding Protections, including the Stalking-Horse Bidder Fee , Minimum Overbid, and the Bidding Increments described below;

(iii) Approving the form and manner of the Notice of Sale and the Assignment Notice; and

(iv) Granting related relief.

(b) "Sale Order" (substantially in the form annexed hereto as Exhibit C):

(i) Approving entry of the Bidding Procedures Order no later than 10 days following the Petition Date;

(ii) Scheduling the sale hearing (the "Sale Hearing") to take place not less than 20 days following the entry of the Bidding Procedures Order;

(iii) Approving the APA;

(iv) Confirming that the sale of the Shares and the Other Purchased Assets shall be free and clear of all Encumbrances;

(v) Confirming that AWBC may assume and assign to the Bank all 365 Contracts, except any 365 Contracts not desired by the Successful Bidder;

(vi) Confirming that AWBC may assume the Tax Sharing Agreement (defined below), and promptly transfer to the Bank any amounts of tax refunds received from any Governmental Authority (as defined in the APA);

(vii) Waiving the 14-day stay incorporated by Bankruptcy Rules 6004(h) and 6006(d);

(viii) Confirming that the Successful Bidder and AWBC may cause the Closing to occur as soon as practicable after the entry of the Sale Order; and

(ix) Approving the findings of fact and conclusions of law reasonably similar, but not limited to, the following:

(A) the Notice of Sale, and the parties who were served with copies of such Notice, were in compliance with Sections 102 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014 and any other applicable provision of the Bankruptcy Code, the Bankruptcy Rules, or any local bankruptcy rule governing the sale of assets free and clear of encumbrances;

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   28

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

(B)   one or more of the standards set forth in Section 363(f) of the Bankruptcy Code has been satisfied for the Sale free and clear of encumbrances has been satisfied;

(C)   the Successful Bidder is a purchaser in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the Sale is entitled to the protections of Section 363(m);

(D)   the Successful Bidder and AWBC did not engage in any conduct which would allow the asset purchase agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code;

(E)   pursuant to Section 105 of the Bankruptcy Code, any creditors of AWBC are prohibited from taking any actions against the Successful Bidder or the Shares and the Other Purchased Assets; and

(F)   the terms and provisions of the Sale are fair and reasonable.

58.   AWBC proposes the following timeline in connection with the relief sought in this Motion:

| EVENT | DATE |
|---|---|
| Objection deadline for Bidding Procedures portion of the Motion | 7-10 days after Petition Date |
| Hearing on Bidding Procedures portion of the Motion | 7-10 days after Petition Date |
| Deadline for competing bids | 10 days before the Auction |
| Hearing on the remainder of the Motion | Immediately following the Auction |

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   29

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

# SALE OF ASSETS

**A.     Terms and Conditions of the APA**

59.     Pursuant to the APA, AWBC will sell the Shares and the Other Purchased Assets free and clear of all Encumbrances.  The following highlights the material terms and conditions of the APA, all of which are more fully explained in the APA:

## a.     Consideration.

60.     The Purchaser will acquire the Shares and the Other Purchased Assets from AWBC for a purchase price of six and one-half million dollars ($6.5 million), including by credit bidding all of the indebtedness owing under the DIP Loan (the "Cash Purchase Price").  The Cash Purchase Price shall be payable by the Purchaser to AWBC at Closing.  Concurrently with the Closing, the Purchaser shall also effect the equity contribution by the Purchaser to the Bank in an amount necessary to obtain the Purchaser Required Approvals but in no event to exceed Two Hundred Million Dollars ($200,000,000) (the "Equity Contribution" and together with the Cash Purchase Price, the "Contemplated Transactions").

## b.     Closing Date and Closing Conditions.

61.     The Sale is subject to approval by the Court and competitive bidding pursuant to the Bidding Procedures Order.  Further, AWBC's and the Purchaser's obligations to consummate the Contemplated Transactions are jointly subject to certain closing conditions, such as the following: (i) the entry of the final Sale Order by the Court approving the Contemplated Transactions, unless such condition is waived, partially or entirely, by the Purchaser; (ii) the Purchaser having obtained all governmental authorizations necessary to permit the Contemplated Transactions, including without limitation, the approval of the Board of Governors of the Federal Reserve System/FRB, the FDIC, and the DFI, as

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  30

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1   applicable; and (iii) the absence of an injunction, restraining order, or other ruling
2   prohibiting or limiting the Contemplated Transactions.

3       62.     The conditions specifically apply to AWBC's obligations to
4   consummate the Contemplated Transactions essentially require that the Purchaser
5   perform all material covenants and obligations under the APA (and not breach any
6   material representations or warranties).

7       63.     Parallel conditions apply to the Purchaser's obligations to
8   consummate the Contemplated Transactions in addition to a few additional
9   conditions.  These material conditions include, but are not limited to, the
10  following: (i) the Bankruptcy Court entering the Bidding Procedures Order; (ii) the
11  Bankruptcy Court entering the Sale Order; (iii) the Purchaser obtaining all of the
12  Purchaser Required Approvals from the relevant Government Authorities without
13  the imposition of any Burdensome Condition; and (iv) the consummation of the
14  Starbuck Transaction (as defined in the APA).

15                      **c.      Termination.**

16      64.     Subject to certain qualifications (further described in the APA) the
17  APA may be terminated in various circumstances, the most significant of which
18  include the following: (i) termination if the Closing does not occur prior to January
19  31, 2011; (ii) termination by either party if there has been a material breach;
20  (iii) termination by either party with fifteen (15) days' prior written notice if any
21  court or governmental authority determines that the subject of the APA violates an
22  applicable legal requirement; or (iv) termination by the Purchaser, if the Purchaser
23  or any of its affiliates, receives notice from a Governmental Authority that it will
24  not grant the Purchaser Required Approval on the terms contemplated by the APA
25  without imposing any Burdensome Condition.

26

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   31

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

#### d.    Representations and Warranties.

65.    The APA contains representations and warranties by both the Purchaser and AWBC. The representations and warranties provided by AWBC regarding the Shares include, but are not limited to, representations with respect to corporate status and authority, capitalization of the Bank, business operations, regulatory reports, permits, deposits, financial matters, tax matters, litigation, claims, and employee benefit plans.  Meanwhile, the Purchaser's representations and warranties in the APA relate to governmental authorizations, investment intent, sufficiency of funding, and non-reliance of representations and warranties not contained in the APA.

#### e.    Covenants.

66.    AWBC agreed to operate the Bank in all material respects in the Ordinary Course of Business consistent with past practice. Additionally, AWBC agreed to certain bank forbearances in which AWBC is prevented from causing the Bank to engage in activities including, but not limited to, the following: (i) entering into new lines of business; (ii) making any capital expenditures in excess of $100,000 individually or $250,000 in the aggregate, other than as required pursuant to Contracts already entered into; (iii) incurring indebtedness, other than borrowing money from the Federal Home Loan Bank System, the FRB or any other Governmental Authority in a manner consistent with past practice; (iv) merging or consolidating into another entity; or (v) amending its organizational documents.

67.    The Purchaser has agreed to take all commercially reasonable best efforts to obtain all necessary permits, consents, approvals and authorizations of all third parties and governmental authorities (collectively, the "Purchaser Required Approvals") necessary to consummate the Contemplated Transactions so long as they do not impose a Burdensome Condition.  The Purchaser has also agreed to

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  32

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

provide certain indemnification in favor of past and present directors and officers of the Bank (the "Indemnified Parties"), as further described below.

68.     Both parties have agreed to cooperate in connection with any filing or submission and in connection with any investigation or other inquiry relating to the Purchaser Required Approvals.  Furthermore, the parties have agreed to other customary pre-closing covenants, such as providing access to information, preserving confidentiality, and using their commercially reasonable best efforts.

### f.     Indemnification.

69.     The Purchaser has agreed to maintain indemnification obligations arising by virtue of the Bank's charter documents (the "Organizational Documents") and by virtue of several director and officers insurance policies (individually, the "D&O Insurance Policy") subject to certain conditions. As more specifically provided in the APA, the Purchaser has agreed to provide the Indemnified Parties (i) certain indemnification and exculpation protections granted under the Bank's Organizational Documents for six (6) years from the Closing Date; (ii) continued, but limited, coverage under the Bank D&O Insurance Policy for five (5) years following the Closing; and (iii) extended reporting coverage for an additional year under the Company's D&O Policy.

### B.     Bidding Procedures

70.     The Bidding Procedures set forth the proposed procedures that prospective bidders must follow in order to bid on the Shares and the Other Purchased Assets.  AWBC crafted the Bidding Procedures to permit an expedited Sale necessitated by the imminent risks faced by AWBC, while simultaneously fostering an orderly and fair sale process.  AWBC has determined that the Bidding Procedures establish a framework that is most likely to maximize the value of the

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  33

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

Shares and the Other Purchased Assets for the benefit of AWBC's estate, its creditors, and other interested parties.

71.     The proposed Bidding Procedures are attached hereto as <u>Exhibit G</u>. Those procedures are summarized in relevant part below subject to certain qualification specifically outlined in the Bidding Procedures.[18]

### a.     Participation Requirements.

72.     In order to be qualified to receive any confidential information from AWBC or the Bank, to submit an Initial Overbid (defined below) and to participate in the Auction, a potential bidder other than the Purchaser (an "<u>Overbidder</u>") must submit each of the following to AWBC: (i) an executed confidentiality agreement and (ii) current audited financial statements and the latest unaudited financial statements (collectively, the "<u>Financials</u>").

### b.     Bid Deadline.

73.     In order to participate at the Auction, an Overbidder must submit its bid in a form acceptable to AWBC (with copies to certain professionals as explained in the Bidding Procedures) on or before ten days before the Sale Hearing, 2010 (the "<u>Bid Deadline</u>").

_____

[18] The summary of the Bidding Procedures set forth herein is provided for informational purposes only.  Interested parties should read the entire Bidding Procedures, which are annexed hereto as <u>Exhibit G</u>.  In the event of any conflict between the Bidding Procedures and this summary, the Bidding Procedures shall control. Capitalized terms used in this summary have the meaning ascribed to them in the Bidding Procedures.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   34

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

### c.    **Bid Requirements.**

74.    A bid must be a written irrevocable offer from an Overbidder and shall contain, among other things, the following:  (a) a proposed asset purchase agreement (the "Competing Purchase Agreement") on substantially the same terms and conditions as those in the APA; (b) a cashier's check made payable to the order of AWBC in the amount of One Million Dollars ($1,000,000) (the "Overbidder's Deposit") which will be retained by AWBC as a deposit; (c) admissible evidence in the form of affidavits or declarations establishing, among other things, the Overbidder's financial ability, good faith, and ability to perform the obligations under the Competing Purchase Agreement (collectively, the "Bidder Representations"); (d) remains open until the conclusion of the Sale Hearing; (e) contains terms and conditions that are higher and better than the terms and conditions of the APA; (f) provides for a purchase price to be paid to AWBC that exceeds the sum of the Purchase Price and the Stalking-Horse Bidder Fee by at least $1,000,000 (the "Minimum Overbid"); and (g) provides for the recapitalization of the Bank.

### d.    **Initial Overbid.**

75.    The Purchaser, and any entity that conforms with the above requirements by submitting a Competing Asset Purchase Agreement, supporting documentation and the Overbidder's Deposit (collectively, an "Initial Overbid") shall each be deemed a "Qualified Overbidder" and may bid for the Shares and the Other Purchased Assets at the Auction.

### e.    **As Is, Where Is.**

76.    The sale of the Shares and the Other Purchased Assets shall be on an "as is, where is" basis and without representations or warranties of any kind, nature, or description by AWBC, its agents, its advisors, or estate, except to the

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  35

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

extent set forth in the APA or in AWBC's purchase agreement(s) with the Successful Bidder(s). Except as otherwise provided in the APA or the purchase agreement(s) with the Successful Bidder(s), all of the right, title and interest in and to the Shares and the Other Purchased Assets to be acquired will be sold free and clear of all liens, security interests, encumbrances, and interests thereon and thereagainst (collectively, the "Encumbrances"). The Encumbrances will attach to the net proceeds of the sale of such Shares and the Other Purchased Assets, subject to any claim of the "stalking horse bidder" to such proceeds for payment of the Stalking-Horse Bidder Fee (as defined below).

### f.      **The Auction.**

77.    If no timely, conforming Initial Overbid is submitted, AWBC shall not conduct an Auction. Rather, AWBC shall request at the Sale Hearing that the Bankruptcy Court approve the proposed Sale of the Shares and the Other Purchased Assets to the Purchaser under the APA and request that the Sale Order shall be immediately effective upon entry. If one or more timely conforming Initial Overbids is received, AWBC will conduct an auction of the Shares and the Other Purchased Assets (the "Auction"), subject to approval of the Bankruptcy Court, in which the Purchaser and all other Qualified Overbidders may participate.

### g.      **Auction Procedures.**

78.    The Auction will be governed by the following procedures, the most significant of which include the following (the "Auction Rules"): (a) bidding will commence at the amount of the highest bid submitted by a Qualified Overbidder, as determined by AWBC, subject to approval by the Bankruptcy Court; (b) each subsequent bid will be in increments of no less than One Million Dollars ($1,000,000) (the "Bidding Increments"); (c) the Purchaser will have the right, but not the obligation to match bids made by any Qualified Overbidder (and credit the

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   36

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

amount of the Stalking-Horse Bidder Fee), and in such event, the Purchaser's matching bid will be deemed the highest and best bid for the Shares and the Other Purchased Assets; (d) if, upon conclusion of the Auction the Purchaser's final bid matches (or is greater than) the highest bid made by any Qualified Overbidder, the Bankruptcy Court will approve the APA and authorize AWBC to sell the Shares and the Other Purchased Assets to the Purchaser; and (e) AWBC may, with Bankruptcy Court approval, elect to deem the Purchaser's final bid to be the highest bid, notwithstanding the receipt of an apparently higher bid from another Overbidder.

### C.  Proposed Procedures for the Assumption and Assignment of Certain Executory Contracts[19]

79.    AWBC seeks the authority to assume and assign various executory contracts ("365 Contracts") to the Bank.[20]  AWBC further seeks authority to assume that certain Tax Sharing Agreement, dated as of January 22, 2010, among AWBC and certain of its affiliates including the Bank (the "Tax Sharing Agreement").  Finally, in connection with the assumption of the Tax Sharing Agreement, AWBC seeks authority to promptly transfer to the Bank any amounts

---

[19] If a party other than the Purchaser is the Successful Bidder or if a transaction other than the Sale is consummated for the sale of the Shares, then these procedures may be modified if necessary by further order of this Court.

[20] The 365 Contracts, initially designated by the Purchaser, will be made available, subject to a confidentiality agreement, to all Qualified Bidders and any other parties potentially interested in bidding on the Shares. The Tax Sharing Agreement will be among such agreements, however, it will not be assigned to the Bank as the Bank is already party to this agreement.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  37

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

of tax refunds received from any governmental authority due to the Bank under the Tax Sharing Agreement.[21]

80.    AWBC shall, within two (2) days after the entry of the Bidding Procedures Order on this Court's docket, serve on each of the non-debtor counterparties to the 365 Contracts (each a "Counterparty") a notice substantially in the form annexed hereto as Exhibit D (the "Assignment Notice") specifying the cure amounts necessary to assume each of the 365 Contracts (the "Cure Cost") and AWBC's intention to assume and assign such agreements to the Bank.  The Assignment Notice may also identify any additional terms or conditions of assumption and assignment.

81.    Objections, if any, to the proposed Cure Costs, or to the proposed assumption and assignment of the 365 Contracts, including, but not limited to, objections relating to adequate assurance of future performance or objections relating to whether applicable law excuses the Counterparty from accepting performance by, or rendering performance to, the Bank for purposes of section 365(c)(1) of the Bankruptcy Code, must be in writing and filed with this Court and served on the Notice Parties (as defined hereinafter) so as to be received no later than ten days after service of an Assignment Notice (the "Designation and Cure Objection Deadline").

---

[21] The 365 Contracts will be made available, subject to a confidentiality agreement, to all Qualified Bidders and any other parties potentially interested in bidding on the Shares.  The Tax Sharing Agreement will be among such agreements; however, it will not be assigned to the Bank as the Bank is already party to the agreement.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  38

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

82.     Where a Counterparty files an objection meeting the requirements set forth herein, objecting to the assumption by AWBC and assignment to the Bank of such 365 Contract (the "Disputed Designation") and/or asserting a cure amount higher than the proposed Cure Costs listed on the Assignment Notice (the "Disputed Cure Costs"), AWBC, the Purchaser, or the Successful Bidder (as the case may be), and the Counterparty shall meet and confer in good faith to attempt to resolve any such objection without Court intervention.  If AWBC, the Counterparty, and the Purchaser (or the Successful Bidder, as the case may be), determine that the objection cannot be resolved without judicial intervention, then the determination of the assumption and assignment of the Disputed Designation and/or the amount to be paid under section 365 of the Bankruptcy Code with respect to the Disputed Cure Costs will be determined by this Court at the next scheduled omnibus hearing that is on a date not less than ten days after the service of such objection, or such other date as determined by this Court, unless AWBC, the Purchaser (or the Successful Bidder, as the case may be), and the Counterparty to the 365 Contract agree otherwise.  If this Court determines at this hearing that the 365 Contract will not be assumed and assigned, then such executory contract shall no longer be considered a 365 Contract, provided, however, that after such determination is made by this Court, AWBC may propose a new Cure Cost in accordance with the procedures set forth herein, including providing the applicable Counterparty with the Assignment Notice setting forth the redesignation and proposed new Cure Cost of the 365 Contract.

83.     Any Counterparty to a 365 Contract who fails to timely file an objection to the proposed Cure Costs or the proposed assumption and assignment of a 365 Contract by the Designation and Cure Objection Deadline is deemed to have consented to such Cure Costs and the assumption and assignment of such 365

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  39

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

1    Contract, and such party shall be forever barred from objecting to the Cure Costs

2    and from asserting any additional cure or other amounts against AWBC, its estate,

3    the Bank, or the Purchaser (or the Successful Bidder, as the case may be).

4    84.    If the Counterparty to a 365 Contract fails to timely object to the

5    assumption and assignment of a 365 Contract or the proposed Cure Cost relating

6    thereto by the Designation and Cure Objection Deadline, or upon the resolution of

7    any timely objection by agreement of the parties or order of this Court approving

8    an assumption and assignment, such 365 Contract shall be deemed to be assumed

9    by AWBC and assigned to the Bank, and the proposed Cure Cost related to such

10   365 Contract shall be established and approved in all respects, subject to the

11   conditions set forth directly below.

12   85.    AWBC's decision to assume and assign the 365 Contracts is subject

13   to Court approval and consummation of the Sale.  Accordingly, subject to the

14   satisfaction of conditions in connection with the Sale, AWBC shall be deemed to

15   have assumed and assigned the 365 Contracts as of the date of and effective only

16   upon the Closing Date (as defined in the APA), and absent such closing, each of

17   the 365 Contracts shall neither be deemed assumed nor assigned and shall in all

18   respects be subject to subsequent assumption or rejection by AWBC under the

19   Bankruptcy Code.  Also, inclusion of any document on the list of 365 Contracts

20   shall not constitute or be deemed to be a determination or admission by AWBC,

21   the Bank, or the Purchaser (or the Successful Bidder, as the case may be) that such

22   document is, in fact, an executory contract within the meaning of the Bankruptcy

23   Code, all rights with respect thereto being expressly reserved.  The Bank shall have

24   no rights in and to a particular 365 Contract until such time as such agreement is

25   assumed and assigned in accordance with the procedures set forth herein.

26

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   40

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

86.     Except as may otherwise be agreed to by the parties to a 365 Contract, the defaults under the 365 Contracts that must be cured in accordance with section 365(b) of the Bankruptcy Code shall be cured as follows: AWBC shall pay all Cure Costs relating to an assumed executory contract within ten days after the later of (i) the Closing Date or (ii) the date on which such 365 Contract is deemed assumed and assigned.

### D.     Notice Procedures

87.     AWBC shall, within two (2) days of the entry of the Bidding Procedures Order on this Court's docket, serve a copy of each of the Motion, the proposed form of Sale Order, the Bidding Procedures Order, and a copy of the Notice of Sale, substantially in the form annexed hereto as Exhibit E, by first-class mail, postage prepaid, upon the following parties (collectively, the "Notice Parties"): (i) all entities known to have expressed an interest in a transaction with respect to recapitalization of the Company or the Bank (including without limitation a purchase of the Shares, the Other Purchased Assets, or a portion thereof), as evidenced by executing an NDA with the Company, or by participating in discussions with the Company or Sandler after having executed an NDA; (ii) any entities known to have asserted any Encumbrance in or upon the Shares or the Other Purchased Assets; (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including the FDIC and Washington DFI; (iv) all parties to the APA and all related agreements; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) Wilmington Trust Company; (ix) U.S. Bank; (x) Preferred Trust Securities, Ltd. VII; (xi) Preferred Trust Securities, Ltd. X; (xii) Preferred Trust Securities, Ltd. XXII; (xiii) Preferred Trust Securities, Ltd. XXV; (xiv) Bank of

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  41

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

New York Mellon; (xiv) all entities that have requested notice in accordance with Bankruptcy Rule 2002; (xv) all other known creditors of AWBC; and (xvi) counsel to any official committee established in this Chapter 11 case.

88.     AWBC also proposes pursuant to Bankruptcy Rules 2002(d) and 2002(l), that within ten (10) days after the date the Bidding Procedures Order is entered on this Court's docket, or as soon thereafter as is practicable, AWBC shall cause notice, substantially in the form of the notice attached hereto as <u>Exhibit F</u> to be published in the national edition of *The Wall Street Journal, The Seattle Times*, and *The Spokesman-Review*. This publication notice shall constitute an additional component of the Notice of Sale.

89.     AWBC shall serve Assignment Notice on each Counterparty in the manner described above.

## **ARGUMENT**

**A.     The Shares and the Other Purchased Assets are Property of AWBC's Bankruptcy Estate.**

90.     Section 541(a) of the Bankruptcy Code provides in relevant part:

> The commencement of a case under section 301, 302, or 303 of this title creates an estate. Such estate is comprised of all the following property, wherever located and by whomever held:
>
> > (1)     Except as provided in subsections (b) and (c)(2) of this section, all legal or equitable interests of the debtor in property as of the commencement of the case.

11 U.S.C. § 541. Congress intended that § 541 be interpreted broadly. *See, e.g., Weingarten Nostat, Inc. v. Serv. Merch. Co., Inc.*, 396 F.3d 737, 742 (6th Cir. 2005). The Shares and the Other Purchased Assets are property of AWBC's estate under § 541(a), and therefore are subject to the jurisdiction of this Court pursuant to 28 U.S.C. § 157(b)(2)(M). Courts have uniformly held that while the assets of non-debtor subsidiaries are not property of the estate, the shares of the subsidiary

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  42

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

owned by a debtor are property of that debtor's bankruptcy estate.  *See, e.g.,*
*United States v. Ken Int'l Co.*, 184 B.R. 102, 107 (D. Nev. 1995) (reciting rule
regarding ownership of non-debtor's stock)(internal citations omitted); *Hays v.*
*Cummins (In re Cummins)*, 166 B.R. 338, 358 (Bankr. W.D. Ark. 1994) (stock
certificates part of debtor's bankruptcy estate); *Murray v. Marres (In re Murray)*,
147 B.R. 688, 690 (Bankr. E.D. Va. 1992) (shares of non-debtor corporation's
stock owned by debtor, not assets of non-debtor corporation, are property of the
estate under section 541); *Deak & Co., Inc. v. Ir. R.M.P. Soedjono (In re Deak &*
*Co., Inc.)*, 63 B.R. 422, 427 (Bankr. S.D.N.Y. 1986) (shares of non-debtor
corporation's stock owned by debtor were considered "legal or equitable interests"
within the property of the debtor's estate).

### B. The Sale Should be Approved as Fair, Reasonable, and in the Best Interest of Creditors.

91.     Bankruptcy Code section 363(b) and Bankruptcy Rule 6004 authorize
a debtor to sell assets of the estate other than in the ordinary course of business,
after notice and a hearing.  *See, e.g., Quintex Entm't, Inc. v. Quintex Entm't, Inc.*
*(In re Quintex Entm't, Inc.)*, 950 F.2d 1492, 1495 (9th Cir. 1991).  In accordance
with Bankruptcy Rule 6004(f)(1), sales of property outside of the ordinary course
of business may be by private sale or public auction.  *See*  FED. R. BANKR. P.
6004(f)(1).  Here, AWBC believes that its ability to select the highest and best
bidder at the Court-supervised Auction enhances and benefits the marketing
process by providing a motivation for bidders to submit a Qualified Bid with a
high market value.

92.     Certain circumstances necessitate and allow for the sale of virtually all
of the estate's property prior to confirmation of a plan.  *Comm. Of Equity Sec.*
*Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983)
("There must be some articulated business justification . . . before the bankruptcy

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  43

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

judge may order such disposition."). One of the most obvious business justifications in any sale of estate assets, is the ultimate purpose of obtaining the highest price for the property sold. *In re Wilde Horse Enters., Inc.*, 136 B.R. 830, 841 (Bankr. C.D. Cal. 1991). "In approving any sale outside the ordinary course of business, the court must not only articulate a sufficient business reason for the sale, it must further find it is in the best interest of the estate, i.e. it is fair and reasonable, that it has been given adequate marketing, that it has been negotiated and proposed in good faith, that the purchaser is proceeding in good faith, and that it is an 'arms-length transaction.'" *Id.*

93.     In assessing the prudence of a section 363 sale, courts have examined (i) whether the proposed transaction has a valid business justification or good business reason; (ii) whether the sale is the result of good faith negotiations; and (iii) whether the proposed purchase price is fair and reasonable. *See, e.g.*, *240 N. Brand Partners, Ltd. v. Colony GFP Partners, L.P., (In re 240 N. Brand Partners, Ltd.)*, 200 B.R. 653, 659 (9th Cir. B.A.P. 1996); *In re Abbotts Dairies of Pa., Inc.*, 788 F.2d 143, 149-50 (3d Cir. 1986); *Travelers Ins. Co. v. Plaza Family P'Ship (In re Plaza Family P'Ship)*, 95 B.R. 166 (Bankr. E.D. Cal. 1989); *Fearing v. Seror (In re Fearing)*, 143 Fed. Appx. 744 (9th Cir. 2005). All three factors are satisfied here.

### 2.     There is a Valid Business Justification and Good Business Reason to Support the Sale.

94.     The Ninth Circuit Bankruptcy Appellate Panel in *Walter v. Sunwest Bank (In re Walter)*, 83 B.R. 14, 15-16 (B.A.P. 9th Cir. 1988) applied a flexible, case-by-case test to determine whether a sound business purpose justifies a proposed sale under section 363(b). Adopting the reasoning of the Fifth Circuit in *Institutional Creditors of Cont'l Air Lines, Inc. v. Cont'l Air Lines, Inc. (In re*

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  44

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

10-06097-PCW11     Doc 2     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 52 of 66

1  *Cont'l Air Lines, Inc.)*, 780 F.2d 1223, 1226 (5th Cir. 1986) and the Second Circuit
2  in *In re Lionel Corp.*, 722 F.2d at 1071, the Panel noted that whether a proffered
3  justification is sufficient will depend on the specifics of the case. This Court
4  should consider all salient factors pertaining to the case and act to further the
5  diverse interests of the debtor and creditors alike. *Id.*

6      95.   The instant facts amply support AWBC's business judgment that the
7  Sale is in the best interest of its creditors and AWBC's estate. As detailed above,
8  an expedited Sale and concurrent recapitalization is AWBC's only viable
9  opportunity to satisfy the Regulators and salvage the Bank's value. In stark
10 contrast, failure by AWBC to consummate the Sale would have disastrous
11 consequences for AWBC's estate.

12     96.   Moreover, the proposed Bidding Procedures and the submission of a
13 stalking horse bid afford assurance that the highest and best price will be realized
14 for the Shares and the Other Purchased Assets. A Notice of Sale will be provided
15 to all persons AWBC believes may have an interest in the Shares and the Other
16 Purchased Assets. AWBC believes notice to such parties will provide appropriate
17 encouragement for overbids for the Shares and the Other Purchased Assets.

18     97.   In sum, the Sale achieves the greatest overall benefit for AWBC's
19 estate. Absent an expedited Sale, the Bank will not remain viable. In the event of
20 a regulatory action, AWBC's interest in the Bank would be lost entirely, thereby
21 wholly eliminating recovery for the estate from AWBC's most significant asset.
22 Accordingly, AWBC believes, in the exercise of its sound business judgment, that
23 the Sale should be approved, pursuant to an expedited process, to provide the best,
24 and for practical purposes, the only, means to salvage the Bank.

25     98.   The courts have long recognized that where a sale by a debtor is made
26 in good faith and upon a reasonable basis—as the Sale is here—"[t]he court will

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   45

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

not entertain objections to a trustee's [debtor in possession's] conduct of the estate." *In re Curlew Valley Assocs.*, 14 B.R. 506, 513-514 (Bankr. D. Utah 1981); *see also In re S. Biotech., Inc.*, 37 B.R. 318, 322-23 (Bankr. M.D. Fla. 1983).  This is because it is the "Trustee [debtor in possession], not the Court, [that] is selling [the] property." *In re Gulf States Steel, Inc. of Ala.,* 285 B.R. 497, 516 (Bankr. N.D. Ala. 2002).  In accordance with *Walters* and the foregoing cases, AWBC submits that there is valid business justification and good business reason for the Sale on the terms contained in the APA and in the manner provided in the Bidding Procedures.  As such, AWBC believes this Court should approve the Sale and allow it to move forward expeditiously.

### 3. The Sale is in Good Faith and Thus the Purchaser or the Successful Bidder Should be Afforded the Protections of 11 U.S.C. § 363(m).

99. Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to any entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal, unless such authorization and such sale or lease were stayed pending appeal.

100. Although the Bankruptcy Code does not define "good faith," courts have found that the good faith requirement focuses principally on the disclosure of all material sale terms and absence of fraud or collusion between bidders.  *See, e.g., Abbotts Dairies*, 788 F.2d at 147-48; *see also In re Apex Oil Co.*, 92 B.R. 847, 869-71 (Bankr. E.D. Mo. 1988).  It is typically only "fraud, collusion between the purchaser and other bidders or the trustee, or an attempt to take grossly unfair advantage of other bidders" that leads to a determination that there was a lack of good faith in a sale proceeding.  *T.C. Investors v. Joseph (In re M Capital Corp.)*,

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  46

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

290 B.R. 743, 748 (B.A.P. 9th Cir. 2003) (quoting *Cmty. Thrift & Loan v. Suchy (In re Suchy)*, 786 F.2d 900, 902 (9th Cir. 1985)).

101.   While the Ninth Circuit does not require a finding of good faith to be made by a bankruptcy court at the time of the sale,[22] the Sale, the Rusnak Declaration, and the Glowasky Declaration all demonstrate that the Sale is proposed in good faith.  The APA is a product of intensive arm's-length negotiations between AWBC and the Purchaser, and does not contain special treatment for AWBC, AWBC's estate, the Purchaser, or their respective affiliates or insiders.  The APA specifically provides for overbids at the Auction.  Moreover, AWBC submits that any asset purchase agreement reached as a result of the Bidding Procedures will be an arm's-length, negotiated transaction entitled to the protections of section 363(m).  To maintain the integrity of the bidding process, the proposed Bidding Procedures require each Qualified Bidder to confirm that it has not engaged in any undisclosed group bidding or any collusion with respect to the bidding or the sale.  In addition, the terms of the Sale will be fully disclosed to creditors and other potential bidders pursuant to the Notice of Sale as described above.

102.   Based on the foregoing, the Purchaser or the Successful Bidder, as the case may be, should be deemed a good faith purchaser within the meaning of section 363(m) of the Bankruptcy Code.

---

[22] *See Thomas v. Namba (In re Thomas)*, 287 B.R. 782, 785 (B.A.P. 9th Cir. 2002) ("[T]he Ninth Circuit does not require that a finding of 'good faith' be made at the time of sale" (internal citations omitted)).

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1   47

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

### 4. The Purchase Price is Fair and Reasonable.

103. An auction sale is generally considered to establish sufficient value for the assets being sold. *See, e.g., Abbotts Dairies*, 788 F.2d at 149. AWBC believes that the Sale process has been structured in a manner that will secure the highest purchase price for the assets being sold. AWBC and Sandler have extensively marketed the Company, the Bank and the Shares, an effort that has generated 67 expressions of interest. AWBC will also provide a Notice of Sale to all known potential bidders, thereby maximizing the possibility that competing bidders will come forward to pay a higher price for the Shares and the Other Purchased Assets than offered by the Purchaser in the APA. In essence, the Purchaser has set the floor for the bidding at the Auction. Just as the Ninth Circuit acknowledged in *Arnold & Baker*, the precise value of the assets being sold will only be recognized at—and as a result of—the sale of the assets. *Arnold & Baker Farms v. U.S.* (*In re Arnold & Baker Farms*), 85 F.3d 1415, 1421 (9th Cir. 1996).

104. AWBC specifically retained Sandler to act as financial advisor to AWBC and to assist AWBC in identifying and analyzing possible transaction structures. Sandler made presentations to the Board of Directors of AWBC for the purpose of assisting the Board of Directors of AWBC in making a reasoned and well informed decision regarding any course of action, which included, without limitation (i) a review of efforts to raise capital through an offering, a recapitalization of AWBC and/or a business combination and to find a financial or strategic partner or buyer through a business combination or otherwise, (ii) a review of market conditions and comparable market transactions, (iii) an overview of the current regulatory environment as it relates to a recapitalization, (iv) an evaluation of the execution risk of one or more proposed transactions involving potential second parties, and (v) an analysis of, and advice regarding, existing bids.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  48

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

That impartial analysis and advice helped AWBC determine the basis for the purchase price set out in the APA, which further demonstrates the fairness and reasonableness of the Purchase Price.

105.    Finally, courts have recognized that a debtor is entitled to "'great judicial deference' in deciding which bid to accept as the best and highest bid." *Gulf States Steel*, 285 B.R. at 516 (internal citation omitted). Here, too, AWBC is entitled to deference in determining not only the manner in which the Shares and the Other Purchased Assets are to be sold, but how the value of those assets is to be maximized. Based on extensive marketing efforts and negotiations surrounding the APA, with the assistance of Sandler, AWBC believes that the Purchaser's offer (subject to overbid at the Auction) satisfies the requirement that the price paid for the Shares and the Other Purchased Assets be fair and reasonable.

**5.      Adequate and Reasonable Notice Has Been Provided.**

106.    Section 363 of the Bankruptcy Code requires that interested parties receive adequate notice of the sale. Full disclosure of the terms of the Sale will be provided pursuant to the Notice of Sale as described above. Such notice is reasonably calculated to provide timely and adequate notice to AWBC's major creditor constituencies, those parties most interested in this case, and those parties potentially interested in bidding on the Shares and the Other Purchased Assets.

107.    AWBC also submits that the notice to be provided via the Assignment Notice is reasonably calculated to provide all Counterparties with proper notice of the potential assumption and assignment of their executory contracts, any Cure Costs relating thereto, and procedures relating thereto, including, but not limited to, the Designation and Cure Objection Deadline. As such, the proposed Assignment Notice is appropriate and sufficient under the circumstances.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1    49

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400    FAX (206) 447-9700

**C.**  **The Sale Satisfies the Requirements of Bankruptcy Code Section 363(f) for the Sale of the Estate's Assets Free and Clear of Liens, Claims, and Encumbrances.**

108.  Section 363(f) of the Bankruptcy Code permits debtors to sell assets free and clear of liens, claims, and encumbrances with interests in the property attaching to the net proceeds of the sale.  Section 363(f) provides:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if –
>
> (1)  applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)  such entity consents;
>
> (3)  such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)  such interest is in bona fide dispute; or
>
> (5)  such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

109.  Further to the APA, where AWBC represents and warrants that the Common Stock is "free and clear of all Encumbrances,"[23] AWBC requests that the Shares and the Other Purchased Assets be transferred to the Purchaser free and clear of all Encumbrances with interests in property attaching to the proceeds of the Sale of the Shares and the Other Purchased Assets.

**D.**  **The Purchaser or the Successful Bidder Will Provide Adequate Assurances of Future Performance under the 365 Contracts to Satisfy the Requirements Imposed by Bankruptcy Code Sections 365(b)(1) and 365(f)(2).**

110.  AWBC seeks approval under Bankruptcy Code section 365 to assume and assign the 365 Contracts to the Bank.  AWBC further requests that the Sale Order provide that the 365 Contracts will be transferred to, and remain in full force

---

[23] *See* APA, § 2.1.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  50

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1    and effect for the benefit of, the Bank, notwithstanding any provisions in the 365

2    Contracts.

3        111.    Section 365(f)(2) of the Bankruptcy Code provides, in pertinent part,

4    that:

5            The trustee may assign an executory contract or unexpired lease of the
             debtor only if –

6                (A)    the trustee assumes such contract or lease in accordance
                       with the provisions of this section; and

7

8                (B)    adequate assurance of future performance by the assignee
                       of such contract or lease is provided, whether or not there has
                       been a default in such contract or lease.

9

10   11 U.S.C. § 365(f)(2).  Under section 365(a) of the Bankruptcy Code, a debtor,

11   "subject to the court's approval, may assume or reject any executory contract or

12   unexpired lease of the debtor."  11 U.S.C. § 365(a).  Section 365(b)(1) of the

13   Bankruptcy Code, in turn, codifies the requirements for assuming an unexpired

14   lease or executory contract of a debtor.  This subsection provides:

15            (b)(1) If there has been a default in an executory contract or unexpired
             lease of the debtor, the trustee may not assume such contract or lease unless,

16           at the time of assumption of such contract or lease, the trustee –

17                (A)    cures, or provides adequate assurance that the trustee will
                       promptly cure, such default;

18

19                (B)    compensates, or provides adequate assurance that the
                       trustee will promptly compensate, a party other than the debtor
                       to such contract or lease, for any actual pecuniary loss to such

20                     party resulting from such default; and

21                (C)    provides adequate assurance of future performance under
                       such contract or lease.

22

23   11 U.S.C. § 365(b)(1).

24       112.    AWBC submits that it will present facts at the Sale Hearing to show

25   the financial credibility, the willingness, and the ability of AWBC to satisfy the

26   assumption requirements imposed by section 365(b)(1) of the Bankruptcy Code.

     Furthermore, AWBC submits it will present additional facts at the Sale Hearing to

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   51

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

show the ability of the Bank (as recapitalized by the Purchaser or the Successful Bidder, as the case may be) to satisfy the assignment requirements imposed by section 365(f)(2) of the Bankruptcy Code. The Sale Hearing thus will provide this Court and other interested parties the opportunity to evaluate the ability of the Bank (as recapitalized by the Purchaser or the Successful Bidder, as the case may be) to provide adequate assurance of future performance under the 365 Contracts, as required under Bankruptcy Code section 365(f)(2)(B). Further, as set forth above, AWBC will give the appropriate Assignment Notice to the Counterparties. Accordingly, this Court should authorize AWBC to assume and assign the 365 Contracts to the Bank according to the proposed procedures described above.

### E. The Proposed Bidding Protections are Reasonable and Necessary to Preserve the Sale Process and Enhance the Value of AWBC's Estate.

113. In order to preserve the Sale process, and the resources already expended by AWBC's bankruptcy estate in favor of such process, AWBC seeks to approve certain bidding protections, including a Minimum Overbid, Bidding Increments, and the Stalking-Horse Bidder's Fee (collectively, the "Bidding Protections"). These Bidding Protections will ensure a competitive and efficient bidding process which excludes disingenuous bidders while preserving the participation of a stalking-horse bidder.

114. Notably, during the past six months, only the Purchaser emerged as a serious buyer willing and able to purchase the Shares and the Other Purchased Assets under a proposed section 363 sale structure. Now, as the Sale process draws to a close, publicity concerns have been compounded by timing constraints and shrinking resources. At this point, AWBC can only proceed with serious buyers. The Minimum Overbid, therefore, will function as an effective tool to identify only highly motivated bidders. A Minimum Overbid of $1 million will

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  52

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 60 of 66

1  ensure both that the competing bidders are serious and that their overbids are
2  meaningfully better for AWBC (notwithstanding the added cost of facilitating
3  further diligence to new bidders under time and publicity constraints). Ultimately,
4  the Minimum Overbid will ensure that the auction will generate a material benefit
5  to AWBC's estate as a whole.  Similarly, the Bidding Increments, set at a
6  minimum of $1 million, will function as an effective filtering tool in the pool of
7  prospective bidders and ensure that competing bidders are seriously motivated to
8  purchase the Shares and the Other Purchased Assets.  Thus, the Bidding
9  Increments also provide a benefit to AWBC's estate.

10     115.    Another Bidding Protection—meant to preserve the Sale process and
11 ultimately preserve AWBC Estate resources already devoted to that Sale process—
12 is the Stalking-Horse Bidder Fee.  Bidding incentives encourage a potential
13 purchaser to invest the requisite time, money, and effort to negotiate with a debtor
14 and perform the necessary due diligence attendant to the acquisition of a debtor's
15 assets, despite the inherent risks and uncertainties of the chapter 11 process.
16 "Agreements to provide breakup fees or reimbursement of fees and expenses are
17 meant to compensate the potential acquirer who serves as a catalyst or 'stalking
18 horse' which attracts more favorable offers." *In re S.N.A. Nut Co.*, 186 B.R. 98,
19 101 (Bankr. N.D. Ill. 1995)

20     116.    Without the prospect of the Stalking-Horse Bidder Fee, the Purchaser
21 has informed AWBC that it would not have continued discussions with the
22 Company or incurred such expenses, nor would the Purchaser have an incentive to
23 continue the Sale process through Closing.  Indeed, under the APA, the Purchaser
24 has the right to abandon the Sale should the Stalking-Horse Bidder Fee be denied
25 even partially.  Without a stalking-horse, AWBC cannot move forward and meet
26 regulatory requirements.  Therefore, in order to ensure an effective and competitive

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  53

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

10-06097-PCW11    Doc 2    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 61 of 66

1  Sale process (which requires a stalking-horse), AWBC seeks authority to pay the

2  Stalking-Horse Bidder Fee to ensure the Purchaser's continued participation.

3      117.   As noted above, the Purchaser has expended over $1 million in

4  documenting and negotiating the Sale. The Stalking-Horse Bidder Fee, therefore, is

5  directly related to the unreimbursed amounts incurred by the Purchaser in relation

6  to the Contemplated Transactions. What's more, the Stalking-Horse Bidder Fee at

7  approximately .05% is well below the typical 3% break-up fee amount permitted in

8  other jurisdictions.[24]

9      118.   AWBC believes that the Bidding Protections are reasonable, given the

10  benefits to the estate of having a stalking horse and a definitive APA, and the risk

11  to the Purchaser that a third-party offer ultimately may be accepted, and necessary

12  to preserve and enhance the value of AWBC's estate.

13      119.   In the bankruptcy context, the test for determining whether a proposed

14  break-up fee should be approved is whether it is in the best interests of the estate.

15  *S.N.A. Nut Co.*, 186 B.R. at 104; *see also In re Am. West Airlines, Inc.*, 166 B.R.

16  908 (Bankr. D. Ariz. 1994); *In re Hupp Indus., Inc.*, 140 B.R. 191 (Bankr. N.D.

17  Ohio 1992).  There must be compelling circumstances "which clearly indicate that

18  payment of the fee would be in the best interests of the estate." *S.N.A. Nut Co.*,

19  186 B.R. at 105.  Accordingly, to be approved, bidding incentives must provide

20  some benefit to the debtor's estate.  *Calpine Corp. v. O'Brien Envtl. Energy, Inc.*

21  *(In re O'Brien Envtl. Energy, Inc.)*, 181 F.3d 527, 533 (3d Cir. 1999).

---

[24] The total transaction, including the Equity Contribution and the Cash Purchase Price, amounts to over $190 million. A typical break-up fee on that amount would be approximately $5.7 million.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1   54

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

120.     The proposed Bidding Protections satisfy this standard.  The APA and the Bidding Protections are the product of extended good faith, arm's-length negotiations between AWBC and the Purchaser.  They are fair and reasonable in amount, particularly in view of the Purchaser's extensive efforts to date, the risk to the Purchaser of being used as a "stalking horse bidder," and the stabilizing effect that the execution of the APA is expected to have (thereby preserving value for creditors and increasing the likelihood of additional bidding).

121.     Further, the Bidding Protections already have encouraged competitive bidding, in that the Purchaser would not have entered into the APA without these provisions.  The mere existence of the Bidding Protections permits AWBC to insist that competing bids for the Shares and the Other Purchased Assets be materially higher or otherwise better than the APA, a clear benefit to AWBC's estate.

122.     In sum, AWBC's ability to offer the Bidding Protections enables it to ensure the Sale to a contractually committed bidder at a price it believes to be fair, while at the same time providing it with the potential of even greater benefit to its estate.  Thus, the Bidding Protections should be approved.

### F.     This Court Should Waive the Fourteen-Day Stay Period Imposed by Bankruptcy Rules 6004(h) and 6006(d).

123.     Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise."  FED. R. BANKR. P. 6004(h).  AWBC requests that the stay imposed by Bankruptcy Rule 6004(h) be waived under the circumstances of this case.  It is in the interest of AWBC's creditors and estate that the Sale be consummated as quickly as possible without any stay pending appeal because of the Bank's significantly undercapitalized status, the risk of mass deposit withdrawals, and the decisive response that the FDIC will implement in the event of significant deposit withdrawals.

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  55

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

124.    AWBC has noticed the hearing on this Motion to all of its creditors, interest holders, and other parties-in-interest, and therefore any person having any objection to the Motion has been afforded a reasonable opportunity to voice any objections or concerns.  Accordingly, AWBC is aware of no prejudice that would be caused by the Court's waiver of Bankruptcy Rule 6004(h).  AWBC requests that any order approving the Sale be effective immediately by providing that the fourteen-day stay is inapplicable.

125.    Bankruptcy Rule 6006(d) similarly provides that an "order authorizing the trustee to assign an executory contract or unexpired lease under § 365(f) is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." FED. R. BANKR. P. 6006(d).  In light of the exigent circumstances outlined above, the assumption and assignment of the 365 Contracts must be effective immediately upon entry of the Sale Order.  Therefore, AWBC requests waiver of the fourteen-day stay under Bankruptcy Rule 6006(d).

## NOTICE

126.    Notice of this Motion has been provided to (i) all entities known to have expressed an interest in a transaction with respect to AWBC, the Bank or the Shares and the Other Purchased Assets (or a portion thereof); (ii) any entities known to have asserted any Encumbrance in or upon the Shares or the Other Purchased Assets; (iii) all federal, state, and local regulatory or taxing authorities or recording offices which have a reasonably known interest in the relief requested by the Motion, including the FDIC and Washington DFI; (iv) all parties to the APA and all related agreements; (v) the Office of the United States Trustee; (vi) the Securities and Exchange Commission; (vii) the Internal Revenue Service; (viii) Wilmington Trust Company; (ix) U.S. Bank; (x) Preferred Trust Securities, Ltd. VII; (xi) Preferred Trust Securities, Ltd. X; (xii) Preferred Trust Securities,

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b), AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND L.R. 6004-1  56

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

dc-620201

1  Ltd. XXII; (xiii) Preferred Trust Securities, Ltd. XXV; (xiv) Bank of New York
2  Mellon; (xv) all entities that have requested notice in accordance with Bankruptcy
3  Rule 2002; (xvii) all other known creditors of AWBC; and (xviii) counsel to any
4  official committee established in this Chapter 11 case.  In light of the nature of the
5  relief requested herein, AWBC submits that no other or further notice is required.

7  *[Remainder of page intentionally left blank]*

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  57

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

**CONCLUSION**

127.    For all of the foregoing reasons, AWBC respectfully requests entry of an order granting the relief requested herein and such other and further relief as the Court deems just.

DATED this 28th day of October, 2010    FOSTER PEPPER PLLC


*/s/ Dillon E. Jackson*

Dillon E. Jackson, WSBA #1539

G. Larry Engel (*pro hac admission pending*)
Vincent Novak (*pro hac admission pending*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:  (415) 268-7000

Kenneth E. Kohler (*pro hac admission pending*)
MORRISON & FOERSTER LLP
555 West Fifth Street, Suite 3500
Los Angeles, CA 90013-1024
Telephone: (213) 892-5815

– and –

Alexandra Steinberg Barrage (*pro hac admission pending*)
MORRISON & FOERSTER LLP
2000 Pennsylvania Avenue, NW
Washington, D.C. 20006
Telephone:  (202) 887-1552


Proposed Counsel for AmericanWest Bancorporation

MOTION FOR ORDERS PURSUANT TO 11 U.S.C. §§ 105(a), 363(b),
AND 365; FED. R. BANKR. P. 2002, 6004, 6006, AND 9014; AND
L.R. 6004-1  58

dc-620201

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700