# ASSET PURCHASE AGREEMENT

by and among

## AMERICANWEST BANCORPORATION,
a Washington corporation,

and

## SKBHC HOLDINGS LLC,
a Delaware limited liability company,

and

## SKBHC HAWKS NEST ACQUISITION CORP.,
a Delaware corporation

Dated as of October 27, 2010

# TABLE OF CONTENTS

**Page**

## ARTICLE 1

### INTERPRETATION

| | | |
|---|---|---|
| 1.1 | Definitions | 1 |
| 1.2 | Currency | 10 |
| 1.3 | Governing Law | 10 |
| 1.4 | Schedules and Exhibits | 11 |

## ARTICLE 2

### PURCHASE OF SHARES AND OTHER ASSETS; EQUITY CONTRIBUTION

| | | |
|---|---|---|
| 2.1 | Purchase and Sale of the Shares and other Assets | 11 |
| 2.2 | Consideration | 11 |
| 2.3 | Payments | 11 |

## ARTICLE 3

### REPRESENTATIONS AND WARRANTIES OF THE COMPANY

| | | |
|---|---|---|
| 3.1 | Corporate Status and Authority; Non-Contravention | 12 |
| 3.2 | Capitalization of the Bank | 13 |
| 3.3 | Business Operations | 14 |
| 3.4 | Regulatory Reports | 15 |
| 3.5 | Deposits | 16 |
| 3.6 | Financial Matters | 16 |
| 3.7 | Tax Matters | 18 |
| 3.8 | Litigation and Claims | 19 |
| 3.9 | Employee Benefit Plans; Labor | 19 |
| 3.10 | Properties and Leases | 21 |
| 3.11 | Absence of Certain Changes | 21 |
| 3.12 | Commitments and Contracts | 22 |
| 3.13 | Risk Management Instruments | 22 |
| 3.14 | Environmental Matters | 23 |
| 3.15 | Insurance | 23 |
| 3.16 | Intellectual Property | 24 |
| 3.17 | Related Party Transactions | 24 |
| 3.18 | Brokers or Finders | 25 |
| 3.19 | Disclaimer of Other Representations and Warranties | 25 |

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 2 of 193

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

4.1     Corporate Status and Authority; Non-contravention .............................................25
4.2     Governmental Authorizations.................................................................................26
4.3     Starbuck Transaction.............................................................................................26
4.4     Investment Intent ..................................................................................................26
4.5     Sufficient Funds....................................................................................................26
4.6     Non-reliance ..........................................................................................................27
4.7     Stalking-Horse Bidder Fee ...................................................................................27

## ARTICLE 5

## PRE-CLOSING MATTERS AND OTHER COVENANTS

5.1     Operations until Closing.......................................................................................27
5.2     Confidentiality......................................................................................................30
5.3     Return of Information ...........................................................................................30
5.4     Consents and Approvals........................................................................................31
5.5     Indemnification; D&O Insurance .........................................................................32
5.6     Certain Company Contracts ..................................................................................33
5.7     DIP Loan Agreement ............................................................................................34
5.8     Payment of the Broker's Fees...............................................................................34
5.9     Stalking-Horse Bidder Fee ...................................................................................34
5.10    Debtor-in-Possession ............................................................................................35
5.11    The Sale Motion....................................................................................................35
5.12    The Bidding Procedures........................................................................................36
5.13    Bankruptcy Efforts ...............................................................................................39
5.14    Public Announcements..........................................................................................39
5.15    Tax Refunds...........................................................................................................40
5.16    Tax Election...........................................................................................................40
5.17    Preparation and Filing of Tax Returns; Taxes......................................................40
5.18    Tax Cooperation ...................................................................................................40
5.19    Tax Proceedings.....................................................................................................40
5.20    Transfer Taxes .......................................................................................................41

## ARTICLE 6

## CONDITIONS OF CLOSING

6.1     Conditions to SKBHC's and the Purchaser's Obligations ...................................42
6.2     Conditions to the Company's Obligations ...........................................................43
6.3     Mutual Condition...................................................................................................43
6.4     Termination ...........................................................................................................43

# ARTICLE 7

## CLOSING TRANSACTIONS

| | | |
|---|---|---|
| 7.1 | Time and Place | 44 |
| 7.2 | Company's Closing Deliverables | 45 |
| 7.3 | Purchaser's Closing Deliverables | 45 |
| 7.4 | Concurrent Delivery | 46 |
| 7.5 | Transfer of Shares | 46 |

# ARTICLE 8

## SURVIVAL OF REPRESENTATIONS AND COVENANTS

| | | |
|---|---|---|
| 8.1 | Survival | 46 |

# ARTICLE 9

## MISCELLANEOUS

| | | |
|---|---|---|
| 9.1 | Legal and Other Fees and Expenses | 46 |
| 9.2 | Notices | 46 |
| 9.3 | Further Assurances | 47 |
| 9.4 | Time of the Essence | 47 |
| 9.5 | Entire Agreement | 48 |
| 9.6 | Assignment | 48 |
| 9.7 | Invalidity | 48 |
| 9.8 | Waiver and Amendment | 48 |
| 9.9 | Third-Party Beneficiaries | 48 |
| 9.10 | Surviving Provisions on Termination | 48 |
| 9.11 | Captions | 48 |
| 9.12 | Counterparts | 49 |

## SCHEDULES AND EXHIBIT

Schedule I          Disclosure Schedule

Schedule 2.1       Other Purchased Assets

Schedule 4.2       Purchaser Required Approvals

Exhibit A           DIP Loan Agreement

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 5 of 193

**ASSET PURCHASE AGREEMENT**

THIS ASSET PURCHASE AGREEMENT (this "Agreement") is made as of October 27, 2010, by and among AmericanWest Bancorporation, a Washington corporation (the "Company"), SKBHC Holdings LLC, a Delaware limited liability company ("SKBHC"), and SKBHC Hawks Nest Acquisition Corp., a Delaware corporation and a wholly-owned Subsidiary of SKBHC (the "Purchaser").

**RECITALS**

A.      The Company owns all of the issued and outstanding shares of common stock of AmericanWest Bank, a Washington state chartered bank that operates in Eastern and Central Washington and Northern Idaho under its legal name, and in Utah under the name "Far West Bank" (the "Bank").

B.      The Company wishes to sell, and the Purchaser wishes to purchase, all of the shares of common stock of the Bank issued and outstanding as of the Closing Date (as hereinafter defined) (the "Shares"), free and clear of all Encumbrances (as hereinafter defined), and certain other assets of the Company, all on the terms and conditions set forth in this Agreement.

C.      The Company intends to file a voluntary bankruptcy petition (the "Bankruptcy Case") under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* (the "Bankruptcy Code"), in the United States Bankruptcy Court for the Eastern District of Washington (the "Bankruptcy Court") on or shortly after the date this Agreement is executed (the date of such filing, the "Petition Date").

D.      The parties intend for the sale and purchase of the Shares and the Other Purchased Assets (the "Sale") to be effectuated pursuant to an order of the Bankruptcy Court under Sections 105, 363 and 365 of the Bankruptcy Code approving such transactions (the "Sale Order").

In consideration of the covenants, agreements, representations and warranties set forth below, and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties, intending to be legally bound, covenant and agree as follows:

**ARTICLE 1**

**INTERPRETATION**

1.1      <u>Definitions</u>.  In this Agreement, unless the context otherwise requires or unless otherwise specifically provided herein:

(a)      "365 Contracts" is defined in Section 5.6.

(b)      "Affiliate" means, with respect to any Person, any other Person controlling, controlled by or under common control with, such Person, with "control" for such purpose meaning the possession, directly or indirectly, of the power to direct or cause the direction of the

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 6 of 193

management and policies of a Person, whether through the ownership of voting securities or voting interests, by contract or otherwise.

(c) "Agreement" is defined in the introductory paragraph.

(d) "Auction" is defined in Section 5.12(f).

(e) "Audited Financial Statements" means the consolidated audited financial statements of the Company, together with the auditor's report thereon, the notes thereto and the supporting schedules, consisting of the consolidated statements of financial condition as of December 31, 2009, 2008 and 2007, and the consolidated statements of operations, stockholders' equity and comprehensive income, and cash flows, each for the years ended December 31, 2009, 2008 and 2007.

(f) "Bank" is defined in the recitals.

(g) "Bank D&O Policy" is defined in Section 5.5(b).

(h) "Bank Insurance Amount" is defined in Section 5.5(b).

(i) "Bank Significant Agreement" is defined in Section 3.12(a).

(j) "Bankruptcy Case" is defined in the recitals.

(k) "Bankruptcy Code" is defined in the recitals.

(l) "Bankruptcy Court" is defined in the recitals.

(m) "Bankruptcy Rules" is defined in Section 5.12(e).

(n) "Benefit Arrangement" means any "employee benefit plan" as defined in Section 3(3) of ERISA (whether or not subject to ERISA) and any other material plan, program, agreement, arrangement, obligation or practice, including, without limitation, any pension, profit sharing, severance, welfare, fringe benefit, employee loan, retirement, medical, welfare, employment or consulting, severance, stay or retention bonuses or compensation, executive or incentive compensation, sick leave, vacation pay, plant closing benefits, disability, workers' compensation, retirement, deferred compensation, bonus, stock option or purchase or other stock-based, tuition reimbursement or scholarship, employee discount, meals, travel, or vehicle allowances, plan, program, agreement, arrangement, obligation or practice, any plans subject to Section 125 of the Code, as amended, and any plans or arrangements providing benefits or payments in the event of a change of control, change in ownership or effective control or sale of assets (i) established, sponsored, maintained, or contributed to, or required to be contributed to, by the Bank or any ERISA Affiliate, on behalf of any current or former director, employee, agent, independent contractor, or service provider of the Bank or its Subsidiary, or their beneficiaries, or (ii) pursuant to which the Bank or any ERISA Affiliate has any obligation (whether contingent or otherwise) with respect to any such persons.

(o) "BHCA" means the Bank Holding Company Act of 1956, as amended.

(p) "Bid Deadline" is defined in Section 5.12(c).

2

(q)     "Bidding Procedures Order" is defined in Section 5.9.

(r)     "Books and Records" means all files, ledgers and correspondence, all manuals, reports, texts, notes, memoranda, invoices, receipts, accounts, accounting records and books, financial statements and financial working papers and all other records and documents of any nature or kind whatsoever, including, without limitation, those recorded, stored, maintained, operated, held or otherwise wholly or partly dependent on discs, tapes and other means of storage, including, without limitation, any electronic, magnetic, mechanical, photographic or optical process, whether computerized or not, and all software, passwords and other information and means of or for access thereto, belonging to the Bank or its Subsidiary or relating to the Business.

(s)     "Broker" means Sandler O'Neill + Partners, L.P.

(t)     "Broker's Fees" means the fees payable by the Company and/or the Bank to the Broker in connection with the closing of the Contemplated Transactions in an aggregate amount equal to the amount set forth in Section 3.18 of the Disclosure Schedule.

(u)     "Burdensome Condition" means any restraint, limitation, term, requirement, provision or condition that would (i) reasonably be expected to impair in any material respect the benefits to SKBHC, the Purchaser or any of their respective Affiliates of the Contemplated Transactions; (ii) require any Person other than the Purchaser or SKBHC to become a bank holding company under the BHCA; (iii) require any Person other than the Purchaser or SKBHC to guaranty, support or maintain the capital of the Bank; (iv) require modification of, or impose any limitation or restriction on, the activities, governance, legal structure, compensation, or fee arrangements of SKBHC, the Purchaser or any of their respective Affiliates (or their respective partners, members or equity holders); (v) cause any Person other than the Purchaser or SKBHC to be deemed to control the Bank; or (vi) require a contribution of capital to the Bank at the Closing in excess of Two Hundred Million Dollars ($200,000,000); provided, however, that the following shall not be deemed to be a "Burdensome Condition": (x) any restraint, limitation, term, requirement, provision or condition imposed, in connection with the approval and consummation of the Starbuck Transaction, by bank regulatory authorities that exercise regulatory authority over SKBHC, the Purchaser and its Affiliates; (y) those restraints, limitations, terms, requirements, provisions or conditions specifically applicable to the Bank or its Subsidiary by reason of their condition as of the date hereof and specifically disclosed to the Purchaser in Section 3.3(b)(ii) of the Disclosure Schedule; and (z) any restraint, limitation, term, requirement, provision or condition that applies generally to bank holding companies and banks as provided by statute, regulation, or written and publicly available supervisory guidance of general applicability, in each case, as in effect on the date hereof.

(v)     "Business" means the business currently carried on by the Bank and its Subsidiary.

(w)     "Business Day" means any day other than a Saturday, Sunday or any federal holiday in the United States.

(x)     "Call Reports" means the Bank's Consolidated Reports of Condition and Income (FFIEC Form 041) or any successor form of the Federal Financial Institutions Examination Council.

3

(y)   "Cash Purchase Price" is defined in Section 2.2.

(z)   "Charter Documents" means articles, articles or certificate of incorporation, bylaws and any other constituted document of a corporate entity.

(aa)   "Closing" means the completion of the sale and purchase of the Shares and the Other Purchased Assets in accordance with Article 7.

(bb)   "Closing Date" means five (5) Business Days following the satisfaction or waiver, as applicable, of the conditions set forth in Article 6 and the Sale Order (other than those conditions that by their nature are to be satisfied at the Closing, but subject to fulfillment or waiver of those conditions), or such other date as may be agreed upon in writing by the Company and the Purchaser or by their respective counsel.

(cc)   "Code" shall mean the Internal Revenue Code of 1986, as amended.

(dd)   "Common Stock" is defined in Section 3.2(a).

(ee)   "Company" is defined in the introductory paragraph.

(ff)   "Company D&O Policy" is defined in Section 5.5(c).

(gg)   "Company's Reports" is defined in Section 3.4(a)(i).

(hh)   "Company Tax Returns" is defined in Section 5.17.

(ii)   "Competing Purchase Agreement" is defined in Section 5.12(c)(i)

(jj)   "Consent" means any approval, consent, ratification, waiver or other authorization.

(kk)   "Contemplated Transactions" means all of the transactions between the Company, the Bank, SKBHC and the Purchaser contemplated by this Agreement and the DIP Loan Agreement.

(ll)   "Contracts" means all contracts, agreements, instruments, leases, indentures and commitments, whether written or oral, relating to the Business to which the Company, the Bank or any other Subsidiary is a party, including, without limitation, non-competition, non-solicitation and confidentiality agreements.

(mm)   "Disclosure Schedule" means the disclosure schedule delivered by the Company to the Purchaser concurrently with execution and delivery of this Agreement in the form of Schedule I.

(nn)   "DIP Loan Agreement" is defined in Section 5.7(a).

(oo)   "Encumbrance" means, whether or not registered or registrable or recorded or recordable, and regardless of how created or arising:

4

(i)        a lien, encumbrance, adverse claim, charge, execution, security interest, pledge against any or all of the Shares or the Other Purchased Assets, and a subordination to any right or claim of others in respect thereof;

(i)        a claim or interest against any or all of the Shares or the Other Purchased Assets;

(ii)       an option or other right to acquire, or to acquire any interest in, any or all of the Shares or the Other Purchased Assets; and

(iii)      any other encumbrance of whatsoever nature and kind against any or all of the Shares or the Other Purchased Assets.

(pp)      "Environmental Claim" means any claim, action, cause of action, suit, proceeding, investigation, order, demand or notice by any Person alleging actual or potential liability (including, without limitation, for investigatory costs, cleanup costs, governmental response costs, natural resources damages, property damages, personal injuries, attorneys' fees or penalties) arising out of, based on, resulting from or relating to (i) the presence, or release into the environment, of, or exposure to, any Materials of Environmental Concern, or (ii) circumstances forming the basis of any violation, or alleged violation, of any Environmental Law.

(qq)      "Environmental Laws" means all Legal Requirements relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, ground water, land surface or subsurface strata, and natural resources), including, without limitation, Legal Requirements relating to (i) emissions, discharges, releases or threatened releases of, or exposure to, Materials of Environmental Concern, (ii) the manufacture, processing, distribution, use, treatment, generation, storage, containment (whether above ground or underground), disposal, transport or handling of Materials of Environmental Concern, (iii) recordkeeping, notification, disclosure and reporting requirements regarding Materials of Environmental Concern, (iv) endangered or threatened species of fish, wildlife and plant and the management or use of natural resources, (v) the preservation of the environment or mitigation of adverse effects on or to human health or the environment, or (vi) emissions or control of greenhouse gases.

(rr)      "Equity Contribution" means the equity contribution, to be made concurrently with the Closing, by the Purchaser to the Bank in an amount necessary to obtain the Purchaser Required Approvals, which equity contribution shall in no event exceed Two Hundred Million Dollars ($200,000,000).  For the avoidance of doubt, the Bank shall not issue any new shares of Common Stock to the Purchaser in connection with the Equity Contribution.

(ss)      "ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended.

(tt)      "ERISA Affiliate" shall mean any entity required to be aggregated in a controlled group or affiliated service group with the Bank for purposes of ERISA or the Code (including under Section 414(b), (c), (m) or (o) of the Code or Section 4001 of ERISA), at any relevant time.

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 10 of 193

(uu)    "FDIC" means the Federal Deposit Insurance Corporation, or any successor thereto.

(vv)    "Federal Reserve Board" means the Board of Governors of the Federal Reserve System, or any successor thereto.

(ww)    "GAAP" shall mean generally accepted accounting principles as in effect in the United States.

(xx)    "Governmental Authority" means any federal, state, municipal, county or regional government or governmental or regulatory authority, domestic or foreign, and includes any department, commission, bureau, board, administrative agency or regulatory body of any of the foregoing or any non-governmental regulatory body that provides standards for certification.

(yy)    "Governmental Authorization" means any Consent, approval, license, registration, permit or waiver issued, granted, given or otherwise made available by or under the authority of any Governmental Authority or pursuant to any Legal Requirement.

(zz)    "Indemnified Parties" is defined in Section 5.5(a).

(aaa)    "Initial Overbid" is defined in Section 5.12(d).

(bbb)    "Interim Financial Statements" means the consolidated unaudited financial statements of the Company, consisting of the consolidated statements of financial condition as of March 31, 2010, June 30, 2010, and, in draft form, September 30, 2010, and the consolidated statements of operations and stockholders' equity, each for the three months ended March 31, 2010, June 30, 2010, and September 30, 2010 and the consolidated statement of cash flows for the nine months ended September 30, 2010.

(ccc)    "Knowledge" of the Company, or words of similar import, including without limitation, the Company being aware of a fact or circumstance, means the actual knowledge as of the date of this Agreement, after reasonable inquiry, of Patrick J. Rusnak, Jay B. Simmons or Shelly L. Krasselt.

(ddd)    "Leased Properties" is defined in Section 3.10.

(eee)    "Legal Requirement" means any federal, state, local, municipal, foreign, international, multinational or other constitution, law, ordinance, principle of common law, code, regulation, statute or treaty.

(fff)    "Liability" means, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, whether or not accrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise.

(ggg)    "Material Adverse Effect" means (a) any fact, effect, event, change, occurrence or circumstance that, by itself or together with other facts, effects, events, changes, occurrences or circumstances, has had or would be reasonably expected to have a material and

6

adverse effect on (1) the business, assets, liabilities (including deposit liabilities), profits, condition (financial or otherwise) or results of operations of the Bank and its Subsidiary or the Business (as applicable), taken as a whole, or (2) the ability of the Company or the Bank to timely consummate the transactions contemplated by this Agreement; or (b) any other act or omission which would materially impair the ability to operate the Business in the Ordinary Course; provided, however, that none of the following shall be taken into account in determining whether there has been a "Material Adverse Effect": (i) changes in GAAP or regulatory accounting requirements, (ii) changes in laws, rules or regulations of general applicability to companies in the U.S. banking industry, (iii) changes in global, national or regional political conditions or general economic or market conditions (including changes in prevailing interest rates, credit availability and liquidity, currency exchange rates, and price levels or trading volumes in the United States or foreign securities markets) affecting other companies in the U.S. banking industry, (iv) any change, in and of itself (as opposed to the facts underlying such change), in the market price or trading volume of the equity securities of the Company on or after the date hereof, (v) the suspension of trading in securities generally on the OTC Bulletin Board, (vi) any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism, (vii) any changes made by the Company or the Bank in the Business or other actions taken, delayed or omitted to be taken by the Company or the Bank at the written request or with the prior written consent of the Purchaser, and (viii) with respect to the Bank, any pre-Closing restrictions or conditions imposed on the Bank as a result of the Regulatory Agreements to which the Bank is a party as of the date of this Agreement; except, with respect to clauses (i), (ii), (iii) and (iv), to the extent that the effects of such change are materially disproportionately adverse to the business, assets, liabilities (including deposit liabilities), profits, condition (financial or otherwise) or results of operations of the Bank and its Subsidiary or the Business (as applicable), taken as a whole, as compared to other similarly situated companies in the U.S. banking industry.

(hhh)    "Material Governmental Authorization" is defined in Section 3.3(b)(ii).

(iii)    "Material Permit" is defined in Section 3.3(a).

(jjj)    "Materials of Environmental Concern" means chemicals, pollutants, contaminants, toxic or hazardous substances, materials or wastes, petroleum and petroleum products, greenhouse gases, asbestos or asbestos-containing materials or products, polychlorinated biphenyls, lead or lead-based paints or materials, radon, fungus, mold, mycotoxins or other substances having an adverse effect on human health or the environment.

(kkk)    "Maturity Date" shall have the meaning given to such term in the DIP Loan Agreement.

(lll)    "Minimum Overbid" is defined in Section 5.12(c)(i).

(mmm)"Notice of Sale" means a notice of the sale of the Shares and the Other Purchased Assets and the Sale Hearing.

(nnn)    "Ordinary Course of Business" or "in the Ordinary Course" means the conduct of the Business in substantially the same manner as the Business was operated on the date of this Agreement, including operations in conformance with the Bank's practices and procedures as of such date.

(ooo)    "Other Purchased Assets" is defined in Section 2.1.

(ppp)    "Outside Date" is defined in Section 6.4(a).

(qqq)    "Overbidder" is defined in Section 5.12(b).

(rrr)    "Overbidder's Deposit" is defined in Section 5.12(c)(ii).

(sss)    "Owned Properties" is defined in Section 3.10.

(ttt)    "Permits" means all permits, licenses, registrations, consents, authorizations, approvals, privileges, waivers, exemptions, orders, certificates, rulings, agreements and other concessions from, of or with Governmental Authorities or other regulatory bodies required to carry on the Business as now being carried on.

(uuu)    "Permitted Liens" means (i) liens for current taxes and assessments not yet delinquent or as to which the Bank is diligently contesting in good faith and by appropriate proceeding either the amount thereof or the liability therefor or both; (ii) liens of landlords, carriers, mechanics, materialmen and repairmen incurred in the Ordinary Course of Business consistent with past practice for sums not yet past due, or which are being contested in good faith by appropriate proceedings and for the payment of which adequate reserves in accordance with GAAP and regulatory accounting principles have been established on the books of the Bank, or the defense of which has been accepted by a title insurer, bonding company, other surety or other Person; (iii) any recorded lien (other than for funded indebtedness) relating to any leased premises; (iv) zoning restrictions, easements, licenses and other restrictions on the use of real property or any interest therein, or minor irregularities in title thereto, which do not materially impair the use of such property or the merchantability or the value of such property or interest therein; (v) liens encumbering the interest of the landlord under any real estate lease the existence of which does not result in a default under such real estate leases; (vi) deposits, liens or pledges to secure payments of worker's compensation, unemployment insurance, pensions or other social security obligations, or the performance of bids, tenders, leases, contracts (other than contracts for the payment of money), public or statutory obligations, surety, stay or appeal bonds, or similar obligations arising in the Ordinary Course of Business; (vii) purchase money mortgages or other purchase money or vendor's liens (including, without limitation, finance leases), provided that no such lien shall extend to or cover any other property of the Bank other than that so purchased; (viii) liens on assets given to secure deposits and other liabilities of the Bank arising in the Ordinary Course of Business (including those given to secure borrowings, advances, or discount window availability from any private or governmental banking entity or any clearinghouse); (ix) pledges of securities to secure fed funds borrowings from other banks; and (x) liens arising out of judgments or awards in respect of which the Bank is in good faith prosecuting an appeal or proceeding for review and in respect of which it has secured a subsisting stay of execution pending such appeal or proceeding and which are disclosed or reserved against on the Bank's financial statements.

(vvv)    "Person" means an individual, legal personal representative, corporation, limited liability company, partnership, firm, trust, trustee, syndicate, joint venture, unincorporated organization or Governmental Authority.

(www)    "Petition Date" is defined in the recitals.

(xxx) "Pre-Closing Tax Period" is defined in Section 5.17.

(yyy) "Proceedings" means any actions, claims, demands, lawsuits, assessments, arbitrations, judgments, awards, decrees, orders, injunctions, prosecutions and investigations, or other proceedings, of, by, against, or relating to, the Bank or its Subsidiary or the Business.

(zzz) "Proprietary Rights" is defined in Section 3.16.

(aaaa) "Purchaser" is defined in the introductory paragraph.

(bbbb) "Purchaser Required Approvals" is defined in Section 4.2.

(cccc) "Qualified Overbidder" is defined in Section 5.12(d).

(dddd) "Qualified Plan" is defined in Section 3.9(b).

(eeee) "Real Property" is defined in Section 3.10.

(ffff) "Regulatory Agreement" is defined in Section 3.3(b)(vii).

(gggg) "Sale" is defined in the recitals.

(hhhh) "Sale Hearing" is defined in Section 5.11(b).

(iiii) "Sale Motion" is defined in Section 5.11.

(jjjj) "Sale Order" is defined in the recitals.

(kkkk) "SEC" means the U.S. Securities and Exchange Commission, or any successor thereto.

(llll) "Shares" is defined in the recitals.

(mmmm) "SKBHC" is defined in the introductory paragraph.

(nnnn) "SKBHC Commitment Agreements" is defined in Section 4.5(b).

(oooo) "SKBHC LLC Agreement" means the Amended and Restated Limited Liability Company Agreement of SKBHC dated as of the date of the consummation of the Starbuck Transaction.

(pppp) "Stalking-Horse Bidder Fee" is defined in Section 5.9.

(qqqq) "Starbuck Agreement" means the Plan and Agreement of Merger, dated as of February 12, 2010, by and among SKBHC, SKBHC Acquisition, Inc. and Starbuck Bankshares, Inc., as amended.

(rrrr) "Starbuck Transaction" means the merger transaction contemplated by the Starbuck Agreement.

(ssss) "Subsidiary" includes any corporation or other entity of which a majority of the capital stock or other ownership interests having ordinary voting power to elect a majority of the board of directors or other persons performing similar functions are at the time, directly or indirectly, owned by such party.

(tttt) "Tax" or "Taxes" means (i) all federal, state, local and foreign taxes, charges, fees, imposts, levies or other like assessments, including, without limitation, all income, gross receipts, alternative or add-on minimum, capital, sales, use, ad valorem, value added, transfer, franchise, profits, inventory, capital stock, license, withholding, payroll, employment, social security, unemployment, excise, severance, stamp, occupation, recapture, real and personal property and estimated taxes, customs duties, fees, assessments and charges of any kind whatsoever, together with any interest, penalties, additions to tax or additional amounts imposed by any taxing authority, (ii) any liability for the payment of any amounts of the type described in clause (i) as a result of being a member of an affiliated, consolidated, combined or unitary group for any period (including any arrangement for group or consortium tax relief or similar arrangement) and (iii) any liability for the payment of any amounts of the type described in clauses (i) or (ii) as a result of any express or implied obligation to indemnify any other Person or as a result of any obligation under any agreement or arrangement to make any payment determined by reference to the Tax liability of a third party.

(uuuu) "Tax Matter" is defined in Section 5.19.

(vvvv) "Tax Returns" means all returns, statements, reports, documents, declarations, forms, designations, claims for refund, and other information and filings (including elections, disclosures, schedules and estimates), and any attachments, addenda or amendments thereto (whether or not a payment is required to be made with respect to any such return or other document) relating to Taxes.

(wwww)    "Tax Sharing Agreement" is defined in Section 3.7(e).

(xxxx) "Transfer Tax Returns" is defined in Section 5.20.

(yyyy) "Transfer Taxes" is defined in Section 5.20.

(zzzz) "Washington DFI" means the Washington State Department of Financial Institutions, or any successor thereto.

(aaaaa) "Working Capital Loan" means the term loan made pursuant to the DIP Loan Agreement whereby the Purchaser, as lender, will lend the Company up to Two Million Dollars ($2,000,000) for the purpose of funding the Company's ongoing working capital requirements, which shall include, without limitation, the expenses incurred during the Bankruptcy Case, beginning on the initial effectiveness date of the DIP Loan Agreement though the Closing Date.

1.2     Currency.  Except where otherwise expressly provided, all monetary amounts in this Agreement are stated and shall be paid in United States currency.

1.3     Governing Law.  This Agreement and the agreements contemplated hereby shall be construed and interpreted, and the rights of the parties shall be determined, in accordance with

the Bankruptcy Code and the substantive laws of the State of Delaware, in each case without regard to the conflict of laws principles thereof or of any other jurisdiction.

1.4    Schedules and Exhibits.  The following are the Schedules and Exhibits which are attached to and form part of this Agreement:

| | |
|---|---|
| Schedule I | Disclosure Schedule |
| Schedule 2.1 | Other Purchased Assets |
| Schedule 4.2 | Purchaser Required Approvals |
| Exhibit A | DIP Loan Agreement |

## ARTICLE 2

## PURCHASE OF SHARES AND OTHER ASSETS; EQUITY CONTRIBUTION

2.1    Purchase and Sale of the Shares and other Assets.  Subject to the terms and conditions set forth in this Agreement, and subject to the entry of a Sale Order, the Company agrees to sell, assign and transfer to the Purchaser, and the Purchaser agrees to purchase from the Company, and SKBHC agrees to cause the Purchaser to purchase from the Company on the Closing Date, effective as of and from the Closing, (a) all of the Shares, free and clear of all Encumbrances, and (b) all of the assets and Contracts of the Company set forth on Schedule 2.1 (the "Other Purchased Assets"), free and clear of all Encumbrances (other than Permitted Liens), for the Cash Purchase Price.

2.2    Consideration.  The amount payable to the Company for the Shares and the Other Purchased Assets will be Six Million Five Hundred Thousand Dollars ($6,500,000) (the "Cash Purchase Price"), which shall, subject to the terms and conditions hereof, be payable by the Purchaser to the Company at Closing.  Concurrently with the Closing, the Purchaser shall make, and SKBHC shall cause the Purchaser to make, the Equity Contribution.

2.3    Payments.  On the Closing Date, the Purchaser shall (a) pay the Cash Purchase Price for the Shares and the Other Purchased Assets to the Company by wire transfer to an account designated by the Company in writing at least two (2) Business Days prior to the Closing Date and (b) fund the Equity Contribution to an account of the Bank designated by the Company.  At the option of the Purchaser, the Purchaser may pay a portion of the Cash Purchase Price by application of amounts due under the DIP Loan Agreement.

## ARTICLE 3

## REPRESENTATIONS AND WARRANTIES OF THE COMPANY

Subject to such exceptions as are disclosed in the Disclosure Schedule dated as of the date hereof and attached hereto, the Company hereby makes the following representations and warranties to SKBHC and the Purchaser as of the date hereof and as of the Closing Date (provided that those representations and warranties which address matters only as of a particular

earlier date shall have been true and correct only on such date). The inclusion of an item in the Disclosure Schedule shall not be deemed an admission by the Company or the Bank that such item represents a material fact, event, or circumstance or has had or would be reasonably expected to have a Material Adverse Effect. Disclosure in any section of the Disclosure Schedule shall apply only to such section of such Disclosure Schedule, except to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is relevant to another section of such Disclosure Schedule.

3.1    Corporate Status and Authority; Non-Contravention.

(a)    Status of the Company:  The Company is duly organized, validly existing and in good standing under the laws of the State of Washington and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct its business in the manner in which its business is now being conducted.  The Company is duly registered as a bank holding company under the BHCA.  The Company is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where failure to be so qualified has not had and would not reasonably be expected to have a Material Adverse Effect.

(b)    Status of Bank:  The Bank is a direct, wholly-owned Subsidiary of the Company, is duly organized, validly existing and in good standing under the laws of the State of Washington, is authorized under the laws of the State of Washington to engage in the Business and otherwise has the corporate power and authority to own or lease all of its properties and assets and to conduct the Business in the manner in which the Business is now being conducted. The Bank is duly qualified to do business and is in good standing in each jurisdiction in which its ownership of properties or conduct of business requires such qualification except where failure to be so qualified has not had and would not reasonably be expected to have a Material Adverse Effect.  The Bank is a Washington chartered bank which is duly licensed by the Washington DFI to engage in commercial banking.  The deposit accounts of the Bank are insured to the fullest extent permitted by law by the Deposit Insurance Fund (including through the Transaction Deposit Insurance Guaranty Program), which is administered by the FDIC.  The FDIC has not been appointed receiver of the Bank.  Complete and correct copies of the Charter Documents of the Bank, as currently in effect, have been delivered or made available to the Purchaser.

(c)    Due Authorization:  (i) The Company has full legal right, corporate power and authority to enter into this Agreement and the DIP Loan Agreement and, subject to the Sale Order, to carry out its obligations hereunder and thereunder; and (ii) the execution and delivery of this Agreement, the DIP Loan Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement and the DIP Loan Agreement, and, subject to the Sale Order, the completion and performance of the Contemplated Transactions have been duly authorized by all necessary corporate action on the part of the Company, and this Agreement, the DIP Loan Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement and the DIP Loan Agreement have been duly executed and delivered by the Company and, subject to the Sale Order, constitute a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their respective terms.  No other corporate proceedings, including any stockholder approvals, are necessary for the execution and delivery by the Company of this Agreement or the DIP Loan Agreement, the performance by it

or of its obligation hereunder or thereunder or the consummation by it of the Contemplated Transactions.

(d)     Non-contravention:  Neither the execution and delivery of this Agreement or the DIP Loan Agreement, nor, subject to the Sale Order, the completion and performance of the Contemplated Transactions, or compliance by the Company with any of the provisions hereof or thereof, will (i) materially violate, materially conflict with, or result in a material breach of any provision of, or constitute a material default (or an event which, with notice or lapse of time or both, would constitute a material default) under, or result in the termination of, or result in the loss of any benefit or creation of any material right on the part of any third party under, or accelerate the performance required by, or result in a right of termination or acceleration of, or result in the creation of any material lien, encumbrance, adverse claim, charge, execution, security interest or pledge upon any of the material properties or assets of the Company or any Subsidiary under any of the terms, conditions or provisions of (A) the Charter Documents of the Company, the Bank or any other Subsidiary, or (B) any material note, bond, mortgage, indenture, deed of trust, license, lease, agreement or other instrument or obligation to which the Company, the Bank or any other Subsidiary is a party or by which it may be bound, or to which the Company, the Bank or any other Subsidiary or any of the properties or assets of the Company, the Bank or any other Subsidiary may be subject, or (ii) assuming the Purchaser Required Approvals are duly obtained, violate in any material respect any Legal Requirement or any judgment, ruling, order, writ, injunction or decree applicable to the Company, the Bank or any other Subsidiary or any of their respective properties or assets.

3.2     Capitalization of the Bank.

(a)     Ownership:  The authorized capital stock of the Bank consists of 500,000 shares of common stock, no par value (the "Common Stock"), of which 429,000 shares of Common Stock are outstanding.  No other shares of capital stock of the Bank are issued or outstanding.  All of the outstanding shares of Common Stock are directly and beneficially owned and held by the Company and have been duly authorized and validly issued, are fully paid and nonassessable with no personal liability attaching to the ownership thereof, have been issued in full compliance with all federal and state securities laws and other Legal Requirements, were not issued in violation of or subject to any preemptive rights or other rights to subscribe for or purchase securities, and are free and clear of all Encumbrances.

(b)     Outstanding Stock Rights:  There are no (i) outstanding preemptive rights, subscriptions, options, calls, warrants or other rights of any kind or nature to acquire any securities of the Bank; (ii) outstanding securities, instruments or obligations that are or may become convertible into or exchangeable for any securities of the Bank; (iii) Contracts under which the Company or the Bank are or may become obligated to sell, issue or otherwise dispose of or redeem, purchase or otherwise acquire any securities of the Bank; (iv) shareholder agreements, voting trusts or other agreements, arrangements or understandings to which the Company or the Bank is a party or of which the Company is aware, that may reasonably be expected to affect the exercise of voting or any other rights with respect to the capital stock of the Bank, or (v) outstanding bonds, debentures, notes or other indebtedness having the right to vote on any matters on which the shareholder of the Bank may vote.

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 18 of 193

(c)     Bank Subsidiaries.     The Bank has one wholly-owned Subsidiary, AmericanWest Holdings, Inc.  The Bank otherwise does not have any Subsidiaries nor own any equity interests in any other Person.

3.3     Business Operations.

(a)     Permits:  The Bank and its Subsidiary hold all Permits material to the Business, including without limitation all Permits required from the FDIC and the Washington DFI, to conduct a commercial banking business (each, a "Material Permit").  All of the Material Permits are validly issued, are in full force and effect and are being complied with by the Bank and its Subsidiary in all material respects.  No notice of breach or default in respect of any Material Permit has been received by the Bank or its Subsidiary and there are no proceedings in progress, pending or threatened which would reasonably be expected to result in the cancellation, revocation, suspension or adverse alteration of any of them, and the Company is not aware of any existing matters or state of facts which is reasonably likely to give rise to any such notice or proceeding.

(b)     Governmental Authorizations:

(i)     Each Governmental Authorization that is held by the Bank or its Subsidiary or that otherwise relates to the Business is valid and in full force and effect.

(ii)     The Bank and its Subsidiary are in compliance with all of the terms and requirements of each Governmental Authorization applicable to it that is material to the Business (a "Material Governmental Authorization").

(iii)     No event has occurred or circumstance exists that will (with or without notice or lapse of time) (A) constitute or result directly or indirectly in a material violation of or a failure to comply with any term or requirement of any Material Governmental Authorization, or (B) result directly or indirectly in the revocation, withdrawal, suspension, cancellation or termination of, or any modification to, or would otherwise impair in any way, any Material Governmental Authorization.

(iv)     Neither the Company nor the Bank (nor its Subsidiary) has received any notice or other communication from any Governmental Authority regarding (A) any actual, alleged, possible or potential violation of or failure to comply with any term or requirement of any Material Governmental Authorization or (B) any actual, proposed, possible or potential revocation, withdrawal, suspension, cancellation, termination of or modification to any Material Governmental Authorization.

(v)     All applications required to have been filed for the renewal of the Material Governmental Authorizations have been duly filed on a timely basis with the appropriate Governmental Authorities, and all other filings required to have been made with respect to such Governmental Authorizations have been duly made on a timely basis with the appropriate Governmental Authority, except as has not had and would not reasonably be expected to have a Material Adverse Effect.

(vi)     There is no authorization, license, approval, consent, order or any other action of, or any registration, declaration, filing or notice with or to any Governmental

14

Authority or court that is required for the execution or delivery by the Company of this Agreement and the DIP Loan Agreement or the validity or enforceability of this Agreement or the DIP Loan Agreement against the Company, and, subject to the Sale Order and the receipt of the Purchaser Required Approvals, the completion or performance by the Company of any of the Contemplated Transactions.

(vii)     The Bank and its Subsidiary are not subject to any cease-and-desist or other similar order or enforcement action issued by, nor is any of them a party to any written agreement, consent agreement or memorandum of understanding with, or a party to any commitment letter or similar undertaking to, or subject to any capital directive by, or adopted any board resolutions at the request of, any Governmental Authority (each item in this sentence, a "Regulatory Agreement"), nor has the Bank or its Subsidiary been notified since December 31, 2008 by any Governmental Authority that it is considering issuing, initiating, ordering, or requesting any such Regulatory Agreement.  The Bank and its Subsidiary are in compliance in all material respects with each Regulatory Agreement to which either of them is a party or subject, and neither the Bank nor its Subsidiary has received any notice from any Governmental Authority indicating that the Bank or its Subsidiary is not in compliance in all material respects with any such Regulatory Agreement.

(viii)    Except for normal examinations conducted by a Governmental Authority in the regular course of the Business, no Governmental Authority has initiated any Proceeding into the Business or operations of the Bank or its Subsidiary since December 31, 2008.  There is no unresolved violation, criticism or exception by any Governmental Authority with respect to any report or statement relating to any examinations or inspections of the Bank or its Subsidiary.  The most recent regulatory examination of the Bank and its Subsidiary was an FDIC visitation examination conducted by the FDIC, commenced on August 30, 2010 and ended on September 30, 2010.  No report of examination has been received with respect to such examination.  As of the date of this Agreement, no regulatory examination of the Bank or its Subsidiary is under way, and no other report of examination is pending.

3.4     Regulatory Reports.

(a)     Company's Reports.

(i)     The Company has filed or furnished, as applicable, on a timely basis, all forms, filings, registrations, submissions, statements, certifications, reports and documents required to be filed or furnished by it with any Governmental Authority, including any and all federal and state banking authorities, since December 31, 2008 (including any amendments thereto, the "Company's Reports").  Each of the Company's Reports, at the time of its filing or being furnished, complied as to form in all material respects with the applicable requirements of the Securities Act of 1933, as amended, and the Securities Exchange Act of 1934, as amended, and any other applicable Legal Requirement applicable to the Company's Reports. As of their respective dates (or, if amended, as of the date of such amendment), the Company's Reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

(ii)     Section 3.4(a)(ii) of the Disclosure Schedule sets forth a draft of the Company's Form 10-Q for the quarter ending September 30, 2010, which the Company

intends to file pursuant to Sections 13 and 15(d) of the Securities Exchange Act of 1934, as amended. Such draft Form 10-Q does not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

(b)     Bank's Reports. The Bank and its Subsidiary have duly filed with the FDIC, the Washington FDI and any other applicable Governmental Authorities, as the case may be, in correct form in all material respects the reports, returns and filing information data required to be filed under any applicable Legal Requirement, including any and all federal and state banking authorities, and such reports were complete and accurate in all material respects and in compliance in all material respects with the requirements of any applicable Legal Requirement. As of their respective dates (or, if amended, as of the date of such amendment), such reports did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements made therein, in light of the circumstances in which they were made, not misleading.

3.5     Deposits. All of the deposits held by the Bank (including the records and documentation pertaining to such deposits) have been established and are held in compliance in all material respects with (i) all applicable policies, practices and procedures of the Bank, and (ii) all applicable Legal Requirements, including anti-money laundering, anti-terrorism, or embargoed persons requirements. All of the deposits held by the Bank are insured to the maximum limit set by the FDIC and the FDIC premium and all assessments have been fully paid, and no proceedings for the termination or revocation of such insurance are pending, or, to the Knowledge of the Company, threatened.

3.6     Financial Matters.

(a)     Company's Financial Statements. The Company has made available to the Purchaser the Audited Financial Statements and the Interim Financial Statements. The representation and warranty set forth in the immediately preceding sentence shall be deemed satisfied to the extent the Audited Financial Statements and the Interim Financial Statements are available on the SEC's EDGAR system accessible at www.sec.gov. The Audited Financial Statements and the Interim Financial Statements (i) are true, accurate and complete in all material respects, (ii) have been prepared in accordance with GAAP and regulatory accounting principles consistently applied except as may be otherwise indicated in the notes thereto and except with respect to the Interim Financial Statements for the omission of footnotes and (iii) fairly present in all material respects the financial condition of the Company as of the respective dates set forth therein and the results of operations, stockholders' equity and cash flows of the Company for the respective periods set forth therein, subject in the case of the Interim Financial Statements to year-end adjustments (none of which are reasonably expected to be material). The consolidated financial statements of the Company to be prepared after the date of this Agreement and prior to the Closing (A) will be true, accurate and complete in all material respects, (B) will have been prepared in accordance with GAAP and regulatory accounting principles consistently applied except as may be otherwise indicated in the notes thereto and except with respect to unaudited financial statements for the omission of footnotes and (C) will fairly present in all material respects the financial condition of the Company as of the respective dates set forth therein and the results of operations, stockholders' equity and cash flows of the Company for the respective periods set forth therein, subject in the case of unaudited financial statements to year-end adjustments (none of which would reasonably be expected to be material).

(b)     Call Reports:  The Company has previously delivered to the Purchaser true and complete copies of the Call Reports of the Bank for the periods ending December 31, 2009, March 31, 2010, June 30, 2010 and, in draft form, September 30, 2010.  The financial statements contained in such Call Reports (i) are true, accurate and complete in all material respects, (ii) have been prepared in accordance with GAAP and regulatory accounting principles consistently applied, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (iii) fairly present in all material respects the financial condition of the Bank as of the respective dates set forth therein and the results of operations and stockholders' equity for the respective periods set forth therein, subject to year-end adjustments (none of which are reasonably expected to be material).  The financial statements contained in the Call Reports of the Bank to be prepared after the date of this Agreement and prior to the Closing (A) will be true, accurate and complete in all material respects, (B) will have been prepared in accordance with GAAP and regulatory accounting principles consistently applied, except as may be otherwise indicated in the notes thereto and except for the omission of footnotes, and (C) will fairly present in all material respects the financial condition of the Bank as of the respective dates set forth therein and the results of operations and stockholders' equity for the respective periods set forth therein, subject to year-end adjustments (none of which are reasonably expected to be material).

(c)     Systems and Processes.  The Bank and its Subsidiary have in place sufficient systems and processes that are customary for a community bank of the size of the Bank and that are designed to (x) provide reasonable assurances regarding the reliability of the Bank's and its Subsidiary's financial statements and (y) in a timely manner accumulate and communicate to the Bank's and its Subsidiary's principal executive officer and principal financial officer the type of information that would be required to be disclosed in the Bank's and its Subsidiary's financial statements.  Neither the Bank or its Subsidiary nor, to the Company's Knowledge, any employee, auditor, accountant or representative of the Bank or its Subsidiary has received or otherwise had or obtained Knowledge of any complaint, allegation, assertion or claim, whether written or oral, regarding the adequacy of such systems and processes or the accuracy or integrity of the Bank's or its Subsidiary's financial statements.  To the Company's Knowledge, there has been no instance of fraud by the Bank or its Subsidiary, whether or not material, that occurred during any period covered by the Call Reports.

(d)     Auditor Independence.  During the periods covered by the Call Reports, the Company's and the Bank's external auditor was independent of the Company and the Bank and their management.  As of the date hereof, the Company's and the Bank's external auditor has not resigned or been dismissed as a result of or in connection with any disagreements with the Company on a matter of accounting principles or practices, financial statement disclosure or auditing scope or procedure.

(e)     Books and Records:  The Books and Records have been and are being maintained in the ordinary course of business in accordance and compliance with all applicable accounting requirements and Legal Requirements and are complete in all material respects to reflect corporate action by the Bank and its Subsidiary.

(f)     Liabilities:  The Bank and its Subsidiary have no material Liabilities of a nature required to be disclosed in a consolidated balance sheet of the Bank and the Subsidiary prepared in accordance with GAAP and regulatory accounting principles except:

17

(i)     Liabilities disclosed on, reflected in or provided for in the Interim Financial Statements for the period ending September 30, 2010 or in the Bank's Call Report for the period ended September 30, 2010;

(ii)     Liabilities incurred in the Ordinary Course of Business since the Interim Financial Statements for the period ending September 30, 2010;

(iii)     Liabilities disclosed in the Disclosure Schedule;

(iv)     Liabilities arising from this Agreement, the DIP Loan Agreement and the Contemplated Transactions (including the incurrence of professional and other transactional fees);

(v)     Liabilities arising from the Bankruptcy Case; and

(vi)     Liabilities arising under Permitted Liens.

3.7     <u>Tax Matters</u>.

(a)     Each of the Bank and its Subsidiary (or the Company on behalf of the Bank or its Subsidiary) has filed all federal income Tax Returns and all other material Tax Returns required to be filed by it.  All such Tax Returns were true, correct and complete in all material respects and accurately reflected in all material respects the taxable income (or other measure of Tax) of the Bank and its Subsidiary.

(b)     Each of the Company, the Bank and its Subsidiary (or the Company on behalf of the Bank or its Subsidiary) has paid all material Taxes required to be paid by the Bank, its Subsidiary or the consolidated, combined, affiliated, unitary or other tax group including the Company, the Bank and its Subsidiary whether or not shown on any Tax Return.  The Bank and its Subsidiary have established reserves in accordance with GAAP that are adequate for the payment of all Taxes not yet due and payable with respect to the assets and operations of the Bank and its Subsidiary.

(c)     Each of the Bank and its Subsidiary (or the Company on behalf of the Bank or its Subsidiary) has withheld and paid to the appropriate taxing authority all material Taxes required to be withheld and paid, including in connection with any amounts owing to any employee, independent contractor, creditor, stockholder or other third party and all Forms W-2 and 1099 and any other forms required with respect thereto have been properly completed and timely filed.

(d)     None of the Company, the Bank or its Subsidiary has received from any taxing authority written notice of, and, to the Knowledge of the Company, there is not threatened, any audit, claim, action, suit, request for information, ruling, determination, investigation or administrative or judicial proceeding that is pending or being conducted with respect to Taxes of the Bank or its Subsidiary.  None of the Company, the Bank or its Subsidiary has received from any taxing authority (including in jurisdictions in which the Bank or its Subsidiary has not filed Tax Returns) written notice of, and, to the Knowledge of the Company, there is not threatened, any proposed assessment, adjustment or deficiency for any amount of Taxes proposed, asserted, or assessed against the Bank or its Subsidiary.

(e)     Neither the Bank nor its Subsidiary is a party to or bound by any Tax sharing, allocation or indemnification agreement or similar agreement or arrangement other than the Tax Sharing Agreement, dated as of January 22, 2010, by and between the Company and the Bank (the "Tax Sharing Agreement").

(f)     Neither the Bank nor its Subsidiary has, in the past seven years or, to the Knowledge of the Company, prior years, constituted either a "distributing corporation" or a "controlled corporation" in a distribution of stock intended to qualify for tax-free treatment under Section 355 of the Code.

(g)     Neither the Bank nor its Subsidiary will be required, for income Tax purposes for any taxable period ending after the Closing Date, to include in its taxable income any item of income or gain or to exclude from its taxable income any item of deduction or loss as a result of any (i) change in method of accounting under Section 481(c) of the Code (or any corresponding or similar provision of state, local or foreign law) for a taxable period ending on or prior to the Closing Date, (ii) closing agreement under Section 7121 of the Code (or any corresponding or similar provision of state, local or foreign law) executed on or prior to the Closing Date, (iii) installment sale or open transaction disposition occurring on or prior to the Closing Date (except as set forth in Section 3.7(g) of the Disclosure Schedule), or (iv) prepaid amount received on or prior to the Closing Date.

(h)     There are no liens or encumbrances for Taxes on any of the assets of the Bank or its Subsidiary other than liens or encumbrances for Taxes not yet due and payable.

(i)     No written claim has been received in the last six years by the Company, the Bank or its Subsidiary from a taxing authority in a jurisdiction where the Bank or its Subsidiary does not file Tax Returns that the Bank or its Subsidiary is or may be subject to taxation by that jurisdiction or should have been included in a combined, consolidated, affiliated, unitary or other group Tax Return of that jurisdiction.

(j)     Neither the Bank nor its Subsidiary has engaged in any "reportable transactions" within the meaning of Treasury Regulations Section 1.6011-4(b).

3.8     <u>Litigation and Claims</u>.  There are no current, pending or, to the Knowledge of the Company, threatened material Proceedings.  There is no material injunction, order, judgment, decree or regulatory restriction imposed upon the Bank or its Subsidiary or the assets of the Bank or its Subsidiary.

3.9     <u>Employee Benefit Plans; Labor</u>.

(a)     Section 3.9(a) of the Disclosure Schedule sets forth a complete and correct list of each Benefit Arrangement.  The Company has made available to the Purchaser correct and complete copies of (i) each Benefit Arrangement (or, in the case of any such Benefit Arrangement that is unwritten, descriptions thereof), (ii) the most recent annual reports on Form 5500 filed with the Internal Revenue Service with respect to each Benefit Arrangement (if any such report was required), (iii) the most recent summary plan description for each Benefit Arrangement for which such summary plan description is required and (iv) each trust agreement and insurance or group annuity contract relating to any Benefit Arrangement.

(b)     Each Benefit Arrangement that is intended to be tax qualified under Section 401(a) of the Code (each, a "Qualified Plan") and each trust established in connection with any Qualified Plan which is intended to be tax exempt under Section 501(a) of the Code is tax qualified or tax exempt, as applicable, and the Bank has received a determination letter or an opinion letter from the Internal Revenue Service upon which it may rely regarding each such Qualified Plan's qualified status under the Code, and (ii) to the Company's Knowledge, no event has occurred since the date of the most recent determination letter or application relating to any such Qualified Plan that would adversely affect the qualification of such Qualified Plan.  The Company has made available to the Purchaser a correct and complete copy of the most recent determination letter or opinion letter received with respect to each Qualified Plan, as well as a correct and complete copy of each pending application for a determination letter, if any.

(c)     Each Benefit Arrangement has been administered in all material respects in accordance with its terms and in compliance with the applicable provisions of ERISA, the Code, all other Legal Requirements and the terms of all applicable collective bargaining agreements (if any).  To the Company's Knowledge, there are no investigations by any Governmental Authority, termination proceedings or other claims (except routine claims for benefits payable under the Benefit Arrangements) or Proceedings against or involving any Benefit Arrangement.

(d)     No Qualified Plan is subject to Title IV of ERISA or Section 412 of the Code.  No direct, contingent or secondary liability to any Person has been incurred or could reasonably be expected to be incurred by the Bank or its ERISA Affiliates under Title IV of ERISA.  Neither the Bank nor any of its ERISA Affiliates have, within the preceding six years, withdrawn in a complete or partial withdrawal from any multiemployer plan (as defined in section 3(37) of ERISA) or incurred any liability under section 4204 of ERISA that has not been satisfied in full.

(e)     The Bank and its Subsidiary have no obligation to provide medical, dental or life insurance benefits (whether or not insured) to any employees or former employees of the Bank or its Subsidiary after retirement or other termination of service (other than (i) coverage mandated by Legal Requirements and (ii) benefits, the full direct cost of which is borne by the employee or former employee (or beneficiary thereof)).

(f)     There are no collective bargaining agreements binding on the Bank or its Subsidiary; none of the employees of the Bank or its Subsidiary is represented by a labor union, and, to the Knowledge of the Company, there is no, and since December 31, 2008, has been no, (i) organizational effort made or threatened by or on behalf of any labor organization or trade union to organize any employees of the Bank or its Subsidiary, and (ii) no demand for recognition of any employees of the Bank or its Subsidiary has been made by or on behalf of any labor organization or trade unions.

(g)     There are no strikes, work stoppages, work slowdowns or lockouts pending or, to the Knowledge of the Company, contemplated or threatened against or involving the Bank or its Subsidiary.

(h)     There are no Proceedings pending or, to the Knowledge of the Company, threatened against or affecting the Bank or its Subsidiary, relating to the alleged material

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 25 of 193

violation of any applicable Legal Requirement pertaining to labor relations or employment matters.

3.10    Properties and Leases.  The Bank (a) has good, valid and marketable title to all the properties and assets reflected in the latest audited balance sheet included in the Audited Financial Statements as being owned by the Company or one of its Subsidiaries or acquired after the date thereof (except properties sold or otherwise disposed of since the date thereof in the Ordinary Course) (the "Owned Properties"), free and clear from encumbrances that would affect the value thereof or interfere with the use made or to be made thereof by the Bank or its Subsidiary in any material respect, (b) is the lessee of all leasehold estates reflected in the latest audited balance sheet included in the Audited Financial Statements or acquired after the date thereof (except for leases that have expired by their terms since the date thereof) (the "Leased Properties" and, collectively with the Owned Properties, the "Real Property"), free and clear from encumbrances that would affect the value thereof or interfere with the use made or to be made thereof by the Bank or its Subsidiary in any material respect, and is in possession of the properties purported to be leased thereunder, and each such lease is valid without default thereunder by the lessee or, to the Knowledge of the Company, the lessor, and (c) owns or leases all properties and assets as are used by the Bank or its Subsidiary in the Business or otherwise necessary to their respective operations as now conducted. Section 3.10 of the Disclosure Schedule contains a true and complete list of all Real Property as of the date of this Agreement. The Real Property is in material compliance with all applicable zoning laws and building codes, and the buildings and improvements located on the Real Property are in good operating condition and in a state of good working order, ordinary wear and tear excepted.  There are no pending or, to the Knowledge of the Company, threatened material condemnation proceedings against the Real Property.  The Bank and its Subsidiary are in compliance with all applicable health and safety related requirements for the Real Property, including those under the Americans with Disabilities Act of 1990 and the Occupational Health and Safety Act of 1970.

3.11    Absence of Certain Changes.  Since December 31, 2009 until the date hereof, except as disclosed (i) in the Company's Reports filed with the SEC after December 31, 2009, (ii) in the draft of the Company's Form 10-Q referred in Section 3.4(a)(ii) (other, than with respect to clauses (i) and (ii), any disclosures therein under the caption "Risk Factors" and any other disclosure therein of risks that are forward looking or predictive in nature), (iii) in the Interim Financial Statements, (iv) in the Company's Call Reports for the three months ended March 31, 2010, June 30, 2010, and September 30, 2010 and (v) in the Disclosure Schedule, the Bank and its Subsidiary have conducted the Business in the Ordinary Course in all material respects and have not changed any accounting methods, principles or practices affecting their respective assets, liabilities or businesses, including any reserving, renewal or residual method, practice or policy (other than as may be required by GAAP or applicable accounting requirements of a Governmental Authority).  Since September 30, 2010, (a) the Bank has not had, and no fact, effect, event, change, occurrence or circumstance has occurred that would reasonably be expected to have, a Material Adverse Effect, and (b) no material default (or event which, with notice or lapse of time, or both, would constitute a material default) exists on the part of the Bank or its Subsidiary or, to the Knowledge of the Company, on the part of any other party, in the due performance and observance of any term, covenant or condition of any Contract to which the Bank or its Subsidiary is a party and which is, individually or in the aggregate, material to the financial condition of the Bank and its Subsidiary.

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 26 of 193

3.12    Commitments and Contracts.

(a)    The Company has provided or otherwise made available (by hard copy, electronic data room or otherwise) to Purchaser or its representatives true, correct and complete copies of each of the following to which the Bank or its Subsidiary is a party or subject or which otherwise relates to the Business (whether written or oral, express or implied) (each, a "Bank Significant Agreement"):

(i)    any Contract which is or would constitute a "material contract" within the meaning of Item 601(b)(10) of Regulation S-K to be performed in whole or in part after the date of this Agreement;

(ii)    any Contract with respect to the employment or service of any current directors, officers, employees or consultants of the Bank or its Subsidiary and of any former director or officer of the Bank or its Subsidiary whose service as such terminated after December 31, 2008, other than the Bank's standard form at-will offer letter;

(iii)    any Contract which limits the freedom of the Bank or its Subsidiary to compete in any material line of business;

(iv)    any Contract which grants any person a right of first refusal, right of first offer or similar right with respect to any material properties, assets or businesses of the Bank or its Subsidiary;

(v)    the Tax Sharing Agreement;

(vi)    any indenture, deed of trust, loan agreement or other financing agreement or instrument to which the Bank or its Subsidiary is the obligor; and

(vii)    any contract relating to the acquisition or disposition of any material business or material assets (whether by merger, sale of stock or assets or otherwise), which acquisition or disposition is not yet complete or where such contract contains continuing material obligations, including continuing material indemnity obligations, of the Bank or its Subsidiary.

(b)    (i) Each of the Bank Significant Agreements has been duly and validly authorized, executed and delivered by the Bank or its Subsidiary and is binding on the Bank or its Subsidiary, as applicable, and in full force and effect; (ii) the Bank and its Subsidiary are in all material respects in compliance with and have in all material respects performed all obligations required to be performed by any of them to date under each Bank Significant Agreement; (iii) the Bank and its Subsidiary have not received notice of any material violation or default (or any condition which with the passage of time or the giving of notice would cause such a violation or default) by any party under any Bank Significant Agreement; and (iv) no other party to any Bank Significant Agreement is, to the Knowledge of the Company, in default in any respect thereunder, except to the extent the filing of the Bankruptcy Case constitutes a default of any such agreement.

3.13    Risk Management Instruments.  Section 3.13 of the Disclosure Schedule sets forth all derivative instruments of the Bank and its Subsidiary, including swaps, caps, floors and

option agreements, whether entered into for the Bank's or its Subsidiary's own account or for the account of a customer of the Bank. All such derivative instruments were entered into (a) only in the Ordinary Course of Business and consistent with past practice, (b) in accordance with all applicable laws, rules, regulations and regulatory policies and (c) with counterparties believed to be financially responsible at the time; and each of them constitutes the valid and legally binding obligation of the Bank or its Subsidiary and is enforceable against the Bank or its Subsidiary, as applicable, and, to the Knowledge of the Company, the other parties thereto (except as enforcement may be limited by applicable bankruptcy, insolvency, reorganization, moratorium, fraudulent transfer and similar laws of general applicability relating to or affecting creditors' rights or by general equity principles) in accordance with its terms. Neither the Bank or its Subsidiary nor any other party thereto, is in breach of any of its material obligations under any such agreement or arrangement.

3.14 <u>Environmental Matters</u>.

(a) The Bank and its Subsidiary are in compliance in all material respects with all Environmental Laws. None of the Bank, the Bank's Subsidiary nor the Company has received any communication from any Person that alleges that the Bank or its Subsidiary is not in compliance with any Environmental Laws and, to the Knowledge of the Company, there are no circumstances that would reasonably be expected to prevent or interfere with such compliance in the future.

(b) There is no Environmental Claim pending or, to the Knowledge of the Company, threatened against the Bank or its Subsidiary or against any person or entity whose liability for any Environmental Claim the Bank or its Subsidiary has retained or assumed by contract or by operation of law.

(c) The Company has provided to Purchaser all assessments, reports, data, results of investigations or audits, and other information that is in the possession of or reasonably available to the Company or the Bank or its Subsidiary regarding environmental matters pertaining to or the environmental condition of any properties owned or operated by the Bank or its Subsidiary, including but not limited to corporate offices or branch locations, or the compliance (or noncompliance) by the Bank or its Subsidiary under any Environmental Laws.

(d) Neither the Bank nor its Subsidiary is required by any Environmental Law or by virtue of the transactions set forth herein and contemplated hereby, or as a condition to the effectiveness of any transactions contemplated hereby, (i) to perform a site assessment for Materials of Environmental Concern, (ii) to remove or remediate Materials of Environmental Concern, (iii) to give notice to or receive approval from any Governmental Authority regarding environmental matters, other than a supervising bankruptcy court with jurisdiction over the pending transaction, or (iv) to record or deliver to any Person any disclosure document or statement pertaining to environmental matters.

3.15 <u>Insurance</u>. The Bank and its Subsidiary maintain insurance underwritten by insurers of recognized financial responsibility, of the types and in the amounts that the Bank and its Subsidiary reasonably believe are adequate for its business, including, but not limited to, insurance covering all real and personal property owned or leased by the Bank or its Subsidiary against theft, damage, destruction, acts of vandalism and all other risks customarily insured

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 28 of 193

against, with such deductibles as are customary for companies in the same or similar business, all of which insurance is in full force and effect.

3.16    Intellectual Property.  The Bank and its Subsidiary own or are licensed to use or otherwise possess legally enforceable rights to use all material patents, patent rights, licenses, inventions, copyrights, know-how (including trade secrets, applications and other unpatented or unpatentable proprietary or confidential information, systems or procedures), trademarks, service marks and trade names (collectively, "Proprietary Rights") used in the conduct of the Business as currently conducted.  The Bank and its Subsidiary have the right to use all material Proprietary Rights owned by the Bank and used in the conduct of the Business as currently conducted without infringing the Proprietary Rights of any third party.  To the Company's Knowledge, the Bank has the right to use all material Proprietary Rights licensed to the Bank and used in the conduct of the Business as currently conducted without infringing the Proprietary Rights of any third party or violating the terms of any licensing or other agreement to which the Bank is a party. To the Company's Knowledge, no person is infringing upon any of the Proprietary Rights of the Bank, except where the infringement of or lack of a right to use such Proprietary Rights would not have any material impact on the Bank.  No charges, claims or litigation have been asserted or, to the Company's Knowledge, threatened against the Bank contesting the right of the Bank to use, or the validity of, any of the Proprietary Rights used in the conduct of Business as currently conducted or challenging or questioning the validity or effectiveness of any license or agreement pertaining thereto or asserting the misuse thereof, and, to the Company's Knowledge, no valid basis exists for the assertion of any such charge, claim or litigation.  All licenses and other agreements to which the Bank is a party relating to Proprietary Rights are in full force and effect and constitute valid, binding and enforceable obligations of the Bank, subject to bankruptcy, insolvency, fraudulent transfer, reorganization, moratorium and similar laws of general applicability relating to or affecting creditors' rights and to general equity principles, as the case may be, and there have not been and there currently are not any defaults (or any event which, with notice or lapse of time, or both, would constitute a default) by the Bank under any license or other agreement affecting Proprietary Rights used in the conduct of the Business as currently conducted, except for defaults, if any, which would not have any material impact on the Bank or would arise from the filing of the Bankruptcy Case.  The validity, continuation and effectiveness of all licenses and other agreements relating to the Proprietary Rights used in the conduct of Business as currently conducted and the current terms thereof will not be affected by the transactions contemplated by this Agreement.

3.17    Related Party Transactions.

(a)    Except as part of the normal and customary terms of an individual's employment or service as a director, neither the Bank nor its Subsidiary is party to any extension of credit (as debtor, creditor, guarantor or otherwise), Contract for goods or services, lease or other agreement with any (i) Affiliate of the Company or the Bank, (ii) insider (or related interest of an insider) of the Company or the Bank (or its Subsidiary), (iii) stockholder owning 5% or more of the outstanding Common Stock of the Company or related interest of such a stockholder, or (iv) to the Knowledge of the Company, and other than credit and consumer banking transactions in the Ordinary Course of Business, employee of the Company or the Bank (or its Subsidiary) who is not an executive officer.  For purposes of the preceding sentence, the term "affiliate" shall have the meaning assigned in the Federal Reserve Board's Regulation W, as amended, and the terms "insider," "related interest," and "executive officer" shall have the meanings assigned in the Federal Reserve Board's Regulation O, as amended.

24

(b)     The Bank and its Subsidiary is in material compliance with Sections 23A and 23B of the Federal Reserve Act, its implementing regulations, and the Federal Reserve Board's Regulation O.

3.18     Brokers or Finders.  Except for the Broker's Fees disclosed in Section 3.18 of the Disclosure Schedule, neither the Company nor the Bank nor its Subsidiary, nor any of their representatives, have incurred any Liability for brokerage or finders' fees or agents' commissions or other similar payments in connection with the Contemplated Transactions.

3.19     Disclaimer of Other Representations and Warranties.  EXCEPT AS EXPRESSLY SET FORTH IN THIS ARTICLE 3, THE COMPANY MAKES NO REPRESENTATION OR WARRANTY, EXPRESS OR IMPLIED, AT LAW OR IN EQUITY, IN RESPECT OF THE SHARES OR THE OTHER PURCHASED ASSETS AND ANY SUCH OTHER REPRESENTATIONS OR WARRANTIES ARE HEREBY EXPRESSLY DISCLAIMED. THE PURCHASER HEREBY ACKNOWLEDGES AND AGREES THAT, EXCEPT TO THE EXTENT SPECIFICALLY SET FORTH IN THIS ARTICLE 3, THE PURCHASER IS PURCHASING THE SHARES AND THE OTHER PURCHASED ASSETS ON AN "AS-IS, WHERE-IS" BASIS.

## ARTICLE 4

## REPRESENTATIONS AND WARRANTIES OF THE PURCHASER

The Purchaser and SKBHC, jointly and severally, hereby make the following representations and warranties to the Purchaser as of the date hereof and as of the Closing Date.

4.1     Corporate Status and Authority; Non-contravention.

(a)     Status of the Purchaser:  The Purchaser is a corporation duly organized, validly existing and in good standing under the laws of the State of Delaware, and has the corporate power to own its property and conduct its business in the manner in which such business is now being conducted and has full power and capacity to enter into this Agreement and the DIP Loan Agreement, carry out the Contemplated Transactions to which it is a party, and duly observe and perform all its obligations contained in this Agreement and the DIP Loan Agreement.

(b)     Status of SKBHC:  SKBHC is a limited liability company duly organized, validly existing and in good standing under the laws of the State of Delaware and has the organizational power to own its property and conduct its business in the manner in which such business is now being conducted and has full power and capacity to enter into this Agreement, carry out the Contemplated Transactions to which it is a party, and duly observe and perform all its obligations contained in this Agreement.  As of the date hereof, SKBHC has two wholly-owned Subsidiaries, the Purchaser and SKBHC Acquisition, Inc.

(c)     Approval of the Starbuck Transaction:  As of the date hereof, the Federal Reserve Board and any other applicable Governmental Authorities have approved the Starbuck Transaction and, on the date of receiving such approval or approvals, no Person, other than SKBHC, has been deemed to "control" SKBHC or SKBHC Acquisition, Inc. for purposes of the BHCA.

25

(d)　Due Authorization:　The execution and delivery of this Agreement and the DIP Loan Agreement and all documents, instruments and agreements required to be executed and delivered by SKBHC or the Purchaser pursuant to this Agreement or the DIP Loan Agreement, as applicable, and the completion and performance of the transactions and obligations contemplated by or contained in this Agreement and the DIP Loan Agreement, have been duly authorized by all necessary organizational or corporate action on the part of SKBHC and the Purchaser, as applicable, and this Agreement and the DIP Loan Agreement have been duly executed and delivered by SKBHC and the Purchaser and constitute a legal, valid and binding obligation of SKBHC and the Purchaser, and, subject to the approval of the Bankruptcy Court, are enforceable in accordance with their respective terms.

(e)　Non-contravention:　Neither the execution and delivery of this Agreement nor the completion and performance of the Contemplated Transactions will (i) contravene any of the provisions of the Charter Documents of SKBHC or the Purchaser, or (ii) result in a material breach of or material default under, or contravene, any material indenture, contract, agreement or instrument to which SKBHC or the Purchaser is a party or by which SKBHC or the Purchaser is bound.

4.2　Governmental Authorizations.　Except for the filing of applications and notices with, and the receipt of consents, authorizations, approvals, exemptions or nonobjections from, as applicable, the Governmental Authorities set forth on Schedule 4.2 (the "Purchaser Required Approvals"), no consents, or approvals of or filings or registrations with any Governmental Authority are necessary on the part of the Purchaser or its Affiliates in connection with the execution and delivery by the Purchaser of this Agreement and the consummation by the Purchaser of the Contemplated Transactions.　As of the date of this Agreement, the Purchaser knows of no reason why any of the Purchaser Required Approvals will not be obtained or that any of the Purchaser Required Approvals will not be granted without imposition of a Burdensome Condition.

4.3　Starbuck Transaction.　As of the date hereof, SKBHC has received all consents, authorization, approvals, exemptions or nonobjections, as applicable, from all Governmental Authorities necessary for it to consummate the Starbuck Transaction, and true and complete copies of the foregoing have been provided to the Company.　Notwithstanding the foregoing, the Purchaser and SKBHC are required to wait until November 10, 2010, the expiration date of all applicable waiting periods relating to the Starbuck Transaction, to consummate the Starbuck Transaction.　SKBHC has previously provided to the Company a complete and accurate extract of the conditions to closing of the Starbuck Transaction under the Starbuck Agreement.　As of the date of this Agreement, the Purchaser knows of no reason why any of such conditions to SKBHC, on the one hand, or Starbuck, on the other hand, consummating the Starbuck Transaction will not be, or have not been, satisfied.

4.4　Investment Intent.　The Purchaser is acquiring the Shares for its own account and not with the view toward distribution within the meaning of Section 2(a)(11) of the Securities Act of 1933, as amended, other than in compliance with all applicable Legal Requirements, including United States federal securities laws.

4.5　Sufficient Funds.

(a)     As of the date hereof, the Purchaser has in hand sufficient funds to pay amounts needed to fund the Working Capital Loan as required by the DIP Loan Agreement.

(b)     SKBHC has entered into Commitment Agreements (the "SKBHC Commitment Agreements"), pursuant to which each investor who is a party thereto has committed, subject to the terms thereof, the SKBHC LLC Agreement and the closing of the Starbuck Transaction, to invest in SKBHC the cash amounts set forth therein, which represent in the aggregate not less than Seven Hundred and Fifty Million Dollars ($750,000,000). SKBHC has provided to the Company a complete and accurate extract of the conditions precedent for the investors to invest in SKBHC contained in the SKBHC Commitment Agreements and the SKBHC LLC Agreement. The SKBHC Commitment Agreements are in full force and effect and, as of the closing of the Starbuck Transaction, constitute legal, valid and binding obligations of SKBHC and, to the knowledge of SKBHC, the other parties thereto. Upon the consummation of the Starbuck Transaction, SKBHC shall have agreed to contribute (or cause to be contributed) to the Purchaser sufficient funds to pay the Cash Purchase Price and make the Equity Contribution as of the Closing Date.

(c)     As of the Closing Date, the Purchaser shall have in hand (or in an escrow funded by Purchaser) sufficient funds to pay the Cash Purchase Price and effect the Equity Contribution.

4.6     Non-reliance.  The Purchaser acknowledges and agrees that in entering into this Agreement it has not relied and is not relying on any representations, warranties or other statements whatsoever, whether written or oral (from or by the Bank, the Company or any Person acting on their behalf) other than those expressly set out in this Agreement (or other related documents referred to herein) and that it will not have any right or remedy rising out of any representation, warranty or other statement not expressly set out in this Agreement.

4.7     Stalking-Horse Bidder Fee.  The Stalking-Horse Bidder Fee represents actual out-of-pocket costs for due diligence of the Bank and for professional and other related fees and expenses incurred by or on behalf of SKBHC in the preparation of its offer to acquire and recapitalize the Bank and the negotiation and drafting of documents related to the Contemplated Transactions.

# ARTICLE 5

## PRE-CLOSING MATTERS AND OTHER COVENANTS

5.1     Operations until Closing.   Except as expressly otherwise provided in this Agreement or as may be otherwise required by any Governmental Authority having jurisdiction of the Bank or the Company, or by the Bankruptcy Court or the Bankruptcy Code, unless otherwise agreed or consented to in writing by the Purchaser, which agreement or consent shall not be unreasonably withheld or delayed, from the date of this Agreement to the Closing:

(a)     Conduct of Business.   The Company shall cause the Bank and its Subsidiary to: (i) subject to the provisions of the Bankruptcy Code and the supervision of the Bankruptcy court, carry on and conduct the Business in all material respects in the Ordinary Course consistent with past practice; (ii) use commercially reasonable efforts to maintain and preserve intact its business organization and advantageous business relationships with, but not

limited to, customers, suppliers and employees, and retain the services of its key officers and key employees; (iii) take no action that is intended to or would reasonably be expect to adversely affect or materially delay the ability of the Company, the Bank or the Purchaser to obtain any necessary approvals of any Governmental Authority required for the Contemplated Transactions or to perform its covenants and agreements under the Agreement or to consummate the Contemplated Transactions; (iv) maintain its Books and Records in the usual, regular and ordinary manner; and (v) provide to the Purchaser and its employees, representatives and agents, reasonable access during normal business hours to the Bank's personnel and its facilities and properties, to the Books and Records, and to all, or true copies of all, title documents, indentures, Contracts, Encumbrances, instruments, leases and other documents relating to the Business, and furnish them with all such information relating to the Business as the Purchaser from time to time reasonably requests; provided that (A) all such materials shall be made available to the Purchaser and its employees, representatives and agents at the premises of the Bank and may not be removed therefrom without consent, and (B) in exercising such access rights, the Purchaser and its employees, representatives and agents shall not unduly disturb or interfere with the activities of the Company, the Bank or the Bank's customers.

(b)     Bank Forbearances. The Company shall cause the Bank and its Subsidiary not to: (i) enter into any new line of business or materially change its lending, investment, underwriting, risk and asset liability management, and other banking and operating policies, except as required by any applicable Legal Requirement or policies imposed by any Governmental Authority; (ii) make any capital expenditures in excess of One Hundred Thousand Dollars ($100,000) individually or Two Hundred and Fifty Thousand Dollars ($250,000) in the aggregate, other than as required pursuant to Contracts already entered into; (iii) terminate, enter into, amend, modify or renew any Benefit Arrangement, Bank Significant Agreement or Permit, other than in the Ordinary Course of Business, or amend or modify any Tax Sharing Agreements or any Contracts with the Broker; (iv) issue, sell or otherwise permit to become outstanding, or dispose of or encumber or pledge, or authorize or propose the creation of, any additional shares of the Bank's or its Subsidiary's stock or any additional options or other rights, grants or awards with respect to the Bank's or its Subsidiary's stock; (v) make, declare, pay or set aside for payment any dividend on or in respect of, or declare or make any distribution on any shares of its capital stock; (vi) sell, transfer, mortgage, encumber or otherwise dispose of or discontinue any of its assets, deposits, businesses or properties, except for sales, transfers, mortgages, encumbrances or other dispositions or discontinuances in the Ordinary Course of Business consistent with past practice and in a transaction that individually or taken together with all other such transactions is not material to the Bank; (vii) incur any indebtedness for borrowed money or issue any debt securities or assume, guarantee or endorse, or otherwise become responsible for the obligations of, any other Person, provided that the Bank may continue to borrow money from the Federal Home Loan Bank System, the Federal Reserve or any other Governmental Authority in a manner consistent with past practice; (viii) make, renew or amend any extension of credit, individually or in the aggregate with other extensions of credit to the same relationship, in excess of One Million Dollars ($1,000,000); provided that the Bank may make, renew or amend any extension of credit in the Ordinary Course of Business and consistent with past practice if, with respect to a pre-existing relationship with a borrower, (A) there has been no material adverse change in the relationship with such borrower, or (B) there has been such a material adverse change but the Bank is attempting to mitigate loss with respect to the borrower in the Ordinary Course of Business and consistent with past practice; (ix) enter into, renew or amend any interest rate swaps, caps, floors and option agreements and other interest rate risk management

28

arrangements, whether entered into for the account of it or for the account of a customer of it, except in the Ordinary Course of Business and consistent with past practice; (x) acquire (other than by way of foreclosures, acquisitions of control in a fiduciary or similar capacity, acquisitions of loans or participation interests, or in satisfaction of debts previously contracted in good faith, in each case in the Ordinary Course of Business and consistent with past practice) all or any portion of the assets, business, deposits or properties of any other Person; (xi) merge or consolidate with or into any legal entity, dissolve, liquidate, or otherwise terminate its existence; (xii) file any application to establish, or to relocate or terminate the operations of, any banking office; (xiii) amend its Charter Documents or similar organizational documents or otherwise add, amend or modify in any respect the duties or obligations of indemnification by the Bank or its Subsidiary with respect to any of their respective directors, officers, employees, agents or other Persons; (xiv) implement or adopt any change in its accounting principles, practices or methods, other than as may be required by GAAP or applicable accounting requirements of a Governmental Authority; (xv) make, change or revoke any Tax election, file any amended Tax Return (unless to correct an error with the prior written consent of the Purchaser, such consent not to be unreasonably withheld or delayed), enter into any closing agreement, settle any Tax audit, claim or assessment, surrender or reduce any right to claim a refund of Taxes (provided, however, that the Company shall file claims for refunds of Taxes for Idaho and Utah for the 2009 and 2010 tax years to the extent permitted by applicable law), agree to extend any statute of limitations relating to Taxes, fail to duly and timely file with appropriate taxing authorities all Tax Returns required to be filed by or with respect to the Bank or its Subsidiary or fail to remit any Taxes due, whether or not shown on any Tax Return; (xvi) without the prior written consent of the Purchaser, such consent not to be unreasonably withheld or delayed, settle any action, suit, claim or proceeding against the Bank or its Subsidiary, except for any action, suit, claim or proceeding arising out of or in connection with this Agreement or the Contemplated Transactions or for any other action, suit, claim or proceeding that is settled in a manner consistent with past practice in an amount or for consideration not in excess of Two Hundred and Fifty Thousand Dollars ($250,000) that would not (A) impose any material restriction on the Business after the Closing, SKBHC, the Purchaser or their respective Affiliates or (B) create precedent for claims that are reasonably likely to be material to the Bank or, after the Closing, to SKBHC, the Purchaser or their respective Affiliates; (xvii) other than in the Ordinary Course of Business and consistent with past practice, terminate, enter into, amend, modify (including by way of interpretation) or renew any employment, consulting, severance, change in control or similar contract, agreement or arrangement with any director, officer, employee or consultant, or grant any salary or wage increase or increase any employee benefit, including incentive or bonus payments (or, with respect to any of the preceding, communicate any intention to take such action), except to make changes that are required by any applicable Legal Requirements; (xviii) terminate, enter into, establish, adopt, amend, modify (including by way of interpretation), make new grants or awards under or renew any Benefit Arrangement, except (A) as required by applicable Legal Requirements, or (B) to satisfy contractual obligations existing as of the date hereof described in Section 5.1(b) of the Disclosure Schedule; (xix) (A) grant, extend, amend (except as required in the diligent prosecution of the Proprietary Rights owned (beneficially, and of record where applicable) by or developed for the Bank), waive, or modify any material rights in or to, sell, assign, lease, transfer, license, let lapse, abandon, cancel, or otherwise dispose of, or extend or exercise any option to sell, assign, lease, transfer, license, or otherwise dispose of, any Proprietary Rights, or (B) fail to exercise a right of renewal or extension under any material agreement under which the Bank is licensed or otherwise permitted by a third party to use any Proprietary Rights (other than "shrink wrap" or "click through" licenses), unless the Company

29

obtains a substantially similar license or right to use such Proprietary Rights on terms as favorable as the terms under the existing agreement; (xx) participate in any program sponsored or administered by any Governmental Authority, which program is not part of the usual and customary banking business of the Bank; (xxi) engage in (or modify in a manner adverse to the Bank) any transactions with any Person known to be a shareholder of the Company or any director or officer of the Company or the Bank (or any Affiliate of any such person), other than deposit relationships in the Ordinary Course of Business consistent with past practice and extensions of credit which are on substantially the same terms, including interest rates and collateral, as those prevailing at the time for comparable transactions with persons unaffiliated with the Company or the Bank and did not involve more than the normal risk of collectability or present other unfavorable features; (xxii) notwithstanding any other provision hereof, knowingly take, or knowingly omit to take, any action that would result in any of the conditions set forth in Section 6 not being satisfied, or any action that would result in any of the representations and warranties of the Company in this Agreement becoming untrue or prevent the Company from performing its obligations under this Agreement or consummating the Closing; or (xxiii) enter into any contract with respect to, or otherwise agree or commit to do, any of the foregoing.

5.2     Confidentiality.  Each party acknowledges that any information, materials and documentation it receives or observes pursuant to or as contemplated by the Contemplated Transactions, either before or after execution of this Agreement, is confidential; provided, however, that the foregoing shall not include information which (a) is or becomes available to the public other than as a result of a disclosure by the recipient party, (b) was known to the recipient party or in its possession prior to its disclosure to the recipient party, (c) becomes available to the recipient party from a source other than the disclosing party, provided that such source is not known by the recipient party to be bound by a confidentiality agreement with the disclosing party and is not otherwise prohibited from transmitting the information to the recipient party by a contractual, legal or fiduciary obligation, or (d) is or was developed independently by the recipient party without reference to confidential information provided by the disclosing party. Each party shall take, and shall cause its employees, representatives and agents to take, all reasonable steps and precautions to protect and maintain the confidentiality of such information, materials and documentation; provided that the foregoing will not prevent the Purchaser from disclosing or making available to its and its Affiliates' respective directors, officers, employees, members, partners, agents, representatives or advisors (including, without limitation, attorneys, accountants, insurers, rating agencies, consultants, bankers and financial advisors), any such information, materials and documentation on a confidential basis for the purpose of carrying out the Contemplated Transactions, or to the extent required by a Legal Requirement.

5.3     Return of Information.  If the Contemplated Transactions pursuant to this Agreement are not completed, each party shall, upon the written request of the other party, return to the other party or destroy (such destruction to be confirmed in writing to the other party upon written request) all materials, documentation, data, records and other papers and copies thereof (whether on paper or in electronic, magnetic, photographic, mechanical or optical storage) relating to the Purchaser or its Affiliates or to the Company, the Bank, the Shares or the Business which is confidential and which is in the possession of such party and maintain the confidentiality of all information or knowledge obtained from the other party, and not use any such information or knowledge for any purpose whatsoever; provided that a party may maintain such information to the extent required by applicable Legal Requirements or such party's established document retention policies (including any requirement to retain e-mail on an

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 35 of 193

automated e-mail archival system) or relating to the safeguarding or backup storage of electronic data or in connection with a legal dispute with the other party.

5.4    Consents and Approvals.

(a)    Purchaser Required Approvals:  SKBHC agrees to use commercially reasonable best efforts to consummate the Starbuck Transaction as promptly as practicable following the date hereof.  The Purchaser agrees to use commercially reasonable best efforts to obtain all Purchaser Required Approvals, and to take, or cause to be taken, all actions and to do, or cause to be done, all things necessary, proper or advisable under any applicable Legal Requirement to consummate the Contemplated Transactions. For the avoidance of doubt, none of the foregoing obligations shall require SKBHC, the Purchaser or any of their respective Affiliates to take any action that would result in the imposition of a Burdensome Condition.

(b)    Preparation of Applications: As promptly as practicable following the execution and delivery of this Agreement but in no event later than ten Business Days thereafter, the Purchaser, with the cooperation of the Company, shall cause to be published all required notices and prepare all necessary documentation and effect all necessary filings in order to obtain the Purchaser Required Approvals.  The Purchaser and the Company will cooperate with each other and will each furnish the other and the other's counsel with all information concerning themselves, their Subsidiaries, directors, officers and stockholders and such other matters as may be reasonably necessary or advisable in connection with any application, petition or any other statement or application made by or on behalf of the Purchaser, the Company or their respective Subsidiaries to any Governmental Authority in connection with the Contemplated Transactions. The Purchaser and the Company shall have the right to review and approve in advance all characterizations of the information relating to them and any of their respective Subsidiaries which appear in any filing made, or written materials submitted, in connection with the transactions contemplated by this Agreement with any Governmental Authority. Notwithstanding anything herein to the contrary, the Purchaser shall not be required to furnish the Company with any (i) personal biographical or financial information of any of the directors, officers, employees, managers or partners of SKBHC, the Purchaser or any of their respective Affiliates or (ii) proprietary and non-public information related to the organizational terms of, or investors in, SKBHC, the Purchaser or any of their respective Affiliates.  In addition, nothing herein shall require SKBHC, the Purchaser or any of their respective Affiliates to take any action that would result in the imposition of a Burdensome Condition.

(c)    Control of SKBHC and SKBHC Acquisition, Inc.: SKBHC shall not take any action which (i) would cause any Person, other than SKBHC, to "control" SKBHC or SKBHC Acquisition, Inc. for purposes of the BHCA or (ii) make any changes to the organization, structure or governance of SKBHC other than as contemplated in the application (and accompanying commitments, if any) to the Federal Reserve Board for approval of the Starbuck Transaction.

(d)    Submission of Applications for Purchaser Required Approvals: The Purchaser and the Company shall use their commercially reasonable best efforts to:

(i)    cooperate in all respects with each other in connection with any filing or submission and in connection with any investigation or other inquiry relating to the Purchaser Required Approvals, including but not limited to the Purchaser, the Company and

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 36 of 193

their respective Subsidiaries cooperating and using commercially reasonable best efforts to make, on a timely basis, all registrations, filings and applications with, give all notices to, and obtain any approvals, orders, qualifications and waivers from a Governmental Authority necessary for the consummation of the transactions contemplated hereby; provided, however, that neither the Company or any of its Affiliates nor the Purchaser or any of its Affiliates shall be required to commence or be a plaintiff in any litigation in connection with any such registration, filing, application, notice, approval, order, qualification or waiver or take any action that would result in the imposition of a Burdensome Condition;

(ii)    subject to any Legal Requirement, permit each other to review and discuss in advance, and consider in good faith the views of the other in connection with, any proposed written communication (or other correspondence or memoranda) between any such party and any Governmental Authority relating to the other party; and

(iii)    promptly inform each other of and supply to each other any written communication (or other correspondence or memoranda) received by them from any Governmental Authority, in each case regarding any of the Contemplated Transactions.

(e)    <u>Access and Investigation</u>: Without in any way limiting anything else contained in this Agreement, the Company shall, in connection with the procurement of any and all Purchaser Required Approvals, permit Purchaser and its representatives reasonable access to the properties and personnel of the Company and its Subsidiaries, and shall disclose and make available to Purchaser and its representatives all books, papers and records relating to the assets, stock ownership, properties, operations, obligations and liabilities of the Company and its Subsidiaries, including, without limitation, all books of account (including the general ledger), tax records, minute books of meetings of boards of directors (and any committees thereof) and stockholders, organizational documents, bylaws, material contracts and agreements, filings with any regulatory authority (except for any confidential portions thereof), accountants' work papers, litigation files, loan files, plans affecting employees and any other business activities or prospects; provided, that such access shall be reasonably related to the procurement of the Purchaser Required Approvals hereunder and, in the reasonable opinion of the Company, not unduly interfere with normal operations or violate any Legal Requirement. Without in any way limiting anything else contained in this Agreement, the Company and the Bank shall make their respective directors, officers, employees and agents and authorized representatives (including counsel and independent public accountants) available to confer with the other party and their representatives; provided, that such access shall be reasonably related to the procurement of the Purchaser Required Approvals hereunder and shall not unduly interfere with normal operations.

5.5    <u>Indemnification; D&O Insurance</u>.

(a)    The Purchaser shall not adversely affect or diminish any of the Bank's duties and obligations of indemnification existing immediately prior to the Closing Date in favor of the individuals who are entitled to indemnification by virtue of the Charter Documents of the Bank in effect as of the date hereof or arising by operation of any Legal Requirement  (the "Indemnified Parties"). Such duties and obligations shall continue in full force and effect for so long as they would (but for the Contemplated Transactions) otherwise survive and continue in full force and effect. All provisions for indemnification and limitation of liability now existing in favor of the Indemnified Parties as provided by any Legal Requirement or in the Charter Documents of the Bank in effect as of the date hereof shall survive closing of the Contemplated

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 37 of 193

Transactions for a period of six years and shall continue in full force and effect with respect to acts or omissions occurring prior to the Closing Date which were committed by such Indemnified Parties in their capacity as officers, directors or employees of the Bank for a period of six years thereafter or, in the case of matters occurring prior to the Closing Date which have not been resolved prior to the sixth anniversary of the Closing Date, until such matters are finally resolved. For a period of six years from the Closing Date, the Purchaser shall cause the Bank to maintain in effect the exculpation and indemnification provisions of the Charter Documents of the Bank in effect as of the date hereof for the benefit of the Indemnified Parties, and shall not amend, repeal or otherwise modify any such provisions in any manner that would adversely affect the rights thereunder of any of the Indemnified Parties.

(b)     In addition to the rights conferred by reason of clause (a), the Purchaser shall use its commercially reasonable best efforts to cause the individuals covered by the directors' and officers' liability insurance policy maintained by the Bank and in effect immediately prior to the Closing ("Bank D&O Policy") to continue to be covered for a period of five (5) years from the Closing Date by the Bank D&O Policy (provided that the Purchaser may substitute therefor policies of at least the same coverage and amounts containing terms and conditions which are not less advantageous than such policy) with respect to acts or omissions covered by the Bank D&O Policy; provided, however, that in no event shall the Purchaser be required to expend on an annual basis more than 200% of the current amount expended by the Bank (the "Bank Insurance Amount") to maintain or procure insurance coverage, and further provided that if the Purchaser is unable to maintain or obtain the insurance called for by this Section 5.5(b) the Purchaser shall use all reasonable efforts to obtain as much comparable insurance as is available for the Bank Insurance Amount.

(c)     Prior to the expiration of the regular term of the existing directors' and officers' liability insurance policy maintained by the Company and in effect immediately prior to the Closing ("Company D&O Policy"), the Purchaser shall pay directly to the insurer the premium required to purchase extended reporting period coverage for an additional year under such policy. The Company has delivered to the Purchaser a copy of the policy and a statement from the insurer regarding the premium required for the purchase of extended reporting period coverage for one year, which has been reported by the insurer to be approximately Three Hundred and Twenty-Five Thousand Dollars ($325,000).

5.6     Certain Company Contracts.  The Company shall, prior to the Closing but during its Bankruptcy Case, pursuant to section 365 of the Bankruptcy Code assume (and take all necessary actions, including but not limited to the payment of cure costs, to effect assumption) and assign to the Bank the Contracts included in the Other Purchased Assets (the "365 Contracts"). In connection with the Bankruptcy Case, the Company shall include in the Sale Motion (i) a request for authorization to assume and assign to the Bank the 365 Contracts, (ii) a request for authorization to assume the Tax Sharing Agreement, and (iii) a request for authorization to promptly transfer to the Bank any amounts of Tax refunds received from any Governmental Authority.  To the extent any 365 Contract may not be assigned to the Bank by the Company without the waiver or consent of, or notice to, one or more Persons (other than the Purchaser), the Company and the Purchaser shall use their commercially reasonable best efforts to obtain all waivers or consents and to make all notices required to permit the assignment of all such 365 Contracts to the Bank prior to the Closing and shall cooperate in all respects with respect thereto; provided that it is understood and agreed that the Company shall not be required

33

to pay any monetary compensation to any Person whose waiver or consent may be required for such assignment in connection with seeking to obtain such waiver or consent.

5.7    <u>DIP Loan Agreement</u>.

(a)    Simultaneously with the commencement of the Bankruptcy Proceedings and pursuant to that certain Superpriority Debtor-in-Possession Credit Agreement between the Purchaser, as lender, and the Company, as borrower, attached hereto as <u>Exhibit A</u> (the "DIP Loan Agreement"), the Purchaser shall provide a debtor-in-possession financing facility to the Company for the purpose of funding the Working Capital Loan.

(b)    The DIP Loan Agreement will become effective upon (i) approval by the Bankruptcy Court; and (ii) satisfaction of customary conditions as set forth in the DIP Loan Agreement. All amounts outstanding under the DIP Loan Agreement will become due and payable on the Maturity Date.

(c)    The obligations of the Company under the DIP Loan Agreement will be secured by a pledge of all of the assets of the Company, including, without limitation, the Shares and the Other Purchased Assets. In addition, the obligations of the Company under the DIP Loan Agreement will be entitled to super-priority administrative claim status.

(d)    Notwithstanding the foregoing, the approval of the DIP Loan Agreement by the Bankruptcy Court (or any portion thereof) shall not be a condition precedent to either party's obligation to consummate the Sale of the Shares and the Other Purchased Assets.

5.8    <u>Payment of the Broker's Fees</u>. At the Closing, subject to the receipt of customary release letters of the Broker in favor of the Bank and the Purchaser in form and substance reasonably satisfactory to the Purchaser, the Bank or the Purchaser, as determined by the Purchaser in its sole discretion, shall pay to the Broker the Broker's Fees in full satisfaction of all obligations of the Bank and the Purchaser in connection with any engagement letters or other agreements of the Company, the Bank or any other Subsidiary with the Broker.

5.9    <u>Stalking-Horse Bidder Fee</u>. In consideration for the Purchaser serving as the stalking-horse bidder and agreeing to effecting the Equity Contribution in connection with the Closing, and this Agreement being subject to termination in the event that the Company receives a higher and better bid consistent with the Bidding Procedures, provided this Agreement is not terminated prior to the Closing due to Purchaser's uncured breach and regardless of whether or not the Purchaser makes any matching or competing bids, the Company shall pay to the Purchaser a stalking-horse bidder fee in an amount equal to One Million Dollars ($1,000,000) (the "Stalking-Horse Bidder Fee") on the first Business Day following the date of consummation of a transaction with an Overbidder, as that term is hereinafter defined. The parties intend that the Stalking-Horse Bidder Fee shall be treated as an administrative expense in the Bankruptcy Case, provided that in no event will the Stalking-Horse Bidder Fee be paid in the absence of a Sale Order.

The Company acknowledges and agrees that (i) the approval of the Stalking-Horse Bidder Fee is an integral part of the transactions contemplated by this Agreement, (ii) in the absence of the Company's obligation to pay the Stalking-Horse Bidder Fee, the Purchaser would not have entered into this Agreement, (iii) the entry of the Purchaser into this Agreement is

necessary for preservation of the estate of the Company and the Bank and is beneficial to the Company because, in the Company's business judgment, it will enhance the Company's ability to maximize the value of its assets for the benefit of its creditors, (iv) the Stalking-Horse Bidder Fee is reasonable in relation to the Purchaser's efforts and to the magnitude of the Contemplated Transactions and the Purchaser's lost opportunities resulting from the time spent pursuing the Contemplated Transactions, and (v) time is of the essence with respect to the entry of a bidding procedures order (the "Bidding Procedures Order") by the Bankruptcy Court, approving, among other things, the process by which bids may be solicited in connection with the sale of the Shares and the Other Purchased Assets (the "Bidding Procedures"). The Company's agreement to pay the Stalking-Horse Bidder Fee is subject to Bankruptcy Court approval of this Agreement, including without limitation approval of payment of the Stalking-Horse Bidder Fee, which approval shall be requested in the Bidding Procedures Order.

5.10    Debtor-in-Possession.    During the pendency of the Bankruptcy Case, the Company shall continue to operate its business as debtor-in-possession pursuant to the Bankruptcy Code.

5.11    The Sale Motion.    On or within two (2) Business Days following the Petition Date, the Company shall file a sale motion with the Bankruptcy Court (the "Sale Motion") seeking the following relief from the Bankruptcy Court in the form of a proposed sale order in a form and substance reasonably acceptable to the Purchaser:

(a)    Approval of the Bidding Procedures and entry of the Bidding Procedures Order no later than ten (10) days following the Petition Date;

(b)    Scheduling the sale hearing (the "Sale Hearing") to take place not less than thirty (30) days following the Petition Date;

(c)    Subject to the Bidding Procedures, approval of the proposed asset purchase agreement between the Company and the Successful Bidder, as that term shall be defined in the Sale Order, including the Sale of the Shares and the Other Purchased Assets to such Successful Bidder and the equity contribution to the Bank by such Successful Bidder contemplated thereby;

(d)    Confirmation that the sale of the Shares and the Other Purchased Assets to the Successful Bidder shall be free and clear of all Encumbrances;

(e)    Confirmation that the Company may assume and assign to the Bank all 365 Contracts, provided that the Company will not be obligated to assume and assign to the Bank any 365 Contracts not desired by the Successful Bidder;

(f)    Confirmation that the Company may assume the Tax Sharing Agreements, and promptly transfer to the Bank any amounts of Tax refunds received from any Governmental Authority;

(g)    Confirmation that the Successful Bidder and the Company may cause the Closing to occur as soon as practicable after the entry of the Sale Order; and

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 40 of 193

(h)     Approval of findings of fact and conclusions of law reasonably similar, but not limited to, the following:

(i)     the Notice of Sale, and the parties who were served with copies of such Notice, were in compliance with Sections 102 and 363 of the Bankruptcy Code and Bankruptcy Rules 2002, 6004, and 9014 and any other applicable provision of the Bankruptcy Code, the Bankruptcy Rules, or any local bankruptcy rule governing the sale of assets free and clear of Encumbrances, or as directed by the Bankruptcy Court as long as the Bankruptcy Court finds that such notice is sufficient under the circumstances;

(ii)     all requirements imposed by Section 363(f) of the Bankruptcy Code for the sale of the Shares free and clear of Encumbrances and the sale of the Other Purchased Assets free and clear of Encumbrances (other than Permitted Liens) have been satisfied;

(iii)     the Successful Bidder is a purchaser of the Shares and the Other Purchased Assets in "good faith" pursuant to Section 363(m) of the Bankruptcy Code, and the Sale is entitled to the protections of Section 363(m);

(iv)     the Successful Bidder and the Company did not engage in any conduct which would allow this Agreement to be set aside pursuant to Section 363(n) of the Bankruptcy Code;

(v)     pursuant to Section 105 of the Bankruptcy Code, any creditors of the Company are prohibited from taking any actions against the Successful Bidder or the Shares and the Other Purchased Assets; and

(vi)     the terms and provisions of the Sale are fair and reasonable.

5.12     <u>The Bidding Procedures</u>.

(a)     The Bidding Procedures and the Bidding Procedures Order shall be in a form and substance acceptable to the Purchaser.

(b)     In order to be qualified to receive any confidential information from the Company or the Bank, to submit an Initial Overbid, as that term is hereinafter defined, and to participate in the Auction, a potential bidder (an "Overbidder") must submit each of the following to the Company on a timely basis:

(i)     An executed confidentiality agreement which shall inure to the benefit of the Successful Bidder, in a form and substance acceptable to the Company and the Purchaser; and

(ii)     Current audited financial statements and latest unaudited financial statements of the Overbidder or, if the Overbidder is an entity formed for the purpose of acquiring the Shares and the Other Purchased Assets, current audited financial statements and latest unaudited financial statements of the equity holders or sponsors of the Overbidder who will guarantee the obligations of the Overbidder, or such other form of financial disclosure and/or credit-quality support or enhancement, if any, that will allow the Company to make a reasonable

36

determination as to the Overbidder's financial and other capabilities to consummate the Sale (including, but not limited to, the ability to obtain all necessary regulatory approvals with respect to the ownership of the Shares and operation of the Bank on a timely basis).

(c)     In order to participate at the Auction, an Overbidder must submit the following to the Company at least ten (10) days prior to the Sale Hearing (the "Bid Deadline"):

(i)     a proposed asset purchase agreement (the "Competing Purchase Agreement"), executed by the Overbidder, that (a) is on substantially the same terms and conditions as those in this Agreement, along with a redlined, marked copy showing all changes between the Competing Purchase Agreement and this Agreement, (b) provides for a purchase price to be paid to the Company that exceeds the sum of the Cash Purchase Price and the Stalking-Horse Bidder Fee by at least One Million Dollars ($1,000,000) (such total amount, the "Minimum Overbid"), (c) provides for the recapitalization of the Bank through an equity contribution on terms not less favorable to the Bank than the Equity Contribution and, in any event, on terms acceptable to Governmental Authorities, (d) remains irrevocable until the earlier of the Closing or fifteen (15) days after entry of the Sale Order, (e) disclaims any right of Overbidder to receive a fee analogous to the Stalking-Horse Bidder Fee or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution and (f) contains a proposed closing date that is not later than the Outside Date hereunder;

(ii)     a cashier's check made payable to the order of the Company in the amount of Eight Million Five Hundred Thousand Dollars ($8,500,000) (the "Overbidder's Deposit") which will be retained by the Company as a nonrefundable deposit for application against the purchase price at the closing of the transaction, or returned to the Overbidder within three (3) calendar days of the Closing, in the event that the Bankruptcy Court does not approve a sale of the Shares and the Other Purchased Assets to the Overbidder;

(iii)     be accompanied by admissible evidence in the form of affidavits or declarations establishing that the Overbidder has the financial ability to pay the purchase price set forth in the Competing Purchase Agreement;

(iv)     remain open until the conclusion of the Sale Hearing;

(v)     contain terms and conditions that are higher and better than the terms and conditions of this Agreement as determined by the Bankruptcy Court following a report and recommendation by the Company as to the highest and best offer;

(vi)     provide for a purchase price to be paid to the Company that exceeds the sum of the Purchase Price and the Stalking-Horse Bidder Fee by at least the Minimum Overbid;

(vii)     be accompanied by admissible evidence in the form of affidavits or declarations establishing the Overbidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code;

(viii)     be accompanied by admissible evidence in the form of affidavits or declarations establishing that the Overbidder is capable and qualified, financially, legally, and

otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement;

(ix)     be accompanied by admissible evidence in the form of affidavits or declarations establishing that the Overbidder has or is capable of obtaining all required regulatory approvals to perform all of its obligations under the Competing Purchase Agreement and to close the transaction not later than the Outside Date; and

(x)     disclaim any right of Overbidder to receive a fee analogous to the Stalking-Horse Bidder Fee or to compensation under Bankruptcy Code Section 503(b) for making a substantial contribution.

(d)     The Purchaser, and any entity that submits a timely, conforming Competing Asset Purchase Agreement and Overbidder's Deposit (an "Initial Overbid"), as set forth above, shall each be deemed a "Qualified Overbidder" and may bid for the Shares at the Auction.  Any entity (other than the Purchaser) that fails to submit a timely, conforming Initial Overbid, as set forth above, shall be disqualified from bidding for the Shares and the Other Purchased Assets at the Auction.

(e)     If no timely, conforming Initial Overbid is submitted, the Company shall not conduct an Auction and shall request at the Sale Hearing that the Bankruptcy Court approve this Agreement, including the Sale of the Shares and the Other Purchased Assets to the Purchaser and the Equity Contribution contemplated thereby, and request that the Sale Order shall be immediately effective upon entry, notwithstanding the provisions of Rule 6004(h) of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 62(g) of the Federal Rules of Civil Procedure;

(f)     If one or more timely conforming Initial Overbids is received, the Company shall conduct an auction of the Shares and the Other Purchased Assets (the "Auction"), subject to approval of the Bankruptcy Court, in which the Purchaser and all other Qualified Overbidders may participate.  The Auction shall be governed by the following procedures:

(i)     all Qualified Bidders shall be deemed to have consented to the core jurisdiction of the Bankruptcy Court and to have waived any right to jury trial in connection with any disputes relating to the Auction or the Sale of the Shares and the Other Purchased Assets;

(ii)     all Qualified Bidders shall be deemed to consent to provide the Company with admissible evidence in the form of affidavits or declarations establishing (A) the Qualified Bidder's good faith, within the meaning of Section 363(m) of the Bankruptcy Code, (B) the fact that the Qualified Bidder is capable and qualified, financially, legally, and otherwise, of unconditionally performing all obligations under the Competing Purchase Agreement (or this Agreement) and (C) the fact that the Qualified Bidder has or is capable of obtaining all required regulatory approvals to perform all of its obligations under the Competing Purchase Agreement (or this Agreement) on or before the deadline set by the Company;

(iii)     each bid by a Qualified Overbidder (other than the Purchaser) shall be automatically reduced by an amount equal to the Stalking-Horse Bidder Fee;

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 43 of 193

(iv)    bidding will commence at the amount of the highest bid submitted by a Qualified Overbidder, as determined by the Company, subject to approval by the Bankruptcy Court;

(v)    each subsequent bid shall be in increments of no less than One Million Dollars ($1,000,000);

(vi)    the Purchaser shall have the right, but not the obligation, in its sole and absolute discretion, to match bids made by any Qualified Overbidder and, in such event, the Purchaser's matching bid shall be deemed the highest and best bid for the Shares and the Other Purchased Assets;

(vii)    if, upon conclusion of the Auction, and consistent with the terms of the Bidding Procedures, the Purchaser's final bid matches or is greater than the highest bid made by any Qualified Overbidder, the Bankruptcy Court shall approve this Agreement, including the Sale of the Shares and the Other Purchased Assets to the Purchaser and the Equity Contribution contemplated thereby, and authorize the Company to sell the Shares and the Other Purchased Assets to the Purchaser, and the amount of the Purchaser's final bid shall constitute the Cash Purchase Price under this Agreement; and

(viii)    the Company may, with Bankruptcy Court approval, elect to deem the Purchaser's final bid to be the highest bid, notwithstanding the receipt of an apparently higher bid from another Overbidder, if the Company reasonably concludes that the Overbidder may not be able to close on a timely basis, or for any other reason.

(g)    The Purchaser has standing and is deemed to be a party in interest with standing to be heard on any motion, hearing or other matter related to this Agreement or any Overbid, or other sale of assets subject to this Agreement.

5.13    _Bankruptcy Efforts_.    The Purchaser and the Company shall use their commercially reasonable best efforts to cause the Bankruptcy Court to (i) enter the Bidding Procedures Order and the Sale Order, and (ii) approve the Stalking-Horse Bidder Fee.

5.14    _Public Announcements_.    Other than mutually agreed upon press releases and other materials to be issued upon the announcement of this Agreement or thereafter, with respect to which the parties shall cooperate in good faith to jointly prepare or communicate consistent with the joint communication policy of the parties, from and after the date hereof, neither party shall make any public announcement or public comment regarding this Agreement or the Contemplated Transactions without the prior written consent of the other party (which consent shall not be unreasonably withheld, delayed or conditioned), unless and only to the extent that (i) the furnishing or use of information is required in making any filing or obtaining any Governmental Authorization required for the consummation of the Contemplated Transactions or (ii) the furnishing or use of such information is required by Legal Requirements, legal proceedings or the rules or regulations of the SEC.  Notwithstanding the foregoing, from and after the Company's first press release announcing the execution of this Agreement, the senior executives of the Company and the Bank shall have the right, consistent with the joint communication policy of the parties and mutually agreed scripts, to communicate with the Bank's customers, employees and vendors and to grant press interviews with the local press.

5.15     Tax Refunds.  The Company shall promptly transfer to the Bank any Tax refunds received from any Governmental Authority.

5.16     Tax Election.  On its consolidated federal income Tax Return for the taxable year in which the Closing Date occurs, the Company shall elect under Treasury Regulations Section 1.1502-36(d) to reduce its tax basis in the Shares to the extent necessary to prevent any reduction of the Bank's attributes.  All Tax Returns filed by the Company, the Bank and its Subsidiary shall be consistent with this provision.  In addition, the Company shall take any other action reasonably requested by the Purchaser to preserve the Bank's attributes.

5.17     Preparation and Filing of Tax Returns; Taxes.  The Company shall include the income of the Bank and its Subsidiary on the Company's consolidated, unitary, affiliated or other combined federal and state income Tax Returns for all periods through the end of the Closing Date (such period, the "Pre-Closing Tax Period" and such Tax Returns, the "Company Tax Returns") and pay any federal and state income Taxes attributable to such income, subject to an obligation of the Bank to reimburse the Company for any such income Taxes paid by the Company.  The Bank shall furnish Tax information to the Company for inclusion in such Tax Returns in accordance with the Bank's past custom and practice.  The income of the Bank and its Subsidiary shall be apportioned to the period up to and including the Closing Date and the period after the Closing Date by closing the books of the Bank and its Subsidiary as of the end of the Closing Date.  The Company shall timely prepare and file (or cause to be prepared and filed) the Company Tax Returns, and shall prepare all Company Tax Returns in a manner consistent with prior practice in respect of the Bank and its Subsidiary unless otherwise required by applicable law or unless the Purchaser consents to such different treatment, such consent not to be unreasonably withheld.  The Company shall provide (or cause to be provided) to the Purchaser a copy of any Company Tax Return at least twenty (20) Business Days prior to the due date for filing such return, and the Purchaser shall have ten (10) Business Days in which to review and comment on such return prior to the filing thereof.  The Company shall not unreasonably withhold its consent to reflecting such Purchaser comments on such returns to the extent permitted by applicable law.  The Purchaser and the Company agree to report all transactions not in the ordinary course of business occurring on the Closing Date after the Closing on the Purchaser's federal and state income Tax Returns to the extent permitted by Treasury Regulations Section 1.1502-76(b)(1)(ii)(B).

5.18     Tax Cooperation.  In connection with the preparation of Tax Returns, audit examinations, and any administrative or judicial proceedings relating to the Tax liabilities imposed on or attributable to the Bank or its Subsidiary, the Purchaser on the one hand and the Company on the other hand shall reasonably cooperate fully with each other, including the furnishing or making available during normal business hours of records, personnel (as reasonably required), books of account, powers of attorney or other materials necessary or helpful for the preparation of such Tax Returns, the conduct of audit examinations or the defense of claims by taxing authorities as to the imposition of Taxes.  The Company shall provide to the Purchaser copies of all information, returns, books, records and documents relating to any tax matters of or attributable to the Bank or its Subsidiary.

5.19     Tax Proceedings.  The Company shall promptly notify the Purchaser upon receipt by the Company of any notice of any inquiries, assessments, audits, proceedings or similar events received from any taxing authority with respect to any Taxes, tax attributes (including net operating losses) or Tax refunds of or attributable to the Bank and its Subsidiary, including such

40

items included in any consolidated, affiliated, unitary or other combined Tax Return, whether attributable to the Pre-Closing Tax Period or any period or portion of a period after the Closing Date (any such inquiry, assessment, audit, proceeding or similar event, a "Tax Matter"). The Purchaser shall have the right to control the process, disposition and decision of whether to settle any Tax Matter in its sole discretion. In addition, the Company shall not enter into any settlement of or otherwise compromise any inquiry, assessment, audit, proceeding or similar event to the extent that such settlement or compromise could adversely affect the Tax liability (including a reduction of a Tax refund, net operating loss or other tax attribute) of the Bank, its Subsidiary or the Purchaser, including under this Agreement or the Tax Sharing Agreement, without the consent of the Purchaser, such consent not to be unreasonably withheld.

5.20 <u>Transfer Taxes</u>. Notwithstanding any other provision of this Agreement, the Purchaser shall be responsible for any transfer, sales, use, stamp, conveyance, value added, recording, registration, documentary, filing and other similar non-income Taxes and administrative fees (including, without limitation, notary fees) ("Transfer Taxes") arising in connection with the consummation of the Contemplated Transactions, whether levied on the Company, the Purchaser or its Affiliates. The Purchaser shall timely prepare (or cause to be prepared) any Tax Returns with respect to Transfer Taxes arising in connection with the consummation of the Contemplated Transactions (the "Transfer Tax Returns"). The Purchaser shall provide (or cause to be provided) to the Company a copy of any Transfer Tax Return at least ten (10) days prior to the due date for filing such return, and the Purchaser shall have five (5) days in which to review and comment on such return prior to the filing thereof. The Purchaser shall take any such Company comments into consideration in good faith, provided, however, that the Purchaser shall have final determination as to the contents of any Transfer Tax Return unless the Company believes and informs the Purchaser that, upon advice of its advisors, a position taken by the Purchaser is not permitted under applicable law, and provided, further, that if the Company so believes any position reflected on a Transfer Tax Return is not permitted under applicable law, the parties shall engage an independent third party accounting firm to determine whether such position is permitted under applicable law and the determination of such accounting firm shall control the treatment of the disputed position(s) on such Transfer Tax Return. The expense of such accounting firm shall be borne 50% by the Company and 50% by the Purchaser. The Company shall timely file all Transfer Tax Returns and the Purchaser shall pay to the Company the amount shown as due on any such return at least three (3) days prior to the due date of such return. Upon the request of the Company, the Purchaser agrees to pay to the Company any additional Transfer Taxes, along with related penalties and interest, if any, if and to the extent the Company is then liable for such Transfer Taxes pursuant to an audit or other proceeding by a taxing authority in respect of any Transfer Taxes that the Purchaser has not previously paid over to the Company or a taxing authority. The Company and the Purchaser shall cooperate to minimize Transfer Taxes. If a certificate or document of exemption is required to reduce or eliminate the Transfer Taxes, the Purchaser will promptly furnish such certificate or document to the Company or the Purchaser will cooperate with the Company to allow the Company to obtain such reduction or exemption from Transfer Taxes.

## ARTICLE 6

## <u>CONDITIONS OF CLOSING</u>

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 46 of 193

6.1    Conditions to SKBHC's and the Purchaser's Obligations.   The obligation of SKBHC and the Purchaser to complete the transactions contemplated by this Agreement is subject to the fulfillment of the following conditions:

(a)    Representations and Warranties:  (i) The representations and warranties of the Company contained in Section 3.1, Section 3.2, Section 3.3, Section 3.11(a) and Section 3.18 shall be true and correct in all respects as of the date of this Agreement and as of the Closing with the same effect as though such representations and warranties had been made as of the Closing (provided that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only on such date) and (ii) the representations and warranties of the Company contained in this Agreement (other than those representations and warranties specified in sub-clause (i) above) shall be true and correct in all respects (without regard to materiality or Material Adverse Effect qualifications contained therein) as of the date of this Agreement and as of the Closing with the same effect as though such representations and warranties had been made as of the Closing (provided that those representations and warranties which address matters only as of a particular earlier date shall have been true and correct only on such date), except where the failure of such representations and warranties in this sub-clause (ii) to be so true and correct (without regard to materiality or Material Adverse Effect qualifications contained therein) has not had and would not reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(b)    Covenants:   The covenants and obligations of the Company to be performed or observed on or before the Closing pursuant to this Agreement shall have been duly performed or observed in all material respects;

(c)    Petition Date:  The Company shall have filed the Bankruptcy Case within one Business Day following the date hereof;

(d)    Bidding Procedures Order:  The Bankruptcy Court shall have entered the Bidding Procedures Order;

(e)    Sale Order: The Bankruptcy Court shall have entered the Sale Order on or prior to the Maturity Date;

(f)    Secretary's Certificate:  The Company shall have delivered to the Purchaser a Secretary's Certificate certifying to the effect that the conditions set forth in Section 6.1(a) and (b) have been satisfied;

(g)    Purchaser Required Approvals: The Purchaser shall have obtained all of the Purchaser Required Approvals without the imposition of any Burdensome Condition, and all applicable waiting periods with respect to any of the Purchaser Required Approvals shall have expired; and

(h)    Closing of Starbuck Transaction.   The consummation of the Starbuck Transaction shall have occurred.

The foregoing conditions are for the benefit of SKBHC and the Purchaser only and accordingly SKBHC and the Purchaser will be entitled to waive compliance with any such conditions if they see fit to do so, without prejudice to their rights and remedies at law and in equity and also

42

without prejudice to any of their rights of termination in the event of non-performance of any other conditions in whole or in part.

6.2 <u>Conditions to the Company's Obligations</u>. The obligation of the Company to complete the transactions contemplated by this Agreement is subject to the fulfillment of each of the following conditions:

(a) <u>Representations and Warranties</u>: The representations and warranties of the Purchaser contained in this Agreement shall be true and correct in all material respects on and as of the Closing with the same effect as though such representations and warranties had been made as of the Closing (provided that those representations and warranties which address matters only as of a particular date shall have been true and correct only on such date);

(b) <u>Covenants</u>: The covenants and obligations of the Purchaser to be performed or observed on or before the Closing pursuant to this Agreement shall have been duly performed or observed in all material respects;

(c) <u>Sale Order</u>: The Bankruptcy Court shall have entered the Sale Order; and

(d) <u>Secretary's Certificate</u>: The Purchaser shall have delivered to Seller a Secretary's Certificate certifying to the effect that the conditions set forth in Section 6.2(a) and (b) have been satisfied.

The foregoing conditions are for the benefit of the Company only and accordingly the Company will be entitled to waive compliance with any such conditions if it sees fit to do so, without prejudice to its rights and remedies at law and in equity and also without prejudice to any of its rights of termination in the event of non-performance of any other conditions in whole or in part.

6.3 <u>Mutual Condition</u>. The obligations of the Company , SKBHC and the Purchaser to complete the Contemplated Transactions are subject to the fulfillment of the condition that no injunction or restraining order or other decision, ruling or order of a court, board, Governmental Authority or administrative tribunal of competent jurisdiction being in effect which prohibits, restrains, limits or imposes conditions on the transactions contemplated by this Agreement and no action or proceeding having been instituted or remaining pending or having been threatened (and such threat not having been withdrawn) before any such court, board, Governmental Authority or administrative tribunal to restrain, prohibit, limit or impose conditions on the transactions contemplated by this Agreement.

6.4 <u>Termination</u>.

(a) In the event that any of the conditions to the obligations of SKBHC and the Purchaser or the Company set forth in this Article 6 are not performed or fulfilled by the earlier of the dates specified in this Article 6 or January 31, 2011 (the "Outside Date"), the Purchaser or the Company, as applicable, may, subject to Section 9.10, terminate this Agreement, in which event the parties will be released from all obligations under this Agreement, except that the Company will not be released from its obligation to pay the Stalking-Horse Bidder Fee unless SKBHC and the Purchaser are in material breach of this Agreement and no party will be released from its obligations, or may terminate this Agreement, if it was reasonably capable of

43

causing such condition or conditions to be fulfilled or has materially breached any of its covenants or obligations in or under this Agreement.

        (b)     This Agreement may also be terminated prior to the Closing:

           (i)     at any time by the mutual written agreement of the Company and the Purchaser;

           (ii)     by the Purchaser (provided, that the Purchaser is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if either of the conditions in Section 6.1(a) or (b) have not been fulfilled and the breach or breaches giving rise to the failure of these conditions to be fulfilled cannot be or have not been cured within fifteen (15) days after written notice by the Purchaser to the Company;

           (iii)     by the Company (provided, that the Company is not then in material breach of any representation, warranty, covenant or other agreement contained herein), if either of the conditions in Section 6.2(a) or (b) have not been fulfilled and the breach or breaches giving rise to the failure of these conditions to be fulfilled cannot be or have not been cured within fifteen (15) days after written notice by the Company to the Purchaser;

           (iv)     by the Company, if the Bankruptcy Court enters a Sale Order approving the Sale to a Qualified Overbidder;

           (v)     by either the Company or the Purchaser, with fifteen (15) days' prior written notice or such shorter period as required by a court or Governmental Authority, or any applicable Legal Requirement, if any court or Governmental Authority shall finally determine that the subject of this Agreement violates any applicable Legal Requirement and the terms of this Agreement cannot be amended to meet all legal requirements to the satisfaction of such court or Governmental Authority;

           (vi)     by either the Company or the Purchaser, if the Purchaser or any of its Affiliates receives written notice from or is otherwise advised by a Governmental Authority that it will not grant (or intends to rescind or revoke if previously approved) any of the Purchaser Required Approval or receives written notice from such Governmental Authority that it will not grant such Purchaser Required Approval on the terms contemplated by this Agreement without imposing any Burdensome Condition; or

           (vii)     upon two days' prior written notice by the Purchaser to the Company, if the Bankruptcy Court fails to approve the Stalking-Horse Bidder Fee as part of the Bidding Procedures Order; provided that such notice of termination is provided to the Company not later than the end of the second Business Day following such date.

## ARTICLE 7

## CLOSING TRANSACTIONS

    7.1   <u>Time and Place</u>.  The Closing shall take place in the offices of Morrison & Foerster, LLP at 555 West Fifth Street, Los Angeles, CA 90013 on the Closing Date; or at such

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 49 of 193

other time and date, or both, as the Company and the Purchaser or their respective counsel may agree upon in writing.

7.2 <u>Company's Closing Deliverables</u>. At the Closing, the Company shall deliver the following to the Purchaser:

(a) stock certificates evidencing the Shares duly endorsed in blank, or accompanied by stock powers duly executed in blank and with all required stock transfer Tax stamps affixed;

(b) all conveyances, transfers, assignments, instruments and other documents which are necessary to assign, sell and transfer the Shares and the Other Purchased Assets to the Purchaser as contemplated by this Agreement in such form and content as the Purchaser may require, acting reasonably;

(c) certified copies of a resolution of the directors of the Company approving the completion of the Contemplated Transactions including, without limitation, the sale of the Shares and the Other Purchased Assets, and the execution and delivery of this Agreement and all documents, instruments and agreements required to be executed and delivered by the Company pursuant to this Agreement in such form and content as the Purchaser may require, acting reasonably;

(d) a certified copy of the Sale Order;

(e) a letter agreement, in form and substance reasonably satisfactory to the Purchaser, provided that the Bankruptcy Court does not disapprove this letter or the content thereof, releasing the Purchaser, the Bank and their respective Affiliates (and their respective officers, directors, employees, managers, partners, members, and principals) from and against any pre-Closing Liabilities to the Company;

(f) an affidavit from the Company that it is not a "foreign person" or subject to withholding requirements under the Foreign Investment in Real Property Tax Act of 1980, as amended; and

(g) except as otherwise agreed by the Purchaser in writing, written resignation letters of all of the members of the board of directors of the Bank, which resignations shall be effective as of the Closing.

7.3 <u>Purchaser's Closing Deliverables</u>. At the Closing, the Purchaser shall effect the Equity Contribution and deliver the following to the Company:

(a) the Cash Purchase Price; and

(b) if the letter agreement referenced in Section 7.2(e) is contemporaneously delivered, a letter agreement, in form and substance reasonably satisfactory to the Company, releasing the Company and its respective Affiliates (and its respective officers, directors, employees, and managers) from and against any pre-Closing Liabilities to the Company.

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 50 of 193

7.4    Concurrent Delivery.  It shall be a condition of the Closing that all matters of payment and the execution and delivery of documents by any party to the others pursuant to the terms of this Agreement shall be concurrent requirements and that nothing will be complete at the Closing until everything required as a condition precedent to the Closing has been paid, executed and delivered, as the case may be.

7.5    Transfer of Shares.  Subject to the terms and conditions set forth in this Agreement, and subject to the entry of a Sale Order, the Sale of the Shares and the Other Purchased Assets to the Purchaser shall be deemed to take effect on the Closing Date.

## ARTICLE 8

## SURVIVAL OF REPRESENTATIONS AND COVENANTS

8.1    Survival.  The Company and the Purchaser agree that all of the representations, warranties, agreements and covenants of the Company and the Purchaser contained in this Agreement, or any instrument delivered pursuant to this Agreement, shall terminate at the Closing Date, except that the representations, warranties, agreements and covenants that by their terms survive the Closing Date and this Article 8 and Article 9 shall survive the Closing Date.

## ARTICLE 9

## MISCELLANEOUS

9.1    Legal and Other Fees and Expenses.  Unless otherwise specifically provided herein, the parties will pay their respective legal, accounting and other professional fees and expenses incurred by each of them in connection with the negotiation and settlement of this Agreement, the completion of the Contemplated Transactions and other matters pertaining hereto.

9.2    Notices.  Any notice, request, demand or other communication required or permitted to be given under this Agreement shall be in writing and delivered by hand, facsimile transmission or prepaid  registered mail (return receipt requested) to the party to which it is to be given as follows:

    To the Company:

        AmericanWest Bancorporation
        41 W. Riverside Avenue, Suite 300
        Spokane, Washington 99201
        Attention:  Jay B. Simmons, Esq.
        Telephone No.: (509) 344-5575
        Facsimile No.:  (509) 465-9681

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 51 of 193

with a copy to:

     Morrison & Foerster LLP
     555 West Fifth Street, Suite 3500
     Los Angeles, California 90013
     Attention:  Henry M. Fields, Esq.
     Telephone No.: (213) 892-5275
     Facsimile No.:  (213) 892-5454

To SKBHC or the Purchaser:

     SKBHC Hawks Nest Acquisition Corp.
     c/o SKBHC Holdings LLC
     8723 E Via De Commercio
     Scottsdale, Arizona 85258
     Attention:  Scott A. Kisting
     Telephone No.: (480) 393-0560
     Facsimile No.: (480) 315-8796

with a copy to:

     Skadden, Arps, Slate, Meagher & Flom LLP
     300 South Grand Avenue, Suite 3400
     Los Angeles, California 90071
     Attention:  Jeffrey H. Cohen, Esq.
             David C. Eisman, Esq.
     Telephone No.: (213) 687-5000
     Facsimile No.: (213) 687-5600

or to such other address or fax number as a party may specify by notice given in accordance with this Section 9.2.  Any such notice, request, demand or other communication given as aforesaid will be deemed to have been given, in the case of delivery by hand or registered mail, when delivered, in the case of delivery by facsimile transmission, when a legible facsimile is received by the recipient if received before 5:00 p.m. local time on a Business Day, or on the next Business Day if such facsimile is received on a day which is not a Business Day or after 5:00 p.m. local time on a Business Day.

     9.3    <u>Further Assurances</u>.  Each of the parties shall execute and deliver such further documents, instruments and agreements and do such further acts and things as may be reasonably required from time to time, either before, on or after the Closing Date, to carry out the full intent and meaning of this Agreement, give effect to the transactions contemplated by this Agreement and assure to the Purchaser good and valid title to the Shares, free and clear of all Encumbrances, and the Other Purchased Assets, free and clear of all Encumbrances (other than Permitted Liens).  The Company shall seek to enforce its rights under any third party non-disclosure or confidentiality agreements on behalf of and at the request and expense of the Purchaser.

     9.4    <u>Time of the Essence</u>.  Time shall be of the essence of this Agreement.

9.5     Entire Agreement.  This Agreement (and all related documents referred to herein, including the schedules and exhibits hereto) constitutes the entire agreement between the Company and the Purchaser pertaining to the Contemplated Transactions and supersedes all prior agreements, undertakings, negotiations and discussions, whether oral or written, of the Company and the Purchaser and there are no warranties, representations, covenants, obligations or agreements between the Company (or any Affiliate thereof) and the Purchaser (or any Affiliate thereof) except as set forth in this Agreement (or any such related document).

9.6     Assignment.  Neither party to this Agreement may assign any of its respective benefits, obligations or liabilities under or in respect of this Agreement without the prior written consent of the other party, which may be withheld in its absolute discretion; provided, however, that the Purchaser may, without the consent of the Company, assign its rights and benefits under or in respect of this Agreement, in whole or in part, to one or more directly or indirectly wholly-owned Subsidiaries of SKBHC, if and to the extent permitted by the Regulatory Approvals and the Bankruptcy Court, but no such assignment will relieve SKBHC and the Purchaser of their obligations under this Agreement.  Any attempted assignment without the necessary consent shall be void.

9.7     Invalidity.  Each of the provisions contained in this Agreement is distinct and severable and a determination of illegality, invalidity or unenforceability of any such provision or part hereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof, unless as a result of such determination this Agreement would fail in its essential purposes.

9.8     Waiver and Amendment.  Except as expressly provided in this Agreement, no amendment or waiver of it will be binding unless made in writing by the party to be bound by such amendment or waiver.  No waiver of any provision, or any portion of any provision, of this Agreement will constitute a waiver of any other part of the provision or any other provision of this Agreement nor a continuing waiver unless otherwise expressly provided.

9.9     Third-Party Beneficiaries.  This Agreement is for the sole benefit of the parties hereto and their permitted assigns and nothing herein express or implied shall give or be construed to give to any Person, other than the parties hereto and such permitted assigns, any legal or equitable rights hereunder; provided, however, that the current directors and officers of the Bank included in the term "Indemnified Parties" shall be deemed to be third-party beneficiaries of the provisions of Section 5.5(a); the directors and officers of the Bank covered by the Bank D&O Policy shall be deemed to be third party beneficiaries of the provisions of Section 5.5(b); and the directors and officers of the Company shall be deemed to be third-party beneficiaries of the provisions of Section 5.5(c).

9.10     Surviving Provisions on Termination.  Notwithstanding any other provisions of this Agreement, if this Agreement is terminated, the provisions of Sections 5.2 and 5.3 shall survive such termination and remain in full force and effect, and each party shall remain liable for any breach of this Agreement prior to its termination.

9.11     Captions.  The captions in this Agreement are inserted for convenience of reference only and shall not be considered a part of or affect the construction or interpretation of any provision of this Agreement.

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 53 of 193

9.12 <u>Counterparts</u>. This Agreement may be signed in counterparts and each such counterpart will constitute an original document and such counterparts, taken together, will constitute one and the same instrument. Electronically transmitted or facsimile copies shall be deemed to be originals.

[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

COMPANY

AmericanWest Bancorporation,
a Washington corporation

By: _____
     Name: Patrick J. Rusnak
     Title:  President and Chief
           Executive Officer


SKBHC

SKBHC Holdings LLC,
a Delaware limited liability company


By: _____
     Name:
     Title:


PURCHASER

SKBHC Hawks Nest Acquisition Corp.,
a Delaware corporation


By: _____
     Name:
     Title:

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 55 of 193

IN WITNESS WHEREOF the parties have executed this Agreement as of the day and year first above written.

COMPANY

AmericanWest Bancorporation,
a Washington corporation

By: _____
      Name:
      Title:

**SKBHC**

SKBHC Holdings LLC,
a Delaware limited liability company

By: _____
      Name: SCOTT A KISTING
      Title: PRESIDENT, CEO

PURCHASER

SKBHC Hawks Nest Acquisition Corp.,
a Delaware corporation

By: _____
      Name: SCOTT A. KISTING
      Title: PRESIDENT, CEO

50

## __SCHEDULE I__

DISCLOSURE SCHEDULE

[SEE ATTACHED]

<u>SCHEDULE I</u>

DISCLOSURE SCHEDULE

OF

AMERICANWEST BANCORPORATION,
a Washington corporation,

in connection with the

ASSET PURCHASE AGREEMENT

by and among

AMERICANWEST BANCORPORATION,
a Washington corporation

and

SKBHC HOLDINGS LLC,
a Delaware limited liability company,

and

SKBHC HAWKS NEST ACQUISITION CORP.,
a Delaware corporation

October 27, 2010

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 58 of 193

# DISCLOSURE SCHEDULE

This Disclosure Schedule (this "Schedule") has been prepared and delivered in connection with the execution and delivery of the Asset Purchase Agreement (the "Agreement"), dated as of October 27, 2010, by and among AMERICANWEST BANCORPORATION, a Washington corporation (the "Company"), and SKBHC HOLDINGS LLC, a Delaware limited liability company ("SKBHC"), and SKBHC HAWKS NEST ACQUISITION CORP., a Delaware corporation (the "Purchaser"). Capitalized terms used, but not otherwise defined, in this Schedule have the meanings ascribed to them in the Agreement.

This Schedule relates to certain of, and, as contemplated by the Agreement, qualifies, certain of the representations, warranties, covenants and obligations made by the Company in the Agreement. This Schedule is qualified in its entirety by references to specific provisions of the Agreement and are not intended to constitute, and shall not be construed as constituting, any representation warranty, covenant or obligation of the Company, except to the extent explicitly provided in the Agreement. Disclosure in any section of this Schedule shall apply only to such section of this Schedule, except to the extent that it is reasonably apparent from the face of such disclosure that such disclosure is relevant to another section of this Schedule.

The disclosure of a particular matter or item of information in this Schedule shall not be taken as an admission by the Company that such disclosure is required to be made under the terms of any of the representations, warranties, and other provisions in the Agreement. Certain matters and items listed in this Schedule are for informational purposes only, notwithstanding the fact that, because they do not rise above applicable materiality thresholds or otherwise, they are not required to be listed in this Schedule by the terms of the Agreement, and this Schedule does not necessarily include other matters and items of a similar nature. Inclusion of information in this Schedule shall not be construed as an admission that such information is material, out of the ordinary course of business or otherwise.

The headings contained in this Schedule are for the convenience of reference only, and shall not be deemed to modify or influence the interpretation of the information contained in this Schedule or the Agreement.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.1(a)</u>

### STATUS OF THE COMPANY

As contemplated under this Agreement, the Company intends to file a voluntary bankruptcy petition under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et seq.* in the Bankruptcy Court.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.1(c)

### DUE AUTHORIZATION

The Company will require approval from the Bankruptcy Court and certain Governmental Authorities, including but not limited to the FDIC, the Washington DFI and the Federal Reserve Board, to perform the Contemplated Transactions. Absent such approvals, the Company would be required to obtain approval from its stockholders and from the holders of the Trust Preferred Securities pursuant to the following indentures: (i) Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2032 dated as of September 26, 2002 between the Company and State Street Bank and Trust Company of Connecticut, National Association; (ii) Indenture for Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2033, dated as of June 26, 2003, between the Bank and U.S. Bank National Association; (iii) Indenture for Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2036, dated as of March 14, 2006, between the Company and Wilmington Trust Company; and (iv) Indenture for Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2037, dated as of March 22, 2007, between the Company and Wilmington Trust Company.

la-1095455

<u>**DISCLOSURE SCHEDULE — SECTION 3.1(d)**</u>

NON-CONTRAVENTION

<u>**Note**</u>: The descriptions below are summaries of certain agreements and in no way modify, supplement or amend the contents included therein. Complete copies of these agreements have been provided to the Purchaser in the electronic data room established by Bowne SmartRoom (the "Data Room"). Also, this schedule does not list the Bank's agreements which restrict the assignment or transfer of rights or obligations, unless such restrictions explicitly reference a change in control of the Bank. Complete copies of the Bank's agreements which restrict the Banks rights or obligations without referencing a change in control have also been provided to the Purchaser in the Data Room.

<u>**Disclosures relating to the Bank**</u>

- The disclosure set forth in Disclosure Schedule Section 3.3(b)(ii) is incorporated herein by reference.

- Directors' and Officers' Insurance policies with Houston Casualty Company and Ironside Insurance Services, LLC for the period beginning October 1, 2010 through October 1, 2011.

- Software License and Services Agreement between the Bank and Cypress Software Systems, L.P. dated October 31, 2007.

- Form of Client Derivatives Services Agreement between the Bank and Tremont Capital Markets Inc. and KeyBank National Association (undated).

- Creekside Business Park Lease between the Bank and Wide Hollow Development LLC, dated March 16, 2006 (relating to the lease of the property located at Creekside Business Park, 3919 Creekside Loop, Yakima, WA 98902).

- Office Lease between the Bank and Riverpark Three, LLC, dated June 19, 2006 (relating to the lease of the property located at 10757 South River Front Parkway, Suite 150, South Jordan, Utah).

- The Company and/or the Bank have entered into agreements with various executives, directors and other employees, including but not limited to employment agreements, supplemental compensation agreements, salary or fee continuation agreements and supplemental retirement plan agreements, which provide for certain benefits in the event of a change in control of the Bank. Such benefits include, but are not limited to, the right to receive an annual salary for a defined period of time, the right to receive a bonus and an acceleration in the vesting of certain performance-based compensation or retirement benefits. Copies of these agreements have been provided to the Purchaser in the Data Room.

- Second Amended and Restated Joint Beneficiary Designation Agreement, dated August 3, 2010, between the Bank and H. Don Norton.

- Change in Control Agreement, dated March 31, 2008, between the Bank and Michael Palmer.

- Change in Control Agreement, dated December 31, 2006, between the Bank and Wade Griffith.

- Split Dollar Insurance Agreement, dated June 20, 2005, between the Bank and Michelle Bell.

## Disclosures relating to the Company

- The disclosures set forth in Disclosure Schedule Section 3.1(c) are incorporated herein by reference.

- The disclosure set forth in Disclosure Schedule Section 3.3(b)(ii) is incorporated herein by reference.

- The filing of the Bankruptcy Case and the sale of the Bank constitutes the sale of substantially all of the assets of the Company and may violate, conflict with, result in a breach of or otherwise constitute a default of numerous, if not all, of the Company's Contracts. These Contracts include, without limitation, the Company's (i) Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2032 dated as of September 26, 2002 between the Company and State Street Bank and Trust Company of Connecticut, National Association; (ii) Indenture for Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2033, dated as of June 26, 2003, between the Bank and U.S. Bank National Association; (iii) Indenture for Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2036, dated as of March 14, 2006, between the Company and Wilmington Trust Company; and (iv) Indenture for Fixed/Floating Rate Junior Subordinated Deferrable Interest Debentures Due 2037, dated as of March 22, 2007, between the Company and Wilmington Trust Company.

- Directors' and Officers' Insurance policies with Houston Casualty Company and Ironside Insurance Services, LLC for the period beginning October 1, 2010 through October 1, 2011.

- Supplemental Agreement for Service Providers between the Company, the Bank and AP Technology (undated).

- Internet License Agreement between the Company and BAI Center, dated March 29, 2010.

- Agreement for Products and Services between the Company and Ceridian Corporation, dated June 30, 2009, as amended by the Amendment dated July 21, 2009.

la-1095455

- IPS-Sendero Product Use and Support Agreement between the Company and Fiserv Solutions, Inc. (doing business as IPS-Sendero), as amended by the Addendum dated June 30, 2003, the Amendment dated September 14, 2005, the Amendment dated October 25, 2006, the Amendment dated June 29, 2010.

- End-user Software Site License Agreement (Premier License Number 98878) between the Company and Grayco Bank Products, Inc., dated August 16, 2000.

- Ground Lease between Bedrock, LLC and the Company, dated May 3, 2002.

- Lease of Business Premises between the Company and Associated Independent Agencies, Inc., dated April 1, 2001.

- Commercial Lease between Darold L. Bingham and Ann Bingham, the Company, as successor in interest to United Security Bancorporation, and the Bank, as successor in interest to the Bank of Pullman, as dated August 24, 1998.

- Amended and Restated Operating Agreement of WIN Partners, LLC, a Washington Limited Liability Company.

- Limited Liability Company Agreement of Historic Havermale LLC, a Washington limited liability company, dated as of April 10, 2004.

- First Amended and Restated Limited Liability Company Agreement of The Montvale Hotel, LLC, a Washington limited liability company.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.2(a)

### CAPITALIZATION OF THE BANK

- The disclosure set forth in Disclosure Section 3.2(b) is incorporated herein by reference.

**Note**: The discussion below is a summary of certain provisions of Washington law. The Company and the Bank do not purport to provide any legal analysis on these provisions, nor are the Company or the Bank providing a legal opinion on the applicability of these provisions to the Contemplated Transactions.

### Assessments

The Bank may be subject to assessments with personal liability attaching to the ownership of the Shares. Under Washington law, whenever it appears to the Director of the Washington Department of Financial Institutions (the "Director") that certain offenses or delinquencies have resulted in a bank being "critically undercapitalized with no reasonably foreseeable prospect of recovery, or that it has suspended payment of its obligations, or is insolvent," the Director may, among other actions, notify such bank "to levy an assessment on its stock." The statute does not establish a procedure for the assessment, other than "within such time and in such manner" as the Director may specify. If a Washington commercial bank were so notified, the bank's board of directors, with the consent of the holders of record of two-thirds of the capital stock, could levy such assessment upon the stockholders pro rata, and a shareholder would forfeit the stock upon which any such assessment is not paid. *See* RCW §§ 30.12.180; 30.44.020.

### Constitutional and Statutory Limitations of Liability

Article XII, Section 11 of the Washington Constitution provides that "each stockholder of any banking or insurance corporation or joint stock association shall be individually and personally liable equally and ratably, and not one for another, for all contracts, debts, and engagements of such corporation or association accruing while they remain such stockholders, to the extent of the amount of their stock therein at the par value thereof, in addition to the amount invested in such shares."

Article XII, Section 11 of the Washington Constitution further provides that "[t]he legislature may provide that stockholders of banking corporations organized under the laws of this state which shall provide and furnish, either through membership in the Federal Deposit Insurance Corporation, or through membership in any other instrumentality of the government of the United States, insurance or security for the payment of the debts and obligations of such banking corporation equivalent to that required by the laws of the United States to be furnished and provided by national banking associations, shall be relieved from liability for the debts and obligations of such banking corporation to the same extent that stockholders of national banking associations are relieved from liability for the debts and obligations of such national banking associations under the laws of the United States."

In accordance with the foregoing constitutional provision, the Washington legislature promulgated Revised Code of Washington ("RCW") § 30.12.230, which provides that "the shareholders of a banking corporation organized under the laws of this state and the deposits of

which are insured by the federal deposit insurance corporation shall not be liable for any debts or obligations of the bank."

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.2(b)</u>

### OUTSTANDING STOCK RIGHTS

- See Engagement Agreement, dated February 18, 2010, between the Company, the Bank and Cappello Capital Corp. A copy of this agreement has been provided to the Purchaser in the Data Room. The Company believes that neither the Bank nor the Company has any obligation to issue any equity or warrants of the Bank under this engagement agreement.

la-1095455

<u>**DISCLOSURE SCHEDULE — SECTION 3.2(c)**</u>

BANK SUBSIDIARIES

- As a member of the Federal Home Loan Bank of Seattle (the "FHLB"), the Bank is required to maintain a minimum level of investment in FHLB stock based on specified percentages of its outstanding FHLB advances. The Bank's investment in FHLB stock is carried at par value, $100 per share, which reasonably approximates its fair value. The Bank may request redemption at par value of any stock in excess of the amount the Bank is required to hold. However, stock redemptions are at the discretion of the FHLB. As of September 30, 2010, the Bank owned approximately $10.3 million of FHLB stock.

- The Bank owns 1,250 shares of Federal Agricultural Mortgage Corporation Class A Voting Common Stock.

- The Bank owns 100 shares of Federal Agricultural Mortgage Corporation Class C common stock.

- The Bank owns 2,556 shares of Federal National Mortgage Association Fannie Mae Voting Common Stock.

- The Bank owns 10,000 shares of Pacific Coast Bankers' Bancshares common stock.

- The Bank owns one unit of limited partnership interest in Homestead Equity Fund IV Limited Partnership, an Oregon limited partnership.

- Pursuant to the Joint Venture Agreement Regarding Morgan Building Project, dated August 11, 2005 and subsequently amended by the First Amendment to the Joint Venture Agreement Regarding Morgan Building Project on June 23, 2006, by and between Morgan Development, L.L.C. and Morgan Building LLC, the Bank owns an interest in the property known as the Morgan Building located at 314 West Sprague and 315 West Riverside, Spokane, Washington.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.3(a)</u>

PERMITS

The disclosure set forth in Disclosure Schedule Section 3.3(b)(ii) is incorporated herein by reference.

The disclosure set forth in the fourth bullet point of Disclosure Schedule 3.10 is incorporated herein by reference.

la-1095455

<u>**DISCLOSURE SCHEDULE — SECTION 3.3(b)(ii)**</u>

**MATERIAL GOVERNMENTAL AUTHORIZATIONS**

The Bank is subject to the Regulatory Agreements listed below, all of which are incorporated in this schedule by reference:

- Stipulation and Consent to the Issuance of an Order to Cease and Desist, dated May 8, 2009, with the Federal Deposit Insurance Corporation and the Washington State Department of Financial Institutions, Division of Banks;

- The Bank received an Order to Cease and Desist dated May 11, 2009, from the FDIC and the Homestate DFI ("Order");

- The Written Agreement, dated September 15, 2009, with the Federal Reserve Board;

- The Prompt Corrective Action Notification of Capital Category, Temporary Liquidity Guarantee Program Restrictions, and Troubled Institution Designation (the "PCA Notification"), issued on August 12, 2009, from the Federal Deposit Insurance Corporation;

- The Board of Directors of the Bank received a Supervisory Directive dated August 12, 2008 from the Homestate DFI. This Supervisory Directive was rescinded in a letter dated September 14, 2009;

- The Board of Directors of the Bank received a Prompt Corrective Action Notice dated February 2, 2009 from the FDIC; and

- The Bank received on February 26, 2010 a Supervisory Prompt Corrective Action Directive dated February 22, 2010 from the FDIC ("PCA Directive").

On August 12, 2009, the FDIC issued the PCA Notification. The PCA Notification notified the Bank that based on the Bank's June 30, 2009, Call Report information, the FDIC had determined that the Bank fell within the Significantly Undercapitalized capital category. Under Section 38 of the Federal Deposit Insurance Act, as of July 31, 2009, the Bank became subject to certain statutory restrictions, including the requirement for submission of a capital restoration plan and restrictions on asset growth, acquisitions, new activities and new branches, payment of dividends and other capital distributions, management fees and senior executive compensation. The Significantly Undercapitalized status also resulted in restrictions on affiliate transactions and on the interest rates payable on the Bank's deposits.

The Bank was required to file a capital restoration plan within 30 days of receipt of the PCA Notification. The PCA Notification also notified the Bank that the bank was ineligible to execute any new borrowings under the Temporary Liquidity Guarantee Program. In addition, the PCA Notification provided that the Bank was formally designated as being in "troubled condition" as of August 8, 2008, which has the consequences provided in the FDIC's Rules and Regulations.

la-1095455

The Bank is not in compliance with some or all of the foregoing Regulatory Agreements. Without limiting the generality of the foregoing:

- The Bank is not in compliance with the provisions of the Regulatory Agreements requiring it to raise capital and/or meet specified capital thresholds.

- The PCA Directive informed the Bank that its Capital Restoration Plan dated July 2, 2009 was unacceptable.

- The Order required the Bank to reduce the level of assets classified as "substandard" or "doubtful" noted in the ROE to 75% of capital by September 8, 2009. As of June 30, 2010, the assets classified as "substandard" or "doubtful' were reduced by $144.6 million since the ROE, and the related ratio was 103%. This target was not achieved by the deadline, primarily due to continued reductions in the Bank's capital.

la-1095455

<u>**DISCLOSURE SCHEDULE — SECTION 3.3(b)(iii)**</u>

IMPAIRMENT OF GOVERNMENTAL AUTHORIZATIONS

The disclosure set forth in Disclosure Schedule Section 3.3(b)(ii) is incorporated herein by reference.

la-1095455

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 72 of 193

## DISCLOSURE SCHEDULE — SECTION 3.3(b)(iv)

### GOVERNMENTAL AUTHORITY NOTICES

The disclosure set forth in Disclosure Schedule Section 3.3(b)(vii) is incorporated herein by reference.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.3(b)(vi)</u>

### REQUIRED GOVERNMENTAL AUTHORIZATIONS

The disclosure set forth in Disclosure Schedule Section 3.1(c) is incorporated herein by reference.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.3(b)(vii)

### AGREEMENTS AND NOTICES FROM REGULATORY AGENCIES

The disclosure set forth in Disclosure Schedule 3.3(b)(ii) is incorporated herein by reference.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.3(b)(viii)

### FINDINGS

- The disclosure set forth in Disclosure Schedule Section 3.3(b)(ii) is incorporated herein by reference.

- Apparent violation of Regulation O involving loans to an executive officer's father.

- Apparent violation of Part 323 of the FDIC Rules and Regulations. Under Section 323.4(c) of this Part, appraisals are required, at a minimum, to analyze and report appropriate deductions and discounts for proposed construction or renovation, partially leased buildings, non-market lease terms, and tract developments with unsold units. On November 6, 2008, the Bank's management renewed a $1.042 million loan, relying on an appraisal dated July 16, 2008. The loan was dependent upon the sale of condominiums, but is alleged to not include required discounts to appraisal value. The Bank, when obtaining an Individual Condominium Unit Appraisal Report on a condominium unit, is also alleged to have failed to include a discount from gross retail values of the condominiums. Further, it is alleged that the appraisal did not have an explanation for why the value of the relevant property increased (as compared to a prior valuation) when the applicable real estate market was in decline.

- Violation of Section 325 of the FDIC Rules and Regulations, which sets forth minimum capital requirements.

- The Bank may have charged interest rates on certain certificates of deposit ("CDs") in excess of those allowed for banks subject to broker deposit restrictions. The Bank reports its exception-priced CDs as broker deposits. As of September 30, 2010, these exception-priced CDs totaled $8,000,000.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.4(a)(i)</u>

### COMPANY'S REPORTS

Pursuant to the Bank's Order to Cease and Desist dated May 11, 2009, from the FDIC and the Washington State Department of Financial Institutions, Division of Banks, and the Company's Written Agreement, dated September 15, 2009, with the Federal Reserve Board, the Bank and the Company are required to submit quarterly written progress report within 30 days of the end of each quarter. The Bank and the Company have received permission to file these reports ten days after the otherwise applicable deadline of October 30, 2010.

la-1095455

# DISCLOSURE SCHEDULE — SECTION 3.4(a)(ii)

## DRAFT OF THE FORM 10-Q

The draft of the Form 10-Q has been made available to the Purchaser in the Data Room during the week of October 15, 2010. This draft does not include, among other items, the qualifications and disclosures relating to the Contemplated Transactions (including but not limited to disclosing the Bankruptcy Proceedings). The Company intends to include information relating to the Contemplated Transactions in the Form 10-Q filed with the SEC.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.4(b)</u>

### BANK REPORTS

The disclosure set forth in Disclosure Schedule Section 3.4(a)(i) is incorporated herein by reference.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.5

### DEPOSITS

The disclosure set forth in the last bullet point of Disclosure Schedule Section 3.3(b)(viii) is incorporated herein by reference.

The disclosure set forth in Disclosure Schedule Section 3.3(b)(ii) is incorporated herein by reference.

la-1095455

COMPANY'S FINANCIAL STATEMENTS

Due to the Company's significant net losses from operations during the past several years, deterioration in the credit quality of the loan portfolio, and the decline in the level of its regulatory capital to support operations, there was substantial doubt about the Company's ability to continue as a going concern for the periods ending December 31, 2008 and 2009, March 31, 2010, June 30, 2010, and September 30, 2010. Although the factors that caused uncertainty about the Company's ability to continue as a going concern continued to exist as of the date of the Audited Financial Statements and Interim Financial Statements, these reports were prepared assuming the Company will, nevertheless, continue as a going concern. The factors described above continue to be present as of the date hereof, and the Company makes no representation on its ability to continue as a going concern for purposes of the Audited Financial Statements, the Interim Financial Statements or otherwise.

la-1095455

<u>**DISCLOSURE SCHEDULE — SECTION 3.6(b)**</u>

COMPANY'S CALL REPORTS

Due to the Company's significant net losses from operations during the past several years, deterioration in the credit quality of the loan portfolio, and the decline in the level of its regulatory capital to support operations, there was substantial doubt about the Company's ability to continue as a going concern for the periods ending December 31, 2008 and 2009, March 31, 2010, June 30, 2010, and September 30, 2010. Although the factors that caused uncertainty about the Company's ability to continue as a going concern continued to exist as of the date of the Call Reports for the periods ending December 31, 2008 and 2009, March 31, 2010, June 30, 2010 and September 30, 2010, these reports were prepared assuming the Company will, nevertheless, continue as a going concern. The factors described above continue to be present as of the date hereof, and the Company makes no representation on its ability to continue as a going concern for purposes of these Call Reports or otherwise.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.6(c)

### SYSTEMS AND PROCESSES

Please see Moss-Adams LLP's March 30, 2010 letter to the Audit Committee of the Company's Board of Directors and the schedule attached therein entitled "AmericanWest Internal Audit Tracking Summary" for a listing of internal control deficiencies. These documents have has been made available to the Purchaser in the Data Room.

## **DISCLOSURE SCHEDULE — SECTION 3.6(f)**

### UNDISCLOSED LIABILITIES

- The disclosure set forth in Disclosure Schedule Section 3.3(b)(ii) is incorporated herein by reference.

- The disclosures set forth in Disclosure Schedule Section 3.8 are incorporated herein by reference.

- The disclosure set forth in Disclosure Schedule Sections 3.6(a) and 3.6(b) is incorporated herein by reference.

- In connection with the Contemplated Transactions, the Bank has incurred, and will continue to incur, significant professional expenses.

la-1095455

TAXES

- In connection with the Contemplated Transactions, the Company may be subject to certain real estate transfer taxes under Washington law and may be required to submit an Excise Tax Affidavit form to the Washington Department of Revenue within one month from the date of the sale or transfer. *See* RCW 82.45 and WAC 458-61A. The Company and the Bank make no representation on the applicability of these requirements to the Contemplated Transactions.

- The Company received a Notice of Proposed Adjustment from the Internal Revenue Service (the "IRS"), dated January 15, 2010, relating to the Company's federal income tax return for 2008. The Company originally filed this tax return on March 15, 2009. The Company filed a superseding tax return on October 7, 2009 to correct income and expenses that were not known or complete at the time of the original filing. The key change was an increase in Bad Debts Expense of $5,930,938, which the IRS examined and found to be appropriate. The Company also proposed an additional $315,580 in Other Deductions, which the IRS also found to be acceptable. Finally, the Company reclassified certain expenses related to Advertising, Wages & Salaries and Other Expenses, which resulted in a decrease to taxable income of $6,261, and reclassified $130,722 of charitable contributions as Promotional/Advertising Expense. While the IRS did not accept the reclassification to Promotional/Advertising Expense, it did accept the $6,261 decrease of taxable income.

- The Company received a Notice of Proposed Adjustment from the IRS, dated January 15, 2010, relating to the Company's federal income tax return for 2008. The Company filed this tax return on March 15, 2009 and claimed refunds from net operating loss carrybacks and a general business credit carryback. The Company reported a loss of $54,595,165 for 2008 and received tentative refunds two months later. The Company filed a superseding tax return on September 11, 2009 to correct income and expenses that were not known or complete at the time of filing, resulting in a loss increase from $54,595,165 to $61,134,985. The Company also filed revised Forms 1139. While the IRS agreed with the Company's calculations in Form 1139, it determined that certain calculations did not reflect required adjustments to Contributions Expenses and reduced the loss claimed by $130,722.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.7(g)

### REQUIRED ITEMS IN TAXABLE INCOME

- The Company may be required to include in its taxable income certain gains, or exclude certain amounts, resulting from the Walla Walla and Clearwater installment sales.

- The Company may be required to include in its taxable income certain gains, or exclude certain amounts, relating to certain prepaid expenses outstanding as of December 31, 2009.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.8</u>

### LITIGATION AND CLAIMS

- The Bank is a plaintiff in various collection cases in the Ordinary Course of Business.

- Please see the Bank's schedule of litigation proceedings, a copy of which has been made available to the Purchaser in the Data Room.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.9(a)

### EMPLOYEE BENEFIT PLANS

- The disclosures set forth in Disclosure Schedule Section 3.9(e) are incorporated herein by reference.

- The Company's Amended and Restated 2006 Equity Incentive Plan.

- Restricted Stock Unit Agreement dated effective September 26, 2006 between the Company and Patrick J. Rusnak.

Please see the Bank's Employee Handbook for a listing of the Employee Benefit Plans, a copy of which has been provided to the Purchaser in the Data Room and is incorporated herein by reference. These benefits include, without limitation, the following Employee Benefit Plans:

- Cafeteria 125 Plan including: group health (medical and dental) insurance, life insurance and optional supplemental life insurance, accidental death and dismemberment insurance, disability income protection (LTD), and flexible spending accounts;

- COBRA;

- 401(k) Retirement Savings Plan;

- Stock Incentive Plan (options and restricted stock awards);

- Worker's Compensation Insurance;

- Each employee may obtain certain bank services at a discount or without charge. Such benefits include, without limitation, one free personal checking account with the Bank and assistance in obtaining a loan;

- Other benefits described in the Bank's Employee Handbook such as vacation, wellness days (personal holidays), sick leave, tuition reimbursement, Family and Medical Leave Act leave, other medical leave, military leave, jury duty leave, employee referral program, discounted bank services, computer purchase loans.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.9(e)

### BENEFITS TO CURRENT OR FORMER EMPLOYEES

- Current or future retired or terminated employees of the Bank may be eligible for benefits under the terms of the Bank's disability income protection plan.

- Employment Agreement, dated as of September 18, 2006, between the Company, the Bank and Patrick J. Rusnak.

- Employment Agreement, dated as of January 28, 2005, as amended thereto, between the Bank and Nicole Sherman.

- Employment Agreement, dated as of April 1, 2008, between the Bank and Jay B. Simmons.

- Employment Agreement, dated as of January 28, 2005, as amended thereto, between the Company, the Bank and Rick Shamberger.

- Employment Agreement, dated as of April 9, 2007, between the Bank and Robert Harris.

- The Bank is a party to other employment agreements which may provide benefits to current or future retired or terminated employees of the Bank. Copies of these agreements have been provided to the Purchaser in the Data Room.

- Change in Control Agreement, dated March 31, 2008, between the Bank and Michael Palmer.

- Change in Control Agreement, dated December 31, 2006, between the Bank and Wade Griffith.

- The Bank is a party to supplemental compensation agreements, salary or fee continuation agreements and supplemental retirement plan agreements which may provide benefits to current or future retired or terminated employees of the Bank. Copies of these agreements have been provided to the Purchaser in the Data Room.

- The Bank is a party to split-dollar life insurance agreements and joint beneficiary designation agreements which may provide benefits to current or future retired or terminated employees of the Bank. Copies of these agreements have been provided to the Purchaser in the Data Room.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.10

### PROPERTIES AND LEASES

- The Bank has Permitted Liens.

- The Bank has various Other Real Estate Owned ("OREO") where certain contractors have asserted liens on the foreclosed property. While certain of these liens are often deemed to be invalid, the Bank makes appropriate adjustments to the carrying value of those liens it deems legitimate.

- The Bank's OREO may not be in compliance with certain laws, building codes and other Legal Requirements.

- The City of Spokane recently identified and notified the Bank of two building code violations with respect to the elevators in the AmericanWest Bank Support Center located at 110 S. Ferrall St., Spokane, WA (a leased facility).

- Title to the properties set forth in Schedule 2.1 are held in the name of the Company.

- See the attached schedule entitled "REAL PROPERTY OF THE BANK".

la-1095455

# DISCLOSURE SCHEDULE — SECTION 3.11

## ABSENCE OF CERTAIN CHANGES

The disclosures set forth in Disclosure Schedule Section 3.1(d) are incorporated herein by reference.

The disclosures set forth in Disclosure Schedule Section 3.6(f) are incorporated herein by reference.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.12(b)

### COMMITMENTS AND CONTRACTS

- The disclosures set forth in Disclosure Schedule Section 3.1(d) are incorporated herein by reference.

- The disclosures set forth in Disclosure Schedule Section 3.8 are incorporated herein by reference.

- That certain Engagement Agreement, dated February 18, 2010, between the Company, the Bank and Cappello Capital Corp.

- Software License Agreement between the Bank and Harland Financial Services related to the CreditQuest software license.

    The Bank entered into an agreement with Harland Financial Services ("HFS") to license its CreditQuest software, which required HFS to provide significant development/customization services to create internal application forms for commercial credits. The agreement provided that HFS would notify the Bank when it deemed Phase 1 of the development/customization effort final, to be followed by up to three rounds of (1) testing by the Bank and notification to HFS of any shortcomings (20 business days), and (2) correction and resubmittal by HFS (20 business days). The Phase 1 software would be deemed accepted if (a) the Bank did not deliver a list of shortcomings within any of its 20 day deadlines, or (b) used the software in production mode. The first annual license fee was not to be invoiced until acceptance.

    HFS delivered the Phase 1 software and notified the Bank it was complete in early May. The Bank tested and provided a list of shortcomings within the 20-day deadline (the "Initial List"), noting that no single item on the list constituted a material shortcoming, but together the items constituted a material failure to build the system to specifications. HFS began efforts to resolve the identified items, and did resolve many of them within 20 business days, but did not (1) notify the Bank that HFS considered the Initial List inadequate or the software accepted, or (2) notify the Bank that HFS believed the Initial List items were all resolved. Given the complexity of the project and the difficulty in fixing some of the Initial List items, the Bank allowed HFS to continue working on those items past HFS' first 20 day deadline.

    In late July or early August, Harland sent to the Bank an invoice dated June 30 for the first annual license fee. This was the first indication to the Bank that HFS might be claiming that Phase 1 was complete and accepted. The Bank has not paid the invoice and has continued to point out to and work with HFS on the remaining items from the Initial List, plus other errors subsequently caused by HFS while implementing fixes to the Initial List items.

la-1095455

The parties are working on a list of items that need to be corrected (from the Bank's point of view) and that HFS will commit to correct, in order to execute an agreement or amendment that would commitment HFS to fix the items and while the Bank moves Phase 1 into production mode and pays the invoice.

- Financial Services Agreement between the Bank and Chex Systems, Inc., dated March 12, 2009, as amended on March 31, 2009 by the Amendment to Attachment 2.

- Electronic Funds Delivery Agreement between the Bank and Metavante Corporation, dated December 31, 2003, as amended on July 14, 2004 and November 14, 2008.

- Agent Bank Agreement (Merchant Referral Program with Cash Advances) between the Bank and Merchant e-Solutions, Inc., dated December 8, 2008.

- Non-Recourse Loan Participation Agreement (Commercial Loan) between the Bank and Baker Boyer National Bank, dated January 29, 2009 (relating to the $1,900,000 loan for the purpose of providing financing for a new 285 unit storage facility).

- Non-Recourse Loan Participation Agreement (Commercial Loan) between the Bank and Baker Boyer National Bank, dated January 29, 2009 (relating to the $2,000,000 loan for the purpose of providing financing for an existing 482 unit storage facility).

- Non-Recourse Loan Participation Agreement (Commercial Loan) between the Bank and Riverview Community Bank, dated August 14, 2008 (relating to the $7,000,000 loan for the purpose of purchasing real property).

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.13

## RISK MANAGEMENT INSTRUMENTS

The Bank periodically enters into forward delivery contracts to sell residential mortgage loans to investors at specific prices and dates in order to hedge the interest rate risk in its portfolio of mortgage loans held for sale and its residential mortgage loan commitments. Credit risk associated with forward contracts is limited to the replacement cost of those forward contracts in a gain position.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.14

### ENVIRONMENTAL MATTERS

Washington law requires sellers of commercial real estate in Washington to disclose certain environmental conditions and other items to buyers in transactions for the sale of commercial real estate. *See* RCW 64.06. The Company and the Bank express no opinion about the applicability of these requirements to the Contemplated Transactions.

la-1095455

# DISCLOSURE SCHEDULE — SECTION 3.16

## INTELLECTUAL PROPERTY

- Ronald A. Katz Technology Licensing ("**RAKTL**") aggressively brings patent infringement lawsuits against banks and other financial institutions asserting that the automated call center technologies used by these banks and other financial institutions infringe upon RAKTL's patent rights. The Bank uses automated call center software that the Bank licenses from Grayco Bank Products, Inc. The Bank has not conducted any research into whether the automated call center software that the Bank licenses from Grayco Bank Products, Inc. infringes upon any of RAKTL's patent rights. However, in light of the foregoing patent infringement lawsuits brought by RAKTL and RAKTL's aggressive patent litigation strategy, RAKTL possibly may bring a patent infringement lawsuit against the Bank relating to the Bank's use of the automated call center software that the Bank licenses from Grayco Bank Products, Inc.

- DataTreasury ("**DT**") aggressively brings patent infringement lawsuits against banks and other financial institutions asserting that the secure check image capture and storage technologies used by these banks and other financial institutions infringe upon DT's patent rights. The Bank uses remote check processing software that the Bank licenses from NBT, Inc. The Bank has not conducted any research into whether the remote check processing software that the Bank licenses from NBT, Inc. infringes upon any of DT's patent rights. However, in light of the foregoing patent infringement lawsuits brought by DT and DT's aggressive patent litigation strategy, DT possibly may bring a patent infringement lawsuit against the Bank relating to the Bank's use of the remote check processing software that the Bank licenses from NBT, Inc.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 3.17(a)</u>

### RELATED PARTY TRANSACTIONS

- Please see the attached schedule entitled "Insider Loans at 9/30/2010".

- The Company and the Bank are parties to the Tax Sharing Agreement between the Company and the Bank dated as of January 22, 2010.

- The Company and the Bank are parties to the Services Agreement between the Bank and the Company.

- The disclosure set forth in the second bullet point of Disclosure Schedule Section 3.3(b)(viii) is incorporated herein by reference.

- The Bank's branch in the City of Ephrata, Washington is leased from G.N.B. Associates, a Washington general partnership.  Donald H. Swartz, a director and chair of the Compensation Committee, is a 25% partner in G.N.B. Associates.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.17(b)

### REGULATION O COMPLIANCE

The disclosures set forth in Disclosure Schedule Section 3.3(b)(viii) are incorporated herein by reference.

la-1095455

## DISCLOSURE SCHEDULE — SECTION 3.18

### BROKERS OR FINDERS

- $4.25 million and other expenses payable to Sandler O'Neill + Partners, L.P. pursuant to the Engagement Letter, dated October 15, 2010, between the Company and Sandler O'Neill + Partners, L.P. and the Engagement Letter, dated October 15, 2010, between the Bank and Sandler O'Neill + Partners, L.P.

- Consideration payable, if any, to Cappello Capital Corp. pursuant to the Engagement Agreement, dated February 18, 2010, between the Company, the Bank and Cappello Capital Corp.

la-1095455

## <u>DISCLOSURE SCHEDULE — SECTION 5.1(b)</u>

CONTRACTUAL OBLIGATIONS

None.

la-1095455

## SCHEDULE 2.1

### OTHER PURCHASED ASSETS

- Supplemental Agreement for Service Providers between the Company, the Bank and AP Technology.

- Internet License Agreement between the Company and BAI Center (BAI), dated March 29, 2010.

- Agreement for Products and Services between the Company and Ceridian Corporation, dated June 30, 2009, as amended by the Amendment dated July 21, 2009.

- Agreement for Purchase of Checks and Related Products between the Company and Deluxe Financial Services, Inc., dated February 5, 2010.

- IPS-Sendero Product Use and Support Agreement between the Company and Fiserv Solutions, Inc. (doing business as IPS-Sendero), as amended by the Addendum dated June 30, 2003, the Amendment dated September 14, 2005, the Amendment dated October 25, 2006, the Amendment dated June 29, 2010.

- End-user Software Site License Agreement (Premier License Number 98878) between the Company and Grayco Bank Products, Inc., dated August 16, 2000.

- Master Services Contract between the Company and Postini, Inc., dated February 15, 2007.

- Professional Services Agreement, attached to the Letter, dated March 30, 2010, from Moss Adams LLP to the Company.

- Professional Services Agreement, attached to the Letter, dated April 27, 2010, from Moss Adams LLP to the Company.

- Employment Agreement, dated as of September 18, 2006, between the Company, the Bank and Patrick J. Rusnak.

- Ground Lease between Bedrock, LLC and the Company, dated May 3, 2002.

- Lease of Business Premises between the Company and Associated Independent Agencies, Inc., dated April 1, 2001.

- Commercial Lease between Darold L. Bingham and Ann Bingham and the Company, as successor in interest to Bank of Pullman, dated September 18, 1998.

- Commercial Lease between Darold L. Bingham and Ann Bingham and the Company, as successor in interest to Bank of Pullman and United Security Bancorporation, dated August 24, 1998.

- All of the Company's rights and interests in the following described real estate, situated in the county of Benton, Washington:

  > Lot 3, EXCEPT the Southwesterly 21 feet thereof; All of Lot 4 and The Southwesterly 30 feet of Lot 5; All in Block 85 of TOWN OF PROSSER, as per plat thereof recorded in Volume 1 of Plats, page 1; situated in the County of Benton, State of Washington.

- All of the Company's rights and interests in Montvale Hotel, LLC, a Washington limited liability company.

- All of the Company's rights and interests in Historic Havermale LLC, a Washington limited liability company.

- All of the Company's rights and interests in life insurance policy no. 13182422 issued by Mutual of New York, and any supplementary contracts issued therewith, upon the life of William C. Dashiell, as set forth in the Assignment, dated October 20, 1999, by the William C. Dashiell Irrevocable Insurance Trust, Keith Sattler, Trustee to the Company, as successor in interest to United Security Bancorporation.

- All of the Company's rights and interests in WIN Partners, LLC, a Washington limited liability company.

# SCHEDULE 4.2

## PURCHASER REQUIRED APPROVALS

(1) Approval of the Board of Governors of the Federal Reserve System under section 3 of the Bank Holding Company Act of 1956

(2) Approval of the Washington State Department of Financial Institutions under applicable state laws and regulations in connection with a change in control of a Washington state-charted bank

(3) Consents for changes in directors or senior executive officers as may be required under section 32 of the Federal Deposit Insurance Act or otherwise

(4) Such other notices, consents, or approvals that may be required as a result of the Regulatory Agreements

**<u>EXHIBIT A</u>**

DIP LOAN AGREEMENT

[SEE ATTACHED]

SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT

among

AMERICANWEST BANCORPORATION,

as Borrower,

and

SKBHC HAWKS NEST ACQUISITION CORP.,

as Lender

Dated as of October 28, 2010

# TABLE OF CONTENTS

Page

SECTION 1. DEFINITIONS ............................................................................................... 2

    1.1    Defined Terms ................................................................................................. 2
    1.2    Other Definitional Provisions ........................................................................ 9

SECTION 2. AMOUNT AND TERMS OF COMMITMENT ..................................... 10

    2.1    Commitment ................................................................................................. 10
    2.2    Procedure for Borrowing ............................................................................. 10
    2.3    Repayment of the Loan ................................................................................ 10
    2.4    Optional Prepayments ................................................................................. 10
    2.5    Interest Rates and Payment Dates ............................................................... 10
    2.6    Pro Rata Treatment and Payments .............................................................. 11
    2.7    Taxes ........................................................................................................... 11
    2.8    Notes ............................................................................................................ 12
    2.9    Priority and Liens ........................................................................................ 12
    2.10   Security ........................................................................................................ 13

SECTION 3. REPRESENTATIONS AND WARRANTIES ....................................... 13

    3.1    Existence; Compliance with Law ................................................................ 13
    3.2    Power; Authorization; Enforceable Obligations ......................................... 14
    3.3    No Legal Bar ............................................................................................... 14
    3.4    No Default ................................................................................................... 14
    3.5    Federal Regulations .................................................................................... 14
    3.6    Investment Company Act; Other Regulations ............................................. 14
    3.7    Accuracy of Information, etc ....................................................................... 15
    3.8    Financial Statements; No Material Adverse Effect ..................................... 15
    3.9    Ownership Of Property; Liens; Investments ............................................... 15
    3.10   Secured Superpriority Obligations .............................................................. 16

SECTION 4. CONDITIONS PRECEDENT ................................................................. 16

    4.1    Conditions to Loan ...................................................................................... 16

SECTION 5. AFFIRMATIVE COVENANTS ............................................................. 18

    5.1    Further Assurances ...................................................................................... 18
    5.2    Use Of Proceeds .......................................................................................... 18
    5.3    Preservation Of Existence; Business, Etc ................................................... 19
    5.4    Budgets; Financial Information; Default Notices ........................................ 19

SECTION 6. NEGATIVE COVENANTS ..................................................................... 19

    6.1    Liens ............................................................................................................ 19
    6.2    Indebtedness ................................................................................................ 20
    6.3    Investments ................................................................................................. 20

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 106 of 193

6.4     Fundamental Changes .................................................................................................... 20
6.5     Dispositions ..................................................................................................................... 20
6.6     Change In Nature Of Business ........................................................................................ 21
6.7     Transactions With Affiliates ........................................................................................... 21
6.8     Accounting Changes ....................................................................................................... 21
6.9     Partnerships, Etc ............................................................................................................. 21
6.10    Speculative Transactions ................................................................................................ 21
6.11    Formation Of Subsidiaries .............................................................................................. 21

SECTION 7. EVENTS OF DEFAULT ............................................................................................... 21

7.1     Events of Default ............................................................................................................ 21
7.2     Application of Proceeds .................................................................................................. 24

SECTION 8. MISCELLANEOUS ..................................................................................................... 24

8.1     Amendments and Waivers ............................................................................................. 24
8.2     Notices ............................................................................................................................ 25
8.3     No Waiver; Cumulative Remedies ................................................................................. 25
8.4     Survival of Representations and Warranties .................................................................. 25
8.5     Payment of Expenses and Taxes .................................................................................... 25
8.6     Payments Set Aside ........................................................................................................ 26
8.7     Successors and Assigns; Assignments ........................................................................... 26
8.8     Set-off ............................................................................................................................. 27
8.9     Counterparts .................................................................................................................... 27
8.10    Severability .................................................................................................................... 27
8.11    Integration ...................................................................................................................... 27
8.12    **GOVERNING LAW** .................................................................................................. 27
8.13    Submission To Jurisdiction; Waivers ............................................................................ 27
8.14    Acknowledgements ........................................................................................................ 28
8.15    Releases of Liens ........................................................................................................... 28
8.16    **WAIVERS OF JURY TRIAL** .................................................................................. 28
8.17    Regulatory ...................................................................................................................... 29

<u>SCHEDULES</u>:
6.2     Existing Debt

<u>EXHIBITS</u>:

A     Form of Loan Notice
B     Form of Security Agreement
C     Form of Note
D     Order
E     Initial Budget

619322.12-Los Angeles Server 2A - MSW

SUPERPRIORITY DEBTOR-IN-POSSESSION CREDIT AGREEMENT (this "Agreement"), dated as of October 28, 2010, among AmericanWest Bancorporation, a Washington corporation and a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), and SKBHC Hawks Nest Acquisition Corp., as lender (together with its successors and assigns, the "Lender").

PRELIMINARY STATEMENTS

1.       On October 28, 2010 (the "Filing Date"), Borrower filed voluntary petitions with the Bankruptcy Court initiating the Case and have continued in the possession of its assets and in the management of its business pursuant to Sections 1107 and 1108 of the Bankruptcy Code.

2.       Borrower has requested that the Lender provide a term loan facility to Borrower in an aggregate principal amount not to exceed the Commitment (as defined herein).

3.       The proceeds of the Loan will be used (i) to pay post-Filing Date related fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (ii) for working capital and other general corporate purposes of the Borrower not materially inconsistent with the aggregate disbursement contemplated in the Budget and to the extent not prohibited hereunder, (iii) to pay fees and expenses of the Borrower's advisors and the advisors to any Creditors' Committee, in each case associated with the Case and (iv) to make any other payments permitted to be made in the Order or in the First Day Orders or by the Bankruptcy Court to the extent not prohibited by this Agreement or otherwise consented by the Lender.

4.       To provide security for the repayment of all obligations of the Borrower hereunder and under the other Loan Documents, the Borrower will provide to the Lender the following (all as more fully described herein):

a.       pursuant to Section 364 (c)(1) of the Bankruptcy Code and the Order, as applicable, a Superpriority Claim in the Case having priority over any claims of any entity, including, without limitation, any claims specified in or ordered pursuant to Sections 105, 326, 330, 331, 503(b), 506(c), 507, 726, 1113, 1114 or any other provisions of the Bankruptcy Code, subject only to the Carve-Out (as defined herein),

b.       pursuant to Section 364(c)(2) of the Bankruptcy Code and the Order, as applicable, a perfected first priority Lien on all unencumbered property and assets of the Borrower of any kind (other than Avoidance Actions and the proceeds therefrom), subject only to the Carve-Out,

c.       pursuant to Section 364(c)(3) of the Bankruptcy Code, a perfected Lien on the property of the Borrower as more fully described herein subject to (i) Liens for taxes not yet due and payable, (ii) mechanic's, materialmen's, warehousemen's or similar Liens that arise by operation of law, (iii) post-petition Capital Lease Obligations or purchase money financings permitted to be entered into hereunder (the Liens described in clauses (i) through this clause (iii), being "Permitted Liens"), and (iv) the Carve-Out.

The parties hereto hereby agree as follows:

1

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 108 of 193

# SECTION 1.   DEFINITIONS

1.1 <u>Defined Terms</u>.  As used in this Agreement (including the recitals hereof), the terms listed in this <u>Section 1.1</u> shall have the respective meanings set forth in this <u>Section 1.1</u>.

"<u>Affiliate</u>":  as to any Person, any other Person that, directly or indirectly, is in control of, is controlled by, or is under common control with, such Person.  For purposes of this definition, "control" of a Person means the power, directly or indirectly, either to (a) vote 10% or more of the securities having ordinary voting power for the election of directors (or persons performing similar functions) of such Person or (b) direct or cause the direction of the management and policies of such Person, whether by contract or otherwise.

"<u>Agreement</u>":  as defined in the preamble hereto.

"<u>Applicable Rate</u>":  9.00% per annum; provided that if the Scheduled Maturity is extended to December 27, 2010, 10.0% per annum for the period from December 12, 2010 through December 27, 2010.

"<u>Assignee</u>":  as defined in <u>Section 8.7</u>.

"<u>Audited Financial Statements</u>":  the audited consolidated balance sheet of the Borrower and its Subsidiaries for the fiscal year ended December 31, 2009, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal year of the Borrower and its Subsidiaries, including the notes thereto.

"<u>Avoidance Actions</u>":  claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code.

"<u>Bank</u>":  AmericanWest Bank, a Washington state chartered bank that operates in Eastern and Central Washington and Northern Idaho under its legal name, and in Utah under the name "Far West Bank".

"<u>Bankruptcy Code</u>":  Title 11 of the United States Code entitled "Bankruptcy", as now and hereafter in effect, or any successor statute.

"<u>Bankruptcy Court</u>":  the United States Bankruptcy Court for the Eastern District of Washington.

"<u>Board</u>":  the Board of Governors of the Federal Reserve System of the United States (or any successor).

"<u>Borrower</u>":  as defined in the preamble hereto.

"<u>Budget</u>":  initially, the consolidated cash flow projections for the Borrower for the 13-week period ending January 27, 2011 attached hereto as <u>Exhibit E</u>, as such projections are updated from time to time pursuant to <u>Section 5.4(a)</u>.

"<u>Business</u>":  the business currently carried on by the Bank and its Subsidiary.

"<u>Business Day</u>":  a day other than a Saturday, Sunday or other day on which commercial banks in New York City are authorized or required by law to close.

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 109 of 193

"Capital Lease Obligations":  as to any Person, the obligations of such Person to pay rent or other amounts under any lease of (or other arrangement conveying the right to use) real or personal property, or a combination thereof, which obligations are required to be classified and accounted for as capital leases on a balance sheet of such Person under GAAP and, for the purposes of this Agreement, the amount of such obligations at any time shall be the capitalized amount thereof at such time determined in accordance with GAAP.

"Capital Stock":  any and all shares, interests, participations or other equivalents (however designated) of capital stock of a corporation, any and all equivalent ownership interests in a Person (other than a corporation) and any and all warrants, rights or options to purchase any of the foregoing.

"Carve-Out": as defined in Section 2.9.

"Carve-Out Trigger Notice":  as defined in Section 2.9.

"Case":  the case of Borrower currently pending under Chapter 11 of the Bankruptcy Code in the Bankruptcy Court.

"Cash Collateral":  "cash collateral" as such term is defined in Section 363(a) of the Bankruptcy Code, or any successor provision.

"Closing Date":  as defined in Section 2.1.

"Code":  the Internal Revenue Code of 1986, as amended from time to time.

"Collateral":  all of the "Collateral" referred to in the Order or the other Security Documents and all of the other property and assets that are or are intended under the terms of the Order or the other Security Documents to be subject to Liens in favor of the Lender.

"Commitment":  the obligation of the Lender to make Loan to the Borrower in an aggregate principal amount up to $2,000,000.

"Commitment Period":  the period from and including the day after the date of this Agreement to November 15, 2010.

"Commonly Controlled Entity":  an entity, whether or not incorporated, that is under common control with the Borrower within the meaning of Section 4001 of ERISA or is part of a group that includes the Borrower and that is treated as a single employer under Section 414 of the Code.

"Contractual Obligation":  as to any Person, any provision of any security issued by such Person or of any agreement, instrument or other undertaking to which such Person is a party or by which it or any of its property is bound.

"Creditors' Committee":  any official committee appointed in the Case.

"Debtor Relief Laws":  the Bankruptcy Code of the United States, and all other liquidation, conservatorship, bankruptcy, assignment for the benefit of creditors, moratorium, rearrangement, receivership, insolvency, reorganization, or similar debtor relief laws of the United States or other applicable jurisdictions from time to time in effect and affecting the rights of creditors generally.

619322.12-Los Angeles Server 2A - MSW

"Default":  any of the events specified in Section 7, whether or not any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Disposition" or "Dispose":  (a) the sale, transfer, license, lease or other disposition (including any sale and leaseback transaction) of any property by the Borrower (or the granting of any option or other right to do any of the foregoing), including any sale, assignment, transfer or other disposal, with or without recourse, of any Capital Stock owned by the Borrower, or any notes or accounts receivable or any rights and claims associated therewith and (b) the issuance of Capital Stock by any Subsidiary of the Borrower to any Person other than the Borrower.

"Dollars" and "$":  dollars in lawful currency of the United States.

"Environmental Laws":  any and all foreign, Federal, state, local or municipal laws, rules, orders, regulations, statutes, ordinances, codes, decrees, requirements of any Governmental Authority or other Requirements of Law (including common law) regulating, relating to or imposing liability or standards of conduct concerning protection of human health or the environment, as now or may at any time hereafter be in effect.

"ERISA":  the Employee Retirement Income Security Act of 1974, as amended from time to time.

"Event of Default":  any of the events specified in Section 7, provided that any requirement for the giving of notice, the lapse of time, or both, has been satisfied.

"Facility":  the Commitment and the Loans made thereunder.

"Filing Date" as defined in the recitals hereto.

"First Day Orders":  as defined in Section 4.1(e).

"GAAP":  generally accepted accounting principles in the United States as in effect from time to time.

"Governmental Approval":  any consent, authorization, approval, order, license, franchise, permit, certificate, accreditation, registration, filing or notice, of, issued by, from or to, or other act by or in respect of, any Governmental Authority.

"Governmental Authority":  any nation or government, any state or other political subdivision thereof, any agency, authority, instrumentality, regulatory body, court, central bank or other entity exercising executive, legislative, judicial, taxing, regulatory or administrative functions of or pertaining to government, any securities exchange and any self-regulatory organization (including the National Association of Insurance Commissioners).

"Guarantee Obligation":  as to any Person (the "guaranteeing person"), any obligation, including a reimbursement, counterindemnity or similar obligation, of the guaranteeing person that guarantees or in effect guarantees, any Indebtedness, leases, dividends or other obligations (the "primary obligations") of any other third Person (the "primary obligor") in any manner, whether directly or indirectly, including any obligation of the guaranteeing person, whether or not contingent, (i) to purchase any such primary obligation or any property constituting direct or indirect security therefor, (ii) to advance or supply funds (1) for the purchase or payment of any such primary obligation or (2) to maintain working capital or equity capital of the primary obligor or otherwise to maintain the net worth or solvency

4

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 111 of 193

of the primary obligor, (iii) to purchase property, securities or services primarily for the purpose of assuring the owner of any such primary obligation of the ability of the primary obligor to make payment of such primary obligation or (iv) otherwise to assure or hold harmless the owner of any such primary obligation against loss in respect thereof; provided, however, that the term Guarantee Obligation shall not include endorsements of instruments for deposit or collection in the ordinary course of business. The amount of any Guarantee Obligation of any guaranteeing person shall be deemed to be the lower of (a) an amount equal to the stated or determinable amount of the primary obligation in respect of which such Guarantee Obligation is made and (b) the maximum amount for which such guaranteeing person may be liable pursuant to the terms of the instrument embodying such Guarantee Obligation, unless such primary obligation and the maximum amount for which such guaranteeing person may be liable are not stated or determinable, in which case the amount of such Guarantee Obligation shall be such guaranteeing person's maximum reasonably anticipated liability in respect thereof as determined by the Borrower in good faith.

"Indebtedness": of any Person at any date, without duplication, (a) all indebtedness of such Person for borrowed money, (b) all obligations of such Person for the deferred purchase price of property or services (other than current trade payables incurred in the ordinary course of such Person's business), (c) all obligations of such Person evidenced by notes, bonds, debentures or other similar instruments, (d) all indebtedness created or arising under any conditional sale or other title retention agreement with respect to property acquired by such Person (even though the rights and remedies of the seller or lender under such agreement in the event of default are limited to repossession or sale of such property), (e) all Capital Lease Obligations of such Person, (f) all obligations of such Person, contingent or otherwise, as an account party or applicant under or in respect of acceptances, letters of credit, surety bonds or similar arrangements, (g) the liquidation value of all redeemable preferred Capital Stock of such Person, (h) all Guarantee Obligations of such Person in respect of obligations of the kind referred to in clauses (a) through (g) above, and (i) all obligations of the kind referred to in clauses (a) through (h) above secured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured by) any Lien on property (including accounts and contract rights) owned by such Person, whether or not such Person has assumed or become liable for the payment of such obligation. The Indebtedness of any Person shall include the Indebtedness of any other entity (including any partnership in which such Person is a general partner) to the extent such Person is liable therefor as a result of such Person's ownership interest in or other relationship with such entity, except to the extent the terms of such Indebtedness expressly provide that such Person is not liable therefor.

"Interest Payment Date":  (a) the last Business Day of each calendar month while any Loan is outstanding and the Maturity Date, and (b) the date of any repayment or prepayment of any Loan.

"Investment" means, as to any Person, any direct or indirect acquisition or investment by such Person, whether by means of (a) the purchase or other acquisition of Capital Stock or debt of another Person, (b) a loan, advance or capital contribution to, Guarantee Obligation or assumption of debt of, or purchase or other acquisition of any other debt or equity participation or interest in, another Person, including any partnership or joint venture interest in such other Person and any arrangement pursuant to which the investor incurs debt of the type referred to in clause (h) of the definition of "Indebtedness" set forth in this Section 1.1 in respect of such Person, or (c) the purchase or other acquisition (in one transaction or a series of transactions) of assets of another Person that constitute a business unit of, or all of a substantial part of the business being conducted by, such Person. For purposes of covenant compliance, the amount of any Investment shall be the amount actually invested, without adjustment for subsequent increases or decreases in the value of such Investment.

"Lender" as defined in the preamble hereto.

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 112 of 193

"Lien":  any mortgage, deed of trust, pledge, hypothecation, collateral assignment, deposit arrangement, encumbrance, lien (statutory or other), charge or other security interest or any preference, priority or other security agreement or preferential arrangement of any kind or nature whatsoever (including any conditional sale or other title retention agreement and any capital lease having substantially the same economic effect as any of the foregoing).

"Loan":  an extension of credit by the Lender to the Borrower pursuant to Section 2.1.

"Loan Documents":  this Agreement, the Security Documents, the Notes and any amendment, waiver, supplement or other modification to any of the foregoing.

"Loan Notice":  a notice of a borrowing substantially in the form of Exhibit A.

"Material Adverse Effect":  means (a) any fact, effect, event, change, occurrence or circumstance that, by itself or together with other facts, effects, events, changes, occurrences or circumstances, has had or would be reasonably expected to have a material and adverse effect on (1) the business, assets, liabilities (including deposit liabilities), profits, condition (financial or otherwise) or results of operations of the Borrower or its Subsidiary or the Business (as applicable), taken as a whole, or (2) the ability of the Borrower to timely consummate the transactions contemplated by this Agreement; or (b) any other act or omission which would materially impair the ability to operate the Business in the Ordinary Course; provided, however, that none of the following shall be taken into account in determining whether there has been a "Material Adverse Effect": (i) changes in GAAP or regulatory accounting requirements, (ii) changes in laws, rules or regulations of general applicability to companies in the U.S. banking industry, (iii) changes in global, national or regional political conditions or general economic or market conditions (including changes in prevailing interest rates, credit availability and liquidity, currency exchange rates, and price levels or trading volumes in the United States or foreign securities markets) affecting other companies in the U.S. banking industry, (iv) any change, in and of itself (as opposed to the facts underlying such change), in the market price or trading volume of the equity securities of the Borrower on or after the date hereof, (v) the suspension of trading in securities generally on the OTC Bulletin Board, (vi) any outbreak or escalation of hostilities, declared or undeclared acts of war or terrorism, (vii) any changes made by the Borrower or its Subsidiary in the Business or other actions taken, delayed or omitted to be taken by the Borrower or its Subsidiary at the written request or with the prior written consent of the Lender, and (viii) with respect to the Subsidiary, any pre-Closing Date restrictions or conditions imposed as a result of the Regulatory Directives to which the Subsidiary is a party as of the date of this Agreement; except, with respect to clauses (i), (ii), (iii) and (iv), to the extent that the effects of such change are materially disproportionately adverse to the business, assets, liabilities (including deposit liabilities), profits, condition (financial or otherwise) or results of operations of the Borrower and its Subsidiary or the Business (as applicable), taken as a whole, as compared to other similarly situated companies in the U.S. banking industry.

"Maturity Date":  the earlier of (a) the Scheduled Maturity Date and (b) the date on which the Loan becomes due and payable pursuant to Section 7.

"Multiemployer Plan":  a Plan that is a multiemployer plan as defined in Section 4001(a)(3) of ERISA.

"New York UCC":  the Uniform Commercial Code as in effect from time to time in the State of New York.

"Non-Excluded Taxes":  as defined in Section 2.7.

"Note":  a promissory note in the form of Exhibit C, as it may be amended, supplemented or otherwise modified from time to time.

"Obligations":  the unpaid principal of and interest on (including interest accruing after the maturity of the Loan) the Loan, and all other obligations and liabilities of the Borrower to the Lender, whether direct or indirect, absolute or contingent, due or to become due, or now existing or hereafter incurred, which may arise under, out of, or in connection with, this Agreement, any other Loan Document or any other document made, delivered or given in connection herewith or therewith, whether on account of principal, interest, reimbursement obligations, fees, indemnities, costs, expenses (including all fees, charges and disbursements of counsel to the Lender, that are required to be paid by the Borrower pursuant hereto) or otherwise.

"Order":  the order of the Bankruptcy Court in the Case in substantially the form attached hereto as Exhibit D authorizing and approving this Credit Agreement and the other Loan Documents under Sections 364(c) and (d) of the Bankruptcy Code and entered at or after a final hearing, in form and substance satisfactory to the Lender and the Borrower.

"Ordinary Course of Business" or "in the Ordinary Course":  the conduct of the Business in substantially the same manner as the Business was operated on the date of this Agreement, including operations in conformance with the Bank's practices and procedures as of such date.

"Other Taxes":  any and all present or future stamp or documentary taxes or any other excise or property taxes, charges or similar levies arising from any payment made hereunder or from the execution, delivery or enforcement of, or otherwise with respect to, this Agreement or any other Loan Document.

"Patriot Act":  the Uniting and Strengthening America by Providing Appropriate Tools Required to Intercept and Obstruct Terrorism (USA PATRIOT ACT) Act of 2001, Title III of Pub. L. 107-56, signed into law October 26, 2001.

"PBGC":  the Pension Benefit Guaranty Corporation established pursuant to Subtitle A of Title IV of ERISA (or any successor).

"Permitted Liens":  as defined in the recitals hereto.

"Person":  an individual, partnership, corporation, limited liability company, business trust, joint stock company, trust, unincorporated association, joint venture, Governmental Authority or other entity of whatever nature.

"Plan":  at a particular time, any employee benefit plan that is covered by ERISA and in respect of which the Borrower or a Commonly Controlled Entity is (or, if such plan were terminated at such time, would under Section 4069 of ERISA be deemed to be) an "employer" as defined in Section 3(5) of ERISA.

"Plan of Reorganization":  means a plan or plans or reorganization in respects of the Case.

"Professionals":  as defined in Section 2.9.

"Professional Expense Cap":  as defined in Section 2.9.

619322.12-Los Angeles Server 2A - MSW

"Properties":  the facilities and properties owned, leased or operated by the Borrower.

"Quarterly Financial Statements":  means the unaudited consolidated financial statements of the Borrower and its Subsidiaries for the fiscal quarter ended September 30, 2010.

"Regulation U":  Regulation U of the Board as in effect from time to time.

"Regulatory Directives":  as defined in Section 3.1.

"Reorganization":  with respect to any Multiemployer Plan, the condition that such plan is in reorganization within the meaning of Section 4241 of ERISA.

"Reportable Event":  any of the events set forth in Section 4043(c) of ERISA, other than those events as to which the thirty day notice period is waived under subsections .27, .28, .29, .30, .31, .32, .34 or .35 of PBGC Reg. § 4043.

"Requirement of Law":  as to any Person, the Bylaws and Certificate of Incorporation or other organizational or governing documents of such Person, and any law, treaty, rule or regulation or determination of an arbitrator or a court or other Governmental Authority, in each case applicable to or binding upon such Person or any of its property or to which such Person or any of its property is subject.

"Responsible Officer":  means the chief executive officer, president, chief financial officer, treasurer or assistant treasurer of the Borrower or any of the other individuals designated in writing to the Lender by an existing Responsible Officer of the Borrower as an authorized signatory of any certificate or other document to be delivered hereunder.

"SEC":  the Securities and Exchange Commission, any successor thereto and any analogous Governmental Authority.

"Secured Obligations" as defined in the Security Agreement.

"Scheduled Maturity Date": December 12, 2010; provided, however that upon written request by the Borrower to the Lender no less than 10 days prior to the then applicable Scheduled Maturity Date, the then applicable Scheduled Maturity Date shall be extended to December 27, 2010 but only if each of the following conditions is satisfied:

> (a)     no Default or Event of Default shall have occurred and be continuing on the then applicable Scheduled Maturity Date;

> (b)     as of the then applicable Scheduled Maturity Date, all representations and warranties of the Borrower in the Loan Documents shall be true and correct in all material respects (except those representations and warranties made as of an earlier date, in which case such representations and warranties shall be true and correct in all material respects as of such earlier date); and

> (c)     on or immediately prior to the then applicable Scheduled Maturity Date, the Borrower shall have paid to the Lender a fee in an amount equal to 2.0% of the Loan then outstanding.

619322.12-Los Angeles Server 2A - MSW

On the then applicable Scheduled Maturity Date, the Borrower shall submit to the Lender a certificate in form and substance reasonably satisfactory to the Lender certifying that each of the foregoing conditions has been satisfied.

"Securities Act":  the Securities Act of 1933, as amended from time to time and any successor statute.

"Security Agreement":  the Security Agreement to be executed and delivered by the Borrower, substantially in the form of Exhibit B.

"Security Documents":  the collective reference to the Security Agreement, the Order, and all other security documents hereafter delivered to the Lender granting a Lien on any property of any Person to secure the Obligations.

"Single Employer Plan":  any Plan that is covered by Title IV of ERISA, but that is not a Multiemployer Plan.

"Subsidiary":  as to any Person, a corporation, partnership, limited liability company or other entity of which shares of stock or other ownership interests having ordinary voting power (other than stock or such other ownership interests having such power only by reason of the happening of a contingency) to elect a majority of the board of directors or other managers of such corporation, partnership or other entity are at the time owned, or the management of which is otherwise controlled, directly or indirectly through one or more intermediaries, or both, by such Person.  Unless otherwise qualified, all references to a "Subsidiary" or to "Subsidiaries" in this Agreement shall refer to a Subsidiary or Subsidiaries of the Borrower.

"Superpriority Claim":  a claim under Section 364(c)(1) of the Bankruptcy Code against Borrower in the Case which is an administrative expense claim having priority over any or all administrative expenses, including, without limitation, administrative expenses of the kind specified in Sections 503(b), 506(c) or 507(b) of the Bankruptcy Code.

"Tax Sharing Agreement" that certain tax sharing agreement, dated as of January 22, 2010, among the Borrower and certain of its affiliates as in effect on the date hereof.

"Uniform Commercial Code" or "UCC":  the Uniform Commercial Code (or any similar or equivalent legislation) as in effect from time to time in any applicable jurisdiction.

"United States":  the United States of America.

"UST":  the United States Trustee appointed to serve in the Case.

1.2  Other Definitional Provisions.

(a)  Unless otherwise specified therein, all terms defined in this Agreement shall have the meanings set forth herein when such terms are used in the other Loan Documents or any certificate or other document made or delivered pursuant hereto or thereto.

(b)  As used herein and in the other Loan Documents, and any certificate or other document made or delivered pursuant hereto or thereto, (i) the words "include", "includes" and "including" shall be deemed to be followed by the phrase "without limitation", (ii) the word "incur" shall be construed to mean incur, create, issue, assume, become liable in respect of or suffer to exist (and the

9

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 116 of 193

words "incurred" and "incurrence" shall have correlative meanings), (iii) the words "asset" and "property" shall be construed to have the same meaning and effect and to refer to any and all tangible and intangible assets and properties, including cash, Capital Stock, securities, revenues, accounts, leasehold interests and contract rights and (iv) references to agreements or other Contractual Obligations shall, unless otherwise specified, be deemed to refer to such agreements or Contractual Obligations as amended, supplemented, restated or otherwise modified from time to time.

(c)  The words "hereof", "herein" and "hereunder" and words of similar import, when used in this Agreement, shall refer to this Agreement as a whole and not to any particular provision of this Agreement, and Section, Schedule and Exhibit references are to this Agreement unless otherwise specified.

(d)  The meanings given to terms defined herein shall be equally applicable to both the singular and plural forms of such terms.

SECTION 2.   AMOUNT AND TERMS OF COMMITMENT

2.1  Commitment.  Subject to the satisfaction of the conditions set forth in Section 4.1, the Lender agrees to make a Loan to Borrower on one occasion (the date of such loan, the "Closing Date") during the Commitment Period in a principal amount not to exceed the Commitment.  The Lender's Commitment shall terminate immediately and without further action upon the earlier of the funding of all or any portion of the Lender's Commitment on the Closing Date and the date Commitment Period expires.

2.2  Procedure for Borrowing.  Borrower shall deliver to Lender a fully executed Loan Notice no later than 10:00 a.m. (New York City time) on the Closing Date specifying the amount to be borrowed, in an amount not to exceed the Commitment.  The Lender shall make the Loan available to Borrower not later than 3:00 p.m. (New York City time) on such date by wire transfer of same day funds in Dollars to such account as Borrower specifies in the Loan Notice.

2.3  Repayment of the Loan.  The Loan of the Lender shall mature on the Maturity Date and shall be indefeasibly repaid in full in immediately available funds on the Maturity Date.

2.4  Optional Prepayments.  The Borrower may at any time and from time to time prepay the Loan, in whole or in part, without premium or penalty, upon irrevocable notice delivered to the Lender no later than 10:00 A.M., New York City time, one Business Day prior thereto, which notice shall specify the date and amount of prepayment.  If any such notice is given, the amount specified in such notice shall be due and payable on the date specified therein, together with accrued interest to such date on the amount prepaid.  Partial prepayments of the Loan shall be in an aggregate principal amount of $500,000 or a whole multiple thereof.

2.5  Interest Rates and Payment Dates.  Each Loan shall bear interest at a rate per annum equal to the Applicable Rate.  All computations of fees and interest shall be made on the basis of a 360-day year and actual days elapsed.

(a)  (i)  On or prior to the Maturity Date, if any Default or Event of Default shall occur, the Loan (whether or not overdue) shall bear interest at a rate per annum equal to the rate that would otherwise be applicable thereto pursuant to the foregoing provisions of this Section plus 2%, (ii) after the Maturity Date, the Loan shall bear interest at a rate per annum equal to the rate then applicable to the Loan under the Facility plus 2% and (iii) if all or a portion of any interest payable on any Loan or any other amount payable hereunder shall not be paid when due (whether at the stated maturity, by

619322.12-Los Angeles Server 2A - MSW

acceleration or otherwise), such overdue amount shall bear interest at a rate per annum equal to the rate then applicable to the Loan under the Facility plus 2%, in each case, with respect to clauses (i), (ii) and (iii) above, from the date of such non-payment until such amount is indefeasibly paid in full in immediately available funds (as well after as before judgment).

(b)  Interest shall be payable in arrears on each Interest Payment Date, provided that interest accruing pursuant to paragraph (a) of this Section shall be payable from time to time on demand.

2.6  Pro Rata Treatment and Payments.  Amounts prepaid on account of the Loan may not be reborrowed.

(a)  All payments (including prepayments) to be made by the Borrower hereunder, whether on account of principal, interest, fees or otherwise, shall be made without setoff or counterclaim and shall be made prior to 12:00 Noon, New York City time, on the due date thereof to the Lender at the office of the Lender specified in Section 8.2 (or such other office as may be specified from time to time by the Lender by written notice to the Borrower), in Dollars and in immediately available funds.  If any payment hereunder becomes due and payable on a day other than a Business Day, such payment shall be extended to the next succeeding Business Day.  In the case of any extension of any payment of principal pursuant to the preceding sentence, interest thereon shall be payable at the then applicable rate during such extension.

2.7  Taxes.  All payments made by the Borrower under this Agreement shall be made free and clear of, and without deduction or withholding for or on account of, any present or future income, stamp or other taxes, levies, imposts, duties, charges, fees, deductions or withholdings, now or hereafter imposed, levied, collected, withheld or assessed by any Governmental Authority, excluding net income taxes and franchise taxes (imposed in lieu of net income taxes) imposed on the Lender as a result of a present or former connection between the Lender and the jurisdiction of the Governmental Authority imposing such tax or any political subdivision or taxing authority thereof or therein (other than any such connection arising solely from the Lender having executed, delivered or performed its obligations or received a payment under, or enforced, this Agreement or any other Loan Document).  If any such non-excluded taxes, levies, imposts, duties, charges, fees, deductions or withholdings ("Non-Excluded Taxes") or Other Taxes are required to be withheld from any amounts payable to the Lender hereunder, the amounts so payable to the Lender shall be increased to the extent necessary to yield to the Lender (after payment of all Non-Excluded Taxes and Other Taxes) interest or any such other amounts payable hereunder at the rates or in the amounts specified in this Agreement, provided, however, that the Borrower shall not be required to increase any such amounts payable to the Lender with respect to any Non-Excluded Taxes (i) that are attributable to the Lender's failure to comply with the requirements of paragraph (d) or (e) of this Section or (ii) that are United States withholding taxes imposed on amounts payable to the Lender at the time the Lender becomes a party to this Agreement, except to the extent that the Lender's assignor (if any) was entitled, at the time of assignment, to receive additional amounts from the Borrower with respect to such Non-Excluded Taxes pursuant to this paragraph.

(a)  In addition, the Borrower shall pay any Other Taxes to the relevant Governmental Authority in accordance with applicable law.

(b)  Whenever any Non-Excluded Taxes or Other Taxes are payable by the Borrower, as promptly as possible thereafter the Borrower shall send to the Lender for its own account a certified copy of an original official receipt received by the Borrower showing payment thereof.  If the Borrower fails to pay any Non-Excluded Taxes or Other Taxes when due to the appropriate taxing authority or fails to remit to the Lender the required receipts or other required documentary evidence, the Borrower shall

619322.12-Los Angeles Server 2A - MSW

indemnify the Lender for any incremental taxes, interest or penalties that may become payable by the Lender as a result of any such failure.

(c)   The agreements in this Section shall survive the termination of this Agreement and the payment of the Loan and all other amounts payable hereunder.

2.8   <u>Notes</u>.  Upon request of the Lender, the Borrower shall execute and deliver a Note to the Lender in the amount of the Loan held by the Lender.

2.9   <u>Priority and Liens</u>.

(a)   <u>Superpriority Claims and Liens</u>.  Borrower hereby covenants, represents and warrants that, upon entry of the Order, the Obligations of Borrower under the Loan Documents: (i) pursuant to Section 364(c)(1) of the Bankruptcy Code, shall at all times constitute joint and several allowed superpriority administrative expense claims in the Case having priority over all other costs and expenses of the kind specified in, or ordered pursuant to, Sections 105, 326, 330, 331, 503(b), 506(c), 507(a), 507(b), 726 or any other provisions of the Bankruptcy Code; (ii) pursuant to Section 364(c)(2) of the Bankruptcy Code, shall on all tangible and intangible property of Borrower that is not subject to post-petition Permitted Liens (other than Avoidance Actions and the proceeds therefrom); and (iii) pursuant to Section 364(c)(3) of the Bankruptcy Code, shall be secured by a perfected Lien upon all tangible and intangible property of Borrower that is subject to post-petition Permitted Liens, junior to such Permitted Liens; in the case of each of clauses (i) through (iii) subject only to on and after delivery of notice by the Lender to the Borrower (and its counsel), the UST and counsel to the Creditors' Committee, if applicable, that an Event of Default has occurred and is continuing and the Lender desires to trigger the Carve-Out (a "<u>Carve-Out Trigger Notice</u>"), the Carve-Out (as defined below); <u>provided that</u>, except as otherwise provided in the Order, no portion of the Carve-Out shall be utilized for the payment of professional fees and disbursements incurred in connection with any challenge to the amount, extent, priority, validity, perfection or enforcement of the indebtedness of Borrower owing to the lender, agents or indemnified parties under this Agreement.  "<u>Carve-Out</u>" means the (a) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), (b) unpaid and allowed fees and expenses of professional persons, retained by the Borrower or any Creditors' Committee (collectively, the "<u>Professionals</u>"), in each case, incurred on and prior to delivery of a Carve-Out Trigger Notice and (c) unpaid and allowed fees and expenses of Professionals incurred subsequent to delivery of a Carve-Out Trigger Notice, in an aggregate amount not to exceed $250,000 (the "<u>Professional Expense Cap</u>").  For the avoidance of doubt, the Professional Expense Cap shall only apply after the delivery of a Carve-Out Trigger Notice.  The Professional Expense Cap shall be reduced, dollar for dollar, by the amount of any fees, costs and expenses incurred and paid to Professionals subsequent to delivery of a Carve-Out Trigger Notice. The Lender agrees that Borrower shall be permitted to pay compensation and reimbursement of expenses allowed and payable under 11 U.S.C. § 330 and 11 U.S.C. § 331, as the same may be due and payable, and the same shall not reduce the Carve-Out prior to the delivery of a Carve-Out Trigger Notice.  The foregoing shall not be construed as a consent to the allowance of any fees and expenses referred to above and shall not affect the right of the Lender to object to the allowance and payment of such amounts.

(b)   <u>Real Property</u>. Subject in all respects to the terms of the Order, the priorities set forth in <u>Section 2.9(a)</u> above and to the Carve-Out, Borrower grants to the Lender a security interest in, and mortgage on, all of the right, title and interest of Borrower in all real property owned by Borrower (including leasehold interests), together in each case with all of the right, title and interest of Borrower in and to all buildings, improvements, and fixtures related thereto, all general intangibles relating thereto and all proceeds thereof.  Borrower shall acknowledge that, pursuant to the Order, the

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11   Doc 2-1   Filed 10/28/10   Entered 10/28/10 02:02:18   Pg 119 of 193

Liens in favor of the Lender of such real property shall be perfected without the recordation of any instruments of mortgage or assignment. Borrower agrees that upon the reasonable request of the Lender, Borrower shall promptly enter into separate mortgages on owned real property in recordable form with respect to such properties on terms reasonably satisfactory to the Lender.

(c) <u>Set-Off</u>. Subject to <u>Section 7</u> hereof, upon the occurrence and during the continuance of any Event of Default, the Lender is hereby authorized at any time and from time to time, to the fullest extent permitted by law and without further order of or application to the Bankruptcy Court, to set off and apply any and all deposits (general or special, time or demand, provisional or final) (other than payroll, trust, withholding and tax accounts) at any time held and other indebtedness at any time owing by the Lender to or for the credit or the account of Borrower against any and all of the obligations of Borrower under the Loan Documents, whether or not such obligations are then due. The Lender shall notify the Borrower of such setoff and application, provided that the failure to give such notice shall not affect the validity of such setoff and application. The rights of the Lender under this <u>Section 2.9(c)</u> are in addition to other rights and remedies which such they may have upon the occurrence and during the continuance of any Event of Default under the Loan Documents or the Order.

(d) <u>Discharge</u>. Borrower agrees that (i) its obligations hereunder shall not be discharged by the entry of an order confirming a Plan of Reorganization (and Borrower, pursuant to Section 1141(d)(4) of the Bankruptcy Code, hereby waives any such discharge) and (ii) the Superpriority Claim granted to the Lender pursuant to the Order, and described in <u>Section 2.9(a)</u> and the Liens granted to the Lender pursuant to the Order, and the Security Documents shall not be affected in any manner by the entry of an order confirming a Plan of Reorganization.

(e) In the event and to the extent that the provisions of this <u>Section 2.9</u> shall conflict with what is set forth in the Order, the Order shall govern.

2.10 <u>Security</u>. Upon entry of the Order, as security for the prompt payment and performance of all Secured Obligations of Borrower, Borrower has granted, in accordance with the provisions of the Security Documents applicable to Borrower and the Order, to the Lender a security interest in all of its right, title and interest in and to all of its Collateral. In the event and to the extent that the provisions of this <u>Section 2.10</u> shall conflict with what is set forth in the Order, the Order shall govern.

### SECTION 3.  REPRESENTATIONS AND WARRANTIES

To induce the Lender to enter into this Agreement and to make the Loan the Borrower hereby represents and warrants to the Lender that:

3.1 <u>Existence; Compliance with Law</u>. The Borrower (a) is duly organized, validly existing and in good standing under the laws of the jurisdiction of its organization, (b) subject to the entry of the Order, has the power and authority, and the legal right, to own and operate its property, to lease the property it operates as lessee and to conduct its business in a manner in which its business is now being conducted, (c) is duly qualified as a bank holding company under the Bank Holding Company Act of 1956, as amended, (d) is in good standing under the laws of each jurisdiction where its ownership, lease or operation of property or the conduct of its business requires such qualification, except to the extent the failure to be so qualified or in good standing could not reasonably be expected to have a Material Adverse Effect and (e) except for the Borrower's non-compliance with certain regulatory agency directives, notices, agreements, and other understandings, including without limitation the Written Agreement, dated September 15, 2009, between the Borrower and the Federal Reserve Board (collectively, the "Regulatory

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 120 of 193

Directives"), is in compliance with all Requirements of Law except to the extent that the failure to comply therewith could not, in the aggregate, reasonably be expected to have a Material Adverse Effect.

3.2 <u>Power; Authorization; Enforceable Obligations</u>. Subject to the entry of the Order, the Borrower has the power and authority, and the legal right, to make, deliver and perform the Loan Documents to which it is a party and to obtain extensions of credit hereunder. The Borrower has taken all necessary organizational action to authorize the execution, delivery and performance of the Loan Documents to which it is a party and to authorize the extensions of credit on the terms and conditions of this Agreement. Other than Bankruptcy Court approval and any approvals required pursuant to any Regulatory Directive (which have been obtained prior to the making of the Loan), no Governmental Approval or consent or authorization of, filing with, notice to or other act by or in respect of, any other Person is required in connection with the extensions of credit hereunder or with the execution, delivery, performance, validity or enforceability of this Agreement or any of the Loan Documents, except the filings to perfect Liens granted under the Security Documents. Each Loan Document has been duly executed and delivered on behalf of the Borrower. This Agreement constitutes, and each other Loan Document upon execution and upon entry of the Order, will constitute, a legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms, except as enforceability may be limited by applicable bankruptcy, insolvency, reorganization, moratorium or similar laws affecting the enforcement of creditors' rights generally and by general equitable principles (whether enforcement is sought by proceedings in equity or at law).

3.3 <u>No Legal Bar</u>. Subject to the entry of the Order and the receipt of any approvals required pursuant to any Regulatory Directive (which shall have occurred prior to the making of the Loan), (i) the execution, delivery and performance of this Agreement and the other Loan Documents, the borrowings hereunder and the use of the proceeds thereof will not violate any Requirement of Law or any Contractual Obligation of the Borrower and will not result in, or require, the creation or imposition of any Lien on any of their respective properties or revenues pursuant to any Requirement of Law or any such Contractual Obligation (other than the Liens created by the Security Documents) and (ii) no Requirement of Law or Contractual Obligation applicable to the Borrower could reasonably be expected to have a Material Adverse Effect.

3.4 <u>No Default</u>. The Borrower is not in default under or with respect to any of its Contractual Obligations in any respect that could reasonably be expected to have a Material Adverse Effect, except with respect to any obligations under the Regulatory Directives. No Default or Event of Default has occurred and is continuing.

3.5 <u>Federal Regulations</u>. No part of the proceeds of the Loan, and no other extensions of credit hereunder, will be used (a) for "buying" or "carrying" any "margin stock" within the respective meanings of each of the quoted terms under Regulation U as now and from time to time hereafter in effect for any purpose that violates the provisions of the Regulations of the Board or (b) for any purpose that violates the provisions of the Regulations of the Board. If requested by the Lender, the Borrower will furnish to the Lender a statement to the foregoing effect in conformity with the requirements of FR Form G-3 or FR Form U-1, as applicable, referred to in Regulation U.

3.6 <u>Investment Company Act; Other Regulations</u>. The Borrower is not an "investment company", or a company "controlled" by an "investment company", within the meaning of the Investment Company Act of 1940, as amended. The Borrower is not subject to regulation under any Requirement of Law (other than Regulation X of the Board) that limits its ability to incur Indebtedness, except for any such limitations imposed under the Regulatory Directives.

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 121 of 193

3.7  Accuracy of Information, etc.  No statement or information contained in this Agreement, any other Loan Document or any other document, certificate or statement furnished by or on behalf of the Borrower to the Lender for use in connection with the transactions contemplated by this Agreement or the other Loan Documents, contained as of the date such statement, information, document or certificate was so furnished, any untrue statement of a material fact or omitted to state a material fact necessary to make the statements contained herein or therein not misleading.  There is no fact known to the Borrower that could reasonably be expected to have a Material Adverse Effect that has not been expressly disclosed herein, in the other Loan Documents or in any other documents, certificates and statements furnished to the Lender for use in connection with the transactions contemplated hereby and by the other Loan Documents.

3.8  Financial Statements; No Material Adverse Effect.

(a)  The Audited Financial Statements (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; (ii) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein; and (iii) show all material indebtedness and other liabilities, direct or contingent, of the Borrower and its Subsidiaries as of the date thereof, including liabilities for taxes, material commitments and Indebtedness, to the extent required by GAAP to be shown therein; it being understood that the Audited Financial Statements contain a going concern qualification.

(b)  The Quarterly Financial Statements, and the related consolidated statements of income or operations, shareholders' equity and cash flows for such fiscal quarter, (i) were prepared in accordance with GAAP consistently applied throughout the period covered thereby, except as otherwise expressly noted therein, and (ii) fairly present in all material respects the financial condition of the Borrower and its Subsidiaries as of the date thereof and their results of operations for the period covered thereby, subject, in the case of clauses (i) and (ii), to the absence of footnotes and to normal year-end audit adjustments; it being understood that the Quarterly Financial Statements contain a going concern qualification.

(c)  Since the date of this Agreement, there has been no change, event, circumstance or development that, individually or in the aggregate, that has had or would reasonably be expected to have a Material Adverse Effect.

(d)  The Budget delivered to the Lender pursuant to Section 4.1(f) or most recently pursuant to Section 5.4(a) was prepared in good faith on the basis of the assumptions and qualifications stated therein, which assumptions and qualifications were reasonably believed by the Borrower to be fair in light of the conditions existing at the time of delivery of such Budget and at the Closing Date, as applicable, and represented, at the time of delivery, the Borrower's best estimate of its future financial needs (it being understood and agreed that projections, forecasts and budgets, whether delivered on, before or after the Closing Date and whether delivered pursuant to this Section or any other provision in this Agreement or the other Loan Documents, are not be viewed as facts and are by their nature speculative and uncertain, subject to significant contingencies and are not a guarantee of financial performance and that actual results may differ from the Budget and the projections therein and such variations may be material).

3.9  Ownership Of Property; Liens; Investments.

619322.12-Los Angeles Server 2A - MSW

(a)     The Borrower has good record and marketable title in fee simple to, or valid leasehold interests in, all real property necessary or used in the ordinary conduct of its business, except for such defects in title as could not, individually or in the aggregate, reasonably be expected to have a Material Adverse Effect.

(b)     The property of the Borrower is not subject to any Liens, other than Liens permitted by Section 6.1.

3.10     Secured Superpriority Obligations

. On and after the Closing Date and the entry of the Order, the Order and the Loan Documents are sufficient to provide the Superpriority Claims and Liens described in, and with the priority provided in, Section 2.9 of this Agreement and the Order (it being understood and agreed that in the event and to the extent that the provisions of Section 2.9 shall conflict with what is set forth in the Order, the Order shall govern).  The Order is in full force and effect and has not been vacated, reversed, modified, amended, rescinded or stayed without the prior written consent of the Lender.

SECTION 4.   CONDITIONS PRECEDENT

4.1 Conditions to Loan.  The agreement of the Lender to extend the Loan requested to be made by it is subject to the satisfaction, prior to or concurrently with the making of such extension of credit on the Closing Date, of the following conditions precedent:

(a)     The Lender shall have received each of the following, each of which shall be originals or telecopies (followed promptly by originals), each dated on or prior to the Closing Date (or, in the case of certificates of governmental officials, a recent date before the Closing Date) each in form and substance satisfactory to the Lender and in such number of copies as may be requested by the Lender:

(i)     duly executed counterparts of this Agreement,

(ii)    the Security Agreement, duly executed by the Borrower, together with:

(A)     certificates representing the Pledged Interests referred to in the Security Agreement accompanied by undated stock powers executed in blank and instruments evidencing the Pledged Debt indorsed in blank.

(B)     acknowledgment copies or stamped receipt copies of proper financing statements, duly filed on or before the Closing Date under the Uniform Commercial Code of all jurisdictions that the Lender may reasonably deem necessary in order to perfect and protect the first priority liens and security interests created under the Security Agreement, covering the Collateral described in the Security Agreement, and

(C)     copies of Uniform Commercial Code, tax and judgment lien searches with respect to the Borrower in each of the jurisdictions where the Borrower is located (within the meaning of Section 9-307 of the New York UCC or the corresponding code or statute

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 123 of 193

of any other applicable jurisdiction), dated on or before the Closing Date, together with copies of all such filings disclosed by such search;

(iii)     such duly executed certificates of resolutions or consents, incumbency certificates and/or other duly executed certificates of Responsible Officers of the Borrower as the Lender may reasonably require evidencing the identity, authority and capacity of each Responsible Officer thereof authorized to act as a Responsible Officer in connection with this Agreement and the other Loan Documents;

(iv)     such documents and duly executed certifications as the Lender may reasonably require to evidence that the Borrower is duly organized or formed, and that the Borrower is validly existing and in good standing in the jurisdiction where it is formed;

(v)     a certificate signed by a Responsible Officer of the Borrower certifying (A) that the conditions specified in Sections 4.1(i) and (j) have been satisfied and (B) as of the Closing Date, since September 30, 2010, there has been no change, event, circumstance or development that, individually or in the aggregate, has had or would reasonably be expected to have a Material Adverse Effect; and

(vi)     a Loan Notice.

(b)     The Borrower shall have paid all accrued fees and expenses of the Lender (including the reasonable and documented fees and expenses of Skadden, Arps, Slate, Meagher & Flom LLP) on or before the Closing Date pursuant to Section 8.5.

(c)     All governmental authorizations and all third party consents and approvals necessary in connection with the transactions contemplated hereby shall have been obtained (without the imposition of any conditions that are not reasonably acceptable to the Lender) and shall remain in effect; all applicable governmental filings shall have been made and all applicable waiting periods in connection with the transactions contemplated hereby shall have expired without, in either case, any action being taken by any Governmental Authority, and no law or regulation shall be applicable in the reasonable judgment of the Lender that restrains, prevents or imposes materially adverse conditions upon the transactions contemplated hereby.  All approvals required pursuant to any Regulatory Directive shall have been obtained (without the imposition of any burdensome conditions on (x) the execution, delivery and performance of the Loan Documents or (y) the exercise of any rights or remedies of the Lender under the Loan Documents) and shall remain in effect.

(d)     The Order shall have been entered by the Bankruptcy Court, shall be in full force and effect and shall not have been amended, modified, stayed or reversed without the prior written consent of the Lender.

(e)     All of the "first day orders" and related orders submitted on or about the date of the commencement of the Case shall be in form and substance reasonably satisfactory to the Lender and the Borrower and, as entered, shall not deviate from the form thereof approved by the Lender in any material respect which is adverse to the interests of the Lender (such orders

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 124 of 193

hereinafter being referred to as "Underline First Day Orders"; it being understood and agreed that notwithstanding anything herein to the contrary, the relief sought in all such First Day Orders approved by the Lender shall be permitted herein and the consent of the Lender to such relief therein shall be deemed to have been obtained).

(f)     The Lender shall have received the initial Budget.

(g)     The Lender shall have received, at least one Business Day prior to the Closing Date, all documentation and other information required by regulatory authorities under applicable "know your customer" and anti-money laundering rules and regulations, including without limitation the Patriot Act.

(h)     Each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents shall be true and correct on and as of such date as if made on and as of such date.

(i)     No Default or Event of Default shall have occurred and be continuing on such date or after giving effect to the extensions of credit requested to be made on such date.

SECTION 5.     AFFIRMATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Loan or Obligations or other amounts are owing to the Lender hereunder or under the other Loan Documents, the Borrower shall:

5.1 Further Assurances.  At any time or from time to time upon the request of the Lender, at the expense of the Borrower, promptly execute, acknowledge and deliver such additional instruments, certificates or documents, and do all such other acts and things as the Lender may reasonably request for purposes of implementing or effectuating the provisions of this Agreement and the other Loan Documents, of providing for payment of the Obligations in accordance with the terms of this Agreement, the Notes and the other Loan Documents, or of more fully perfecting or renewing the rights of the Lender with respect to the Collateral (or with respect to any additions thereto or replacements or proceeds or products thereof or with respect to any other property or assets hereafter acquired by the Borrower which may be deemed to be part of the Collateral) pursuant hereto or thereto.  Upon the exercise by the Lender of any power, right, privilege or remedy pursuant to this Agreement or the other Loan Documents which requires any consent, approval, recording, qualification or authorization of any Governmental Authority, the Borrower shall execute and deliver, or will cause the execution and delivery of, all applications, certifications, instruments and other documents and papers that the Lender may be required to obtain from the Borrower for such governmental consent, approval, recording, qualification or authorization (to the extent the Borrower is permitted by applicable law to do so).  The Borrower shall fully preserve or cause to be fully preserved the Liens granted by the Security Documents.  The Borrower agrees that all costs and expenses reasonably expended or otherwise incurred pursuant to this Section 5.1 (including reasonable attorneys' fees and disbursements) by the Lender shall constitute Obligations and shall be paid by the Borrower in accordance with the terms hereof.

5.2     Use Of Proceeds.  Use the proceeds of the Loan (a) to pay fees and expenses associated with negotiation, execution and delivery of this Agreement and the other Loan Documents, (b) for working capital and other general corporate purposes of the Borrower not materially inconsistent with the aggregate disbursement contemplated in the Budget and to the extent not prohibited hereunder, (c) to pay fees and expenses of the Borrower's advisors and the advisors to any Creditors' Committee, in each

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 125 of 193

case associated with the Case subject to the restrictions thereon set forth in the Order and (d) to make any other payments permitted to be made in the Order or in the First Day Orders, or by the Bankruptcy Court to the extent not prohibited by this Agreement or the Order or otherwise consented by the Lender.

5.3     Preservation Of Existence; Business, Etc.  (a) Preserve, renew and maintain in full force and effect its legal existence and good standing under the laws of the jurisdiction of its organization; (b) take all reasonable action to maintain all rights, privileges, permits, licenses and franchises necessary in the normal conduct of its business; (c) preserve or renew all of its material registered patents, trademarks, trade names and service marks; and (d) maintain and operate its business in substantially the manner in which it is presently conducted and operated.

5.4     Budgets; Financial Information; Default Notices.  Deliver to the Lender, in form satisfactory to the Lender:

(a)  not later than Wednesday of each week (or if such day is not a Business Day, the next succeeding Business Day), an updated Budget for the immediately following 13-week period, together with a flash report as to the actual performance of the prior week ending Friday and a comparison of the actual performance for such week against the forecast for such week in the previous Budget, in each case with written explanations of material variances;

(b)  promptly upon request by the Lender, such consolidated balance sheets of the Borrower and its Subsidiaries, related consolidated statements of income or operations, shareholders' equity, and cash flows, cash balance reports or any other financial reports as requested by the Lender; and

(c)  promptly (and in any event within two Business Days) provide written notice to the Lender of the occurrence of any Default or Event of Default, describing the nature of such Default or Event of Default and any remedial actions being taken with respect thereto.

SECTION 6.   NEGATIVE COVENANTS

The Borrower hereby agrees that, so long as the Commitment remains in effect or any Loan or other Obligations or other amounts are owing to the Lender hereunder or under any other Loan Document, the Borrower shall not directly or indirectly:

6.1  Liens.  Create, incur, assume or suffer to exist any Lien upon any of its property, assets or revenues, whether now owned or hereafter acquired, or sign or file or suffer to exist under the Uniform Commercial Code of any jurisdiction a financing statement that names the Borrower as debtor, or sign or suffer to exist any security agreement authorizing any secured party thereunder to file such financing statement, or assign any accounts or other right to receive income, other than the following:

(a)     Liens pursuant to any Loan Document and the Order;

(b)     Liens for taxes not yet due or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person in accordance with GAAP;

(c)     landlords', carriers', warehousemen's, mechanic's, materialmen's, repairmen's or other like Liens arising in the ordinary course of business which, to the extent not subject to Section 362 of the Bankruptcy Code, are not overdue for a period of more than 30 days or which are being contested in good faith and by appropriate proceedings diligently conducted, if adequate reserves with respect thereto are maintained on the books of the applicable Person;

619322.12-Los Angeles Server 2A - MSW

(d)     pledges or deposits in the ordinary course of business in connection with workers' compensation, unemployment insurance and other social security legislation, other than any Lien imposed by ERISA; and

(e)     deposits to secure the performance of bids, trade contracts and leases (other than Indebtedness), statutory obligations, surety bonds (other than bonds related to judgments or litigation), performance bonds and other obligations of a like nature incurred or arising in the ordinary course of business.

6.2     <u>Indebtedness</u>.  Create, incur, assume or suffer to exist any Indebtedness, except:

(a)     Indebtedness under the Loan Documents; and

(b)     Indebtedness outstanding on the date hereof and listed on <u>Schedule 6.2</u>.

6.3     <u>Investments</u>.  Make or hold any Investments, except:

(a)     Investments held by the Borrower in the form of cash or cash equivalents;

(b)     Investments consisting of extensions of credit in the nature of accounts receivable or notes receivable arising from the grant of trade credit in the ordinary course of business, and Investments received in satisfaction or partial satisfaction thereof from financially troubled account debtors to the extent reasonably necessary in order to prevent or limit loss; and

(c)     Investments existing on the date hereof.

6.4     <u>Fundamental Changes</u>.  Merge, dissolve, liquidate, consolidate with or into another Person, or Dispose of (whether in one transaction or in a series of transactions) all or substantially all of its assets (whether now owned or hereafter acquired) to or in favor of any Person.

6.5     <u>Dispositions</u>.  Make any Disposition or enter into any agreement to make any Disposition, except:

(a)     Dispositions of obsolete or worn out property or property no longer used or useful in the business of the Borrower, whether now or hereafter owned or leased, in the ordinary course of business of such Person;

(b)     Dispositions of inventory in the ordinary course of business;

(c)     Dispositions of equipment, software or real property to the extent that (i) such property is exchanged for credit against the purchase price of similar replacement property or (ii) the proceeds of such Disposition are reasonably promptly applied to the purchase price of such replacement property;

(d)     the sale, lease, sub-lease, license, sub-license or consignment of personal property of the Borrower in the ordinary course of business and leases or subleases of real property permitted by clause (a) for which rentals are paid on a periodic basis over the term thereof;

(e)     the settlement or write-off of accounts receivable or sale of overdue accounts receivable for collection in the ordinary course of business consistent with past practice; and

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 127 of 193

(f)     sale, exchange or other disposition of cash and cash equivalents in the ordinary course of business;

provided, however, that any Disposition pursuant to Section 6.5(a) through (f) shall be for fair market value.

6.6     Change In Nature Of Business.  Engage in any line of business different from those lines of business conducted by the Borrower on the date hereof.

6.7     Transactions With Affiliates.  Enter into any transaction of any kind with any Affiliate of the Borrower, whether or not in the ordinary course of business, other than on fair and reasonable terms substantially as favorable to the Borrower as would be obtainable by the Borrower at the time in a comparable arm's length transaction with a Person other than an Affiliate; provided that the foregoing restriction shall not apply to transactions, arrangements, fees reimbursements and indemnities specifically and expressly permitted between or among such parties under this Agreement.

6.8     Accounting Changes.  Make any change in (i) accounting policies or reporting practices in a manner that could materially affect the results of computation of any financial ratio or data for a given reporting period, except (x) as required by generally accepted accounting principles, (y) as required for compliance with the Sarbanes-Oxley Act or (z) as pre-approved by the Lender, or (ii) fiscal year.

6.9     Partnerships, Etc.  Become a general partner in any general or limited partnership or joint venture.

6.10     Speculative Transactions.  Engage in any transaction involving any interest rate protection agreement, foreign currency exchange agreement, commodity price protection agreement or other interest or currency exchange rate or commodity price hedging arrangement (including caps and collars with respect to interest rates, currency exchange rates or commodity prices) or futures contracts for speculative purposes or any similar speculative transactions, which are, in any case, inconsistent with prior practice and not otherwise made in the ordinary course of business.

6.11     Formation Of Subsidiaries.  Organize or invest in any new Subsidiary.

SECTION 7.   EVENTS OF DEFAULT

7.1 Events of Default.  If any of the following events shall occur and be continuing:

(a)     the Borrower shall fail to pay any principal of any Loan when due in accordance with the terms hereof; or the Borrower shall fail to pay any interest on any Loan or any other amount payable hereunder or under any other Loan Document, within two days after any such interest or other amount becomes due in accordance with the terms hereof; or

(b)     any representation or warranty made or deemed made by the Borrower herein or in any other Loan Document or that is contained in any certificate, document or financial or other statement furnished by it at any time under or in connection with this Agreement or any such other Loan Document shall prove to have been inaccurate in any material respect on or as of the date made or deemed made; or

(c)     the Borrower fails to perform or observe any term, covenant or agreement contained in any of Sections 2.9 or 2.10, Section 5 or Section 6; or

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 128 of 193

(d)     the Borrower shall default in the observance or performance of any provision contained in this Agreement or any other Loan Document (other than as provided in paragraphs (a) through (c) of this Section), and such default shall continue unremedied for a period of five days after notice to the Borrower from the Lender; or

(e)    the Borrower shall (i) default in making any payment of any principal of any Indebtedness (including any Guarantee Obligation, but excluding the Loan and any payments related to accelerated junior subordinated debentures) on the scheduled or original due date with respect thereto; or (ii) default in making any payment of any interest on any such Indebtedness beyond the period of grace, if any, provided in the instrument or agreement under which such Indebtedness was created; or (iii) default in the observance or performance of any other agreement or condition relating to any such Indebtedness or contained in any instrument or agreement evidencing, securing or relating thereto, or any other event shall occur or condition exist, the effect of which default or other event or condition is to cause, or to permit the holder or beneficiary of such Indebtedness (or a trustee or agent on behalf of such holder or beneficiary) to cause, with the giving of notice if required, such Indebtedness to become due prior to its stated maturity or (in the case of any such Indebtedness constituting a Guarantee Obligation) to become payable; or

(f)    the Borrower shall default in the observance or performance of the Tax Sharing Agreement and such default shall continue unremedied for a period of five days after notice to such the Borrower from the Lender;

(g)    the Borrower becomes unable or admits in writing its inability or fails to generally to pay its debts incurred postpetition as they become due; or

(h)     (i)  any Person shall engage in any "prohibited transaction" (as defined in Section 406 of ERISA or Section 4975 of the Code) involving any Plan, (ii) any "accumulated funding deficiency" (as defined in Section 302 of ERISA), whether or not waived, shall exist with respect to any Plan or any Lien in favor of the PBGC or a Plan shall arise on the assets of the Borrower or any Commonly Controlled Entity, (iii) a Reportable Event shall occur with respect to, or proceedings shall commence to have a trustee appointed, or a trustee shall be appointed, to administer or to terminate, any Single Employer Plan, which Reportable Event or commencement of proceedings or appointment of a trustee is, in the reasonable opinion of the Lender, likely to result in the termination of such Plan for purposes of Title IV of ERISA, (iv) any Single Employer Plan shall terminate for purposes of Title IV of ERISA, (v) the Borrower or any Commonly Controlled Entity shall, or in the reasonable opinion of the Lender is likely to, incur any liability in connection with a withdrawal from, or the Insolvency or Reorganization of, a Multiemployer Plan or (vi) any other event or condition shall occur or exist with respect to a Plan; and in each case in clauses (i) through (vi) above, such event or condition, together with all other such events or conditions, if any, could, in the sole judgment of the Lender, reasonably be expected to have a Material Adverse Effect; or

(i)     one or more judgments or decrees shall be entered against the Borrower involving in the aggregate a liability (not paid or fully covered by insurance as to which the relevant insurance company has acknowledged coverage) of $500,000 or more, and all such judgments or decrees shall not have been vacated, discharged, stayed or bonded pending appeal within 5 days from the entry thereof; or

619322.12-Los Angeles Server 2A - MSW

(j)       any of the Security Documents shall cease, for any reason, to be in full force and effect, or the Borrower or any Affiliate of the Borrower shall so assert, or any Lien created by any of the Security Documents shall cease to be enforceable and of the same effect and priority purported to be created thereby; or

(k)       an order (which has not been stayed) with respect to the Case shall be entered by the Bankruptcy Court appointing, or the Borrower shall file an application for an order with respect to the Case seeking the appointment of, (i) a trustee under Section 1104 of the Bankruptcy Code, or (ii) an examiner with enlarged powers relating to the operation of the business (powers beyond those set forth in Section 1106(a)(3) and (4) of the Bankruptcy Code) under Section 1106(b) of the Bankruptcy Code; or

(l)       an order with respect to the Case shall be entered by the Bankruptcy Court converting the Case to a Chapter 7 case or the Borrower shall file a motion or not oppose a motion seeking such relief, unless such motion is consented to by the Lender; or

(m)       the Bankruptcy Court shall enter an order or orders granting relief from the automatic stay applicable under Section 362 of the Bankruptcy Code to the holder or holders of any security interest to permit foreclosure (or the granting of a deed in lieu of foreclosure or the like) on any Collateral of the Borrower which has a value in excess of $500,000 in the aggregate or permits any third party to commence or continue any litigation against the Borrower involving a potential liability not covered by insurance in excess of $500,000 in the aggregate; or

(n)       an order with respect to the Case shall be entered by the Bankruptcy Court without the express prior written consent of the Lender (i) to revoke, reverse, stay, modify, supplement or amend the Order, (ii) to permit any administrative expense or any claim (now existing or hereafter arising, of any kind or nature whatsoever) to have administrative priority as to the Borrower equal or superior to the priority of the Lender in respect of the Obligations, except for allowed administrative expenses to the extent set forth in the Order, or (iii) to grant or permit the grant of a Lien on the Collateral other than a Permitted Lien or any Lien in favor of the Lender; or

(o)       the Borrower shall make any payment of principal or interest or otherwise on account of any prepetition Indebtedness or trade payable (excluding payments effected by a setoff of obligations as permitted by Section 553 of the Bankruptcy Code) in excess of $10,000 without the express prior written consent of the Lender and the approval of the Bankruptcy Court other than Permitted Adequate Protection Payments or as provided for in any First Day Orders; or

(p)       the Borrower shall file a motion in the Case (i) to use Cash Collateral of the Lender under Section 363(c) of the Bankruptcy Code without the express prior written consent of the Lender (it being understood and agreed that the Lender consents to the proposed use of Cash Collateral on the terms and conditions set forth in the form of Order attached hereto), (ii) to recover from any portions of the Collateral any costs or expenses of preserving or disposing of such Collateral under Section 506(c) of the Bankruptcy Code, to cut off rights in the Collateral under Section 552(b) of the Bankruptcy Code, or (iii) to take any other action or actions materially adverse to the Lender or its rights and remedies hereunder or under any of the other Loan Documents or the Lender's interest (as lender under the Loan Documents) in any of the Collateral; or

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 130 of 193

(q)     an order shall be entered by the Bankruptcy Court dismissing the Case which does not contain a provision for termination of the Commitment, and payment in full in cash of all Obligations of the Borrower hereunder and under the other Loan Documents upon entry thereof; or

(r)     the Asset Purchase Agreement, dated as of October 27, 2010, between the Borrower and the Lender is terminated;

then, Lender may, by five (5) Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditors' Committee, the UST and the Bankruptcy Court), declare the Loan (with accrued interest thereon) and all other amounts owing under this Agreement and the other Loan Documents to be due and payable forthwith, whereupon the same shall immediately become due and payable.  Except as expressly provided above in this Section, presentment, demand, protest and all other notices of any kind are hereby expressly waived by the Borrower.  In the event and to the extent that the provisions of this <u>Section 7.1</u> conflict with what is set forth in the Order, the Order shall govern.  Notwithstanding the foregoing, any Event of Default under clause (o) above may be cured through the return to the Borrower, within five days following notice from the Lender of such Event of Default, of all sums paid which constitute or caused an Event of Default under clause (o) above.  Upon the return of all such sums, the Borrower shall provide notice thereof to the Lender, along with such other evidence the Lender may reasonably require to confirm that such payment has been made to the Borrower, and upon delivery of such items such Event of Default shall then be cured and cease to be in effect or continuing.

7.2   <u>Application of Proceeds</u>.  If an Event of Default shall have occurred and be continuing, the Lender may at any time apply (a) all payments received by the Lender under the Loan Documents, whether from the Borrower or otherwise and (b) all or any part of proceeds constituting Collateral, in payment of the Obligations in the following order:

(a) *first*, to the payment of all costs and expenses of such sale, collection or other realization, all other expenses, liabilities and advances made or incurred by the Lender in connection therewith, and all amounts for which the Lender is entitled to compensation, reimbursement and indemnification under any Loan Document and all advances made by the Lender thereunder for the account of the Borrower, and to the payment of all costs and expenses paid or incurred by the Lender in connection with the Loan Documents, all in accordance with <u>Section 8.5</u> and the other terms of this Agreement and the Loan Documents;

(b) *second*, thereafter, to the payment of all other Obligations; and

(c) *third*, thereafter, to the payment to or upon the order of the Borrower or to whosoever may be lawfully entitled to receive the same or as a court of competent jurisdiction may direct.

## SECTION 8.   MISCELLANEOUS

8.1   <u>Amendments and Waivers</u>.  No amendment, supplement, modification or waiver of any of the provisions of this Agreement or any other Loan Document shall be deemed to be made unless the same shall be in writing signed on behalf of the Borrower and the Lender and each waiver, if any, shall be a waiver only with respect to the specific instance involved and shall in no way impair the rights of the parties making such waiver or the obligations of the other parties to such party in any other respect or at any other time.  Any such waiver and any such amendment, supplement or modification shall be

619322.12-Los Angeles Server 2A - MSW

binding upon the Borrower, the Lender and all future holders of the Loan.  In the case of any waiver, each of the Borrower and the Lender shall be restored to their former position and rights hereunder and under the other Loan Documents, and any Default or Event of Default waived shall be deemed to be cured and not continuing; but no such waiver shall extend to any subsequent or other Default or Event of Default, or impair any right consequent thereon.

        8.2  <u>Notices</u>.  All notices, requests and demands to or upon the respective parties hereto to be effective shall be in writing (including by facsimile), and, unless otherwise expressly provided herein, shall be deemed to have been duly given or made when delivered, or three Business Days after being deposited in the mail, postage prepaid, or, in the case of facsimile notice, when received, addressed as follows, or to such other address as may be hereafter notified by the respective parties hereto:

| | |
|---|---|
| Borrower: | AmericanWest Bancorporation |
| | 41 W. Riverside Avenue, Suite 300 |
| | Spokane, Washington 99201 |
| | Attention: Jay B. Simmons, Esq. |
| | |
| | Facsimile No.: (509) 465-9681 |
| | Telephone: (509) 467-6993 |
| Lender: | SKBHC Hawks Nest Acquisition Corp. |
| | c/o SKBHC Holdings LLC |
| | 8723 E Via De Commercio |
| | Scottsdale, Arizona 85258 |
| | Attention:  Scott A. Kisting |
| | |
| | Facsimile No.: (480) 315-8796 |
| | Telephone: (480) 315-8796 |

<u>provided</u> that any notice, request or demand to or upon the Lender shall not be effective until received.

        Notices and other communications to the Lender hereunder may be delivered or furnished by electronic communications pursuant to procedures approved by the Lender.

        8.3  <u>No Waiver; Cumulative Remedies</u>.  No failure to exercise and no delay in exercising, on the part of the Lender, any right, remedy, power or privilege hereunder or under the other Loan Documents shall operate as a waiver thereof; nor shall any single or partial exercise of any right, remedy, power or privilege hereunder preclude any other or further exercise thereof or the exercise of any other right, remedy, power or privilege.  The rights, remedies, powers and privileges herein provided are cumulative and not exclusive of any rights, remedies, powers and privileges provided by law.

        8.4  <u>Survival of Representations and Warranties</u>.  All representations and warranties made hereunder, in the other Loan Documents and in any document, certificate or statement delivered pursuant hereto or in connection herewith shall survive the execution and delivery of this Agreement and the making of the Loan and other extensions of credit hereunder.

        8.5  <u>Payment of Expenses and Taxes</u>.  The Borrower agrees (a) to pay or reimburse the Lender for all its reasonable and documented out-of-pocket costs and expenses incurred in connection with the development, preparation and execution of, and any amendment, supplement or modification to, this Agreement and the other Loan Documents and any other documents prepared in connection herewith or therewith, and the consummation and administration of the transactions contemplated hereby and thereby, including the reasonable fees and disbursements of counsel to the Lender and filing and

619322.12-Los Angeles Server 2A - MSW

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 132 of 193

recording fees and expenses, with statements with respect to the foregoing to be submitted to the Borrower from time to time as the Lender shall deem appropriate, in an aggregate amount not to exceed $100,000, (b) to pay or reimburse the Lender for all its documented costs and expenses incurred in connection with the enforcement or preservation of any rights under this Agreement, the other Loan Documents and any such other documents, including the fees and disbursements of counsel to the Lender, (c) to pay, indemnify, and hold the Lender harmless from, any and all recording and filing fees and any and all liabilities with respect to, or resulting from any delay in paying, stamp, excise and other taxes, if any, that may be payable or determined to be payable in connection with the execution and delivery of, or consummation or administration of any of the transactions contemplated by, or any amendment, supplement or modification of, or any waiver or consent under or in respect of, this Agreement, the other Loan Documents and any such other documents, and (d) to pay, indemnify, and hold the Lender, and the officers, directors, trustees, employees, agents, advisors and Affiliates of the Lender and its officers, directors, employees, affiliates, agents and controlling persons (each, an "Indemnitee") harmless from and against any and all other liabilities, obligations, losses, damages, penalties, actions, judgments, suits, costs, expenses or disbursements of any kind or nature whatsoever with respect to the execution, delivery, enforcement, performance and administration of this Agreement, the other Loan Documents and any such other documents (regardless of whether any Indemnitee is a party hereto and regardless of whether any such matter is initiated by a third party, the Borrower or any other Person), including any of the foregoing relating to the use of proceeds of the Loan or the violation of, noncompliance with or liability under, any Environmental Law applicable to the operations of the Borrower or any of the Properties and the reasonable fees and expenses of legal counsel in connection with claims, actions or proceedings by any Indemnitee against the Borrower under any Loan Document (all the foregoing in this clause (d), collectively, the "Indemnified Liabilities"), provided, that the Borrower shall have no obligation hereunder to any Indemnitee with respect to Indemnified Liabilities to the extent such Indemnified Liabilities are found by a final and nonappealable decision of a court of competent jurisdiction to have resulted from the gross negligence or willful misconduct of such Indemnitee. Without limiting the foregoing, and to the extent permitted by applicable law, the Borrower agrees not to assert and to cause its Subsidiaries not to assert, and hereby waives and agrees to cause its Subsidiaries to waive, all rights for contribution or any other rights of recovery with respect to all claims, demands, penalties, fines, liabilities, settlements, damages, costs and expenses of whatever kind or nature, under or related to Environmental Laws, that any of them might have by statute or otherwise against any Indemnitee. All amounts due under this Section 8.5 shall be payable not later than 10 days after written demand therefor. Statements payable by the Borrower pursuant to this Section 8.5 shall be submitted to the address of the Borrower set forth in Section 8.2, or to such other Person or address as may be hereafter designated by the Borrower in a written notice to the Lender. The agreements in this Section 8.5 shall survive repayment of the Loan and all other amounts payable hereunder.

8.6     Payments Set Aside. To the extent that any payment by or on behalf of the Borrower is made to the Lender, or the Lender exercises its right of setoff, and such payment or the proceeds of such setoff or any part thereof is subsequently invalidated, declared to be fraudulent or preferential, set aside or required (including pursuant to any settlement entered into by the Lender in its discretion) to be repaid to a trustee, receiver or any other party, in connection with any proceeding under any Debtor Relief Law or otherwise, then to the extent of such recovery, the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such setoff had not occurred.

8.7     Successors and Assigns; Assignments. The provisions of this Agreement shall be binding upon and inure to the benefit of the parties hereto and their respective successors and assigns permitted hereby, except that (i) the Borrower may not assign or otherwise transfer any of its rights or obligations hereunder without the prior written consent of the Lender (and any attempted assignment or

transfer by the Borrower without such consent shall be null and void) and (ii) the Lender may assign to one or more assignees (each, an "Assignee") all or a portion of its rights and obligations under this Agreement with notice to the Borrower.

8.8  Set-off.  In addition to any rights and remedies of the Lender provided by law, the Lender and its Affiliates shall have the right, without prior notice to the Borrower, any such notice being expressly waived by the Borrower to the extent permitted by applicable law, upon any amount becoming due and payable by the Borrower hereunder (whether at the stated maturity, by acceleration or otherwise), to set off and appropriate and apply against such amount any and all deposits (general or special, time or demand, provisional or final), in any currency, and any other credits, indebtedness or claims, in any currency, in each case whether direct or indirect, absolute or contingent, matured or unmatured, at any time held or owing by the Lender or any Affiliate of the Lender to or for the credit or the account of the Borrower, as the case may be.  The Lender agrees promptly to notify the Borrower after any such setoff and application made by the Lender or any Affiliate, provided that the failure to give such notice shall not affect the validity of such setoff and application.

8.9  Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.  A set of the copies of this Agreement signed by all the parties shall be lodged with the Borrower and the Lender.

8.10  Severability.  Any provision of this Agreement that is prohibited or unenforceable in any jurisdiction shall, as to such jurisdiction, be ineffective to the extent of such prohibition or unenforceability without invalidating the remaining provisions hereof, and any such prohibition or unenforceability in any jurisdiction shall not invalidate or render unenforceable such provision in any other jurisdiction.

8.11  Integration.  This Agreement and the other Loan Documents represent the entire agreement of the Borrower and the Lender with respect to the subject matter hereof and thereof, and there are no promises, undertakings, representations or warranties by the Lender relative to the subject matter hereof not expressly set forth or referred to herein or in the other Loan Documents.

8.12  **GOVERNING LAW.  THIS AGREEMENT AND THE RIGHTS AND OBLIGATIONS OF THE PARTIES UNDER THIS AGREEMENT SHALL BE GOVERNED BY, AND CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAW OF THE STATE OF NEW YORK, AND TO THE EXTENT APPLICABLE, THE BANKRUPTCY CODE.**

8.13  Submission To Jurisdiction; Waivers.

(a)  SUBMISSION TO JURISDICTION.  THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY SUBMITS, FOR ITSELF AND ITS PROPERTY, TO THE BANKRUPTCY COURT, OR IN THE EVENT THAT THE BANKRUPTCY COURT DOES NOT HAVE JURISDICTION OVER ANY MATTER OR IF IT HAS JURISDICTION BUT DOES NOT EXERCISE SUCH JURISDICTION FOR ANY REASON, THEN TO THE NONEXCLUSIVE JURISDICTION OF ANY NEW YORK STATE COURT OR FEDERAL COURT OF THE UNITED STATES OF AMERICA SITTING IN NEW YORK CITY, AND ANY APPELLATE COURT FROM ANY THEREOF, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY, OR

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 134 of 193

FOR RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN THE BANKRUPTCY COURT, ANY SUCH NEW YORK STATE COURT OR, TO THE FULLEST EXTENT PERMITTED BY LAW, IN SUCH FEDERAL COURT.  EACH OF THE PARTIES HERETO AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND MAY BE ENFORCED IN OTHER JURISDICTIONS BY SUIT ON THE JUDGMENT OR IN ANY OTHER MANNER PROVIDED BY LAW.  NOTHING IN THIS AGREEMENT SHALL AFFECT ANY RIGHT THAT THE LENDER MAY OTHERWISE HAVE TO BRING ANY ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS IN THE COURTS OF ANY JURISDICTION.

(b)     WAIVER OF VENUE.  THE BORROWER HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVES, TO THE FULLEST EXTENT IT MAY LEGALLY AND EFFECTIVELY DO SO, ANY OBJECTION THAT IT MAY NOW OR HEREAFTER HAVE TO THE LAYING OF VENUE OF ANY SUIT, ACTION OR PROCEEDING ARISING OUT OF OR RELATING TO THIS AGREEMENT OR ANY OF THE OTHER LOAN DOCUMENTS TO WHICH IT IS A PARTY IN ANY NEW YORK STATE OR FEDERAL COURT.  EACH OF THE PARTIES HERETO HEREBY IRREVOCABLY WAIVES, TO THE FULLEST EXTENT PERMITTED BY LAW, THE DEFENSE OF AN INCONVENIENT FORUM TO THE MAINTENANCE OF SUCH ACTION OR PROCEEDING IN ANY SUCH COURT.

(c)     SERVICE OF PROCESS.  THE BORROWER IRREVOCABLY CONSENTS TO SERVICE OF PROCESS IN THE MANNER PROVIDED FOR NOTICES IN SECTION 8.2. NOTHING IN THIS AGREEMENT WILL AFFECT THE RIGHT OF THE LENDER TO SERVE PROCESS IN ANY OTHER MANNER PERMITTED BY APPLICABLE LAW.

8.14     Acknowledgements.  The Borrower hereby acknowledges that:

(a)     it has been advised by counsel in the negotiation, execution and delivery of this Agreement and the other Loan Documents;

(b)     the Lender does not have a fiduciary relationship with or duty to the Borrower arising out of or in connection with this Agreement or any of the other Loan Documents, and the relationship between the Lender, on one hand, and the Borrower, on the other hand, in connection herewith or therewith is solely that of debtor and creditor; and

(c)     no joint venture is created hereby or by the other Loan Documents or otherwise exists by virtue of the transactions contemplated hereby among the Borrower and the Lender.

8.15     Releases of Liens.  At such time as the Loan and the other Obligations under the Loan Documents shall have been indefeasibly paid in full in immediately available funds and the Commitment has been terminated, the Collateral shall be released from the Liens created by the Security Documents, and the Security Documents and all obligations (other than those expressly stated to survive such termination) of the Lender and the Borrower under the Security Documents shall terminate, all without delivery of any instrument or performance of any act by any Person.

8.16     **WAIVERS OF JURY TRIAL.  EACH OF THE PARTIES HEREBY IRREVOCABLY AND UNCONDITIONALLY WAIVE TRIAL BY JURY IN ANY LEGAL**

**ACTION OR PROCEEDING RELATING TO THIS AGREEMENT OR ANY OTHER LOAN DOCUMENT AND FOR ANY COUNTERCLAIM THEREIN.**

       8.17    <u>Regulatory</u>.  The Borrower will, and will cause each of its Subsidiaries to, provide, to the extent commercially reasonable or required by any Requirement of Law, such information and take such actions as are reasonably requested by the Lender to assist the Lender in maintaining compliance with applicable law.

*(Remainder of page left blank intentionally)*

619322.12-Los Angeles Server 2A - MSW

IN WITNESS WHEREOF, the parties hereto have caused this Agreement to be duly executed and delivered by their proper and duly authorized officers as of the day and year first above written.

AMERICANWEST BANCORPORATION

By:_____

    Name:
    Title:

**LENDER:**

SKBHC HAWKS NEST ACQUISITION CORP.


By:_____
  Name:
  Title:

**EXISTING INDEBTEDNESS**

| Trust Name | Total Junior Subordinated Debt |
|---|---|
| AmericanWest Statutory Trust I | $10,310,000 |
| Columbia Trust Statutory Trust I | $3,093,000 |
| AmericanWest Capital Trust II | $7,217,000 |
| AmericanWest Capital Trust III | $20,619,000 |
| Total | $41,239,000 |

# EXHIBIT A

## [FORM OF] LOAN NOTICE

[_____], 2010

SKBHC Hawks Nest Acquisition Corp., as the
    Lender party to the Credit Agreement
    referred to below
c/o SKBHC Holdings LLC
8723 E Via De Commercio
Scottsdale, Arizona 85258
Attention: Scott A. Kisting

Ladies and Gentlemen:

       The undersigned, AmericanWest Bancorporation, a Washington corporation and a debtor and debtor in possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower"), refers to the Superpriority Debtor-in-Possession Credit Agreement, dated as of October 28, 2010 (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"; the capitalized terms defined therein being used herein as therein defined), among the Borrower and SKBHC Hawks Nest Acquisition Corp., as lender (the "Lender"), and hereby gives you notice, irrevocably, pursuant to Section 2.2 of the Credit Agreement, that the undersigned hereby requests a borrowing under the Credit Agreement, and in that connection sets forth below the information relating to such borrowing of the Loan (the "Credit Event") as required by Section 2.2 of the Credit Agreement:

1.     The Business Day of the Credit Event is:       [_____], 20[__]

2.     Loan:       $[___,___,___]

3.     The proceeds of the Loan are to be disbursed to     Bank: [_____]
     the following account:     ABA: [_____]
                                              Account No.: [_____]

     The Borrower hereby certifies that:

       (A)     each of the representations and warranties made by the Borrower in or pursuant to the Loan Documents are true and correct on and as of the date hereof as if made on and as of the date hereof; and

       (B)     no Default or Event of Default has occurred and is continuing on the date hereof or after giving effect to the Credit Event requested to be made on the date specified above.

Exhibit A-1

Very truly yours,

**AMERICANWEST BANCORPORATION**

By: _____
Name:
Title:

Exhibit A-2

## EXHIBIT B

[SEE ATTACHED]

**SUPERPRIORITY DEBTOR-IN-POSSESSION SECURITY AGREEMENT**

Dated [_____], 2010

between

AMERICANWEST BANCORPORATION

and

SKBHC HAWKS NEST ACQUISITION CORP.,

as Lender

# T A B L E   O F   C O N T E N T S

**Section**                                                                                              **Page**

Section 1.    Grant of Security ................................................................................ 2
Section 2.    Security for Obligations ...................................................................... 5
Section 3.    Borrower Remains Liable ..................................................................... 5
Section 4.    Delivery and Control of Security Collateral ...................................... 5
Section 5.    Superpriority Claim and Liens .............................................................. 6
Section 6.    Representations and Warranties ........................................................... 6
Section 7.    Further Assurances ................................................................................ 7
Section 8.    Post-Closing Changes; Collections on Receivables and Related Contracts .................. 8
Section 9.    Intellectual Property Collateral ............................................................ 9
Section 10.   Voting Rights; Dividends; Etc. ............................................................. 9
Section 11.   Transfers and Other Liens; Additional Shares .................................. 11
Section 12.   Lender Appointed Attorney-in-Fact .................................................. 11
Section 13.   Lender May Perform ............................................................................ 11
Section 14.   The Lender's Duties .............................................................................. 11
Section 15.   Remedies ................................................................................................ 12
Section 16.   Indemnity and Expenses ...................................................................... 13
Section 17.   Amendments; Waivers; Etc. ................................................................. 14
Section 18.   Notices, Etc. ........................................................................................... 14
Section 19.   Continuing Security Interest; Assignments under the Credit Agreement ................... 14
Section 20.   Release; Termination ............................................................................ 14
Section 21.   Execution in Counterparts .................................................................. 14
Section 22.   Governing Law ...................................................................................... 15

Schedules

Schedule I         -    Location, Chief Executive Office, Place Where Agreements Are Maintained, Type Of Organization, Jurisdiction Of Organization And Organizational Identification Number
Schedule II        -    Pledged Interests and Pledged Debt
Schedule III       -    Changes in Name, Location, Etc.
Schedule IV        -    Patents, Trademarks and Trade Names, Copyrights and IP Agreements
Schedule V         -    Account Collateral

Exhibits

Exhibit A          -    Form of Intellectual Property Security Agreement

## SUPERPRIORITY DEBTOR-IN-POSSESSION SECURITY AGREEMENT

   SECURITY AGREEMENT dated [_____], 2010[1] between AmericanWest Bancorporation, a Washington corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code (the "Borrower") and SKBHC Hawks Nest Acquisition Corp., as lender (together with its successors and assigns, the "Lender").

## PRELIMINARY STATEMENTS.

   (1) The Borrower has entered into a Superpriority Debtor-in-Possession Credit Agreement dated as of October 28, 2010 (said Credit Agreement, as it may hereafter be amended, amended and restated, supplemented or otherwise modified from time to time, being the "Credit Agreement") with the Lender.

   (2) Pursuant to the Credit Agreement, the Borrower is entering into this Agreement in order to grant to the Lender a security interest in the Collateral (as hereinafter defined).

   (3) The grant of the security interest, pledge and Lien contained herein has been authorized and granted pursuant to the Bankruptcy Code by the Order.

   (4) To supplement the Order without in any way diminishing or limiting the effect of the Order or the security interest, pledge and Lien granted thereby, the parties hereto desire to more fully evidence such security interest, pledge and Lien.

   (5) The Borrower is the owner of the shares of stock or other Equity Interests (the "Initial Pledged Interests") set forth opposite the Borrower's name on and as otherwise described in Schedule II hereto and issued by the Persons named therein.

   (6) The Borrower has opened deposit accounts (the "Deposit Accounts") with banks, in the name of the Borrower and subject to the terms of this Agreement, as described in Schedule V hereto.

   (7) It is a condition precedent to the making of Loan by the Lender under the Credit Agreement that the Borrower shall have granted the assignment and security interest and made the pledge and assignment contemplated by this Agreement.

   (8) Terms defined in the Credit Agreement and not otherwise defined in this Agreement are used in this Agreement as defined in the Credit Agreement.  Further, unless otherwise defined in this Agreement or in the Credit Agreement, terms defined in Article 8 or 9 of the UCC (as defined below) and/or in the Federal Book Entry Regulations (as defined below) are used in this Agreement as such terms are defined in such Article 8 or 9 and/or the Federal Book Entry Regulations.  "UCC" means the Uniform Commercial Code as in effect, from time to time, in the State of New York; provided that, if perfection or the effect of perfection or non-perfection or the priority of any security interest in any Collateral is governed by the Uniform Commercial Code as in effect in a jurisdiction other than the State of New York, "UCC" means the Uniform Commercial Code as in effect from time to time in such other jurisdiction for purposes of the provisions hereof relating to such perfection, effect of perfection or non-

---

[1] The Closing Date.

10-06097-FPC11  Doc 2-1  Filed 10/28/10  Entered 10/28/10 02:02:18  Pg 145 of 193

perfection or priority. The term "Federal Book Entry Regulations" means (a) the federal regulations contained in Subpart B ("*Treasury/Reserve Automated Debt Entry System (TRADES)*") governing book-entry securities consisting of U.S. Treasury bills, notes and bonds and Subpart D ("*Additional Provisions*") of 31 C.F.R. Part 357, 31 C.F.R. § 357.2, § 357.10 through § 357.15 and § 357.40 through § 357.45 and (b) to the extent substantially similar to the federal regulations referred to in clause (a) above (as in effect from time to time), the federal regulations governing other book-entry securities.

NOW, THEREFORE, in consideration of the premises and in order to induce the Lender to make the Loan under the Credit Agreement, the Borrower hereby agrees with the Lender as follows:

Section 1.      Grant of Security. The Borrower hereby grants to the Lender a security interest in the Borrower's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Borrower, wherever located, and whether now or hereafter existing or arising, as security for the Secured Obligations (as defined below) (collectively, the "Collateral"):

(a)      all equipment (any and all such property being the "Equipment");

(b)      all inventory (any and all such property being the "Inventory");

(c)      all accounts, chattel paper (including, without limitation, tangible chattel paper and electronic chattel paper), instruments (including, without limitation, promissory notes), deposit accounts, letter-of-credit rights,  general intangibles (including, without limitation, payment intangibles) and other obligations of any kind, whether or not arising out of or in connection with the sale or lease of goods or the rendering of services and whether or not earned by performance, and all rights now or hereafter existing in and to all supporting obligations and in and to all security agreements, mortgages, Liens, leases, letters of credit and other contracts securing or otherwise relating to the foregoing property (any and all of such accounts, chattel paper, instruments, deposit accounts, letter-of-credit rights, general intangibles and other obligations, to the extent not referred to in clause (d), (e), or (f) below, being the "Receivables", and any and all such supporting obligations, security agreements, mortgages, Liens, leases, letters of credit and other contracts being the "Related Contracts");

(d)      the following (the "Security Collateral):

(i)      the Initial Pledged Interests and the certificates, if any, representing the Initial Pledged Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the Initial Pledged Interests and all subscription warrants, rights or options issued thereon or with respect thereto;

(ii)      all other shares of stock and other Equity Interests from time to time acquired by or owned by the Borrower in any manner (such shares and other Equity Interests, together with the Initial Pledged Interests, being the "Pledged Interests"), and the certificates, if any, representing such additional shares or other Equity Interests, and all dividends, distributions, return of capital, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such shares or other Equity Interests and all subscription warrants, rights or options issued thereon or with respect thereto;

(iii)     all indebtedness from time to time owed to the Borrower (such indebtedness being the "Pledged Debt") and the instruments, if any, evidencing such indebtedness, and all interest, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such indebtedness; and

(iv)     all other investment property (including, without limitation, all (A) securities, whether certificated or uncertificated, (B) security entitlements, (C) securities accounts, (D) commodity contracts and (E) commodity accounts) in which the Borrower has now, or acquires from time to time hereafter, any right, title or interest in any manner, and the certificates or instruments, if any, representing or evidencing such investment property, and all dividends, distributions, return of capital, interest, distributions, value, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such investment property and all subscription warrants, rights or options issued thereon or with respect thereto;

(e)  the following (collectively, the "Account Collateral"):

(i)     the Deposit Accounts and all funds and financial assets from time to time credited thereto (including, without limitation, all cash equivalents), all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of such funds and financial assets, and all certificates and instruments, if any, from time to time representing or evidencing the Deposit Accounts;

(ii)     all promissory notes, certificates of deposit, deposit accounts, checks and other instruments from time to time delivered to or otherwise possessed by the Lender for or on behalf of the Borrower, including, without limitation, those delivered or possessed in substitution for or in addition to any or all of the then existing Account Collateral; and

(iii)     all interest, dividends, distributions, cash, instruments and other property from time to time received, receivable or otherwise distributed in respect of or in exchange for any or all of the then existing Account Collateral;

(f)  the following (collectively, the "Intellectual Property Collateral"):

(i)     all patents, patent applications and inventions claimed or disclosed therein and all improvements thereto ("Patents");

(ii)     all trademarks, service marks, domain names, trade dress, logos, designs, slogans, trade names, business names, corporate names and other source identifiers, whether registered or unregistered (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable law), together, in each case, with the goodwill symbolized thereby ("Trademarks");

(iii)     all copyrights, including, without limitation, copyrights in Computer Software (as hereinafter defined), Internet web sites and the content thereof, whether registered or unregistered ("Copyrights");

3

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 147 of 193

(iv)     all computer software, programs and databases (including, without limitation, source code, object code and all related applications and data files), firmware and documentation and materials relating thereto, and any substitutions, replacements, improvements, error corrections, updates and new versions of any of the foregoing ("Computer Software");

(v)     all confidential and proprietary information, including, without limitation, know-how, trade secrets, manufacturing and production processes and techniques, inventions, research and development information, databases and data, including, without limitation, technical data, financial, marketing and business data, pricing and cost information, business and marketing plans and customer and supplier lists and information (collectively, "Trade Secrets"), and all other intellectual, industrial and intangible property of any type;

(vi)     all registrations and applications for registration for any of the foregoing, including, without limitation, those registrations and applications for registration set forth in Schedule IV hereto (as such Schedule IV may be supplemented from time to time by any Intellectual Property Security Agreement executed by the Borrower and the Lender from time to time), together with, as applicable, all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations thereof;

(vii)     all tangible embodiments of the foregoing, all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Borrower accruing thereunder or pertaining thereto;

(viii)     all agreements, permits, consents, orders and franchises relating to the license, development, use or disclosure of any of the foregoing to which the Borrower, now or hereafter, is a party or a beneficiary ("IP Agreements"); and

(ix)     any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages;

(g)  all books and records (including, without limitation, customer lists, credit files, printouts and other computer output materials and records) of the Borrower pertaining to any of the Collateral; and

(h)  all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral (including, without limitation, proceeds, collateral and supporting obligations that constitute property of the types described in clauses (a) through (g) of this Section 1 and this clause (h)) and, to the extent not otherwise included, all (A) payments under insurance (whether or not the Lender is the loss payee thereof), or any indemnity, warranty or guaranty, payable by reason of loss or damage to or otherwise with respect to any of the foregoing Collateral, (B) tort claims, including, without limitation, all commercial tort claims and (C) cash;

provided, however, that (i) the Collateral shall not include any Avoidance Actions and the proceeds and recoveries therefrom and (ii) notwithstanding anything to the contrary contained in clause (f) above, Intellectual Property Collateral shall not include intellectual property in relation to which any applicable

4

law, regulation, agreement with a domain name registrar, or other contractual arrangement, prohibits the creation of a security interest therein or would otherwise invalidate the Borrower's right, title or interest therein.

Section 2.    Security for Obligations.  This Agreement secures the payment of all Obligations of the Borrower now or hereafter existing under the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, fees, premiums, penalties, indemnifications, contract causes of action, costs, expenses or otherwise (all such Obligations being the "Secured Obligations").

Section 3.    Borrower Remains Liable.  Anything herein to the contrary notwithstanding, (a) the Borrower shall remain liable under the contracts and agreements included in the Borrower's Collateral to the extent set forth therein to perform all of its duties and obligations thereunder to the same extent as if this Agreement had not been executed, (b) the exercise by the Lender of any of the rights hereunder shall not release the Borrower from any of its duties or obligations under the contracts and agreements included in the Collateral and (c) the Lender shall have no obligation or liability under the contracts and agreements included in the Collateral by reason of this Agreement or any other Loan Document, nor shall the Lender be obligated to perform any of the obligations or duties of the Borrower thereunder or to take any action to collect or enforce any claim for payment assigned hereunder.

Section 4.    Delivery and Control of Security Collateral.  (a)  All certificates or instruments representing or evidencing Security Collateral shall be delivered to and held by or on behalf of the Lender pursuant hereto and shall be in suitable form for transfer by delivery, or shall be accompanied by duly executed instruments of transfer or assignment in blank, all in form and substance reasonably satisfactory to the Lender.  If an Event of Default shall have occurred and be continuing, the Lender shall have the right (i) at any time to exchange certificates or instruments representing or evidencing Security Collateral for certificates or instruments of smaller or larger denominations and (ii) at any time in its discretion and without notice to the Borrower, to transfer to or to register in the name of the Lender or any of its nominees any or all of the Security Collateral, subject only to the revocable rights specified in Section 10(a).

(b)  With respect to any Security Collateral in which the Borrower has any right, title or interest and that constitutes an uncertificated security, upon reasonable request from the Lender, the Borrower  will use commercially reasonable efforts to cause the issuer thereof, either (i) to register the Lender as the registered owner of such security or (ii) to agree in an authenticated record with the Borrower and the Lender that such issuer will comply with instructions with respect to such security originated by the Lender without further consent of the Borrower, such authenticated record to be in form and substance reasonably satisfactory to the Lender.  With respect to any Security Collateral in which the Borrower has any right, title or interest and that is not an uncertificated security, upon the request of the Lender upon the occurrence and during the continuance of an Event of Default, the Borrower will notify each issuer of Pledged Interests pledged by the Borrower that such Pledged Interests is subject to the security interest granted hereunder.

(c)    With respect to any Security Collateral in which the Borrower has any right, title or interest and that constitutes a security entitlement in which the Lender is not the entitlement holder, upon reasonable request from the Lender, the Borrower will use commercially reasonable efforts to cause the securities intermediary with respect to such security entitlement either (i) to identify in its records the Lender as the entitlement holder of such security entitlement against such securities intermediary or (ii) to agree in an authenticated record with the Borrower and the Lender that such securities intermediary will comply with entitlement orders (that is, notifications communicated to such securities intermediary directing transfer or redemption of the financial asset to which the Borrower has a security entitlement)

5

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 149 of 193

originated by the Lender without further consent of the Borrower, such authenticated record to be in form and substance reasonably satisfactory to the Lender.

(d)  Upon the request of the Lender upon the occurrence and during the continuance of an Event of Default and without further order from the Bankruptcy Court, but subject to the Order, the Borrower will notify each such issuer of Pledged Debt that such Pledged Debt pledged by the Borrower is subject to the security interest granted hereunder.

(e)  Without the prior written consent of the Lender, the Borrower shall not vote to enable or take any other action to cause any issuer of any Pledged Interests which are not securities (for purposes of the UCC) on the date hereof to elect or otherwise take any action to cause such Pledged Interests to be treated as securities for purposes of the UCC unless the Borrower shall promptly notify the Lender in writing of any such proposed election or action and shall take all steps necessary or advisable to establish the Lender's "control" on the date such Pledged Interests are treated as securities for purposes of the UCC.

Section 5.      Superpriority Claim and Liens.  So long as the Loan or any other Obligation (other than indemnification Obligations for which no claims have been made) of the Borrower under any Loan Document shall remain unpaid or unsatisfied or the Lender shall have any Commitment under the Credit Agreement, the Borrower hereby covenants, represents and warrants that, upon entry of the Order, the Obligations of the Borrower under the Loan Documents shall be secured by the Liens and claims to the extent provided in the Order and Sections 2.9 and 2.10 of the Credit Agreement.

Section 6.      Representations and Warranties.  The Borrower represents and warrants as follows:

(a)  The Borrower's exact legal name, as defined in Section 9-503(a) of the UCC, is correctly set forth in Schedule I hereto.  The Borrower is located (within the meaning of Section 9-307 of the UCC) and has its chief executive office and the office in which it maintains the copies of each Related Contract to which the Borrower is a party and all originals of all chattel paper that evidence Receivables of the Borrower, in the state or jurisdiction set forth in Schedule I hereto.  The information set forth in Schedule I hereto with respect to the Borrower is true and accurate in all respects.  The Borrower has not within the last year changed its name, location, chief executive office, place where it maintains its agreements, type of organization, jurisdiction of organization or organizational identification number from those set forth in Schedule I hereto except as disclosed in Schedule III hereto.

(b)  All Security Collateral consisting of certificated securities and instruments have been delivered to the Lender to the extent required by Section 4(a).

(c)  The Borrower is the legal and beneficial owner of the Collateral free and clear of any Lien, claim, option, or right of others, other than Liens permitted under the Credit Agreement and the Order.  No effective financing statement or other instrument similar in effect covering all or any part of such Collateral or listing the Borrower or any trade name of the Borrower as debtor is on file in any recording office, except such as may have been filed in favor of the Lender relating to the Loan Documents or as otherwise permitted under the Credit Agreement and the Order.

(d)  The Initial Pledged Interests pledged by the Borrower constitute the percentage of the issued and outstanding Equity Interests of the issuers thereof indicated on Schedule II hereto.

619741.05-Los Angeles Server 2A - MSW

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 150 of 193

(e)  As of the Closing Date, the Borrower has no deposit accounts, other than the Account Collateral listed on Schedule V hereto, as such Schedule V may be amended from time to time upon the reasonable request of the Lender.

(f)  All filings and other actions (other than (A) actions necessary to obtain control of Collateral as provided in Sections 9-104, 9-105 and 9-107 of the UCC and Section 16 of Uniform Electronic Transactions Act and (B) actions necessary to perfect the Lender's security interest with respect to Collateral evidenced by a certificate of ownership) necessary to perfect, to the extent that perfection can be accomplished by such filings or other actions, the security interest in the Collateral of the Borrower created under this Agreement have been (or contemporaneously herewith will be) duly made or taken and, upon the entry by the Bankruptcy Court of the Order, are (or, upon filing or taking of such other actions, will be) in full force and effect, and upon the entry by the Bankruptcy Court of the Order and without in any way diminishing or limiting the effect of the Order, this Agreement creates in favor of the Lender a valid and, together with such filings and other actions, perfected first priority security interest in the Collateral of the Borrower, to the extent that perfection can be accomplished by such filings or actions, subject to the Carve-Out and Liens permitted under the Credit Agreement and the Order, securing the payment of the Secured Obligations.  Notwithstanding the foregoing, nothing in this Agreement shall require the Borrower to make any filings or take any actions to record or perfect the security interest in any Intellectual Property Collateral outside the United States.

(g)  Subject to the entry of the Order, no further authorization or approval or other action by, and no further notice to or filing with, any governmental authority or regulatory body or any other third party is required for (i) the grant by the Borrower of the security interest granted hereunder or for the execution, delivery or performance of this Agreement by the Borrower, (ii) the perfection or maintenance of the security interest created hereunder (including the first priority nature of such security interest, subject to the Carve-Out and Liens permitted under the Credit Agreement and the Order), or (iii) the exercise by the Lender of its voting or other rights provided for in this Agreement or the remedies in respect of the Collateral pursuant to this Agreement, except as may be required in connection with the disposition of any portion of the Security Collateral by laws affecting the offering and sale of securities generally.

(h)  Upon entry of the Order, the Borrower has the corporate power and authority and the legal right to execute and deliver, to perform its obligations under, and to grant the Lien on the Collateral pursuant to, this Agreement and has taken all necessary corporate actions to authorize its execution, delivery and performance of, and grant of the Lien on the Collateral pursuant to, this Agreement.

(i)  Upon the entry of the Order, the Borrower is duly authorized to execute and deliver this Agreement to the Lender, and this Agreement constitutes the legal, valid and binding obligation of the Borrower, enforceable against the Borrower in accordance with its terms (subject to applicable bankruptcy, insolvency, reorganization, moratorium or other laws affecting creditors' rights generally and subject to general principles of equity, regardless of whether considered in a proceeding in equity or at law).

Section 7.    Further Assurances.  (a)  The Borrower agrees that from time to time, at the expense of the Borrower, the Borrower will promptly execute and deliver, or otherwise authenticate, all further instruments and documents, and take all further action that may be necessary or desirable, or that the Lender may reasonably request, in order to perfect and protect any pledge or security interest granted or purported to be granted by the Borrower hereunder or to enable the Lender to exercise and enforce its rights and remedies hereunder with respect to any Collateral.  Without limiting the generality

619741.05-Los Angeles Server 2A - MSW

of the foregoing, the Borrower will promptly with respect to Collateral:  (i) if an Event of Default shall have occurred and be continuing or if requested by the Lender, and without further order of the Bankruptcy Court, mark conspicuously each document included in Inventory, each chattel paper included in Receivables, each Related Contract and, at the request of the Lender, each of its records pertaining to such Collateral with a legend, in form and substance satisfactory to the Lender, indicating that such document, chattel paper, Related Contract or Collateral is subject to the security interest granted hereby; (ii) if any such Collateral shall be evidenced by a promissory note or other instrument or chattel paper individually or in the aggregate in an amount in excess of $100,000, at the reasonable request of the Lender, deliver and pledge to the Lender hereunder such note or instrument or chattel paper duly indorsed and accompanied by duly executed instruments of transfer or assignment, all in form and substance reasonably satisfactory to the Lender; (iii) execute or authenticate and file such financing or continuation statements, or amendments thereto, and such other instruments or notices, as may be necessary, or as the Lender may reasonably request, in order to perfect and preserve the security interest granted or purported to be granted by the Borrower hereunder; (iv) at the reasonable request of the Lender, deliver and pledge to the Lender certificates representing Security Collateral that constitutes certificated securities, accompanied by undated stock or bond powers executed in blank; (v) at the reasonable request of the Lender, take all action necessary to ensure that the Lender has control of Collateral consisting of deposit accounts, electronic chattel paper, investment property, letter-of-credit rights and transferable records as provided in Sections 9-104, 9-105, 9-106 and 9-107 of the UCC and in Section 16 of Uniform Electronic Transactions Act; (vi) at the reasonable request of the Lender, take all action to ensure that the Lender's security interest is noted on any certificate of ownership related to any Collateral evidenced by a certificate of ownership; (vii) at the reasonable request of the Lender, cause the Lender to be the beneficiary under all letters of credit that constitute Pledged Collateral, with the exclusive right to make all draws under such letters of credit, and with all rights of a transferee under Section 5-114(e) of the UCC; and (viii) at the reasonable request of the Lender, deliver to the Lender evidence that all other action that the Lender may reasonably deem necessary in order to perfect and protect the security interest created by the Borrower under this Agreement has been taken.

(b)  The Borrower hereby authorizes the Lender to file one or more financing or continuation statements, and amendments thereto, including, without limitation, one or more financing statements indicating that such financing statements cover all assets or all personal property (or words of similar effect) of the Borrower, in each case without the signature of the Borrower, and regardless of whether any particular asset described in such financing statements falls within the scope of the UCC or the granting clause of this Agreement.  A photocopy or other reproduction of this Agreement or any financing statement covering the Collateral or any part thereof shall be sufficient as a financing statement where permitted by law.  The Borrower ratifies its authorization for the Lender to have filed such financing statements, continuation statements or amendments filed prior to the date hereof..

(c)  The Borrower will furnish to the Lender from time to time statements and schedules further identifying and describing the Collateral of the Borrower and such other reports in connection with such Collateral as the Lender may reasonably request, all in reasonable detail and similar in nature and scope to other statements and schedules required under or constituting a part of this Agreement.

Section 8.        Post-Closing Changes; Collections on Receivables and Related Contracts.  (a)  The Borrower will not change its name, type of organization, jurisdiction of organization, organizational identification number or location from those set forth in Section 6(a) of this Agreement without first giving at least 15 days' prior written notice to the Lender and taking all action reasonably required by the Lender for the purpose of perfecting or protecting the security interest granted by this Agreement.  The Borrower will hold and preserve its records relating to the Collateral, including, without limitation, the Related Contracts.  If the Borrower does not have an organizational identification number and later obtains one, it will forthwith notify the Lender of such organizational identification number.

8

619741.05-Los Angeles Server 2A - MSW

(b)  Except as otherwise provided in this subsection (b), the Borrower will continue to have the right to collect, at its own expense, all amounts due or to become due the Borrower under the Receivables and Related Contracts.  In connection with such collections, the Borrower may take (and, during an Event of Default at the Lender's direction, will take) such action as the Borrower or, during an Event of Default, the Lender may deem necessary or advisable to enforce collection of the Receivables and Related Contracts; provided, however, that the Lender shall have the right at any time, upon the occurrence and during the continuance of an Event of Default and upon written notice to the Borrower of its intention to do so, to notify each person obligated under any Receivables and Related Contracts (each, an "Obligor") of the assignment of such Receivables and Related Contracts to the Lender and to direct such Obligors to make payment of all amounts due or to become due to the Borrower thereunder directly to the Lender and, upon such notification and at the reasonable expense of the Borrower, to enforce collection of any such Receivables and Related Contracts, to adjust, settle or compromise the amount or payment thereof, in the same manner and to the same extent as the Borrower might have done, and to otherwise exercise all rights with respect to such Receivables and Related Contracts, including, without limitation, those set forth in Section 9-607 of the UCC.  After receipt by the Borrower of the notice from the Lender referred to in the proviso to the preceding sentence, (i) all amounts and proceeds (including, without limitation, instruments) received by the Borrower in respect of the Receivables and Related Contracts of the Borrower shall be received in trust for the benefit of the Lender hereunder, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement) to be applied as provided in Section 15(b) and (ii) the Borrower will not adjust, settle or compromise the amount or payment of any Receivable or amount due on any Related Contract, release wholly or partly any Obligor thereof, or allow any credit or discount thereon.  The Borrower will not permit or consent to the subordination of its right to payment under any of the Receivables and Related Contracts to any other indebtedness or obligations of the Obligor thereof.

Section 9.    Intellectual Property Collateral    (a)  The Borrower shall take all steps which it or the Lender deems reasonable and appropriate under the circumstances to preserve and protect each item of its material Intellectual Property Collateral, including, without limitation, maintaining the quality of any and all products or services used or provided in connection with any of the Trademarks.

(b)  The Borrower agrees that should it obtain an ownership interest in any item of the type set forth in Section 1(f) that is not on the date hereof a part of the Intellectual Property Collateral ("After-Acquired Intellectual Property") (i) the provisions of this Agreement shall automatically apply thereto, and (ii) any such After-Acquired Intellectual Property and, in the case of trademarks, the goodwill symbolized thereby, shall automatically become part of the Intellectual Property Collateral subject to the terms and conditions of this Agreement with respect thereto.  Within ten days of acquiring After-Acquired Intellectual Property, the Borrower shall give prompt written notice to the Lender identifying the After-Acquired Intellectual Property acquired, and the Borrower shall execute and deliver to the Lender with such written notice, or otherwise authenticate, an agreement, in substantially the form set forth in Exhibit A hereto (an "Intellectual Property Security Agreement") covering the registered or applied for U.S. After-Acquired Intellectual Property, which Intellectual Property Security Agreement Supplement the Lender may record with the U.S. Patent and Trademark Office, the U.S. Copyright Office, or any other U.S. governmental authorities necessary to perfect the security interest hereunder in such registered or applied for After-Acquired Intellectual Property.

Section 10.    Voting Rights; Dividends; Etc.  (a)  So long as no Event of Default shall have occurred and be continuing:

9

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 153 of 193

(i)     The Borrower shall be entitled to exercise any and all voting and other consensual rights pertaining to the Security Collateral of the Borrower or any part thereof for any purpose;

(ii)     The Borrower shall be entitled to receive and retain any and all dividends, interest and other distributions paid in respect of the Security Collateral of the Borrower if and to the extent that the payment thereof is not otherwise prohibited by the terms of the Loan Documents; provided, however, that any and all

(A)     dividends, interest and other distributions paid or payable other than in cash in respect of, and instruments and other property received, receivable or otherwise distributed in respect of, or in exchange for, any Security Collateral,

(B)     dividends and other distributions paid or payable in cash in respect of any Security Collateral of the Borrower in connection with a partial or total liquidation or dissolution or in connection with a reduction of capital, capital surplus or paid-in-surplus, and

(C)     cash paid, payable or otherwise distributed in respect of principal of, or in redemption of, or in exchange for, any Security Collateral of the Borrower,

shall be, and shall be forthwith delivered to the Lender to hold as, Security Collateral and shall, if received by the Borrower, be received in trust for the benefit of the Lender, be segregated from the other property or funds of the Borrower and be forthwith delivered to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

(iii)     The Lender will execute and deliver (or cause to be executed and delivered) to the Borrower all such instruments as the Borrower may reasonably request for the purpose of enabling the Borrower to exercise the voting and other rights that it is entitled to exercise pursuant to paragraph (i) above and to receive the dividends or interest payments that it is authorized to receive and retain pursuant to paragraph (ii) above.

(b)  Upon the occurrence and during the continuance of an Event of Default and without further order from the Bankruptcy Court, but subject to the Order:

(i)     All rights of the Borrower (A) to exercise or refrain from exercising the voting and other consensual rights that it would otherwise be entitled to exercise pursuant to Section 10(a)(i) shall, upon notice to the Borrower by the Lender, cease and (B) to receive the dividends, interest and other distributions that it would otherwise be authorized to receive and retain pursuant to Section 10(a)(ii) shall automatically cease, and all such rights shall thereupon become vested in the Lender, which shall thereupon have the sole right to exercise or refrain from exercising such voting and other consensual rights and to receive and hold as Security Collateral such dividends, interest and other distributions.

(ii)     All dividends, interest and other distributions that are received by the Borrower contrary to the provisions of paragraph (i) of this Section 10(b) shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender as Security Collateral in the same form as so received (with any necessary indorsement).

10

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 154 of 193

Section 11.  <u>Transfers and Other Liens; Additional Shares</u>.  (a)  The Borrower agrees that it will not (i) sell, assign or otherwise dispose of, or grant any option with respect to, any of the Collateral, other than sales, assignments and other dispositions of Collateral, and options relating to Collateral, permitted under the terms of the Credit Agreement or expressly permitted by the Order, or (ii) create or suffer to exist any Lien upon or with respect to any of the Collateral of the Borrower except for the pledge, assignment and security interest created under this Agreement and Liens permitted under Section 6.1 of the Credit Agreement or expressly permitted by the Order; <u>provided</u> that in no event shall any of the Security Collateral be sold, assigned or disposed of or be or become subject to a Lien (other than the Liens created under this Agreement).

(b)  The Borrower agrees that it will (i) cause each issuer of the Pledged Interests pledged by the Borrower not to issue any Equity Interests or other securities in addition to or in substitution for the Pledged Interests issued by such issuer, except to the Borrower, and (ii) pledge hereunder, immediately upon its acquisition (directly or indirectly) thereof, any and all additional Equity Interests or other securities.

Section 12.  <u>Lender Appointed Attorney-in-Fact</u>.  Subject to the Order, the Borrower hereby irrevocably appoints the Lender the Borrower's attorney-in-fact, with full authority in the place and stead of the Borrower and in the name of the Borrower or otherwise, from time to time, upon the occurrence and during the continuance of an Event of Default, in the Lender's discretion, to take any action and to execute any instrument that the Lender may deem necessary or advisable to accomplish the purposes of this Agreement, including, without limitation:

(a)  to obtain and adjust insurance claims with respect to the Collateral,

(b)  to ask for, demand, collect, sue for, recover, compromise, receive and give acquittance and receipts for moneys due and to become due under or in respect of any of the Collateral,

(c)  to receive, indorse and collect any drafts or other instruments, documents and chattel paper, in connection with clause (a) or (b) above, and

(d)  to file any claims or take any action or institute any proceedings that the Lender may deem necessary for the collection of any of the Collateral or otherwise to enforce the rights of the Lender with respect to any of the Collateral.

Section 13.  <u>Lender May Perform</u>.  If the Borrower fails to perform any agreement contained herein, the Lender may, but without any obligation to do so and without notice, itself perform, or cause performance of, such agreement, and the expenses of the Lender incurred in connection therewith shall be payable by the Borrower under <u>Section 15</u>.

Section 14.  <u>The Lender's Duties</u>.  The powers conferred on the Lender hereunder are solely to protect the Lender's interest in the Collateral and shall not impose any duty upon it to exercise any such powers.  Except for the safe custody of any Collateral in its possession and the accounting for moneys actually received by it hereunder, the Lender shall have no duty as to any Collateral, as to ascertaining or taking action with respect to calls, conversions, exchanges, maturities, tenders or other matters relative to any Collateral, or as to the taking of any necessary steps to preserve rights against any parties or any other rights pertaining to any Collateral.  The Lender shall be deemed to have exercised reasonable care in the custody and preservation of any Collateral in its possession if such Collateral is accorded treatment substantially equal to that which it accords its own property.

11

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 155 of 193

Section 15.    Remedies.  If any Event of Default shall have occurred and be continuing, within five (5) Business Days' prior written notice to the Borrower (with a copy to counsel for the Borrower, counsel for the Creditors' Committee, the UST and the Bankruptcy Court) and without further order of or applicable to the Bankruptcy Court:

(a)  The Lender may exercise in respect of the Collateral, in addition to other rights and remedies provided for herein or otherwise available to it, all the rights and remedies of a secured party upon default under the UCC (whether or not the UCC applies to the affected Collateral) and also may:  (i) require the Borrower to, and the Borrower hereby agrees that it will at its expense and upon request of the Lender forthwith, assemble all or part of the Collateral as directed by the Lender and make it available to the Lender at a place and time to be designated by the Lender that is reasonably convenient to both parties; (ii) without notice except as specified below, sell the Collateral or any part thereof in one or more parcels at public or private sale, at any of the Lender's offices or elsewhere, for cash, on credit or for future delivery, and upon such other terms as the Lender may deem commercially reasonable; (iii) occupy any premises owned or leased by the Borrower where the Collateral or any part thereof is assembled or located for a reasonable period in order to effectuate its rights and remedies hereunder or under law, without obligation to the Borrower in respect of such occupation; and (iv) exercise any and all rights and remedies of the Borrower under or in connection with the Collateral, or otherwise in respect of the Collateral, including, without limitation, (A) any and all rights of the Borrower to demand or otherwise require payment of any amount under, or performance of any provision of, the Receivables, the Related Contracts and the other Collateral, (B) withdraw, or cause or direct the withdrawal, of all funds with respect to the Account Collateral and (C) exercise all other rights and remedies with respect to the Receivables, the Related Contracts and the other Collateral, including, without limitation, those set forth in Section 9-607 of the UCC.  The Borrower agrees that, to the extent notice of sale shall be required by law, at least ten days' notice to the Borrower of the time and place of any public sale or the time after which any private sale is to be made shall constitute reasonable notification.  The Lender shall not be obligated to make any sale of Collateral regardless of notice of sale having been given.  The Lender may adjourn any public or private sale from time to time by announcement at the time and place fixed therefor, and such sale may, without further notice, be made at the time and place to which it was so adjourned.

(b)  Any cash held by or on behalf of the Lender and all cash proceeds received by or on behalf of the Lender in respect of any sale of, collection from, or other realization upon all or any part of the Collateral may, in the discretion of the Lender, be held by the Lender as collateral for, and/or then or at any time thereafter applied (after payment of any amounts payable to the Lender pursuant to Section 15) in whole or in part by the Lender against, all or any part of the Secured Obligations, as set forth in Section 7.2 of the Credit Agreement.  Any surplus of such cash or cash proceeds held by or on behalf of the Lender and remaining after payment in full of all of the Secured Obligations shall be paid over to the Borrower or to whomsoever may be lawfully entitled to receive such surplus.

(c)  All payments received by the Borrower in respect of the Collateral shall be received in trust for the benefit of the Lender, shall be segregated from other funds of the Borrower and shall be forthwith paid over to the Lender in the same form as so received (with any necessary indorsement).

(d)  The Lender may at any time or from time to time, charge, set-off and otherwise apply all or any part of the Secured Obligations against any funds held with respect to the Account Collateral or in any other deposit account.  The Lender agrees to notify the Borrower promptly

12

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 156 of 193

after any such charge or set-off; provided that failure to give such notice shall not affect the validity of such charge or set-off.

(e)  In the event of any sale or other disposition of any of the Intellectual Property Collateral of the Borrower, the goodwill symbolized by any Trademarks subject to such sale or other disposition shall be included therein, and the Borrower shall supply to the Lender or its designee the Borrower's know-how and expertise relating to such Intellectual Property Collateral, and documents relating to any Intellectual Property Collateral subject to such sale or other disposition, and the Borrower's customer lists and other records and documents relating to such Intellectual Property Collateral and to the manufacture, distribution, advertising and sale of products and services of the Borrower that relate to such Intellectual Property Collateral.

(f)  If the Lender shall determine to exercise its right to sell all or any of the Security Collateral of the Borrower pursuant to this Section 15, the Borrower agrees that, upon request of the Lender, the Borrower will, at its own expense, do or cause to be done all such other acts and things as may be necessary to make such sale of such Security Collateral or any part thereof valid and binding and in compliance with applicable law.

(g)  The Lender is authorized, in connection with any sale of the Security Collateral pursuant to this Section 15, to deliver or otherwise disclose to any prospective purchaser of the Security Collateral any information in its possession relating to such Security Collateral.

(h)  At any public (or, to the extent permitted by law, private) sale made pursuant to this Agreement, the Lender may bid for or purchase, free (to the extent permitted by applicable law) from any right of redemption, stay, valuation or appraisal on the part of the Borrower (all said rights being also hereby waived and released to the extent permitted by applicable law), the Collateral or any part thereof offered for sale and may make payment on account thereof by using any claim then due and payable to the Lender from the Borrower as a credit against the purchase price, and the Lender may, upon compliance with the terms of sale, hold, retain and dispose of such property without further accountability to the Borrower therefor.  For purposes hereof, a written agreement to purchase the Collateral or any portion thereof shall be treated as a sale thereof; the Lender shall be free to carry out such sale pursuant to such agreement and the Borrower shall not be entitled to the return of the Collateral or any portion thereof subject thereto, notwithstanding the fact that after the Lender shall have entered into such an agreement all Events of Default shall have been remedied and the Obligations paid in full.

(i)  In the event and to the extent that the provisions of this Section 15 conflict with what is set forth in the Order, the Order shall govern.

Section 16.  Indemnity and Expenses.  (a)  The Borrower agrees to indemnify, defend and save the Lender and each of its Affiliates and its respective officers, directors, employees, agents, sub-agents and advisors (each, an "Indemnified Party") from, and hold harmless each Indemnified Party against, and shall pay on demand, any and all claims, damages, losses, liabilities and related expenses (including, without limitation, the fees, charges and disbursements of counsel for any Indemnified Party) incurred by or asserted against any Indemnified Party, in each case arising out of or in connection with or resulting from this Agreement (including, without limitation, enforcement of this Agreement), except to the extent such claim, damage, loss, liability or expense is found in a final, non-appealable judgment by a court of competent jurisdiction to have resulted from such Indemnified Party's gross negligence or willful misconduct.

13

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 157 of 193

(b)  The Borrower will upon demand pay to the Lender the amount of any and all reasonable documented out-of-pocket expenses, including, without limitation, the reasonable and documented out-of-pocket fees and expenses of its counsel and of any experts and agents, that the Lender may incur in connection with (i) the administration of this Agreement, (ii) the custody, preservation, use or operation of, or the sale of, collection from or other realization upon, any of the Collateral of the Borrower, (iii) the exercise or enforcement of any of the rights of the Lender or (iv) the failure by the Borrower to perform or observe any of the provisions hereof.

Section 17.     Amendments; Waivers; Etc.  No amendment or waiver of any provision of this Agreement, and no consent to any departure by the Borrower herefrom, shall in any event be effective unless the same shall be in writing and signed by the Lender and, with respect to any amendment, the Borrower, and then such waiver or consent shall be effective only in the specific instance and for the specific purpose for which given.  No failure on the part of the Lender to exercise, and no delay in exercising any right hereunder, shall operate as a waiver thereof; nor shall any single or partial exercise of any such right preclude any other or further exercise thereof or the exercise of any other right.

Section 18.     Notices, Etc.  All notices, requests and demands to or upon the Lender or the Borrower hereunder shall be effected in the manner provided for in Section 8.2 of the Credit Agreement.

Section 19.     Continuing Security Interest; Assignments under the Credit Agreement.  This Agreement shall create a continuing security interest in the Collateral and shall (a) remain in full force and effect until such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitments have been terminated, (b) be binding upon the Borrower, its successors and assigns and (c) inure, together with the rights and remedies of the Lender hereunder and its respective successors and permitted assigns.  Without limiting the generality of the foregoing clause (c), the Lender may assign or otherwise transfer all or any portion of its rights and obligations under the Credit Agreement (including, without limitation, all or any portion of its Commitments, the Loan owing to it and the Note or Notes, if any, held by it) to any other Person, and such other Person shall thereupon become vested with all the benefits in respect thereof granted to the Lender herein or otherwise, in each case as provided in Section 8.8 of the Credit Agreement.

Section 20.     Release; Termination.  At such time as the Secured Obligations (other than indemnification Obligations for which no claims have been made) shall have been indefeasibly paid in full in immediately available funds and the Commitments have been terminated, the pledge and security interest granted hereby shall terminate and all rights to the Collateral shall revert to the Borrower.  Upon any such termination, the Lender will, at the Borrower's expense, promptly execute and deliver to the Borrower such documents as the Borrower shall reasonably request to evidence such termination.

Section 21.     Execution in Counterparts.  This Agreement may be executed by one or more of the parties to this Agreement on any number of separate counterparts, and all of said counterparts taken together shall be deemed to constitute one and the same instrument.  Delivery of an executed signature page of this Agreement by facsimile transmission shall be effective as delivery of a manually executed counterpart hereof.

14

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 158 of 193

Section 22.    <u>Governing Law</u>.  This Agreement and the rights and obligations of the parties under this Agreement shall be governed by, and construed and interpreted in accordance with, the law of the State of New York, and to the extent applicable, the Bankruptcy Code.

[Remainder of page left blank]

15

IN WITNESS WHEREOF, each of the undersigned has caused this Agreement to be duly executed and delivered as of the date first above written.

AMERICANWEST BANCORPORATION

By _____
   Name:
   Title:

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 160 of 193

SKBHC HAWKS NEST ACQUISITION CORP.,
as Lender


By: _____
Name:
Title:

# FORM OF
## SUPERPRIORITY DEBTOR-IN-POSSESSION
## INTELLECTUAL PROPERTY SECURITY AGREEMENT

This SUPERPRIORITY DEBTOR-IN-POSSESSION INTELLECTUAL PROPERTY SECURITY AGREEMENT (as amended, amended and restated, supplemented or otherwise modified from time to time, the "IP Security Agreement") dated [_____], 2010, between AmericanWest Bancorporation (the "Borrower") and SKBHC Hawks Nest Acquisition Corp., as lender (the "Lender").

WHEREAS, AmericanWest Bancorporation, a Washington corporation and a debtor and debtor-in-possession in a case pending under Chapter 11 of the Bankruptcy Code, has entered into a Superpriority Debtor-in-Possession Credit Agreement dated as of October 28, 2010 (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), with SKBHC Hawks Nest Acquisition Corp., as the Lender. Terms defined in the Credit Agreement and not otherwise defined herein are used herein as defined in the Credit Agreement.

WHEREAS, as a condition precedent to the making of the Loan by the Lender under the Credit Agreement, the Borrower has executed and delivered that certain Superpriority Debtor-in-Possession Security Agreement dated [_____], 2010 between the Borrower and the Lender (as amended, amended and restated, supplemented or otherwise modified from time to time, the "Security Agreement").

WHEREAS, under the terms of the Security Agreement, the Borrower has granted to the Lender a security interest in the Additional Collateral (as defined in Section 1 below) of the Borrower and has agreed as a condition thereof to execute this IP Security Agreement for recording with the U.S. Patent and Trademark Office, the United States Copyright Office or other U.S. governmental authorities.

NOW, THEREFORE, for good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Borrower agrees as follows:

SECTION 1. Grant of Security. The Borrower hereby grants to the Lender a security interest in all of the Borrower's right, title and interest in and to the following, in each case, as to each type of property described below, whether now owned or hereafter acquired by the Borrower, wherever located, and whether now or hereafter existing or arising, except to the extent any applicable law, regulation, agreement with a domain name registrar or other contractual arrangement prohibits the creation of a security interest therein or would otherwise invalidate the Borrower's right, title or interest therein (the "Additional Collateral"):

> (i) the patents and patent applications set forth in Schedule A hereto (the "Patents");

> (ii) the trademark and service mark registrations and applications set forth in Schedule B hereto (provided that no security interest shall be granted in United States intent-to-use trademark applications to the extent that, and solely during the period in which, the grant of a security interest therein would impair the validity or enforceability of such intent-to-use trademark applications under applicable federal law), together with the goodwill symbolized thereby (the "Trademarks");

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 162 of 193

(iii)     the copyright registrations and applications set forth in <u>Schedule C</u> hereto (the "<u>Copyrights</u>");

(iv)     all reissues, divisions, continuations, continuations-in-part, extensions, renewals and reexaminations of any of the foregoing (as applicable), all rights in the foregoing provided by international treaties or conventions, all rights corresponding thereto throughout the world and all other rights of any kind whatsoever of the Borrower accruing thereunder or pertaining thereto;

(v)     any and all claims for damages and injunctive relief for past, present and future infringement, dilution, misappropriation, violation, misuse or breach with respect to any of the foregoing, with the right, but not the obligation, to sue for and collect, or otherwise recover, such damages; and

(vi)     any and all proceeds of, collateral for, income, royalties and other payments now or hereafter due and payable with respect to, and supporting obligations relating to, any and all of the Collateral of or arising from any of the foregoing.

SECTION 2.  <u>Supplement to Security Agreement</u>.  Schedule IV to the Security Agreement is, effective as of the date hereof, hereby supplemented to add to such Schedule the Additional Collateral.

SECTION 3.  <u>Security for Obligations</u>.  The grant of a security interest in, the Additional Collateral by the Borrower under this IP Security Agreement secures the payment of all Obligations of the Borrower now or hereafter existing under or in respect of the Loan Documents, whether direct or indirect, absolute or contingent, and whether for principal, reimbursement obligations, interest, premiums, penalties, fees, indemnifications, contract causes of action, costs, expenses or otherwise.

SECTION 4.  <u>Recordation</u>.  The Borrower authorizes and requests that the Register of Copyrights, the Commissioner for Patents and the Commissioner for Trademarks and any other applicable government officer record this IP Security Agreement.

SECTION 5.  <u>Execution in Counterparts</u>.  This IP Security Agreement may be executed in any number of counterparts, each of which when so executed shall be deemed to be an original and all of which taken together shall constitute one and the same agreement.

SECTION 6.  <u>Grants, Rights and Remedies</u>.  This IP Security Agreement has been entered into in conjunction with the provisions of the Security Agreement.  The Borrower does hereby acknowledge and confirm that the grant of the security interest hereunder to, and the rights and remedies of, the Lender with respect to the Additional Collateral are more fully set forth in the Security Agreement, the terms and provisions of which are incorporated herein by reference as if fully set forth herein.  If there is a conflict between this IP Security Agreement and the Security Agreement, the terms and provisions of the Security Agreement shall control.

SECTION 7.  <u>Governing Law</u>.  This IP Security Agreement shall be governed by, and construed in accordance with, the laws of the State of New York.

[Remainder of page left blank]

IN WITNESS WHEREOF, each of the undersigned have caused this IP Security Agreement to be duly executed and delivered as of the date first above written.

<u>Address for Notices:</u>

41 W. Riverside Avenue, Suite 300
Spokane, Washington 99201

AmericanWest Bancorporation

By _____
    Name:
    Title:

Security Agreement

SKBHC HAWKS NEST ACQUISITION CORP.,
as Lender

By _____
Name:
Title:

# EXHIBIT C

## [FORM OF] NOTE

THIS NOTE AND THE OBLIGATIONS REPRESENTED HEREBY MAY NOT BE TRANSFERRED EXCEPT IN COMPLIANCE WITH THE TERMS AND PROVISIONS OF THE CREDIT AGREEMENT REFERRED TO BELOW.

$_____                                            New York, New York

                                                         _____ __, 20__

         FOR VALUE RECEIVED, the undersigned, AmericanWest Bancorporation, a Washington corporation (the "Borrower"), HEREBY UNCONDITIONALLY PROMISES TO PAY to SKBHC Hawks Nest Acquisition Corp. (the "Lender") or its registered assigns in Dollars (this and each other capitalized term used herein without definition having the meaning assigned to such term in the Credit Agreement referred to below) and in immediately available funds, the principal amount of (a) _____ DOLLARS ($_____), or, if less, (b) the unpaid principal amount of the Loan made by the Lender under the Credit Agreement. The principal amount shall be paid in the amounts and on the dates specified in Section 2.3 of the Credit Agreement. The Borrower further agrees to pay interest in like money at such office on the unpaid principal amount hereof from time to time outstanding at the rates and on the dates specified in the Credit Agreement.

         The holder of this Note is authorized to indorse on the schedules annexed hereto and made a part hereof or on a continuation thereof which shall be attached hereto and made a part hereof the date and amount of the Loan and the date and amount of each payment or prepayment of principal thereof. Each such indorsement shall constitute prima facie evidence of the accuracy of the information indorsed. The failure to make any such indorsement or any error in any such indorsement shall not affect the obligations of the Borrower in respect of the Loan.

         This Note (a) is the Note issued pursuant to the Superpriority Debtor-in Possession Credit Agreement, dated as of October 28, 2010, among the Borrower and SKBHC Hawks Nest Acquisition Corp., as the Lender (as amended, restated, amended and restated, supplemented or otherwise modified from time to time, the "Credit Agreement"), (b) is subject to the provisions of the Credit Agreement, to which reference is hereby made for a more complete statement of the terms and conditions under which the Loan evidenced hereby were made and are to be repaid, (c) is subject to optional and mandatory prepayment in whole or in part as provided in the Credit Agreement and (d) is secured and guaranteed as provided in the Loan Documents. Reference is hereby made to the Credit Agreement for a statement of all the terms and conditions under which the Loan evidenced hereby are to be repaid. Reference is hereby made to the Loan Documents for a description of the properties and assets in which a security interest has been granted, the nature and extent of the security and the guarantees, the terms and conditions upon which the security interests and each guarantee were granted and the rights of the holder of this Note in respect thereof. The principal balance of the Loan owing to the Lender, the rates of interest applicable thereto and the date and amount of each payment made on account of the principal thereof, shall be recorded by the Lender on its books; provided that the failure of the Lender to make any such recordation shall not affect the obligation of the Borrower to make a payment when due of any amount owing under the Credit Agreement or this Note.

         Upon the occurrence and during the continuance of any one or more Events of Default, all principal and all accrued interest then remaining unpaid on this Note shall become, or may be declared to be, immediately due and payable, all as provided in the Credit Agreement. No failure in exercising any

Exhibit C-1

621745.05-Los Angeles Server 2A - MSW

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 166 of 193

rights hereunder or under the other Loan Documents on the part of the Lender shall operate as a waiver of such rights.

All parties now and hereafter liable with respect to this Note, whether maker, principal, surety, guarantor, indorser or otherwise, hereby expressly waive presentment, demand, protest and all other notices or requirements of any kind.

**NOTWITHSTANDING ANYTHING TO THE CONTRARY CONTAINED HEREIN OR IN THE CREDIT AGREEMENT, THIS NOTE MAY NOT BE TRANSFERRED EXCEPT PURSUANT TO AND IN ACCORDANCE WITH THE REGISTRATION AND OTHER PROVISIONS OF <u>SECTION 8.7</u> OF THE CREDIT AGREEMENT.**

**THIS NOTE SHALL BE GOVERNED BY, AND SHALL BE CONSTRUED AND INTERPRETED IN ACCORDANCE WITH, THE LAWS OF THE STATE OF NEW YORK.**

*[Signature page follows]*

Exhibit C-2

**IN WITNESS WHEREOF**, Borrower has caused this Note to be duly executed and delivered by its officer thereunto duly authorized as of the date and at the place first written above.

**AMERICANWEST BANCORPORATION**

By: _____
Name:
Title:

Exhibit C-3

THE LOAN AND REPAYMENTS OF THE LOAN

| Date | Amount of the Loan | Amount of Principal of the Loan Repaid | Unpaid Principal Balance of the Loan | Notation Made By |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

Exhibit C-4

621745.05-Los Angeles Server 2A - MSW

**<u>EXHIBIT D</u>**

[SEE ATTACHED]

Dillon E. Jackson WSBA #1539
Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Telephone:     (206) 447-4400
Facsimile No.:  (206) 447-9700

G. Larry Engel (*pro hac admission pending*)
MORRISON & FOERSTER LLP
425 Market Street
San Francisco, California 94105-2482
Telephone:     (415) 268-7000
Facsimile No.:  (415) 268-7522

Proposed Counsel for
AMERICANWEST BANCORPORATION

MOFO DRAFT
10/26/2010
PRIVILEGED & CONFIDENTIAL

UNITED STATES BANKRUPTCY COURT

EASTERN DISTRICT OF WASHINGTON

| | |
|---|---|
| In re | Case No. _____ |
| AMERICANWEST BANCORPORATION, | Chapter    11 |
| Debtor. | **FINAL ORDER AUTHORIZING AWBC TO OBTAIN POSTPETITION FINANCING ON A SENIOR SECURED, SUPERPRIORITY BASIS AND AUTHORIZING THE USE OF CASH COLLATERAL** |

On October 28, 2010, AmericanWest Bancorporation (the "AWBC"), the debtor and debtor-in-possession in the above-captioned Chapter 11 case (the "Case"), filed a motion (the "Motion") seeking, pursuant to sections 105, 361, 362, 363(c)(2), 364(c)(1), 364(c)(2), and 364(c)(3) of Title 11 of the United States Code (as amended, the "Bankruptcy Code"), Rules 2002, 4001(c), and 9014 of the Federal Rules of Bankruptcy Procedure (as amended, the "Bankruptcy Rules"), and Rule 4001-2 of the Local Rules for the

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 171 of 193

United States Bankruptcy Court for the Eastern District of Washington (the "Local Rules"), the entry of this final order (the "Final Order"):

    (I)    authorizing AWBC to obtain postpetition financing pursuant to a debtor-in-possession credit agreement, substantially in the form annexed hereto as Exhibit A (as amended, supplemented, or otherwise modified from time to time, the "DIP Credit Agreement")[1] by and between AWBC, as borrower, and SKBHC Hawks Nest Acquisition Corp. as lender (together with its successors and assigns, the "DIP Lender"), and together with all other related agreements, documents and instruments contemplated thereby (collectively, the "DIP Credit Documents"), authorizing AWBC to borrow up to $2,000,000, plus all other interest, fees and expenses due and payable under the DIP Credit Documents (the "Obligations"), such financing to be (A) secured by first-priority senior secured liens on all unencumbered tangible and intangible property of AWBC of any kind, as covered by the DIP Credit Documents (other than Avoidance Actions and the proceeds therefrom), subject only to the Carve-Out, pursuant to sections 364(c)(2) of the Bankruptcy Code, and (B) secured by a perfected lien upon all tangible and intangible property of AWBC that is subject to and junior to the Carve-Out and the Permitted

---

[1]    Capitalized terms not defined herein shall have the meanings ascribed to them in the DIP Credit Agreement.

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL - 2

sf-2909557

Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Phone (206) 447-4400  Fax (206) 447-9700

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 172 of 193

|   |   |   |
|---|---|---|
| 1 |  | Liens as defined in the DIP Credit Documents pursuant to |
| 2 |  | sections 364(c)(3) of the Bankruptcy Code; |
| 3 | (II) | granting the DIP Lender superpriority administrative claims in the |
| 4 |  | Case pursuant to section 364(c)(1) of the Bankruptcy Code, such |
| 5 |  | claims to be senior in right of payment over any and all |
| 6 |  | administrative expenses of the kinds specified in |
| 7 |  | sections 503(b) and 507(a) of the Bankruptcy Code or otherwise, |
| 8 |  | subject only to the Carve-Out (such credit facility being referred to |
| 9 |  | herein as the "DIP Facility"); and |
| 10 | (III) | authorizing AWBC to use Cash Collateral (as defined below) |
| 11 |  | pursuant to section 363(c) of the Bankruptcy Code. |

12    This Court having considered the Motion and the exhibits attached

13 thereto and the *Declaration of Patrick J. Rusnak, Chief Executive Officer of*

14 *AmericanWest Bancorporation, in Support of Chapter 11 Petition and First*

15 *Day Pleadings*; a hearing having been held and concluded on November ____,

16 2010 before this Court (the "Hearing"); the Court having considered upon the

17 entire record made at the Hearing, including arguments of counsel; and after

18 due deliberation and sufficient cause appearing therefor:

19    IT IS HEREBY FOUND AND CONCLUDED that:

20    (A)    On October 28, 2010 (the "Filing Date"), AWBC filed a

21 voluntary petition for relief with this Court under Chapter 11 of the Bankruptcy

22 Code, thereby commencing this Case.  AWBC is continuing in possession of its

23 property, and operating and managing its business as a debtor-in-possession,

24 pursuant to sections 1107 and 1108 of the Bankruptcy Code.

25    (B)    This Court has jurisdiction over these proceedings and the

26 parties and property affected hereby pursuant to 28 U.S.C. §§ 157(b) and 1334.

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 3

sf-2909557

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1  Consideration of this Motion constitutes a core proceeding as defined in 28
2  U.S.C. § 157(b)(2). Venue is proper before this Court pursuant to 28 U.S.C.
3  §§ 1408 and 1409.

4        (C)  Telephone, facsimile notice or overnight mail notice of the
5  Hearing and the entry of this Final Order has been provided to: (i) any entities
6  known to have asserted any Encumbrance in or upon the Shares or the Other
7  Purchased Assets; (ii) all federal, state, and local regulatory or taxing authorities
8  or recording offices which have a reasonably known interest in the relief
9  requested by the Motion, including the Federal Deposit Insurance Corporation
10  and the Washington State Department of Financial Institutions; (iii) the Office
11  of the United States Trustee; (iv) the Securities and Exchange Commission; (v)
12  the Internal Revenue Service; (vi) Wilmington Trust Company; (vii) U.S. Bank;
13  (viii) Preferred Trust Securities, Ltd. VII; (ix) Preferred Trust Securities, Ltd.
14  X; (x) Preferred Trust Securities, Ltd. XXII; (xi) Preferred Trust Securities, Ltd.
15  XXV; (xii) Bank of New York Mellon; (xiii) all entities that have requested
16  notice in accordance with Bankruptcy Rule 2002; (xiv) all other known
17  creditors of AWBC; and (xv) counsel to any official committee established in
18  this Chapter 11 case (collectively, the "Notice Parties"). Under the exigent
19  circumstances, the requisite notice of the Motion and the relief requested
20  thereby and this Final Order have been provided in accordance with Bankruptcy
21  Rule 4001, which notice is sufficient for all purposes under the Bankruptcy
22  Code, including, without limitation, sections 102(1) and 364 of the Bankruptcy
23  Code, and no other notice need be provided for entry of this Final Order.

24        (D)  The relief requested by the Motion is necessary to avoid
25  harm to AWBC's estate, and good, adequate, and sufficient cause has been

26

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 4

sf-2909557

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

shown to justify the granting of the relief requested herein, and the immediate
entry of this Final Order.

(E)     AWBC does not have sufficient available resources of
working capital and financing to carry on operations without the DIP Facility
and the use of Cash Collateral (as defined below).  AWBC has an immediate
need to obtain financing under the DIP Facility and to use Cash Collateral, in
order to permit, among other things, AWBC to continue its business operations
in an orderly manner, maintain business relationships, and satisfy other working
capital and operational needs.

(F)     AWBC is unable to obtain unsecured credit allowable under
section 503(b)(1) of the Bankruptcy Code as an administrative expense or
pursuant to sections 364(a) and 364(b) of the Bankruptcy Code.  Financing on a
post-petition basis is not available to AWBC unless AWBC grants: (i) the DIP
Facility Liens (as defined below) upon the DIP Facility Collateral (defined
below), pursuant to sections 364(c)(2) and 364(c)(3) of the Bankruptcy Code, to
secure the Obligations, and (ii) the Superpriority Claims (as defined below) in
respect of the Obligations, pursuant to section 364(c)(1) of the Bankruptcy
Code.  The DIP Lender has indicated a willingness to make such loans and
advances and provide such other financial accommodations pursuant to the
terms and conditions of the DIP Credit Documents.  Under the circumstances,
AWBC is otherwise unable to obtain financing on more favorable terms from
sources other than the DIP Lender under the DIP Credit Documents.

(G)     Concurrently while negotiating the DIP Credit Agreement,
AWBC has negotiated an asset purchase agreement (the "APA") pursuant to
which SKBHC Hawks Nest Acquisition Corp., which is also serving as the DIP
Lender (the "Purchaser"), proposes to purchase the issued and outstanding

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 5

sf-2909557

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

shares of common stock (the "Shares") of AmericanWest Bank, a Washington-chartered bank that operates in Eastern and Central Washington, Northern Idaho, and Utah (the "Bank") from AWBC, together with the Other Purchased Assets (as defined in the APA), through a Court-approved competitive bidding process. Pursuant to the APA, the Purchaser would act as a stalking-horse bidder offering to pay AWBC $6.5 million for the Shares and the Other Purchased Assets and would, simultaneously with the closing of the APA, invest in the Bank for recapitalization purposes an amount necessary to obtain the Purchaser Required Approvals (as defined in the APA) but in no event to exceed Two Hundred Million Dollars ($200,000,000). Further, pursuant to the APA, as reimbursement for acting as the stalking-horse bidder, AWBC would pay the Purchaser $1,000,000 as a Stalking-Horse Bidder Fee (as defined in the APA) should a third party overbid the Purchaser and purchase the Shares and the Other Purchased Assets.

(H)     The APA, the DIP Facility, and the use of Cash Collateral have been negotiated in good faith and at arms-length between AWBC and the Purchaser/DIP Lender, as applicable. As such, the terms applicable to the APA, the DIP Facility, and the use of Cash Collateral by AWBC shall be deemed to have been extended, issued, made, or used as the case may be, in good faith as required by, and within the meaning of, section 364(e) of the Bankruptcy Code, and the DIP Lender is entitled to the protections of section 364(e) of the Bankruptcy Code.

(I)     The terms of the DIP Facility and this Final Order are fair and reasonable, and reflect AWBC's exercise of prudent business judgment consistent with its fiduciary duties, and are supported by reasonably equivalent value and fair consideration.

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL - 6

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400   FAX (206) 447-9700

sf-2909557

1     (J)     This Court concludes that entry of this Final Order is in the
2   best interests of AWBC's estate and creditors because its implementation,
3   among other things, will allow for AWBC to remain in business by providing
4   the working capital necessary to sustain ongoing working capital requirements,
5   which shall include, without limitation, the expenses incurred during the
6   Company's Case.  Absent the entry of this Final Order, AWBC's estate would
7   be immediately and irreparably harmed.

8     (K)     Each of the foregoing findings by this Court will be deemed
9   a finding of fact if and to the full extent that it makes and contains factual
10  findings, and will be deemed a conclusion of law if and to the full extent that it
11  makes and contains legal conclusions.

12      Based upon the foregoing findings and conclusions, and upon the
13  record made by AWBC before this Court at the hearing on the Motion, and
14  good and sufficient cause appearing therefor,

15      IT IS HEREBY ORDERED that:

16      1.     The Motion is granted on an final basis, subject to the terms
17  and conditions set forth in this Final Order.

18      2.     All objections, if any, to the Motion are resolved hereby or,
19  to the extent not resolved, are overruled.

20      3.     AWBC is expressly authorized and empowered to execute
21  and deliver the DIP Credit Documents together with any other document of any
22  kind required to be executed and delivered in connection therewith.  AWBC is
23  authorized and obligated to comply with and perform, and is bound by, all of
24  the terms, conditions, and waivers contained therein, and AWBC is authorized,
25  directed, and obligated to repay amounts borrowed, with interest, fees, and
26  expenses, and any other allowed charges and amounts, to the DIP Lender in

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 7

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 177 of 193

accordance with and subject to the terms and conditions set forth in the DIP
Credit Documents not later than 45 days after the date of the DIP Credit
Agreement subject to one extension not to exceed 15 days (the "Maturity
Date").  None of the DIP Credit Documents, any provision thereof, any right
arising under any provision thereof, or any pre-Filing Date payments made to
the DIP Lender (solely in its capacity as a DIP Lender) in connection with the
DIP Lender's commitment to enter into the DIP Credit Documents shall be
voidable or avoidable under section 548 of the Bankruptcy Code, under any
applicable State Uniform Fraudulent Transfer Act, Uniform Fraudulent
Conveyance Act or similar statute or common law, or otherwise.  AWBC is
further authorized, obligated, and directed to pay all fees and expenses incurred
by the DIP Lender with respect to the origination of the DIP Credit Documents,
including without limitation the reasonable fees and expenses of professionals
engaged by the DIP Lender, in an aggregate amount not to exceed $100,000
(the "Fee Cap"), in each case in accordance with and subject to the terms of the
DIP Credit Documents.  The Fee Cap, however, will not apply to fees or
expenses incurred by the DIP Lender while defending the DIP Credit
Documents in any litigation or any other dispute. None of the fees and expenses
of the professionals engaged by the DIP Lender payable pursuant to this
paragraph shall be subject to separate approval by this Court (but this Court
shall resolve any dispute as to the reasonableness of any such fees and
expenses), and no recipient of any such payment shall be required to file any
interim or final fee application with respect thereto.

       4.     AWBC is expressly authorized to borrow from the DIP
Lender, on the terms and subject to the conditions and limitations in availability

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 8

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

set forth in the DIP Credit Documents and this Final Order, up to $2,000,000 in the aggregate.

5.     AWBC is authorized to use the proceeds of the DIP Facility for ongoing working capital needs and to pay operating costs and expenses of AWBC during the pendency of the Case in accordance with the terms of the DIP Credit Agreement, including the payment of the fees, costs and expenses of AWBC's advisors and the advisors to any official committee of creditors (each, a "Committee") appointed in the Case.  Without the prior written consent of the DIP Lender, no portion of the DIP Facility, the DIP Facility Collateral (as defined below), or the Cash Collateral shall be used (a) to investigate the DIP Lender, (b) to object to or contest in any manner, or raise any defense to (i) the Superpriority Claims (as defined below) or (ii) the DIP Facility Liens (as defined below) granted to the DIP Lender pursuant to this Final Order, (c) to request authorization to obtain a postpetition loan or other financial accommodation pursuant to sections 364(c) or (d) of the Bankruptcy Code on a non-consensual basis, or (d) to prevent, hinder, or otherwise delay the exercise or enforcement of, or seek to modify, any rights and remedies of the DIP Lender, as applicable, arising under the DIP Credit Documents or this Final Order (collectively, the "Prohibited Actions").

6.     Pursuant to section 364(c)(1) of the Bankruptcy Code, all of the Obligations shall constitute allowed claims (the "Superpriority Claims") against AWBC with priority over any and all administrative expenses, third-party claims under section 507(b) of the Bankruptcy Code for diminution in collateral value, and all other claims against AWBC, now existing or hereafter arising, of any kind whatsoever, including, without limitation, all administrative expenses of the kind specified in sections 503(b) and 507(b) of the Bankruptcy

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 9

sf-2909557

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

Code, which allowed claims shall be payable from and have recourse to all pre and postpetition property of AWBC and all proceeds thereof (excluding Avoidance Actions (defined below) and the proceeds and recoveries therefrom), subject only to the payment of the Carve-Out (defined below) to the extent specifically provided for herein.

        7.     As security for the Obligations, the DIP Lender shall have and is hereby granted (effective upon the date of this Final Order and without the necessity of the execution by AWBC of mortgages, security agreements, pledge agreements, financing statements or otherwise), valid and perfected security interests in, and liens (the "Liens"), on all unencumbered tangible and intangible assets of AWBC, including without limitation all issued and outstanding Shares of the Bank now owned or hereafter acquired by AWBC as covered by the DIP Credit Documents (the "Assets") as well as all proceeds, products, rents and profits thereof, including all cash from the payment of dividends or interest on the Shares, together with all other property described in Bankruptcy Code section 363(a) and applicable case law constituting "cash collateral" (the "Cash Collateral" and together with the Assets, the "DIP Facility Collateral"). The DIP Facility Collateral includes without limitation, all cash or checks on hand, all cash or securities deposited into any account maintained by AWBC, and the proceeds of all causes of action (excluding claims and causes of action arising under sections 502(d), 544, 545, 547, 548, 549, 550 or 551 of the Bankruptcy Code ("Avoidance Actions") and the proceeds and recoveries therefrom) with the following priorities:

        (a)     pursuant to section 364(c)(2) of the Bankruptcy Code, a first-priority, perfected Lien upon all of AWBC's right, title and interest in, to, and under the DIP Facility Collateral that is not

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL - 10

sf-2909557

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

otherwise encumbered by Permitted Liens (as defined in the DIP Credit Agreement); and

(b) pursuant to section 364(c)(3) of the Bankruptcy Code, the best available junior, perfected Lien upon all of AWBC's right, title, and interest in, to and under all DIP Facility Collateral which is subject to the Permitted Liens.

The foregoing Liens are referred to herein as the "DIP Facility Liens." Except to the extent expressly set forth in this Final Order, the Liens granted pursuant to this Final Order and the DIP Credit Documents to the DIP Lender to secure the Obligations shall not be subordinated to or made pari passu with any other lien or security interest.

8. Upon the occurrence and during the continuation of an Event of Default (defined below) with respect to which DIP Lender provides written notice to counsel to AWBC and its counsel, the U.S. Trustee, and counsel to the Committee that the Carve-Out is invoked (a "Carve-Out Trigger Notice"), the Superpriority Claims, the DIP Facility Liens, and any claims or liens ranking junior in priority to the Superpriority Claims and the DIP Facility Liens shall be subject to payment of the Carve-Out. As used herein, "Carve-Out" means the (a) unpaid fees of the Clerk of the Bankruptcy Court and the U.S. Trustee pursuant to 28 U.S.C. § 1930(a), (b) unpaid and allowed fees and expenses of professional persons, retained by AWBC or any Committee (collectively, the "Professionals"), in each case, incurred on and prior to delivery of a Carve-Out Trigger Notice and (c) unpaid and allowed fees and expenses of Professionals incurred subsequent to delivery of a Carve-Out Trigger Notice, in an aggregate amount not to exceed $250,000 (the "Professional Expense Cap") provided, however, that, upon an Event of Default, prior to receiving payment of any fees and expenses out of the Carve-

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL - 11

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2909557

Out, any professional who received a retainer from AWBC shall first apply any unused portion of such retainer to any outstanding fees and expenses. So long as no Event of Default shall have occurred and be continuing and no Carve-Out Trigger Notice shall have been delivered, AWBC will be permitted to pay compensation and reimbursement of fees and expenses allowed and payable under 11 U.S.C. sections 105(a), 330 and 331, as the same may be due and payable, subject to the rights of any party in interest to object to any fees, expenses, reimbursement or compensation of any Professionals. For the avoidance of doubt, the Professional Expense Cap shall only apply after the delivery of a Carve-Out Trigger Notice.  The Professional Expense Cap shall be reduced, dollar for dollar, by the amount of any fees, costs and expenses paid to Professionals and incurred subsequent to delivery of a Carve-Out Trigger Notice.  Payment of any obligations relating to the Carve-Out shall not, and shall not be deemed to, (i) reduce AWBC's obligations to the DIP Lender or (ii) subordinate, modify, alter or otherwise affect any of the liens and security interests of the DIP Lender (or the DIP Lender's respective claims against AWBC).

9.     Upon entry of, and to the extent provided in, this Final Order, neither AWBC nor its estate may assert a claim under section 506(c) of the Bankruptcy Code for any costs and expenses incurred in connection with the preservation, protection, or enhancement of, or realization by the DIP Lender upon the DIP Facility Collateral.  The DIP Lender will not be subject to the equitable doctrine of "marshaling" or any other similar doctrine with respect to any DIP Facility Collateral.

10.     All DIP Facility Liens binding and perfected automatically upon the entry of this Final Order.  The DIP Lender will not be required to file

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL - 12

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

10-06097-FPC11     Doc 2-1     Filed 10/28/10     Entered 10/28/10 02:02:18     Pg 182 of 193

or serve financing statements, mortgages, notices of lien, or similar instruments which otherwise may be required under federal or state law in any jurisdiction, or take any action, including taking possession, to validate and perfect the DIP Facility Liens, as applicable. If, however, the DIP Lender in its reasonable discretion shall determine to file any such financing statements, mortgages, agreements, notices of lien, or similar instruments, or to otherwise confirm perfection of such DIP Facility Liens, AWBC at AWBC's expense is hereby authorized, directed, and obligated to cooperate with and assist in such process to the extent provided in the DIP Credit Documents or this Final Order, and all such documents shall be deemed to have been perfected at the time of and on the date of this Final Order, with the priorities set forth herein, and shall be and hereby are deemed and adjudicated senior to any other post-petition filing by any other person or entity with respect to the same collateral. A certified copy of this Final Order may, in the discretion of the DIP Lender, be filed with or recorded in filing or recording offices in addition to or in lieu of such financing statements, mortgages, notices of lien, or similar instruments, and all filing offices are hereby authorized to accept such certified copy of this Final Order for filing and recording.

11. Prior to any Event of Default, AWBC is hereby authorized to use the Cash Collateral of the DIP Lender solely on the terms and conditions contained in this Final Order except as otherwise provided in the DIP Credit Documents.

12. Events of default under this Final Order (the "Events of Default") will include the following:

(a) The entry of an order, which is not stayed, converting AWBC's Chapter 11 Case to a case under chapter 7 of the

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL - 13

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2909557

1   Bankruptcy Code, or AWBC files a motion or does not

2   oppose a motion seeking such relief, unless consented to by

3   the DIP Lender;

4   (b)   The entry of an order dismissing the Case, or AWBC files a

5   motion or does not oppose a motion seeking such relief,

6   unless consented to by the DIP Lender;

7   (c)   The entry of an order granting appointment of (i) a trustee

8   under section 1104 of the Bankruptcy Code or (ii) an

9   examiner with enlarged powers related to the operation of

10  the business under section 1106(b) of the Bankruptcy Code

11  (powers beyond those set forth in section 1106(a)(3) and (4)

12  of the Bankruptcy Code) or AWBC files a motion or does

13  not oppose a motion seeking such relief, unless consented to

14  by the DIP Lender;

15  (d)   The filing a motion by AWBC (i) to further use Cash

16  Collateral of the DIP Lender under section 363(c) of the

17  Bankruptcy Code without the express prior written consent

18  of the DIP Lender (it being understood and agreed that the

19  DIP Lender consents to the proposed use of Cash Collateral

20  on the terms and conditions set forth in this Final Order),

21  (ii) to recover from any portions of the DIP Facility

22  Collateral any costs or expenses of preserving or disposing

23  of such collateral under section 506(c) of the Bankruptcy

24  Code, (iii) to cut off rights in the DIP Facility Collateral

25  under section 552(b) of the Bankruptcy Code, or (iv) to take

26  any other action or actions materially adverse to the DIP

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 14

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

| | | |
|---|---|---|
| 1 | | Lender or its rights and remedies under the DIP Credit |
| 2 | | Documents or the DIP Lender's interest (as lender under the |
| 3 | | DIP Credit Agreement) in any of the DIP Facility Collateral; |
| 4 | (e) | Except for the Carve-Out, the Permitted Liens, or as |
| 5 | | permitted in this Final Order, the entry of any order of the |
| 6 | | Bankruptcy Court granting a super-priority claim or lien pari |
| 7 | | passu with or senior to that granted to the DIP Lender |
| 8 | | hereunder; |
| 9 | (f) | The entry of any order in the Case or any successor case, |
| 10 | | (i) which order constitutes the stay, modification (without |
| 11 | | the consent of the DIP Lender), appeal or reversal of this |
| 12 | | Final Order, or (ii) which order otherwise materially |
| 13 | | adversely affects the effectiveness of this Final Order; |
| 14 | (g) | The entry of any unstayed order in the Case granting relief |
| 15 | | from the automatic stay applicable under section 362 of the |
| 16 | | Bankruptcy Code so as to allow a third party or third parties |
| 17 | | to proceed against any property of AWBC which has a |
| 18 | | value, or to commence or continue any litigation against |
| 19 | | AWBC, involving potential liability not covered by |
| 20 | | insurance in excess of $500,000 in the aggregate; |
| 21 | (h) | The payment of principal or interest or otherwise in a |
| 22 | | manner inconsistent with the DIP Credit Agreement; and |
| 23 | (i) | The occurrence of any other Event of Default as defined |
| 24 | | under the DIP Credit Agreement. |
| 25 | 13. | Upon the occurrence of and during the continuance of an |
| 26 | | Event of Default, the DIP Lender is entitled to exercise rights and remedies and |

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 15

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

take all or any of the following actions without further relief from the automatic stay pursuant to section 362(a) of the Bankruptcy Code or any other applicable stay or injunction (which have been modified and vacated, as heretofore ordered, to the extent necessary to permit such exercise of rights and remedies and the taking of such actions) or further order of or application to this Court: (a) terminate its obligation to make advances under the DIP Credit Agreement; (b) charge a default rate of interest as set forth in the DIP Credit Agreement; (c) terminate AWBC's right to use Cash Collateral and require AWBC to segregate and preserve all Cash Collateral for the benefit of the DIP Lender; (d) declare the principal of and accrued interest, fees, and other liabilities constituting the Obligations to be immediately due and payable; and/or (e) take any other action or exercise any other right or remedy permitted to the DIP Lender under the DIP Credit Documents, this Final Order, or by operation of law; provided, however, that the DIP Lender may not exercise its rights under clauses (d) or (e) without first providing to counsel for AWBC, counsel for any Committee appointed in the Case, and the U.S. Trustee five business days' written notice (an "Enforcement Notice") of any such Event of Default and the proposed exercise of rights and remedies. AWBC waives any right to seek relief under the Bankruptcy Code, including, without limitation, under section 105 of the Bankruptcy Code, to the extent any such relief would in any way restrict or impair the rights and remedies of the DIP Lender set forth in this Final Order and in the DIP Credit Documents, provided that AWBC will retain the right to challenge the occurrence of an Event of Default as discussed below. If AWBC, or any other person challenges the occurrence of an Event of Default, any such person may request an expedited hearing before this Court (subject to the Court's availability) and the DIP Lender shall be permitted

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH COLLATERAL - 16

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

10-06097-FPC11    Doc 2-1    Filed 10/28/10    Entered 10/28/10 02:02:18    Pg 186 of 193

immediately to take any action described in clauses (a), (b), (c), and (d) as described above, but unless the Court orders otherwise, the DIP Lender shall not take the actions described in clause (e) above pending any such hearing.

14. Except as set forth in paragraph 13 hereof and in the DIP Credit Documents, AWBC waives demand, protest, notice of protest, notice of default or dishonor, notice of payment and nonpayment, nonpayment at maturity, release, compromise, settlement, extension, or renewal of documents, instruments, chattel paper, and guaranties at any time held by the DIP Lender with respect to the DIP Facility on which AWBC may in any way be liable. So long as the DIP Lender complies with its obligations, if any, under applicable law (including the Bankruptcy Code), and AWBC remains in control of the DIP Facility Collateral, (i) the DIP Lender shall not, in any way or manner, be liable or responsible for (A) the safekeeping of the DIP Facility Collateral, (B) any loss or damage thereto occurring or arising in any manner or fashion from any cause, (C) any diminution in the value thereof, or (D) any act or default of any carrier, servicer, bailee, custodian, forwarding agency, or other person, and (ii) all risk of loss, damage or destruction of the DIP Facility Collateral shall be borne by AWBC.

15. AWBC is authorized to perform all acts, and execute and comply with the terms of such other documents, instruments, and agreements in addition to the DIP Credit Documents as the DIP Lender may reasonably require as evidence of and for the protection of the Obligations, or which otherwise may be reasonably deemed necessary by the DIP Lender to effectuate the terms and conditions of the DIP Credit Documents or this Final Order. AWBC and the DIP Lender are hereby authorized to implement, in accordance with the terms of the DIP Credit Agreement, any amendments, waivers, or

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 17

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

1  modifications to the DIP Credit Documents that are not materially adverse to

2  AWBC without further order of this Court.

3       16.    Without limiting the rights of access and information

4  afforded to the DIP Lender under the DIP Credit Documents (but subject to the

5  limitations set forth in the DIP Credit Documents), AWBC will be required to

6  afford representatives, agents, and/or employees of the DIP Lender reasonable

7  access to AWBC's premises and its records in accordance with the DIP Credit

8  Documents, and shall cooperate, consult with, and provide to such persons all

9  such information.

10       17.    Having been found to be extending credit to, and permitting

11  the use of Cash Collateral by, AWBC in good faith, based on the record before

12  this Court, the DIP Lender will be entitled to the full protection of

13  section 364(e) of the Bankruptcy Code with respect to the Obligations and the

14  DIP Facility Liens created, adjudicated, or authorized by this Final Order in the

15  event that this Final Order or any finding, adjudication, or authorization

16  contained herein is stayed, vacated, reversed, or modified on appeal.  Any stay,

17  modification, reversal, or vacation of this Final Order will not affect the validity

18  of any Obligations of AWBC to the DIP Lender incurred by AWBC pursuant

19  hereto prior to the DIP Lender's actual receipt of written notice of the effective

20  date of any such stay, modification, reversal, or vacation.  Notwithstanding any

21  such stay, modification, reversal, or vacation, all financing extended to, and

22  Cash Collateral used by, AWBC pursuant to this Final Order and all

23  Obligations incurred by AWBC pursuant hereto prior to the DIP Lender's

24  actual receipt of written notice of the effective date of any such stay,

25  modification, reversal, or vacation shall be governed in all respects by the

26  original provisions hereof, and the DIP Lender shall be entitled to all the rights,

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 18

sf-2909557

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1 privileges, and benefits, including, without limitation, the liens, security

2 interests, and first priorities granted herein with respect to all such Obligations.

3        18.     The provisions of this Final Order and any actions taken

4 pursuant hereto shall survive entry of any order (a) confirming any plan of

5 reorganization in the Case, (b) converting the Case to a chapter 7 case, or

6 (c) dismissing the Case, and to the greatest extent permitted by applicable law,

7 the terms and provisions of this Final Order, as well as the Superpriority Claims

8 and the DIP Facility Liens granted pursuant to this Final Order, the DIP Credit

9 Documents, and related documents (as applicable) shall continue in full force

10 and effect notwithstanding the entry of any such order, and such Superpriority

11 Claims and DIP Facility Liens will maintain their priority as provided by this

12 Final Order until all of the non-contingent Obligations are indefeasibly paid in

13 full in cash and all contingent Obligations are cash collateralized as provided

14 for under the DIP Credit Agreement.

15        19.     The DIP Lender is hereby relieved of the requirement to file

16 proofs of claim in the Cases with respect to any Obligations.

17        20.     Nothing in this Final Order, the DIP Credit Documents or

18 any other documents related to these transactions shall in any way be construed

19 or interpreted to impose or allow the imposition upon the DIP Lender of any

20 liability for any claims arising from the prepetition or postpetition activities of

21 AWBC in the operation of their businesses, or in connection with their

22 restructuring efforts. The DIP Lender will not be deemed to be in control of the

23 operations of AWBC or to be acting as a "responsible person" or "owner or

24 operator" with respect to the operation or management of AWBC (as such

25 terms, or any similar terms, are used in the United States Comprehensive

26

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 19

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2909557

1  Environmental Response, Compensation and Liability Act, 29 U.S.C. §§ 9601

2  et seq. as amended, or any similar federal or state statute).

3        21.    The stipulations and admissions contained in this Final

4  Order shall be binding upon AWBC, its estate, and all parties in interest in all

5  circumstances.  As such, pursuant to this Final Order, (i) the DIP Lender's

6  Obligations will not be subject to counterclaim, setoff, subordination,

7  recharacterization, defense or avoidance, for all purposes in the Case and any

8  subsequent chapter 7 case, (ii)  the DIP Facility Liens on the DIP Facility

9  Collateral shall be deemed to be legal, valid, binding, perfected, and of the

10  priority described in this Final Order, not subject to recharacterization,

11  subordination, avoidance, or reduction, and (iii) the Obligations and the DIP

12  Facility Liens on the DIP Facility Collateral shall not be subject to any

13  challenge by any party in interest, and any such party in interest shall be

14  enjoined from, seeking to exercise the rights of any of AWBC's estate,

15  including, without limitation, any successor thereto (including, without

16  limitation, any estate representative or a chapter 7 or 11 trustee appointed or

17  elected for AWBC).  If any proceeding is filed, the stipulations and admissions

18  contained this Final Order shall nonetheless remain binding and preclusive on

19  any Committee and on any other person or entity.  Nothing in this Final Order

20  vests or confers on any Person (as defined in the Bankruptcy Code) standing or

21  authority to pursue any cause of action belonging to AWBC or its estate.

22        22.    Without prejudice to the rights of any other party, AWBC

23  waives any and all claims and causes of action against the DIP Lender, and its

24  respective agents, affiliates, subsidiaries, directors, officers, employees,

25  representatives, attorneys, professionals and advisors, directly related to the DIP

26  Facility, this Final Order, or the negotiation of the terms thereof.

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 20

sf-2909557

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1      23.    The stay of this Final Order set forth in Bankruptcy Rule

2   6004 is hereby waived and this Final Order shall be effective immediately upon

3   its entry.

4      24.    To the fullest extent permitted by law, the provisions of this

5   Final Order and the DIP Credit Documents shall be binding upon and inure to

6   the benefit of the parties thereto, and their respective successors and assigns,

7   including any trustee or other fiduciary hereafter appointed in the Case or in any

8   subsequent chapter 7 case as a legal representative of AWBC or its estate.

9      25.    To the extent any provision of this Final Order conflicts with

10  any provision of the Motion or any provision of the DIP Credit Documents, the

11  provisions of this Final Order shall control.

12     26.    This Court shall retain jurisdiction to enforce this Final

13  Order, and over any matters or disputes arising from or relating to the

14  implementation of this Final Order.

15

16      Dated: _____, 2010
        Spokane, Washington

17                                          _____
                                            UNITED STATES
18                                          BANKRUPTCY JUDGE

19

20

21

22

23

24

25

26

FINAL ORDER AUTHORIZING THE DEBTOR TO OBTAIN DIP FINANCING ON A
SENIOR SECURED SUPERPRIORITY BASIS AND AUTHORIZING USE OF CASH
COLLATERAL - 21

Foster Pepper PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Phone (206) 447-4400  Fax (206) 447-9700

sf-2909557

**EXHIBIT E**

[SEE ATTACHED]

| | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Other Income | | | | | | | | | | | | | | |
| **Total Receipts** | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | |
| **Expenses** | | | | | | | | | | | | | | |
| Payroll & Benefits | | | | | 3,215 | | | | 3,215 | | | | 3,215 | 9,645 |
| Other Operating Expenses | | | | | 1,471 | | | | 1,471 | | | | 1,471 | 4,413 |
| Utilities | | | | | | | | | | | | | | - |
| Debt Service | | | | | 1,313 | 1,313 | 1,313 | 1,313 | 2,633 | 2,633 | 2,633 | 2,633 | 3,953 | 19,733 |
| Property & Liability Insurance | | | | | | | | | | | | | | - |
| Other Taxes & Permits | | | | | | | | | | | | | | - |
| Ordinary Course Professionals | | | | | 1,105 | | | | 175 | | | | 100 | 1,380 |
| Restructuring Fees/Expenses | | | | | 167,000 | | | | 167,000 | | | | 166,000 | 500,000 |
| Capital Expenditures | | | | | | | | | | | | | | - |
| Critical Vendor Payments | | | | | 1,734 | | | | 1,734 | | | | 1,734 | 5,202 |
| Other/Contingency | | | | | | | | | | | | | | - |
| **Total Expenses** | $0 | $0 | $0 | $0 | $175,837 | $1,313 | $1,313 | $1,313 | $176,228 | $2,633 | $2,633 | $2,633 | $176,473 | $540,372 |
| **DIP Operating Account Activity** | | | | | | | | | | | | | | |
| Beginning Balance | 97,008 | 97,008 | 97,008 | 97,008 | 97,008 | 96,171 | 94,858 | 93,546 | 92,233 | 92,006 | 89,373 | 86,741 | 84,108 | |
| Add: Receipts | - | - | - | - | - | - | - | - | - | - | - | - | - | |
| Less: Disbursements | - | - | - | - | (175,837) | (1,313) | (1,313) | (1,313) | (176,228) | (2,633) | (2,633) | (2,633) | (176,473) | |
| Add: DIP Funding | | | | | 175,000 | | | | 176,000 | | | | 176,000 | |
| **Ending Cash Balance** | $97,008 | $97,008 | $97,008 | $97,008 | $96,171 | $94,858 | $93,546 | $92,233 | $92,006 | $89,373 | $86,741 | $84,108 | $83,636 | |
| **Cumulative DIP Outstanding** | $0 | $0 | $0 | $0 | $175,000 | $175,000 | $175,000 | $175,000 | $351,000 | $351,000 | $351,000 | $351,000 | $527,000 | |
| Calculation of Interest at 9% on DIP | $0 | $0 | $0 | $0 | $1,313 | $1,313 | $1,313 | $1,313 | $2,633 | $2,633 | $2,633 | $2,633 | $3,953 | |

**Detailed Breakdown of Expenses**

**Payroll & Benefits**
  Amounts are estimated based on each employee's respective time on HC activity.

**Other Operating Expenses**
  Allocated rent to the HC from the Bank $971/monthly and board of director monthly fees at an estimated $500/monthly.

**Ordinary Course Professionals**
  Amounts are 5% of the actual billings by vendors on a monthly basis.  Below are estimates of the expected billings and assumptions:

| | Total Invoice | | | | | Allocated Expenses | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Oct | Nov | Dec | Jan | Total | 5% Nov | 5% Dec | 5% Jan | |
| RR Donnelly | - | 2,000 | 2,000 | 1,000 | 5,000 | 100 | 100 | 50 | Estimated $1,000 for each 10-Q and earnings release, $500 per other 8-K |
| Nasdaq | - | - | - | - | - | - | - | - | |
| Illinois Stock | - | 9,997 | - | - | 9,997 | 500 | - | - | Invoices received for services from current through 6/2011 and not yet paid |
| Business Wire | - | 5,000 | 1,000 | 1,000 | 7,000 | 250 | 50 | 50 | Estimated $4,000 for earnings release and $500 per press release |
| Broadridge | - | 5,100 | 500 | - | 5,600 | 255 | 25 | - | Estimated $500 for shareholder search and $5,100 (3,500 * $1.44 for shareholder mailer) |
| Total | | | | | | 1,105 | 175 | 100 | |

**Restructuring Fees/Expenses**

| | | |
|---|---|---|
| MoFo | 350,000 | |
| Foster Pepper | 150,000 | |
| Total | 500,000 | allocated amount evenly for 3 months |

**Critical Vendors**
  Moss Adams, Roberts Kaplan, BDO Seidman and BoardVantage standard costs per month based on the estimated amount of HC costs associated with budgeted expenses for each vendor.  As such, amounts do not change based on actual billings/payments from the Bank.

| | |
|---|---|
| Moss Adams | 1,250 |
| BDO Seidman | 188 |
| Roberts Kaplan | 208 |
| BoardVantage | 88 |
| Total monthly | 1,734 |