1  Dillon E. Jackson WSBA #1539
   Foster Pepper PLLC
2  1111 Third Avenue, Suite 3400
   Seattle, Washington 98101-3299
3  Telephone:     (206) 447-4400
   Facsimile No.:  (206) 447-9700
4
   G. Larry Engel (*pro hac admission pending*)
5  MORRISON & FOERSTER LLP
   425 Market Street
6  San Francisco, California 94105-2482
   Telephone:     (415) 268-7000
7  Facsimile:     (415) 268-7522
8  Proposed Counsel for
   AMERICANWEST BANCORPORATION
9
10
11              UNITED STATES BANKRUPTCY COURT
12              EASTERN DISTRICT OF WASHINGTON
13
14 | In re | Case No.   10-06097-PCW-11 |
15 | AMERICANWEST | Chapter 11 |
   | BANCORPORATION, | |
16 | | **DECLARATION OF PATRICK** |
   | Debtor. | **J. RUSNAK  IN SUPPORT OF** |
17 | | **CHAPTER 11 PETITION AND** |
   | | **FIRST-DAY PLEADINGS** |
18
19

20 I, Patrick J. Rusnak, declare under penalty of perjury as follows:

21      1.      I am President and Chief Executive Officer of AmericanWest

22 Bancorporation ("AWBC") and of AmericanWest Bank (the "Bank")[1], and I have

23

24 ───────────────

25      [1] Unless otherwise indicated, references herein to the "Company" collectively refer to

26 AWBC and the Bank.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11   Doc 3   Filed 10/28/10   Entered 10/28/10 02:05:36   Pg 1 of 36

1  served in those positions since July 2008. The following is a list of my other
2  current and past roles at the Company:

3      • Since November 2008, I have served as a director of the
4        Company;
5      • Between September 2006 and July 2008, I served as Executive
6        Vice President and Chief Operating Officer of the Company;
7        and
8      • Since April 2007, I have served as Principal Financial Officer
9        of the Company.

10  2.      In these roles, I have become familiar with the Company's day-to-day
11  operations, business, and financial affairs.

12  3.      I have over 20 years of experience with financial institutions. The
13  following is a list of positions that I have held outside of the Company in the
14  last ten years:

15      • Between May 2005 and June 2006, I was Executive Vice
16        President and Chief Operating Officer of Western Sierra
17        Bancorp;
18      • Between July 2004 and February 2005, I was Executive Vice
19        President of Umpqua Holdings Corporation; and
20      • Between October 2000 and July 2004, I served as Executive
21        Vice President and Chief Financial Officer of Humboldt
22        Bancorp, which was acquired by Umpqua Holdings
23        Corporation.

24  4.      The same directors and officers of AWBC also serve as directors
25  and officers of the Bank.

26

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 2

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 2 of 36

5.      I submit this declaration (the "Declaration") in support of AWBC's petition for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101, *et. seq.* (the "Bankruptcy Code") and the relief set forth in the motions and applications filed by AWBC concurrently herewith (the "First-Day Pleadings")[2]. I also submit this Declaration to assist this Court and any interested parties in understanding the circumstances that compelled the petition for relief in the above-captioned case.

6.      In brief, AWBC's bankruptcy filing is a quick and efficient means to save the Bank, including hundreds of employees' jobs, while simultaneously allowing the Bank to continue servicing the needs of thousands of individuals and businesses in the Bank's market areas.   This filing is designed to facilitate the sale of Bank to a pre-existing buyer, ideally within 30-60 days of the bankruptcy filing date.  The Bank has not filed for bankruptcy, is not in receivership, and will continue to operate its business in the normal course pending the proposed sale and recapitalization.  AWBC's bankruptcy filing does not and will not impact the operation of the Bank, its services to customers, or affect the FDIC insurance of its customers' deposit accounts, which will continue to the fullest extend provided by law.  As detailed below, several regulating agencies have been fully apprised of AWBC's bankruptcy and its intentions to sell the Bank.

_____

[2] All capitalized terms not otherwise defined herein shall have the meanings ascribed to them in the relevant First-Day Pleading or that certain Asset Purchase Agreement, dated as of  October 27, 2010 by and between AWBC and the Purchaser (the "APA") filed contemporaneously herewith, as appropriate.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  - 3

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 3 of 36

1     7.     Over the past two years, the Bank has fallen victim to the current

2    financial crisis and has incurred significant losses, which have seriously depleted

3    its capital.  As explained in more detail below, the Bank has been in default for

4    more than six months of a regulatory directive to raise capital.  Failure to

5    recapitalize the Bank presents risk of seizure and closure at any time.

6     8.     Except as otherwise indicated, all of the facts set forth in this

7    Declaration are based upon my personal knowledge, my review of the Company's

8    relevant books and records, information provided to me by the Company's

9    management, or my opinion based upon my understanding and familiarity with the

10    Company's business operations.  References to the Bankruptcy Code and all

11    related legal matters, including information relative to the Chapter 11 bankruptcy

12    process, are based upon my understanding of those matters in reliance upon

13    explanations provided to me by counsel.  If called as a witness, I could and would

14    testify competently thereto.

15     9.     After briefly addressing the bankruptcy filing, Part I of this

16    Declaration describes AWBC's corporate structure, business operations, capital

17    structure, and the circumstances surrounding the commencement of this

18    Chapter 11 case.  Part II sets forth the relevant facts in support of certain First-

19    Day Pleadings.

20                             PART I

21                        BACKGROUND

22    **_The Chapter 11 Filing_**

23     10.     On October 28, 2010 (the "Petition Date"), AWBC filed a

24    voluntary petition for relief under Chapter 11 of the Bankruptcy Code.

25     11.     Pursuant to sections 1107(a) and 1108 of the Bankruptcy Code,

26    AWBC continues in the management and possession of its property as a debtor-

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  4

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

in-possession.  No trustee or examiner has been appointed in this case, and no official committee has been appointed or designated as of the date of this Declaration.

### *AWBC's Objectives in Bankruptcy*

12.     The Bank has been subject to significant regulatory action by the Federal Deposit Insurance Corporation (the "FDIC") and the Washington Department of Financial Institutions (the "DFI") (collectively, the "Regulators") for over two years.  If AWBC is unable to recapitalize the Bank promptly, it faces possible seizure of the Bank by the DFI and appointment of the FDIC as receiver.  Based on the ratio of asset size to loss to the FDIC's deposit insurance fund for all bank failures during 2010, a receivership for the Bank could result in a $330 million dollar loss to the FDIC's Deposit Insurance Fund—resulting in a total loss for AWBC and its creditors.

13.     Despite AWBC's strenuous efforts to raise capital on behalf of the Bank and comply with applicable regulatory requirements, AWBC has not been successful thus far.  Beginning early in 2008, AWBC undertook extensive efforts to raise capital on behalf of Bank. Over 95 potential investors and 34 strategic partners were contacted.  Those efforts were thwarted, in part, because of a difficult obstacle inherent in its capital structure.  AWBC previously issued junior subordinated debentures to four statutory trusts, which in turn issued securities commonly known as Trust Preferred Securities or "TruPS."  The TruPS were eventually collateralized into complicated structures of collateralized debt obligations ("CDOs").  These CDOs issued securities in several tranches with complex payment and priority terms.  Any new investor in AWBC faced the prospect of seeing the first $40 million of its capital being used to enhance the standing of the TruPS.  Accordingly, AWBC sought a

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  5

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

1    restructuring of the TruPS that would enhance the chances of attracting new

2    capital.

3        14.    Unfortunately, these efforts were of no avail, in part because of the

4    way in which the TruPS are held.  In these structures, the ultimate TruPS

5    holders cannot easily be identified, which has made it impossible, as a practical

6    matter, to coordinate an out-of-court restructuring with such holders.

7        15.    Unable to attract capital for the Bank through investments in

8    AWBC, the Bank proceeded to seek a direct capital investment.  However, the

9    amount of capital needed to adequately recapitalize the Bank for regulatory

10   purposes would have diluted AWBC's ownership down to a fraction of the

11   shares of the Bank.  In this situation, such a transaction would likely constitute

12   a "sale of substantially all of AWBC's assets" requiring (essentially

13   unattainable) approval by the TruPS holders and by a majority of AWBC's

14   common stockholders.

15       16.    As a result of continued deterioration in the Bank's asset quality

16   and the continued inability to recapitalize the Bank, AWBC became insolvent

17   by the second quarter of 2010.  This significantly impeded the Company's[3]

18   ability to raise further capital because, in addition to the concern investors had

19   with the inability to restructure the TruPS, any new capital investment would

20   in some part be absorbed by the pre-existing equity shortfall, resulting in the

21   immediate dilution of any investor's new capital contribution.

22

23

24   _____

25       [3] Unless otherwise indicated, references herein to the "Company"

26   collectively refer to AWBC and the Bank.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  6

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

17.     Consequently, AWBC has concluded that the only way to recapitalize the Bank (avoiding the risk of its seizure by regulators), and thereby preserve value for AWBC and its stakeholders is to conduct a Sale of the Bank pursuant to Section 363 of the Bankruptcy Code.  Through the bankruptcy process, AWBC will be able to recapitalize the Bank, and the value obtained in connection with the Sale will be preserved for AWBC's creditors, including the holders of the TruPS obligations.  Furthermore, AWBC has obtained a commitment from one dedicated investor with the requisite regulatory approvals and capital commitments to accomplish a transaction of this magnitude.  Specifically, the Purchaser is prepared to proceed with a transaction which would recapitalize the Bank with the amount needed to satisfy regulatory requirements—up to $200 million—and concurrently to acquire the Bank from AWBC for $6,500,000—a commitment most investors could not make on the shortened time frame applicable to this case due to regulatory pressures.

18.     AWBC has commenced this Chapter 11 case as the only plausible mechanism to recapitalize the Bank while protecting, to the greatest extent possible, AWBC's creditors.  By commencing this Chapter 11 case, AWBC hopes to sell its 100% equity ownership in the Bank and Other Purchased Assets on an expedited basis, concurrently with the recapitalization of the Bank by the Purchaser in order to comply with regulatory requirements.

19.     Absent a sale of the Shares and the Other Purchased Assets to a sufficiently capitalized and qualified bank or bank holding company concurrent with a significant capital infusion by the Purchaser, the Bank will not meet the Regulators' capital requirements and will not be financially viable on an ongoing basis.  The Purchaser presents the Bank with a solution to this dilemma—a proposed acquirer with the requisite financial resources to acquire

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 7

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

and recapitalize the Bank and with the regulatory posture to obtain regulatory approval for the transaction (having been approved on October 26, 2010 by the Federal Reserve Board to become a bank holding company).

20.     I believe that any course of action other than a sale of the Shares and the Other Purchased Assets will preclude the return of any value to the creditors or shareholders of AWBC, and would have adverse consequences for the Bank's customers, communities and employees.  An expedited sale of the Shares and the Other Purchased Assets at the best possible price, with the Purchaser's commitment to concurrently recapitalize the Bank, is therefore the only feasible way to establish the Bank as a viable institution on an ongoing basis and protect, to the greatest extent possible, AWBC's creditors and other stakeholders.

### *Corporate Structure and Business Operations*

21.     Founded in 1983, AWBC, headquartered in Spokane, Washington, is a Washington corporation registered as a bank holding company under the Bank Holding Company Act of 1956.  AWBC is the direct or indirect corporate parent of two non-debtor subsidiaries:  the Bank, a Washington state chartered bank that is insured by the FDIC and wholly-owned by AWBC; and AmericanWest Holdings, Inc., a Washington corporation that is wholly-owned by the Bank.  The Bank operates in Eastern and Central Washington and Northern Idaho, and in Utah where it conducts business under the tradename of "Far West Bank."

22.     AWBC functions as a holding company for the Bank, which is its primary asset.  The Bank gathers deposits and provides loans to approximately 77,000 customers across the Inland Northwest through branches located primarily in Spokane, Yakima, Walla Walla, and the Tri-Cities area.  The Bank

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY PLEADINGS - 8

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 8 of 36

serves customers in a total of 58 branches, including a branch in Salt Lake City, Utah, and branches in suburban and rural communities in Eastern and Central Washington, Northern Idaho, and Utah. As of October 28, 2010 (the "Petition Date"), the Company collectively had approximately 540 employees across its 58 branches and two support facilities.

23. The Bank offers agricultural loan products and commercial loan products to hundreds of farmers and small businesses across its market areas in Washington, Idaho and Utah. The Bank offers a variety of deposit accounts to both consumer and business customers, including checking accounts, money market demand accounts, and savings accounts. Numerous services also provide the Bank's consumer and business customers with convenient bank access, including ACH origination, remote check capture (i.e., on-site imaging and electronic processing of checks), sweep accounts, and currency services. The Bank also generates non-interest income by offering both consumer and business credit cards and merchant bankcard services through arrangements with third party providers.

24. The Bank and AWBC are highly regulated institutions. The principal regulators of the Bank are the FDIC and the DFI. The principal regulators of AWBC are the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of San Francisco. Unless context otherwise requires, references herein to the "Regulators" collectively refer to these four state and federal regulatory agencies.

**The Bank's Capital Structure and AWBC's TruPS**

25. AWBC's 100% equity ownership in the Bank totals 429,000 issued and outstanding shares of common stock of the Bank, no par value (the "Shares"). No other shares of capital stock of the Bank are issued or

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 9

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2903314

outstanding. All of the Shares are beneficially owned and held by AWBC, have been duly authorized and validly issued, are fully paid and nonassessable, have been issued in full compliance with all applicable securities laws and other applicable legal requirements, and are free and clear of any and all Encumbrances.

26. As of September 30, 2010, AWBC had outstanding unsecured indebtedness totaling approximately $47.2 million,[4] consisting of: (a) four outstanding issuances of junior subordinated debentures issued to four statutory trusts (the "Trusts") that in turn issued their preferred securities, commonly known as "TruPS," to investors; and (b) approximately $3,600 in trade debt. AWBC's principal amount of junior subordinated debt was approximately $41.2 million, which backs exactly $40 million of TruPS issued to investors.[5] The accrued interest on the junior subordinated debentures totaled $6.0 million, payment of which has been deferred since September 2008 in accordance with the declarations of trust governing the subordinated indentures. Wilmington Trust Company acts as trustee of two of the Trusts and U.S. Bank acts as trustee of the other two Trusts.

---

[4] This total includes the $6.0 million of accrued deferred interest relating to the issuance of TruPS. Such interest, however, has not been capitalized and is not included in the principal balance of $41.2 million described herein.

[5] The excess amount of the debentures over the amount of the TruPS represents the common equity of the Trusts, which is held by AWBC. The common equity interest has no economic value.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 10

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2903314

27.     Each of the four TruPS issuances, corresponding to AWBC's junior subordinated debentures, was sold as a block into a separate limited liability company (each a "PreTSL").[6]  Each PreTSL issued several tranches, or priorities, of notes (e.g., Class A-1 Senior Notes, Class A-2 Senior Notes, Mezzanine Notes, and Subordinated Notes) to numerous institutional and accredited individual investors through offerings exempt from securities registration.  Each PreTSL's notes are collateralized with the TruPS held by that PreTSL, along with TruPS and debt obligations of other entities.   The PreTSLs are unmanaged, pooled CDOs, with Bank of New York Mellon ("BNYM") acting as CDO trustee (the "CDO Trustee") under the indenture applicable to each PreTSL.  BNYM has limited authority to make decisions with respect to the CDOs and the collateralized assets.  Direct ownership of the notes issued by the CDOs is widely dispersed, and identifying the ultimate investors is extremely difficult.

### *Circumstances Leading to the Commencement of the Chapter 11 Case*

28.     The current financial and credit crisis—resulting in approximately 250 nationwide bank failures since 2008[7]—has significantly hampered the

---

[6] "PreTS[SM]" is a registered service mark, derived from "Preferred Term Securities," another term for trust preferred securities.  "PreTSL" is the common shorthand for each of the limited liability companies that has issued TruPS collateralized by AWBC's junior subordinated debentures, with each such company having a name in the form of "Preferred Term Securities [__] Limited" with the "[__]" representing the Roman numeral designating the specific entity.

[7] Twenty-five banks failed and were taken over by the FDIC in 2008,

(Footnote continues on next page.)

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 11

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

1  Bank's business and ability to meet certain state and federal regulatory
2  requirements for capital, profitability and credit quality.   Beginning
3  approximately three years ago, effects from the housing crisis, including
4  tumbling home prices, soaring loan defaults, and high unemployment rates,
5  began to take their toll on the Bank's, and ultimately the Company's, financial
6  condition.

7       29.    Beginning in 2007, the Company's management initiated efforts to
8  deal with asset quality problems in its loan portfolio, reduce expenses, build
9  capital reserves, and take other appropriate actions to return the Bank to
10  profitability and reduce its risk profile.  However, in early 2008 it became clear
11  to the Company's management and Board of Directors that additional capital
12  would be required to address the Bank's financial problems.

13       30.    Beginning in 2008 and continuing to the present, the Company has
14  undertaken significant efforts to raise additional capital, including efforts to sell
15  Bank assets, or to sell AWBC or the Bank to another financial institution.
16  AWBC's multi-phased marketing effort is summarized as follows:

17       31.    In March of 2008, the Company engaged Sandler O'Neill &
18  Partners, L.P. ("Sandler"), a recognized investment banking firm with particular
19  experience with respect to financial institutions, to advise and assist the
20  Company in raising additional capital.

21
22
23  _____

(Footnote continued from previous page.)

24
25  while 140 failed in 2009.  Over 130 banks have failed thus far in 2010.  *See*
26  http://www.fdic.gov/bank/individual/failed/banklist.html

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  12

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

32.     Starting in the first quarter of 2008, the Company focused on a number of methods for raising capital for AWBC (with the goal of AWBC contributing the funds to the Bank to increase the Bank's capital).

33.     During the fourth quarter of 2008 the Company submitted an application to the U.S. Department of the Treasury (the "Treasury") and the FDIC to issue $57 million of preferred stock under the newly enacted TARP Capital Purchase Program.[8]   At the request of the FDIC, the Company's application stipulated that the Treasury's approval could be conditioned on a private equity co-investment of $57 million.  The Company and Sandler had significant discussions with potential investors, and had informal commitments for $35 million in private equity co-investment, but could not obtain commitments for the full $57 million in private equity, as required by the federal regulators, prior to the deadline for processing final TARP applications. Subsequently, on April 28, 2009, at the strong recommendation of the FDIC, the Company submitted a letter to the FDIC withdrawing its TARP application.

34.     Through the end of 2008 and continuing into 2010, the Company continued extensive efforts to improve the Bank's regulatory capital levels,

---

[8] On October 3, 2008, Congress enacted the Emergency Economic Stabilization Act of 2008 (introduced as the Troubled Asset Relief Program or "TARP").  Generally, under the TARP Capital Purchase Program, the U.S. Department of the Treasury is authorized to purchase assets and equity from qualifying financial institutions as a means of strengthening the financial sector. *See generally* http://www.federalreserve.gov/bankinforeg/tarpinfo.htm.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 13

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

1    through raising additional capital at AWBC and through a sale of clusters of

2    branches.[9]

3         35.    In February 2010, in addition to the Company's engagement of

4    Sandler, the Company retained Cappello Capital Corp. ("Cappello"), known for

5    its corporate finance advisory expertise, as a second financial advisor. Cappello

6    was retained to focus mainly on attracting investors that did not traditionally

7    invest in the financial industry. Together, the Company, Sandler and Cappello

8    continued a sustained and targeted strategy to explore strategic alternatives and

9    obtain the approximately $100 million or more in private capital commitments

10   estimated necessary to return the Bank to a condition that would satisfy the

11   requirements of the FDIC and the DFI.

12        36.    In the second quarter of 2010, it became abundantly clear that

13   potential investors were not willing to invest directly in AWBC if it meant their

14   investment would stand behind the full amount of principal and interest due on

15   AWBC's junior subordinated indentures related to the TruPS. Therefore, the

16   Company and Sandler continued investigation of the feasibility of a discounted

17   tender offer for the TruPS that they had initiated early in 2009.

18        37.    In 2010, the Company's management contacted the CDO Trustee,

19   Sandler, and Hexagon Securities, a financial advisor with experience dealing

20

21   _____

22        [9] The FDIC informed the Bank that the FDIC would not consider

23   approval of any sale of branches unless the sale were part of an overall

24   transaction (i.e., including additional capital) that would return the Bank to

25   satisfactory regulatory capital levels. As a result, the Bank ceased efforts to

26   market branches to other parties.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 14

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

1  with TruPS issues, to determine the process for a discounted tender offer and

2  the likelihood of success.  Based on such discussions and public information

3  regarding other financial institutions' unsuccessful attempts at discounted

4  tender offers, it became clear that the CDO Trustee would not approve a

5  discounted tender offer without the written approval of 100% of the ultimate

6  TruPS holders, i.e., all holders of the respective CDO's notes.  Receiving that

7  level of approval would be an insurmountable obstacle for several reasons:  (1)

8  it is extremely difficult to identify the TruPS holders in order to solicit

9  approvals, (2) approval would be required from the holders of junior priority

10  notes who would receive nothing in payment based on a discounted tender

11  offer, and therefore have no incentive to approve, and (3) the position taken by

12  certain aggressive investors to adamantly reject discounts and payment at

13  anything other than face value.[10]

14        38.    Addressing the difficulties surrounding a discounted tender offer

15  for the TruPS, Hexagon Securities advised that AWBC proceed with a

16  discounted tender offer, and if it could obtain approval of 75% of the TruPS

17  holders, it should then file a declaratory action suit against the CDO Trustee to

18  force it to accept the discounted tender offer based on that level of acceptance.

19  However, this process would take at least a year, well beyond the FDIC's

20  deadline for the Bank to raise capital, and there was no assurance of success.

21        39.    The Company next investigated the feasibility for private investors

22  to invest directly at the Bank level, so that their investment would not stand

23

24  _____

25      [10] *See* Robert Barba, *Capitol Bancorp Latest Victim of Stubborn

26  Debtholders*, *American Banker*, October 21, 2010.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 15

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 15 of 36

behind the full weight of the junior subordinated debentures. However, significant issues involving shareholder approval[11] and potential claims by the CDO Trustee (on behalf of the TruPS holders) that the Bank or the investors would have assumed the obligations of the junior subordinated debentures made this approach unattractive to investors.

40. From 2008 through the second quarter of 2010, the Company considered a number of investment strategies to achieve a successful capital raise. During this period, the Company and Sandler contacted approximately 100 parties, executing confidentiality agreements with 67 of such parties. As it identified new potential investment strategies, the Company and Sandler re-contacted qualified parties who had previously expressed interest in a transaction with the Company. However, by the second quarter of 2010, it was clear that, although there was significant investor interest in the Bank because of its solid core deposit franchise, no investor was willing to engage in any of the transaction structures discussed above. Regardless of the Company's position on the feasibility of any particular mechanism, if there was no investor willingness to proceed, the mechanism would not work.

---

[11] Investment in the Bank at the necessary level would likely constitute a sale of substantially all of AWBC's assets, which would require prior shareholder approval and approval of the Regulators and, most likely, the Federal Reserve Bank of San Francisco. Such investment would also cause such dilution of AWBC's ownership interest in the Bank that it would render AWBC insolvent, such that AWBC's shareholders would lower the value of their investment and therefore have no incentive to approve the transaction.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 16

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

41.     The Company's inability heretofore to raise additional capital has been a major cause of increased scrutiny and action by the Regulators and creates significant risk that the Bank will be seized if not recapitalized on an expedited time frame consistent with the transactions described herein.  I believe that a recapitalization of the Bank is critical if the Bank is to be restored to financial viability on an ongoing basis.

42.     As a result of the Bank's announcement that it had ceased to be "well-capitalized" as of June 30, 2008, the DFI conducted an off-site interim examination of the Bank's financial health.  This led to the first of a series of increasingly serious enforcement actions against the Bank or AWBC by the FDIC, DFI, and the Federal Reserve Bank of San Francisco ("FRB"), which regulates AWBC as a bank holding company.  First, the DFI issued a Supervisory Directive against the Bank effective August 8, 2008 (the "DFI Directive").  The DFI Directive required the Bank to provide periodic liquidity and credit quality reports, update the DFI regarding the status of liquidity planning and previously announced capital raising initiatives, notify the DFI about significant changes in management and financial condition, retain a permanent Chief Executive Officer, and seek prior written consent of the DFI before paying dividends.[12]

43.     Second, on February 2, 2009, the FDIC issued a Prompt Corrective Action Notification (the "PCA Notification") to the Bank. The PCA

---

[12] On September 17, 2009, the DFI notified the Bank that the DFI Directive was being rescinded, as it had been effectively superseded by the PCA Directive discussed in paragraph 20.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY PLEADINGS - 17

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

Notification was issued under the Prompt Correction Action provisions of the FDIA and FDIC regulations. The FDIA and FDIC regulations identify five capital categories for banking institutions — well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized. The PCA Notification formally advised the Bank that it was significantly undercapitalized, which is the next-to-lowest capital category. As such, the Bank was required to submit a capital restoration plan (the "Capital Restoration Plan") and it became subject to a wide range of restrictions relating to its senior management team, management compensation, dividends, loan loss reserves, reductions in troubled assets, liquidity, asset growth, and other aspects of its business. In response to the PCA Notification, the Bank submitted its Capital Restoration Plan to the FDIC on March 20, 2009, which the Bank subsequently amended on July 2, 2009. That Capital Restoration Plan was rejected.

44. Third, on May 8, 2009, the Bank entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (the "Stipulation") with the FDIC and the DFI. Pursuant to the Stipulation, the FDIC and the DFI issued an Order to Cease and Desist (the "Order") against the Bank on May 11, 2009. The Order required, among other things, that the Bank take actions necessary to return to the "well-capitalized" category by September 9, 2009.

45. Fourth, on September 15, 2009, AWBC entered into a Written Agreement (the "Written Agreement") with the FRB, imposing on AWBC restrictions and requirements substantially similar to those contained in the PCA Notification and the Order, including the obligation to submit a capital restoration plan.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY PLEADINGS - 18

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 18 of 36

46.     Fifth, on February 26, 2010, the Bank received a Prompt Corrective Action Directive (the "PCA Directive") from the FDIC.  The PCA Directive directed the Bank to recapitalize within 30 days of receipt, and reiterated various requirements previously imposed on the Bank by the Order.

47.     Taken together, the Order and the PCA Directive required the Bank, among other things, to recapitalize or accept an offer to be acquired by or combine with another financial institution by March 28, 2010.

48.     Although the Company's management has undertaken all actions within its power to comply with all aspects of the PCA Notification, the Order, the Written Agreement, and the PCA Directive (collectively, the "Regulatory Orders"), the Company has, to date, been unable to comply with their most important terms — the recapitalization or sale of the Bank.  Full satisfaction of the Regulatory Orders will depend on raising a significant amount of additional capital.  I believe that a recapitalization of the Bank is the only path for restoring the Bank to financial viability on an ongoing basis.

49.     The Bank continues to remain in the significantly undercapitalized capital category.  Any undercapitalized banking institution, and particularly one that has failed to comply with an order to recapitalize, is subject to a wide variety of enforcement remedies by the FDIC, including seizure by the DFI and placement in an FDIC receivership.  If this occurs, past experience uniformly points to an unhappy set of results:  the shareholders' investment in the banking institution immediately will be wiped out (with the creditors of the shareholders being adversely affected as well), the institution will be sold or liquidated at a substantial loss to the FDIC's deposit insurance fund, many of the institution's employees will lose their jobs, customers with deposits in excess of FDIC insurance limits are at risk of losing that portion of their deposits, borrowers

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  19

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11     Doc 3     Filed 10/28/10     Entered 10/28/10 02:05:36     Pg 19 of 36

may be deprived of needed financing, and the communities served by the institution will be adversely impacted by its loss.

50.     Following the seizure, the FDIC, as receiver, may bring civil actions against directors, officers, parent companies, and third parties in an effort to recover losses for the receivership estate.  The FDIC also can exercise other enforcement remedies which, depending upon the circumstances, may include the imposition of severe civil money penalties against the institution, its parent companies, officers, directors, employees, and other institution affiliated parties; removal of directors, officers, and other institution affiliated parties from participating in the affairs of the institution (or, indeed, participating in the affairs of any other insured depository institution and certain government agencies); or terminating the institution's FDIC insurance.

51.     During the current financial crises, very few, if any, banking institutions that have received prompt corrective action directives have been able to avoid seizure and FDIC receivership and loss of the shareholders' complete investment.  A review of prompt corrective action directives issued since January 2009 in the FDIC's Western Region — in which the Bank is included — indicates that 26 of the 30 banks that received such directives were ultimately seized by the FDIC.  On average, the time between the deadline for compliance with a prompt corrective action directive and the seizure of the institution was only 68 days.  The Bank has already gone over 240 days since it failed to comply with the PCA Directive's capital raising requirement.  The period of time that the Bank has continued to exist, when contrasted with the experience of other banking institutions in the Western Region, is unique.  The experience of these other banks demonstrates that no banking institution that is

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY PLEADINGS - 20

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

1    significantly undercapitalized could reasonably expect to remain open for such
2    a period of time.

3            52.     In an effort to comply with the Regulatory Orders and restore the
4    Bank to viability, the Company undertook the efforts described above to
5    address the TruPS obstacle and attract potential investors.  However, as
6    mentioned above, it is abundantly clear that, as a practical matter, (a) no
7    investor is willing to satisfy the $47.2 million[13] in junior subordinated debt
8    related to the TruPS, (b) a discount of the TruPS obligations through a
9    discounted tender offer — to the extent it would even be obtainable — cannot
10   be achieved within the Regulators' timeframe, and that, regardless of the time
11   required, no investor is willing to commit to a transaction involving a
12   discounted tender offer for the TruPS, (c) AWBC was insolvent as of the
13   second quarter of 2010, and (d) an investment directly at the Bank level outside
14   of bankruptcy also presents an insurmountable obstacle in attracting investors.
15   While the Company does not wish to provoke any disputes with the holders of
16   the TruPS, it simply cannot afford to continue seeking any recapitalization
17   solution that has a remote possibility of success.  Continued delay in this regard
18   would further erode the franchise value of the Bank and therefore the value to
19   AWBC and its creditors.  It also damages prospects for the Bank's rescue and
20   negatively impacts the many customers, employees, and affected communities
21   who rely on the Bank.

22

23

24   _____

25        [13] This amount includes principal and accrued interest as of September
26   30, 2010.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  21

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 21 of 36

53.     In its continuing efforts to identify a viable mechanism for a capital raise, in April and May of 2010 the Company began to investigate the recapitalization of the Bank through a section 363 sale of the Bank to one or more investors as part of the bankruptcy of AWBC, followed by an injection of capital by the new owners into the Bank to restore the Bank to required levels of regulatory capital.

54.     As it investigated this possibility, the Company and Sandler again contacted qualified investors, who had earlier expressed interest in the Company, to discuss this approach, and also conducted discussions with newly identified potential investors.  During the efforts to remarket the Bank under the newly proposed section 363 sale structure, the Company contacted fourteen different parties, including four parties who had been in prior discussions with the Company, and confidentiality agreements were executed by ten new potential investors.

55.     In June 2010, the Company began negotiating a stalking horse bid with a potential purchaser.  However, the potential purchaser could not obtain the requisite financing for the transaction, and negotiations did not result in a definitive agreement.

56.     The Company is well aware of the numerous obstacles involved in raising capital in today's economic environment.  Notwithstanding the Company's unrelenting efforts over the last two years, no interested parties other than the Purchaser have been willing or able to commit to what is expected by the Regulators.  The Bank is currently under a variety of Regulatory Orders.  I believe that absent a Sale, the Bank cannot under any conceivable circumstances be restored to financial viability.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 22

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11     Doc 3     Filed 10/28/10     Entered 10/28/10 02:05:36     Pg 22 of 36

57.    Following its comprehensive marketing efforts, after 30 months of strategic analysis and negotiations, including discussions with the Regulators and the FRB, the Company, in consultation with Sandler, identified the Purchaser's bid for the Shares and the Other Purchased Assets as the only viable way to accomplish the necessary recapitalization of the Bank and to protect the interests of AWBC's creditors.  After extensive negotiations regarding the terms and conditions thereof, AWBC and the Purchaser have agreed, in principle, to the key terms of the Sale, and have executed the APA, which remains subject to this Court's approval.

58.    If effectuated, the Sale will recapitalize the Bank, ensure the Bank's regulatory compliance, maximize the value available for AWBC's creditors, preserve hundreds of jobs, and save the FDIC many millions of dollars, while simultaneously allowing the Bank to continue serving the needs of thousands of individuals and businesses in the Bank's market areas.

59.    During the months preceding this Chapter 11 filing, the Company's management has engaged in numerous detailed discussions and in-person meetings with the Regulators to keep them apprised of its recapitalization efforts.   Many of these conversations focused on the requirements of the Regulators for approval of a sale and recapitalization of the Bank, and whether the FDIC and DFI would defer regulatory action long enough to allow recapitalization to proceed.  Generally, throughout the process, the Regulators have remained supportive of the Company's recapitalization efforts.  Within the last three months, the Company introduced to the Regulators, in a number of meetings, the prospect of a Section 363 bankruptcy sale as the potential key to overcome the obstacles that the Company had encountered in its recapitalization efforts.  Shortly thereafter, the Purchaser

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  - 23

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

emerged as a potential party to such a transaction, and thereafter both representatives of the Purchaser and management of the Company explored in depth with the Regulators the proposed transaction, including the bankruptcy sale process that is the subject of the Sale Motion.

60.     As the transaction will require regulatory approval, the Regulators will need to evaluate the regulatory applications that Purchaser contemplates submitting within a matter of days before passing on the transaction.  However, the Regulators have not objected to this bankruptcy filing or otherwise to the path on which the Company has embarked to secure adequate capital for the Bank.

61.     During the past six months, only the Purchaser emerged as a serious buyer willing and able to purchase the Shares and the Other Purchased Assets under a proposed section 363 sale structure.

62.     As the Sale process draws to a close, publicity concerns have been compounded by timing constraints and shrinking resources.  At this point, AWBC can only proceed with serious buyers.

PART II

FIRST-DAY PLEADINGS

63.     Contemporaneously with the filing of its Chapter 11 petition, AWBC has filed the First-Day Pleadings seeking entry of a number of orders (the "First-Day Orders") that AWBC believes are necessary to enable it to operate in Chapter 11 and reduce the risk of adverse regulatory intervention before the Sale and recapitalization can be consummated.  AWBC respectfully requests that each of the First-Day Orders be entered as a critical element in preventing such regulatory intervention and in achieving a successful transition

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 24

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

into Chapter 11.  A description of certain of the First-Day Pleadings is provided below.[14]

**Emergency Motion for Order Setting Hearing Dates on Shortened Time (the "Emergency Motion")**

64.    In the Emergency Motion, AWBC has sought entry of an order for this Court's expedited consideration of the Sale, in addition to related requests for expedited notice procedures to all parties in interest.

65.    I believe that the Sale is the only viable option that effectively addresses the Company's financial situation.  Given the Bank's significantly undercapitalized condition, the Sale must be effectuated expeditiously to avoid a potential customer crisis and preserve going concern value for all stakeholders, including creditors, employees, and the communities served by the Bank.[15]

66.    First, as a result of the Company's required public announcement of this bankruptcy filing, I believe that there is significant risk of customer confusion.[16]  Notwithstanding the fact that at least 97% of the Bank's customer

---

[14] The motions for employment of estate professionals, approval of the sale and bidding procedures, and related proposed form of orders are supported by separate declarations filed simultaneously with the First-Day Pleadings described herein.

[15] Simultaneously with the filing of this Declaration, AWBC has sought the entry of the proposed *Order Setting Hearing Dates* for purposes of this Court's expedited consideration of the Sale.

[16] Indeed, this precise scenario happened to IndyMac.  Depositors withdrew a total of $1.3 billion after certain third-party statements sparked

(Footnote continues on next page.)

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

1  deposits are fully protected by FDIC insurance, during any prolonged period of

2  uncertainty customers may become concerned and may look elsewhere for

3  banking services.

4      67.    Throughout, the Company and the Purchaser have kept the

5  Regulators and the FRB fully informed of the pending Sale and related

6  bankruptcy process.  As part of the Company's ongoing discussions with the

7  FDIC, the FDIC has advised AWBC that it does not object to the Sale.

8  Nevertheless, the FDIC will remain sensitive to the situation and has made it

9  clear to AWBC that a prolonged process could put the Bank at jeopardy, and

10  that it reserves the right to act promptly.  In particular, the Regulators cannot be

11  expected to permit the Bank to operate with its current level of depleted capital

12  for any length of time.

13      68.    Second, I believe that a non-expedited process allowing for a

14  longer auction period would lend little to no net value to AWBC's estate, and

15  could indeed prove futile.  With the marketing process ongoing for over 30

16  months already, the Company believes that every party that reasonably could be

17  expected to have the interest and capacity to consummate a transaction to

18  purchase or recapitalize the Bank is aware of the Company's marketing efforts.

19  In order to be a successful bidder, a potential investor would need sufficient

20  funds to recapitalize the Bank to required regulatory levels, and be able to

21  obtain regulatory approvals to acquire the Bank within the currently available

_____

(Footnote continued from previous page.)

24  widespread panic. Reuters' News, *U.S. seizes IndyMac as financial troubles*

25  *spread*, July 12, 2008, *available at*

26  http://www.reuters.com/article/idUSWA000014120080712.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  - 26

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 26 of 36

1  time frame.  At present, all other qualified potential investors who have
2  expressed interest in the Bank have stopped pursuing the opportunity.  The
3  Company has made extensive financial and operational information available to
4  potential investors, through the Company's virtual data room,[17] that has
5  provided ample opportunity to prospective investors to conduct significant
6  levels of due diligence, with full cooperation by the Company.  Therefore,
7  potential bidders who may re-emerge and participate in the bidding process
8  should have little need for further time to make and submit an Initial Overbid.
9      69.    I believe that there is no solution outside of a section 363 sale in
10  bankruptcy that can be expected to timely address the Bank's significantly
11  undercapitalized status.  The universe of potential investors who have or could
12  obtain timely regulatory approval is very small.  The universe of potential
13  investors who either have regulatory approvals in hand or who could obtain
14  them quickly is finite and identifiable, and most, if not all, of these entities have
15  already investigated and declined to be a part of the Company's recapitalization
16  efforts (including the bankruptcy and section 363 sale approach).  During this
17  marketing period, only the Purchaser has remained actively interested, spending
18  over $1 million in expenses in connection with diligence and negotiations with
19  AWBC.  Also during this period, the Purchaser made it clear to the Company

---

22       [17] The Company maintains an on-line data room, hosted by Bowne
23  Group, Inc., that the Company has populated with electronic copies of pertinent
24  financial and operational information, including information specifically
25  requested by potential investors.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  27

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 27 of 36

1    that without the prospect of a Stalking-Horse Bidder Fee to reimburse such

2    expenses, the Purchaser would not have continued its efforts either.[18]

3          70.     Therefore, an expedited process designed to consummate the Sale

4    within 30-45 days, while also providing an opportunity for bidders to

5    participate and demonstrate their likelihood of regulatory approvals, achieves

6    the overarching objectives of the Company: recapitalizing the Bank as required

7    by the Regulators and FRB and preserving the Bank's going concern for the

8    benefit of its stakeholders.

9          71.     Third, the most important reason for an expedited sale process is to

10   minimize the risk that the Regulators seize the Bank.  Although the Regulators

11   have not objected to the Sale process, I believe that they also remain poised to

12   seize and close the Bank in the event the Bank is in jeopardy and they will not

13   tolerate its operation for any length of time at its current inadequate level of

14   capital.  The seizure and closure of the Bank could result in the loss of hundreds

15   of jobs across the Inland Northwest.  If customers begin to withdraw their

16   deposits, the FDIC could be forced to act quickly.  In that event, I believe that

17   value would be irretrievably and needlessly lost, harming everyone who

18   depends on the Bank — including thousands of loyal customers and

19   employees — and creating a significant and unnecessary loss to the FDIC's

20

21

22        [18] For this reason, the APA notes that the Stalking-Horse Bidder Fee was

23   an integral part of the negotiations surrounding the APA, and in the absence of

24   the Company's obligation to pay the Stalking-Horse Bidder Fee, the Purchaser

25   would not have entered into the APA, nor would the Purchaser be obligated to

26   proceed to Closing.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 28

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

1  deposit insurance fund.  I am informed and believe that the longer the

2  Regulators and the FRB must wait for the consummation of a sale and

3  recapitalization of the Bank, the greater the risk of significant deposit

4  withdrawals and the resulting risk of swift action by the FDIC and DFI.

5      72.    I believe that an expedited sale process avoids these serious

6  negative consequences.  The Bank has done everything appropriate within its

7  power to address the Regulators' and FRB's concerns.  Nevertheless, the Bank

8  needs to achieve recapitalization on an expedited basis.  I believe that in order

9  to maintain maximum value, reassure the Regulators that forbearance is

10  appropriate, and garner the Regulators' and FRB's continued support for the

11  Sale, it is imperative that the Company act quickly to consummate the Sale and

12  recapitalization of the Bank.

13      73.    I am informed and believe that final regulatory approval may take

14  time, and may not occur prior to the court's approval of the Sale.  I am

15  informed and believe that the Regulators will need to review specific and

16  detailed business and recapitalization plans, including the role of senior

17  management, new directors, and other key employees.  However, the Company,

18  its financial advisors believe, and we believe that the Regulators concur, that an

19  announcement by the Company that the Sale has been approved by this Court,

20  pending only regulatory approval, will significantly or completely alleviate the

21  risk of customer confusion and concern, and the attendant risk of significant

22  withdrawals.  However, a prolonged period of uncertainty could put the

23  Regulators' review — and therefore the Sale — in jeopardy.

24      74.    Further to the proposed procedures and timeline and in the

25  *Emergency Motion for Order Setting Hearing Dates* filed contemporaneously

26  herewith, I believe that the Sale represents the best opportunity to recapitalize

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  -  29

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

the Bank and thereby preserve the value of AWBC's assets for the benefit of all
stakeholders. I believe that the Sale is the only viable and timely alternative.

75. I believe that the Sale process has been structured in a manner that
will secure the highest purchase price for the assets being sold.

76. As President and Chief Executive Officer of AWBC, I believe that
an expedited Sale is a sound business decision in the best interest of AWBC's
creditors and its estate.

**Motion of AWBC for Entry of Order (I) Authorizing AWBC to Obtain
Postpetition Financing on a Senior Secured, Superpriority Basis; and (II)
Authorizing the Use of Cash Collateral (the "DIP Motion").**

77. In order to help reduce the risk of adverse supervisory action
before a sale of the Shares and the Other Purchased Assets can be
consummated, AWBC has negotiated the DIP Facility with a total commitment
of up to $2 million to obtain the working capital necessary to fund AWBC's
Chapter 11 case. Among other features, the DIP Facility includes certain
safeguards for the DIP Lender's protection as a debtor-in-possession lender,
since as a lender it bears the full risk of any decline in the value of the Shares
and the Other Purchased Assets that would serve as its collateral.

78. In accordance with the relief sought in the DIP Motion and the
terms of the DIP Order, the DIP Lender has agreed to allow AWBC to utilize
the cash collateral generated by the DIP Lender's collateral. The DIP Lender
has also agreed to provide AWBC with debtor-in-possession financing under
the DIP Credit Agreement, secured by a senior secured, superpriority lien on
AWBC's assets and the proceeds thereof.

79. AWBC has an immediate need to access additional operating
capital in order to fund the day-to-day operating expenses of its business,

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 30

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 30 of 36

1   including payments to remaining employees and professionals sought to be
2   retained in this Chapter 11 case. Such payments are necessary to sustain the
3   going-concern value of the Bank and ensure its future viability. Moreover,
4   access to additional operating capital will enable AWBC to demonstrate to its
5   regulating entities, vendors, suppliers, and employees that it has sufficient
6   liquidity to continue to operate its business, maintain its properties, and pay
7   necessary expenses during the crucial first days of its reorganization efforts and
8   the pendency of this Chapter 11 case.

9       80.     AWBC negotiated the DIP Credit Agreement with the DIP Lender
10  through a good faith and arm's-length process. I believe that the DIP Credit
11  Agreement contains terms that are in the best interests of AWBC, its estate, and
12  other parties-in-interest.

13      81.     Approval of the DIP Credit Agreement will not only ensure that
14  AWBC's estate will be administratively solvent, but will also help maximize
15  ultimate recovery for AWBC creditors. Without authorization of the DIP Credit
16  Agreement, AWBC will be unable to fund its Chapter 11 case, or pay for
17  services and expenses necessary to preserve and maximize the value of
18  AWBC's business. Indeed, absent sufficient funds to support its business, the
19  value of the Shares will quickly erode, as will AWBC's ability to consummate
20  the Sale. Moreover, I am informed and believe that Bank seizure and FDIC
21  receivership would be imminent, causing irreparable harm to AWBC's estate,
22  employees, creditors, customers, and other stakeholders.

23      82.     AWBC and the DIP Lender negotiated the DIP Credit Agreement,
24  through a good faith and arm's-length process.

25      83.     I do not believe that it would have been able to obtain postpetition
26  financing on terms more favorable than those contained in the DIP Credit

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 31

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2903314

Agreement from any source other than the DIP Lender. The ongoing oversight by the Regulators, the risk of regulatory action, and the uncertainty surrounding the Bank's recapitalization all have made it difficult for AWBC to attract financing. Moreover, I believe that the DIP Facility is an important feature of the Sale proposed in connection herewith and serves as a material portion of the Purchaser's consideration, since the Purchaser will have the option to credit bid the indebtedness owing under the DIP Facility as part of the purchase price. I believe that such financing would not be practicable by a third-party lender in light of the DIP Lender/Purchaser's unique knowledge of AWBC, particularly given its extensive due diligence in connection with the Sale.

84. I believe that the terms and conditions of the DIP Facility are fair, reasonable and appropriate under the circumstances. I believe that the DIP Facility is the best financing option available under the present circumstances, particularly given the expedited timeframe within which it must meet the Regulators' concerns. Further, with the inclusion of the Carve-Out, the DIP Facility would not directly or indirectly deprive AWBC's estate or other parties-in-interest of possible rights and powers by inappropriately restricting the services for which professionals may be paid in this case.

85. The DIP Lender has consented to AWBC's use of the Cash Collateral securing the DIP Facility pursuant to the terms of the proposed DIP Order.

**Motion for Administrative Order Establishing Procedures for Payment of Interim Professional Fees and Expenses on a Monthly Basis (the "Knudsen Motion")**

86. By the Knudsen Motion, AWBC has sought approval to retain certain professionals (the "Retained Professionals") in this Chapter 11 case. In

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 32

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

the Knudsen Motion, AWBC requested that a procedure for compensating and reimbursing professionals on a monthly basis be established, thereby enabling this Court and all parties-in-interest to monitor fees incurred more effectively and on a more current basis.

87. The requested procedure would generally require all Retained Professionals to present to AWBC, AWBC's counsel, the attorneys and the chairperson of any committees appointed pursuant to § 1102, the United States Trustee, and all parties requesting special notice (collectively, the "Notice Parties"). a detailed statement of services rendered and expenses incurred by each Retained Professional for the preceding month or earlier.

88. Absent a timely objection, (a) AWBC would, pursuant to its normal accounts payable procedures for its monthly invoices, pay, or (b) the Retained Professional would use any unexhausted retainer in its possession to pay, 80% of the fees and 100% of the expenses requested in such invoice.

89. These payments would be subject to this Court's subsequent approval as part of the normal interim fee applications process.

90. I believe that entry of an order implementing the procedures in the Knudsen Motion will be in the best interests AWBC, its estate, and other parties-in-interest. I believe that such procedures will facilitate close monitoring of the costs of case administration, will diminish the financial constraints on the Professionals, and will assist AWBC in implementing an efficient cash management system to maintain cash flow availability.

**Motion for Authority to Waive Requirements to File List of Equity Security Holders and to Include Equity Security Holders on the Matrix (the "Shareholder Motion")**

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION AND FIRST-DAY PLEADINGS - 33

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 33 of 36

1    91.    AWBC has in excess of 4,800 equity security holders holding
2    approximately 17,234,000 shares.  Approximately 1,471 holders have
3    certificates while the remaining shares are held electronically.  Certain holders
4    have contracted to have their identity kept anonymous and are reached through
5    designated brokers.  AWBC communicates with its equity security holders
6    through Broadridge Financial Solutions, Inc. ("Broadridge"), a company that
7    has provided and continues to provide investor communications services to
8    AWBC.  I am informed and believe that Broadridge can provide notices to the
9    equity security holders.

10    92.    Because AWBC has thousands of equity security holders, it would
11    be onerous and expensive for AWBC to provide them all copies of all pleadings
12    and documents that must be served on creditors in this Chapter 11 case.

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS  - 34

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON  98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

1    I declare under penalty of perjury under the laws of the United States of

2   America that the foregoing is true and correct.

3

4        Executed this 27th day of October, 2010, at Spokane, Washington.

5

6

7                                     */s/ Patrick J. Rusnak*
                                      Patrick J. Rusnak, Declarant

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF PATRICK J. RUSNAK IN SUPPORT OF CHAPTER 11 PETITION
AND FIRST-DAY PLEADINGS - 35

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400 FAX (206) 447-9700

sf-2903314

1    I declare under penalty of perjury under the laws of the United States of

2    America that the foregoing is true and correct.

3

4    Executed this 27th day of October, 2010, at Spokane, Washington.

5

6

7    _____

8                                    Patrick J. Rusnak, Declarant

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

DECLARATION OF PATRICK J. RUSNAK  IN SUPPORT OF CHAPTER 11
PETITION AND FIRST-DAY PLEADINGS-

FOSTER PEPPER PLLC
1111 THIRD AVENUE, SUITE 3400
SEATTLE, WASHINGTON 98101-3299
PHONE (206) 447-4400  FAX (206) 447-9700

sf-2903314

10-06097-PCW11    Doc 3    Filed 10/28/10    Entered 10/28/10 02:05:36    Pg 36 of 36