Dillon E. Jackson WSBA #1539  The Honorable Patricia C. Williams
Christopher M. Alston, WSBA #18823  Chapter 11
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Telephone: (206) 447-4400
Facsimile No.: (206) 447-9700

Counsel for
AMERICANWEST BANCORPORATION

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON
## AT SPOKANE

| | |
|---|---|
| In Re: | Case No. 10-06097-PCW-11 |
| AMERICANWEST BANCORPORATION, | Chapter 11 |
| Debtor. | **DEBTOR'S DISCLOSURE STATEMENT** |

AMERICANWEST BANCORPORATION ("AWBC") submits the following Debtor's Disclosure Statement pursuant to Chapter 11 of the Bankruptcy Code.

## I.  INTRODUCTION

**A.  General**

On October 28, 2010 (the "Petition Date"), AWBC (also referred to as "Debtor") filed a voluntary petition for relief under Chapter 11 of Title II of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Eastern District of Washington at Spokane (the "Bankruptcy Court").

DEBTOR'S DISCLOSURE STATEMENT – 1 of 41

Pursuant to Section 1125 of the Bankruptcy Code, Debtor has prepared and filed this Disclosure Statement, which was approved by the Bankruptcy Court on _____, 2011, for submission to holders of claims, along with the Plan of Distribution (the "Plan"). The Disclosure Statement is provided for the purpose of explaining the Plan and to give creditors information so that they may have a better understanding of the Debtor and its Plan and thereby make a reasonably informed decision in exercising their right to vote on acceptance of the Plan.

THE ONLY REPRESENTATIONS WHICH ARE AUTHORIZED OR WHICH MAY BE MADE CONCERNING THE DEBTOR, THE VALUE OF ITS ASSETS OR THE PLAN OF LIQUIDATION, ARE THE REPRESENTATIONS CONTAINED HEREIN. THE FINANCIAL INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT. FOR THAT REASON, THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT THAT THE INFORMATION CONTAINED IN THE DISCLOSURE STATEMENT IS WITHOUT INACCURACY. HOWEVER, GREAT EFFORT HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS FAIRLY PRESENTED.

**B.** **Chapter 11 Plan Confirmation Process**

The Bankruptcy Code is a remedial statute designed to effect the reorganization of financially distressed entities and individuals or the orderly liquidation of their assets. Formulation and confirmation of a plan is a principal function of a chapter 11 case. The plan may affect the claims and interests of all parties, provide for the assumption or rejection of executory contracts and unexpired leases, and provide for the prosecution or settlement of claims belonging to the bankruptcy estate.

DEBTOR'S DISCLOSURE STATEMENT – 2 of 41

51120724.12

1. <u>Confirmation Requirements and Conditions Precedent</u>. A plan can be confirmed by the Bankruptcy Court and made binding on a impaired class of creditors if it is accepted by the holders of at least two-thirds in dollar amount and one-half in number of the claim holders who have voted on the plan. The plan can be confirmed by the Bankruptcy Court, and made binding on an impaired class of interests if it is accepted by the holders of at least two-thirds in dollar amount of the interest holders who have voted on the plan.

In the event that the requisite number of acceptances of a particular class which is impaired under a plan is not obtained, the Bankruptcy Court may nonetheless confirm the plan if the Bankruptcy Court finds under Section 1129(b) of the Bankruptcy Code that the plan accords fair and equitable treatment of any such class rejecting the plan. Additionally, a debtor may ask the Court to find that certain of the classes are impaired. Creditors and interest holders whose claims are unimpaired are deemed to have accepted the plan.

The Bankruptcy Code requires that if a class of claims is impaired under the plan, at least one class of claims that is impaired must vote to accept the plan in order for the plan to be confirmed.

Further, in order for the plan to be confirmed, the Bankruptcy Code requires, among other things, that (a) the plan be proposed in good faith, (b) the debtor disclose specified information concerning payments made or promised in insiders, and (c) the plan comply with the applicable provisions of chapter 11 of the Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also imposes requirements that (a) confirmation of the plan is not likely to be followed by the need for further financial reorganization, and (b) the plan be fair and equitable with respect to each class of claims or equity security (stock) interests which is impaired under the plan.

Before the plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the plan provides, with respect to each class, that each holder of a claim or equity security interest of such class either (a) as accepted the plan, or (b) will receive or retain under the plan on account of such claim or equity security interest, property of a value, as of the Effective Date (as defined in the plan), that is not less than the amount that such persons would receive or retain if the debtor were, on the Effective Date, liquidated under Chapter 7 of the Bankruptcy Code.

2.     <u>Modification of the Plan</u>.  The Debtor may propose amendments to or modifications of a plan under Section 1127 of the Bankruptcy Code at any time prior to the date on which the Court enters an order confirming the plan (the "<u>Confirmation Date</u>").  After the Confirmation Date, the Debtor may remedy any defects or omissions or reconcile any inconsistencies in the plan or in the order confirming the plan pursuant to Section 1129 of the Bankruptcy Code (the "<u>Confirmation Order</u>") in such manner as may be necessary to carry out the purposes and intent of the plan so long as the holders of Claims and Equity Security Interests are not materially and adversely affected.

3.     <u>Revocation of the Plan</u>.  The Debtor reserves the right to revoke and withdraw the Plan at any time prior to the Confirmation Date.  In the event of such withdrawal or revocation, or if confirmation does not occur, the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or to prejudice in any manner the rights of the Debtor.

4.     <u>Defined Terms</u>.  The defined terms used in this Disclosure Statement shall have the meanings stated in the Plan unless otherwise stated.

51120724.12
10-06097-PCW11     Doc 180     Filed 03/15/11     Entered 03/15/11 14:24:26     Pg 4 of 41

5.    <u>Undefined Terms</u>.  A term used in the Plan and not otherwise defined herein but that is defined in the Bankruptcy Code has the meaning stated in the Bankruptcy Code.  A term used in the Disclosure Statement and not otherwise defined herein and not defined in the Bankruptcy code, but defined in the Plan has the meaning stated in the Plan.  To the extent of any inconsistencies between the Plan and the Disclosure Statement, the Plan shall supersede the Disclosure Statement.

## II.  DESCRIPTION OF THE BUSINESS OF THE DEBTOR AND HISTORY OF THE DEBTOR PRIOR TO FILING

**A.    General Background**

Founded in 1983, AWBC, headquartered in Spokane, Washington, is a Washington corporation registered as a bank holding company under the Bank Holding Company Act of 1956.  AWBC is the direct or indirect corporate parent of two non-debtor subsidiaries:  AmericanWest Bank (the "<u>Bank</u>"), a Washington state-chartered bank that is insured by the Federal Deposit Insurance Corporation ("<u>FDIC</u>") and wholly-owned by AWBC; and AmericanWest Holdings, Inc., a Washington corporation that is wholly-owned by the Bank.  The Bank operates in Eastern and Central Washington and Northern Idaho, and in Utah where it conducts business under the tradename of "Far West Bank."  Unless otherwise indicated, references herein to the "<u>Company</u>" collectively refer to AWBC and the Bank.

Prior to the Sale described in Section II G below, AWBC functioned as a holding company for the Bank, which was its primary asset.  The Bank gathers deposits and provides loans to approximately 77,000 customers across the Inland Northwest through branches located primarily in Spokane, Yakima, Walla Walla, and the Tri-Cities area.  The Bank serves customers in a total of 58 branches,

10-06097-PCW11    Doc 180    Filed 03/15/11    Entered 03/15/11 14:24:26    Pg 5 of 41

including a branch in Salt Lake City, Utah, and branches in suburban and rural communities in Eastern and Central Washington, Northern Idaho, and Utah. As of the Petition Date, the Company collectively had approximately 540 employees across its 58 branches and two support facilities.

The Bank offers agricultural loan products and commercial loan products to hundreds of farmers and small businesses across its market areas in Washington, Idaho, and Utah. The Bank offers a variety of deposit accounts to both consumer and business customers, including checking accounts, money market demand accounts, and savings accounts. Numerous services also provide the Bank's consumer and business customers with convenient bank access, including ACH origination, remote check capture (i.e., on-site imaging and electronic processing of checks), sweep accounts, and currency services. The Bank also generates non-interest income by offering both consumer and business credit cards and merchant bankcard services through arrangements with third-party providers.

The Bank and AWBC are highly regulated institutions. The principal regulators of the Bank are the FDIC and the Washington Department of Financial Institutions (the "DFI"). The principal regulators of AWBC are the Board of Governors of the Federal Reserve System and the Federal Reserve Bank of San Francisco. Unless context otherwise requires, references herein to the "Regulators" collectively refer to these four state and federal regulatory agencies.

**B.      The Bank's Capital Structure and AWBC's TruPS**

AWBC held 100% of the equity ownership in the Bank totaling 429,000 issued and outstanding shares of common stock of the Bank, no par value (the "Shares"). No other shares of capital stock of the Bank are issued or outstanding. All of the Shares of the Bank were owned by AWBC.

51120724.12
10-06097-PCW11    Doc 180    Filed 03/15/11    Entered 03/15/11 14:24:26    Pg 6 of 41

As of September 30, 2010, AWBC had outstanding unsecured indebtedness totaling approximately $47.2 million,[1] consisting of: (a) four outstanding issuances of junior subordinated debentures issued to four statutory trusts (the "Trusts") that in turn issued their preferred securities, commonly known as Trust Preferred Securities or "TruPS," to investors; and (b) approximately $50,000 in trade debt. The principal amount of AWBC's junior subordinated debt was approximately $41.2 million, which backs exactly $40 million of TruPS issued to investors.[2] The accrued interest on the junior subordinated debentures totaled $6.0 million. Wilmington Trust Company acts as trustee of two of the Trusts and U.S. Bank acts as trustee of the other two Trusts (the "Indenture Trustees"). Each of the four Trust agreements provide that the junior subordinated debentures shall be junior to certain obligations of AWBC, such as indebtedness for all borrowed money ("Senior Indebtedness").[3] The junior subordinated debentures are not subordinated

_____

[1] This total includes the $6.0 million of accrued deferred interest relating to the issuance of TruPS. Such interest, however, has not been capitalized and is not included in the principal balance of $41.2 million described herein.

[2] The excess amount of the debentures over the amount of the TruPS represents the common equity of the Trusts, which is held by AWBC. The common equity interest has no economic value.

[3] Each Trust agreement defines "Senior Indebtedness" to mean, with respect to AWBC, (i) the principal, premium, if any, and interest in respect of (A) indebtedness of AWBC for money borrowed and (B) indebtedness evidenced by securities, debentures, notes, bonds or other similar instruments issued by AWBC; (ii) all capital lease obligations of AWBC; (iii) all obligations of AWBC issued or assumed as the deferred purchase price of property, all conditional sale obligations of AWBC and all obligations of AWBC under any title retention agreement; (iv) all obligations of AWBC for the reimbursement of any letter of credit, any banker's acceptance, any security purchase facility, any repurchase agreement or similar arrangement, any interest rate swap, any other hedging arrangement, any obligation under options or any similar credit or other transaction; (v) all obligations of the type referred to in clauses (i) through (iv) above of other Persons for the payment

51120724.12

to AWBC's trade debt. AWBC has no obligations that could be characterized as Senior Indebtedness.

Each of the four TruPS issuances corresponding to AWBC's four issuances of debentures (the "AWBC TruPS") was sold as a block into a separate limited liability company (each a "PreTSL").[4] Each PreTSL issued several tranches, or priorities, of notes (e.g., Class A 1 Senior Notes, Class A 2 Senior Notes, Mezzanine Notes, and Subordinated Notes) to numerous institutional and accredited and individual investors through offerings exempt from securities registration. Each PreTSL's notes are collateralized with the TruPS held by that PreTSL, along with TruPS and debt obligations of other entities. The PreTSLs are unmanaged, pooled collateralized debt obligations (or "CDOs"), with Bank of New York Mellon ("BNYM") acting as CDO trustee under the indenture applicable to each PreTSL.

## C.     The Company's Objectives

As described below, the Bank has been subject to significant regulatory action by the Regulators for over two years. For some months prior to the Petition Date it was clear that if AWBC was unable to recapitalize the Bank promptly, it faced possible seizure of the Bank by the DFI and appointment of the FDIC as

_____

of which AWBC is responsible or liable as obligor, guarantor or otherwise; and (vi) all obligations of the type referred to in clauses (i) through (v) above of other Persons secured by any lien on any property or asset of AWBC (whether or not such obligation is assumed by AWBC), whether incurred on or prior to the date of this Indenture or thereafter incurred.

[4] "PreTS$^{SM}$" is a registered service mark, derived from "Preferred Term Securities," another term for trust preferred securities. "PreTSL" is the common shorthand for each of the limited liability companies that has issued PreTS$^{SM}$ collateralized by AWBC's TruPS, , with each such company having a name in the form of "Preferred Term Securities [#] Limited" with the "[#]" representing the Roman numeral designating the specific entity.

DEBTOR'S DISCLOSURE STATEMENT – 8 of 41

51120724.12

receiver. A receivership for the Bank could have resulted in a $330 million dollar loss to the FDIC's Deposit Insurance Fund and would have resulted in a total loss for AWBC and its creditors.

AWBC commenced this Chapter 11 case as the only plausible mechanism to recapitalize the Bank while protecting, to the greatest extent possible, AWBC's creditors. By commencing this Chapter 11 case, AWBC sought to sell its 100% equity ownership in the Bank and the Other Purchased Assets (as defined in the APA described below) on an expedited basis, concurrently with the recapitalization of the Bank by the Purchaser (defined below) in order to comply with regulatory requirements.

Absent a sale of the Shares and the Other Purchased Assets to a well qualified bank or bank holding company concurrent with a significant capital infusion by the Purchaser, the Bank would not have been able to meet the Regulators' capital requirements and would ultimately be placed into receivership. The Purchaser presented the Bank with the requisite financial resources to acquire and recapitalize the Bank and with the regulatory posture to obtain regulatory approval for the transaction (having been approved on October 26, 2010, by the Federal Reserve Board to become a bank holding company).

Any course of action other than a sale of the Shares and the Other Purchased Assets would have precluded the return of any value to the AWBC's creditors, and would have resulted in adverse consequences for the Bank's customers, communities, and employees. An expedited sale of the Shares and the Other Purchased Assets at the best possible price, with the Purchaser's commitment to concurrently recapitalize the Bank, was the only feasible way to establish the Bank as a viable institution on an ongoing basis and protect, to the greatest extent possible, AWBC's creditors and other stakeholders.

51120724.12

**D.  Factors Leading to the Sale**

The current financial and credit crisis — resulting in approximately 325 nationwide bank failures since 2008[5] — significantly hampered the Bank's business and ability to meet certain state and federal regulatory requirements for capital, profitability, and credit quality.  Beginning approximately three years ago, effects from the housing crisis, including tumbling home prices, soaring loan defaults, and high unemployment rates, began to take their toll on the Bank's, and ultimately the Company's, financial condition.

**E.  The Company's Efforts to Recapitalize**

Beginning in 2007, the Company's management initiated efforts to deal with asset quality problems in its loan portfolio, reduce expenses, build capital reserves, and take other appropriate actions to return the Bank to profitability and reduce its risk profile.  However, in early 2008 it became clear to the Company's management and Board of Directors that additional capital would be required to address the Bank's financial problems.

Beginning in 2008 and continuing to the Petition Date, the Company undertook significant efforts to raise additional capital, including efforts to sell Bank assets, or to sell AWBC or the Bank to another financial institution.

**F.  State and Federal Regulatory Actions**

The Company's inability to raise additional capital was a major cause of increased scrutiny and action by the Regulators and created significant risk that the Bank would be seized if not recapitalized on an expedited time frame consistent

---

[5] Twenty-five banks failed and were taken over by the FDIC in 2008, while 140 failed in 2009.  Nearly 160 banks failed in 2010.  <u>See</u> http://www.fdic.gov/bank/individual/failed/banklist.html.

51120724.12

with the transactions described below.  A recapitalization of the Bank was critical if the Bank was to be restored to financial viability on an ongoing basis.

As a result of the Bank's announcement that it had ceased to be "well-capitalized" as of June 30, 2008, the DFI conducted an off-site interim examination of the Bank's financial health.  This led to the first of a series of increasingly serious enforcement actions against the Bank or AWBC by the FDIC, DFI, and the Federal Reserve Bank of San Francisco ("FRB"), which regulated AWBC as a bank holding company.  First, the DFI issued a Supervisory Directive against the Bank effective August 8, 2008 (the "DFI Directive").  The DFI Directive required the Bank to provide periodic liquidity and credit quality reports, update the DFI regarding the status of liquidity planning and previously announced capital raising initiatives, notify the DFI about significant changes in management and financial condition, retain a permanent Chief Executive Officer, and seek prior written consent of the DFI before paying dividends.[6]

Second, on February 2, 2009, the FDIC issued a Prompt Corrective Action Notification (the "PCA Notification") to the Bank.  The PCA Notification was issued under the Prompt Correction Action provisions of the FDIA and FDIC regulations.  The FDIA and FDIC regulations identify five capital categories for banking institutions — well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized.  The PCA Notification formally advised the Bank that it was significantly undercapitalized, which is the next-to-lowest capital category.  As such, the Bank was required to submit a capital restoration plan (the "Capital Restoration Plan"), and it became

---

[6] On September 17, 2009, the DFI notified the Bank that the DFI Directive was being rescinded, as it had been effectively superseded by the PCA Directive discussed below.

51120724.12

10-06097-PCW11    Doc 180    Filed 03/15/11    Entered 03/15/11 14:24:26    Pg 11 of 41

subject to a wide range of restrictions relating to its senior management team, management compensation, dividends, loan loss reserves, reductions in troubled assets, liquidity, asset growth, and other aspects of its business. In response to the PCA Notification, the Bank submitted its Capital Restoration Plan to the FDIC on March 20, 2009, which the Bank subsequently amended on July 2, 2009. That Capital Restoration Plan was rejected.

Third, on May 8, 2009, the Bank entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (the "Stipulation") with the FDIC and the DFI. Pursuant to the Stipulation, the FDIC and the DFI issued an Order to Cease and Desist (the "Cease and Desist Order") against the Bank on May 11, 2009. The Cease and Desist Order required, among other things, that the Bank take actions necessary to return to the "well-capitalized" category by September 9, 2009.

Fourth, on September 15, 2009, AWBC entered into a Written Agreement (the "Written Agreement") with the FRB, imposing on AWBC restrictions and requirements substantially similar to those contained in the PCA Notification and the Cease and Desist Order, including the obligation to submit a capital restoration plan.

Fifth, on February 26, 2010, the Bank received a Prompt Corrective Action Directive (the "PCA Directive") from the FDIC. The PCA Directive directed the Bank to recapitalize within 30 days of receipt, and reiterated various requirements previously imposed on the Bank by the Cease and Desist Order.

Taken together, the Cease and Desist Order and the PCA Directive required the Bank, among other things, to recapitalize or accept an offer to be acquired by or combine with another financial institution by March 28, 2010.

1   Although the Company's management had undertaken all actions within its
2   power to comply with all aspects of the PCA Notification, the Cease and Desist
3   Order, the Written Agreement, and the PCA Directive (collectively, the
4   "Regulatory Orders"), the Company was unable to comply with their most
5   important terms — the recapitalization or sale of the Bank.  Full satisfaction of the
6   Regulatory Orders depended on raising a significant amount of additional capital.
7   A recapitalization of the Bank was the only path for restoring the Bank to financial
8   viability on an ongoing basis.

9       The Bank continued to remain in the significantly undercapitalized capital
10  category.  Any undercapitalized banking institution, and particularly one that is
11  critically undercapitalized and has failed to comply with an order to recapitalize, is
12  subject to a wide variety of enforcement remedies by the FDIC.  Most
13  significantly, a critically undercapitalized institution may be seized at any time by
14  the DFI and placed in an FDIC receivership.  If this had occurred AWBC's
15  investment in the banking Bank would have been wiped out (with its creditors
16  adversely affected as well), the institution would have been sold or liquidated at a
17  substantial loss to the FDIC's deposit insurance fund, many of the institution's
18  employees would have lost their jobs, customers with deposits in excess of FDIC
19  insurance limits would be at risk of losing that portion of their deposits, borrowers
20  deprived of needed financing, and the communities served by the Bank will be
21  adversely impacted by its loss.

22      During the current financial crises, very few, if any, banking institutions that
23  have received prompt corrective action directives have been able to avoid seizure
24  and FDIC receivership and loss of the shareholders' complete investment.  A
25  review of prompt corrective action directives issued since January 2009 in the
26  FDIC's Western Region — in which the Bank is included — indicates that 26 of

DEBTOR'S DISCLOSURE STATEMENT – 13 of 41

51120724.12

the 30 banks that received such directives were ultimately seized by the FDIC. On average, the time between the deadline for compliance with a prompt corrective action directive and the seizure of the institution was only 68 days. As of the Petition Date, the Bank had already gone over 240 days since it failed to comply with the PCA Directive's capital raising requirement. The period of time that the Bank continued to exist, when contrasted with the experience of other banking institutions in the Western Region, is unique. The experience of these other banks demonstrates that no banking institution that is significantly undercapitalized could reasonably expect to remain open for such a period of time.

**G.     Work with Interested Parties**

Prior to the Petition Date, the Company considered a number of investment strategies to achieve a successful capital raise. The Company and its investment banking firm, Sandler O'Neill & Partners, L.P., a recognized investment banking firm with particular experience with respect to financial institutions, ("Sandler"), contacted approximately 100 parties, executing confidentiality agreements with 67 of such parties. As it identified new potential investment strategies, the Company and Sandler re-contacted qualified parties who had previously expressed interest in a transaction with the Company.

In February 2010, in addition to the Company's engagement of Sandler, the Company retained Cappello Capital Corp. ("Cappello"), as a second financial advisor.

**H.     Agreement With Purchaser**

Following its comprehensive marketing efforts, after 30 months of strategic analysis and negotiations, including discussions with the Regulators and the FRB, the Company, in consultation with Sandler, identified the bid by SKBHC Holdings LLC and its wholly-owned subsidiary SKBHC Hawks Nest Acquisition Corp.

DEBTOR'S DISCLOSURE STATEMENT – 14 of 41

(collectively, the "Purchaser"), for the Shares and the Other Purchased Assets as the only viable way to accomplish the necessary recapitalization of the Bank and to protect the interests of AWBC's creditors. After extensive negotiations regarding the terms and conditions thereof, AWBC and the Purchaser agreed, in principle, to the key terms of the sale of the Shares to the Purchaser (the "Sale"), and executed an asset purchase agreement with the Purchaser (the "APA").

As effectuated, the Sale recapitalized the Bank, ensured the Bank's regulatory compliance, maximized the value available for AWBC's creditors, preserved hundreds of jobs, and saved the FDIC many millions of dollars, while simultaneously allowing the Bank to continue serving the needs of thousands of individuals and businesses in the Bank's market areas.

## I. Discussions with the Regulators

During the months preceding this Chapter 11 filing, the Company's management engaged in numerous detailed discussions and in-person meetings with the Regulators to keep them apprised of its recapitalization efforts. Many of these conversations focused on the requirements of the Regulators for approval of a sale and recapitalization of the Bank, and whether the FDIC and DFI would defer regulatory action to allow recapitalization to proceed. Generally, throughout the process, the Regulators remained supportive of the Company's recapitalization efforts. In the three months prior to the Petition Date, the Company introduced to the Regulators, in a number of meetings, the prospect of a Section 363 bankruptcy sale as the potential key to overcome the obstacles that the Company had encountered in its recapitalization efforts. After the Purchaser emerged as a potential party to such a transaction, both representatives of the Purchaser and management of the Company explored in depth with the Regulators the proposed transaction, including the bankruptcy sale process.

1    The Regulators needed to evaluate the regulatory applications that Purchaser

2    contemplated submitting before passing on the transaction.  However, the

3    Regulators did not object to this bankruptcy filing as a means to secure adequate

4    capital for the Bank.

5    **J.    The DIP Facility**

6        In order to help reduce the risk of adverse supervisory action before a sale of

7    the Shares and the Other Purchased Assets can be consummated, prior to the

8    Petition Date, AWBC negotiated a debtor-in-possession loan agreement (the "DIP

9    Facility") with the Purchaser to obtain the working capital necessary to fund

10   AWBC's Chapter 11 case.

11       AWBC had an immediate need to access additional operating capital in

12   order to fund the day-to-day operating expenses of its business, including

13   payments to remaining employees and professionals sought to be retained in this

14   Chapter 11 case.  Such payments were necessary to sustain the going-concern

15   value of the Bank and ensure its future viability.  Moreover, access to additional

16   operating capital enabled AWBC to demonstrate to its regulating entities, vendors,

17   suppliers, and employees that it has sufficient liquidity to continue to operate its

18   business, maintain its properties, and pay necessary expenses during the crucial

19   first days of its reorganization efforts and the pendency of this Chapter 11 case.

20       As set forth in the DIP Credit Agreement, and subject to the terms and

21   conditions thereof, Purchaser agreed to provide the DIP Facility with a total

22   commitment of up to $2 million.

23       Among other features, the DIP Facility included certain safeguards for

24   Purchaser's protection as a debtor-in-possession lender, since as a lender it bore the

25   full risk of any decline in the value of the Shares and the Other Purchased Assets

26

DEBTOR'S DISCLOSURE STATEMENT – 16 of 41

that would serve as its collateral. The DIP Facility was secured by a senior secured, superpriority lien on AWBC's assets and the proceeds thereof.

### III. EVENTS DURING CHAPTER 11 CASE

**A. Post-Bankruptcy Developments.**

1. <u>AWBC Continued as Debtor-In-Possession</u>. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, AWBC has continued in the management and possession of its property as a debtor-in-possession since the Petition Date. No trustee or examiner has been appointed in this case.

2. <u>Hiring of Professionals</u>. Shortly after the filing of the petition, Debtor sought and obtained Bankruptcy Court approval of Foster Pepper PLLC ("<u>Foster Pepper</u>") as its counsel. The Bankruptcy Court also authorized the Debtor to employ the following professionals:

    a) Morrison & Foerster LLP as Special Counsel; and

    b) Sandler O'Neill & Partners LP as Financial Advisors

    c) BDO Seidman LLP as Accountants

3. <u>The Creditors' Committee</u>. Shortly after the case was filed, an Unsecured Creditors' Committee (the "<u>Committee</u>") was formed by the United States Trustee. The members of the Committee are three of the four Trusts described in Section I B above. The Committee appeared and participated in the case by and through the attorneys for the two Indenture Trustees. Through the Indenture Trustees' attorneys, the Committee members have monitored and conferred with the Debtor on the activities of the Debtor during the case.

4. <u>Approval of the DIP Facility</u>. The Debtor filed a Motion to approve the DIP Facility (the "<u>DIP Motion</u>"), by which the Purchaser agreed to allow AWBC to utilize the cash collateral generated by its collateral.

DEBTOR'S DISCLOSURE STATEMENT – 17 of 41

51120724.12

The DIP Motion was approved by the Bankruptcy Court on November 18, 2010.

5.     <u>Post-Petition Marketing Efforts and Approval of the Sale</u>.  Concurrent with filing the petition commencing this Chapter 11 case, the Debtor filed its Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365; Fed. R. Bankr. P. 2002, 6004, 6006, and 9014; and L.B.R. 6004-1 (I) Approving (A) Bidding Procedures and (B) the Form and Manner of Notice of (i) the Sale of Certain Assets and (ii) the Assumption and Assignment of Certain Executory Contracts, and Granting Related Relief; (II) Authorizing and Approving (A) the Sale of Certain Assets and (B) the Assumption and Assignment of Certain Executory Contracts; and (III) Waiving of the 14-Day Stay of Fed. R. Bankr. P. 6004(h) and 6006(d) (the "<u>Sale Motion</u>").  The Bankruptcy Court entered an order approving procedures for parties interested in submitting competing bids for the Shares and Other Purchased Assets and establishing November 29, 2010 as the deadline for submitting competing bids and December 9, 2010 as the date for a hearing to approve a sale of the Share and Other Purchased Assets to the party making the highest and best offer (the "<u>Bidding Procedures Order</u>").

The Debtor continued its marketing efforts to ensure a competitive bidding process.  Specifically, the Debtor's counsel contacted interested parties by:

- Sending copies of the Bidding Procedures Order, the Sale Motion, and the Notice of Sale to all parties that had previously expressed interest and had been given access to the Company's electronic data room, as well as to all parties that had entered appearances in the case and filed requests for special notice;

- Publishing notice of the Bidding Procedures and deadlines in the national edition of *The Wall Street Journal*, as well as *The*

*Seattle Times*, *The Spokesman-Review*, and *The Salt Lake Tribune*; and

- Sending notice of bankruptcy court pleadings to all creditors. These steps were designed to provide all interested parties an opportunity to bid pursuant to the Bidding Procedures Order.

In addition to these affirmative post-petition marketing efforts, the Company engaged with and was responsive to inquiries from several interested parties, including Columbia Banking System, Inc., the holding company for Columbia State Bank headquartered in Tacoma, Washington ("Columbia"). Upon execution of a non-disclosure agreement on November 4, 2010, Columbia's designated personnel were immediately provided access to AWBC's virtual data room ("VDR"). Based upon a review of information in the VDR, on November 5, 2010, Columbia provided AWBC with a listing of approximately 300 loan files selected for on-site review. Approximately ten representatives of Columbia engaged in on-site due diligence, including a review of loan files and other information, at the Bank's administrative office in Spokane, Washington on November 8-10, 2010. Although accommodations were provided for Columbia personnel to continue the due diligence work on November 11 (a federal banking holiday) and November 12, Columbia elected to terminate the on-site diligence on November 10.

Sandler engaged with and was responsive to inquiries from three other interested parties in addition to Columbia. A new private equity firm that had not expressed interest pre-petition signed a non-disclosure agreement and reviewed materials in the VDR. Sandler had several phone conversations with this private equity firm from November 15, 2010 through November 23, 2010, during which time Sandler assisted the private equity firm in conducting its due diligence of the Company. On November 23, 2010, the private equity firm indicated that it would

51120724.12

not be submitting a bid.  The other two parties with whom Sandler had contact declined to execute a confidentiality agreement that would have allowed them to access the VDR and conduct due diligence of the Company.

Notwithstanding the marketing efforts of the Debtor and the simultaneous marketing efforts pursued by Sandler, no additional bids were received prior to the November 29, 2010 bid deadline.  Accordingly, no auction was conducted and the Purchaser was deemed to be the successful bidder.

The Bankruptcy Court approved the Sale Motion and the Sale to Purchaser on December 9, 2010.  The Sale Agreement closed in accordance with the terms of the APA on December 20, 2010, and the Purchaser paid the Debtor $6.5 million, less a credit for the amount that Purchaser had loaned to the Debtor under the DIP Facility.

6.    Interim Payment Order.  On December 14, 2010, the Bankruptcy Court entered an order establishing procedures for payment of interim professional fees and expenses (the "Interim Payment Order").  Under the Bankruptcy Rules, professionals usually cannot be paid more than once every 120 days.  Under the Interim Payment Order, professionals hired by the Debtor during the case were authorized to be paid by the Debtor each month 80% of their fees and 100% of their expenses incurred in the prior month.  Approximately every 180 days the professionals will submit formal applications requesting approval by the Bankruptcy Court of all fees and expenses incurred on behalf of the Debtor.  If the Bankruptcy Court approves the applications, the professionals will be paid the 20% of the fees held back.  If the Bankruptcy Court does not approve all of the amounts requested by a professional, the professional will be required to repay any amounts that exceed the total amount approved by the Bankruptcy Court.

51120724.12

7. <u>Claims Bar Date</u>. The Court issued an order establishing January 31, 2011, as the deadline by which any creditor whose claim was listed as disputed, contingent or unliquidated in the Debtors' schedules, or who disagreed with the amount of the claim as scheduled by the Debtors, must file a proof of claim with the Bankruptcy Court. The order also establishes April 27, 2011 as the deadline for governmental units to file a proof of claim.

## IV. DEBTOR'S CURRENT FINANCIAL INFORMATION

**A. Summary**

As of the Petition Date, Debtor listed total assets of approximately $8,306,646, and liabilities of approximately $47,399,789.

**B. Funds on Hand.**

Debtor holds approximately $5,896,209 in its accounts. The sources of funds include $97,345 held in its accounts as of the Filing Date plus proceeds from the Sale.

**C. No Other Property.**

There is no other property owned by the Debtor which might be sold and the proceeds used to pay creditors. All of the property of the Debtor was sold as part of the Sale.

**D. Review of Claims**

A final analysis of the scheduled claims versus claims filed will be conducted with respect to the Debtor's secured, priority and unsecured obligations. The Debtor may file objections to claims scheduled or filed based upon that review.

DEBTOR'S DISCLOSURE STATEMENT – 21 of 41

51120724.12

# V. MEANS FOR EXECUTION OF THE PLAN

**A.     Organization of Debtor**

After the Effective Date and the commencement of the Distributions under the Plan, the Bylaws and Articles of Incorporation of the Reorganized Debtor shall be modified such that the Board of Directors shall be reduced to one person and the number of shareholders shall be reduced to one person.  The sole director and shareholder shall be Patrick J. Rusnak.

**B.     Post-Confirmation Dissolution of Committee**

Upon the Effective Date, the Committee shall be dissolved and shall have no duties, power, obligations, or authority.

**C.     Distribution of Funds**

Patrick J. Rusnak shall serve as the Distribution Agent.  On the Distribution Date, or as soon as practicable thereafter, the Distribution Agent shall commence distributions to holders of Allowed Claims as provided in the Plan.  The Distribution Agent shall be entitled to compensation at the rate of $250 per hour.

**D.     Reservation of Funds**

The Reorganized Debtor shall reserve sufficient funds at the time distributions are commenced to holders of Allowed Claims to adequately provide for disputed Claims.  Upon resolution of the disputed Claims, the reserved funds shall be distributed as provided under the Plan.

**E.     Source of Funds**

Funds for the distributions proposed under the Plan are the Sale Proceeds and any additional cash held in the Debtor's bank accounts.

**F.     Tax Determination**

As described more fully in Section X below, the Debtor will either a) proceed under Section 505(a) of the Bankruptcy Code to obtain a Final Order

51120724.12

that all of the tax returns filed by the Debtor prior to the Petition Date are accepted, final and no longer subject to further review by the Internal Revenue Service, or b) reach a final resolution establishing that the Internal Revenue Service holds no Prepetition Tax Claims. This final resolution shall be approved by an order of the Bankruptcy Court after notice to all parties who have requested special notice in the Case and an opportunity for a hearing. Distributions under the Plan will not be made prior to April 27, 2011 and thereafter distributions can be made with the provision for reserves to deal with any remaining disputed claims. Final resolution of the prepetition tax claims, may occur by entry of a Final Unstayed Order or formal withdrawal of any claims filed by the IRS.

Promptly upon the filing of any returns for post-petition periods, the Debtor will seek an accelerated determination that the returns are accepted, final and no longer subject to further review under the procedures provided in Section 505(c) of the Bankruptcy Code.

Until final determination of the Tax Claims of the Internal Revenue Service, the Reorganized Debtor shall retain sufficient reserves that in the opinion of its tax and legal advisors are sufficient to respond to any liability in full. If any party in interest disputes the necessity and/or extent of the amounts held in reserves, the party in interest shall be entitled seek an order modifying the amount on motion and notice in accordance with the Bankruptcy Rules.

As further discussed in Article VII, the Debtor firmly believes that there will be no pre petition Tax Claim for two reasons. First, the returns will be accepted. Second, any obligation in the unlikely event of an adjustment would under the Tax Sharing Agreement with the Bank, be an obligation of the Bank.

51120724.12

**G.     Post-Effective Date Administrative Expenses**

A reserve sufficient to complete outstanding legal and administrative work to resolve all claims, dissolve the corporation and provide communication to parties in interest shall be established.  Any excess from the reserve after the cessation of all activity will be distributed first to holders of any unpaid Unclassified Claims on a *pro rata* basis until holders of such claims are paid in full, then to holders of any unpaid Class 2 Claims on a *pro rata* basis until holders of such claims are paid in full, then to holders of Class 3 Claims on a *pro rata* basis.

**H.     Actions On or After the Effective Date**

On the Effective Date:

1.     The Reorganized Debtor and the Distribution Agent shall be responsible for implementing the Plan.

2.     All of the Assets that have not been sold pursuant to the Sale, including without limitation all causes of action under Chapter V of the Bankruptcy Code, shall vest in the Reorganized Debtor free and clear of all liens, security interests and claims, except as otherwise expressly provided for in the Plan.  After distributions under the Plan are made it is not contemplated that the Debtor will have any assets remaining other then funds for windup expenses.

3.     The Reorganized Debtor and the Distribution Agent shall comply with the Plan and make the distributions required by the Plan.

4.     In the event of a dispute on any Claim, the amount of such Claim that is not subject to dispute shall be an Allowed Claim and distribution made thereon.

**I.     Treatment of Executory Contracts**

The Debtor shall assume the equipment leases with CIT Communications Finance Corporation identified in Claim #7 filed in this case.  As part of that

process, Debtor will simultaneously assign the leases to AmericanWest Bank. The leases are not in default, no cure amount is due and assumption by AmericanWest Bank which is already a party under the leases as amended shall constitute full compliance with all terms of the Bankruptcy Code relating to assumption and assignment of executory contracts including adequate assurance of future performance.

Upon the Effective Date and without any further order of the Bankruptcy Court, the Debtor shall be deemed to have rejected all executory contracts and unexpired leases not previously assumed or specifically assumed under the Plan.

Any person or entity holding a Claim based upon the rejection of an executory contract or unexpired lease must file with the Bankruptcy Court and serve on the Debtor a Proof of Claim within twenty-one (21) days after the Confirmation Date. The failure to file a Proof of Claim by this deadline will result in such Claim being Disallowed and forever discharged.

**J. Claims Objections**

The Reorganized Debtor and any other party in interest shall have thirty (30) days following the Confirmation Date to file an objection to any Claim with the Bankruptcy Court. All Claim objections shall be determined by the Bankruptcy Court after notice to the person whose claim is being objected to and opportunity for a hearing in accordance with the Bankruptcy Rules. The Debtor shall reserve 115% of the amount of any disputed claim pending determination of the dispute by settlement or by order of the Bankruptcy Court.

Issues for resolution by the Bankruptcy Court include:

1. Objection to any claim by CIT on its leases.

2. Objection to claims filed by shareholders clarifying that holders of interests do not receive any payment under the plan.

DEBTOR'S DISCLOSURE STATEMENT – 25 of 41

3. Objections to the IRS claims under section 505 of the Bankruptcy Code.

4. Objections to any claims related to or arising out of the claims of Cappello Capital Corp. for alleged services rendered to the Debtor and the Bank, including claims made by Cappello against the Bank and Sandler.

## VI. DESCRIPTION OF THE PLAN

### A. Treatment of Creditors

The Bankruptcy Code establishes the priority of distributions to creditors and interest holders with respect to assets of the Debtor. The order of distribution set forth in the Plan (which is described below) meets the requirements of the Bankruptcy Code.

### B. Unclassified Claims

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, claims of a kind specified in Section 507(a)(2), (3) and (8) are not to be classified under the Plan. These claims include the following:

1. <u>Administrative Claims</u>. These are claims for expenses incurred which are determined to be actual and necessary costs of preserving the estate constitute administrative claims. The Debtor has incurred and will incur additional expenses for the administration of the Estate, which include; a) professional fees of the attorneys and other professionals for the Debtor; and b) claims of landlords and lessors under unexpired leases and executory contracts that were in effect during the bankruptcy case. Administrative Expense Claims will be treated as follows:

a) <u>Ordinary Course Administrative Expense Claims</u>. An Administrative Expense Claim that has occurred in the ordinary course of the business of the Debtor, other than Professional Fee Administrative Claims, shall be deemed allowed and paid by the Debtor in the ordinary course in the amounts

reflected on the books and records of the Debtor. Certain of such claims which are subject to disclosure filings or Bankruptcy Court order shall be paid in accordance with such disclosure or order.

b) <u>Administrative Expense Claims Bar Date</u>. Any person or entity holding an Administrative Expense Claim which has not been paid by the Debtor as of the Confirmation Date (except for professionals whose employment has been approved by the Bankruptcy Court) shall file with the Bankruptcy Court and serve on the Debtor a Proof of Claim <u>no later than twenty-one (21) days after the Confirmation Date.</u> Failure to file and serve an Administrative Expense Claim by this date shall conclusively bar the claimant from asserting its Administrative Expense Claim, and the Administrative Expense Claim shall be Disallowed and forever discharged.

c) <u>Professional Fee Administrative Expense Claims</u>. All professional fees and expenses for professionals whose employment has been approved by the Bankruptcy Court may be paid on an interim basis in accordance with the Interim Payment Order. Final requests for payment of fees and reimbursement of expenses shall be allowed and paid as approved by the Bankruptcy Court, first from any advance fee deposits held by the professional fee claimant, and then in full on the later of a) the Distribution Date, and b) 15 days after Bankruptcy Court approval of the fees and expenses.

d) <u>Professional Fee Bar Date</u>. Applications for final awards of compensation for services and expenses for professionals incurred prior to the Effective Date shall be filed with the Bankruptcy Court and served on the Debtor <u>on or before twenty-one (21) days after the Effective Date</u>. Failure to file and serve an final application by this date shall conclusively bar the claimant from

51120724.12

asserting its Administrative Expense Claim for compensation and expenses, and the Administrative Expense Claim shall be Disallowed and forever discharged.

e) <u>Post-Confirmation Professional Fees</u>. Professionals whose employment has been approved by the Bankruptcy Court and who continue to provide services to the Reorganized Debtor after the Effective Date shall be compensated and reimbursed for their expenses by filing and serving a notice of interim compensation and reimbursement of expenses on a monthly basis in the manner describe in the Interim Payment Order, and shall be entitled to payment from the Reorganized Debtor on a monthly basis in accordance with the Interim Payment Order. The Interim Payment Order shall be deemed modified so that payment of such post-confirmation professional fees and expenses shall be subject neither to a holdback nor a further order of the Bankruptcy Court, absent an objection and that is filed and served by a party in interest in the manner provided in the Interim Payment Order. If a proper objection is filed and served, then the objection shall be resolved in the manner prescribed by the Interim Payment Order.

2. <u>Priority Tax Claims</u>. On the Distribution Date, each holder of an Allowed Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code shall be paid in full or on a *pro rata* basis if there are insufficient funds in the Distribution Fund to pay all Priority Tax Claims in full on the Distribution Date.

**C. Classification of Claims and Interests**

The claims and interests are classified as follows:

<u>Class 1</u>: Secured Claims, which are Claims secured by assets of the Debtor. The only known holder of a Secured Claim is the Purchaser, who obtained a Secured Claim as a result of the DIP Facility approved by the Bankruptcy Court. After closing of the Sale, any amounts due under the DIP Facility were credited to

the purchase price, so the Purchaser's Secured Claim was satisfied. Thus, it there should be no payments due or made to Class 1.

Class 2: Unsecured Claims, which are Claims against the Debtor that arose before the Petition Date and are not an Administrative Expense Claim, Tax Claim, Secured Claim. Class 2 Claims include Subordinated Claims, which are Claims against the Debtor held by one or more of the Trusts described in Section II B. above. There are no Claims in any category superior to the Subordinated Claims other than Administrative Expense Claims, Tax Claims, and Secured Claims.[7]

Class 3: Equity Interests in the Debtor, which are the interests of a shareholder in the Debtor.

**D. Treatment of Claims**

1. Class 1: Secured Claims. Holders of Allowed Secured Claims, have been paid in full in accordance with the loan documents on or before the Distribution Date. Class 1 Claims are unimpaired.

2. Class 2: Unsecured Claims. On the Distribution Date, each holder of an Allowed Unsecured Claim shall be paid *pro rata* from the sums remaining in the Distribution Fund after payment in full of all Unclassified Claims and the Claims in Class 1, and less any reserves for Disputed Claims or estimated remaining Administrative Expenses. The Trusts will be responsible for distributions to their respective beneficiaries under their respective trust agreements after payment of applicable fees and expenses of the Indenture Trustees pursuant to the trust agreements. The Trusts shall not be obligated to pay any amounts that may be payable to the Debtor under the trust agreements, and the

---

[7] The Subordinations for the trusts holding such Claims is to certain types of loan obligations. The Debtor has no such loan obligations.

51120724.12
10-06097-PCW11    Doc 180    Filed 03/15/11    Entered 03/15/11 14:24:26    Pg 29 of 41

Debtor waives any right or claim to any payment from the Trusts. Class 2 Claims are impaired.

3.    Class 3: Equity Interests. Holders of Equity Interests shall receive nothing on account of their equity interests, and all of the issued and outstanding stock of the Debtor shall be cancelled as of the Effective Date. Class 3 interests are impaired and shall be deemed to reject the Plan and need not vote.

## VII.  ESTIMATION OF CLAIMS AND DISTRIBUTIONS UNDER THE PLAN

As of the date of this Disclosure Statement, the following is the Debtor's best estimation of the amounts claimed by the various creditors under the Plan. This is merely an estimate, as Claims participating in the Plan may be augmented or reduced through litigation, compromise or other development subsequent to the date of this Disclosure Statement.

| CLAIM | | ESTIMATED AMOUNT OF CLAIMS | ESTIMATED DISTRIBUTION |
|---|---|---|---|
| Administrative Expenses (excluding professionals) | | $    168,849 | $168,849(100%) |
| Priority Tax Claims | | $0 | $0  (100%) |
| Class 1 | Secured Claims | $        0 | $        NA |
| Class 2 | Unsecured Claims | $47,918,039 | $5,750,000  (12%) |
| Class 3 | Equity Interests | Common stock | $        0    (0%) |

This estimation is based upon the Debtor's position that it has no exposure to the Internal Revenue Service for tax obligations. See below for a discussion of the potential obligations to Internal Revenue Service. In the unlikely event the Debtor is found to have significant tax obligations to the Internal Revenue Service the estimated total amount to be distributed to Allowed Claims herein then it is possible that holders of Allowed Claims may not be paid as anticipated. Based on

51120724.12

all the available information and on the opinions of its advisors, the Debtor believe that the risk of financially meaningful is negligible.

## VIII.  POST-CONFIRMATION MANAGEMENT

After confirmation of the Plan, the Debtor will employ the following people:

1.     Patrick J. Rusnak as the Chief Executive Officer and President, who will be primarily responsible for executing the Plan and winding up the Reorganized Debtor's affairs.  Mr. Rusnak will be compensated at the rate of $250 per hour.

2.     Jay B. Simmons, as the Executive Vice President, General Counsel and Secretary, who will assist with the execution of the Plan and the winding up of the Reorganized Debtor's affairs, and will coordinate the work of the professionals providing services to the Reorganized Debtor.  Mr. Simmons will be compensated at the rate of $200 per hour.

3.     Shelly Krasselt, as the Principal Accounting Officer, who will provide necessary accounting functions, prepare financial reports, and assist with the execution of the Plan and the winding up of the Reorganized Debtor's affairs.  Ms. Krasselt will be compensated at the rate of $100 per hour.

The above individuals will be paid by the Distribution Agent on a monthly basis and their payments reported as part of the post confirmation reports required under the Bankruptcy Rules.

## IX.  TAX CONSEQUENCES OF THE PLAN

Certain federal income tax consequences of the Plan are described below. The tax consequences are subject to uncertainties, including the taxpayer status of particular creditors, methods of accounting, and prior action taken by creditors with respect to their claims.  Creditors are therefore advised to consult with their tax advisers regarding the individual tax consequences of the Plan.

51120724.12

In general, a Creditor using the accrual method of accounting will recognize a gain or loss on the exchange to the extent that the difference between the cash received is greater or less than the creditor's basis in the claim exchanged. Moreover, the gain or loss will be a capital gain or loss if the creditor held the claim as a capital asset.

A creditor using the cash method of accounting will recognize a gain or loss on the exchange as above, except to the extent that the cash exceeds the original amount of the original claim. In that case, the excess may be treated as interest insofar as interest accrued on the claim and was not previously reported as income by the creditor.

## X. PENDING AND CONTEMPLATED LITIGATION

The Debtor is not currently a party to any litigation or proceedings. The following describes potential claims or adversary proceedings that may be asserted by or against the Debtor:

**A. Tax Claims of the Internal Revenue Service**

The Debtor and the Bank filed consolidated tax returns each year. Based upon net operating losses in prior tax years, the Debtor and the Bank received sizable income tax refunds in recent tax years. Under the Internal Revenue Code, the Internal Revenue Service may examine the returns filed by the Debtor and Bank as far back as 2003 and, if adjustments are made against the Debtor and Bank, potentially demand return of some or all of the amounts that were refunded. The total amount refunded to the Debtor and the Bank based on the tax returns that can still be reviewed is approximately $24 million. In theory, the Internal Revenue Service could audit these returns, conclude the returns were inaccurate and that the Debtor and the Bank owe tax for one or more of the audited tax years, and demand the Debtor and the Bank return some or all of the amounts refunded.

However most of the amount at issue has been subject to an earlier review by the IRS. Further because some of the deductions which produced the refunds were capped by provisions of the Code and were thus not fully taken, the adjustments would have to be huge in magnitude to effect the amount of the refund granted on any year.

The Internal Revenue Service has filed a "protective" claim in this case in the amount of $3,674,802.00. The purpose of the claim is to allow the Joint Committee on Taxation to pass upon the refunds which were awarded under the consolidated returns as provided in Section 6405(a) of the Internal Revenue Code.

The deadline for filing government claims is April 26, 2011. However, the debtor expects no further government claims, precautionary or otherwise.

The Debtor is confident that is has no exposure to the Internal Revenue Service. Further, the Internal Revenue Service has not given any indication that it believes there are any issues with any of the prior tax returns filed by the Debtor and the Bank.

To obtain a prompt and final resolution of any potential liability for pre-prepetition tax obligations to the Internal Revenue Service due for prior tax years or for tax years 2010 or 2011, the Debtor intends to commence a proceeding under section 505 of the Bankruptcy Code. This Bankruptcy Code section authorizes the Bankruptcy Court to determine the amount of any tax, any fine or penalty related to a tax or any addition to a tax on an expedited basis.

**B.    Cappello Suit.**

On February 2, 2011, Cappello Capital Corp. filed suit in Los Angeles, California against the Bank, Sandler O'Neill and 10 unnamed John Doe defendants. The suit demands payment from the defendants of over $11 million, seeks to impose a constructive trust on the sale proceeds and the recapitalization

funds, and seeks a fee of $292,500 on the purchase price of $6.5 million. Sandler has indicated that its agreement with the Bank and AWBC may implicate a claim for indemnity against both of them.

Cappello's claims against AWBC and perhaps the other defendants are barred because they were not an approved professional entitled to compensation in the Bankruptcy case, did not file a claim prior to the claims bar date and for other reasons.

The suit has been removed to the United States District Court for the Central District of California and there is a Motion before that Court to move the case to the Eastern District of Washington.

The suit will very likely delay distributions under the Plan until the claims arising under the suit against AWBC and the proceeds of the Sale are clearly defined. Thus prompt resolution of the litigation will be sought.

**C.    Avoidance Actions**

The Debtor will retain all rights and causes of action authorized by Chapter V of the Bankruptcy Code. This Bankruptcy Code chapter authorizes the Debtor to, under limited circumstances, seek the return of certain transfers made by the Debtor for the benefit of the estate ("Avoidance Actions"). The Debtor has analyzed its books and records to determine if there are potential Avoidance Actions. At this time, the Debtor does not anticipate pursuing any Avoidance Actions against any person or entity.

**D.    Objections to Claims**

The Debtor reserves the right to object to any claims scheduled or filed.

CIT Communications Finance Corporation has filed a claim for lease which is not in default and will be assumed and assigned to the Bank. There will be no

loss to the claimant and there should be no claim allowed to CIT because they will be fully paid as contracted.

The IRS has filed a precautionary claim in the case, but all indications are that this claim will be withdrawn once their audit and determination of no liability has been cleared by the Joint Committee on Taxation.

Several shareholders have filed claims which indicate a misunderstanding of the classification of equity security interests. There is no dispute about the amount of their stated investment, but such claims represent interests, not unsecured claims. Objections to allowance as unsecured claims will be filed as a matter of clarification.

At this time, the Debtor is not aware of other significant claims to which it will object.

## XI. LIQUIDATION ANALYSIS

Liquidation of the assets of the Debtor occurred under the 363 Sale. The tasks that remain are dealing with claims and the mechanics of distribution of the funds held by the Debtor. The alternative to the chapter 11 Plan is conversion of the bankruptcy case to a proceeding under Chapter 7 of the Bankruptcy Code. If that were to happen, a Chapter 7 trustee would be appointed. He or she would incur costs learning the case, and then hire counsel for advice. Debtor believes that conversion to Chapter 7 result in an additional layer of administrative expense that would diminish the funds otherwise available for distribution to Creditors. It is also likely that distribution to Allowed Claims would be substantially delayed.

## XII. FINANCIAL PROJECTIONS

The Debtor will not engage in any operations after confirmation. Thus, financial projections and a discussion of underlying assumptions are not necessary.

51120724.12

# XIII.  PAYMENTS MADE FOR SERVICES

The following amounts have been allowed and/or paid to professionals for services and expenses as of January 31, 2011:

| Name | Amount Incurred | 80% fees + costs | Amount Remaining Due |
|------|-----------------|------------------|----------------------|
| Foster Pepper | $ 134,160.38 | $108,332.38 | $25,828 |
| Morrison & Foerster | $519547.73 | $418,072.43 | $101,475 |
| Sandler O'Neill | $65,179 | $  Fully paid | 0 |

As described in Section III.A.6 above, each month professionals have been paid 80% of their fees and 100% of the expenses pursuant to the Interim Payment Order.  No professional has submitted an application for final approval of fees and expenses, so the Bankruptcy Court has not yet entered an order allowing any fees and expenses.  The Debtor anticipates the above professionals will submit applications by no later than April 28, 2011, seeking the approval of amounts already paid and the approval and payment of the unpaid amounts.

# XIV.  TRANSACTIONS WITH INSIDERS

A. **Post Petition Payments.**

Since the Petition Date, the Debtor has paid insiders the following amounts:

| Name | Amount |
|------|--------|
| Patrick J. Rusnak | $        0 |
| Jay B. Simmons | $        0 |
| Shelly Krasselt | $        0 |
| Kay C. Carnes, Director | $      1200 |
| J. Frank Armijo, Director | $      1200 |
| Craig D. Eerkes, Director | $      1200 |
| Donald H. Swartz II, Director | $      1200 |
| P. Mike Taylor, Director | $      1200 |

B. **Prepetition Payments.**

In the year prior to the Petition Date, the Debtor paid insiders the following amounts:

DEBTOR'S DISCLOSURE STATEMENT – 36 of 41

51120724.12

| Name | Amount |
|------|--------|
| 1.  Patrick J. Rusnak | $        12,500.00 |
| 2.  Jay B. Simmons | $          9,250.00 |
| 3.  Shelly Krasselt | $          5,201.00 |
| 4.  Kay C. Carnes, Director | $          1,200.00 |
| 5.  J. Frank Armijo, Director | $          1,005.00 |
| 6.  Craig D. Eerkes, Director | $          1,172.00 |
| 7.  Donald H. Swartz II, Director | $          1,369.00 |
| 8.  P. Mike Taylor, Director | $          1,218.00 |

As noted in Section II A above, the Bank was a wholly-owned subsidiary of the Debtor.  Prior to and after the Petition Date, the individuals identified on lines 1 through 3 above (collectively, the "Officers") performed services for both the Bank and the Debtor, and the individuals identified on lines 4 through 8 above (collectively, the "Directors") served on the Boards of Directors of both the Bank and the Debtor.  For serving on the boards of the Bank and the Debtor (whose board meetings were held concurrently), the Directors received a monthly retainer of $960, received $520 for attending a board meeting, and additional amounts for service on committees.  The Bank paid the Directors this compensation, and then the Debtor paid the Bank 5% of the amount that was paid to the Directors.  The compensation paid to the Directors during the last 12 months stated above reflects the total amounts the Debtor paid to the Bank for the Debtor's 5% share of the services provided by the Directors the year before the commencement of this Chapter 11 proceeding.

With respect to the Officers, the Bank also paid these individuals their salaries each month, and the Debtor then paid the Bank for 5% of the amounts paid.  The compensation paid during the last 12 months stated above reflects the total amounts the Debtor paid to the Bank for the Debtor's 5% share of the services

51120724.12

provided by the Officers during the year before the commencement of this Chapter 11 proceeding.

The Debtor and the Bank shared other goods and services as well, including legal and accounting services, rents due under personal property and real property leases, and payroll processing services. It was the practice for the Bank to pay all vendors and then the Debtor would reimburse the Bank an agreed percentage for the Debtor's share of those services. In most instances, the agreed amount was 5% of the amount paid by the Bank. Of the stated total amount the Debtor paid to the Bank including reimbursement of goods a services in the 12 months prior to Petition Date, $50,186.25 represents the amount the Debtor reimbursed the Bank for shared services of the Officers, the Directors, and other persons and entities providing goods, services and other matters of value to both the Debtor and the Bank. Since these payments were for and on account of the services and goods provided by the vendors, the Debtor considered these payments to have been made to those vendors and not the Bank.

**C.     Direct Payments to Officers and Board Members,**

After closing of the Sale on December 20, 2010, the Debtor no longer shared the services of the Officers and the Directors with Bank. After the Sale, all of the Directors were required to resign from the board of the Bank. Until the bankruptcy proceeding concludes, the Debtor will still need the services to be provided by the Officers and it still need the Directors for corporate governance. After closing of the Sale, the Debtor paid the Officers $0 and Directors $6000 directly.

**D.     Tax Refunds.**

The Debtor and the Bank have consistently filed Consolidated Returns. Tax liabilities and refunds are allocated between the Debtor and the Bank in accordance with the source of the activity giving rise to the liability or refund. All of the

DEBTOR'S DISCLOSURE STATEMENT – 38 of 41

financially material tax attributes reported in the consolidated returns arose from the operations of the Bank. The Debtor and the Bank have a Tax Sharing agreement which allocates these rights and obligations between them. As the parent company the Debtor executed the consolidated returns and was the recipient of the refunds from the IRS. Over the 12 months prior to the Filing Date $13,228,345 was received on the consolidated returns in refunds from the IRS and turned over to the Bank in accordance with Tax Sharing agreement.

## XV. CONFIRMATION OF PLAN

### A. Voting Procedures

A ballot to be used for voting your acceptance or rejection of the Plan is being mailed to you with this Disclosure Statement and Plan. Holders of claims and equity security interests should read the instructions carefully, complete, date and sign the ballot, and transmit it as instructed. In order to be counted, your ballot must be received at the indicated address not later than \_\_\_\_\_ **a.m./p.m. on _____, 2011**. Failure to vote or a vote to reject the Plan will not affect the treatment to be accorded a claim or interest if the Plan nevertheless is confirmed.

If more than one-half in number of claimants voting and at least two-thirds in amount of the allowed claims of such claimants in each class of claims vote to accept the Plan, such classes will be deemed to have accepted the Plan. For purposes of determining whether a class of claims has accepted or rejected the Plan, only votes of those who have timely returned their ballots will be considered.

### B. Hearing on Confirmation

The hearing on confirmation of the Plan has been set for _____, **2011**, at _____ before the Honorable Patricia C. Williams, 904 W. Riverside, Spokane, Washington. The Bankruptcy Court will confirm the Plan

at the hearing only if certain requirements, as set forth in § 1129 of the Bankruptcy Code and described below, are satisfied.

**C.    Best Interests of Creditors**

If any holder of a claim or interest does not accept the Plan, the Bankruptcy Court must determine that each holder of a claim or interest will receive or retain under the Plan on account of that holder's claim or interest property having a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date.  This is commonly referred to as the "best interests of creditors" standard.  As discussed in the section of this Disclosure Statement entitled "Liquidation Analysis," unsecured creditors would likely realize substantially less in the event of conversion of the case to a Chapter 7 proceeding than they will receive under the Plan.  Accordingly, the Debtor believes that the Plan satisfies this test.

**D.    Feasibility**

The Debtor must also establish that confirmation of the Plan is not likely to be followed by liquidation or the need for financial reorganization.  Because the Plan does not provide for future business operations but simply the distribution of proceeds, "feasibility" is virtually assured.

**E.    Treatment of Dissenting Classes of Creditors**

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan.  Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class.  Because no junior class of claims or interests will receive

any distribution unless and until each senior class is paid in full, the Debtor believes that this requirement of the Bankruptcy Code will be met.

**F.      Effect of Confirmation**

The provisions of the Plan will bind the Debtor and all other parties in interest, including any creditor or equity security holder of the Debtor, whether or not such creditor or shareholder is impaired under the Plan and whether or not such creditor or equity security holder has accepted the Plan.

**XVI.  CONCLUSION**

The Debtor has endeavored to obtain the best possible outcome for its creditors in this case, and believes that the Plan described above is fair and equitable for all concerned.  Your acceptance of the Plan is therefore recommended.

DATED this 15th day of March, 2011.

**AmericanWest Bancorporation,**
**Debtor and Debtor in Possession**

*s/ Patrick J. Rusnak*

_____
Patrick J. Rusnak, CEO
AmericanWest Bancorporation

51120724.12