1
2
3
4
5

Dillon E. Jackson WSBA #1539
Christopher M. Alston, WSBA #18823
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Telephone: (206) 447-4400
Facsimile No.: (206) 447-9700

The Honorable Patricia C. Williams
Chapter 11

6
7

Counsel for
AMERICANWEST BANCORPORATION

8

9
10
11

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

12

In Re:

Case No. 10-06097-PCW-11

13
14
15
16
17

AMERICANWEST
BANCORPORATION,

               Debtor.

Chapter 11

**ORDER APPROVING
DISCLOSURE STATEMENT
AND PROVIDING FOR NOTICE
AND BALLOT AND RESPONSE
DATES ON PLAN**

18
19
20
21
22
23
24
25
26

    THIS MATTER came before the Court on May 12, 2011 upon the request of
AmericanWest Bancorporation ("Debtor"), debtor-in-possession herein for
approval of the Debtor's Disclosure Statement As Amended ("Disclosure
Statement") and providing for notice for the hearing on confirmation. The Court
has reviewed the files and records herein and deeming itself fully advised, finds
and concludes as follows:

    A.    Notice hereof was properly given in accordance with applicable rules;

**ORDER APPROVING
DISCLOSURE STATEMENT
— 1 of 3**
51143176.3

B.     The Disclosure Statement contains information of a kind, and in sufficient detail, as far as is reasonably practicable under the circumstances, that would enable a hypothetical reasonable investor to make an informed judgment about the plan;

C.     The Disclosure Statement otherwise complies with applicable provisions of the Bankruptcy Code and the Federal Rules of Bankruptcy Procedure; and

D.     The Court finds and concludes that the Disclosure Statement complies in all respects with § 1125 of the Bankruptcy Code.

E.     Debtor's request to limit notice to creditors is appropriate because equity security holders are to receive nothing under the Plan and are deemed as a matter of law to have rejected the Plan.

Now, therefore, based on the foregoing, it is hereby

**ORDERED THAT:**

1.     The Disclosure Statement, in the form attached hereto as **Exhibit A**, is approved and the Debtor may now solicit acceptances or rejections of the Plan of Reorganization ("Plan") pursuant to 11 U.S.C. § 1125 attached hereto as **Exhibit B**.

2.     The Debtor shall cause to be placed in the mail to all creditors and other parties filing requests for notice indicated on the official mailing matrix maintained by the Clerk of the Court a copy of the Plan and the Disclosure Statement, along with a ballot, in the form attached hereto as **Exhibit C** on which creditors may indicate acceptance or rejection of the Plan.

3.     All ballots shall be served on counsel for the Debtor not later than Wednesday, **June 15, 2011 not later than 5:00 p.m.** in order to be considered.

**ORDER APPROVING
DISCLOSURE STATEMENT
– 2 of 3**
511431176.3

1    4.    The Debtor shall file with the Court a Report of Ballots on or before

2    Friday, **June 17, 2011**.

3    5.    Any objections to confirmation of the Plan shall be filed with the

4    Court and served on Debtor's counsel no later than Tuesday, **June 21, 2011**.

5    6.    A hearing shall be held commencing on Thursday, **June 30, 2011** at

6    **11:00 a.m.** in court for this Court's consideration of confirmation of the Plan and

7    any objections thereto which have been timely filed pursuant to the terms of this

8    Order.

9

10

11

12

13

14

15

16

17

18

19

20

21    Presented by:

22    FOSTER PEPPER PLLC

23    */s/ Dillon E. Jackson*
      Dillon E. Jackson, WSBA #1539

24    Christopher M. Alston, WSBA #1882?

25    Counsel for American
26    West Bancorporation

_Patricia C Williams_
Patricia C. Williams
Bankruptcy Judge

05/13/2011 10:27:58

**ORDER APPROVING
DISCLOSURE STATEMENT**
– 3 of 3
51143176.3

# EXHIBIT A

1  Dillon E. Jackson WSBA #1539                The Honorable Patricia C. Williams
2  Christopher M. Alston, WSBA #18823                                  Chapter 11
   FOSTER PEPPER PLLC
3  1111 Third Avenue, Suite 3400
   Seattle, Washington  98101-3299
4  Telephone:  (206) 447-4400
5  Facsimile No.:  (206) 447-9700

6  Counsel for
7  AMERICANWEST BANCORPORATION

8

9              UNITED STATES BANKRUPTCY COURT
              EASTERN DISTRICT OF WASHINGTON
10                      AT SPOKANE

11

12 In Re:                              |  Case No. 10-06097-PCW-11

13 AMERICANWEST                        |  Chapter 11
   BANCORPORATION,
14                                      |  **DEBTOR'S DISCLOSURE**
15                          Debtor.     |  **STATEMENT**

16

17     AMERICANWEST BANCORPORATION ("AWBC") submits the

18 following Debtor's Disclosure Statement pursuant to Chapter 11 of the Bankruptcy

19 Code.

20                      **I. INTRODUCTION**

21 **A.    General**

22     On October 28, 2010 (the "Petition Date"), AWBC (also referred to as

23 "Debtor") filed a voluntary petition for relief under Chapter 11 of Title II of the

24 United States Code (the "Bankruptcy Code") with the United States Bankruptcy

25 Court for the Eastern District of Washington at Spokane (the "Bankruptcy Court").

26

DEBTOR'S DISCLOSURE STATEMENT – 1 of 40
51120724.16

1    Pursuant to Section 1125 of the Bankruptcy Code, Debtor has prepared and
2    filed this Disclosure Statement, which was approved by the Bankruptcy Court on
3    May 12, 2011, for submission to holders of claims, along with the Plan of
4    Distribution (the "Plan"). The Disclosure Statement is provided for the purpose of
5    explaining the Plan and to give creditors information so that they may have a better
6    understanding of the Debtor and its Plan and thereby make a reasonably informed
7    decision in exercising their right to vote on acceptance of the Plan.

8    THE ONLY REPRESENTATIONS WHICH ARE AUTHORIZED OR
9    WHICH MAY BE MADE CONCERNING THE DEBTOR, THE VALUE OF ITS
10   ASSETS OR THE PLAN OF LIQUIDATION, ARE THE REPRESENTATIONS
11   CONTAINED HEREIN. THE FINANCIAL INFORMATION CONTAINED IN
12   THIS DISCLOSURE STATEMENT HAS NOT BEEN SUBJECT TO AN AUDIT
13   BY AN INDEPENDENT CERTIFIED PUBLIC ACCOUNTANT. FOR THAT
14   REASON, THE DEBTOR IS NOT ABLE TO WARRANT OR REPRESENT
15   THAT THE INFORMATION CONTAINED IN THE DISCLOSURE
16   STATEMENT IS WITHOUT INACCURACY. HOWEVER, GREAT EFFORT
17   HAS BEEN MADE TO ENSURE THAT ALL SUCH INFORMATION IS
18   FAIRLY PRESENTED.

19   **B.    Chapter 11 Plan Confirmation Process**

20   The Bankruptcy Code is a remedial statute designed to effect the
21   reorganization of financially distressed entities and individuals or the orderly
22   liquidation of their assets. Formulation and confirmation of a plan is a principal
23   function of a chapter 11 case. The plan may affect the claims and interests of all
24   parties, provide for the assumption or rejection of executory contracts and
25   unexpired leases, and provide for the prosecution or settlement of claims belonging
26   to the bankruptcy estate.

1        **1.**    <u>Confirmation Requirements and Conditions Precedent</u>. A plan can be
confirmed by the Bankruptcy Court and made binding on a impaired class of
creditors if it is accepted by the holders of at least two-thirds in dollar amount and
one-half in number of the claim holders who have voted on the plan. The plan can
be confirmed by the Bankruptcy Court, and made binding on an impaired class of
interests if it is accepted by the holders of at least two-thirds in dollar amount of
the interest holders who have voted on the plan.

In the event that the requisite number of acceptances of a particular class
which is impaired under a plan is not obtained, the Bankruptcy Court may
nonetheless confirm the plan if the Bankruptcy Court finds under Section 1129(b)
of the Bankruptcy Code that the plan accords fair and equitable treatment of any
such class rejecting the plan. Additionally, a debtor may ask the Court to find that
certain of the classes are impaired. Creditors and interest holders whose claims are
unimpaired are deemed to have accepted the plan.

The Bankruptcy Code requires that if a class of claims is impaired under the
plan, at least one class of claims that is impaired must vote to accept the plan in
order for the plan to be confirmed.

Further, in order for the plan to be confirmed, the Bankruptcy Code requires,
among other things, that (a) the plan be proposed in good faith, (b) the debtor
disclose specified information concerning payments made or promised in insiders,
and (c) the plan comply with the applicable provisions of chapter 11 of the
Bankruptcy Code. Section 1129(a) of the Bankruptcy Code also imposes
requirements that (a) confirmation of the plan is not likely to be followed by the
need for further financial reorganization, and (b) the plan be fair and equitable with
respect to each class of claims or equity security (stock) interests which is impaired
under the plan.

Before the plan may be confirmed, the Bankruptcy Court must find (with certain exceptions) that the plan provides, with respect to each class, that each holder of a claim or equity security interest of such class either (a) as accepted the plan, or (b) will receive or retain under the plan on account of such claim or equity security interest, property of a value, as of the Effective Date (as defined in the plan), that is not less than the amount that such persons would receive or retain if the debtor were, on the Effective Date, liquidated under Chapter 7 of the Bankruptcy Code.

2. <u>Modification of the Plan</u>.  The Debtor may propose amendments to or modifications of a plan under Section 1127 of the Bankruptcy Code at any time prior to the date on which the Court enters an order confirming the plan (the "<u>Confirmation Date</u>").  After the Confirmation Date, the Debtor may remedy any defects or omissions or reconcile any inconsistencies in the plan or in the order confirming the plan pursuant to Section 1129 of the Bankruptcy Code (the "<u>Confirmation Order</u>") in such manner as may be necessary to carry out the purposes and intent of the plan so long as the holders of Claims and Equity Security Interests are not materially and adversely affected.

3. <u>Revocation of the Plan</u>.  The Debtor reserves the right to revoke and withdraw the Plan at any time prior to the Confirmation Date.  In the event of such withdrawal or revocation, or if confirmation does not occur, the Plan shall be deemed null and void.  In such event, nothing contained herein shall be deemed to constitute a waiver or release of any claims by or against the Debtor or to prejudice in any manner the rights of the Debtor.

4. <u>Defined Terms</u>.  The defined terms used in this Disclosure Statement shall have the meanings stated in the Plan unless otherwise stated.

51120724.16

10-06097-PCW11 Doc 215 Filed 05/13/11 Entered 05/13/11 13:38:17 Pg 8 of 74

1    5.    Underdefined Terms.  A term used in the Plan and not otherwise defined

2  herein but that is defined in the Bankruptcy Code has the meaning stated in the

3  Bankruptcy Code.  A term used in the Disclosure Statement and not otherwise

4  defined herein and not defined in the Bankruptcy code, but defined in the Plan has

5  the meaning stated in the Plan.  To the extent of any inconsistencies between the

6  Plan and the Disclosure Statement, the Plan shall supersede the Disclosure

7  Statement.

## II. DESCRIPTION OF THE BUSINESS OF THE DEBTOR AND HISTORY OF THE DEBTOR PRIOR TO FILING

### A.    General Background

Founded in 1983, AWBC, headquartered in Spokane, Washington, is a
Washington corporation registered as a bank holding company under the Bank
Holding Company Act of 1956.  AWBC is the direct or indirect corporate parent of
two non-debtor subsidiaries: AmericanWest Bank (the "Bank"), a Washington
state-chartered bank that is insured by the Federal Deposit Insurance Corporation
("FDIC") and wholly-owned by AWBC; and AmericanWest Holdings, Inc., a
Washington corporation that is wholly-owned by the Bank.  The Bank operates in
Eastern and Central Washington and Northern Idaho, and in Utah where it
conducts business under the tradename of "Far West Bank."  Unless otherwise
indicated, references herein to the "Company" collectively refer to AWBC and the
Bank.

Prior to the Sale described in Section II G below, AWBC functioned as a
holding company for the Bank, which was its primary asset.  The Bank gathers
deposits and provides loans to approximately 77,000 customers across the Inland
Northwest through branches located primarily in Spokane, Yakima, Walla Walla,
and the Tri-Cities area.  The Bank serves customers in a total of 58 branches,

DEBTOR'S DISCLOSURE STATEMENT – 5 of 40
51120724.16

1 | including a branch in Salt Lake City, Utah, and branches in suburban and rural
2 | communities in Eastern and Central Washington, Northern Idaho, and Utah. As of
3 | the Petition Date, the Company collectively had approximately 540 employees
4 | across its 58 branches and two support facilities.

5 | The Bank offers agricultural loan products and commercial loan products to
6 | hundreds of farmers and small businesses across its market areas in Washington,
7 | Idaho, and Utah. The Bank offers a variety of deposit accounts to both consumer
8 | and business customers, including checking accounts, money market demand
9 | accounts, and savings accounts. Numerous services also provide the Bank's
10 | consumer and business customers with convenient bank access, including ACH
11 | origination, remote check capture (i.e., on-site imaging and electronic processing
12 | of checks), sweep accounts, and currency services. The Bank also generates non-
13 | interest income by offering both consumer and business credit cards and merchant
14 | bankcard services through arrangements with third-party providers.

15 | The Bank and AWBC are highly regulated institutions. The principal
16 | regulators of the Bank are the FDIC and the Washington Department of Financial
17 | Institutions (the "DFI"). The principal regulators of AWBC are the Board of
18 | Governors of the Federal Reserve System and the Federal Reserve Bank of San
19 | Francisco. Unless context otherwise requires, references herein to the
20 | "Regulators" collectively refer to these four state and federal regulatory agencies.

21 | **B.    The Bank's Capital Structure and AWBC's TruPS**

22 | AWBC held 100% of the equity ownership in the Bank totaling 429,000
23 | issued and outstanding shares of common stock of the Bank, no par value (the
24 | "Shares"). No other shares of capital stock of the Bank are issued or outstanding.
25 | All of the Shares of the Bank were owned by AWBC.

26 |

DEBTOR'S DISCLOSURE STATEMENT – 6 of 40
51120724.16

As of September 30, 2010, AWBC had outstanding unsecured indebtedness totaling approximately $47.2 million,[1] consisting of: (a) four outstanding issuances of junior subordinated debentures issued to four statutory trusts (the "Trusts") that in turn issued their preferred securities, commonly known as Trust Preferred Securities or "TruPS," to investors; and (b) approximately $50,000 in trade debt. The principal amount of AWBC's junior subordinated debt was approximately $41.2 million, which backs exactly $40 million of TruPS issued to investors.[2] The accrued interest on the junior subordinated debentures totaled $6.0 million. Wilmington Trust Company acts as trustee of two of the Trusts and U.S. Bank acts as trustee of the other two Trusts (the "Indenture Trustees"). Each of the four Trust agreements provide that the junior subordinated debentures shall be junior to certain obligations of AWBC, such as indebtedness for all borrowed money ("Senior Indebtedness").[3] The junior subordinated debentures are not subordinated

---

[1] This total includes the $6.0 million of accrued deferred interest relating to the issuance of TruPS. Such interest, however, has not been capitalized and is not included in the principal balance of $41.2 million described herein.

[2] The excess amount of the debentures over the amount of the TruPS represents the common equity of the Trusts, which is held by AWBC. The common equity interest has no economic value.

[3] Each Trust agreement defines "Senior Indebtedness" to mean, with respect to AWBC, (i) the principal, premium, if any, and interest in respect of (A) indebtedness of AWBC for money borrowed and (B) indebtedness evidenced by securities, debentures, notes, bonds or other similar instruments issued by AWBC; (ii) all capital lease obligations of AWBC; (iii) all obligations of AWBC issued or assumed as the deferred purchase price of property, all conditional sale obligations of AWBC and all obligations of AWBC under any title retention agreement; (iv) all obligations of AWBC for the reimbursement of any letter of credit, any banker's acceptance, any security purchase facility, any repurchase agreement or similar arrangement, any interest rate swap, any other hedging arrangement, any obligation under options or any similar credit or other transaction; (v) all obligations of the type referred to in clauses (i) through (iv) above of other Persons for the payment

DEBTOR'S DISCLOSURE STATEMENT – 7 of 40
51120724.16

to AWBC's trade debt. AWBC has no obligations that could be characterized as Senior Indebtedness.

Each of the four TruPS issuances corresponding to AWBC's four issuances of debentures (the "AWBC TruPS") was sold as a block into a separate limited liability company (each a "PreTSL").[4] Each PreTSL issued several tranches, or priorities, of notes (e.g., Class A 1 Senior Notes, Class A 2 Senior Notes, Mezzanine Notes, and Subordinated Notes) to numerous institutional and accredited and individual investors through offerings exempt from securities registration. Each PreTSL's notes are collateralized with the TruPS held by that PreTSL, along with TruPS and debt obligations of other entities. The PreTSLs are unmanaged, pooled collateralized debt obligations (or "CDOs"), with Bank of New York Mellon ("BNYM") acting as CDO trustee under the indenture applicable to each PreTSL.

## C.     The Company's Objectives

As described below, the Bank has been subject to significant regulatory action by the Regulators for over two years. For some months prior to the Petition Date it was clear that if AWBC was unable to recapitalize the Bank promptly, it faced possible seizure of the Bank by the DFI and appointment of the FDIC as

---

of which AWBC is responsible or liable as obligor, guarantor or otherwise; and (vi) all obligations of the type referred to in clauses (i) through (v) above of other Persons secured by any lien on any property or asset of AWBC (whether or not such obligation is assumed by AWBC), whether incurred on or prior to the date of this Indenture or thereafter incurred.

[4] "PreTS[SM]" is a registered service mark, derived from "Preferred Term Securities," another term for trust preferred securities. "PreTSL" is the common shorthand for each of the limited liability companies that has issued PreTS[SM] collateralized by AWBC's TruPS, , with each such company having a name in the form of "Preferred Term Securities [#] Limited" with the "[#]" representing the Roman numeral designating the specific entity.

DEBTOR'S DISCLOSURE STATEMENT – 8 of 40
51120724.16

receiver. A receivership for the Bank could have resulted in a $330 million dollar loss to the FDIC's Deposit Insurance Fund and would have resulted in a total loss for AWBC and its creditors.

AWBC commenced this Chapter 11 case as the only plausible mechanism to recapitalize the Bank while protecting, to the greatest extent possible, AWBC's creditors. By commencing this Chapter 11 case, AWBC sought to sell its 100% equity ownership in the Bank and the Other Purchased Assets (as defined in the APA described below) on an expedited basis, concurrently with the recapitalization of the Bank by the Purchaser (defined below) in order to comply with regulatory requirements.

Absent a sale of the Shares and the Other Purchased Assets to a well qualified bank or bank holding company concurrent with a significant capital infusion by the Purchaser, the Bank would not have been able to meet the Regulators' capital requirements and would ultimately be placed into receivership. The Purchaser presented the Bank with the requisite financial resources to acquire and recapitalize the Bank and with the regulatory posture to obtain regulatory approval for the transaction (having been approved on October 26, 2010, by the Federal Reserve Board to become a bank holding company).

Any course of action other than a sale of the Shares and the Other Purchased Assets would have precluded the return of any value to the AWBC's creditors, and would have resulted in adverse consequences for the Bank's customers, communities, and employees. An expedited sale of the Shares and the Other Purchased Assets at the best possible price, with the Purchaser's commitment to concurrently recapitalize the Bank, was the only feasible way to establish the Bank as a viable institution on an ongoing basis and protect, to the greatest extent possible, AWBC's creditors and other stakeholders.

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 13 of 74

**D.     Factors Leading to the Sale**

The current financial and credit crisis — resulting in approximately 325 nationwide bank failures since 2008[5] — significantly hampered the Bank's business and ability to meet certain state and federal regulatory requirements for capital, profitability, and credit quality.  Beginning approximately three years ago, effects from the housing crisis, including tumbling home prices, soaring loan defaults, and high unemployment rates, began to take their toll on the Bank's, and ultimately the Company's, financial condition.

**E.     The Company's Efforts to Recapitalize**

Beginning in 2007, the Company's management initiated efforts to deal with asset quality problems in its loan portfolio, reduce expenses, build capital reserves, and take other appropriate actions to return the Bank to profitability and reduce its risk profile.  However, in early 2008 it became clear to the Company's management and Board of Directors that additional capital would be required to address the Bank's financial problems.

Beginning in 2008 and continuing to the Petition Date, the Company undertook significant efforts to raise additional capital, including efforts to sell Bank assets, or to sell AWBC or the Bank to another financial institution.

**F.     State and Federal Regulatory Actions**

The Company's inability to raise additional capital was a major cause of increased scrutiny and action by the Regulators and created significant risk that the Bank would be seized if not recapitalized on an expedited time frame consistent

---

[5] Twenty-five banks failed and were taken over by the FDIC in 2008, while 140 failed in 2009.  Nearly 160 banks failed in 2010.  <u>See</u> http://www.fdic.gov/bank/individual/failed/banklist.html.

51120724.16

with the transactions described below. A recapitalization of the Bank was critical if the Bank was to be restored to financial viability on an ongoing basis.[6]

As a result of the Bank's announcement that it had ceased to be "well-capitalized" as of June 30, 2008, the DFI conducted an off-site interim examination of the Bank's financial health. This led to the first of a series of increasingly serious enforcement actions against the Bank or AWBC by the FDIC, DFI, and the Federal Reserve Bank of San Francisco ("FRB"), which regulated AWBC as a bank holding company. First, the DFI issued a Supervisory Directive against the Bank effective August 8, 2008 (the "DFI Directive"). The DFI Directive required the Bank to provide periodic liquidity and credit quality reports, update the DFI regarding the status of liquidity planning and previously announced capital raising initiatives, notify the DFI about significant changes in management and financial condition, retain a permanent Chief Executive Officer, and seek prior written consent of the DFI before paying dividends.[7]

Second, on February 2, 2009, the FDIC issued a Prompt Corrective Action Notification (the "PCA Notification") to the Bank. The PCA Notification was issued under the Prompt Correction Action provisions of the FDIA and FDIC regulations. The FDIA and FDIC regulations identify five capital categories for banking institutions — well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized. The PCA Notification formally advised the Bank that it was significantly undercapitalized,

---

[6] "Recapitalization" as used in this Disclosure Statement means an infusion of funds into the Bank sufficient to satisfy capital requirements imposed by the DFI and FDIC.

[7] On September 17, 2009, the DFI notified the Bank that the DFI Directive was being rescinded, as it had been effectively superseded by the PCA Directive discussed below.

51120724.16

which is the next-to-lowest capital category. As such, the Bank was required to submit a capital restoration plan (the "Capital Restoration Plan"), and it became subject to a wide range of restrictions relating to its senior management team, management compensation, dividends, loan loss reserves, reductions in troubled assets, liquidity, asset growth, and other aspects of its business. In response to the PCA Notification, the Bank submitted its Capital Restoration Plan to the FDIC on March 20, 2009, which the Bank subsequently amended on July 2, 2009. That Capital Restoration Plan was rejected.

Third, on May 8, 2009, the Bank entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (the "Stipulation") with the FDIC and the DFI. Pursuant to the Stipulation, the FDIC and the DFI issued an Order to Cease and Desist (the "Cease and Desist Order") against the Bank on May 11, 2009. The Cease and Desist Order required, among other things, that the Bank take actions necessary to return to the "well-capitalized" category by September 9, 2009.

Fourth, on September 15, 2009, AWBC entered into a Written Agreement (the "Written Agreement") with the FRB, imposing on AWBC restrictions and requirements substantially similar to those contained in the PCA Notification and the Cease and Desist Order, including the obligation to submit a capital restoration plan.

Fifth, on February 26, 2010, the Bank received a Prompt Corrective Action Directive (the "PCA Directive") from the FDIC. The PCA Directive directed the Bank to recapitalize within 30 days of receipt, and reiterated various requirements previously imposed on the Bank by the Cease and Desist Order.

Taken together, the Cease and Desist Order and the PCA Directive required the Bank, among other things, to recapitalize or accept an offer to be acquired by or combine with another financial institution by March 28, 2010.

Although the Company's management had undertaken all actions within its power to comply with all aspects of the PCA Notification, the Cease and Desist Order, the Written Agreement, and the PCA Directive (collectively, the "Regulatory Orders"), the Company was unable to comply with their most important terms — the recapitalization or sale of the Bank. Full satisfaction of the Regulatory Orders depended on raising a significant amount of additional capital. A recapitalization of the Bank was the only path for restoring the Bank to financial viability on an ongoing basis.

The Bank continued to remain in the significantly undercapitalized capital category. Any undercapitalized banking institution, and particularly one that is critically undercapitalized and has failed to comply with an order to recapitalize, is subject to a wide variety of enforcement remedies by the FDIC. Most significantly, a critically undercapitalized institution may be seized at any time by the DFI and placed in an FDIC receivership. If this had occurred AWBC's investment in the banking Bank would have been wiped out (with its creditors adversely affected as well), the institution would have been sold or liquidated at a substantial loss to the FDIC's deposit insurance fund, many of the institution's employees would have lost their jobs, customers with deposits in excess of FDIC insurance limits would be at risk of losing that portion of their deposits, borrowers deprived of needed financing, and the communities served by the Bank will be adversely impacted by its loss.

During the current financial crises, very few, if any, banking institutions that have received prompt corrective action directives have been able to avoid seizure

1 and FDIC receivership and loss of the shareholders' complete investment. A
2 review of prompt corrective action directives issued since January 2009 in the
3 FDIC's Western Region — in which the Bank is included — indicates that 26 of
4 the 30 banks that received such directives were ultimately seized by the FDIC. On
5 average, the time between the deadline for compliance with a prompt corrective
6 action directive and the seizure of the institution was only 68 days. As of the
7 Petition Date, the Bank had already gone over 240 days since it failed to comply
8 with the PCA Directive's capital raising requirement. The period of time that the
9 Bank continued to exist, when contrasted with the experience of other banking
10 institutions in the Western Region, is unique. The experience of these other banks
11 demonstrates that no banking institution that is significantly undercapitalized could
12 reasonably expect to remain open for such a period of time.

13 **G.    Work with Interested Parties**

14      Prior to the Petition Date, the Company considered a number of investment
15 strategies to achieve a successful capital raise. The Company and its investment
16 banking firm, Sandler O'Neill & Partners, L.P., a recognized investment banking
17 firm with particular experience with respect to financial institutions, ("Sandler"),
18 contacted approximately 100 parties, executing confidentiality agreements with 67
19 of such parties. As it identified new potential investment strategies, the Company
20 and Sandler re-contacted qualified parties who had previously expressed interest in
21 a transaction with the Company.

22      In February 2010, in addition to the Company's engagement of Sandler, the
23 Company retained Cappello Capital Corp. ("Cappello"), as a second financial
24 advisor.

25

26

### H. Agreement With Purchaser

Following its comprehensive marketing efforts, after 30 months of strategic analysis and negotiations, including discussions with the Regulators and the FRB, the Company, in consultation with Sandler, identified the bid by SKBHC Holdings LLC and its wholly-owned subsidiary SKBHC Hawks Nest Acquisition Corp. (collectively, the "Purchaser"), for the Shares and the Other Purchased Assets as the only viable way to accomplish the necessary recapitalization of the Bank and to protect the interests of AWBC's creditors. After extensive negotiations regarding the terms and conditions thereof, AWBC and the Purchaser agreed, in principle, to the key terms of the sale of the Shares to the Purchaser (the "Sale"), and executed an asset purchase agreement with the Purchaser (the "APA").

As effectuated, the Sale recapitalized the Bank, ensured the Bank's regulatory compliance, maximized the value available for AWBC's creditors, preserved hundreds of jobs, and saved the FDIC many millions of dollars, while simultaneously allowing the Bank to continue serving the needs of thousands of individuals and businesses in the Bank's market areas.

### I. Discussions with the Regulators

During the months preceding this Chapter 11 filing, the Company's management engaged in numerous detailed discussions and in-person meetings with the Regulators to keep them apprised of its recapitalization efforts. Many of these conversations focused on the requirements of the Regulators for approval of a sale and recapitalization of the Bank, and whether the FDIC and DFI would defer regulatory action to allow recapitalization to proceed. Generally, throughout the process, the Regulators remained supportive of the Company's recapitalization efforts. In the three months prior to the Petition Date, the Company introduced to the Regulators, in a number of meetings, the prospect of a Section 363 bankruptcy

DEBTOR'S DISCLOSURE STATEMENT – 15 of 40
51120724.16

1  sale as the potential key to overcome the obstacles that the Company had
2  encountered in its recapitalization efforts.  After the Purchaser emerged as a
3  potential party to such a transaction, both representatives of the Purchaser and
4  management of the Company explored in depth with the Regulators the proposed
5  transaction, including the bankruptcy sale process.

6       The Regulators needed to evaluate the regulatory applications that Purchaser
7  contemplated submitting before passing on the transaction.  However, the
8  Regulators did not object to this bankruptcy filing as a means to secure adequate
9  capital for the Bank.

10  **J.      The DIP Facility**

11       In order to help reduce the risk of adverse supervisory action before a sale of
12  the Shares and the Other Purchased Assets can be consummated, prior to the
13  Petition Date, AWBC negotiated a debtor-in-possession loan agreement (the "DIP
14  Facility") with the Purchaser to obtain the working capital necessary to fund
15  AWBC's Chapter 11 case.

16       AWBC had an immediate need to access additional operating capital in
17  order to fund the day-to-day operating expenses of its business, including
18  payments to remaining employees and professionals sought to be retained in this
19  Chapter 11 case.  Such payments were necessary to sustain the going-concern
20  value of the Bank and ensure its future viability.  Moreover, access to additional
21  operating capital enabled AWBC to demonstrate to its regulating entities, vendors,
22  suppliers, and employees that it has sufficient liquidity to continue to operate its
23  business, maintain its properties, and pay necessary expenses during the crucial
24  first days of its reorganization efforts and the pendency of this Chapter 11 case.

25

26

As set forth in the DIP Credit Agreement, and subject to the terms and conditions thereof, Purchaser agreed to provide the DIP Facility with a total commitment of up to $2 million.

Among other features, the DIP Facility included certain safeguards for Purchaser's protection as a debtor-in-possession lender, since as a lender it bore the full risk of any decline in the value of the Shares and the Other Purchased Assets that would serve as its collateral. The DIP Facility was secured by a senior secured, superpriority lien on AWBC's assets and the proceeds thereof.

## III. EVENTS DURING CHAPTER 11 CASE

**A. Post-Bankruptcy Developments.**

1. <u>AWBC Continued as Debtor-In-Possession</u>. Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, AWBC has continued in the management and possession of its property as a debtor-in-possession since the Petition Date. No trustee or examiner has been appointed in this case.

2. <u>Hiring of Professionals</u>. Shortly after the filing of the petition, Debtor sought and obtained Bankruptcy Court approval of Foster Pepper PLLC ("<u>Foster Pepper</u>") as its counsel. The Bankruptcy Court also authorized the Debtor to employ the following professionals:

        a)     Morrison & Foerster LLP as Special Counsel; and

        b)     Sandler O'Neill & Partners LP as Financial Advisors

        c)     BDO Seidman LLP as Accountants

3. <u>The Creditors' Committee</u>. Shortly after the case was filed, an Unsecured Creditors' Committee (the "<u>Committee</u>") was formed by the United States Trustee. The members of the Committee are three of the four Trusts described in Section I B above. The Committee appeared and participated in the case by and through the attorneys for the two Indenture Trustees. Through the

1     Indenture Trustees' attorneys, the Committee members have monitored and
2     conferred with the Debtor on the activities of the Debtor during the case.

3        4.    Approval of the DIP Facility. The Debtor filed a Motion to approve
4     the DIP Facility (the "DIP Motion"), by which the Purchaser agreed to allow
5     AWBC to utilize the cash collateral generated by its collateral.

6        The DIP Motion was approved by the Bankruptcy Court on November 18,
7     2010.

8        5.    Post-Petition Marketing Efforts and Approval of the Sale. Concurrent
9     with filing the petition commencing this Chapter 11 case, the Debtor filed its
10    Motion for Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), and 365; Fed. R. Bankr.
11    P. 2002, 6004, 6006, and 9014; and L.B.R. 6004-1 (I) Approving (A) Bidding
12    Procedures and (B) the Form and Manner of Notice of (i) the Sale of Certain
13    Assets and (ii) the Assumption and Assignment of Certain Executory Contracts,
14    and Granting Related Relief; (II) Authorizing and Approving (A) the Sale of
15    Certain Assets and (B) the Assumption and Assignment of Certain Executory
16    Contracts; and (III) Waiving of the 14-Day Stay of Fed. R. Bankr. P. 6004(h) and
17    6006(d) (the "Sale Motion"). The Bankruptcy Court entered an order approving
18    procedures for parties interested in submitting competing bids for the Shares and
19    Other Purchased Assets and establishing November 29, 2010 as the deadline for
20    submitting competing bids and December 9, 2010 as the date for a hearing to
21    approve a sale of the Share and Other Purchased Assets to the party making the
22    highest and best offer (the "Bidding Procedures Order").

23        The Debtor continued its marketing efforts to ensure a competitive bidding
24    process. Specifically, the Debtor's counsel contacted interested parties by:

25            •    Sending copies of the Bidding Procedures Order, the Sale
26                Motion, and the Notice of Sale to all parties that had previously

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 22 of 74

expressed interest and had been given access to the Company's electronic data room, as well as to all parties that had entered appearances in the case and filed requests for special notice;

- Publishing notice of the Bidding Procedures and deadlines in the national edition of *The Wall Street Journal*, as well as *The Seattle Times*, *The Spokesman-Review*, and *The Salt Lake Tribune*; and

- Sending notice of bankruptcy court pleadings to all creditors.

These steps were designed to provide all interested parties an opportunity to bid pursuant to the Bidding Procedures Order.

In addition to these affirmative post-petition marketing efforts, the Company engaged with and was responsive to inquiries from several interested parties, including Columbia Banking System, Inc., the holding company for Columbia State Bank headquartered in Tacoma, Washington ("Columbia"). Upon execution of a non-disclosure agreement on November 4, 2010, Columbia's designated personnel were immediately provided access to AWBC's virtual data room ("VDR"). Based upon a review of information in the VDR, on November 5, 2010, Columbia provided AWBC with a listing of approximately 300 loan files selected for on-site review. Approximately ten representatives of Columbia engaged in on-site due diligence, including a review of loan files and other information, at the Bank's administrative office in Spokane, Washington on November 8-10, 2010. Although accommodations were provided for Columbia personnel to continue the due diligence work on November 11 (a federal banking holiday) and November 12, Columbia elected to terminate the on-site diligence on November 10.

Sandler engaged with and was responsive to inquiries from three other interested parties in addition to Columbia. A new private equity firm that had not

1   expressed interest pre-petition signed a non-disclosure agreement and reviewed

2   materials in the VDR. Sandler had several phone conversations with this private

3   equity firm from November 15, 2010 through November 23, 2010, during which

4   time Sandler assisted the private equity firm in conducting its due diligence of the

5   Company. On November 23, 2010, the private equity firm indicated that it would

6   not be submitting a bid. The other two parties with whom Sandler had contact

7   declined to execute a confidentiality agreement that would have allowed them to

8   access the VDR and conduct due diligence of the Company.

9        Notwithstanding the marketing efforts of the Debtor and the simultaneous

10   marketing efforts pursued by Sandler, no additional bids were received prior to the

11   November 29, 2010 bid deadline. Accordingly, no auction was conducted and the

12   Purchaser was deemed to be the successful bidder.

13        The Bankruptcy Court approved the Sale Motion and the Sale to Purchaser

14   on December 9, 2010. The Sale Agreement closed in accordance with the terms of

15   the APA on December 20, 2010, and the Purchaser paid the Debtor $6.5 million,

16   less a credit for the amount that Purchaser had loaned to the Debtor under the DIP

17   Facility.

18        6.   <u>Interim Payment Order</u>. On December 14, 2010, the Bankruptcy

19   Court entered an order establishing procedures for payment of interim professional

20   fees and expenses (the "Interim Payment Order"). Under the Bankruptcy Rules,

21   professionals usually cannot be paid more than once every 120 days. Under the

22   Interim Payment Order, professionals hired by the Debtor during the case were

23   authorized to be paid by the Debtor each month 80% of their fees and 100% of

24   their expenses incurred in the prior month. Approximately every 180 days the

25   professionals will submit formal applications requesting approval by the

26   Bankruptcy Court of all fees and expenses incurred on behalf of the Debtor. If the

Bankruptcy Court approves the applications, the professionals will be paid the 20% of the fees held back. If the Bankruptcy Court does not approve all of the amounts requested by a professional, the professional will be required to repay any amounts that exceed the total amount approved by the Bankruptcy Court.

7.  <u>Claims Bar Date</u>. The Court issued an order establishing January 31, 2011, as the deadline by which any creditor whose claim was listed as disputed, contingent or unliquidated in the Debtors' schedules, or who disagreed with the amount of the claim as scheduled by the Debtors, must file a proof of claim with the Bankruptcy Court. The order also establishes April 27, 2011 as the deadline for governmental units to file a proof of claim.

## IV. DEBTOR'S CURRENT FINANCIAL INFORMATION

**A.  Summary**

As of the Petition Date, Debtor listed total assets of approximately $8,306,646, and liabilities of approximately $47,399,789.

**B.  Funds on Hand.**

Debtor holds approximately $5,896,209 in its accounts. The sources of funds include $97,345 held in its accounts as of the Filing Date plus proceeds from the Sale.

**C.  No Other Property.**

There is no other property owned by the Debtor which might be sold and the proceeds used to pay creditors. All of the property of the Debtor was sold as part of the Sale.

**D.  Review of Claims**

A final analysis of the scheduled claims versus claims filed will be conducted with respect to the Debtor's secured, priority and unsecured obligations.

DEBTOR'S DISCLOSURE STATEMENT – 21 of 40
51120724.16

The Debtor may file objections to claims scheduled or filed based upon that review.

## V. MEANS FOR EXECUTION OF THE PLAN

**A.    Organization of Debtor**

After the Effective Date and the commencement of the Distributions under the Plan, the Bylaws and Articles of Incorporation of the Reorganized Debtor shall be modified such that the Board of Directors shall be reduced to one person and the number of shareholders shall be reduced to one person. The sole director and shareholder shall be Patrick J. Rusnak.

**B.    Post-Confirmation Dissolution of Committee**

Upon the Effective Date, the Committee shall be dissolved and shall have no duties, power, obligations, or authority.

**C.    Distribution of Funds**

Patrick J. Rusnak shall serve as the Distribution Agent. On the Distribution Date, or as soon as practicable thereafter, the Distribution Agent shall commence distributions to holders of Allowed Claims as provided in the Plan. The Distribution Agent shall be entitled to compensation at the rate of $250 per hour.

**D.    Reservation of Funds**

The Reorganized Debtor shall reserve sufficient funds at the time distributions are commenced to holders of Allowed Claims to adequately provide for disputed Claims. Upon resolution of the disputed Claims, the reserved funds shall be distributed as provided under the Plan.

**E.    Source of Funds**

Funds for the distributions proposed under the Plan are the Sale Proceeds and any additional cash held in the Debtor's bank accounts.

**F.     Tax Determination**

The Debtor's potential tax obligations are described in Section X below.

**G.     Post-Effective Date Administrative Expenses**

A reserve sufficient to complete outstanding legal and administrative work to resolve all claims, dissolve the corporation and provide communication to parties in interest shall be established. Any excess from the reserve after the cessation of all activity will be distributed first to holders of any unpaid Unclassified Claims on a *pro rata* basis until holders of such claims are paid in full, then to holders of any unpaid Class 2 Claims on a *pro rata* basis until holders of such claims are paid in full, then to holders of Class 3 Claims on a *pro rata* basis.

**H.     Actions On or After the Effective Date**

On the Effective Date:

1.     The Reorganized Debtor and the Distribution Agent shall be responsible for implementing the Plan.

2.     All of the Assets that have not been sold pursuant to the Sale, including without limitation all causes of action under Chapter V of the Bankruptcy Code, shall vest in the Reorganized Debtor free and clear of all liens, security interests and claims, except as otherwise expressly provided for in the Plan. After distributions under the Plan are made it is not contemplated that the Debtor will have any assets remaining other then funds for windup expenses.

3.     The Reorganized Debtor and the Distribution Agent shall comply with the Plan and make the distributions required by the Plan.

4.     In the event of a dispute on any Claim, the amount of such Claim that is not subject to dispute shall be an Allowed Claim and distribution made thereon.

I.      **Treatment of Executory Contracts**

The Debtor shall assume the equipment leases with CIT Communications Finance Corporation identified in Claim #7 filed in this case. As part of that process, Debtor will simultaneously assign the leases to AmericanWest Bank. The leases are not in default, no cure amount is due and assumption by AmericanWest Bank which is already a party under the leases as amended shall constitute full compliance with all terms of the Bankruptcy Code relating to assumption and assignment of executory contracts including adequate assurance of future performance.

Upon the Effective Date and without any further order of the Bankruptcy Court, the Debtor shall be deemed to have rejected all executory contracts and unexpired leases not previously assumed or specifically assumed under the Plan.

Any person or entity holding a Claim based upon the rejection of an executory contract or unexpired lease must file with the Bankruptcy Court and serve on the Debtor a Proof of Claim within twenty-one (21) days after the Confirmation Date. The failure to file a Proof of Claim by this deadline will result in such Claim being Disallowed and forever discharged.

J.      **Claims Objections**

The Reorganized Debtor and any other party in interest shall have thirty (30) days following the Confirmation Date to file an objection to any Claim with the Bankruptcy Court. All Claim objections shall be determined by the Bankruptcy Court after notice to the person whose claim is being objected to and opportunity for a hearing in accordance with the Bankruptcy Rules. The Debtor shall reserve 115% of the amount of any disputed claim pending determination of the dispute by settlement or by order of the Bankruptcy Court.

Issues for resolution by the Bankruptcy Court include:

1.     Objection to any claim by CIT on its leases.

2.     Objection to claims filed by shareholders clarifying that holders of interests do not receive any payment under the plan.

3.     Objections to the IRS claims under section 505 of the Bankruptcy Code.

4.     Objections to any claims related to or arising out of the claims of Cappello Capital Corp. for alleged services rendered to the Debtor and the Bank, including claims made by Cappello against the Bank and Sandler.

## VI. DESCRIPTION OF THE PLAN

**A.     Treatment of Creditors**

The Bankruptcy Code establishes the priority of distributions to creditors and interest holders with respect to assets of the Debtor. The order of distribution set forth in the Plan (which is described below) meets the requirements of the Bankruptcy Code.

**B.     Unclassified Claims**

Pursuant to Section 1123(a)(1) of the Bankruptcy Code, claims of a kind specified in Section 507(a)(2), (3) and (8) are not to be classified under the Plan. These claims include the following:

1.     <u>Administrative Claims</u>. These are claims for expenses incurred which are determined to be actual and necessary costs of preserving the estate constitute administrative claims. The Debtor has incurred and will incur additional expenses for the administration of the Estate, which include; a) professional fees of the attorneys and other professionals for the Debtor; and b) claims of landlords and lessors under unexpired leases and executory contracts that were in effect during the bankruptcy case. Administrative Expense Claims will be treated as follows:

a)     Ordinary Course Administrative Expense Claims. An Administrative Expense Claim that has occurred in the ordinary course of the business of the Debtor, other than Professional Fee Administrative Claims, shall be deemed allowed and paid by the Debtor in the ordinary course in the amounts reflected on the books and records of the Debtor. Certain of such claims which are subject to disclosure filings or Bankruptcy Court order shall be paid in accordance with such disclosure or order.

b)     Administrative Expense Claims Bar Date. Any person or entity holding an Administrative Expense Claim which has not been paid by the Debtor as of the Confirmation Date (except for professionals whose employment has been approved by the Bankruptcy Court) shall file with the Bankruptcy Court and serve on the Debtor a Proof of Claim no later than twenty-one (21) days after the Confirmation Date. Failure to file and serve an Administrative Expense Claim by this date shall conclusively bar the claimant from asserting its Administrative Expense Claim, and the Administrative Expense Claim shall be Disallowed and forever discharged.

c)     Professional Fee Administrative Expense Claims. All professional fees and expenses for professionals whose employment has been approved by the Bankruptcy Court may be paid on an interim basis in accordance with the Interim Payment Order. Final requests for payment of fees and reimbursement of expenses shall be allowed and paid as approved by the Bankruptcy Court, first from any advance fee deposits held by the professional fee claimant, and then in full on the later of a) the Distribution Date, and b) 15 days after Bankruptcy Court approval of the fees and expenses.

d)     Professional Fee Bar Date. Applications for final awards of compensation for services and expenses for professionals incurred prior to the

1   Effective Date shall be filed with the Bankruptcy Court and served on the Debtor

2   on or before twenty-one (21) days after the Effective Date. Failure to file and

3   serve an final application by this date shall conclusively bar the claimant from

4   asserting its Administrative Expense Claim for compensation and expenses, and

5   the Administrative Expense Claim shall be Disallowed and forever discharged.

6            e)    Post-Confirmation Professional Fees. Professionals whose

7   employment has been approved by the Bankruptcy Court and who continue to

8   provide services to the Reorganized Debtor after the Effective Date shall be

9   compensated and reimbursed for their expenses by filing and serving a notice of

10  interim compensation and reimbursement of expenses on a monthly basis in the

11  manner describe in the Interim Payment Order, and shall be entitled to payment

12  from the Reorganized Debtor on a monthly basis in accordance with the Interim

13  Payment Order. The Interim Payment Order shall be deemed modified so that

14  payment of such post-confirmation professional fees and expenses shall be subject

15  neither to a holdback nor a further order of the Bankruptcy Court, absent an

16  objection and that is filed and served by a party in interest in the manner provided

17  in the Interim Payment Order. If a proper objection is filed and served, then the

18  objection shall be resolved in the manner prescribed by the Interim Payment Order.

19       2.    Priority Tax Claims. On the Distribution Date, each holder of an

20  Allowed Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code

21  shall be paid in full or on a *pro rata* basis if there are insufficient funds in the

22  Distribution Fund to pay all Priority Tax Claims in full on the Distribution Date.

23  **C.    Classification of Claims and Interests**

24       The claims and interests are classified as follows:

25       Class 1:    Secured Claims, which are Claims secured by assets of the

26  Debtor. The only known holder of a Secured Claim is the Purchaser, who obtained

a Secured Claim as a result of the DIP Facility approved by the Bankruptcy Court. After closing of the Sale, any amounts due under the DIP Facility were credited to the purchase price, so the Purchaser's Secured Claim was satisfied. Thus, it there should be no payments due or made to Class 1.

Class 2: Unsecured Claims, which are Claims against the Debtor that arose before the Petition Date and are not an Administrative Expense Claim, Tax Claim, Secured Claim. Class 2 Claims include Subordinated Claims, which are Claims against the Debtor held by one or more of the Trusts described in Section II B. above. There are no Claims in any category superior to the Subordinated Claims other than Administrative Expense Claims, Tax Claims, and Secured Claims.[8]

Class 3: Equity Interests in the Debtor, which are the interests of a shareholder in the Debtor.

**D. Treatment of Claims**

1. Class 1: Secured Claims. Holders of Allowed Secured Claims, have been paid in full in accordance with the loan documents on or before the Distribution Date. Class 1 Claims are unimpaired.

2. Class 2: Unsecured Claims. On the Distribution Date, each holder of an Allowed Unsecured Claim shall be paid *pro rata* from the sums remaining in the Distribution Fund after payment in full of all Unclassified Claims and the Claims in Class 1, and less any reserves for Disputed Claims or estimated remaining Administrative Expenses. The Trusts will be responsible for distributions to their respective beneficiaries under their respective trust agreements after payment of applicable fees and expenses of the Indenture Trustees pursuant to the trust agreements. The Trusts shall not be obligated to pay

---

[8] The Subordinations for the trusts holding such Claims is to certain types of loan obligations. The Debtor has no such loan obligations.

any amounts that may be payable to the Debtor under the trust agreements, and the Debtor waives any right or claim to any payment from the Trusts. Class 2 Claims are impaired.

      3.    Class 3: Equity Interests. Holders of Equity Interests shall receive nothing on account of their equity interests, and all of the issued and outstanding stock of the Debtor shall be cancelled as of the Effective Date. Class 3 interests are impaired and shall be deemed to reject the Plan and need not vote.

## VII. ESTIMATION OF CLAIMS AND DISTRIBUTIONS UNDER THE PLAN

As of the date of this Disclosure Statement, the following is the Debtor's best estimation of the amounts claimed by the various creditors under the Plan. This is merely an estimate, as Claims participating in the Plan may be augmented or reduced through litigation, compromise or other development subsequent to the date of this Disclosure Statement.

| CLAIM | | ESTIMATED AMOUNT OF CLAIMS | ESTIMATED DISTRIBUTION |
|---|---|---|---|
| Administrative Expenses (excluding professionals) | | $ 168,849 | $168,849(100%) |
| Priority Tax Claims | | $0 | $0 (100%) |
| Class 1 | Secured Claims | $ 0 | $ NA |
| Class 2 | Unsecured Claims | $47,918,039 | $5,750,000 (12%) |
| Class 3 | Equity Interests | Common stock | $ 0 (0%) |

This estimation is based upon the Debtor's position that it has no exposure to the Internal Revenue Service for tax obligations. See below for a discussion of the potential obligations to Internal Revenue Service. In the unlikely event that the precautionary claim filed by the Internal Revenue Service is allowed, the estimated amount to be distributed to non priority Allowed Claims herein will be reduced..

51120724.16

10-06097-PCW11   Doc 215   Filed 05/13/11   Entered 05/13/11 13:38:17   Pg 33 of 74

## VIII. POST-CONFIRMATION MANAGEMENT

After confirmation of the Plan, the Debtor will employ the following people:

1. Patrick J. Rusnak as the Chief Executive Officer and President, who will be primarily responsible for executing the Plan and winding up the Reorganized Debtor's affairs. Mr. Rusnak will be compensated at the rate of $250 per hour.

2. Jay B. Simmons, as the Executive Vice President, General Counsel and Secretary, who will assist with the execution of the Plan and the winding up of the Reorganized Debtor's affairs, and will coordinate the work of the professionals providing services to the Reorganized Debtor. Mr. Simmons will be compensated at the rate of $200 per hour.

3. Shelly Krasselt, as the Principal Accounting Officer, who will provide necessary accounting functions, prepare financial reports, and assist with the execution of the Plan and the winding up of the Reorganized Debtor's affairs. Ms. Krasselt will be compensated at the rate of $100 per hour.

The above individuals will be paid by the Distribution Agent on a monthly basis and their payments reported as part of the post confirmation reports required under the Bankruptcy Rules.

## IX. TAX CONSEQUENCES OF THE PLAN

Certain federal income tax consequences of the Plan are described below. The tax consequences are subject to uncertainties, including the taxpayer status of particular creditors, methods of accounting, and prior action taken by creditors with respect to their claims. Creditors are therefore advised to consult with their tax advisers regarding the individual tax consequences of the Plan.

In general, a Creditor using the accrual method of accounting will recognize a gain or loss on the exchange to the extent that the difference between the cash

1   received is greater or less than the creditor's basis in the claim exchanged.
2   Moreover, the gain or loss will be a capital gain or loss if the creditor held the
3   claim as a capital asset.

4         A creditor using the cash method of accounting will recognize a gain or loss
5   on the exchange as above, except to the extent that the cash exceeds the original
6   amount of the original claim.  In that case, the excess may be treated as interest
7   insofar as interest accrued on the claim and was not previously reported as income
8   by the creditor.

## X.  PENDING AND CONTEMPLATED LITIGATION

10        The Debtor is not currently a party to any litigation or proceedings.  The
11  following describes potential claims or adversary proceedings that may be asserted
12  by or against the Debtor:

### A.    Tax Claims of the Internal Revenue Service

14        The Debtor and the Bank filed consolidated tax returns each year.  Based
15  upon net operating losses in prior tax years, the Debtor and the Bank received
16  sizable income tax refunds in recent tax years.  Under the Internal Revenue Code,
17  the Internal Revenue Service may examine the returns filed by the Debtor and
18  Bank as far back as 2003 and, if adjustments are made against the Debtor and
19  Bank, potentially demand return of some or all of the amounts that were refunded.
20  The total amount refunded to the Debtor and the Bank based on the tax returns that
21  can still be reviewed is approximately $24 million.   In theory, the Internal
22  Revenue Service could audit these returns, conclude the returns were inaccurate
23  and that the Debtor and the Bank owe tax for one or more of the audited tax years,
24  and demand the Debtor and the Bank return some or all of the amounts refunded.
25  However most of the amount at issue has been subject to an earlier review by the
26  IRS. Further because some of the deductions which produced the refunds were

DEBTOR'S DISCLOSURE STATEMENT – 31 of 40
51120724.16

capped by provisions of the Code and were thus not fully taken, the adjustments would have to be huge in magnitude to effect the amount of the refund granted on any year.

The Internal Revenue Service has filed a "protective" claim in this case in the amount of $3,674,802.00. The purpose of the claim is to allow the Joint Committee on Taxation to pass upon the refunds which were awarded under the consolidated returns as provided in Section 6405(a) of the Internal Revenue Code.

The deadline for filing government claims is April 26, 2011. However, the debtor expects no further government claims, precautionary or otherwise. Further, Debtor believes that the returns now before the Joint Committee on Taxation will be accepted and the current "precautionary claim" will then be withdrawn.

Further on under the Tax Sharing Agreement with the Bank, the liability for any such claim is to be paid by the Bank. However, the Tax Sharing Agreement is not biding upon the government and the Debtor would remain liable on the claim until it was paid by the Bank.

**B.    Section 505 of the Bankruptcy Code provides procedures for determination of tax liability by the Bankruptcy Court.  Section 505 has procedures for prepetition tax disputes as well as determinations regarding post petition tax liabilities.  Debtor intends to utilize these procedures to the extent necessary to provide for timely distribution to creditors. Cappello Suit.**

On February 2, 2011, Cappello Capital Corp. filed suit in Los Angeles, California against the Bank, Sandler O'Neill and 10 unnamed John Doe defendants. The suit demands payment from the defendants of over $11 million, seeks to impose a constructive trust on the sale proceeds and the recapitalization funds, and seeks a fee of $292,500 on the purchase price of $6.5 million. Sandler has indicated that its agreement with the Bank and AWBC may implicate a claim

1  for indemnity against both of them.  Sandler filed a Motion for Allowance of
2  Adminstrative Expenses based on their claim for indemnity on April 22, 2011.
3  The motion has yet been heard.

4       Cappello's claims against AWBC and perhaps the other defendants are
5  barred because they were not an approved professional entitled to compensation in
6  the Bankruptcy case, did not file a claim prior to the claims bar date and for other
7  reasons.

8       The suit has been removed to the United States District Court for the Central
9  District of California and there is a Motion before that Court to move the case to
10  the Eastern District of Washington.

11       The suit will very likely delay distributions under the Plan until the claims
12  arising under the suit against AWBC and the proceeds of the Sale are clearly
13  defined.  Thus prompt resolution of the litigation will be sought.

14  **C.      Avoidance Actions**

15       The Debtor will retain all rights and causes of action authorized by
16  Chapter V of the Bankruptcy Code.  This Bankruptcy Code chapter authorizes the
17  Debtor to, under limited circumstances, seek the return of certain transfers made by
18  the Debtor for the benefit of the estate ("Avoidance Actions").  The Debtor has
19  analyzed its books and records to determine if there are potential Avoidance
20  Actions.  At this time, the Debtor does not anticipate pursuing any Avoidance
21  Actions against any person or entity.

22  **D.      Objections to Claims**

23       The Debtor reserves the right to object to any claims scheduled or filed.

24       CIT Communications Finance Corporation has filed a claim for lease which
25  is not in default and will be assumed and assigned to the Bank.  There will be no

26

DEBTOR'S DISCLOSURE STATEMENT – 33 of 40
51120724.16

1   loss to the claimant and there should be no claim allowed to CIT because they will
2   be fully paid as contracted.

3       The IRS has filed a precautionary claim in the case, but all indications are
4   that this claim will be withdrawn once their audit and determination of no liability
5   has been cleared by the Joint Committee on Taxation.

6       Several shareholders have filed claims which indicate a misunderstanding
7   of the classification of equity security interests.  There is no dispute about the
8   amount of their stated investment, but such claims represent interests, not
9   unsecured claims.  Objections to allowance as unsecured claims will be filed as a
10  matter of clarification.

11      At this time, the Debtor is not aware of other significant claims to which it
12  will object.

## XI.  LIQUIDATION ANALYSIS

14      Liquidation of the assets of the Debtor occurred under the 363 Sale.  The
15  tasks that remain are dealing with claims and the mechanics of distribution of the
16  funds held by the Debtor.  The alternative to the chapter 11 Plan is conversion of
17  the bankruptcy case to a proceeding under Chapter 7 of the Bankruptcy Code.  If
18  that were to happen, a Chapter 7 trustee would be appointed.  He or she would
19  incur costs learning the case, and then hire counsel for advice.  Debtor believes that
20  conversion to Chapter 7 result in an additional layer of administrative expense that
21  would diminish the funds otherwise available for distribution to Creditors.  It is
22  also likely that distribution to Allowed Claims would be substantially delayed.

## XII.  FINANCIAL PROJECTIONS

24      The Debtor will not engage in any operations after confirmation.  Thus,
25  financial projections and a discussion of underlying assumptions are not necessary.

26

# XIII. PAYMENTS MADE FOR SERVICES

The following amounts have been allowed and/or paid to professionals for services and expenses as of January 31, 2011:

| Name | Amount Incurred | 80% fees + costs | Amount Remaining Due |
|---|---|---|---|
| Foster Pepper | $134,160.38 | $108,332.38 | $25,828 |
| Morrison & Foerster | $519,547.73 | $418,072.43 | $101,475 |
| Sandler O'Neill | $65,179 | $ Fully paid | 0 |

As described in Section III.A.6 above, each month professionals have been paid 80% of their fees and 100% of the expenses pursuant to the Interim Payment Order. No professional has submitted an application for final approval of fees and expenses, so the Bankruptcy Court has not yet entered an order allowing any fees and expenses. The Debtor anticipates the above professionals will submit applications by no later than April 28, 2011, seeking the approval of amounts already paid and the approval and payment of the unpaid amounts.

# XIV. TRANSACTIONS WITH INSIDERS

## A. Post Petition Payments.

Since the Petition Date, the Debtor has paid insiders the following amounts:

| Name | Amount |
|---|---|
| Patrick J. Rusnak | $ 0 |
| Jay B. Simmons | $ 0 |
| Shelly Krasselt | $ 0 |
| Kay C. Carnes, Director | $ 1200 |
| J. Frank Armijo, Director | $ 1200 |
| Craig D. Eerkes, Director | $ 1200 |
| Donald H. Swartz II, Director | $ 1200 |
| P. Mike Taylor, Director | $ 1200 |

## B. Prepetition Payments.

In the year prior to the Petition Date, the Debtor paid insiders the following amounts:

DEBTOR'S DISCLOSURE STATEMENT – 35 of 40
51120724.16

| Name | Amount |
|------|--------|
| 1.  Patrick J. Rusnak | $ 12,500.00 |
| 2.  Jay B. Simmons | $ 9,250.00 |
| 3.  Shelly Krasselt | $ 5,201.00 |
| 4.  Kay C. Carnes, Director | $ 1,200.00 |
| 5.  J. Frank Armijo, Director | $ 1,005.00 |
| 6.  Craig D. Eerkes, Director | $ 1,172.00 |
| 7.  Donald H. Swartz II, Director | $ 1,369.00 |
| 8.  P. Mike Taylor, Director | $ 1,218.00 |

As noted in Section II A above, the Bank was a wholly-owned subsidiary of the Debtor. Prior to and after the Petition Date, the individuals identified on lines 1 through 3 above (collectively, the "Officers") performed services for both the Bank and the Debtor, and the individuals identified on lines 4 through 8 above (collectively, the "Directors") served on the Boards of Directors of both the Bank and the Debtor. For serving on the boards of the Bank and the Debtor (whose board meetings were held concurrently), the Directors received a monthly retainer of $960, received $520 for attending a board meeting, and additional amounts for service on committees. The Bank paid the Directors this compensation, and then the Debtor paid the Bank 5% of the amount that was paid to the Directors. The compensation paid to the Directors during the last 12 months stated above reflects the total amounts the Debtor paid to the Bank for the Debtor's 5% share of the services provided by the Directors the year before the commencement of this Chapter 11 proceeding.

With respect to the Officers, the Bank also paid these individuals their salaries each month, and the Debtor then paid the Bank for 5% of the amounts paid. The compensation paid during the last 12 months stated above reflects the total amounts the Debtor paid to the Bank for the Debtor's 5% share of the services

1 provided by the Officers during the year before the commencement of this
2 Chapter 11 proceeding.
3     The Debtor and the Bank shared other goods and services as well, including
4 legal and accounting services, rents due under personal property and real property
5 leases, and payroll processing services. It was the practice for the Bank to pay all
6 vendors and then the Debtor would reimburse the Bank an agreed percentage for
7 the Debtor's share of those services. In most instances, the agreed amount was 5%
8 of the amount paid by the Bank. Of the stated total amount the Debtor paid to the
9 Bank including reimbursement of goods a services in the 12 months prior to
10 Petition Date, $50,186.25 represents the amount the Debtor reimbursed the Bank
11 for shared services of the Officers, the Directors, and other persons and entities
12 providing goods, services and other matters of value to both the Debtor and the
13 Bank. Since these payments were for and on account of the services and goods
14 provided by the vendors, the Debtor considered these payments to have been made
15 to those vendors and not the Bank.

16 **C.**     **Direct Payments to Officers and Board Members,**

17     After closing of the Sale on December 20, 2010, the Debtor no longer shared
18 the services of the Officers and the Directors with Bank. After the Sale, all of the
19 Directors were required to resign from the board of the Bank. Until the bankruptcy
20 proceeding concludes, the Debtor will still need the services to be provided by the
21 Officers and it still need the Directors for corporate governance. After closing of
22 the Sale, the Debtor paid the Officers $0 and Directors $6000 directly.

23 **D.**     **Tax Refunds.**

24     The Debtor and the Bank have consistently filed Consolidated Returns. Tax
25 liabilities and refunds are allocated between the Debtor and the Bank in accordance
26 with the source of the activity giving rise to the liability or refund. All of the

1    financially material tax attributes reported in the consolidated returns arose from

2    the operations of the Bank. The Debtor and the Bank have a Tax Sharing

3    agreement which allocates these rights and obligations between them. As the

4    parent company the Debtor executed the consolidated returns and was the recipient

5    of the refunds from the IRS. Over the 12 months prior to the Filing Date

6    $13,228,345 was received on the consolidated returns in refunds from the IRS and

7    turned over to the Bank in accordance with Tax Sharing agreement.

## XV. CONFIRMATION OF PLAN

9    **A.**    **Voting Procedures**

10    A ballot to be used for voting your acceptance or rejection of the Plan is

11    being mailed to you with this Disclosure Statement and Plan. Holders of claims

12    and equity security interests should read the instructions carefully, complete, date

13    and sign the ballot, and transmit it as instructed. In order to be counted, your ballot

14    must be received at the indicated address **not later than 5:00 p.m. on**

15    **June 15, 2011.** Failure to vote or a vote to reject the Plan will not affect the

16    treatment to be accorded a claim or interest if the Plan nevertheless is confirmed.

17    If more than one-half in number of claimants voting and at least two-thirds

18    in amount of the allowed claims of such claimants in each class of claims vote to

19    accept the Plan, such classes will be deemed to have accepted the Plan. For

20    purposes of determining whether a class of claims has accepted or rejected the

21    Plan, only votes of those who have timely returned their ballots will be considered.

22    **B.**    **Hearing on Confirmation**

23    The hearing on confirmation of the Plan has been set for **June 30, 2011**, at

24    **11:00 a.m.** before the Honorable Patricia C. Williams, 904 W. Riverside, Spokane,

25    Washington. The Bankruptcy Court will confirm the Plan at the hearing only if

26

certain requirements, as set forth in § 1129 of the Bankruptcy Code and described below, are satisfied.

**C.     Best Interests of Creditors**

If any holder of a claim or interest does not accept the Plan, the Bankruptcy Court must determine that each holder of a claim or interest will receive or retain under the Plan on account of that holder's claim or interest property having a value, as of the Effective Date of the Plan, that is not less than the amount such holder would receive or retain if the Debtor was liquidated under Chapter 7 of the Bankruptcy Code on such date. This is commonly referred to as the "best interests of creditors" standard. As discussed in the section of this Disclosure Statement entitled "Liquidation Analysis," unsecured creditors would likely realize substantially less in the event of conversion of the case to a Chapter 7 proceeding than they will receive under the Plan. Accordingly, the Debtor believes that the Plan satisfies this test.

**D.     Feasibility**

The Debtor must also establish that confirmation of the Plan is not likely to be followed by liquidation or the need for financial reorganization. Because the Plan does not provide for future business operations but simply the distribution of proceeds, "feasibility" is virtually assured.

**E.     Treatment of Dissenting Classes of Creditors**

The Bankruptcy Code requires the Bankruptcy Court to find that the Plan does not discriminate unfairly, and is fair and equitable with respect to each class of claims or interests that is impaired under, and has not accepted, the Plan. Upon such a finding, the Bankruptcy Court may confirm the Plan despite the objections of a dissenting class. Because no junior class of claims or interests will receive

1  any distribution unless and until each senior class is paid in full, the Debtor
2  believes that this requirement of the Bankruptcy Code will be met.
3  **F.    Effect of Confirmation**
4       The provisions of the Plan will bind the Debtor and all other parties in
5  interest, including any creditor or equity security holder of the Debtor, whether or
6  not such creditor or shareholder is impaired under the Plan and whether or not such
7  creditor or equity security holder has accepted the Plan.

8                    **XVI.  CONCLUSION**
9       The Debtor has endeavored to obtain the best possible outcome for its
10 creditors in this case, and believes that the Plan described above is fair and
11 equitable for all concerned.  Your acceptance of the Plan is therefore
12 recommended.
13      DATED this 15th day of March, 2011.

14                    **AmericanWest Bancorporation,**
                      **Debtor and Debtor in Possession**
15

16                    *s/ Patrick J. Rusnak*
17                    _____
                      Patrick J. Rusnak, CEO
18                    AmericanWest Bancorporation
19
20
21
22
23
24
25
26

DEBTOR'S DISCLOSURE STATEMENT – 40 of 40
51120724.16

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

**List Classifying Claims and Interests**

CASE NAME:                          CASE NUMBER:
**AMERICANWEST BANCORPORATION**      **10-06097-PCW**

The following is a list of CREDITORS, set out and alphabetized by CLASS, as set forth in the debtor's Proposed Plan. The AMOUNT DUE is based on the amount of the claim as indicated by the debtor on the schedules (S), or by the amount of the claim as filed by a creditor (C), or as determined by the court in a judicial hearing (J), whichever is latest in time.

| CLASS | I/U* | MEMBER(s) OF CLASS** | AMOUNT DUE | BASIS*** |
|-------|------|----------------------|------------|----------|
| 1 | U | NONE | NONE | |
| | | | | |
| 2 | I | AmericanWest Capital Trust II | $8,603,133.39# | C |
| | | AmericanWest Capital Trust III | $24,044,373.77# | C |
| | | AmericanWest Statutory Trust I | $11,905,733.07# | C |
| | | Columbia Trust Statutory Trust I | $3.370,726.49# | C |
| 3++ | I | Shareholders (lists on file) | NONE | S |

\* "I" indicates impaired and "U" indicates unimpaired for each class.

\*\* If the member appears in more than one class as a result of the claim being secured in part and unsecured in part, a "+ " to the right of the class member's name indicates that the claim is secured in part and unsecured in part.

\*\*\* If the amount listed is based upon the claim as is scheduled by the debtor, an "S" is indicated under basis.  If the amount listed is based upon a proof of claim filed by the creditor, indicate "C" as the basis.  If the amount listed is based upon a judicial determination of the claim , indicate "J" as the basis.  I hereby tate under penalty of perjury that the information contained in the above List Classifying Claims and Interests is true and correct to the best of my knowledge and belief.

++Shareholders neither receive nor retain any value under the Plan and are deemed to have voted to reject the plan.  Claims filed by shareholders for payment are subject to objection.

#Exact amounts subject to adjustment for fees, costs and interest.

*s/ Dillon E. Jackson*
_____
Dillon E. Jackson
Foster Pepper PLLC
Counsel for Proponent of Plan

# EXHIBIT B

Dillon E. Jackson WSBA #1539       The Honorable Patricia C. Williams
Christopher M. Alston, WSBA #18823               Chapter 11
FOSTER PEPPER PLLC
1111 Third Avenue, Suite 3400
Seattle, Washington 98101-3299
Telephone: (206) 447-4400
Facsimile No.: (206) 447-9700

Counsel for
AMERICANWEST BANCORPORATION

## UNITED STATES BANKRUPTCY COURT
## EASTERN DISTRICT OF WASHINGTON
## AT SPOKANE

| | |
|---|---|
| In Re: | Case No. 10-06097-PCW-11 |
| AMERICANWEST BANCORPORATION, | Chapter 11 |
| Debtor. | **DEBTOR'S PLAN OF DISTRIBUTION** |

     AMERICANWEST BANCORPORATION ("AWBC") proposes the following Debtor's Plan of Distribution pursuant to Chapter 11 of the Bankruptcy Code.

### ARTICLE 1  DISCLOSURE STATEMENT

     AWBC has filed the Debtor's Disclosure Statement with this Plan of Distribution pursuant to Section 1125 of the Bankruptcy Code and Federal Rule of Bankruptcy Procedure 3016(b). This Plan of Distribution is being disseminated to creditors for vote after Bankruptcy Court approval of the information in the Debtor's Disclosure Statement. The Debtor's Disclosure Statement contains useful information to assist creditors in making an informed judgment about how to vote

PLAN OF DISTRIBUTION – 1 of 26
51115086.17

on this Plan of Reorganization.  Please read the Debtor's Disclosure Statement with care in evaluating the impact of this Plan of Reorganization upon your claim or interest.

## ARTICLE 2   DEFINITIONS

A term used in this Plan of Reorganization that is not defined below and is used in the Bankruptcy Code shall have the meaning ascribed in the Bankruptcy Code.  The following terms when used in this Plan of Reorganization have the meanings specified below.

**2.1    Additional Distributions.**

Refers to distributions to Allowed Claims made after the initial distribution made on the Distribution Date.  There may be one or more Additional Distributions.

**2.2    Administrative Expense Claim:**

A Claim entitled to priority under Section 507(a)(2) and (b) of the Bankruptcy Code, including (i) Claims arising since the Petition Date of a type described in Section 503(b) of the Bankruptcy Code, (ii) all Claims of professional persons employed pursuant to an order of the Bankruptcy Court, and (iii) all fees and charges assessed against the bankruptcy estate under 28 U.S.C. §1930.

**2.3    Allowed Claim:**

Refers to (i) any Claim which has been listed by Debtor in its Schedules, as such Schedules may be amended from time to time in accordance with Bankruptcy Rule 1009, as liquidated in amount and not disputed or contingent and for which no contrary proof of claim has been filed, (ii) any Claim which is not a Disputed Claim, (iii) any Ordinary Course Administrative Expense Claim which is not a Disputed Claim, (iv) any Claim that is compromised, settled, or otherwise resolved pursuant to the authority granted to the Debtor or the Reorganized Debtor pursuant

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 48 of 74

to a Final Order of the Bankruptcy Court, (v) any Claim which, if a Disputed Claim, has been allowed by a Final Order, or (vi) any other Claim which has been allowed by a Final Order; provided, however, that any Claim allowed solely for the purpose of voting to accept or reject the Plan pursuant to an order of the Bankruptcy Court shall not be considered an Allowed Claim hereunder until such time as it qualifies as an Allowed Claim under one of the categories set forth above. Any party in interest shall have the same right to object to an amendment of Debtor's schedules as to a proof of claim, and any Claim covered by such amendment as to which an objection has been filed shall not become an Allowed Claim until allowed by a Final Order. A reference to a specific class of Claims in conjunction with the word "Allowed" (e.g., Allowed General Unsecured Claim) incorporates this definition of Allowed Claims.

**2.4    AmericanWest Bank:**

AmericanWest Bank, which was, until the Closing of the Sale, a wholly-owned subsidiary of the Debtor.

**2.5    Assets:**

All assets of the Debtor, and all property of the Debtor's bankruptcy estate under Section 541 of the Bankruptcy Code, including without limitation the stock in AmericanWest Bank.

**2.6    Ballot:**

The ballot approved by the Bankruptcy Court to accompany the Plan and Disclosure Statement which shall be sent to all Creditors entitled to vote on the Plan.

**2.7    Ballot Deadline:**

The deadline established by Order of the Bankruptcy Court for submission of Ballots on the Plan, which is June 15, 2011.

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 49 of 74

1    **2.8**    **Bankruptcy Code:**

2        The Bankruptcy Code as amended and set forth in Title 11 of the United

3    States Code.

4    **2.9**    **Bankruptcy Court:**

5        The United States Bankruptcy Court for the Eastern District of Washington

6    at Spokane before which the Case is pending or any other court exercising

7    jurisdiction over the Case in the future.

8    **2.10**    **Bankruptcy Rules:**

9        The Federal Rules of Bankruptcy Procedure as supplemented by the Local

10   Bankruptcy Rules for the Eastern District of Washington and any other local rules

11   applicable to the Bankruptcy Court.

12   **2.11**    **Business Day:**

13       A day that is not a federal holiday, a Saturday or a Sunday.

14   **2.12**    **Case:**

15       The Debtor's bankruptcy case, which is presently pending in the Bankruptcy

16   Court under Bankruptcy No. 10-06097-PCW-11.

17   **2.13**    **Claim:**

18       Means "claim" as defined in Section 101(5) of the Bankruptcy Code.

19   **2.14**    **Claims Bar Date or Bar Date:**

20       The date set by the Bankruptcy Court as the last day for filing proofs of

21   claim in the Case, which was January 31, 2011.

22   **2.15**    **Class:**

23       A class of claims or interests as defined in Sections 2.12 and 2.28 of the

24   Plan.

25

26

**2.16  Closing and Closing Date:**

The closing of the Sale of all of the Assets, including 100% of the stock of AmericanWest Bank, which closed on December 20, 2010.

**2.17  Committee:**

Means the Unsecured Creditors' Committee appointed by the United States Trustee in the Case.

**2.18  Confirmation Date:**

The date of the entry of the Confirmation Order on the Bankruptcy Court's docket.

**2.19  Confirmation Order:**

The order of the Bankruptcy Court confirming the Plan pursuant to Section 1129 of the Bankruptcy Code.

**2.20  Creditor:**

Means "creditor" as defined in Section 101(10) of the Bankruptcy Code.

**2.21  Debtor:**

AmericanWest Bancorporation, a Washington Corporation.

**2.22  Debtor in Possession Financing:**

The debtor in possession financing arrangement between SKBHC Hawks Nest Acquisition Corp., as lender, and Debtor as debtor, approved by the Bankruptcy Court by an order entered November 18, 2010.

**2.23  Disallowed:**

With respect to a Claim, a Claim or any portion thereof which has been disallowed by a Final Order or which becomes disallowed as a result of the claimants failure to timely file a proof of claim, as provided herein.

PLAN OF DISTRIBUTION – 5 of 26
51115086.17

**2.24  Disclosure Statement:**

The Disclosure Statement approved by the Bankruptcy Court for submission to Creditors.

**2.25  Disputed Claim:**

A Claim scheduled as a disputed or contingent Claim, and a Claim for which a proof of claim has been filed and as to which an objection has been or hereafter is timely filed and which objection has not been withdrawn and has not been denied by a Final Order of the Bankruptcy Court.

**2.26  Distribution Agent:**

The person identified in Section 7.3 who will distribute funds payable to holders of Allowed Claims pursuant to the Plan.

**2.27  Distribution Date:**

The first Business Day that is 25 days after the later of (i) the Effective Date and (ii) entry of a Final Unstayed Order resolving the Pre-petition Tax Claim of the Internal Revenue Service.

**2.28  Distribution Fund:**

The Distribution Fund shall be comprised of the Sale Proceeds and the cash assets of the Debtor.

**2.29  Effective Date:**

The first Business Day the Confirmation Order becomes a Final Unstayed Order.

**2.30  Equity Interest:**

The interest of a shareholder in the Debtor.

**2.31  Final Decree:**

The Final Decree entered by the Bankruptcy Court closing the Case.

51115086.17

**2.32  Finally Determined:**

With respect to a Claim, a Claim which has been Allowed or Disallowed by a Final Order.

**2.33  Final Order:**

An order or judgment of the Bankruptcy Court as to which the time for appeal has expired without a notice of appeal having been filed or, if a notice of appeal has been filed, as to which such appeal has been finally resolved.

**2.34  Final Unstayed Order:**

A Final Order which has not been stayed by a court of competent jurisdiction.

**2.35  Indenture Trustees:**

U.S. Bank and Wilmington.

**2.36  Interim Payment Order:**

The Order Establishing Procedures for Payment of Interim Professional Fees and Expenses entered by the Bankruptcy Court in the Case on December 14, 2010.

**2.37  Notice and Hearing:**

"Notice and Hearing" or similar language shall mean the notice and hearing procedure provided in the applicable Bankruptcy Rules.

**2.38  Petition Date:**

Date of the filing of the petition for relief by the Debtor, which is October 28, 2010.

**2.39  Plan:**

This Plan of Reorganization in its present form or as it may be amended or modified prior to entry of the Confirmation Order and in the form confirmed by the Bankruptcy Court in the Confirmation Order. "Plan" shall also include the Plan

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 53 of 74

1  confirmed on the Confirmation Date as may be amended after the Confirmation
2  Date in accordance with the Bankruptcy Code or order of the Bankruptcy Court.

**2.40  Proponent:**

Proponent is the Debtor, who is the person proposing confirmation of the
Plan to the Bankruptcy Court.

**2.41  *Pro Rata:***

Refers to a distribution formula for distribution of funds to members of a
class of creditors.  The formula defining the percentage of the fund to be received
by each member of the class and is expressed as:  Fund Amount times the Allowed
Claim divided by the Total of Allowed Claims in Class.  Each member of the class
will under a *pro rata* distribution receive the same percentage of their Allowed
Claim.

**2.42  Reorganized Debtor:**

The Debtor, on and after the Effective Date.

**2.43  Sale:**

The sale of all of the Assets of the Debtor to SKBHC Holdings LLC and its
wholly-owned subsidiary SKBHC Hawks Nest Acquisition Corp., approved by the
Bankruptcy Court, which closed on December 20, 2010.

**2.44  Sale Order:**

The Order of the Bankruptcy Court approving the Sale entered on
December 9, 2010.

**2.45  Sale Proceeds:**

Proceeds from the Sale paid to the Debtor in the amount of $6,500,000.

**2.46  Secured Claim:**

The secured and priority claim of SKBHC Hawks Nest Acquisition Corp.
for the Debtor in Possession Financing.

PLAN OF DISTRIBUTION – 8 of 26
51115086.17

**2.47  Subordinated Claim:**

A Claim against the Debtor held by one or more of the Trusts that are related to the Trust Preferred Securities ("TruPS") that are further defined and discussed in the Disclosure Statement.  In this Plan Subordinated Claims are classified as Unsecured Claims.

**2.48  Tax Claim:**

Any Claim held by a governmental entity against the Debtor.

**2.49  Trusts**

The following trusts formed by the Debtor or its predecessor: AmericanWest Statutory Trust I, AmericanWest Statutory Trust II, AmericanWest Statutory Trust III, and Columbia Trust Statutory Trust I.

**2.50  Unclassified Claim:**

A Claim other than a Claim of a kind specified in Section 507(a)(2), 507(a)(3), or 507(a)(8) of the Bankruptcy Code.

**2.51  Unsecured Claim:**

A Claim against the Debtor that arose before the Petition Date and is not an Administrative Expense Claim, Tax Claim on a Secured Claim.  Unsecured Claims include Subordinated Claims.

**2.52  U.S. Bank:**

U.S. Bank National Association, as indenture trustee and institutional trustee.

**2.53  Wilmington:**

Wilmington Trust Company, as indenture trustee and institutional trustee.

51115086.17

## ARTICLE 3   PAYMENT OF UNCLASSIFIED CLAIMS

**3.1** **Administrative Expense Claims:**

### 3.1.1   Ordinary Course Administrative Expense Claims.

An Administrative Expense Claim that has occurred in the ordinary course of the business of the Debtor, other than Professional Fee Administrative Claims, shall be deemed allowed and paid by the Debtor in the ordinary course in the amounts reflected on the books and records of the Debtor.  Certain of such claims which are subject to disclosure filings or Bankruptcy Court order shall be paid in accordance with such disclosure or order.

### 3.1.2   Administrative Expense Claims Bar Date.

Any person or entity holding an Administrative Expense Claim which has not been paid by the Debtor as of the Confirmation Date (except for professionals whose employment has been approved by the Bankruptcy Court) shall file with the Bankruptcy Court and serve on the Debtor a Proof of Claim no later than twenty-one (21) days after the Confirmation Date.  Failure to file and serve an Administrative Expense Claim by this date shall conclusively bar the claimant from asserting its Administrative Expense Claim, and the Administrative Expense Claim shall be Disallowed and forever discharged.

### 3.1.3   Professional Fee Administrative Expense Claims.

All professional fees and expenses for professionals whose employment has been approved by the Bankruptcy Court may be paid on an interim basis in accordance with the Interim Payment Order.  Final requests for payment of fees and reimbursement of expenses shall be allowed and paid as approved by the Bankruptcy Court, first from any advance fee deposits held by the professional fee claimant, and then in full on the later of (i) the Distribution Date, and (ii) 15 days after Bankruptcy Court approval of the fees and expenses.

### 3.1.4 Professional Fee Bar Date.

Applications for final awards of compensation for services and expenses for professionals incurred prior to the Effective Date shall be filed with the Bankruptcy Court and served on the Debtor <u>on or before twenty-one (21) days after the Effective Date</u>. Failure to file and serve a final application by this date shall conclusively bar the claimant from asserting its Administrative Expense Claim for compensation and expenses, and the Administrative Expense Claim shall be Disallowed and forever discharged.

### 3.1.5 Post-Confirmation Professional Fees.

Professionals whose employment has been approved by the Bankruptcy Court and who continue to provide services to the Reorganized Debtor after the Effective Date shall be compensated and reimbursed for their expenses by filing and serving a notice of interim compensation and reimbursement of expenses on a monthly basis in the manner describe in the Interim Payment Order, and shall be entitled to payment from the Reorganized Debtor on a monthly basis in accordance with the Interim Payment Order. The Interim Payment Order shall be deemed modified so that payment of such post-confirmation professional fees and expenses shall be subject neither to a holdback nor a further order of the Bankruptcy Court, absent an objection that is filed and served by a party in interest in the manner provided in the Interim Payment Order. If a proper objection is filed and served, then the objection shall be resolved in the manner prescribed by the Interim Payment Order.

### 3.2 Priority Tax Claims:

On the Distribution Date, each holder of an Allowed Claim entitled to priority under Section 507(a)(8) of the Bankruptcy Code shall be paid in full or on

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 57 of 74

a *pro rata* basis if there are insufficient funds in the Distribution Fund to pay all Priority Tax Claims in full on the Distribution Date.

## ARTICLE 4   CLASSIFICATION OF CLAIMS AND INTERESTS

The claims and interests are classified as follows:

Class 1:     Secured Claims.

Class 2:     Unsecured Claims.

Class 3:     Equity Interests in the Debtor.

## ARTICLE 5   TREATMENT OF CLAIMS

**5.1     Class 1: Secured Claims.**

**5.1.1   Treatment.**

Holders of Allowed Secured Claims, if any, shall be paid in full in accordance with the loan documents on or before the Distribution Date.

**5.1.2   Impairment.**

Class 1 Claims are unimpaired.

**5.2     Class 2: Unsecured Claims.**

**5.2.1   Treatment.**

On the Distribution Date, each holder of an Allowed Unsecured Claim shall be paid *pro rata* from the sums remaining in the Distribution Fund after payment in full of all Unclassified Claims and the Claims in Class 1, and less any reserves for Disputed Claims or estimated remaining Administrative Expenses for distribution to Wilmington and U.S. Bank, each as trustee under the respective indentures, who shall then be responsible for further distribution of such funds in accordance with the terms of this plan, the applicable indentures and trust documents.  For clarification the failure of either Wilmington or U.S. Bank to seek allowance of any of their fees and expenses as Administrative Expenses under the Plan shall not prejudice or impair each of their ability to recover such fees and

10-06097-PCW11   Doc 215   Filed 05/13/11   Entered 05/13/11 13:38:17   Pg 58 of 74

expenses in accordance with the distribution provisions of the respective applicable indentures and trust documents.

The Trusts shall not be obligated to pay any amounts that may be payable to the Debtor under the trust agreements, and the Debtor waives any right or claim to any payment from the Trusts.

### 5.2.2  Impairment.

Class 2 Claims are impaired.

## 5.3  Class 3:  Equity Interests.

### 5.3.1  Treatment.

Holders of Equity Interests shall receive nothing on account of their equity interests, and all of the issued and outstanding stock of the Debtor shall be cancelled as of the Effective Date.

### 5.3.2  Impairment.

Class 3 interests are impaired.

### 5.3.3  Plan Rejection.

Because this class will receive no value, this Class 3 is deemed to have voted against confirmation of the Plan.

## ARTICLE 6   VALIDITY OF PRIOR ORDERS

Except as provided in the Plan, the Confirmation Order, or other order entered by the Bankruptcy Court, this Plan does not alter or amend the prior orders entered by the Bankruptcy Court in this case, including without limitation the Sale Order and the Debtor in Possession Financing Order entered November 18, 2010.

## ARTICLE 7   MEANS FOR EXECUTION OF THE PLAN

## 7.1  Organization of Debtor.

After the Effective Date and after distributions under the Plan have been commenced, the Bylaws and Articles of Incorporation of the Reorganized Debtor

PLAN OF DISTRIBUTION – 13 of 26
51115086.17

shall be modified such that the Board of Directors shall be reduced to one person and the number of shareholders shall be reduced to one person. The sole director and shareholder shall be Patrick J. Rusnak to serve until the dissolution and winding up of the Debtor has been completed.

**7.2    Dissolution of Pre-Confirmation Committee.**

Upon the Effective Date, the Committee shall be dissolved and shall have no duties, power, obligations, or authority.

**7.3    Distribution Agent.**

Patrick J. Rusnak shall serve as the Distribution Agent. On the Distribution Date, or as soon as practicable thereafter, the Distribution Agent shall commence distributions to holders of Allowed Claims as provided in the Plan. The Distribution Agent shall be entitled to compensation at the rate of $250 per hour.

**7.4    Reservation of Funds—Additional Distributions.**

As of the Distribution Date, the Reorganized Debtor shall reserve sufficient funds to adequately provide for anticipated costs of administration and disputed Claims. As disputed Claims are resolved, the reserved funds freed by such resolution shall be distributed as under the Plan. There may be one or more Additional Distributions.

**7.5    Post-Confirmation Management.**

The Board of Directors will be reduced to one person. After confirmation of the Plan, the Debtor will employ the following people:

1.    Patrick J. Rusnak as the Chief Executive Officer and President, who will be primarily responsible for executing the Plan and winding up the Reorganized Debtor's affairs. Mr. Rusnak will be compensated at the rate of $250 per hour.

51115086.17

2.      Jay B. Simmons, as the Executive Vice President, General Counsel and Secretary, who will assist with the execution of the Plan and the winding up of the Reorganized Debtor's affairs, and will coordinate the work of the professionals providing services to the Reorganized Debtor.  Mr. Simmons will be compensated at the rate of $200 per hour.

3.      Shelly Krasselt, as the Principal Accounting Officer, who will provide necessary accounting functions, prepare financial reports, and assist with the execution of the Plan and the winding up of the Reorganized Debtor's affairs.  Ms. Krasselt will be compensated at the rate of $100 per hour.

The above individuals will be paid by the Distribution Agent on a monthly basis.  The post confirmation financial reports shall detail the compensation paid for these services.

**7.6     Source of Funds.**

Funds for the distributions proposed under the Plan are the Sale Proceeds and any additional cash held in the Debtor's bank accounts.

**7.7     Tax Determination.**

**7.7.1   Pre-Petition Tax Claims.**

The Debtor will either (i) proceed under Section 505(a) of the Bankruptcy Code to obtain a Final Order that all of the tax returns filed by the Debtor prior to the Petition Date are accepted, final and no longer subject to further review by the Internal Revenue Service, or (ii) reach a final resolution on the pre-petition Tax Claims held by the Internal Revenue Service, which final resolution shall be approved by an order of the Bankruptcy Court without notice if no Claim is allowed and only after notice to all parties who have requested special notice in the Case and an opportunity for a hearing if a Claim is allowed.  Distributions under the Plan will not be made prior to April 27, 2011 and either 1) entry of a Final

10-06097-PCW11     Doc 215     Filed 05/13/11     Entered 05/13/11 13:38:17     Pg 61 of 74

Unstayed Order resolving the pre-petition Tax Claims of the Internal Revenue Service or 2) withdrawal of the IRS claims filed in the Case.

### 7.7.2 Post-Petition Taxes.

Promptly upon the filing of any returns for post-petition periods, the Debtor will seek an accelerated determination that the returns are accepted, final and no longer subject to further review under the procedures provided in Section 505(c) of the Bankruptcy Code.

### 7.7.3 Reserves.

Until final determination of the pre- and post-petition Tax Claims of the Internal Revenue Service, the Reorganized Debtor shall retain sufficient reserves that in the opinion of its tax and legal advisors are sufficient to respond to any liability in full. If any party in interest disputes the necessity and/or extent of the amounts held in reserves, the party in interest shall be entitled seek an order modifying the amount on motion and notice in accordance with the Bankruptcy Rules.

### 7.8 Post-Effective Date Administrative Expenses.

A reserve sufficient to complete outstanding legal and administrative work to resolve all claims, dissolve the Reorganized Debtor and provide communication to parties in interest shall be established. Any excess from the reserve after the cessation of all activity will be distributed first to holders of any unpaid Unclassified Claims on a *pro rata* basis until holders of such claims are paid in full, then to holders of any unpaid Class 2 Claims on a *pro rata* basis until holders of such claims are paid in full, then to holders of Class 3 Claims on a *pro rata* basis.

51115086.17

**7.9    Actions On or After the Effective Date.**

On the Effective Date:

7.9.1  The Reorganized Debtor and the Distribution Agent shall be responsible for implementing the Plan.

7.9.2  All of the Assets including without limitation all causes of action under Chapter V of the Bankruptcy Code, shall vest in the Reorganized Debtor free and clear of all liens, security interests and claims, except as otherwise expressly provided for in the Plan.  After distributions under the Plan competed, it is not contemplated that the Debtor will have any assets remaining other then funds for windup expenses.

7.9.3  The Distribution Agent shall comply with the Plan and make the distributions required by the Plan.

7.9.4  In the event of a dispute on any Claim, the amount of such Claim that is not subject to dispute shall be an Allowed Claim and distribution made thereon.

**7.10    Post-Confirmation Consultation.**

After the Confirmation Date, the Distribution Agent and the Reorganized Debtor will continue to consult with the Indenture Trustees on Administrative Expenses, settlement of contested claims, and any post confirmation litigation in which the Reorganized Debtor is a Party.  The Indenture Trustees will be advised of such activities, receive notice of any action requiring a Court Order and will have the right to object or otherwise be heard on such actions.

**7.11    Cancellation of Securities.**

On the Effective Date, except to the extent otherwise provided herein, all notes, stock, instruments, certificates, debentures, agreements, indentures, declarations of trust, guarantees and other documents evidencing the Claims related to the Trusts and Equity Interests shall be deemed automatically canceled,

PLAN OF DISTRIBUTION – 17 of 26
51115086.17

shall be of no further force, whether surrendered for cancellation or otherwise; provided, that the indentures and other trust documents related to the Trusts shall survive solely for the purpose of: (i) allowing the applicable Indenture Trustees to receive distributions on account of Trust Claims and make further distributions in accordance with this Plan and the applicable indentures and trust documents and (ii) permitting the applicable Indenture Trustees to exercise any lien rights it may have against property held or collected by such Indenture Trustee to deduct its reasonable fees, costs and expenses from any amounts held by it, in accordance with the applicable indentures and trust documents, and for indemnification as provided therein. Immediately upon final distribution, the Trusts shall be canceled, dissolved and terminated and each Indenture Trustee shall be discharged of any obligations to the Debtor or any other Person under the applicable indentures, trust documents and guarantees.

**7.12 Distributions on Account of Trust Claims/Distribution Record Date.**

The Debtor shall make any distributions on account of Claims related to the Trusts to the applicable Indenture Trustee. The applicable Indenture Trustee shall make further distribution of such amounts, after deduction for its reasonable fees, costs and expenses, in accordance with this Plan and the provisions of the indentures and trust documents to holders of record as of the Confirmation Date.

## ARTICLE 8    TREATMENT OF EXECUTORY CONTRACTS

**8.1    Assumption and Rejection.**

The Debtor shall assume the equipment leases with CIT Communications Finance Corporation identified in Claim #7 filed in this case. Debtor will assign the leases to AmericanWest Bank. The leases are not in default, no cure amounts are due and assumption by AmericanWest Bank which is already a party under the leases as amended shall constitute full compliance with all terms of the Bankruptcy

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 64 of 74

Code relating to assumption and assignment of executory contracts including adequate assurance of future performance.

Upon the Effective Date and without any further order of the Bankruptcy Court, the Debtor shall be deemed to have rejected all executory contracts and unexpired leases not previously assumed or specifically assumed under the Plan.

**8.2    Rejection Claims.**

Any person or entity holding a Claim based upon the rejection of an executory contract or unexpired lease must file with the Bankruptcy Court and serve on the Debtor a Proof of Claim <u>within twenty-one (21) days after the Confirmation Date</u>. The failure to file a Proof of Claim by this deadline will result in such Claim being Disallowed and forever discharged.

### ARTICLE 9    CLAIMS OBJECTIONS

The Reorganized Debtor and any other party in interest shall have thirty (30) days following the Confirmation Date to file an objection to any Claim with the Bankruptcy Court. All Claim objections shall be determined by the Bankruptcy Court after notice to the person whose claim is being objected to and opportunity for a hearing in accordance with the Bankruptcy Rules. The Debtor shall reserve 115% of the amount of any disputed claim pending determination of the dispute by settlement or by Order of the Bankruptcy Court.

### ARTICLE 10   UNCLAIMED FUNDS

The Reorganized Debtor may stop payment on any check made in payment on an Allowed Claim or Administrative Expense under the Plan any time 60 days after the check was mailed. The Reorganized Debtor may rely on the address set forth in each proof of claim (or if there is no proof of claim, the address set forth in the bankruptcy schedules) unless the creditor provides the Reorganized Debtor with a written notice of a change in the creditor's address.

10-06097-PCW11    Doc 215    Filed 05/13/11    Entered 05/13/11 13:38:17    Pg 65 of 74

## ARTICLE 11 REPORTS AND STATUTORY FEES

Until the Case is closed, the Reorganized Debtor shall (i) file post-confirmation reports consistent with Local Bankruptcy Rule 2015-1(c), and (ii) pay all quarterly fees due and payable to the Office of the United States Trustee.

## ARTICLE 12 MODIFICATION OF THE PLAN

The Debtor may propose amendments or modifications to the Plan at any time prior to the Confirmation Date. After the Confirmation Date, the Debtor or the Reorganized Debtor may, with approval of the Bankruptcy Court, and so long as it does not materially or adversely affect the interests of creditors, remedy any defect or omission, or reconcile any inconsistencies in the Plan or in the Confirmation Order, in such a manner as may be necessary to carry out the purposes and effect of the Plan.

## ARTICLE 13 EFFECT OF CONFIRMATION

**13.1 Discharge.**

Allowed Claims that are paid in full are discharged and any liability arising therefrom shall be extinguished completely.

**13.2 Injunction.**

Allowed Claims that are not paid in full shall not be discharged, but all holders of all Claims, whether or not they are paid in full, will be enjoined from enforcement of any claim or taking any action against the Reorganized Debtor or against property of the estate being administered under the Plan to collect their debts from or against the Reorganized Debtor except as specifically authorized by the Plan, or to enforce the terms of the Plan.

All holders of Equity Interests also shall be enjoined from enforcement of any claim or taking any action against the Reorganized Debtor or against property

10-06097-PCW11     Doc 215     Filed 05/13/11     Entered 05/13/11 13:38:17     Pg 66 of 74

of the estate being administered under the Plan except as specifically authorized by the Plan, or to enforce the terms of the Plan.

**13.3 Exculpation and Limitation of Liability.**

Neither the Debtor, the Reorganized Debtor, the Committee, the Indenture Trustees nor any of their respective present or former members, managers, officers, directors, employees, advisors, attorneys, or agents for them acting in such capacity will have or incur any liability to, or be subject to any right of action by, any holder of a Claim or Equity Interest or any other party-in-interest or any of their respective agents, employees, representatives, financial advisors, attorneys, affiliates, or any of their successors or assigns, for any act or omission in connection with, relating to, or arising out of the Case, the pursuit of confirmation of the Plan, or the administration of the Plan, or the property to be distributed under the Plan, except for their willful misconduct; and in all respects such parties shall be entitled to reasonably rely upon the advice of counsel with respect to their duties and responsibilities under the Plan or in the context of the Case.

## ARTICLE 14    RETENTION OF JURISDICTION

**14.1 Generally.**

Following the Confirmation Date, the Bankruptcy Court shall retain jurisdiction over the Reorganized Debtor which retention of jurisdiction shall continue after entry of the Final Decree. The Bankruptcy Court's retained jurisdiction shall give it authority to hear matters arising in or related to the case and the Plan, including without limitation:

1.      To determine all adversary proceedings, applications, motions and contested matters instituted prior to the closing of the Case, including Claims objections;

51115086.17

1     2.     To ensure that distributions are accomplished as provided in the Plan
2 and, if requested, to provide orders approving distributions;

3     3.     To determine all objections to Administrative Claims filed both before
4 and after the Confirmation Date;

5     4.     To determine any objection to a Claim or any litigation relating to the
6 allowance of the Claim;

7     5.     To enter and implement such orders as may be appropriate in the
8 event the Confirmation Order is for any reason stayed, revoked, modified or
9 vacated;

10     6.     To issue orders in aid of execution of the Plan and to issue injunctions
11 or take such other actions or make such other orders as may be necessary or
12 appropriate to restrain interference with the Plan or its execution or implementation
13 by any entity;

14     7.     To consider all modifications of the Plan, to cure any defect or
15 omission in the Plan, or to reconcile any inconsistency in the Plan or any order of
16 the Bankruptcy Court, necessary to carry out the purpose and intent of the Plan
17 including, without limitation, the Confirmation Order;

18     8.     To determine all applications for compensation and reimbursement of
19 expenses of professionals under sections 330, 331 and 503(b) of the Bankruptcy
20 Code;

21     9.     To determine any disputes arising in connection with the
22 interpretation, implementation, execution or enforcement of the Plan, the
23 Confirmation Order or any other order of the Bankruptcy Court;

24     10.     To determine all matters concerning state, local and federal taxes in
25 accordance with sections 346, 505, and 1146 of the Bankruptcy Code;

26

1         11.    To determine any other matter not inconsistent with the Bankruptcy

2   Code; and

3         12.    To enter a Final Decree.

4   **14.2   Reopening Not a Prerequisite to Jurisdiction.**

5         Exercise of the Bankruptcy Court's continuing jurisdiction on matters

6   related to the Case or the Plan shall not require that the Case be formally reopened.

7   However, the Bankruptcy Court may order a closed case to be reopened in its

8   discretion.

9                 **ARTICLE 15  EVENTS OF DEFAULT**

10        In the event Debtor defaults under the provisions of the Plan, any Creditor

11   desiring to assert such a default shall serve on the Debtor written notice of the

12   alleged default.  The Debtor shall have 30 days from receipt of the written notice in

13   which to cure the default.  If a default is not cured within the 30-day notice period,

14   the Creditor providing such notice of default may thereafter file with the

15   Bankruptcy Court and serve upon Debtor and its counsel a motion requesting

16   relief.  The Bankruptcy Court, upon a finding of a material default, shall issue an

17   order as appropriate under the circumstances.  If the Creditor is the Internal

18   Revenue Service, then it may revert to its ordinary administrative collection

19   procedures after giving 30 days' written notice of the default as provided herein.

20               **ARTICLE 16  GENERAL PROVISIONS**

21   **16.1   Substantial Consummation.**

22         The Plan shall be deemed substantially consummated when the initial

23   distributions under the plan have been made and reserves for disputed claims, post

24   petition administrative expenses and expenses of dissolution and winding up have

25   been established.

26

**16.2    Stay of Confirmation Order Shall Not Apply.**

The 14 day stay of enforceability of the Confirmation Order pursuant to Bankruptcy Rule 3020(e) shall not apply, and the Confirmation Order shall be enforceable according to its terms immediately upon entry absent further order of a court of competent jurisdiction.

**16.3    Governing Law**

The construction, implementation and enforcement of the Plan and all rights and obligations arising under the Plan shall be governed by, and construed and enforced in accordance with, the laws of the State of Washington without giving effect to its conflicts of law principles, except to the extent that the Bankruptcy Code or Bankruptcy Rules or other federal laws are applicable, and subject to the provisions of any contract, instrument, release, or other agreement or document to which the Debtor is a party and that has been approved by the Bankruptcy Court.

**16.4    Notices.**

Any notice required or permitted to be provided under the Plan shall be in writing and served by regular first class mail, overnight delivery, or hand-delivery to the parties set forth below:

For the Debtor and Reorganized Debtor:

    Dillon E. Jackson
    Foster Pepper PLLC
    1111 Third Avenue, Suite 3400
    Seattle, WA  98101-3299
    Phone:  (206) 447-4400
    Fax:  (206) 447-9700

     -and-

    G. Larry Engel
    Morrison & Foerster
    425 Market Street

San Francisco, CA 94105
Phone: (415) 268-7000
Fax: (415) 268-7522

**16.5  Final Decree.**

After the Plan has been substantially consummated, the Reorganized Debtor may file an application for a Final Decree showing that the Plan has been substantially consummated.  The Reorganized Debtor will  serve the application for a Final Decree on the United States Trustee, the Internal Revenue Service, and on parties that have filed requests for special notice in the Case.  After service of the notice and an opportunity for a hearing in accordance with the Bankruptcy Rules, an order approving the Reorganized Debtor's final report, entering a Final Decree and closing the Reorganization Case may be entered.

**16.6  Headings.**

The headings of the articles, paragraphs, and section of the Plan are inserted for convenience only and will not affect the interpretation hereof.

**16.7  Successors and Assigns.**

The rights, benefits and obligations of any person named or referred to in the Plan shall be binding upon, and will inure to the benefit of, the heirs, executors, administrators, successors or assigns of such Person.

**16.8  Corporate Dissolution.**

After the Effective Date, the Reorganized Debtor may seek to dissolution and winding up of its affairs under the applicable provisions of Washington law without further order of the Court, provide that the Reorganized Debtor may seek such Bankruptcy Court orders as may be necessary to aid in the completion of its dissolution and winding up.

PLAN OF DISTRIBUTION – 25 of 26
51115086.17

## ARTICLE 17  REQUEST FOR CONFIRMATION

The Debtor requests entry of a Confirmation Order pursuant to Section 1129 of the Bankruptcy Code. As to the Class of Interests, Debtor requests confirmation over the deemed rejected Class of Interests pursuant to 1129(b).

DATED this 15th day of March, 2011.

**AmericanWest Bancorporation,**
**Debtor and Debtor in Possession**

*s/ Patrick J. Rusnak*

_____

Patrick J. Rusnak, CEO
AmericanWest Bancorporation

PLAN OF DISTRIBUTION – 26 of 26
51115086.17

# EXHIBIT C

LF 3018 c (8/2010)

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON

In re: AMERICANWEST                    Case No.  10-06097-PCW11
       BANCORPORATION

**BALLOT FOR ACCEPTING OR REJECTING PLAN OF REORGANIZATION**

1.    The Plan of Reorganization referred to in this ballot was filed by
      __AMERICANWEST BANCORPORATION__ · on __MARCH 15, 2011__ .
      The Plan of Reorganization can be confirmed by the court and thereby made binding on
      you if it is accepted by the holders of two-thirds in amount and more than one-half in
      number of claims in each class.  In order for your vote to count, you must complete and
      return this ballot within the time set forth below.

2.    The undersigned, a creditor or equity security holder of the above-named debtor,

                              ☐  **ACCEPTS**
                                              (Check only one)
                              ☐  **REJECTS**

      the Plan of Reorganization for the Debtor.

3.    The Plan of Reorganization places my claim or interest in Class No. _____ .

4.    Name of creditor or
      equity security holder:     _____
                                              (Type or print)

                         By:     _____
                                              (Signature)

5.    Address of creditor
      or equity security holder:  _____

                                  _____

6.    Return ballot on or before __June 15, 2011__  to:   Dillon E. Jackson
                                                          1111 3rd Ave.  Ste. 3400
                                                          Seattle, Washington 98101