DANIEL R. BROWN
BROWN LEGAL ADVISORS, LLC
1253 W. FOSTER AVE., SUITE 3E
CHICAGO, IL 60640
(773) 527-0585

BRUCE K. MEDEIROS
DAVIDSON BACKMAN MEDEIROS PLLC
1550 BANK OF AMERICA FINANCIAL CENTER
601 WEST RIVERSIDE AVENUE
SPOKANE, WASHINGTON 99201
(509) 624-4600

Counsel for
Holdco Advisors L.P., Plan Proponent

Holdco Advisors L.P.'s Mailing Address:
32 Broadway, Suite 1112
New York, NY 10004

UNITED STATES BANKRUPTCY COURT
EASTERN DISTRICT OF WASHINGTON
AT SPOKANE

| | |
|---|---|
| In re | ) |
| | ) |
| AMERICANWEST | ) Case No. 10-06097-PCW-11 |
| BANCORPORATION, | ) |
| | ) Chapter 11 |
| | ) |
| Debtor. | ) **THIRD AMENDED DISCLOSURE** |
| | ) **STATEMENT REGARDING CHAPTER** |
| | ) **11 PLAN OF REORGANIZATION** |
| | ) **PROPOSED BY HOLDCO ADVISORS** |
| | ) **L.P. DATED JUNE 11, 2013** |
| | ) |
| | ) **Disclosure Statement Hearing** |
| | ) |
| | ) |
| | ) June 12, 2013, at 11:00 a.m. |
| | ) 904 W. Riverside Ave. |
| | ) Room 304 |
| | ) Spokane, Washington |
| | ) |

THIS DISCLOSURE STATEMENT HAS BEEN PREPARED PURSUANT TO SECTION 1125 OF THE BANKRUPTCY CODE AND BANKRUPTCY RULE 3016(b) AND IS NOT NECESSARILY IN ACCORDANCE WITH THE FEDERAL OR STATE SECURITIES LAWS OR SIMILAR LAWS. THIS DISCLOSURE STATEMENT CONTAINS SUMMARIES OF CERTAIN PROVISIONS OF THE CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY HOLDCO ADVISORS L.P. (INCLUDING ALL EXHIBITS THERETO), AS MODIFIED OR AMENDED FROM TIME TO TIME (THE "PLAN") AND CERTAIN OTHER DOCUMENTS. THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS PROVIDED FOR THE PURPOSE OF SOLICITING ACCEPTANCES OF THE PLAN AND SHOULD NOT BE RELIED UPON FOR ANY PURPOSE OTHER THAN TO DETERMINE WHETHER AND HOW TO VOTE ON THE PLAN. HOLDCO ADVISORS L.P. ("HOLDCO" OR THE "PLAN PROPONENT") BELIEVES THAT THESE SUMMARIES ARE FAIR AND ACCURATE.

THE STATEMENTS AND INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT HAVE BEEN MADE AS OF THE DATE OF THIS DISCLOSURE STATEMENT UNLESS OTHERWISE SPECIFIED. HOLDERS OF CLAIMS AND EQUITY INTERESTS REVIEWING THIS DISCLOSURE STATEMENT SHOULD NOT INFER AT THE TIME OF SUCH REVIEW THAT THERE HAVE BEEN NO CHANGES IN THE FACTS SET FORTH IN THIS DISCLOSURE STATEMENT SINCE THE DATE OF THIS DISCLOSURE STATEMENT. EACH HOLDER OF A CLAIM ENTITLED TO VOTE ON THE PLAN SHOULD CAREFULLY REVIEW THE PLAN, THIS DISCLOSURE STATEMENT, AND THE PLAN SUPPLEMENT IN THEIR ENTIRETY BEFORE CASTING A BALLOT. THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE LEGAL, BUSINESS, FINANCIAL, OR TAX ADVICE. ANY ENTITIES DESIRING ANY SUCH ADVICE OR ANY OTHER ADVICE SHOULD CONSULT WITH THEIR OWN ADVISORS.

NO ONE IS AUTHORIZED TO GIVE ANY INFORMATION WITH RESPECT TO THE PLAN OTHER THAN THAT WHICH IS CONTAINED IN THIS DISCLOSURE

STATEMENT. NO REPRESENTATIONS CONCERNING AMERICANWEST BANCORPORATION (THE "DEBTOR") OR THE VALUE OF ITS PROPERTY HAVE BEEN AUTHORIZED BY THE PLAN PROPONENT OTHER THAN AS SET FORTH IN THIS DISCLOSURE STATEMENT AND THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT. ANY INFORMATION, REPRESENTATIONS, OR INDUCEMENTS MADE TO OBTAIN AN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN AS SET FORTH, OR INCONSISTENT WITH, THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT, THE DOCUMENTS ATTACHED TO THIS DISCLOSURE STATEMENT OR THE PLAN SHOULD NOT BE RELIED UPON BY ANY HOLDER OF A CLAIM OR EQUITY INTEREST.

WITH RESPECT TO CONTESTED MATTERS, ADVERSARY PROCEEDINGS, AND OTHER PENDING, THREATENED, OR POTENTIAL LITIGATION OR OTHER ACTIONS, THIS DISCLOSURE STATEMENT DOES NOT CONSTITUTE, AND MAY NOT BE CONSTRUED AS, AN ADMISSION OF FACT, LIABILITY, STIPULATION, OR WAIVER, BUT RATHER AS A STATEMENT MADE IN THE CONTEXT OF SETTLEMENT NEGOTIATIONS PURSUANT TO RULE 408 OF THE FEDERAL RULES OF EVIDENCE.

THIS DISCLOSURE STATEMENT HAS NOT BEEN APPROVED OR DISAPPROVED BY THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION, NOR HAS THE UNITED STATES SECURITIES AND EXCHANGE COMMISSION PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THIS DISCLOSURE STATEMENT OR UPON THE MERITS OF THE PLAN.

ALTHOUGH THE PLAN PROPONENT BELIEVES THAT THE PLAN COMPLIES WITH ALL APPLICABLE PROVISIONS OF THE BANKRUPTCY CODE, THE PLAN PROPONENT CANNOT ASSURE SUCH COMPLIANCE OR THAT THE BANKRUPTCY COURT WILL CONFIRM THE PLAN.

iii

PLEASE REFER TO ARTICLE IX OF THIS DISCLOSURE STATEMENT, ENTITLED "CERTAIN RISK FACTORS TO BE CONSIDERED PRIOR TO VOTING," FOR A DISCUSSION OF CERTAIN CONSIDERATIONS IN CONNECTION WITH A DECISION BY A HOLDER OF AN IMPAIRED CLAIM TO ACCEPT THE PLAN.

**THE BANKRUPTCY COURT HAS SCHEDULED THE CONFIRMATION HEARING TO COMMENCE ON _____, 2013, AT _____ BEFORE THE HONORABLE PATRICIA C. WILLIAMS, UNITED STATES BANKRUPTCY JUDGE, IN THE UNITED STATES BANKRUPTCY COURT FOR THE EASTERN DISTRICT OF WASHINGTON, LOCATED AT 904 W. RIVERSIDE AVENUE, STE. 304, SPOKANE, WASHINGTON. THE CONFIRMATION HEARING MAY BE ADJOURNED FROM TIME TO TIME BY THE BANKRUPTCY COURT WITHOUT FURTHER NOTICE EXCEPT FOR AN ANNOUNCEMENT OF THE ADJOURNED DATE MADE AT THE CONFIRMATION HEARING OR BY NOTICE OF ANY ADJOURNMENT OF THE CONFIRMATION HEARING FILED BY THE PLAN PROPONENT.**

**TO BE COUNTED, THE BALLOTS UPON WHICH HOLDERS OF IMPAIRED CLAIMS ENTITLED TO VOTE SHALL CAST THEIR VOTE TO ACCEPT OR REJECT THE PLAN INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED IN ACCORDANCE WITH THE INSTRUCTIONS ON SUCH BALLOT. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE XI OF THIS DISCLOSURE STATEMENT AND DISCLOSURE STATEMENT ORDER AND NOTICE. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE PLAN PROPONENT.**

**OBJECTIONS TO CONFIRMATION OF THE PLAN MUST BE FILED AND SERVED ON OR BEFORE _____, 2013 AT 11:59 P.M. PREVAILING PACIFIC TIME, IN ACCORDANCE WITH THE SOLICITATION PROCEDURES AND**

iv

DISCLOSURE STATEMENT ORDER, WHICH ARE DESCRIBED IN FURTHER DETAIL IN ARTICLE XI OF THIS DISCLOSURE STATEMENT. UNLESS OBJECTIONS TO CONFIRMATION ARE TIMELY SERVED AND FILED IN COMPLIANCE WITH THE SOLICITATION PROCEDURES AND DISCLOSURE STATEMENT ORDER, THEY MAY NOT BE CONSIDERED BY THE BANKRUPTCY COURT.

THIS DISCLOSURE STATEMENT CONTAINS FORWARD-LOOKING STATEMENTS WITHIN THE MEANING OF SECTION 27A AND SECTION 21E OF THE SECURITIES ACT, AS AMENDED. SUCH STATEMENTS MAY CONTAIN WORDS SUCH AS "MAY," "WILL," "MIGHT," "EXPECT," "BELIEVE," "ANTICIPATE," "COULD," "WOULD," "ESTIMATE," "CONTINUE," "PURSUE," OR THE NEGATIVE THEREOF OR COMPARABLE TERMINOLOGY, AND MAY INCLUDE, WITHOUT LIMITATION, INFORMATION REGARDING THE PLAN PROPONENT'S EXPECTATIONS REGARDING FUTURE EVENTS. FORWARD-LOOKING STATEMENTS ARE INHERENTLY UNCERTAIN, AND ACTUAL RESULTS MAY DIFFER FROM THOSE EXPRESSED OR IMPLIED IN THIS DISCLOSURE STATEMENT AND THE FORWARD-LOOKING STATEMENTS CONTAINED HEREIN. IN PREPARING THIS DISCLOSURE STATEMENT, THE PLAN PROPONENT RELIED ON FINANCIAL DATA DERIVED FROM THE DEBTOR'S DISCLOSURE STATEMENT AND OTHER PRIOR FILINGS WITH THE BANKRUPTCY COURT OR OTHERWISE MADE AVAILABLE TO IT AT THE TIME OF SUCH PREPARATION AND ON VARIOUS ASSUMPTIONS. THE PLAN PROPONENT RELIES UPON THE FINANCIAL INFORMATION PROVIDED BY THE DEBTOR IN ITS DISCLOSURE STATEMENT, AS WELL AS THE DEBTOR'S REPRESENTATION(S) THAT SUCH FINANCIAL INFORMATION FAIRLY REFLECTS THE FINANCIAL CONDITION OF THE DEBTOR AS OF THE DATE OF THE FILING OF THE DEBTOR'S DISCLOSURE STATEMENT, AND THAT THE ASSUMPTIONS REGARDING FUTURE EVENTS REFLECT

v

REASONABLE BUSINESS JUDGMENTS. IT SHOULD BE NOTED, HOWEVER, THAT NO REPRESENTATIONS OR WARRANTIES ARE MADE BY THE PLAN PROPONENT AS TO THE ACCURACY OF THE FINANCIAL INFORMATION CONTAINED HEREIN OR THE PLAN PROPONENT'S ASSUMPTIONS REGARDING DISTRIBUTIONS UNDER THE PLAN. THE PLAN PROPONENT EXPRESSLY CAUTIONS READERS NOT TO PLACE UNDUE RELIANCE ON ANY FORWARD-LOOKING STATEMENTS CONTAINED HEREIN.

AMONG THE FACTORS THAT COULD CAUSE ACTUAL RESULTS TO DIFFER MATERIALLY FROM CURRENT ESTIMATES OF FUTURE PERFORMANCE IS THE PLAN PROPONENT'S ABILITY TO PROSECUTE, CONFIRM, AND CONSUMMATE A PLAN WITH RESPECT TO THIS CASE.

THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS AS OF THE FILING DATE OF THIS DISCLOSURE STATEMENT AND THE PLAN PROPONENT IS UNDER NO OBLIGATION, AND EXPRESSLY DISCLAIM ANY OBLIGATION, TO PUBLICLY UPDATE ANY FORWARD-LOOKING STATEMENTS, WHETHER AS A RESULT OF NEW INFORMATION, FUTURE EVENTS, OR OTHERWISE.

# I.   Defined Terms

Unless the context otherwise requires, the following terms shall have the following meanings when used in capitalized form herein:[1]

1.   ***"Section 382"*** means the section of the Internal Revenue Code that imposes an annual limitation on a company's use of its taxable losses in the year following a change in ownership of the company.

2.   ***"382(l)(5) Exception"*** means an exception to the Section 182 Limitation that generally applies when so-called "qualified creditors" of a debtor in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan.

3.   ***"382(l)(6) Exception"*** means an exception to the Section 182 Limitation where the 382(l)(5) Exception is not applicable, either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception.

4.   ***"Section 383"*** means the section of the Internal Revenue Code that imposes an annual limitation on the use of a corporation's excess tax credits following an ownership change. Section 383 provides that the use of excess tax credits in post-change years is limited to the "portion of the tax liability which is attributable to so much of the taxable income as does not exceed the Section 382 limitation for such post-change year to the extent available after the application of Section 382 and subsections (b) and (c) [of Section 383]."

5.   ***"Accrued Professional Compensation"*** means, at any given moment, all accrued and/or unpaid fees and expenses including, without limitation, fees or expenses Allowed or awarded by a Final Order of the Bankruptcy Court or any other court of competent jurisdiction) for legal, financial advisory, accounting and other services and reimbursement of expenses that are awardable and allowable under sections 328, 330(a) or 331 of the Bankruptcy Code or otherwise rendered prior to the Effective Date, or thereafter in connection with, and only with (x) applications Filed pursuant to section 330 and 331 of the Bankruptcy Code and (y) motions seeking the enforcement of the provisions of the Plan or Confirmation Order, by all Professionals in the Case that the Bankruptcy Court has not denied by a Final Order, to the extent that any such fees and expenses have not previously been paid regardless of whether a fee application has been filed for any such amount. To the extent that the Bankruptcy Court or any higher court denies by a Final Order any amount of a Professional's fees or expenses, then those amounts shall no longer be Accrued Professional Compensation.

---

[1]   All capitalized terms not defined herein have the meaning ascribed to them in the Plan.  All terms used and not otherwise defined herein that are defined in the Bankruptcy Code shall have the meanings ascribed to them in the Bankruptcy Code.

6. ***"Administrative Claim"*** means a Claim for payment of an administrative expense of a kind specified in section 503(b) of the Code and entitled to priority pursuant to sections 507(a)(l) or 507(b) of the Code, including compensation of and reimbursement of costs to Professionals, and all fees and charges assessed against the Debtor and the Estate under 28 U.S.C. section 1930.

7. ***"Administrative Claim Objection Bar Date"*** means the deadline for the Reorganized Debtor to object to Administrative Claims Filed in the Case which deadline shall be the later of: (a) 120 days after the Effective Date, or (b) 120 days after the particular request for an administrative expense payment has been filed, except as extended by an agreement between the Creditor and the Reorganized Debtor, or by order of the Bankruptcy Court.

8. ***"Affiliate"*** means the term "affiliate" as defined in section 101(2) of the Bankruptcy Code.

9. ***"Allowed Administrative Claim"*** means all or that portion of an Administrative Claim which is an Allowed Claim.

10. ***"Allowed Claim"*** means that portion of a Claim which: (a) was scheduled by the Debtor pursuant to section 521 of the Code, other than a Claim scheduled as disputed, contingent or unliquidated; (b) is set forth in a proof of Claim which was timely filed with the Bankruptcy Court, and as to which no objection has been filed within the time provided by the Plan; or (c) if a proof of Claim is timely filed and an objection to the proof of Claim was filed, has been allowed by a Final Order.

11. ***"Allowed Convenience Claim"*** means all or that portion of a Convenience Claim which is an Allowed Claim.

12. ***"Allowed Priority Tax Claim"*** means all or that portion of a Priority Tax Claim which is an Allowed Claim.

13. ***"Allowed Secured Claim"*** means an Allowed Claim secured by a lien on any property of the Estate, but only to the extent of the value of the interest of the holder of such Allowed Claim in such property, the calculation of which shall not include any demand for default interest, penalty interest or other similar demands.

14. ***"Allowed General Unsecured Claim"*** means all or that portion of a General Unsecured Claim that is an Allowed Claim.

15. ***"AMT"*** means alternative minimum tax.

16. ***"AMTI"*** means a corporation's alternative minimum taxable income.

17. ***"Avoidance Actions"*** means any and all avoidance, recovery, subordination or other actions or remedies that may be brought on behalf of the Debtor, the Reorganized Debtor or its Estate under the Bankruptcy Code or applicable non-bankruptcy law, including, without limitation, actions or remedies under sections 510, 542, 543, 544, 545, 547, 548,

8

549, 550, 551, 552 and 553 of the Bankruptcy Code.

18.      ***"Ballot"*** means a ballot sent to Holders of Claims to be counted as a vote to accept or reject the Plan.

19.      ***"Bank"*** means AmericanWest Bank, a Washington state-chartered bank insured by the FDIC.

20.      ***"Bankruptcy Code"*** means title I of the Bankruptcy Reform Act of 1978, as amended from time to time, as set forth in sections 101 *et seq.* of title 11 of the United States Code, and applicable portions of titles 18 and 28 of the United States Code.

21.      ***"Bankruptcy Court"*** means the United States Bankruptcy Court for the Eastern District of Washington, having jurisdiction over the Case and, to the extent of any reference made pursuant to section 157 of title 28 of the United States Code, the unit of such District Court pursuant to section 151 of title 28 of the United States Code; or, in the event such court ceases to exercise jurisdiction over the Case, such court or unit thereof that exercises jurisdiction over the Case in lieu thereof.

22.      ***"Bankruptcy Rules"*** means the Federal Rules of Bankruptcy Procedure and the Local Bankruptcy Rules for the Bankruptcy Court, to the extent applicable to the Case, including all amendments thereto to the extent such amendments are applicable to the Case.

23.      ***"Bar Date Order"*** means the Order Establishing Claims Bar Date, dated December 30, 2010 [Docket No. 168].

24.      ***"Business Day"*** means any day except Saturday, Sunday, "legal holiday" (as that term is defined in Bankruptcy Rule 9006(a)) or any day on which commercial banks in Spokane, Washington are authorized by law to close.

25.      ***"Capital Loss Carryforwards"*** means the application of the prior net operating losses to future years' profits in order to reduce overall tax liability of a company.  In general, net operating losses may be carried forward for the five taxable years following the loss year.  The amount of net capital loss carryforwards from any taxable year prior to the first year after a company ownership change is limited under the principles of Section 382 of the Internal Revenue Code.

26.      ***"Case"*** means the chapter 11 case number 10-06097-PCW-11 under the Code, commenced by the Debtor on the Petition Date.

27.      ***"Cash"*** means legal tender of the United States of America or the equivalent thereof, and with respect to the Disputed Reserve, including bank deposits, checks and readily marketable securities or instruments issued by an entity, including, without limitation, readily marketable direct obligations of, or obligations guaranteed by, the United States of America, commercial paper of domestic corporations carrying a Moody's rating of "A" or better, or equivalent rating of any other nationally-recognized rating service, or

9

interest-bearing certificates of deposit or other similar obligations of domestic banks or other financial institutions having a shareholders' equity or capital of not less than one hundred million dollars ($100,000,000) having maturities of not more than one (1) year, at the then best generally available rates of interest for like amounts and like periods.

28. **"Causes of Action"** means all claims, actions, causes of action, including choses in action, suits, debts, dues, sums of money, accounts, reckonings, bonds, bills, specialties, covenants, contracts, controversies, agreements, promises, variances, trespasses, damages, judgments, remedies, rights of set off, third-party claims, subrogation claims, contribution claims, reimbursement claims, indemnity claims, counterclaims and cross claims (including, without limitation, all claims and any avoidance, recovery, subordination or other actions against insiders and/or any other Entities under the Bankruptcy Code, including Avoidance Actions) of the Debtor, the Debtor in Possession, the Reorganized Debtor and/or the Estate (including, without limitation, those actions set forth on Exhibit "A" to the Plan Supplement) that are or may be pending on, or may be instituted by the Reorganized Debtor after, the Effective Date against any entity, based in law or equity, including, without limitation, under the Bankruptcy Code, whether direct, indirect, derivative or otherwise and whether asserted or unasserted as of the Effective Date.

29. **"Certificate"** means any instrument, including, without limitation, any note, bond, indenture or other document evidencing or creating any indebtedness or obligation of the Debtor, evidencing a Claim against the Debtor.

30. **"Claim"** means the term as defined in section 101(5) of the Code.

31. **"Claims Objection Bar Date"** means the deadline for the Reorganized Debtor to object to Claims Filed in the Case (except for Administrative Claims), which deadline shall be the later of (a) 90 days after the Effective Date; or (b) 90 days after the relevant proof of Claim has been filed, except as extended by an agreement between the Creditor and the Reorganized Debtor or by order of the Bankruptcy Court.

32. **"Claims Register"** means the official register of proofs of Claim filed in the Case and maintained by the clerk of the Court.

33. **"Class"** means a group of Claims or Interests classified together in a class designated in Article III.

34. **"Code"** means the Bankruptcy Code.

35. **"Committee"** means the Official Committee of Unsecured Creditors appointed by the Office of the United States Trustee in the Case pursuant to section 1102(a), as it may be constituted from time to time, and its current and former members.

36. **"Common Stock"** means common stock of the Debtor.

37. **"Confirmation Date"** means the date of Entry of the Confirmation Order.

10

38. **"Confirmation Hearing"** means the hearing before the Bankruptcy Court to be held in accordance with section 1128(a) of the Code.

39. **"Confirmation Order"** means the order of the Bankruptcy Court confirming the Plan pursuant to section 1129 of the Code.

40. **"Convenience Claim"** means (i) any Allowed General Unsecured Claim for an amount of $7,500 or less or (ii) any Allowed General Unsecured Claim in an amount greater than $7,500, but which is reduced to $7,500 by election of the Holder thereof pursuant to such Holder's Ballot. In no event shall any Convenience Claim exceed $7,500 for the purposes of allowance, treatment or Distribution under this Plan.

41. **"Creditor"** means any Person that is the holder of a Claim.

42. **"Cure"** means the payment of Cash by the Debtor or Reorganized Debtor, as applicable, or the distribution of other property (as the Debtor or the Reorganized Debtor, as applicable, and the counterparty to the executory contract or unexpired lease may agree or the Bankruptcy Court may order), as necessary to (a) cure a monetary default by the Debtor in accordance with the terms of an executory contract or unexpired lease of the Debtor and (b) permit the Debtor to assume such executory contract or unexpired lease under sections 365 and 1123 of the Bankruptcy Code.

43. **"Cure Bar Date"** means the date that is thirty days after the Effective Date.

44. **"Debtor"** means AmericanWest Bancorporation, a Washington corporation.

45. **"Disclosure Statement"** means the **THIRD AMENDED DISCLOSURE STATEMENT RE CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY HOLDCO ADVISORS L.P. FOR DEBTOR AMERICANWEST BANCORPORATION DATED JUNE 11, 2013** (and all annexes attached thereto or referenced therein) that relates to this Plan and is approved pursuant to section 1125 of the Code in an order Entered by the Bankruptcy Court, as such Disclosure Statement may be amended, modified or supplemented.

46. **"Disclosure Statement Order"** means an order Entered by the Bankruptcy Court approving this Disclosure Statement.

47. **"Disputed Claim"** means any Claim which is not an Allowed Claim.

48. **"Disputed Reserve"** means the reserve for Disputed Clams as forth in Article VI.B. of the Plan.

49. **"Distribution"** means any distribution of New Common Stock or any distributions of Net Free Cash that may be issued on account of the Proceeds Distribution Election to be made in accordance with the Plan, as applicable.

50. **"Distribution Date"** means (i) the Initial Distribution Date, and (ii) any subsequent date on which a Distribution is made by the Reorganized Debtor.

11

51. **"Distribution Record Date"** means the record date for determining the entitlement of Holders of Claims to receive Distributions under the Plan on account of Allowed Claims. The Distribution Record Date shall be two business days after the Confirmation Date.

52. **"Effective Date"** means the first Business Day on which all the conditions precedent to the effectiveness of the Plan are satisfied or waived as provided in this Plan, *provided*, *however*, that if a stay, injunction or similar provision of the Confirmation Order is in effect, the Effective Date shall be the first Business Day after such stay, injunction or similar proceeding is no longer in effect.

53. **"Entered"** or **"Entry"** means the recording on the Bankruptcy Court docket for the Case by the clerk of the Bankruptcy Court.

54. **"Estate"** means the estate of the Debtor created on the Petition Date by section 541 of the Bankruptcy Code.

55. **"Exculpated Parties"** means in their individual and representative capacities as such, the TOPrS Indenture Trustees, the Committee and its individual members, Holdco, all Entities controlled by or under common control of the foregoing, all affiliates of all of the foregoing, and all of their respective current and former directors, officers, members, partners, employees, attorneys, accountants, investment bankers, financial advisors, consultants, and other professionals (including their respective officers, directors, employees, members, attorneys, and professional advisors).

56. **"Fair Market Value Price"** means a price equal to fair market value as determined by the Board of Directors in good faith as of a date not more than 30 days prior to the closing date of the applicable transaction.

57. **"FDIC"** means the Federal Deposit Insurance Corporation.

58. **"File"** or **"Filed"** means, with respect to any pleading, entered on the docket of the Case and properly served in accordance with the Bankruptcy Rules or with respect to a Claim, a Claim for which a proof of Claim has been properly and timely filed in accordance with the Bar Date Order.

59. **"Final Order"** means an order or judgment Entered by the Bankruptcy Court or any other court exercising jurisdiction over the subject matter of the Case and the parties: (i) that has not been reversed, stayed, modified or amended; (ii) as to which no appeal, certiorari proceeding, reargument, or other review or rehearing has been requested or is still pending; and (iii) as to which the time for filing a notice of appeal or petition for certiorari shall have expired. Notwithstanding, and in lieu of the foregoing, with respect to the Confirmation Order, Final Order means an order or judgment of the Bankruptcy Court confirming the Plan and with respect to which no stay pending appeal is in effect.

60. **"Free Cash"** means (a) Cash owned by the Debtor as of the Effective Date plus (b) Cash proceeds from (i) any loan participation, loan, investment financial instrument, or anything similar to any of the foregoing, that is owned by the Debtor as of the Effective

12

Date; (ii) any Causes of Action and (iii) any other tangible or intellectual property assets that are owned by the Debtor as of the Effective Date plus (c) amounts, if any, refunded under the Debtor's insurance policies.

61. **"General Unsecured Claim"** means a Claim against the Debtor that is not a Secured Claim, Administrative Claim, Priority Tax Claim, Convenience Class Claim or Equity Interest. For the avoidance of doubt, TOPrS Unsecured Claims, all Class 3 Claims, and the Sandler Unsecured Claim are General Unsecured Claims under the Plan.

62. **"Governmental Entity"** means any legislature, agency, bureau, department, commission, court, political subdivision, tribunal or other instrumentality of government whether local, state, federal or foreign, and such other entities as defined and described in section 101(27) of the Code.

63. **"Holdco"** means Holdco Advisors L.P.

64. **"Holdco Fees"** means the reasonable, documented third party fees and expenses (including, without limitation, professional fees and expenses) of Holdco incurred through the Effective Date related to the Plan (including with respect to potential modifications thereof), the Disclosure Statement, and all other Plan documents and matters related thereto.

65. **"Holder or Holders"** mean any entity or entities holding a Claim against or an Interest in the Debtor.

66. **"Impaired"** means, with respect to a Claim, Equity Interest, or Class of Claims or Equity Interests, "impaired" within the meaning of sections 1123(a)(4) and 1124 of the Bankruptcy Code.

67. **"Initial Distribution Date"** means the Effective Date, or as soon as reasonably practicable after the Effective Date.

68. **"Insider"** means the term as defined in section 101(31) of the Code.

69. **"Interests"** means any equity interests, ownership rights, or shares in the Debtor (including, without limitation, all capital stock, stock certificates, common stock, preferred stock, partnership interests, membership and other interests in a limited liability company, rights, options, warrants, contingent warrants, convertible or exchangeable securities, investment securities, subscriptions or other agreements and contractual rights to acquire or obtain such an interest or share in the Debtor, partnership interests in the Debtor's stock appreciation rights, conversion rights, repurchase rights, redemption rights, dividend rights, preemptive rights and liquidation preferences, puts, calls or commitments of any character whatsoever relating to any such equity, ownership interests or shares of capital stock of the Debtor or obligating the Debtor to issue, transfer or sell any shares of capital stock) whether or not certificated, transferable, voting or denominated "stock" or a similar security, and any Claim relating to or arising from any of the foregoing.

13

70. **_"Internal Revenue Code"_** means the Internal Revenue Code of 1986, as amended.

71. **_"IRS"_** means the Internal Revenue Service.

72. **_"Investment Company Act"_** means the Investment Company Act of 1940, 15 U.S.C. § 80a–1 et seq., as now in effect or hereafter amended.

73. **_"Lien"_** shall have the meaning set forth in section 101(37) of the Bankruptcy Code.

74. **_"Loss Corporation"_** means any corporation with a net operating loss carryover or a net operating loss for the taxable year in which an ownership change occurs.

75. **_"Material Causes of Action"_** means any Causes of Action seeking a recovery of more than $20,000.

76. **_"Net Free Cash"_** means Free Cash after full payment or satisfaction of, or reasonable reserve for, all: Allowed Secured, Administrative, Priority Tax Claims; Convenience Class Claims, costs of administering and implementing the Plan; and the ordinary course business expenses related to the assets identified in the definition of Free Cash. For the avoidance of doubt, costs of administering and implementing the Plan, the ordinary course business expenses related to the assets identified in the definition of Free Cash not otherwise related to the assets identified in the definition of Free Cash that would not otherwise be incurred in a chapter 11 liquidation, including without limitation the incremental cost of any insurance purchased after (or in contemplation of) the Effective Date above what would be required in a chapter 11 liquidation plan and the costs of any employee benefits resolutions above what would be required in a chapter 11 liquidation plan, shall not operate to reduce Free Cash.

77. **_"New Board"_** means the board of directors of the Reorganized Debtor.

78. **_"New Common Stock"_** means New Series A Common Stock and New Series B Common Stock.

79. **_"New Series A Common Stock"_** means newly-issued shares of series A common stock of the Reorganized Debtor, if any, which shall be entitled to ten votes per share and have a par value of $0.01 per share.

80. **_"New Series B Common Stock"_** means the newly-issued shares of series B common stock of the Reorganized Debtor, if any, which shall be entitled to one vote per share and have a par value of $0.01 per share, if issued at all, al as described in this Plan.

81. **_"NOLs"_** means net operating losses.

82. **_"NYSE"_** means the New York Stock Exchange.

83. **_"Person"_** means an individual, partnership, limited liability company, corporation, association, joint stock company, trust, entity, joint venture, labor organization, unincorporated organization, Governmental Entity, and such other entities as defined and

14

described in section 101(41) of the Code.

84.    **"Petition Date"** means October 28, 2010.

85.    **"Plan"** means the **THIRD AMENDED CHAPTER 11 PLAN OF REORGANIZATION PROPOSED BY HOLDCO ADVISORS L.P.** (including all exhibits thereto), as modified or amended from time to time.

86.    **"Plan Advisor"** means the Person appointed and serving in such capacity pursuant to this Plan.

87.    **"Plan Supplement"** means the compilation of documents and exhibits relevant to the implementation of the Plan that will be filed prior to the transmission of this Plan to Holders of Allowed Claims in connection with the solicitation of votes to accept this Plan, and which may be amended, supplemented or modified through and including the date of the Confirmation Hearing.

88.    **"Pre-Change Losses"** means the amount of NOLs and built-in losses of a corporation prior to an "ownership change" within the meaning of Section 382 of the Internal Revenue Code.

89.    **"Priority Tax Claim"** means a Claim entitled to priority under sections 502(i) and 507(a)(8) of the Code.

90.    **"Pro Rata"** means the ratio of the amount of an Allowed General Unsecured Claim in a particular Class to the aggregate amount of all General Unsecured Claims that have not yet been disallowed.

91.    **"Proceeds Distribution Election"** means the right of each Holder who so elects to receive a Pro Rata Distribution of Net Free Cash, which may be evidenced in part, at the Reorganized Debtor's option (only if necessary to cause Section 382(l)(5) of the Internal Revenue Code to apply to the Plan) by New Series B Common Stock.

92.    **"Proceeds Distribution Election Segregated Account"** means an account in a bank or other financial institution selected by the Debtor or Reorganized Debtor.

93.    **"Professionals"** means those Persons (a) employed in the Case under sections 327 or 1103 of the Code, and (b) entitled, under sections 330, 503(b), 506(b), or 507(a)(1) of the Code, to seek compensation for legal, accounting or other professional services and the costs and expenses related to such services from the Debtor or the Estate.

94.    **"Quarterly Distribution Date"** means the first Business Day after the end of each quarterly calendar period (i.e., March 31, June 30, September 30 and December 31 of each calendar year).

15

95. **_"Regulators"_** means collectively the FDIC, the Washington Department of Financial Institutions the Board of Governors of the Federal Reserve System, and the Federal Reserve Bank of San Francisco.

96. **_"Releasees"_** means, in their individual and representative capacities as such, the TOPrS Indenture Trustees, the Committee and its individual members, Holdco, Sandler, the Bank, SKBHC, Starbuck, the Debtor's current and former directors and officers, all Entities controlled by or under common control of the foregoing, all affiliates of all of the foregoing, and all of their respective current and former directors, officers, members, partners, employees, attorneys, accountants, investment bankers, financial advisors, consultants, and other professionals (including their respective officers, directors, employees, members, attorneys, and professional advisors).

97. **_"Releasing Parties"_** means, collectively: (a) Holders of Claims in Classes entitled to vote on the Plan who: (i) vote to accept the Plan; (ii) vote to reject the Plan and do not opt-out of the Third Party Releases; or (iii) abstain from voting on the Plan and, accordingly, do not opt-out of the Third Party Releases; and (b) the Committee.

98. **_"Reorganized Debtor"_** means the Debtor or any successor thereto, by merger, consolidation or otherwise, on or after the Effective Date.

99. **_"Representatives"_** means, with regard to an entity or the Committee, officers, directors, members, employees, advisors, attorneys, professionals, accountants, investment bankers, financial advisors, consultants, agents and other representatives (including their respective officers, directors, employees, members and professionals).

100. **_"Resolution Event"_** means, with respect to a Disputed Claim, any one of the following events: (a) an order by the Bankruptcy Court is entered allowing such Disputed Claim pursuant to section 502(b) of the Bankruptcy Code, after notice and a hearing; (b) an order by the Bankruptcy Court is entered temporarily allowing such Disputed Claim for voting purposes only pursuant to Bankruptcy Rule 3018(a), after notice and a hearing; (c) a stipulation or other agreement is executed between the Holder of the Disputed Claim and Holdco resolving the objection to the Disputed Claim and allowing the Disputed Claim in an agreed upon amount; or (d) the pending objection to the Disputed Claim voluntarily is withdrawn by Holdco.

101. **_"Sale"_** means the sale of the Debtor's assets to SKBHC Holdings LLC and its wholly-owned subsidiary SKBHC Hawks Nest Acquisition Corp., approved by the Bankruptcy Court, which closed on December 20, 2010.

102. **_"Sandler"_** means Sandler O'Neill & Partners, L.P.

103. **_"Schedules"_** means the Schedule of Assets and Liabilities and Statement of Financial Affairs, as may have been amended, and as Filed by the Debtor in the Case.

104. **_"Section 382 Limitation"_** means the limitation of Pre-Change Losses determined under Section 382 of the Internal Revenue Code in the case of an "ownership change."

105. **_"Secured Claim"_** means a Claim against the Debtor secured by a lien on any property of the Estate.

106. **_"SKBHC"_** means, collectively or individually, as applicable, SKBHC Hawk's Nest Acquisition Corporation and SKBHC LLC.

107. **_"Solicitation Package"_** means those certain documents, as described in Article X.C herein, to be sent to Holders of Claims in Voting Classes.

108. **_"Solicitation Procedures"_** means the solicitation and voting procedures, attached as Exhibit 1 to and/or included in the Disclosure Statement Order.

109. **_"Starbuck"_** means Starbuck Bancshares, Inc., successor by merger to SKBHC Hawk's Nest Acquisition Corporation.

110. **_"Tax Code"_** means the Internal Revenue Code.

111. **_"Third Party Release"_** means the release granted by the Releasing Parties to the Releasees pursuant to Article VIII.D.

112. **_"TOPrS"_** means the trust originated preferred securities issued by the TOPrS Trusts.

113. **_"TOPrS Debentures"_** means the debentures issued by the Debtor pursuant to the TOPrS Debenture Indentures.

114. **_"TOPrS Debenture Indenture"_** means the indenture agreements between the Debtor and each TOPrS Debenture Indenture Trustee.

115. **_"TOPrS Debenture Indenture Trustee"_** means the indenture trustees of each of the TOPrS Debentures.

116. **_"TOPrS Documents"_** means, with respect to each TOPrS Trust, the TOPrS Indenture, the TOPrS Trust Guarantee and all instruments and agreements executed in connection therewith.

117. **_"TOPrS Indenture"_** means the TOPrS Debenture Indenture and the TOPrS Trust Indenture.

118. **_"TOPrS Indenture Trustees"_** means the TOPrS Debenture Indenture Trustee and the TOPrS Trust Indenture Trustee.

119. **_"TOPrS Indenture Trustee Fees"_** means any payments due under the Indentures to the Indenture Trustees or their professionals for services rendered prior to the Effective Date.

120. **_"TOPrS Trusts"_** means, collectively, AmericanWest Capital Statutory Trust I, AmericanWest Capital Statutory Trust II, AmericanWest Capital Statutory Trust III and Columbia Trust Statutory Trust I.

17

121. **"TOPrS Trust Guarantee"** means the guarantee agreement of the Debtor with respect to each of the TOPrS.

122. **"TOPrS Trust Guarantee Trustee"** means the guarantee trustees of each of the TOPrS Trust Guarantees.

123. **"TOPrS Trust Indenture"** means the amended and restated declarations of trust or amended and restated trust agreements governing each of the TOPrS Trusts.

124. **"TOPrS Trust Indenture Trustee"** means the trustees of each of the TOPrS Trusts under the TOPrS Trust Indentures.

125. **"TOPrS Unsecured Claims"** means Claims on account of the $47,391,827.43 in TOPrS Debentures issued to the TOPrS Trusts and any guarantees related thereto. For the avoidance of doubt, TOPrS Unsecured Claims are Class 2 Claims under the Plan.

126. **"Treasury Regulations"** means the United States Department of Treasury regulations promulgated under the Internal Revenue Code.

127. **"Unimpaired"** means not Impaired.

128. **"Voting Classes"** means Classes of Claims, the Holders of which are entitled to vote to accept or reject the Plan.

129. **"Voting Deadline"** means that date and time set forth in the Disclosure Statement Order by which the Plan Proponent must receive Ballots from Holders of Allowed Claims in Voting Classes.

130. **"Voting Record Date"** means that date set forth in the Disclosure Statement Order for determining which Holders of Claims and Equity Interests are entitled to vote to accept or reject the Plan.

## II.  Introduction and Summary

This Disclosure Statement (the "Disclosure Statement") has been prepared by Holdco Advisors, L.P. ("HoldCo" or the "Plan Proponent"). Holdco manages $10 million in principal value of TOPrS Unsecured Claims (as defined in the Plan). HoldCo is an asset management and advisory firm that specializes in distressed and event-driven credit and equity investing. HoldCo's principals have significant experience in the distressed investment arena. The purpose of this Disclosure Statement is to provide the holders of claims against the Debtor with adequate information to make an informed judgment about the Second Amended Chapter 11 Plan Of Reorganization Proposed By Holdco Advisors L.P. (the "Plan"), before determining whether to object to the Plan and before exercising their right to vote for acceptance or rejection of the Plan.

This Disclosure Statement includes (among other things) a brief history of the Debtor, a summary of its Chapter 11 case, a description of the claims against and equity interests in the Debtor, a summary of the Plan, and a discussion of the Plan's feasibility. The Disclosure

18

Statement also describes the treatment of the Debtor's principal outstanding liabilities and the anticipated sources, amounts and timing of compensation on account of such liabilities.

The Plan Proponent requests that you vote promptly for the Plan upon reviewing the accompanying materials. The Plan Proponent believes that the restructuring contemplated by the Plan will yield a recovery to creditors greater than the return that could be achieved through other restructuring alternatives or a liquidation under Chapter 7 of the Bankruptcy Code.

If you have any questions concerning the procedures for voting, or any questions concerning your treatment under the Plan, please contact:

> Daniel R. Brown
> Brown Legal Advisors, LLC
> 1253 W. Foster Ave.
> Suite 3E
> Chicago, IL 60640

The Plan Proponent reserves the right to amend, modify, or supplement the Plan at any time before the confirmation of the Plan, provided that, such amendments or modifications do not materially alter the treatment of, or distributions to, creditors and holders of equity interests under the Plan.

The foregoing is qualified in its entirety by the more detailed information contained in the Plan and elsewhere in this Disclosure Statement. This summary does not purport to be complete, and Creditors are urged to read and review the Plan in full.

The Plan Proponent now submits this Disclosure Statement, pursuant to section 1125 of the Bankruptcy Code, to holders of Claims against and Equity Interests in the Debtor in connection with the solicitation of votes to accept or reject the Plan and the Confirmation Hearing, which is scheduled for _____, 2013, at _____ prevailing Pacific Time. A copy of the Plan is attached hereto as <u>Exhibit A</u> and incorporated herein by reference.

    **1.**     **Rules of Interpretation, Computation of Time, and References to Monetary Figures**

        **a.**     **Rules of Interpretation**

For purposes of this Disclosure Statement: (a) whenever from the context it is appropriate, each term, whether stated in the singular or the plural, shall include both the singular and the plural, and pronouns stated in the masculine, feminine, or neuter gender shall include the masculine, feminine, and the neuter gender; (b) unless otherwise specified, any reference in this Disclosure Statement to a contract, instrument, release, indenture, or other agreement or document being in a particular form or on particular terms and conditions means that such document shall be substantially in such form or substantially on such terms and conditions; (c) unless otherwise specified, any reference in this Disclosure Statement to an existing document, schedule, or exhibit, whether or not filed, shall mean such document, schedule, or exhibit, as it may have been or may be amended, modified, or supplemented; (d) any reference to

19

an entity as a holder of a Claim or Equity Interest includes that entity's successors and assigns; (e) unless otherwise specified, all references in this Disclosure Statement to Articles are references to Articles of this Disclosure Statement; (f) unless otherwise specified, all references in this Disclosure Statement to exhibits are references to exhibits in the Plan Supplement; (g) the words "herein," "hereof," and "hereto" refer to this Disclosure Statement in its entirety rather than to a particular portion of this Disclosure Statement; (h) subject to the provisions of any contract, certificate of incorporation, bylaw, instrument, release, or other agreement or document entered into in connection with the Plan, the rights and obligations arising pursuant to the Plan shall be governed by, and construed and enforced in accordance with applicable federal law, including the Bankruptcy Code and Bankruptcy Rules; (i) captions and headings to Articles are inserted for convenience of reference only and are not intended to be a part of or to affect the interpretation of this Disclosure Statement; (j) unless otherwise set forth in this Disclosure Statement, the rules of construction set forth in section 102 of the Bankruptcy Code shall apply; (k) any term used in capitalized form in this Disclosure Statement that is not otherwise defined herein in the Plan but that is used in the Bankruptcy Code or the Bankruptcy Rules shall have the meaning assigned to such term in the Bankruptcy Code or the Bankruptcy Rules, as applicable; (l) all references to docket numbers of documents Filed in the Case are references to the docket numbers under the Bankruptcy Court's CM/ECF system; and (m) all references to statutes, regulations, orders, rules of courts, and the like shall mean as amended from time to time, as applicable to the Case, unless otherwise stated.

In computing any period of time prescribed or allowed, the provisions of Bankruptcy Rule 9006(a) shall apply. If the date on which a transaction may occur pursuant to this Disclosure Statement shall occur on a day that is not a Business Day, then such transaction shall instead occur on the next succeeding Business Day.

### b. Reference to Monetary Figures

All references in this Disclosure Statement to monetary figures shall refer to currency of the United States of America, unless otherwise expressly provided.

## 2. Overview of Chapter 11

Chapter 11 is the principal business reorganization chapter of the Bankruptcy Code. In addition to permitting debtor rehabilitation, chapter 11 promotes equality of treatment for similarly situated holders of claims and equity interests, subject to the priority of distributions prescribed by the Bankruptcy Code.

The commencement of a Case creates an estate that comprises all of the legal and equitable interests of the debtor as of the commencement of the chapter 11 case. The Bankruptcy Code provides that a debtor may continue to operate its business and remain in possession of its property as a debtor in possession.

As a result of various factors described more fully herein, the Plan Proponent has determined that the Plan is in the best interests of the Debtor's creditors.

Prior to soliciting acceptances of a proposed chapter 11 plan, section 1125 of the Bankruptcy Code requires a debtor to prepare a disclosure statement containing information of a kind, and in sufficient detail, to enable a hypothetical reasonable investor to make an informed judgment regarding acceptance of the chapter 11 plan. This Disclosure Statement is being submitted in accordance with the requirements of section 1125 of the Bankruptcy Code.

### III.   Background To The Case

The following is a general summary of the Debtor's business and history prior to filing this Case. The background information regarding the Debtor's business and history was obtained by the Plan Proponent, in large part, from the Debtor's Disclosure Statement, filed on May 13, 2011 [Docket No. 215]. The Plan Proponent relies on the accuracy and veracity of the statements contained in the Debtor's Disclosure Statement and other pleadings filed by the Debtor with this Court, and makes no independent representations or warranties regarding the accuracy and/or veracity of the information provided by the Debtor.

**A.**   **The Debtor's Business**

**1.**   **Summary of the Debtor's Business**

**a.**   The Debtor was founded in 1992, and is a Washington corporation registered as a bank holding company under the Bank Holding Company Act of 1956, with headquarters located in Spokane, Washington. Prior to the sale of the Bank in 2010 (as discussed below), the Debtor was the sole shareholder of the Bank the Bank, in turn, was the sole shareholder of AmericanWest Holdings, Inc. The Bank, under the Debtor's ownership, operated in Eastern and Central Washington, Northern Idaho, and in Utah (where it conducted business under the trade name of "Far West Bank").

**Capital Structure and the TOPrS**

According to the Debtor, as of September 30, 2010, the Debtor had outstanding unsecured indebtedness totaling approximately $47.2 million,[2] consisting of four outstanding issuances of junior subordinated debentures issued to the four TOPrS Trusts, that in turn issued their trust originated preferred securities preferred securities to investors. The Debtor asserts that the principal amount of the its junior subordinated debt was approximately $41.2 million, which backs exactly $40 million of TruPS issued to investors.[3] The Debtor notes that the accrued interest on the junior subordinated debentures totaled $6.0 million. Wilmington Trust Company acts as trustee of two of the Trusts and U.S. Bank acts as trustee of the other two Trusts (the "Indenture Trustees"). Each of the four Trust agreements provide that the junior subordinated debentures shall be junior to certain obligations of the Debtor, such as indebtedness for all

---

[2]   The Debtor represents that his total includes the $6.0 million of accrued deferred interest relating to the issuance of TOPrS. According to the Debtor, however, such interest has not been capitalized and is not included in the principal balance of $41.2 million described herein.

[3]   The excess amount of the debentures over the amount of the TOPrS represents the common equity of the Trusts, which is held by the Debtor. The common equity interest has no economic value.

borrowed money ("Senior Indebtedness").[4]  The junior subordinated debentures are not subordinated to the Debtor's trade debt.  The Debtor asserts that it has no obligations that could be characterized as Senior Indebtedness.  The Debtor claims that each of the four TruPS issuances corresponding to the Debtor's four issuances of debentures was sold as a block into a separate limited liability company (each a "PreTSL").[5]

According to the Debtor, Each PreTSL issued several tranches, or priorities, of notes (e.g., Class A 1 Senior Notes, Class A 2 Senior Notes, Mezzanine Notes, and Subordinated Notes) to numerous institutional and accredited and individual investors through offerings exempt from securities registration.  According to the Debtor, PreTSL's notes are collateralized with the TruPS held by that PreTSL, along with TruPS and debt obligations of other entities. The Debtor represents that the PreTSLs are unmanaged, pooled collateralized debt obligations (or "CDOs"), with Bank of New York Mellon ("BNYM") acting as CDO trustee under the indenture applicable to each PreTSL.

## IV.   The Case

The following is a general summary of the Case, including the events leading up to the chapter 11 filing, certain administrative matters addressed during the Case, and the Debtor's post-petition restructuring attempts.  Some of the information regarding the Debtor's bankruptcy case was obtained by the Plan Proponent from the Debtor's Disclosure Statement.  The Plan Proponent relies on the accuracy and veracity of the statements contained in the Debtor's Disclosure Statement and other pleadings filed by the Debtor with this Court, and makes no independent representations or warranties regarding the accuracy and/or veracity of the information provided by the Debtor.

---

[4]   Each Trust agreement defines "Senior Indebtedness" to mean, with respect to the Debtor, (i) the principal, premium, if any, and interest in respect of (A) indebtedness of the Debtor for money borrowed and (B) indebtedness evidenced by securities, debentures, notes, bonds or other similar instruments issued by the Debtor; securities, debentures, notes, bonds or other similar instruments issued by the Debtor; (ii) all capital lease obligations of the Debtor; (iii) all obligations of the Debtor issued or assumed as the deferred purchase price of property, all conditional sale obligations assumed as the deferred purchase price of property, all conditional sale obligations of the Debtor and all obligations of the Debtor under any title retention agreement; (iv) all obligations of the Debtor for the reimbursement of any letter of credit, any banker's acceptance, any security purchase facility, any repurchase agreement or similar arrangement, any interest rate swap, any other hedging arrangement, any obligation under options or any similar credit or other transaction; (v) all obligations of the type referred to in clauses (i) through (iv) above of other Persons for the payment of which the Debtor is responsible or liable as obligor, guarantor or otherwise; and (vi) all obligations of the type referred to in clauses (i) through (v) above of other Persons secured by any lien on any property or asset of the Debtor (whether or not such obligation is assumed by the Debtor), whether incurred on or prior to the date of this Indenture or thereafter incurred.

[5]   "PreTSL[SM] is a registered service mark, derived from "Preferred Term Securities," another term for trust preferred securities.

22

### A.      The Debtor's Bankruptcy Case and Related Postpetition Events

#### 1.      Initiation of the Case

On the Petition Date, the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. The Debtor continues to operate its business as a debtor in possession pursuant to sections 1107(a) and 1108 of the Bankruptcy Code. No trustee or examiner has been appointed in the Case.

#### 2.      Factors Leading to the Sale

According to the Debtor, the financial and credit crisis — resulting in hundreds of nationwide bank failures since 2008 — significantly hampered the Bank's business and ability to meet certain state and federal regulatory requirements for capital, profitability, and credit quality. The Debtor asserts that effects from the housing crisis, including tumbling home prices, soaring loan defaults, and high unemployment rates, began to take their toll on the Bank's, and ultimately the Company's, financial condition.

#### 3.      The Debtor's Efforts to Recapitalize

The Debtor asserts that, beginning in 2007, management initiated efforts to deal with asset quality problems in the Bank's loan portfolio, reduce expenses, build capital reserves, and take other actions to return the Bank to profitability and reduce its risk profile. In early 2008, however, the Debtor asserts that the management and the Debtor's Board of Directors determined that additional capital would be required to address the Bank's financial problems.

From 2008 through the Petition Date, the Debtor asserts that the Bank and the Debtor undertook significant efforts to raise additional capital, including efforts to sell Bank assets, or to sell the Debtor or the Bank to another financial institution.

#### 4.      State and Federal Regulatory Actions

According to the Debtor, as a result of the Bank's announcement that it had ceased to be "well capitalized" as of June 30, 2008, the Washington State Department of Financial Institutions ("DFI") conducted an off-site interim examination of the Bank's financial health. The Debtor asserts that this investigation led to the first of a series of increasingly serious enforcement actions against the Bank or the Debtor by the FDIC, DFI, and the Federal Reserve Bank of San Francisco ("FRB"), which regulated the Debtor as a bank holding company. The Debtor notes that first, the DFI issued a Supervisory Directive against the Bank effective August 8, 2008 (the "DFI Directive"). According to the Debtor, the DFI Directive required the Bank to provide periodic liquidity and credit quality reports, update the DFI regarding the status of liquidity planning and previously announced capital raising initiatives, notify the DFI about significant changes in management and financial condition, retain a permanent Chief Executive Officer, and seek prior written consent of the DFI before paying dividends.[6]

---

[6]      On September 17, 2009, the DFI notified the Bank that the DFI Directive was being rescinded, as it had been effectively superseded by the PCA Directive discussed below.

23

Subsequently, according to the Debtor, on February 2, 2009, the FDIC issued a Prompt Corrective Action Notification (the "PCA Notification") to the Bank. As noted by the Debtor, the PCA Notification was issued under the Prompt Correction Action provisions of the FDIA and FDIC regulations. The Debtor states that the FDIA and FDIC regulations identify five capital categories for banking institutions — well-capitalized, adequately capitalized, undercapitalized, significantly undercapitalized, and critically undercapitalized. The Debtor asserts that the PCA Notification formally advised the Bank that it was significantly undercapitalized, which is the next-to-lowest capital category. As such, according to the Debtor, the Bank was required to submit a capital restoration plan (the "Capital Restoration Plan"), and it became subject to a wide range of restrictions relating to its senior management team, management compensation, dividends, loan loss reserves, reductions in troubled assets, liquidity, asset growth, and other aspects of its business. The Debtor states that in response to the PCA Notification, the Bank submitted its Capital Restoration Plan to the FDIC on March 20, 2009, which the Bank subsequently amended on July 2, 2009 – and which Capital Restoration Plan was rejected.

Further, as stated by the Debtor, on May 8, 2009, the Bank entered into a Stipulation and Consent to the Issuance of an Order to Cease and Desist (the "Stipulation") with the FDIC and the DFI. Pursuant to the Stipulation, the FDIC and the DFI issued an Order to Cease and Desist (the "Cease and Desist Order") against the Bank on May 11, 2009. The Debtor asserts that the Cease and Desist Order required, among other things, that the Bank take actions necessary to return to the "well-capitalized" category by September 9, 2009.

Subsequently, the Debtor asserts that, on September 15, 2009, it entered into a Written Agreement (the "Written Agreement") with the FRB, imposing on the Debtor restrictions and requirements substantially similar to those contained in the PCA Notification and the Cease and Desist Order, including the obligation to submit a capital restoration plan. The Debtor further asserts that on February 26, 2010, the Bank received a Prompt Corrective Action Directive (the "PCA Directive") from the FDIC. According to the Debtor, the PCA Directive directed the Bank to recapitalize within 30 days of receipt, and reiterated various requirements previously imposed on the Bank by the Cease and Desist Order.

According to the Debtor, the Cease and Desist Order and the PCA Directive required the Bank, among other things, to recapitalize or accept an offer to be acquired by or combine with another financial institution by March 28, 2010.

The Debtor asserts that, although the Company's management had undertaken all actions within its power to comply with all aspects of the PCA Notification, the Cease and Desist Order, the Written Agreement, and the PCA Directive (collectively, the "Regulatory Orders"), the Company was unable to comply with their most important terms — the recapitalization or sale of the Bank. Full satisfaction of the Regulatory Orders depended on raising a significant amount of additional capital.

According to the Debtor, the Bank continued to remain in the significantly undercapitalized capital category. As noted by the Debtor, a critically undercapitalized institution may be seized at any time by the DFI and placed in an FDIC receivership.

### 5. Work With Interested Parties

According to the Debtor, prior to the Petition Date, the Debtor and the Bank considered a number of investment strategies to achieve a successful capital raise. They and their investment banking firm, Sandler O'Neill & Partners, L.P. ("Sandler") contacted approximately 100 parties, executing confidentiality agreements with 67 of such parties..

Further, in February 2010, in addition to the engagement of Sandler, the Debtor and the Bank retained Cappello Capital Corp. ("Cappello"), as a second financial advisor.

### 6. The Purchaser

According to the Debtor, the Debtor, in consultation with Sandler, negotiated with SKBHC Holdings LLC and its wholly-owned subsidiary SKBHC Hawks Nest Acquisition Corp. (collectively, the "Purchaser") regarding the terms and conditions of a potential sale of substantially all of its assets, including its interest in the Bank. Pursuant to the terms of an Asset Purchase Agreement, dated as of October 27, 2010 (the "APA"), the Debtor agreed to sell, and the Purchaser agreed to purchase assets of the Debtor, including the Debtor's interest in the Bank, as part of a contemplated Chapter 11 sale process to be conducted in the Bankruptcy Court. The sale process is further described in Section IV.A.8.e below.

### 7. The DIP Facility

Prior to the Petition Date, according to the Debtor, the Debtor negotiated a debtor-in-possession loan agreement (the "DIP Facility") with the Purchaser to obtain the working capital necessary to fund the Case.

According to the Debtor, it had an immediate need to access additional operating capital in order to fund the day-to-day operating expenses of its business, including payments to remaining employees and professionals sought to be retained in this Case. As set forth in the DIP Credit Agreement, and subject to the terms and conditions thereof, Purchaser agreed to provide the DIP Facility with a total commitment of up to $2 million. The Debtor asserts that, among other features, the DIP Facility included certain safeguards for Purchaser's protection as a debtor-in-possession lender, since as a lender it bore the full risk of any decline in the value of the Shares and the Other Purchased Assets that would serve as its collateral. The DIP Facility was secured by a senior secured, superpriority lien on the Debtor's assets and the proceeds thereof.

### 8. Post-Bankruptcy Developments

#### a) The Debtor Continued as Debtor-In-Possession

Pursuant to Sections 1107(a) and 1108 of the Bankruptcy Code, the Debtor has continued in the management and possession of its property as a debtor-in-possession since the Petition Date. No trustee or examiner has been appointed in this case.

25

### b) Hiring of Professionals

Shortly after the filing of the petition, Debtor sought and obtained Bankruptcy Court approval of Foster Pepper PLLC ("Foster Pepper") as its counsel. The Bankruptcy Court also authorized the Debtor to employ the following professionals:

a) Morrison & Foerster LLP as Special Counsel; and

b) Sandler O'Neill & Partners LP as Financial Advisors

c) BDO Seidman LLP as Accountants

### c) The Creditors' Committee

Shortly after the case was filed, the Committee was formed by the United States Trustee. The members of the Committee are three of the four Trusts described above. The Committee appeared and participated in the case by and through the attorneys for the two Indenture Trustees. Through the Indenture Trustees' attorneys, the Committee members have monitored and conferred with the Debtor on the activities of the Debtor during the case.

### d) Approval of the DIP Facility

The Bankruptcy Court approved the DIP Facility on November 18, 2010.

### e) Post-Petition Sale of the Debtor's Interest in the Bank

**Sale Motion.** The Debtor filed its motion for approval of the transactions with the Purchaser (the "*Sale Motion*") on October 28, 2010. The pleadings filed with the Sale Motion included a copy of the proposed APA. The APA detailed the proposed transactions, including (i) provision for assumption of a tax sharing agreement between the Bank and the Debtor, (ii) provisions regarding the post-closing allocation of tax attributes between the Debtor and the Bank, (iii) a release by the Debtor of all claims against the Bank and the Purchaser, and (iv) payment of approximately $6 million to the Debtor's estate.

**Bid Procedures Order.** The Bankruptcy Court entered a bid procedures order on November 3, 2010, which provided for notice to parties in interest and set deadlines for objections and competing bids. No party other than the Purchaser submitted a bid for the Bank.

**Sale Order.** On December 9, 2010, the Bankruptcy Court entered its Order (i) Authorizing and Approving the Sale of Certain Assets Free and Clear of All Encumbrances, (ii) Authorizing and Approving the Assumption and Assignment of Certain Executory Contracts, and (iii) Waiving the 14-Day Stay of Fed. R. Bankr. P. 6004(h) and 6006(d) ("*Sale Order*"). The Sale Order approved the APA, and authorized the Debtor to consummate the transactions contemplated in the APA.

**Closing of Sale.** The transactions contemplated in the APA closed on December 20, 2010. Upon closing of the Sale, the Debtor no longer had any interest in the Bank. In

connection with the closing the Purchaser paid the Debtor $6.5 million, less a credit for the amount that purchaser had loaned to the Debtor under a debtor-in-possession financing facility.

### 9.    Claims Bar Dates

The Court issued an order which established January 31, 2011, as the deadline by which any creditor whose claim was listed as disputed, contingent or unliquidated in the Debtor's schedules, or who disagreed with the amount of the claim as scheduled by the Debtor, must file a proof of claim with the Bankruptcy Court. The order also established April 27, 2011 as the deadline for governmental units to file a proof of claim.

### 10.    The Debtor's Liquidating Plan and Holdco's Initial Disclosure Statement and Competing Plan

On March 15, 2011, the Debtor filed its Plan of Distribution [Docket No. 179] (the "Liquidating Plan"), pursuant to which the Debtor proposed to make distributions to creditors and wind up the Debtor's affairs.  The Liquidating Plan contemplated that, following the plan's effective date, the Reorganized Debtor's Board of Directors would be reduced to one individual, with one remaining shareholder.  The single remaining director was to act as Distribution Agent, and commence distributions to all holders of allowed claims under the Liquidating Plan, which distributions would be made from the Sale Proceeds and remaining cash held in the Debtor's bank accounts.  The Distribution Agent would then be responsible for winding up the Debtor's business affairs.

On March 15, 2011, the Debtor also filed its Disclosure Statement in connection with the Liquidating Plan.  [Docket No. 180].  A hearing regarding the approval of the Debtor's Disclosure Statement was held on May 12, 2011, and an order approving the Debtor's Disclosure Statement (as amended to incorporate the Court's comments and proposed changes) was entered on May 13, 2011.  [Docket No. 215].

A hearing regarding the confirmation of the Debtor's Liquidating Plan was scheduled for June 30, 2011 at 11:00 a.m.  Prior to the June 30, 2011 hearing, however, on June 15, 2011, the Debtor filed a motion seeking to extend the balloting deadline and adjourn the confirmation hearing, along with all related deadlines, based upon the Debtor's concern that certain trustees for the Debtor's TruPS had not received ballots and/or proper notice of the confirmation hearing during the solicitation process.  [Docket No. 227].

On November 3, 2011, the Court conducted a conference regarding the status of the Debtor's solicitation and progress towards confirmation of the Debtor's Liquidating Plan. Holdco participated in the November 3 conference, and advised the Court of its intent to submit a competing plan.  During the November 3 conference, the Court authorized Holdco to submit a competing plan which would be considered for confirmation alongside the Debtor's Liquidating Plan.

On December 19, 2011, Holdco filed a competing plan and disclosure statement, and moved to have the Court approve Holdco's disclosure statement on an expedited basis.  The

27

Debtor, the U.S. Trustee, and the Wilmington Trust Company, as indenture trustee, each filed objections to approval of Holdco's disclosure statement.

On December 22, 2011, the Court held a hearing to consider approval of Holdco's disclosure statement. The Court determined to continue the hearing until January 12, 2012. This hearing was further continued to February 2, 2012. At the February 2, hearing, the Court set a status conference for March 8, 2012 to address certain issues raised against Holdco's disclosure statement. Principally, the Debtor and the creditor's committee questioned Holdco's standing as a creditor. The Court also scheduled a hearing for March 23, 2012 to address the standing issues, and another hearing for April 26, 2012 regarding approval of Holdco's disclosure statement.

At the March 8, 2012 status conference, the Court determined that the standing issues raised against Holdco were moot. The Court then allowed the Debtor, Holdco, and the creditor's committee to determine new deadlines by which Holdco would file an amended disclosure statement and plan.

On May 24, 2012, the Debtor filed an amended plan and disclosure statement. The Debtor's plan was a plan of liquidation that contained releases for Sandler, SKBHC, Starbuck, the Bank, the Debtor's professionals, and the Debtor's directors and officers. The Debtor's disclosure statement also contained a description of a settlement between the Debtor and Sandler regarding Sandler's alleged indemnification claim discussed in more detail below in Article VII.G hereof. On May 25, 2012, Holdco also filed an amended plan and disclosure statement. Holdco's amended plan was a plan of reorganization that did not contain any releases for Sandler, SKBHC, Starbuck, the Bank, the Debtor's professionals, and the Debtor's directors and officers. Holdco's amended plan also did not contemplate a settlement with Sandler regarding its alleged indemnification claim. *For the avoidance of doubt, Holdco did not support the Sandler settlement and did not agree that it is in the best interests of the Debtor and its estate.*

### 11. Mediation Regarding the Releases and Sandler Settlement Contained in the Debtor's Amended Plan

As a result of the competing plans and disclosure statements filed by the Debtor and Holdco, the Debtor and Holdco were poised to simultaneously seek approval of competing disclosure statements and confirmation of competing plans. This process would have involved substantial litigation regarding plan confirmation.

Holdco and the Debtor, with the support of the Committee, agreed to enter into mediation to resolve the issues raised by the competing plans, and to avoid the substantial cost to the Debtor's estate that litigating competing plans would entail. To that end, Holdco and the Debtor entered into a joint motion to direct mediation [Docket No. 369] (the "Mediation Motion"). As detailed in the Mediation Motion, the Debtor and Holdco agreed to mediate the following issues:

> a) Determine if there are any meritorious litigation claims that he/she recommends be pursued in connection with the Court approved 363 sale of the bank which was completed in December 2011. For clarification, litigation should be recommended only if the Mediator concludes that he/she believes there is a **probability** of a net gain to the estate from

28

pursuing such litigation, net of expenses.  Possible targets of such litigation would include the debtor's officers/directors, the purchaser, debtor's consultant/financial advisors, and counsel involved in the sale.

b)      Determine whether the Debtor's estate has any claims in connection with downstreams or payments of money from the Debtor to its subsidiary bank on account of tax refunds received by the Debtor.  Possible targets of such claims would include the Debtor's current and former directors and officers, the purchaser, the Debtor's consultant/financial advisors, and counsel to the Debtor (or the prepetition company) at the time such downstreams or payments were made.

c)      Determine whether the Debtor has any avoidance claims against its current or former directors and officers on account of payments made to such current or former directors or officers prior to the commencement of the Debtor's chapter 11 case.

d)      Evaluate whether the Debtor's proposed settlement of claims asserted by Sandler on its indemnification claim related to the 363 sale of the bank is in the best interests of the Debtor's estate and its creditors

Holdco and the Debtor agreed that the recommendation of the mediator would be binding.  The Debtor agreed that if Holdco joined in the mediation motion, the Debtor would withdraw its competing plan and disclosure statement.

The Honorable Michael Hogan, U.S. Bankruptcy Judge, was appointed as mediator.  The mediation began in June 2012 and concluded on April 10, 2013 – a period spanning nearly ten months.  In connection with the mediation process, Holdco submitted a 20-page mediation statement outlining is views regarding potential claims against Sandler, SKBHC, the Debtor's professionals, and the Debtor's directors and officers.  The Debtor's counsel provided its own mediation statement to the mediator.

Upon receiving written submissions from Holdco and the Debtor, the mediator began his an investigation that spanned over 8 months, during which he or his agents interviewed key personnel at Holdco, the Debtor, Sandler, and SKBHC.  On April 10, 2013, the mediator reported his conclusions to the parties.

As a result of the mediation, the releases of Sandler, SKBHC, the Debtor's professionals, and the Debtor's directors and officers will be included in the Plan, and the Debtor has withdrawn its competing plan.  As such, only one plan will be presented to creditors for a vote.  ***For the avoidance of doubt, however, Holdco did not support the Sandler settlement and did not agree that it is in the best interests of the Debtor and its estate.***  Pursuant to the mediation agreement, however, Holdco cannot object to the Sandler settlement to the extent such settlement is consistent with the description of the settlement provided to Holdco and the mediator.

29

## V. The **Purpose** and Effect of Holdco's Plan

Holdco's Plan provides for the reorganization of the Debtor and for Holders of certain Allowed Claims to receive equity in the Reorganized Debtor, with the option for each Holder of TOPrS Unsecured Claims and General Unsecured Claims to receive instead a "cash out" right of payment and/or a security that results in cash from certain of the Debtor's assets, including Cash held by the Reorganized Debtor as of the Effective Date. The Plan Proponent believes the Plan will maximize the value of the Estate. In order to effectuate the Distributions, the Plan provides that all of the assets of the Debtor's Estate (including Causes of Action not expressly released under the Plan) shall vest in the Reorganized Debtor.[7] The New Board shall be appointed as of the Effective Date and shall be responsible for implementing the Plan.

The Plan Proponent believes that the Plan maximizes recoveries for Holders of Allowed Claims and strongly recommends that you vote to accept the Plan (if you are entitled to vote). The Plan Proponent believes that any alternative to confirmation of the Plan, such as a conversion of the Case to a case under chapter 7 of the Bankruptcy Code would result in significant delay, litigation, and additional costs, and, ultimately, would lower the recoveries for all Holders of Allowed Claims.

### 1. Treatment of Claims and Equity Interests

#### a. Classification

The Plan divides all Claims (other than Administrative Claims and Priority Tax Claims) and all Equity Interests into various Classes. Listed below is a summary of the Classes of Claims and Equity Interests under the Plan.

| CLASS | CLAIMS | IMPAIRMENT/VOTING |
|-------|--------|-------------------|
| 1 | Secured | Unimpaired – Not Entitled to Vote |
| 2 | TOPrS Unsecured Claims | Impaired – Entitled to Vote |
| 3 | General Unsecured Claims | Impaired – Entitled to Vote |
| 4 | Sandler Unsecured Claim | Impaired – Entitled to Vote |
| 5 | Convenience | Unimpaired – Not Entitled to Vote |
| 6 | Equity Interests | Impaired – Not Entitled to Vote |

The following tables summarize the Classes of Claims and Equity Interests under the Plan, as well as the treatment of such Classes. To the extent that any inconsistency exists between the summaries contained in this Disclosure Statement and the information set forth in the Plan, the Plan shall govern. The ranges of recoveries listed below are based on various assumptions, including assumptions regarding asset realization, the total amount of the Allowed TOPrS Unsecured Claims, General Unsecured Claims, Administrative Claims, Priority Tax

---

[7]   As described further in the Plan, this Disclosure Statement shall refer to the Debtor as the Reorganized Debtor for any time period on or after the Effective Date.

Claims and assumptions concerning the costs to operate the Reorganized Debtor's business and pursue certain litigation.

**b.  Unclassified Claims**

| Claim | Plan Treatment | Projected Recovery Under the Plan |
|---|---|---|
| Administrative Claims | Paid in full in Cash | 100.0% |
| Priority Tax Claims | Paid in full in Cash | 100.0% |

**c.  Summary of Classification and Treatment of Classified Claims and Equity Interests**

The classification, treatment, and the projected recoveries of classified Claims and Equity Interests under the Plan are described in summary form below for illustrative purposes only and are subject to the more detailed and complete descriptions contained in Article III of the Plan.

| Class | Claim/ Equity Interest | Plan Treatment of Class |
|---|---|---|
| 1 | Secured Claims | At the sole option of the Plan Proponent, (i) paid in full in Cash, (ii) receive the collateral securing its Allowed Secured Claim, or (iii) receive other treatment rendering such Secured Claim Unimpaired. |
| 2 | TOPrS Unsecured Claims | Each Holder of an Allowed Unsecured Claim shall receive either (i) its Pro Rata Distribution of New Series A Common Stock or, if it so elects, (ii) the Proceeds Distribution Election. Notwithstanding anything to the contrary in this Plan, at Holdco's election in its sole and absolute discretion, any holder of an Allowed TOPrS Unsecured Claim who may not be a holder of New Series A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use below may be deemed to have elected the Proceeds Distribution Election. |
| 3 | General Unsecured Claims | Each Holder of an Allowed Unsecured Claim shall receive  either (i) its Pro Rata Distribution of New Series A Common Stock or, if it so elects (ii) the Proceeds Distribution Election. Notwithstanding anything to the contrary in this Plan, at Holdco's election in its sole and absolute discretion, any holder of an Allowed General Unsecured Claim who may not be a holder of New Series A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use below may be deemed to have elected the Proceeds Distribution Election |
| 4 | Sandler Unsecured Claim | The Holder of an Allowed Sandler Unsecured Claim shall receive its Pro Rata distribution of Net Free Cash. |

31

| Class | Claim/ Equity Interest | Plan Treatment of Class |
|-------|------------------------|--------------------------|
| 4 | Convenience Claims | Each Holder of an Allowed Convenience Claim shall receive cash equal to the full amount of its Convenience Claim, unless the Holder otherwise agrees to less favorable treatment. |
| 6 | Equity Interests | Deemed canceled |

## 2. Claims Estimates

As of May 13, 2011, the date the Debtor filed its Disclosure Statement, the following, according to the Debtor's representations contained therein, is the Debtor's best estimation of the amounts claimed by the Debtor's various creditors [*see* the Debtor's Disclosure Statement, filed on May 31, 2011 at Docket No. 215]. According to the Debtor's representations, these amounts represent mere estimates, as Claims participating in the Plan already may have been, or may continue to be augmented or reduced through litigation, compromise or other development subsequent to the date of this Disclosure Statement.

| CLAIM | | ESTIMATED AMOUNT OF CLAIMS |
|-------|---|----------------------------|
| Administrative Expenses (excluding professionals but including the Sandler Administrative Expense Claim) | | $558,000[8] |
| Priority Tax Claims | | $0 |
| Class 1 | Secured Claims | $0 |
| Classes 2 and 3 | TOPrS Unsecured Claims and General Unsecured Claims | $47,918,039 |
| Class 4 | Sandler Unsecured Claim | $500,000[9] |
| Class 5 | Convenience Claims | $0 |
| Class 6 | Equity Interests | Common Stock |

---

[8] Based on estimates provided by Sandler on June 3, 2013.

[9] Based on estimate provided by Sandler on June 3, 2013.

32

These estimations are based upon the Debtor's claims/assertions that it has no exposure to the IRS for tax obligations. See below for a discussion of the potential obligations to IRS. In the event the Debtor is found to have significant tax obligations to the IRS, the estimated total amount to be distributed to Allowed Claims herein will be altered, and it is possible that holders of Allowed Claims may not be paid as anticipated. Based on all the available information provided by the Debtor and its financial advisors, the Plan Proponent believes the risk of these factors having a material impact is small.

### 3. Consummation

Following Confirmation, the Plan will be consummated on the Effective Date, which is the date that is the first Business Day after the Confirmation Date on which no stay of the Confirmation Order is in effect and all conditions to the occurrence of the Effective Date have been satisfied or waived. Distributions to be made under the Plan will be made on or as soon as reasonably practicable after the Effective Date in accordance with the Plan.

### 4. Certain Factors to Be Considered Prior to Voting

Prior to voting to accept or reject the Plan, each Holder in a voting Class should carefully consider all of the information in this Disclosure Statement, especially the risk factors described in Article IX herein.

### 5. Voting and Confirmation

Holders of Claims in Classes 1 and 4 are Unimpaired and are conclusively presumed to accept the Plan. Holders of Equity Interests in Class 6 are wholly impaired and are conclusively presumed to reject the Plan. Accordingly, Holders of Claims or Equity Interests in Classes 1, 4, and 5 are not entitled to vote on the Plan, and the vote of such Holders of Claims and Equity Interests shall not be solicited. Only Holders of Claims in Classes 2 and 3 are entitled to vote to either accept or reject the Plan.

For the avoidance of doubt, the Holders of Claims in Class 2 consist solely of the beneficial holders of TOPrS, and only the beneficial holders of the TOPrS are entitled to vote on the Plan. Registered holders that are not beneficial holders are entitled to cast ballots solely for the purpose of conveying the will of the beneficial holders that they represent. The TOPrS Indenture Trustees are not entitled to vote on the Plan.

Pursuant to sections 1126(c) and 1126(d) of the Bankruptcy Code and except as otherwise provided in section 1126(e) of the Bankruptcy Code, an Impaired Class of Claims has accepted the Plan if the Holders of at least two-thirds in dollar amount and more than one-half in number of the Allowed Claims in such Class actually voting have voted to accept the Plan.

Assuming the requisite acceptances are obtained, the Plan Proponent intends to seek confirmation at the Confirmation Hearing scheduled to commence on January 12, 2012, at 10:00 a.m., prevailing Pacific Standard time, before the Bankruptcy Court. Section 1129(a)(10) of the Bankruptcy Code shall be satisfied for purposes of confirmation by acceptance of the Plan by an Impaired Class of Claims. The Plan Proponent shall seek confirmation of the Plan pursuant to

section 1129(b) of the Bankruptcy Code because Class 6, Equity Interests of the Debtor, is deemed to reject the Plan. The Plan Proponent also reserves the right to modify the Plan and seek confirmation consistent with the Bankruptcy Code.

The Bankruptcy Court has established January 9, 2011 as the Voting Record Date for determining which Holders of Claims are eligible to vote to accept or reject the Plan. Ballots, along with this Disclosure Statement, the Plan, and the Disclosure Statement Order, will be mailed to all registered Holders of Claims as of the Voting Record Date that are entitled to vote to accept or reject the Plan. An appropriate return envelope, postage prepaid, will be included with each Ballot, if appropriate.

**BALLOTS CAST BY HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE PLAN PROPONENT BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY. THE BALLOTS AND THE PRE-ADDRESSED, POSTAGE PRE-PAID ENVELOPES ACCOMPANYING THE BALLOTS WILL INDICATE WHETHER THE BALLOT MUST BE RETURNED TO THE PLAN PROPONENT. THE ADDRESS FOR BALLOTS RETURNABLE TO THE PLAN PROPONENT, OTHER THAN BALLOTS SENT VIA OVERNIGHT MAIL OR BY HAND DELIVERY, AND THE GENERAL CONTACT INFORMATION FOR HOLDCO, IS:**

**Holdco Advisors, L.P.**
**c/o Brown Legal Advisors, LLC**
**Attn: Daniel R. Brown**
**1253 W. Foster Ave., Suite 3E**
**Chicago, IL 60640**

**FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL DANIEL R. BROWN, COUNSEL TO THE PLAN PROPONENT AT (773) 527-0585.**

**TO BE COUNTED, THE BALLOTS CAST BY HOLDERS INDICATING ACCEPTANCE OR REJECTION OF THE PLAN MUST BE RECEIVED BY THE PLAN PROPONENT NO LATER THAN THE VOTING DEADLINE. SUCH BALLOTS SHOULD BE CAST IN ACCORDANCE WITH THE SOLICITATION PROCEDURES DESCRIBED IN FURTHER DETAIL IN ARTICLE XI OF THIS DISCLOSURE STATEMENT AND THE DISCLOSURE STATEMENT ORDER. ANY BALLOT RECEIVED AFTER THE VOTING DEADLINE SHALL BE COUNTED IN THE SOLE DISCRETION OF THE PLAN PROPONENT.**

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except Ballots), please refer to the docket for this case, available at the Court's website, http://www.waeb.uscourts.gov/ or request a copy from the Plan Proponent (including Ballots), using the contact information for Holdco provided above.

THE PLAN PROPONENT BELIEVES THAT THE PLAN IS IN THE BEST INTEREST OF ALL HOLDERS OF CLAIMS AND RECOMMENDS THAT ALL SUCH HOLDERS WHOSE VOTES ARE BEING SOLICITED VOTE TO <u>ACCEPT</u> THE PLAN.

## VI.   The Reorganized Debtor's Business Plan

### A.   The Reorganized Debtor's Business Plan

The Debtor was a bank holding company for the Bank.  The Debtor, primarily through its operating unit, engaged in, among other things: (i) originating and purchasing real estate loans secured by income producing properties for retention in its loan portfolio; (ii) accepting customer deposits through certificates of deposits, money market, passbook, and demand deposit accounts; (iii) generally engaging in financial services; (iv) making investments; and (v) pursuing causes of action against borrowers and other counterparties.

The New Board shall consist of the Plan Advisor and the two principals of Holdco, all of whom will have experience in the financial services industry and bank holding company liquidations.  The New Board will have the broad mandate of deciding how to implement the go-forward business of the Reorganized Debtor which will be subject to change at any time, and may decide, at their discretion, to give money back to shareholders or pursue (through internal or external management) investments or other financial services as outlined in greater detail in the Plan Supplement.

### B.   Feasibility of the Plan

The Plan Proponent believes the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtor.  The Plan Proponent believes that it will have sufficient funds on hand as of the Effective Date to fund all Plan Distributions required to be paid in Cash on the Effective Date.  Further, upon emergence from bankruptcy on the Effective Date, the Reorganized Debtor will be debt-free and does not require any exit financing.  Therefore the Reorganized Debtor will have no debt service requirements, removing that potential burden on the Reorganized Debtor's cash flow.  The management and New Board of the Reorganized Debtor, who will be disclosed in accordance with section 1129(a)(5) of the Bankruptcy Code, will be comprised of individuals with experience in the financial services industry.  Accordingly, the Plan Proponent believes the Plan satisfies the feasibility requirement of section 1129(a)(11) of the Bankruptcy Code.

## VII.   Summary Of The Plan

### A.   Administrative and Priority Tax Claims

#### 1.   Administrative Claims

Subject to the provisions of sections 328, 330(a) and 331 of the Bankruptcy Code, the Reorganized Debtor shall pay each Holder of an Allowed Administrative Claim the full unpaid amount of such Allowed Administrative Claim in Cash: (a) on the Effective Date or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due or as soon as practicable thereafter); (b) if such Claim is Allowed after the Effective Date, on the date

35

such Claim is Allowed or as soon as practicable thereafter (or, if not then due, when such Allowed Administrative Claim is due); (c) at such later time as may be agreed upon by such Holder and the Reorganized Debtor, as applicable; or (d) at such time and upon such terms as set forth in an order of the Bankruptcy Court.

2.    **Priority Tax Claims**

The Reorganized Debtor shall pay each Holder of an Allowed Priority Tax Claim the full unpaid amount of such Allowed Priority Tax Claim in Cash, on or as soon as practicable after the latest of: (a) the Effective Date; (b) the date such Allowed Priority Tax Claim becomes Allowed; and (c) the date such Allowed Priority Tax Claim is payable under applicable non-bankruptcy law.

**B.    Classification and Treatment of Claims and Equity Interests**

The Plan constitutes a chapter 11 plan of reorganization for the Debtor.  Except for Administrative Claims and Priority Tax Claims, all Claims against and Equity Interests in the Debtor are placed in Classes.  In accordance with section 1123(a)(1) of the Bankruptcy Code, the Debtor has not classified Administrative Claims and Priority Tax Claims, as described in Article III of the Plan.

The table in Article III of the Plan classifies Claims against and Equity Interests in the Debtor for all purposes, including voting, confirmation and Distribution pursuant hereto and pursuant to sections 1122 and 1123(a)(1) of the Bankruptcy Code.  The Plan deems a Claim or Equity Interest to be classified in a particular Class only to the extent that the Claim or Equity Interest qualifies within the description of that Class and shall be deemed classified in a different Class to the extent that any remainder of such Claim or Equity Interest qualifies within the description of such different Class.  A Claim or Equity Interest is in a particular Class, other than for voting purposes, only to the extent that any such Claim or Equity Interest is Allowed in that Class and has not been paid or otherwise settled prior to the Effective Date.

Summary of Classification and Treatment of Classified Claims and Equity Interests

| CLASS | CLAIMS | IMPAIRMENT/VOTING |
|---|---|---|
| 1 | Secured Claims | Unimpaired – Not Entitled to Vote |
| 2 | TOPrS Unsecured Claims | Impaired – Entitled to Vote |
| 3 | General Unsecured Claims | Impaired – Entitled to Vote |
| 4 | Sandler Unsecured Claim | Impaired – Entitled to Vote |
| 5 | Convenience Claims | Unimpaired – Not Entitled to Vote |
| 6 | Equity Interests | Impaired – Not Entitled to Vote |

1.    **Class 1 (Secured Claims).**

a.    *Classification.*  Class 1 consists of all Secured Claims.

b.    *Impairment and Voting.* Class 1 is Unimpaired under the Plan and the Holders of Class 1 Allowed Secured Claims, if any, are deemed to accept the Plan.

36

c. *Treatment.* The legal, equitable and contractual rights of the Holders of Allowed Secured Claims are unaltered by the Plan. Unless otherwise agreed to by the Holder of an Allowed Secured Claim and the Plan Proponent, each Holder of an Allowed Secured Claim shall receive on the later of (x) the Effective Date, and (y) the date an order of the Bankruptcy Court allowing the Secured Claim becomes a Final Order, on account of and in full satisfaction of its Allowed Secured Claim, either of the following treatments at the election of Plan Proponent: (i) Cash equal to the amount of the Allowed Secured Claim or (ii) possession of the property in which the Holder of the Allowed Secured Claim has a perfected, unavoidable and enforceable lien, security interest or other charge and relief from the automatic stay provided by section 362 of the Code to foreclose, collect upon or set-off the property in accordance with applicable non-bankruptcy law; *provided*, *however*, that any time after the Confirmation Date but before the Effective Date, the Plan Proponent can elect to give to the Holder of an Allowed Secured Claim the treatment provided in subparagraph (ii) above.

**2. Class 2— TOPrS Unsecured Claims**

a. *Classification*: Class 2 consists of all TOPrS Unsecured Claims.

b. *Impairment and Voting*: Class 2 is Impaired by the Plan. Each holder of an Allowed TOPrS Unsecured Claim is entitled to vote to accept or reject the Plan.

c. *Treatment*: In full satisfaction, settlement, release and compromise of and in exchange for each TOPrS Unsecured Claim, each Holder of a TOPrS Unsecured Claim shall receive on or as soon as reasonably practicable after the Effective Date either (i) its Pro Rata Distribution of New Series A Common Stock or, if it so elects (ii) the Proceeds Distribution Election. Notwithstanding anything to the contrary in this Plan, at Holdco's election in its sole and absolute discretion, any holder of an Allowed Class 2 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under the Investment Company Act that Holdco elects to use below may be deemed to have elected the Proceeds Distribution Election.

**3. Class 3— General Unsecured Claims**

a. *Classification*: Class 3 consists of all General Unsecured Claims that are not TOPrS Claims or the Sandler Unsecured Claim and exceed the $7,500 threshold for inclusion in Class 5 (Convenience Claims).

b. *Impairment and Voting*: Class 3 is Impaired by the Plan. Each holder of an Allowed General Unsecured Claim is entitled to vote to accept or reject the Plan.

c. *Treatment*: In full satisfaction, settlement, release and compromise of and in exchange for each General Unsecured Claim, each Holder of an Allowed General Unsecured Claim shall receive on or as soon as reasonably practicable after the Effective Date either (i) its Pro Rata Distribution of New Series A Common Stock or, if it so elects (ii) the Proceeds Distribution Election. Notwithstanding anything to the contrary in this Plan, at Holdco's election in its sole and absolute discretion, any holder of an Allowed Class 3 Claim who may not be a holder of New Class A Common Stock consistently with an exemption under

the Investment Company Act that Holdco elects to use below may be deemed to have elected the Proceeds Distribution Election.

### 4. Class 4 – Sandler Unsecured Claim

a. *Classification*: Class 4 consists solely of the Sandler Unsecured Claim.

b. *Impairment and Voting*: Class 4 is Impaired by the Plan. The holder of an Allowed Sandler Unsecured Claim is entitled to vote to accept or reject the Plan.

c. *Treatment*: In full satisfaction, settlement, release and compromise of and in exchange for the Sandler Unsecured Claim, the Holder of the Sandler Unsecured Claim shall receive on or as soon as reasonably practicable after the Effective Date its Pro Rata share of Net Free Cash.

### 5. Class 5 - Convenience Claims

a. *Classification*: Class 5 consists of Convenience Claims.

b. *Impairment and Voting*: Class 5 is unimpaired by the Plan. The holders of Class 5 Convenience Claims are deemed to accept the Plan pursuant to section 1126(f) of the Code.

c. *Treatment*: In full satisfaction, settlement, release, and compromise of and in exchange for each Convenience Claim, each Holder of an Allowed Convenience Claim shall receive, on account of and in full satisfaction of its Allowed Convenience Claim, Cash equal to 100% of the amount of the Allowed Convenience Claim on the later of (x) the Effective Date, or as soon as reasonably practicable thereafter, and (y) the date an order of the Bankruptcy Court allowing the Convenience Claim becomes a Final Order, or as soon as reasonably practicable thereafter.

### 6. Class 6 Holders Of Interests

Class 6 is comprised of holders of Interests. Holders of Class 6 Interests shall neither receive nor retain any property under the Plan and all Interests of the Debtor shall be cancelled as of the Effective Date. Class 6 is impaired under the Plan and the holders of Class 6 Interests are deemed to reject the Plan.

### C. Means for Implementation of the Plan

1. **Corporate Existence.** Except as otherwise provided in the Plan or Plan Supplement, the Reorganized Debtor shall continue to exist after the Effective Date as a separate corporate entity with all the powers of a corporation pursuant to the applicable law in the jurisdiction in which the Debtor is incorporated or formed and pursuant to the certificate of incorporation, charter and bylaws in effect prior to the Effective Date, except to the extent the Plan Proponent elects to reincorporate the Debtor in another jurisdiction or make any other

38

amendments to such certificate of incorporation, charter or bylaws, pursuant to documents contained in the Plan Supplement, in which case such documents in effect prior to the Effective Date are deemed to be amended pursuant to the Plan and require no further action or approval. For the avoidance of doubt, the Reorganized Debtor may reincorporate from and after the Effective Date in a jurisdiction other than Washington as the Plan Proponent may in its sole discretion select.

      **2.** **Directors and Officers of the Debtor on the Effective Date.** On the Effective Date, the persons then acting as directors and officers of the Debtor shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Debtor or the Case.

      **3.** **Cancellation of TOPrS Debentures, TOPrS and Equity Interests**

On the Effective Date, except to the extent otherwise provided in the Plan, all notes, stock, instruments, certificates and other documents evidencing the TOPrS Unsecured Claims and Equity Interests, including the TOPrS Documents, the TOPrS Trusts and the TOPrS shall be deemed automatically canceled, shall be of no further force, whether surrendered for cancellation or otherwise, and the obligations of the Debtor thereunder or in any way related thereto shall be discharged.

      **a)** **Limited Survival of TOPrS Documents.**

Notwithstanding anything to the contrary contained in this Plan, (a) the TOPrS Documents will continue in effect solely for purposes of (ii) allowing the applicable TOPrS Indenture Trustee to receive and make the Distributions to be made pursuant to this Plan on account of TOPrS Unsecured Claims, from Distributions received from the Reorganized Debtor in accordance with this Plan, and (ii) permitting such TOPrS Indenture Trustee to maintain any rights or Liens it may have under the applicable TOPrS Documents against property held or collected by the TOPrS Indenture Trustees to receive TOPrS Indenture Trustee Fees and indemnification, provided that the Debtor or Reorganized Debtor, as applicable, will not have any obligation to any TOPrS Indenture Trustee for payment of any such TOPrS Indenture Trustee Fees or indemnifications except as otherwise provided in this Plan, and (b) the TOPrS Debentures issued under such agreements will continue in effect solely for the purposes of permitting Holders thereof to receive Distributions from the applicable TOPrS Indenture Trustee in accordance with the Plan.

      **b)** **Payment of Indenture Trustee Fees**

On or as soon as practicable after the Effective Date, the Reorganized Debtor shall pay the TOPrS Indenture Trustee Fees incurred prior to the Effective Date (the "Pre-Effective Date Indenture Trustee Fees"), after submission of invoices therefor, up to an aggregate maximum of $550,000 (the "Pre-Effective Date Fee Cap"). As a precondition to payment of the Pre-Effective Date Indenture Trustee Fees, the TOPrS Indenture Trustees shall, after the Effective Date, submit to the Bankruptcy Court its invoices (as redacted solely to preserve any privilege or immunity) and an application for payment of such Pre-Effective Date Indenture Trustee Fees. The Bankruptcy Court shall review each application for payment of Pre-Effective Date Indenture

Trustee Fees for reasonableness, as required under section 1129(a)(4) of the Bankruptcy Code. After the Bankruptcy Court has approved an application for payment of such fees as reasonable, the Reorganized Debtor shall, as soon as practicable thereafter, reimburse the TOPrS Indenture Trustee in Cash for such Pre-Effective Date Indenture Trustee Fees as approved by the Bankruptcy Court.

The Reorganized Debtor shall also pay in Cash the reasonable fees and expenses incurred by the TOPrS Indenture Trustees after the Effective Date, promptly after submission to the Plan Advisor of invoices therefor (as redacted solely to preserve any privilege or immunity) (the "Post-Effective Date Indenture Trustee Fees"), up to an aggregate maximum of $10,000 (the "Post-Effective Date Fee Cap"); *provided*, *however*, that to the extent that the TOPrS Indenture Trustees, in their initial request for approval of Pre-Effective Date Indenture Trustee Fees, seek less than an aggregate of $550,000 of Pre-Effective Date Indenture Trustee Fees, the Post-Effective Fee Cap shall be increased by the difference between $550,000 and the amount initially sought in Pre-Effective Date Indenture Trustee Fees, up to a maximum of $15,000, resulting in a maximum Post-Effective Date Fee Cap of $25,000.

In consideration for the Pre-Effective Date Fee Cap and Post-Effective Date Fee Cap, Holdco shall not object or cause any party to object to the TOPrS Indenture Trustees' fee applications.

If Holdco, the Reorganized Debtor, or the Plan Advisors, in their sole discretion, request that the TOPrS Indenture Trustees take action in connection this chapter 11 case in response to unanticipated events (a "Fee Trigger Event"), Holdco, the Reorganized Debtor, and the Plan Advisor shall negotiate in good faith with the TOPrS Indenture Trustees to raise the Pre-Effective Date Fee Cap or the Post-Effective Date Fee Cap, as the case may be, to account for the additional fees and expenses incurred by the TOPrS Indenture Trustees in connection with taking such requested action. If the TOPrS Indenture Trustees, on the one hand, and Holdco, the Reorganized Debtor or Plan Advisor, on the other hand, cannot agree to raise the Pre-Effective Date Fee Cap or the Post-Effective Date Fee Cap, as applicable, then the TOPrS Indenture Trustees shall be under no obligation to take any action upon any such request of Holdco, the Reorganized Debtor or Plan Advisor, as applicable, in response to such Fee Trigger Event.

Notwithstanding anything in the Plan or the TOPrS Documents to the contrary, unless there is a Fee Cap Trigger Event, the Pre-Effective Date Indenture Trustee and the Post-Effective Date Indenture Trustee fees shall not exceed $560,000 in the aggregate, or such other, lower amount as determined by the Bankruptcy Court. To the extent that the TOPrS Indenture Trustees have incurred fees and expenses in excess of $560,000 or such lower amount approved as reasonable by the Bankruptcy Court, the TOPrS Indenture Trustees shall not seek to collect such fees and expenses from any source, including from the Reorganized Debtor or from distributions to creditors through the exercise of any charging lien or similar collection mechanism.

If and only if Holdco elects in its sole discretion, payment of the TOPrS Indenture Trustee Fees shall not reduce the recovery, if any, of the Holders of Allowed Class 3 and 4 Claims and such Holders will be entitled to receive the same Distributions they would otherwise be entitled to receive absent payment of the TOPrS Indenture Trustee Fees.

40

#### c) Payment of Holdco Fees.

On or as soon as practicable after the Effective Date, the Reorganized Debtor shall pay the Holdco Fees. On or as soon as practicable after the Effective Date, the Reorganized Debtor shall pay the Holdco Fees. As a precondition to payment of any Holdco Fees, Holdco shall, after the Effective Date, submit to the Bankruptcy Court its invoices and an application for payment of such Holdco Fees. The Bankruptcy Court shall review each application for payment of Holdco Fees for reasonableness, as required under section 1129(a)(4) of the Bankruptcy Code. After the Bankruptcy Court has approved an application for payment of Holdco Fees as reasonable, the Reorganized Debtor shall, as soon as practicable thereafter, reimburse Holdco in Cash for such Holdco Fees. If and only if Holdco elects in its sole discretion, payment of the Holdco Fees shall not reduce the recovery, if any, of the Holders of Allowed Class 3 and 4 Claims, and such Holders will be entitled to receive the same Distributions they would otherwise be entitled to receive absent payment of the Holdco Fees.

### 4. Reorganized Debtor Securities

#### a) New Series A Common Stock

The Reorganized Debtor's equity interests shall consist of New Series A Common Stock, and, if the Debtor elects (only if necessary to cause Section 382(l)(5) of the Internal Revenue Code to apply to the Plan), New Series B Common Stock. On the Effective Date, or as soon as reasonably practicable thereafter, the Reorganized Debtor shall issue or reserve for issuance all securities to be issued pursuant to the terms of the Plan, without need for any further corporate or shareholder action. Shares of New Series A Common Stock and shares of New Series B Common stock issued on account of the Proceeds Distribution Election, if any, and depending on the election of the applicable Holder of a particular General Unsecured Claim, shall be issued Pro Rata to (a) Holders of Allowed TOPrS Unsecured Claims and (b) Holders of Allowed General Unsecured Claims.

#### b) Issuance of New Series B Common Stock (Separate Series or Classes of Common Stock)

Unless Holdco determines in its sole discretion that issuance of New Common Series B Common Stock is unnecessary to preserve the Reorganized Debtor's tax attributes, on the Effective Date each Holder that has made the Proceeds Distribution Election with respect to which the Reorganized Debtor chooses to issue New Series B Common Stock shall be issued New Series B Common Stock.

In such case, the Pro Rata Distribution of Net Free Cash that would have been issued to such Holders will be issued to a wholly owned, special purpose bankruptcy remote vehicle of the Reorganized Debtor and the Reorganized Debtor's certificate of incorporation shall provide that (i) any Distributions by such special purpose vehicle shall be used exclusively for funding dividend, distribution, or redemption payments on the New Series B Common Stock and (ii) each holder of New Series B Common Stock shall be entitled to its Pro Rata share of Net Free

Cash as if such Holder had received such Pro Rata share of Net Free Cash in accordance with the Plan. If New Series B Common Stock is issued to the Holders making a Proceeds Distribution Election as provided above, then (x) the certificate of incorporation, charter and bylaws of the special purpose vehicle referred to above shall be subject to the approval of Holdco and the Indenture Trustee, (y) the rights, preferences and privileges of the New Series B Common Stock contained in the certificate of incorporation, charter and bylaws of Reorganized Debtor shall be subject to the approval of Holdco; and (z) the certificate of incorporation of Reorganized Debtor shall provide that (I) the holder of each share of New Series B Common Stock, if any, shall be entitled to receive a dividend, distribution, redemption, or similar payment corresponding to and from Distributions that on account of such Holder's Pro Rata share of Net Free Cash in accordance with the Plan, (II) the holder of each share of New Series B Common Stock shall be entitled to a liquidation preference in an aggregate amount equal to the their respective Pro Rata share of Net Free Cash as of the date of the liquidation or dissolution of the Reorganized Debtor, which may be satisfied by the distribution of the Net Free Cash held by the special purpose vehicle created pursuant to the Plan to the holders of the New Series B Common Stock pursuant to such liquidation or dissolution and (III) Reorganized Debtor may not be merged or consolidated with any other Entity or liquidated or dissolved at any time that the New Series B Common Stock is outstanding unless adequate provision is made to secure the right of the holders of the New Series B Common Stock to receive Distributions of Net Free Cash as provided for in the Plan.

Alternatively, the Reorganized Debtor's certificate of incorporation, and certificate of incorporation, charter and bylaws of the special purpose vehicle referred to above shall provide that at any time on or after the Effective Date, the New Board shall in its discretion distribute the Net Free Cash held by such special purpose vehicle to holders of New Series B Common Stock in the form of a dividend, distribution, redemption, or any other type of payment, after which the Reorganized Debtor shall have no further obligations to make distributions to holders of New Series B Common Stock. Moreover, at the election of Holdco, in lieu of the creating a special purpose vehicle, the Debtor may distribute the Pro Rata share of Net Free Cash allocable to the holders of New Series B Common Stock, in accordance with the Plan, directly to holders of New Series B Common Stock on the Effective Date, which such distribution shall be in addition to, and not in lieu of the shares of New Series B Common Stock to be distributed on such date.

### c) **Alternative Treatment**

Alternatively, to the extent the Reorganized Debtor issues the New Series B Common Stock as one or more separate series or classes of common stock on account the Proceeds Distribution Election, each Holder who elects to receive the Proceeds Distribution Election:

(1) shall be entitled on account of such New Series B Common Stock to a pro rata share (such share to be calculated based on such Holder's number of shares of such New Series B Common Stock divided by the total outstanding shares as of the Effective Date of New Series B Common Stock issued to Holders who elect to receive the Proceeds Distribution Election) of any Net Free Cash that constitutes net proceeds of the Causes of Action, pursuant to redemption upon

42

the terms set forth in the Reorganized Debtor's articles of incorporation upon entry of a Final Order resolving the Causes of Action; and

(2) shall also be entitled to a right of payment equal to such holder's Pro Rata share of Net Free Cash that does not constitute the proceeds of the Causes of Action.

Each share of New Series B Common Stock shall entitle the Holder of such share to exercise voting rights equal to 1/20 of the voting rights exercisable by each of Holder of New Series A Common Stock.

### d) Dividends

Except as otherwise provided by applicable law or in the corporate documents that will be included in the Plan Supplement, the holders of New Series A Common Stock and the New Series B Common Stock, if any, shall share ratably in all dividends and other distributions, whether in respect of liquidation or dissolution (voluntary or involuntary) or otherwise. Without limiting the generality of the immediately preceding sentence, Holders of Allowed Claims who properly and timely make the Proceeds Distribution Election shall not receive an amount greater than the Pro Rata portion of Net Free Cash that such Holders would have received if all Net Free Cash was Distributed Pro Rata to all Holders of Allowed General Unsecured Claims, and all Cash received by such Holders shall be applied in reduction of such amount.

### e) Other Attributes

Shares of New Series A Common Stock and the New Series B Common Stock, if any, shall have conversion rights, redemption rights, preemptive rights, transfer restrictions and other rights, responsibilities and restrictions typically associated with common stock, all as set forth in the Plan Supplement, in order to preserve and maximize the value of all tax attributes that are or will be held by the Reorganized Other Attributes of New Series A and B Common Stock. Shares of New Series A Common Stock and the New Series B Common Stock, if any, shall have conversion rights, redemption rights, preemptive rights, transfer restrictions and other rights, responsibilities and restrictions typically associated with common stock, all as set forth in the Plan Supplement, in order to preserve and maximize the value of all tax attributes that are or will be held by the Reorganized Debtor from and after the Effective Date.

### f) Redemption of Common Stock

The New Board may elect to redeem all shares of New Common Stock held by a particular stockholder at any time, so long as the New Common Stock is redeemed for Fair Market Value Price. For purposes of the redemption of the New Common Stock, to determine whether the New Common Stock is redeemed for Fair Market Value, the New Board shall consult with its professional advisors in determining the Fair Market Value for the New Common Stock, and may rely on its professional advisors to determine such Fair Market Value. Prior to making a final determination to exercise the Reorganized Debtor's redemption right under this paragraph, the Reorganized Debtor shall send a written notice to such stockholder (at the notice address appearing in the Reorganized Debtor's records) advising the stockholder of the Reorganized Debtor's intention to exercise its redemption right. In the event that the

stockholder notifies the Reorganized Debtor in writing (within sixty (60) days after the date of the Reorganized Debtor's notice) that such stockholder objects to the redemption of its shares, then the Reorganized Debtor shall not exercise the redemption right. In the event that the stockholder does not respond to the Reorganized Debtor's notice within sixty (60) days, the stockholder is deemed to have consented to the proposed redemption. In the event that the stockholder does not respond to the Reorganized Debtor's notice within sixty (60) days after the date of the Reorganized Debtor's notice (or the stockholder notifies the Reorganized Debtor that it approves or does not object to such redemption), then the New Board shall be entitled to make a final determination to exercise the redemption right. In the event that the New Board makes such a final determination, then the redemption shall take place on a date determined by the New Board (but such redemption date shall be no later than 30 days after the New Board's final determination) and shall be at a price equal to the Fair Market Value Price. The purchase price payable in any such redemption shall be paid in cash or by check on the closing date. Such redemption shall be effective on the closing date of the redemption regardless of whether or not the stockholder participates in the closing or delivers his or its stock certificate to the Reorganized Debtor for cancellation.

### 5. Exemption from the Registration Requirements of the Securities Act, Investment Company Act

#### a) Exemption from Securities Act.

The offering, issuance, and distribution of securities pursuant to the Plan shall be exempt from the registration requirements of section 5 of the Securities Act as one or more private placements pursuant to any and all applicable exemptions, including, as applicable, exemptions provided by Section 1145 of the Bankruptcy Code, Section 4(2) of the Securities Act and/or Rule 506 of Regulation D under the Securities Act, based on the number of creditors receiving securities under the Plan, the Reorganized Debtor's belief as to their status as accredited investors, and other factors. As a result, the securities issued under the Plan likely will be "restricted securities" for purposes of the federal securities laws. The Reorganized Debtor also reserves all rights to rely, if necessary in its sole discretion, on other exemptions to the registration requirements of section 5 of the Securities Act.

#### b) Investment Company Act.

In addition, the Reorganized Debtor expects to rely on one or more of the exemptions contained in the Investment Company Act, which exemptions may include, without limitation, exemptions under Sections 3(c)1 and 3(c)7. In order to ensure that the Reorganized Debtor qualifies for all applicable exemptions under the Investment Company Act (including, without limitation, Section 3(c)(7) if the Reorganized Debtor relies on such exemption), then all holders of the Reorganized Debtor's equity interests will be required to be "Qualified Purchasers" and/or "Accredited Investors" as defined under the applicable federal laws unless and until the Board of Directors determines otherwise. Companies that are investment companies within the meaning of the Investment Company Act, and that do not qualify for an exemption from the provisions of such Act, are required to register with the Securities and Exchange Commission and are subject to substantial regulations with respect to capital structure, operations, transactions with affiliates and other matters. In the event such companies do not register under the Investment Company

Act, they may not, among other things, conduct public offerings of their securities in the United States or engage in interstate commerce in the United States

### 6. Restructuring Transactions

On the Effective Date or as soon as reasonably practicable thereafter, the Reorganized Debtor may take all actions as may be necessary or appropriate to effect any transaction described in, approved by, contemplated by or necessary to effectuate the Plan, including: (1) the execution and delivery of appropriate agreements or other documents of merger, consolidation or reorganization containing terms that are consistent with the terms of the Plan and that satisfy the requirements of applicable law; (2) the execution and delivery of appropriate instruments of transfer, assignment, assumption or delegation of any property, right, liability, duty or obligation on terms consistent with the terms of the Plan; (3) the filing of appropriate certificates of incorporation, charter, merger or consolidation with the appropriate governmental authorities pursuant to applicable law; and (4) all other actions that the Reorganized Debtor determines are necessary or appropriate.

### a) Corporate Action

Each of the matters provided for by the Plan involving the corporate structure of the Debtor or corporate, financing or related actions to be taken by or required of the Reorganized Debtor shall, as of the Effective Date, be deemed to have occurred and be effective as provided in the Plan (except to the extent otherwise indicated), and shall be authorized, approved, and, to the extent taken prior to the Effective Date, ratified in all respects without any requirement of further action by Holders of Claims or Equity Interests, the directors of the Debtor or any other entity. Without limiting the foregoing, such actions will include: the adoption and (as applicable) filing of amended and restated certificate of incorporation, charter, bylaws and other governance documents; the appointment of officers and (as applicable) directors for the Reorganized Debtor; the issuance of the New Common Stock and any security or instrument issued by the Reorganized Debtor on account of part of the Proceeds Distribution Election, and all related documents and instruments (as applicable). The Reorganized Debtor shall enter into such agreements and amend their corporate governance documents to the extent necessary to implement the terms and conditions of the Plan.

### b) Effectuating Documents; Further Transactions

On and after the Effective Date, the Reorganized Debtor, and the officers and members of the New Board thereof, are authorized to and may issue, execute, deliver, file or record such contracts, securities, instruments, releases, and other agreements or documents and take such actions as may be necessary or appropriate to effectuate, implement, and further evidence the terms and conditions of the Plan and the securities issued pursuant to the Plan in the name of and on behalf of the Reorganized Debtor, without the need for any approvals, authorizations, or consents except for those expressly required pursuant to the Plan.

### c) Exemption from Certain Transfer Taxes and Recording Fees

Pursuant to section 1146(a) of the Bankruptcy Code, any transfer from the Debtor to the Reorganized Debtor or to any entity pursuant to, in contemplation of, or in connection with the Plan or pursuant to:  (1) the issuance, distribution, transfer, or exchange of any debt, securities, or other interest in the Debtor or the Reorganized Debtor; (2) the creation, modification, consolidation, or recording of any mortgage, deed of trust or other security interest, or the securing of additional indebtedness by such or other means; (3) the making, assignment, or recording of any lease or sublease; or (4) the making, delivery, or recording of any deed or other instrument of transfer under, in furtherance of, or in connection with, the Plan, including any deeds, bills of sale, assignments, or other instrument of transfer executed in connection with any transaction arising out of, contemplated by, or in any way related to the Plan, shall not be subject to any document recording tax, sales tax, stamp tax, conveyance fee, intangibles or similar tax, mortgage tax, real estate transfer tax, mortgage recording tax, Uniform Commercial Code filing or recording fee, regulatory filing or recording fee, or other similar tax or governmental assessment, and the appropriate state or local governmental officials or agents shall forego the collection of any such tax or governmental assessment and to accept for filing and recordation any of the foregoing instruments or other documents without the payment of any such tax or governmental assessment.

### d) Board Representation

The New Board shall consist of the Plan Advisor and the two principals of Holdco, and the backgrounds and qualifications of the New Board shall be disclosed in the Plan Supplement prior to the Confirmation Date in accordance with section 1129(a)(5) of the Bankruptcy Code. The Plan Advisor, however, will have substantially reduced voting power as compared to the other members of the New Board on matters pertaining to the management of the Reorganized Debtor's business affairs. The initial members of the New Board shall serve staggered terms of one, two and three years, as designated, and thereafter, the members of the New Board shall be elected on a staggered three-year basis by the holders of New Series A Common Stock.  Initially, the New Board members shall not receive compensation for their services as members of the New Board.  The New Board will, however, have the right to determine compensation matters in accordance with its fiduciary duties.

### e) Senior Management

Senior management of the Reorganized Debtor shall initially consist of the New Board or a subset of the New Board.  The backgrounds and qualifications of the New Board shall be disclosed in the Plan Supplement prior to the Confirmation Date in accordance with section 1129(a)(5) of the Bankruptcy Code.

### f) Committee

As of the Effective Date, the Committee shall dissolve, and its members shall be released and discharged from all further authority, duties, responsibilities and obligations relating to and arising from the Case.  The retention and employment of any Professionals retained by the Committee shall terminate as of the Effective Date.  Any and all orders providing the Committee

46

with standing and authority to bring any Causes of Action, shall be vacated, null, void and of no effect from and after the Effective Date, and from and after the Effective Date the Committee shall have no standing or authority whatsoever to bring or prosecute any Causes of Action.

### g) Vesting of Assets in the Reorganized Debtor

Except as otherwise provided in this Plan or in any agreement, instrument or other document relating thereto, on or after the Effective Date pursuant to section 1141 of the Bankruptcy Code, all property of the Estate and any property acquired by the Debtor pursuant hereto shall vest in the Reorganized Debtor, free and clear of all Liens, Claims, charges or other encumbrances. Except as may be provided in this Plan or the Confirmation Order, including without limitation with respect to the Proceeds Distribution Election Segregated Account, on and after the Effective Date, the Reorganized Debtor may use, acquire or dispose of property and compromise or settle any Claims without supervision or approval by the Bankruptcy Court and free of any restrictions of the Bankruptcy Code or Bankruptcy Rules.

### h) Prohibition Against Pledging Assets

Notwithstanding anything to the contrary contained herein, the Reorganized Debtor shall be precluded from, and the Confirmation Order shall expressly prohibit the Reorganized Debtor from, pledging any interest in (a) the Disputed Reserve or the assets therein; (b) the Proceeds Distribution Election Segregated Account or the assets therein; or (c) any assets, or the proceeds thereof, that are or could become part of the Proceeds Distribution Election, including, without limitation, any Causes of Action or the proceeds thereof. The Confirmation Order shall also provide that any such pledge in violation of this section of the Plan is null and void.

### i) Deregistration

As soon after the Effective Date as is practicable, the Reorganized Debtor shall file a Form 15 Certification and Notice of Termination of Registration Under Section 12(g) of the Securities Exchange Act of 1934 or Suspension of Duty to File Reports Under Sections 12 and 15(d) of the Securities and Exchange Act of 1934 with the United States Securities and Exchange Commission or to otherwise comply with the statutory or regulatory requirements of a publicly traded company, including, but not limited to, seeking to deregister the Equity Interests.

### j) Allowance of TOPrS Unsecured Claims.

The TOPrS Unsecured Claims are deemed to be Allowed Claims in the amounts as set forth in the Plan Supplement. Holders of TOPrS Unsecured Claims shall receive a Distribution of New Series A Common Stock or the Proceeds Distribution Election, as applicable, on the Initial Distribution Date at the appropriate time, as determined by such Holder's election, based on the Allowed amount of such TOPrS Unsecured Claim in accordance with Article 3 of the Plan.

### k) Plan Advisor

As of the Effective Date, the Plan Advisor, John Decker, (whose background and qualifications shall be disclosed in the Plan Supplement), shall be appointed and shall perform the duties set forth in this paragraph. The compensation of the Plan Advisor shall be $35,000 per year. Although the Plan Advisor will be a member of the New Board, the Plan Advisor will have substantially reduced voting power as compared to the other members of the New Board. The Plan Advisor shall oversee and have decision-making authority regarding any litigation and/or settlement of Causes of Action, the administration and payment of Distributions, and the approval of TOPrS Indenture Trustee Fees as reasonable before such fees are submitted to the Bankruptcy Court for approval as reasonable. The fiduciary duties of the Plan Advisor shall run to all parties entitled to Distributions under the Plan, whether or not such beneficiaries have elected the Proceeds Distribution Election. The Plan Advisor shall consult with the Reorganized Debtor regarding any material decision in connection with all Causes of Action. The Plan Advisor shall, consider the calculation of Net Free Cash, including the following factors, among other things: (a) the amount of Cash; (b) the pending Claims against the Estate; (c) the status of litigation of any Causes of Action; (d) the appropriate reserves for such Causes of Action; (e) any administrative and related costs of administering the Plan; and (f) the length of time since the Effective Date and the previous distribution of Net Free Cash.

Additional information regarding the Plan Advisor will be contained in the Plan Supplement.

### D. Provisions Governing Distributions

#### 1. Initial Distribution Date

On the Initial Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan.

#### 2. Disputed Reserve

##### a) Establishment of Disputed Reserve

On the Initial Distribution Date, and after making all Distributions required to be made on such date under the Plan, the Reorganized Debtor shall establish a separate Disputed Reserve for Disputed Claims, which Disputed Reserve shall be administered by the Reorganized Debtor. The Reorganized Debtor shall reserve a number of shares of New Common Stock, an amount of Cash, or any other security or equity interest issued under the Plan, depending on the election of the Holder of such Disputed Claims, and whether the Debtor elects to issue a security on account of the part of the Proceeds Distribution Election, sufficient to provide Holders of Disputed Claims the treatment such Holders would be entitled to receive under the Plan if all such Disputed Claims were to become Allowed Claims (or such lesser amount as may be estimated by the Bankruptcy Court).

48

### b) Maintenance of Disputed Reserve

The Reorganized Debtor shall hold unissued New Common Stock and Cash in the Disputed Reserve in trust, segregated from and not to be commingled with any other assets of the Reorganized Debtor, for the benefit of the Holders of Claims ultimately determined to be Allowed. The Reorganized Debtor shall, in its sole discretion, distribute such amounts (net of any expenses, including taxes, relating thereto), as provided herein, as such Disputed Claims are resolved by a Final Order, and such New Common Stock and Cash will be distributable in respect of such Disputed Claims as such amounts would have been distributable had the Disputed Claims been Allowed Claims as of the Effective Date.

### c) Establishment and Maintenance of Proceeds Distribution Election Segregated Account

On the Effective Date, and after making all Distributions required to be made on such date under the Plan, the Reorganized Debtor shall establish the Proceeds Distribution Election Segregated Account, into which shall on that date and from time to time thereafter as it becomes available be deposited all Net Free Cash necessary and sufficient to make Distributions to Holders of Claims that elect to receive the Proceeds Distribution Election. All Cash in the Proceeds Distribution Election Segregated Account shall be held pursuant to the investment guidelines contained in the exhibits to the Plan Supplement. The Confirmation Order shall provide that such account, and all funds required by this section to be deposited into such account, shall be segregated from, and shall not be commingled with, any other assets of the Reorganized Debtor, and as against creditors of the Reorganized Debtor, shall not be considered or deemed to be, property of the Reorganized Debtor or subject to claims by creditors of the Reorganized Debtor, and shall be held in trust for the sole benefit of Holders of Claims that elect to receive the Proceeds Distribution Election.

### 3. Quarterly Distributions

On each Quarterly Distribution Date or as soon thereafter as is reasonably practicable, the Reorganized Debtor shall make the Distributions required to be made under the Plan on such date. Any Distribution that is not made on the Initial Distribution Date or on any other date specified herein because the Claim that would have been entitled to receive that Distribution is not an Allowed Claim on such date, shall be held by the Reorganized Debtor as applicable, in the Disputed Reserve and distributed on the first Quarterly Distribution Date after such Claim is Allowed. No interest shall accrue or be paid on the unpaid amount of any Distribution paid on a Quarterly Distribution Date.

### 4. Record Date for Distributions

Except as otherwise provided in a Final Order of the Bankruptcy Court or as otherwise stipulated by the Debtor or Reorganized Debtor, as applicable, the transferees of Claims that are transferred pursuant to Bankruptcy Rule 3001 on or prior to the Distribution Record Date will be treated as the Holders of those Claims for all purposes, notwithstanding that any period provided by Bankruptcy Rule 3001 for objecting to the transfer may not have expired by the Distribution Record Date. The Reorganized Debtor shall have no obligation to recognize any transfer of any

Claim occurring after the Distribution Record Date. In making any Distribution with respect to any Claim, the Reorganized Debtor shall be entitled instead to recognize and deal with, for all purposes hereunder, only the entity that is listed on the proof of Claim Filed with respect thereto or on the Schedules as the Holder thereof as of the close of business on the Distribution Record Date and upon such other evidence or record of transfer or assignment that are known to the Reorganized Debtor as applicable, as of the Distribution Record Date.

### 5. General Provisions; Undeliverable Distributions

Subject to Bankruptcy Rule 9010, and except as otherwise provided herein, Distributions to the Holders of Allowed Claims shall be made by the Reorganized Debtor at (i) the address of each Holder as set forth in the Schedules, unless superseded by the address set forth on proofs of Claim Filed by such Holder or (ii) the last known address of such Holder if no proof of Claim is Filed or if the Debtor or Reorganized Debtor, as applicable, has been notified in writing of a change of address; *provided, however*, that Distributions paid by the Reorganized Debtor for the benefit of Holders of TOPrS Debentures and the TOPrS shall be made to the appropriate TOPrS Indenture Trustee under the respective TOPrS Indenture for such obligations, unless the TOPrS Indenture Trustees consent to the Reorganized Debtor making direct distributions of New Series A Common Stock or New Series B Common Stock, as the case may be, directly to the registered holders of the TOPrS entitled to receive such stock distributions. The TOPrS Indenture Trustees shall consent to the Reorganized Debtor making direct distributions to registered TOPrS holders entitled to receive New Series A Common Stock or New Series B Common Stock, as the case may be, if the Reorganized Debtor has paid in full the Pre-Effective Date Indenture Trustee Fees allowed by the Bankruptcy Court and the TOPrS holders have presented their TOPrS certificates or have otherwise satisfied the preconditions to distributions set forth in the Plan. To facilitate direct distributions to registered TOPrS holders, on the Effective Date the TOPrS Indenture Trustees shall provide the Reorganized Debtor a list of all registered TOPrS holders as of the Distribution Record Date. For the avoidance of doubt, direct distributions or New Series A Common Stock or New Series B Common Stock, as the case may be, shall be made to and in the name of the registered TOPrS holder, and such distributed stock shall not reference the TOPrS Indenture Trustees in any manner.

To the extent distributions are made to the TOPrS Indenture Trustees and not directly to TOPrS holders, each such TOPrS Indenture Trustee shall administer the distributions to the respective holders of TOPrS Unsecured Claims in accordance with the Plan and the applicable TOPrS Indentures. Distribution to a TOPrS Indenture Trustee shall be promptly remitted by such TOPrS Indenture Trustee to the Holders of the TOPrS Unsecured Claims entitled thereto (i.e., the Holder of the relevant TOPrS on the applicable Distribution Record Date) in accordance with this Plan and the TOPrS Indentures, and each such Distribution by the Reorganized Debtor to a TOPrS Indenture Trustee shall be deemed to have discharged the obligation of the Debtor to make such Distribution to the Holders of TOPrS Unsecured Claims represented by such TOPrS Indenture Trustee. The TOPrS Indenture Trustees shall not be required to give any bond or surety or other security for the performance of their duties unless otherwise ordered by the Bankruptcy Court. The TOPrS Indenture Trustees shall only be required to make distributions in accordance with the terms of the Plan and the respective TOPrS Indenture and shall have no liability for actions taken in accordance with the Plan or in reliance upon information provided to

10-06097-FPC11   Doc 439   Filed 06/11/13   Entered 06/11/13 15:38:20   Pg 50 of 98

the TOPrS Indenture Trustees in accordance with the Plan, except for liabilities resulting from their own gross negligence or willful misconduct. If any Distribution is returned as undeliverable, the Reorganized Debtor may, in its discretion, make such efforts to determine the current address of the Holder of the Claim with respect to which the Distribution was made as the Reorganized Debtor deems appropriate, but no Distribution to any Holder shall be made unless and until the Reorganized Debtor has determined the then-current address of the Holder, at which time the Distribution to such Holder shall be made to the Holder without interest. Amounts in respect of any undeliverable Distributions made by the Reorganized Debtor shall be returned to, and held in trust by, the Reorganized Debtor, until the Distributions are claimed or are deemed to be unclaimed property under section 347(b) of the Bankruptcy Code. The Reorganized Debtor shall have the discretion to determine how to make Distributions in the most efficient and cost-effective manner possible; *provided*, *however*, that its discretion may not be exercised in a manner inconsistent with any express requirements of the Plan. The rights of the TOPrS Indenture Trustee to assert (a) its charging Lien on TOPrS Indenture Trustee Fees that are due and owing consistent with Article VII.C.3.b hereof ; or (b) any other rights or arguments to payment on TOPrS Indenture Trustee Fees that are due and owing consistent with Article VII.C.3.b hereof other than asserting its charging Lien, are preserved. The TOPrS Indenture Trustees shall not be entitled to assert their charging Lien, or any other rights or arguments to payment, on TOPrS Indenture Trustee Fees other than those that are due and owing consistent with Article VII.C.3.b hereof.

### 6. Unclaimed Property

Except with respect to property not distributed because it is being held in the Disputed Reserve, Distributions that are not claimed by the expiration of one year from the Initial Distribution Date or Quarterly Distribution Date applicable to such Distribution, shall be deemed to be unclaimed property under section 347(b) of the Bankruptcy Code and shall vest or revest in the Reorganized Debtor, and the Claims with respect to which those Distributions are made shall be automatically canceled. After the expiration of such one-year period, the Claim of any entity to those Distributions shall be discharged and forever barred. Nothing contained in the Plan shall require the Reorganized Debtor to attempt to locate any Holder of an Allowed Claim. Except as otherwise provided in the Plan, all funds or other property that vests or revests in the Reorganized Debtor pursuant to this Article shall be distributed by the Reorganized Debtor in accordance with the provisions of the Plan.

### 7. Other Ministerial and Mechanical Details

Please see the Plan and Plan Supplement for further mechanical details regarding the Plan.

### 8. No Distributions in Excess of Allowed Amount of Claim

No Holder of an Allowed Claim shall receive in respect of that Claim any Distribution in excess of the Allowed amount of that Claim.

### 9. Setoff and Recoupment

51

The Reorganized Debtor may, but shall not be required to, set off against, or recoup from, any Claim and the Distributions to be made pursuant to the Plan in respect thereof, any Claims or defenses of any nature whatsoever that the Debtor, the Estate or the Reorganized Debtor may have against the Holder of such Claim, but neither the failure to do so nor the allowance of any Claim under the Plan shall constitute a waiver or release by the Debtor, the Estate, or the Reorganized Debtor of any right of setoff or recoupment that any of them may have against the Holder of any Claim.

### 10. Disputed Claims

The Plan contains detailed provisions regarding the treatment of and method of resolving Disputed Claims. Parties in interest are respectfully invited to review the Plan for further details.

### E. Treatment of Executory Contracts and Unexpired Leases

#### 1. Reservation of Rights

Neither the exclusion nor inclusion of any contract or lease in the Plan Supplement, nor anything contained in the Plan, shall constitute an admission that any such contract or lease is in fact an executory contract or unexpired lease or that the Reorganized Debtor has any liability thereunder. If there is a dispute regarding whether a contract or lease is or was executory or unexpired at the time of assumption or rejection, the Reorganized Debtor, as applicable, shall have thirty (30) days following entry of a Final Order resolving such dispute to alter their treatment of such contract or lease.

#### 2. Default Rejection of Executory Contracts and Unexpired Leases.

All executory contracts or unexpired leases of the Debtor, except (a) those previously assumed and assigned by Final Order and (b) those which are assumed under the Plan, are rejected. The Plan Proponent shall file a schedule of executory contracts to be assumed, if any, in the Plan Supplement.

#### 3. Procedural Issues.

The Plan shall constitute a motion to reject any executory contracts and unexpired leases not identified in the Plan Supplement Exhibit "B" as executory contracts or unexpired leases to be assumed, and the Debtor and Reorganized Debtor shall have no further liability thereunder. The entry of the Confirmation Order by the Bankruptcy Court shall constitute approval of any such rejections pursuant to sections 365(a) and 1123 of the Bankruptcy Code and that the rejection thereof is in the best interest of the Debtor, its Estate and all parties in interest in the Case.

#### 4. Claims Based on Rejection of Executory Contracts or Unexpired Leases.

Claims created by the rejection of executory contracts and unexpired leases pursuant to Article IV of the Plan, or the expiration or termination of any executory contract or unexpired lease prior to the Effective Date, must be filed with the Bankruptcy Court and served on the

52

Reorganized Debtor no later than thirty (30) days after the Effective Date. Any Claims arising from the rejection of an executory contract or unexpired lease pursuant to Article IV for which proofs of Claim are not timely filed within that time period will be forever barred from assertion against the Debtor, the Reorganized Debtor, the Estate, its successors and assigns, and its assets and properties, unless otherwise ordered by the Bankruptcy Court or as otherwise provided herein. All such Claims shall, as of the Effective Date, be subject to the permanent injunction set forth in this Plan. Unless otherwise ordered by the Bankruptcy Court, all such Claims that are timely filed as provided herein shall be treated as General Unsecured Claims under the Plan.

### 5. Cure of Defaults for Assumed Executory Contracts and Unexpired Leases.

a.  Cure of Defaults. Any provisions or terms of the Debtor's executory contracts or unexpired leases to be assumed pursuant to the Plan that are, or may be, alleged to be in default, shall be satisfied solely by Cure or by a waiver of Cure agreed upon between the Debtor and applicable counterparty. Except with respect to executory contracts or unexpired leases in which the Debtor and the applicable counterparties have stipulated in writing to payment of Cure, all requests for payment of Cure must be Filed on or before the Cure Bar Date. Any request for payment of Cure that is not timely Filed shall be disallowed automatically and forever barred from assertion and shall not be enforceable against the Reorganized Debtor, without the need for any objection by the Reorganized Debtor or further notice to or action, order, or approval of the Bankruptcy Court, and any such Claim for Cure shall be deemed fully satisfied, released, and discharged, notwithstanding anything included in the Schedules or in any proof of Claim to the contrary; provided, however, that nothing shall prevent the Reorganized Debtor from paying any Cure despite the failure of the relevant counterparty to File such request for payment of such Cure. The Reorganized Debtor also may settle any Cure without further notice to or action, order, or approval of the Bankruptcy Court.

b.  Objections to Cure. If the Plan Proponent or Reorganized Debtor, as applicable, object to any request for Cure or any other matter related to assumption, the Bankruptcy Court shall determine the Allowed amount of such Cure and any related issues. If there is a dispute regarding such Cure, the ability of the Reorganized Debtor or any assignee to provide "adequate assurance of future performance" within the meaning of section 365 of the Bankruptcy Code, or any other matter pertaining to assumption, then such Cure shall occur as soon as reasonably practicable after entry of a Final Order resolving such dispute, approving such assumption (and, if applicable, assignment), or as may be agreed upon by the Plan Proponent or Reorganized Debtor and the counterparty to the executory contract or unexpired lease. Any counterparty to an executory contract or unexpired lease that fails to object timely to the proposed assumption of any executory contract or unexpired lease will be deemed to have consented to such assumption. The Plan Proponent or Reorganized Debtor, as applicable, reserve the right, either to reject or nullify the assumption of any executory contract or unexpired lease no later than thirty (30) days after a Final Order determining the Cure or any request for adequate assurance of future performance required to assume such executory contract or unexpired lease.

(c)  Release and Satisfaction of Debtor upon Assumption. Assumption of any executory contract or unexpired lease pursuant to the Plan or otherwise and after satisfaction of

53

any Cure, shall result in the full release and satisfaction of any Claims or defaults, whether monetary or nonmonetary, including defaults of provisions restricting the change in control or ownership interest composition or other bankruptcy-related defaults, arising under any assumed executory contract or unexpired lease at any time prior to the effective date of assumption.

The Plan contains detailed provisions regarding the treatment of executory contracts the Plan Proponent intends the Debtor to assume and those the Plan Proponent intends the Debtor to reject. Parties in interest are respectfully invited to review the Plan for further details.

### F.    Pending And Contemplated Litigation

#### 1.    Cappello Litigation

On February 2, 2011, Cappello Capital Corp. filed suit in Los Angeles, California against the Bank, Sandler O'Neill and 10 unnamed John Doe defendants (the "Cappello Litigation"). The suit demands payment from the defendants of over $11 million, seeks to impose a constructive trust on the sale proceeds and the recapitalization funds, and seeks a fee of $292,500 on the purchase price of $6.5 million. The Cappello Litigation was removed to the United States District Court for the Central District of California, and thereafter transferred to the United States District Court for the Eastern District of Washington, which in turn referred the matter for pre-trial proceedings to the Bankruptcy Court. The Cappello Litigation is currently pending in the Bankruptcy Court.

#### 2.    Avoidance Actions

Subject to Article VII.I.4.a below, the Plan Proponent will retain all rights and causes of action authorized by Chapter V of the Baenkruptcy Code that are not expressly released herein, which causes of action will be prosecuted by the Reorganized Debtor. This Bankruptcy Code chapter authorizes a Debtor (or, in this instance, the Reorganized Debtor) to, under limited circumstances, seek the return of certain transfers made by the Debtor for the benefit of the estate ("Avoidance Actions"). The Reorganized Debtor will analyze the Debtor's books and records to determine if there are potential Avoidance Actions.

#### 3.    Objections to Claims

The Reorganized Debtor reserves the right to object to any claims scheduled or filed.

According to the Debtor, the IRS filed a precautionary claim in the case, this claim has been withdrawn and a determination of no liability has been cleared by the Joint Committee on Taxation.

The Reorganized Debtor will conduct a review of the Debtor's schedule and claims register, and will make the requisite determinations regarding whether to prosecute objections to existing claims.

### G.    The Sandler Settlement

In June 2012, Sandler filed a motion for allowance of a Claim for an Administrative Expense for the attorneys' fees and costs incurred in defending the Cappello Litigation. Sandler's claims are allegedly based on certain provisions of the engagement agreement between the Debtor and Sandler that was approved by the Bankruptcy Court after the Petition Date. Sandler contends that it has a similar claim against the Bank under Sandler's engagement agreement with the Bank. Resolution of Sandler's claim against the Debtor is the subject of the a settlement between the Debtor, Sandler, the Bank, Starbuck and SKBHC (the "Sandler Settlement Agreement" or the "Sandler Settlement"). The Debtor and Sandler contend that the Sandler Settlement Agreement effectively allocates the indemnification obligations between the Debtor

and the Bank. The mediator in the Plan mediation concluded that approval of the proposed Sandler Settlement Agreement is in the best interests of the Debtor and its estate.

Holdco did not support the Sandler Settlement and did not agree that it is in the best interests of the Debtor and its estate.

The Sandler Settlement is summarized below. This is a summary only – in the event of any discrepancy between this summary and the Sandler Settlement Agreement, the Sandler Settlement Agreement will control.

### 1. Sandler's Allowed Claims in the Bankruptcy Case.

Sandler shall have the following claims (collectively, the "Sandler Claims"), each of which shall be deemed Allowed for all purposes in the Bankruptcy Case:

  a)   a claim entitled to priority pursuant to Section 503 of the Bankruptcy Code in an amount equal to forty percent (40%) of the amount of all fees and costs incurred by Sandler in the Cappello Litigation as of the date of entry of the Confirmation Order (the "Sandler Administrative Claim"); and

  b)   an unsecured claim for an amount equal to the lesser of (i) forty percent (40%) of all amounts paid by Sandler or paid by the Bank for the benefit of Sandler, including without limitation, attorney's fees and costs, any amounts required to be paid pursuant to a Final Order, and any amount paid by Sandler in connection with settlement of the Cappello Litigation, and (ii) one million dollars ($1,000,000) (the "Sandler Unsecured Claim").

### 2. Assignment of Cappello Claims; Allocation of Recoveries.

The Debtor will assign to the Bank any and all rights and claims it may have against Cappello, including without limitation the right to seek recovery from Cappello of (i) fees and costs paid pursuant to the engagement agreement entered into between the Debtor and Sandler (the "Sandler Engagement Agreement"), and (ii) damages for violation of the automatic stay in connection with the filing and prosecution of the Cappello Litigation. The Bank will be entitled to prosecute such claims in the name of the Debtor.

Sandler and/or the Bank may recover from Cappello some or all of the fees and costs incurred by Sandler in connection with the Cappello Litigation. In such event, Sandler or the Bank, as the case may be, shall pay to the Debtor an amount equal to the total amount of all attorney's fees and costs recovered from Cappello (after deducting the fees and costs incurred in recovering such amounts), multiplied by the fraction, the numerator of which is the amount disbursed by the Debtor pursuant to the Plan to Sandler on account of the Sandler Administrative Claim and the Sandler Unsecured Claim, and the denominator of which is the total amount of all

56

fees and costs incurred by Sandler in the Cappello Litigation (without regard to the source of payment of such fees and costs).

### 3.    Bankruptcy Court Orders.

The Debtor waives any right to contest, vacate or otherwise modify (including without limitation pursuant to Federal Rule of Civil Procedure 60), the entry of the Sale Order, the Confirmation Order, any order approving the Sandler Settlement, and any other orders entered in the Bankruptcy Case affecting the interests of the Bank, Sandler, SKBHC or Starbuck.

### 4.    Tax Sharing Agreement.

The Debtor and the Bank entered into a prepetition agreement regarding the rights and obligations between them as a consolidated tax filing group (the "Tax Sharing Agreement"). The Debtor and the Bank agree that (i) the Tax Sharing Agreement was assumed by the Debtor pursuant to the terms of the Sale Order, and (ii) the Bank has filed post closing income tax returns for the periods following the closing of the Sale consistent with the Tax Sharing Agreement. The Debtor further agrees that (i) it has no entitlement to the benefit of or any refund or reduction in tax payable arising out of or related to tax attributes allocated to the Bank pursuant to the Tax Sharing Agreement, and (ii) it has no right to any tax attributes attributable to operation of the Bank before or after closing of the Sale.

### 5.    Waiver by Bank and SKBHC.

Except as provided in an executed agreement between Sandler and the Debtor memorializing the Sandler Settlement that is approved by the Bankruptcy Court, the Plan, and the Confirmation Order, the Bank, Starbuck and SKBHC waive any claims against the Debtor related to the Sandler Claims.

### 6.    Release by the Debtor.

Capitalized terms used in this paragraph but not otherwise defined herein shall have the meanings ascribed to them in the Sandler Settlement Agreement. On the Effective Date, the Debtor shall be deemed to have released the Bank, Starbuck, SKBHC, Sandler and their respective affiliates, and each of their respective predecessors and successors in interest, and their respective directors, officers, employees, representatives and agents (including without limitation all consultants, accountants, and counsel), of and from any and all claims, damages, liabilities, obligations, actions and causes of action, whether sounding in tort, contract, equity or otherwise, whether known or unknown, whether suspected or unsuspected, and whether arising directly in favor of the Debtor, or by way of assignment, subrogation, or indemnification held by the Debtor, arising out of or related to any act, failure to act, event or state of facts occurring on or prior to the effective date of the Effective Date, or the continuation or reoccurrence of any such act, failure to act, event or state of facts occurring after the Effective Date, and including without limitation claims arising out of or related to (i) the Sale Process, (ii) the engagement of Sandler and the performance of Sandler pursuant to the Sandler Engagement Agreement, (iii) the negotiation, documentation, and execution of this Settlement Agreement, (iv) the negotiation and

57

confirmation of the Disclosure Statement and the Plan, (v) entry of the Confirmation Order, and (vi) consummation of the Plan. The Debtor understands and agrees that (i) it is releasing potentially unknown claims; (ii) the foregoing release is being fairly and knowingly made; and (iii) it is aware that it may have limited knowledge with respect to claims they are releasing. Nothing in this paragraph shall relieve any parties of their obligations under the Sandler Settlement.

As of May 1, 2013, the estimated amount of legal fees and costs Sandler will incur through the anticipated confirmation date is approximately $1.25 million, thus the estimated Sandler Administrative Claim will be approximately $500,000.

The Debtor will file a motion to approve the foregoing settlement prior to confirmation of the Plan. Holdco did not support the Sandler Settlement and did not agree that it is in the best interests of the Debtor and its estate.

### H. Conditions Precedent to Confirmation and the Effective Date.

### 4. Conditions to Confirmation.

The only condition precedent to confirmation of the Plan is that the Bankruptcy Court shall have Entered the Confirmation Order in form and substance acceptable to the Plan Proponent and the Committee.

### 5. Conditions to the Effective Date.

The following are conditions precedent to the occurrence of the Effective Date, each of which must be satisfied or waived in accordance with the Plan:

(i)     the Confirmation Order shall be a Final Order;

(ii)     all other actions and all agreements, instruments or other documents necessary to implement the terms and provisions of the Plan shall have been effected, and in each case, shall have been duly and validly executed and delivered by the parties thereto and all conditions to their effectiveness shall have been satisfied or waived in accordance therewith; and

(iii)     the Debtor shall have received all authorizations, consents, rulings, opinions, or other documents that are determined by Holdco, to be necessary to implement the Plan and that are required by law, regulation, or order.

### 6. Waiver of Conditions Precedent

The Debtor, with the Committee's and Holdco's consent (such consent not to be unreasonably withheld), may waive the occurrence of or modify any condition precedent in Article IX of the Plan. Any such written waiver of a condition precedent set forth in this Article may be effected at any time, without notice, without leave or order of the Bankruptcy Court, and without any formal action other than proceeding to consummate the Plan. The failure of the Debtor to exercise any of the foregoing rights shall not be deemed a waiver of any other rights,

and each such right shall be deemed an ongoing right, which may be asserted at any time. Any actions required to be taken on the Effective Date shall take place and shall be deemed to have occurred simultaneously, and no such action shall be deemed to have occurred prior to the taking of any other such action.

## I.    Effect of Plan Confirmation

### 1.    Satisfaction of Claims.

Except to the extent otherwise provided in the Plan, the treatment of all Claims or Interests in the Debtor under the Plan shall be in exchange for and in complete satisfaction and release of, all Claims or Interests in the Debtor of any nature whatsoever, known or unknown, including any interest accrued or expenses incurred thereon from and after the Petition Date, or against the Estate. Except as otherwise provided in the Plan, upon the Effective Date, all Claims and Interests in the Debtor and the Estate shall be satisfied and released in full in exchange for the consideration provided under the Plan. Except as otherwise provided in the Plan, all Persons shall be precluded and enjoined from asserting against the Debtor, the Estate or the Reorganized Debtor any Claims or Interests or other Claims based upon any act or omission, transaction or other activity of any kind or nature that occurred prior to the Effective Date.

### 2.    Discharge.

Except as otherwise specifically provided in this Plan or in the Confirmation Order, pursuant to section 1141(d) of the Code, the Distributions and rights that are provided in this Plan shall be in complete satisfaction, discharge and release, effective as of the Effective Date, of all Claims, including any interest or penalties accrued on such Claims from and after the Petition Date, whether known or unknown, against liabilities of, liens on, obligations of, rights against and Interests in the Debtor, or any of its assets or properties, regardless of whether any property shall have been distributed or retained pursuant to this Plan on account of such Claims, rights and Interests, including but not limited to, Claims and Interests that arose before the Confirmation Date, including all debts of the kind specified in sections 502(g), 502(h) and 502(i) of the Bankruptcy Code, in each case whether or not (a) a proof of Claim or interest based upon such Claim, debt, right or Interest is Filed or deemed Filed under section 501 of the Code; (b) a Claim or Interest based upon such Claim, debt, right or Interest is allowed under section 502 of the Code, or (c) the Holder of such a Claim, debt, right, or Interest accepted this Plan. The Confirmation Order shall constitute a determination of the discharge of all of the Claims against and Interests in the Debtor, subject to the occurrence of the Effective Date.

### 3.    Compromise and Settlement.

Pursuant to section 363 of the Bankruptcy Code and Bankruptcy Rule 9019, and in consideration for the Distributions and other benefits provided pursuant to the Plan, the provisions of the Plan shall constitute a good faith compromise of all Claims and Equity Interests on the terms set forth in the Plan. The entry of the Confirmation Order shall constitute the Bankruptcy Court's approval of the compromise or settlement of all Claims and Equity Interests, as well as a finding by the Bankruptcy Court that such compromise or settlement is fair, equitable, reasonable and in the best interests of the Debtor, the Estate and Holders of Claims

and Equity Interests. Entry of the Confirmation Order also shall constitute the Bankruptcy Court's approval of the releases set forth in the Plan pursuant to Bankruptcy Rule 9019 and its finding that the releases are: (i) in exchange for the good and valuable consideration provided by the Releasees, a good faith settlement and compromise of the Claims released by releases set forth in the Plan; (ii) in the best interests of the Debtor and all Holders of Claims; (iii) fair, equitable and reasonable; (iv) given and made after due notice and opportunity for hearing; and (v) a bar to any of the Debtor or the Reorganized Debtor, the Committee, or the Holders of Claims against the Debtor asserting any Claim released by the Releasing Parties set forth in the Plan against any of the Releasees.

    4.    **Releases.**

        a)    ***Releases of Third Parties by the Debtor.*** **Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, the Debtor on behalf of itself and the Estate, for the good and valuable consideration provided by each of the Releasees, hereby provides a full release to the Releasees (and each such Releasee so released shall be deemed released by the Debtor) and their respective properties from any and all Causes of Action and any other debts, obligations, rights, suits, damages, actions, derivative claims, remedies and liabilities whatsoever, whether known or unknown, foreseen or unforeseen, existing as of the Effective Date, in law, at equity, whether for tort, contract, violations of federal or state securities laws, or otherwise, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date arising from or related in any way to the Debtor, including, without limitation, those that the Debtor or the Reorganized Debtor would have been legally entitled to assert or that any Holder of a Claim against or Equity Interest in the Debtor or other entity would have been legally entitled to assert for or on behalf of the Debtor, the Reorganized Debtor or the Estate and further including those in any way related to the Case or the Plan.**

        b)    ***Releases of Third Parties by Others.*** **Notwithstanding anything contained in the Plan to the contrary, on the Effective Date and effective as of the Effective Date, the Releasing Parties shall be deemed to provide a full release to the Releasees and their respective property from any and all Causes of Action, whether known or unknown, whether for tort, contract, violations of federal or state securities laws or otherwise, and all direct claims, based in whole or in part upon any act or omission, transaction, or other occurrence or circumstances existing or taking place prior to or on the Effective Date**

60

**arising from or related in any way to the Debtor, including those in any way related to the Case or the Plan;** *provided,* *however,* **that the foregoing provisions shall have no effect on the liability of any Releasee that results from any act or omission that is determined in a Final Order to be solely due to such Releasee's own gross negligence or intentional or willful misconduct or fraud.**

       5.       **Exculpation of Exculpated Parties.**

**The Exculpated Parties shall neither have nor incur any liability to any Person for any act taken or omission made in good faith in connection with or related to the administration of the Case, including, but not limited to, the formulation, implementation, confirmation, or consummation of the Plan, the Disclosure Statement, or any other contract, instrument, release, or other agreement or document created in connection with the Plan or regarding any Distribution made under the Plan, except to the extent that the action taken or omitted to be taken by each of the same is determined by a Final Order to be due to such Person's own respective gross negligence, intentional or willful misconduct or fraud.**

       6.       **Good Faith Solicitation**

Upon entry of the Confirmation Order, pursuant to section 1125(e) of the Code, Holdco and its respective present and former members, officers, directors, employees, agents, advisors, representatives, successors and assigns, and any Professionals (acting in such capacity) employed by any of the foregoing Persons will be deemed to have solicited votes on the Plan in good faith and in compliance with the Code and any applicable non-bankruptcy law, and, therefore, shall have no liability for the violation of any applicable law, rule or regulation governing the solicitation of votes on the Plan.

       7.       **Cramdown**

Notwithstanding anything to the contrary contained herein or in the Plan, Holdco reserves the right to seek confirmation of the Plan pursuant to section 1129(b) of the Code in the event any impaired Class of Claims or Interests does not vote to accept the Plan.

61

## 8. Preservation of Rights of Action.

To the extent not released or discharged hereunder, the Reorganized Debtor shall pursue any and all of the Debtor's Causes of Action that could, in the Plan Advisor's discretion, bring value into the Debtor's estate. Such causes of action may include claims for preferences and fraudulent transfers, tort claims, and claims arising from action taken by bank regulators. Thus, although many of the Debtor's Causes of Action are being released under the Plan in connection with the investigation and report completed by the mediator, one of the Plan Advisor's primary roles is to ensure that any other Causes of Action not released are preserved and monetized for the benefit of creditors.

### a) Vesting of Causes of Action.

Except as expressly released or otherwise expressly provided in the Plan, pursuant to section 1123(b) of the Code, the Debtor and the Reorganized Debtor, as applicable, exclusively shall be vested with and shall retain and may enforce any and all Causes of Action that the Debtor or the Estate may hold or have against any Person or entity, all of which are hereby preserved, including all Causes of Action, and all rights of disallowance, offset, recharacterization and/or equitable subordination with respect to claims, and causes of action that have been or may be brought by or on behalf of the Debtor, the Estate, the Committee or the Reorganized Debtor. Such claims, rights and causes of action shall remain assets of and vest in the Reorganized Debtor, whether or not litigation relating thereto is pending on the Effective Date, and whether or not any such claims, rights and causes of action have been listed or referred to in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court. Neither the Debtor, the Estate, the Committee, nor the Reorganized Debtor waives, releases, relinquishes, forfeits, or abandons (nor shall they be estopped or otherwise precluded or impaired from asserting) any claims, rights and causes of action or defenses that constitute property of the Debtor or its Estate: (a) whether or not such claims, rights, causes of action, or defenses have been listed or referred to this Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court, (b) whether or not such claims, rights and causes of action, or defenses are currently known to the Debtor, and (c) whether or not a defendant in any litigation relating to such claims, rights or causes of action filed a proof of Claim in the Case, filed a notice of appearance or any other pleading or notice in the Case, voted for or against this Plan, or received or retained any consideration under this Plan. Without in any manner limiting the scope of the foregoing, notwithstanding any otherwise applicable principle of law or equity, including any principles of judicial estoppel, res judicata, collateral estoppel, issue preclusion, or any similar doctrine, (x) the failure to list, disclose, describe, identify, analyze or refer to any claims, rights and causes of action, or defenses in the Plan, the Disclosure Statement, or any other document filed with the Bankruptcy Court shall in no manner waive, eliminate, modify, release, or alter the right of the Debtor or the Reorganized Debtor, to commence, prosecute, defend against, settle, recover on account of, and realize upon any such claims, rights and causes of action, that the Debtor, its Estate, or the Committee may have as of the Effective Date, and (y) from and after the Effective Date, the Reorganized Debtor shall have exclusive standing and authority to prosecute any Causes of Action.

### b) Reservation of Causes of Action.

The Debtor and the Reorganized Debtor expressly reserve all its Causes of Action, including, without limitation, all claims, rights, Causes of Action, and defenses for later adjudication by the Debtor or Reorganized Debtor, as applicable, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, waiver, estoppel (judicial, equitable or otherwise) or laches will apply to such claims, rights and causes of action, and defenses upon or after the confirmation or consummation of the Plan based on the Disclosure Statement, the Plan or the Confirmation Order. In addition, the Debtor and the Reorganized Debtor expressly reserve the right to pursue or adopt claims, rights and causes of action that are alleged in any lawsuits in which the Debtor is a defendant or an interested party, against any entity, including the plaintiffs or co-defendants in such lawsuits. Any entity to whom the Debtor has incurred an obligation (whether on account of services, purchase, sale of goods or otherwise), or who has received services from the Debtor, or who has received money or property from the Debtor, or who has transacted business with the Debtor, or who has leased equipment or property from or to the Debtor should assume that such obligation, receipt, transfer or transaction may be reviewed by the Reorganized Debtor subsequent to the Effective Date and may be the subject of an action after the Effective Date, whether or not: (a) such entity has filed a proof of Claim against the Debtor in this Case; (b) such entity's proof of Claim has been objected to by the Debtor; (c) such entity's Claim was included in the Debtor's Schedules; or (d) such entity's scheduled Claim has been objected to by the Debtor or has been identified by the Debtor as contingent, unliquidated or disputed.

### c) Reservation of Rights Regarding Claims.

Neither the failure to list a Claim in the Schedules filed by the Debtor, the failure of the Debtor or any other Person to object to any Claim for purpose of voting, the failure of the Debtor or any other Person to object to a Claim or Administrative Claim before confirmation or consummation of the Plan or the Effective Date, the failure of any Person to assert a Claim or cause of action before confirmation or consummation of the Plan or the Effective Date, the absence of a proof of Claim having been filed with respect to a Claim nor any action or inaction of the Debtor or any other Person with respect to a Claim or Administrative Claim, other than a legally effective express waiver or release, shall be deemed a waiver or release of the right of the Debtor or the Reorganized Debtor before or after solicitation of votes on the Plan or before or after the Confirmation Date or the Effective Date to (a) object to or examine such Claim or Administrative Claim in whole or in part or (b) retain and either assign or exclusively assert, pursue, prosecute, utilize, otherwise act or otherwise enforce any claim or cause of action against the holder of any such Claim.

### c) Injunction.

**Except as otherwise expressly provided in the Plan, the documents executed pursuant to this Plan, or the Confirmation Order, on and after the Effective Date, all Persons and Entities who have held, currently hold, or may hold a debt, Claim, or Interest discharged pursuant to the terms of this Plan (including but not limited to Governmental**

63

**Entities, which includes but is not limited to States and other governmental units, and any State official, employee, or other entity acting in an individual or official capacity on behalf of any State or other governmental units) shall be permanently enjoined from: (a) taking any of the following actions on account of any such discharged debt, Claim, or Interest: (1) commencing or continuing in any manner any action or other proceeding against the Debtor, the Reorganized Debtor, their successors, or their property; (2) enforcing, attaching, executing, collecting, or recovering in any manner any judgment, award, decree, or order against the Debtor, the Reorganized Debtor, their successors, or their property; (3) creating, perfecting, or enforcing any lien or encumbrance against the Debtor, the Reorganized Debtor, their successors, or their property; (4) asserting any set off, right of subrogation, or recoupment of any kind against any obligation due the Debtors, the Reorganized Debtors, their successors, or their property; and (5) commencing or continuing any action, in any manner, in any place that does not comply with or is inconsistent with the provisions of the Plan; and (b) taking any of the foregoing actions on account of any Claims or Causes of Action that are revested in, or transferred to, the Reorganized Debtor as of the Effective Date or under the Plan commencing or continuing in any manner any action or other proceeding of any kind to recover on or otherwise with respect to such Claims or rights of action.  Any person or entity injured by any willful violation of such injunction shall recover actual damages, including costs and attorneys' fees, and, in appropriate circumstances, may recover punitive damages from the willful violator.**

>      **J.      Retention of Jurisdiction.**

Following the Effective Date, the Bankruptcy Court shall retain such jurisdiction to the maximum extent as is legally permissible, including, without limitation, for the following purposes:

>      1.      To determine the allowability, amount, classification, or priority of Claims upon objection by the Reorganized Debtor;

>      2.      To construe and to take any action to execute and enforce the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, to issue such orders as may be necessary for the implementation, execution, performance, and consummation of the Plan, and all matters referred to herein, and to determine all matters that may be pending before the Bankruptcy Court in the Case on or before the Effective Date;

>      3.      To rule on any and all applications for allowance of compensation and expense reimbursement of Professionals for periods on or before the Effective Date;

>      4.      To rule on any request for payment of any Administrative Claim or administrative expense;

64

5. To resolve any dispute regarding the implementation, execution, performance, consummation, or interpretation of the Plan;

6. To resolve all applications, adversary proceedings, contested matters, and other litigated matters instituted on or before the Effective Date;

7. To hear and determine any actions related to the recovery rights and avoidance actions, whether or not such actions are pending on or commenced after the Effective Date and to recover any assets of the Debtor's Estate;

8. To determine such other matters and to perform other functions as may be provided in the Confirmation Order;

9. To modify the Plan under section 1127 of the Code, to remedy any apparent nonmaterial defect or omission in the Plan, or to reconcile any nonmaterial inconsistency in the Plan so as to carry out its intent and purposes;

10. To issue injunctions or take such other actions or make such other orders as may be necessary or appropriate to restrain interference with the Plan or its execution or implementation by any entity;

11. To issue such orders in aid of execution of the Plan and the Confirmation Order, notwithstanding any otherwise applicable non-bankruptcy law, with respect to any entity, to the full extent authorized by the Code;

12. To hear and determine any tax disputes concerning, and to determine and declare any tax effects under the Plan; and

13. To enter a final decree closing the Case.

**K.    Miscellaneous Provisions.**

The Plan also contains numerous miscellaneous provisions.    Parties in interest are respectfully invited to review the Plan for further details.

**VIII.    Statutory Requirements For Confirmation Of The Plan.**

The following is a brief summary of the confirmation process.    Holders of Claims and Equity Interests are encouraged to review the relevant provisions of the Bankruptcy Code and to consult their own advisors.

65

**A. The Confirmation Hearing.**

Section 1128(a) of the Bankruptcy Code requires the Bankruptcy Court, after notice, to conduct a hearing to consider confirmation of a plan. Section 1128(b) of the Bankruptcy Code provides that any party in interest may object to confirmation.

**B. Confirmation Standards.**

At the Confirmation Hearing, the Bankruptcy Court will determine whether the Plan satisfies the requirements of section 1129 of the Bankruptcy Code. The Plan Proponent believes that: (1) the Plan satisfies or will satisfy all of the statutory requirements of chapter 11 of the Bankruptcy Code; (2) it has complied or will have complied with all of the requirements of chapter 11 of the Bankruptcy Code; and (3) the Plan has been proposed in good faith. Specifically, the Plan Proponent believes that the Plan satisfies or will satisfy the applicable Confirmation requirements of section 1129 of the Bankruptcy Code, including those set forth below.

    a) The Plan complies with all applicable provisions of the Bankruptcy Code.

    b) The Plan Proponent will have complied with the applicable provisions of the Bankruptcy Code.

    c) The Plan has been proposed in good faith and not by any means forbidden by law.

    d) Any payment made or to be made under the Plan for services or for costs and expenses in, or in connection with, the Case, or in connection with the Plan and incident to the Case, has been or will be disclosed to the Bankruptcy Court, and any such payment: (a) made before the Confirmation of the Plan will be reasonable; or (b) will be subject to the approval of the Bankruptcy Court as reasonable, if it is to be fixed after Confirmation of the Plan.

    e) Each Holder of an Impaired Claim has accepted the Plan or will receive or retain under the Plan on account of such Claim property of a value as of the Effective Date of the Plan that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated on that date under chapter 7 of the Bankruptcy Code.

    f) Each Class of Claims that is entitled to vote on the Plan has either accepted the Plan or is not Impaired under the Plan, or the Plan can be confirmed without the approval of such voting Class of Claims or Equity Interests pursuant to section 1129(b) of the Bankruptcy Code.

66

g)     Except to the extent that the Holder of a particular Claim will agree to a different treatment of its Claim, the Plan provides that Holders of Administrative Claims and Holders of Priority Tax Claims shall receive payment in Cash, in full on the Effective Date, unless otherwise agreed to by the Creditor and the Plan Proponent or the Reorganized Debtor.

h)     At least one Class of Impaired Claims has accepted the Plan, determined without including any acceptance of the Plan by any Insider holding a Claim in that Class.

i)     Confirmation of the Plan is not likely to be followed by the liquidation or the need for further financial reorganization of the Debtor or any successors thereto under the Plan, unless the Plan contemplates such liquidation or reorganization.

j)     The Debtor has paid the required filing fees pursuant to 28 U.S.C. § 1930 to the clerk of the Bankruptcy Court.

k)     In addition to the filing fees paid to the clerk of the Bankruptcy Court, the Debtor will pay quarterly fees no later than the last day of the calendar month following the calendar quarter for which the fee is owed in the Debtor's Case for each quarter (including any fraction thereof), to the United States Trustee, until the case is closed.

**C.     Financial Feasibility.**

The Bankruptcy Code permits a chapter 11 plan to be confirmed if it is not likely to be followed by liquidation or the need for further financial reorganization, other than as provided in such plan. Holdco believes the Plan meets the feasibility requirement set forth in section 1129(a)(11) of the Bankruptcy Code, as Confirmation is not likely to be followed by liquidation or the need for further financial reorganization of the Reorganized Debtor. The discussion regarding feasibility is set forth above and is incorporated here by reference.

**D.     Best Interests of Creditors Test.**

Under the Bankruptcy Code, confirmation of a plan also requires a finding that the plan is in the "best interests" of creditors. Under the "best interests" test, the Bankruptcy Court must find (subject to certain exceptions) that the Plan provides, with respect to each Impaired Class, that each Holder of an Allowed Claim or Equity Interest in such Impaired Class has accepted the Plan, or will receive or retain under the Plan property of a value, as of the Effective Date, that is not less than the amount that such Holder would receive or retain if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

The Plan Proponent believes that the Plan will produce a greater recovery for Holders of Allowed Claims against the Estate than would be achieved in a liquidation pursuant to chapter 7

67

of the Bankruptcy Code. One reason for this is a function of the Plan structure and the protections built in to the Plan structure that shield Creditors electing the Proceeds Distribution Election from the risks of the Reorganized Debtor's post-confirmation business activities. Essentially, the Plan provides Holders of TOPrS Unsecured Claims and General Unsecured Claimswith an option – they can either elect to "cash out" and thereby receive a Distribution based upon Cash on hand and the proceeds, if any, recovered by the Reorganized Debtor in any potential causes of action or assets, or they can do nothing, and if confirmed, then the Plan by default converts their Allowed Claims into New Series A Common Stock. The Cash that will be available for Distribution to those who elect the Proceeds Distribution Election – the Cash on hand on the Effective Date and other assets – will be segregated (to the extent and in the amount necessary to make Distributions to those Creditors who properly elect the Proceeds Distribution Election) and not consumed by the Reorganized Debtor in its operations post-confirmation. Thus, there are no circumstances under which Creditors who are Holders of Allowed Claims will recover less than would be available in a chapter 7 liquidation, unless they specifically assume that risk by refraining from electing the Proceeds Distribution Election and instead receive New Series A Common Stock on account of their Allowed Claims.

Indeed, the process of transitioning control over the Debtor's estate from the Debtor-in-possession to a chapter 7 trustee would entail substantial transition costs not present in a reorganization that would substantially reduce creditor recoveries. The chapter 7 trustee would have to appoint new counsel who would be required to "catch up to speed" on the details of a bankruptcy case that is now nearly three years old. The fees associated with this transition would thus be substantial, and make a chapter 7 liquidation less attractive for creditors seeking to maximize recoveries.

In addition, the Plan and the chapter 11 process afford creditors substantial benefits that are not present in a chapter 7 liquidation. Specifically, the Plan incorporates a settlement with Sandler that reduces Sandler's approximately $1.25 million Administrative Claim (based on estimates provided by Sandler on June 4, 2013) to approximately $540,000, and relegates the balance as a General Unsecured Claim. This settlement, which would likely have not been possible outside of a chapter 11 case, and, in Holdco's view, without the pressure to settle that Holdco created by filing and prosecuting the Plan, saves the creditors approximately $600,000 in administrative costs that would have substantially impacted recoveries to all creditors.

Furthermore, the holders of Allowed General Unsecured Claims that elect the Proceeds Distribution Election will receive their recoveries with no dilution for chapter 7 trustee fees and costs, including the costs of administering the chapter 7 case. If this Case were converted to a chapter 7 liquidation, a trustee would be appointed by the Bankruptcy Court. That trustee would liquidate the remaining assets of the Debtor's Estate and distribute the proceeds in accordance with the priorities established under the Code. Indeed, the releases provided under the Plan would not exist in a chapter 7 case meaning that the chapter 7 trustee would have had to conduct an independent investigation into the merits of various Causes of Action before granting any such releases or otherwise settling the Debtor's claims. In the chapter 11 process, and in connection with filing this Plan, an independent mediator was appointed, who conducted an investigation at a low cost – $100,000 was the maximum that could be spent on the mediator's

investigation. As such, creditors receive the benefit of a remarkably inexpensive investigation, the costs of which would have otherwise reduced their recoveries.

All administrative expenses of the chapter 7 case, including the chapter 7 trustee's fees (which can be higher than 3% of the total amount collected and disbursed) would have to be paid in full before payment of the unpaid administrative expenses from the Case. Unpaid chapter 11 Administrative Claims would, in turn, be paid in full before any Distribution could be made to unsecured Creditors. It is unusual for Distributions to be made within one year of the appointment of a chapter 7 trustee in a case involving substantial assets or Claims.

Thus, in a chapter 7 liquidation, it is likely the total proceeds would be approximately the same, or possibly less for those creditors that elect the Proceeds Distribution Election. However, the administrative expenses associated with the chapter 7 case would very likely exceed the expenses that the Reorganized Debtor will incur in the implementation of the Plan, and the Distributions likely would be delayed longer than the Distributions that will be made under the Plan. Therefore, the Plan Proponent believes that the Plan satisfies the requirements of the "best interests" test and provides Creditors at least as much present value as they would receive in a chapter 7 liquidation.

Based upon the conclusions set forth herein, the Plan Proponent believes that the value of Distributions, if any, in a hypothetical chapter 7 liquidation to Holders of Allowed General Unsecured Claims would be less than or equal to the value of distributions to such Holders under the Plan and the Plan Proponent believes that the Plan satisfies the "best interests" test of section 1129(a)(7) of the Bankruptcy Code.

### E.     Acceptance by Impaired Classes.

The Bankruptcy Code requires, as a condition to confirmation, that, except as described in the following section, each class of claims or equity interests that is impaired under a plan, accept the plan. A class that is not "impaired" under a plan is conclusively presumed to have accepted the plan and, therefore, solicitation of acceptances with respect to such class is not required. A class is "impaired" unless the plan: (i) leaves unaltered the legal, equitable, and contractual rights to which the claim or the equity interest entitles the holder of such claim or equity interest; (ii) cures any default and reinstates the original terms of such obligation; or (iii) provides that, on the Effective Date, the holder of such claim or equity interest receives Cash equal to the allowed amount of that claim or, with respect to any equity interest, any fixed liquidation preference to which the holder of such equity interest is entitled to any fixed price at which the debtor may redeem the security.

Section 1126(c) of the Bankruptcy Code defines acceptance of a plan by a class of impaired claims as acceptance by holders of at least two-thirds in dollar amount and more than one-half in number of claims in that class, but for that purpose counts only those who actually vote to accept or to reject the plan. Thus, a class of claims will have voted to accept the plan only if two-thirds in amount and a majority in number actually voting cast their Ballots in favor of acceptance.

69

The Claims in Classes 1 and 4 are not Impaired under the Plan, and, as a result, the Holders of such Claims are conclusively presumed to have accepted the Plan.

The Voting Classes – Classes 2 and 3 are Impaired under the Plan, and the Holders of Claims in such Classes are entitled to vote on the Plan. Pursuant to section 1129 of the Bankruptcy Code, the Holders of Claims in the Voting Classes must accept the Plan for the Plan to be confirmed without application of the "fair and equitable test" to such Classes and without considering whether the Plan "discriminates unfairly" with respect to such Classes, as both standards are described herein.

### F. Confirmation Without Acceptance by All Impaired Classes.

Section 1129(b) of the Bankruptcy Code allows a bankruptcy court to confirm a Plan even if all other impaired classes entitled to vote on the plan have not accepted it, *provided* that the plan has been accepted by at least one impaired class. Pursuant to section 1129(b) of the Bankruptcy Code, notwithstanding an impaired class's rejection or conclusively presumed rejection of the plan, such plan will be confirmed, at the plan proponent's request, in a procedure commonly known as "cram down," so long as the plan does not "discriminate unfairly" and is "fair and equitable" with respect to each class of claims or equity interests that is impaired under, and has not accepted, the plan.

### 1. No Unfair Discrimination.

This test applies to classes of claims or equity interests that are of equal priority and are receiving different treatment under the Plan. The test does not require that the treatment be the same or equivalent, but that such treatment be "fair." In general, bankruptcy courts consider whether a plan discriminates unfairly in its treatment of classes of claims of equal rank (e.g., classes of the same legal character). Bankruptcy courts will take into account a number of factors in determining whether a plan discriminates unfairly, and, accordingly, a plan could treat two classes of unsecured creditors differently without unfairly discriminating against either class.

### 2. Fair and Equitable Test.

This test applies to classes of different priority and status (e.g., secured versus unsecured) and includes the general requirement that no class of claims receive more than 100% of the amount of the allowed claims in such class. As to the non-accepting class, the test sets different standards depending on the type of claims or equity interests in such class.

Secured Claims: The condition that a plan be "fair and equitable" to a non-accepting class of secured claims includes the requirements that: (a) the holders of such secured claims retain the liens securing such claims to the extent of the allowed amount of the claims, whether the property subject to the liens is retained by the debtor or transferred to another entity under the plan; and (b) each holder of a secured claim in the class receives deferred cash payments totaling at least the allowed amount of such claim with a present value, as of the effective date of the plan, at least equivalent to the value of the secured claimant's interest in the debtor's property subject to the liens.

Unsecured Claims:  The condition that a plan be "fair and equitable" to a non-accepting class of unsecured claims includes the following requirement that either:  (a) the plan provides that each holder of a claim of such class receive or retain on account of such claim property of a value, as of the effective date of the plan, equal to the allowed amount of such claim; or (b) the holder of any claim or any equity interest that is junior to the claims of such class will not receive or retain under the plan on account of such junior claim or junior equity interest any property.

Equity Interests:  The condition that a plan be "fair and equitable" to a non-accepting class of equity interests includes the requirements that either:  (a) the plan provides that each holder of an equity interest in that class receives or retains under the plan on account of that equity interest property of a value, as of the effective date of the plan, equal to the greater of: (i) the allowed amount of any fixed liquidation preference to which such holder is entitled; (ii) any fixed redemption price to which such holder is entitled; or (iii) the value of such interest; or (b) if the class does not receive the amount as required under (a) hereof, no class of equity interests junior to the non-accepting class may receive a distribution under the plan.

The Plan Proponent will seek confirmation of the Plan under section 1129(b) of the Bankruptcy Code in view of the conclusively presumed rejection by Class 6 To the extent that any of the Voting Classes vote to reject the Plan, the Plan Proponent further reserves the right to (a) seek Confirmation of the Plan under section 1129(b) of the Bankruptcy Code and/or (b) modify the Plan in accordance with Article XI of the Plan.

The votes of Holders of Equity Interests in Class 6 are not being solicited because, as set forth in Article III of the Plan, there will be no distribution to this Class.

Notwithstanding the conclusively presumed rejection by Class 6 or any Class that votes to reject the Plan, the Plan Proponent does not believe that the Plan discriminates unfairly against any Impaired Class of Claims or Equity Interests.  The Plan Proponent believes that the Plan and the treatment of all Classes of Claims and Equity Interests under the Plan satisfy the foregoing requirements for nonconsensual confirmation of the Plan.

## IX.  Certain Risk Factors To Be Considered Prior To Voting

### A.  Certain Bankruptcy Law Considerations.

The occurrence or non-occurrence of any or all of the following contingencies, and any others, including those additional risk factors described herein could affect distributions available to Holders of Allowed Claims under the Plan but will not necessarily affect the validity of the vote of the Impaired Classes to accept or reject the Plan or necessarily require a re-solicitation of the votes of Holders of Claims in such Impaired Classes.

### 1. Parties in Interest May Object to the Plan's Classification of Claims and Equity Interests.

Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an equity interest in a particular class only if such claim or equity interest is substantially similar to the other claims or equity interests in such class. The Plan Proponent believes that the classification of Claims and Equity Interests under the Plan complies with the requirements set forth in the Bankruptcy Code because the Plan Proponent created Classes of Claims and Equity Interests, each encompassing Claims or Equity Interests, as applicable, that are substantially similar to the other Claims and Equity Interests in each such Class. Nevertheless, there can be no assurance that the Bankruptcy Court will reach the same conclusion.

### 2. Failure to Satisfy Vote Requirements.

If votes are received in number and amount sufficient to enable the Bankruptcy Court to confirm the Plan, the Plan Proponent intends to seek, as promptly as practicable thereafter, confirmation of the Plan. In the event that sufficient votes are not received, the Plan Proponent may seek to confirm an alternative chapter 11 plan. There can be no assurance that the terms of any such alternative chapter 11 plan would be similar or as favorable to the Holders of Allowed Claims as those proposed in the Plan.

### 3. The Plan Proponent May Not Be Able to Secure Confirmation of the Plan.

Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation of a chapter 11 plan, and requires, among other things, a finding by the bankruptcy court that: (a) such plan "does not unfairly discriminate" and is "fair and equitable" with respect to any non-accepting classes; (b) confirmation of such plan is not likely to be followed by a liquidation or a need for further financial restructuring unless such liquidation or reorganization is contemplated by the plan; and (c) the value of distributions to non-accepting holders of claims and equity interests within a particular class under such plan will not be less than the value of distributions such holders would receive if the Debtor were liquidated under chapter 7 of the Bankruptcy Code.

There can be no assurance that the requisite acceptances to confirm the Plan will be received. Even if the requisite acceptances are received, there can be no assurance that the Bankruptcy Court will confirm the Plan. A non-accepting Holder of an Allowed Claim might challenge either the adequacy of this Disclosure Statement or whether the balloting procedures and voting results satisfy the requirements of the Bankruptcy Code or Bankruptcy Rules. Even if the Bankruptcy Court determines that this Disclosure Statement, the balloting procedures, and the voting results are appropriate, the Bankruptcy Court can still decline to confirm the Plan if it finds that any of the statutory requirements for Confirmation have not been met, including the requirement that the terms of the Plan do not "unfairly discriminate" and are "fair and equitable" to non-accepting Classes. If the Plan is not confirmed, it is unclear what distributions, if any, Holders of Allowed Claims will receive with respect to their Allowed Claims.

The Plan Proponent, subject to the terms and conditions of the Plan, reserves the right to modify the terms and conditions of the Plan as necessary for confirmation. Any such modifications could result in a less favorable treatment of any non-accepting Class, as well as of any Classes junior to such non-accepting Class, than the treatment currently provided in the Plan. Such a less favorable treatment could include a Distribution of property to the Class affected by the modification of a lesser value than currently provided in the Plan, or no Distribution of property whatsoever under the Plan.

More specifically, in the event this Plan cannot be confirmed, the Plan Proponent explicitly reserves its right to amend this Plan to a liquidating plan under Chapter 11 of the Bankruptcy Code, which liquidating plan would also preserve the Causes of Action (including the Former Director and Officer Causes of Action) the Debtor purports to release in its plan, and which are specifically preserved pursuant to the within Plan.

### 4. Nonconsensual Confirmation.

In the event that any impaired class of claims or equity interests does not accept a chapter 11 plan, a bankruptcy court may nevertheless confirm such a plan at the proponent's request if at least one impaired class has accepted the plan (with such acceptance being determined without including the vote of any "insider" in such class), and, as to each impaired class that has not accepted the plan, the bankruptcy court determines that the plan "does not discriminate unfairly" and is "fair and equitable" with respect to the dissenting impaired classes. The Plan Proponent believes that the Plan satisfies these requirements and the Plan Proponent may request such nonconsensual Confirmation in accordance with subsection 1129(b) of the Bankruptcy Code. Nevertheless, there can be no assurance that the Bankruptcy Court will reach this conclusion. In addition, the pursuit of nonconsensual confirmation of the Plan may result in, among other things, increased expenses relating to Professionals.

### 5. The Plan Proponent May Object to the Amount or Classification of a Claim.

Except as otherwise provided in the Plan, the Plan Proponent and the Reorganized Debtor reserve the right to object to the amount or classification of any Claim under the Plan. The estimates set forth in this Disclosure Statement cannot be relied on by any Holder of a Claim where such Claim is subject to an objection. Any Holder of a Claim that is subject to an objection may not receive its expected share of the estimated Distributions described in this Disclosure Statement and may not be entitled to vote on the Plan.

### 6. Risk of Non-Occurrence of the Effective Date.

Although the Plan Proponent believes that the Effective Date may occur quickly after the Confirmation Date, there can be no assurance as to such timing or as to whether the Effective Date will, in fact, occur. As noted above, the occurrence of the Effective Date could be delayed for months or years after the Confirmation Date.

### 7. Contingencies Could Affect Votes of Impaired Classes to Accept or Reject the Plan.

The distributions available to Holders of Allowed Claims under the Plan can be affected by a variety of contingencies. The occurrence of any and all such contingencies, which could affect distributions available to Holders of Allowed Claims under the Plan, will not affect the validity of the vote taken by the Impaired Classes to accept or reject the Plan or require any sort of revote by the Impaired Classes.

### B. Risk Factors that May Affect the Recovery Available to Holders of Allowed Claims.

HOLDERS OF CLAIMS SHOULD READ AND CONSIDER CAREFULLY THE FACTORS SET FORTH BELOW, AS WELL AS THE OTHER INFORMATION SET FORTH IN THIS DISCLOSURE STATEMENT AND RELATED DOCUMENTS, REFERRED TO OR INCORPORATED BY REFERENCE IN THIS DISCLOSURE STATEMENT, PRIOR TO VOTING TO ACCEPT OR REJECT THE PLAN. THIS ARTICLE PROVIDES INFORMATION REGARDING POTENTIAL RISKS IN CONNECTION WITH THE PLAN. THESE FACTORS SHOULD NOT, HOWEVER, BE REGARDED AS CONSTITUTING THE ONLY RISKS INVOLVED IN CONNECTION WITH THE PLAN AND ITS IMPLEMENTATION.

### 1. The Plan Proponent Cannot State with any Degree of Certainty What Recovery Will Be Available to Holders of Allowed Claims in Voting Classes.

Many unknown factors make certainty of creditor recoveries under the Plan unachievable. Among them are the following: First, the Plan Proponent cannot know with any certainty, at this time, the exact value of the New Common Stock in the Reorganized Debtor, or other common stock issued in connection with the Proceeds Distribution Election, or what the results will be of the Reorganized Debtor's post-confirmation business activities. Second, the Plan Proponent cannot know with any certainty, at this time, the number or amount of Claims that will ultimately be Allowed. Third, the Plan Proponent cannot know with any certainty, at this time, the number or size of Claims senior to the Voting Classes or unclassified Claims that will ultimately be Allowed.

### C. Risk Factors Could Negatively Impact the Reorganized Debtor's Business.

The risks enumerated above could have a materially adverse effect on the business, financial condition, or results of operations of the Reorganized Debtor. Moreover, the Reorganized Debtor's business plan will only be developed fully after confirmation of the Plan and based upon the decisions of the New Board, made consistently with the fiduciary duties the members of the New Board will owe. Thus, there are many unknowns about the prospects of creditor recoveries on account of the New Common Stock unknown, uncertain and highly speculative. The Reorganized Debtor's business may be adversely affected by the major recession currently being experienced in the United States. Investment returns could be less than

projected and the Reorganized Debtor might be forced to liquidate investments to raise Cash. The Reorganized Debtor may invest in or acquire highly illiquid assets, including, without limitation, disputed, contingent and unliquidated causes of action against third parties. The Reorganized Debtor may be require to engage in prolonged, expensive and speculative litigation, and may be required to succeed in such litigation in order to monetize such causes of action. Additional risks and uncertainties not currently known to the Plan Proponent or that the Plan Proponent currently deems immaterial may also materially adversely affect the Reorganized Debtor's business, financial condition, or results of operations. Moreover, the Reorganized Debtor will be engaged in inherently risky business, and there is substantial risk that the Reorganized Debtor's business plan will not perform as well as intended. There is no assurance that management will select investments that produce results that meet expectations. There is no assurance that New Common Stock will avoid becoming worthless and losing all of its value.

In addition to the possibility of a loss in the value of the New Common Stock due to risks associated with the Reorganized Debtor's business, a liquid trading market for the New Common Stock may never develop. As of the Effective Date, the New Common Stock will not be listed for trading on any stock exchange or trading system, and no such listing is anticipated in the future. Consequently, the trading liquidity of the New Common Stock is expected to be very limited. In addition, it is expected that from and after the Effective Date, the certificate of incorporation of the Reorganized Debtor will contain certain restrictions in relation to the transfer of New Common Stock. In particular, without the prior approval of the New Board, no person will be permitted to acquire, whether directly or indirectly, and whether in one transaction or a series of related transactions, shares of the Reorganized Debtor to the extent that, after giving effect to the proposed acquisition, (i) the purported transferee or, as a result of the proposed acquisition, any other person, would hold more than 4.9% of the total equity value of the Reorganized Debtor, or (ii) a person who already holds at least 4.9% of the total equity value of the Reorganized Debtor shares would hold shares representing a higher percentage of that value.

Further, any creditor making the decision to elect to take the New Series A Common Stock rather than the Proceeds Distribution Election should understand that liabilities of the Reorganized Debtor and its business will be satisfied before there is any distribution to holders of the New Series A Common Stock. **As a result of the above risk factors, the ultimate value of each share of the Reorganized Debtor's New Series A Common Stock is uncertain and holders thereof may incur a complete loss.**

### D. Additional Risk Factors.

#### 1. Unidentified Investments.

The Reorganized Debtor has not identified any particular investments to make with Cash available now or in the future other than to make investments on the basis of opportunities as they may arise. Therefore, holders of New Series A Common Stock of the Reorganized Debtor must rely on the ability of the Reorganized Debtor's management in making investments consistent with the objectives of the Reorganized Debtor. Holders of New Series A Common Stock of the Reorganized Debtor will not have the opportunity to evaluate the relevant economic,

financial, and other information which will be utilized by the Reorganized Debtor's management in deciding whether or not to make a particular investment.

### 2. Highly Competitive Market for Investment Opportunities.

The activity of identifying, completing, and realizing on attractive investments is highly competitive and involves a high degree of uncertainty. There can be no assurance that the Reorganized Debtor's management will be able to identify and complete investments which satisfy its investment objective, or realize the value of such investments, or that it will be able to invest fully its available cash at any time. The Reorganized Debtor will be competing for investment opportunities against various other groups, including industry participants, investment firms, and commercial banks.

### 3. Passive Investment.

In order to safeguard their limited liability for and in respect of the Reorganized Debtor's liabilities, holders of New Series A Common Stock of the Reorganized Debtor must rely entirely on the management of the Reorganized Debtor to conduct and manage the affairs of the Reorganized Debtor.

### 4. Legal, Tax, and Regulatory Risks.

Legal, tax, and regulatory changes could occur that may adversely affect the Reorganized Debtor.

### 5. Risk of Limited Number of Investments.

As the Reorganized Debtor may make only a limited number of investments and because the Reorganized Debtor's investments may will involve a high degree of risk, poor performance by a few of the investments could severely affect the total returns to the holders of New Series A Common Stock. If an investment fails to achieve desired returns, the Reorganized Debtor may suffer a partial or total loss of such investment.

### 6. The Reorganized Debtor Is Subject to Credit Risk.

The Reorganized Debtor is exposed to the risk that third parties that owe the Reorganized Debtor money, securities, or other assets will not repay their obligations. Credit risk arises anytime the Reorganized Debtor commits, invests, or otherwise extends funds through contractual agreements, whether reflected on or off the balance sheet. These parties may default on their obligations due to bankruptcy, lack of liquidity, operational failure, or other reasons.

### 7. The Reorganized Debtor May be Further Adversely Affected by Current Economic and Market Conditions.

The national and global economic downturn has resulted in significant financial market disruptions which may depress overall the market value of financial institutions, limit access to capital, or have a material adverse effect on the financial condition or results of operations of investment companies in general, including the Reorganized Debtor. In addition, the possible duration and severity of the adverse economic cycle is unknown and may exacerbate the Reorganized Debtor's exposure to credit risk. The Reorganized Debtor may be, particularly

76

exposed to downturns in the U.S. commercial real estate markets. Reflecting concern about the stability of the financial markets generally and the strength of counterparties, many lenders and institutional investors have reduced or ceased providing funding to borrowers, including to other financial institutions. This market turmoil and tightening of credit have led to an increased level of delinquencies, lack of consumer confidence, increased market volatility, and widespread reduction of business activity and employment generally. The resulting economic pressure on consumers and lack of confidence in the financial markets has adversely affected the Debtor's business, financial condition, and results of operations. The Reorganized Debtor cannot be certain that the difficult conditions in the financial markets are likely to experience sustainable improvement in the near future. A worsening or prolonging of these conditions would likely exacerbate the adverse effects of these difficult market conditions on the Reorganized Debtor and others in the financial services industry. Financial markets have experienced, and may continue to experience, periods of high volatility accompanied by reduced liquidity. These markets are susceptible to severe events evidenced by rapid depreciation in asset values accompanied by a reduction in asset liquidity. Under these extreme conditions, hedging and other risk management strategies may not be as effective at mitigating trading losses as they would be under more normal market conditions. The Reorganized Debtor's risk management and monitoring processes seek to quantify and mitigate risk to more extreme market moves. Severe market events have historically been difficult to predict, however, and the Reorganized Debtor could realize significant losses if unprecedented extreme market events were to occur.

### 8. The Reorganized Debtor Will Be Exposed to Risk of Environmental Liability When It Takes Title to Real Property.

In the course of its business, the Reorganized Debtor may foreclose on and take title to real estate. As a result, the Reorganized Debtor may be subject to environmental liabilities with respect to these properties. The Reorganized Debtor may be held liable to a governmental entity or to third parties for property damage, personal injury, investigation, and clean-up costs incurred by these parties in connection with environmental contamination or may be required to investigate or clean-up hazardous or toxic substances or chemical releases at properties. The costs associated with investigation or remediation activities could be substantial. If the Reorganized Debtor becomes subject to significant environmental liabilities, its financial condition and results of operations could be adversely affected.

### 9. The Reorganized Debtor's Investment Results Are Subject to General and Regional Economic Conditions, Which Are Beyond Its Control.

The Reorganized Debtor's success depends to a large degree on the general economic conditions of the diverse geographic markets it serves. Local economic conditions have a significant impact on the generation of commercial, commercial real estate, and real estate loans; the ability of borrowers to repay these loans; and the value of the collateral securing these loans. Adverse changes in the economic conditions of the markets in which the Reorganized Debtor invests could also negatively impact the financial results of the Reorganized Debtor. For example, adverse changes in these factors could lead to reduced interest income and an increase in the provision for loan losses. This is consistent with what has occurred during the current economic downturn with the Debtor incurring significant operating losses and a corresponding reduction in shareholders' equity during the past years.

### 10. If The Reorganized Debtor Fails to Effectively Manage Credit Risk, Its Business and Financial Condition Will Suffer.

The Reorganized Debtor must effectively manage credit risk. There are risks inherent in making any loan, including risks with respect to the period of time over which the loan may be

repaid, risks relating to proper loan underwriting and guidelines, risks resulting from changes in economic and industry conditions, risks inherent in dealing with individual borrowers and risks resulting from uncertainties as to the future value of collateral. There is no assurance that credit risk monitoring and loan approval procedures of the Reorganized Debtor are or will be adequate or will reduce the inherent risks associated with lending. The credit administration personnel, policies, and procedures of the Reorganized Debtor may not adequately adapt to changes in economic or any other conditions affecting customers and the quality of its loan portfolio. Any failure to manage such credit risks may materially adversely affect the business and our consolidated results of operations and financial condition of the Reorganized Debtor.

### 11. The Reorganized Debtor Is Subject To Losses Due to the Errors or Fraudulent Behavior of Employees or Third Parties.

The Reorganized Debtor will be exposed to many types of operational risk, including the risk of fraud by employees and outsiders, clerical recordkeeping errors, and transactional errors. The business of the Reorganized Debtor is dependent on its employees as well as third-party service providers to process a large number of increasingly complex transactions. The Reorganized Debtor could be materially adversely affected if one of its employees causes a significant operational breakdown or failure, either as a result of human error or where an individual purposefully sabotages or fraudulently manipulates operations or systems. When the Reorganized Debtor originates loans, it relies upon information supplied by loan applicants and third parties, including the information contained in the loan application, property appraisal and title information, if applicable, and income documentation provided by third parties. If any of this information is misrepresented and such misrepresentation is not detected prior to loan funding, the Reorganized Debtor will generally bear the risk of loss associated with the misrepresentation. Any of these occurrences could result in a diminished ability of the Reorganized Debtor to operate its business, potential liability to customers, reputational damage and regulatory intervention, which could negatively impact the business, financial condition, and results of operations of the Reorganized Debtor.

### 12. The Reorganized Debtor Will Depend on Its Senior Management Team, and the Unexpected Loss of One or More of Its Senior Executives Could Adversely Affect Its Business and Financial Results.

The future success of the Reorganized Debtor significantly depends on the continued services and performance of its key management personnel and its future performance will depend on its ability to motivate and retain these and other key personnel. The loss of the services of members of senior management, or other key employees, or the inability to attract additional qualified personnel as needed, could materially and adversely affect the businesses and the consolidated results of operations and financial condition of the Reorganized Debtor.

### 13. If Borrowers and Guarantors Fail to Perform as Required by the Terms of Their Loans, the Reorganized Debtor Will Sustain Losses.

A significant source of risk arises from the possibility that losses will be sustained if the Reorganized Debtor's borrowers and guarantors fail to perform in accordance with the terms of their loans and guaranties. This risk increases when the economy is weak. The Reorganized Debtor intends to implement underwriting and credit monitoring procedures and credit policies that it believes are appropriate to reduce this risk by assessing the likelihood of nonperformance. These policies and procedures, however, may not prevent unexpected losses that could materially adversely affect the Reorganized Debtor's results of operations.

78

**14.    The Reorganized Debtor Is Exposed to Operational Risks that Can Negatively Affect Its Financial Condition.**

The Reorganized Debtor will be exposed to operational risk.  In its daily operations, the Reorganized Debtor will rely on the continued efficacy of its technical and telecommunication systems, operational infrastructure, relationships with third parties, and the vast array of associates and key executives.  Failure by any or all of these resources subjects us to risks that may vary in size, scale, and scope. These risks include, among other things, operational, technical, and computer system failures, ineffectiveness or exposure due to interruption in third party support, the risk of fraud or theft by employees or outsiders and unauthorized transactions by employees or operational errors (including clerical or recordkeeping errors), as well as the loss of key individuals or failure on the part of the key individuals to perform properly.

**15.    Economic and Market Developments, Including the Potential for Inflation, May Have an Adverse Effect on the Business of the Reorganized Debtor, Possibly in Ways That Are Not Predictable or That the Reorganized Debtor May Fail to Anticipate.**

Recent economic and market developments and the potential for continued economic disruptions and inflation present considerable risks and challenges to the Reorganized Debtor. Dramatic declines in the housing market, with decreasing home prices and increasing delinquencies and foreclosures throughout most of the nation, have negatively impacted the credit performance of mortgage and construction loans and resulted in significant write downs of assets by many financial institutions.  General downward economic trends, reduced availability of commercial credit, and increasing unemployment have also negatively impacted the credit performance of commercial and consumer credit, resulting in additional write downs.  These risks and challenges have significantly diminished overall confidence in the national economy, the financial markets, and many financial institutions and financial services companies.  This reduced confidence could further compound the overall market disruptions and risks to financial services companies, including the Reorganized Debtor.  In addition to economic conditions, the business of the Reorganized Debtor also is affected by political uncertainties, volatility, illiquidity, interest rates, inflation, and other developments impacting the financial markets. Such factors have affected and may further adversely affect, both credit and financial markets and future economic growth, resulting in adverse effects on the Reorganized Debtor and other financial services companies in ways that are not predictable or that the Reorganized Debtor may fail to anticipate.

**16.    If the Reorganized Debtor Experiences Loan Losses in Excess of Estimated Amounts, the Earnings of the Reorganized Debtor Will Be Adversely Affected.**

The risk of credit losses on loans varies with, among other things, general economic conditions, the type of loan being made, the creditworthiness of the borrower over the term of the loan and, in the case of a collateralized loan, the value and marketability of the collateral for the loan.  The Reorganized Debtor will maintain an allowance for loan losses based upon, among other things, historical experience, an evaluation of economic conditions, and regular reviews of loan portfolio quality.  Based upon such factors, the Reorganized Debtor's management will make various assumptions and judgments about the ultimate collectability of its loan portfolio and provide an allowance for loan losses.  These assumptions and judgments are even more complex and difficult to determine given recent market developments, the potential for continued market turmoil, and the significant uncertainty of future conditions in the general economy and the financial services industry.  If management's assumptions and judgments prove to be incorrect and the allowance for loan losses is inadequate to absorb future losses, or management

79

determines to increase the allowance for loan losses, the earnings, financial condition, results of operations and prospects of the Reorganized Debtor could be significantly and adversely affected.

### E. Disclosure Statement Disclaimer.

#### 1. Information Contained Herein Is for Soliciting Votes.

The information contained in this Disclosure Statement is for the purposes of soliciting acceptances of the Plan and may not be relied upon for any other purposes.

#### 2. This Disclosure Statement Was Not Approved by the United States Securities and Exchange Commission.

Although this Disclosure Statement will be filed with the Securities Exchange Commission on a Form 8-K, neither the Securities Exchange Commission nor any state regulatory authority has passed upon the accuracy or adequacy of this Disclosure Statement, or the exhibits or the statements contained herein, and any representation to the contrary is unlawful.

#### 3. This Disclosure Statement May Contain Forward Looking Statements.

This Disclosure Statement may contain "forward looking statements" within the meaning of the Private Securities Litigation Reform Act of 1995. Such statements consist of any statement other than a recitation of historical fact and can be identified by the use of forward looking terminology such as "may," "expect," "anticipate," "estimate" or "continue" or the negative thereof or other variations thereon or comparable terminology. The reader is cautioned that all forward looking statements are necessarily speculative and there are certain risks and uncertainties that could cause actual events or results to differ materially from those referred to in such forward looking statements. The information contained herein and attached hereto are estimates only, and the timing and amount of actual distributions to Holders of Allowed Claims may be affected by many factors that cannot be predicted. Therefore, any analyses, estimates or recovery projections may or may not turn out to be accurate.

#### 4. Reliance on Exemptions from Registration Under the Securities Act and Investment Company Act.

The Plan provides that the Debtor and the Reorganized Debtor may rely on section 1145 of the Bankruptcy Code as well as exemptions from registration under the Securities Act and the Investment Company Act. Parties in interest are invited to review the Plan for further details.

#### 5. No Legal or Tax Advice Is Provided to You by this Disclosure Statement.

**This Disclosure Statement is not legal advice to you.** The contents of this Disclosure Statement should not be construed as legal, business, or tax advice. Each Holder of a Claim or an Equity Interest should consult his or her own legal counsel and accountant with regard to any

80

legal, tax, and other matters concerning his or her Claim or Equity Interest. This Disclosure Statement may not be relied upon for any purpose other than to determine how to vote on the Plan, or object to confirmation of the Plan.

### 6. No Admissions Made.

The information and statements contained in this Disclosure Statement will neither (a) constitute an admission of any fact or liability by any entity (including, without limitation, the Plan Proponent) nor (b) be deemed evidence of the tax or other legal effects of the Plan on the Debtor, Holders of Allowed Claims or Equity Interests, or any other parties in interest.

### 7. Failure to Identify Litigation Claims or Projected Objections.

No reliance should be placed on the fact that a particular litigation claim or projected objection to a particular Claim is, or is not, identified in this Disclosure Statement. The Plan Proponent or the Reorganized Debtor, may seek to investigate, file, and prosecute objections to Claims and may object to Claims after the Confirmation or Effective Date of the Plan irrespective of whether this Disclosure Statement identifies such Claims or objections to such Claims.

### 8. No Waiver of Right to Object or Right to Recover Transfers and Assets.

The vote by a Holder of an Allowed Claim for or against the Plan does not constitute a waiver or release of any Claims, Causes of Action, or rights of the Debtor or the Reorganized Debtor (or any party in interest, as the case may be) to object to that Holder's Allowed Claim, or recover any preferential, fraudulent, or other voidable transfer of assets, regardless of whether any Claims, Causes of Action of the Debtor, its Estate or the Reorganized Debtor are specifically or generally identified herein.

### 9. Information Was Provided by the Debtor and Was Relied Upon by the Debtor's Professionals.

As repeatedly noted herein, the Plan Proponent has relied upon information provided by the Debtor in connection with the preparation of this Disclosure Statement. The Plan Proponent has not verified independently the accuracy or completeness of the information upon which it has relied.

### 10. Potential Exists for Inaccuracies, and the Plan Proponent Has No Duty to Update.

The statements contained in this Disclosure Statement are made by the Plan Proponent as of the date hereof, unless otherwise specified herein, and the delivery of this Disclosure Statement after that date does not imply that there has not been a change in the information set forth herein since that date. While the Plan Proponent has used its reasonable business judgment to ensure the accuracy of all of the information provided in this Disclosure Statement and in the Plan, the Plan Proponent nonetheless cannot, and does not, confirm the current accuracy of all

81

statements appearing in this Disclosure Statement. Further, although the Plan Proponent may subsequently update the information in this Disclosure Statement, it has no affirmative duty to do so unless ordered to do so by the Bankruptcy Court.

**11. No Representations Outside this Disclosure Statement Are Authorized.**

No representations concerning or relating to the Debtor, this Case, or the Plan are authorized by the Bankruptcy Court or the Bankruptcy Code, other than as set forth in this Disclosure Statement. Any representations or inducements made to secure your acceptance or rejection of the Plan that are other than as contained in, or included with, this Disclosure Statement, should not be relied upon by you in arriving at your decision. You should promptly report unauthorized representations or inducements to the counsel to the Debtor and the United States Trustee.

**12. Liquidation Under Chapter 7.**

The Case may be converted to a case under chapter 7 of the Bankruptcy Code, pursuant to which a trustee would be elected or appointed to liquidate the assets of the Debtor for distribution in accordance with the priorities established by the Bankruptcy Code. A discussion of the effects that a chapter 7 liquidation would have on the recoveries of Holders of Claims is set forth in Article VII herein, "Statutory Requirements for Confirmation of the Plan."

**X. Certain United States Federal Income Tax Consequences.**

The following is a summary of certain United States federal income tax consequences of the Plan to the Debtor and certain Holders of Claims and Equity Interests and is based upon information provided by the Debtor. This summary does not address the United States federal income tax consequences to Holders (i) whose Claims or Equity Interests are Unimpaired or otherwise entitled to payment in full in Cash under the Plan or (ii) that are deemed to reject the Plan. This summary is based on the Internal Revenue Code, Treasury Regulations thereunder, and administrative and judicial interpretations and practice, all as in effect on the date of this Disclosure Statement and all of which are subject to change or differing interpretations, possibly with retroactive effect. Due to the lack of definitive judicial and administrative authority in a number of areas, substantial uncertainty may exist with respect to some of the tax consequences described below. No opinion of counsel has been obtained and the Plan Proponent does not intend to seek a ruling from the IRS as to any of the tax consequences of the Plan discussed below. This summary is not binding on the IRS or the courts. There can be no assurance that the IRS will not assert, or that a court will not sustain, a different position than any position discussed below.

This summary does not address all aspects of United States federal income taxation that may be relevant to the Debtor or to certain Holders in light of their individual circumstances, nor does it discuss tax issues applicable to Holders of Claims or Equity Interests that are not "United States persons" (as such term is defined in the Internal Revenue Code) or that are otherwise subject to special treatment under United States federal income tax law (including, without limitation, banks, brokers, dealers and traders in securities, financial institutions, governmental

82

authorities or agencies, insurance companies, mutual funds, pass-through entities, regulated investment companies, small business investment companies, tax-exempt organizations, and trusts and those holding, or who will hold, Claims, Equity Interests, New Series A Common Stock or New Series B Common Stock as part of a hedge, straddle, conversion or constructive sale transaction). This summary assumes (i) each Holder of a Claim or Equity Interest holds its Claim, Equity Interests, New Series A Common Stock or other Common Stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election as "capital assets" (generally, property held for investment) within the meaning of Section 1221 of the Internal Revenue Code and (ii) the debt obligations(s) underlying each Allowed Claim is properly treated as debt (rather than equity) of the Debtor. Moreover, this summary does not purport to cover all aspects of United States federal income taxation that may apply to the Debtor and Holders of Claims and Equity Interests based upon their particular circumstances. Additionally, this summary does not discuss any tax consequences that may arise under any laws other than United States federal income tax law, including under state, local, estate, gift, foreign or other tax law.

ACCORDINGLY, THE FOLLOWING SUMMARY OF CERTAIN UNITED STATES FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT A SUBSTITUTE FOR CAREFUL TAX PLANNING AND ADVICE BASED UPON THE INDIVIDUAL CIRCUMSTANCES PERTAINING TO A HOLDER OF A CLAIM OR EQUITY INTEREST. ALL HOLDERS OF CLAIMS OR EQUITY INTERESTS ARE URGED TO CONSULT THEIR OWN TAX ADVISORS FOR THE FEDERAL, STATE, LOCAL, ESTATE, GIFT, FOREIGN AND OTHER TAX CONSEQUENCES APPLICABLE UNDER THE PLAN.

**IRS CIRCULAR 230 DISCLOSURE**: TO ENSURE COMPLIANCE WITH REQUIREMENTS IMPOSED BY THE IRS, ANY TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS NOT INTENDED OR WRITTEN TO BE USED, AND CANNOT BE USED, BY ANY TAXPAYER FOR THE PURPOSE OF AVOIDING TAX-RELATED PENALTIES UNDER THE INTERNAL REVENUE CODE. TAX ADVICE CONTAINED IN THIS DISCLOSURE STATEMENT (INCLUDING ANY ATTACHMENTS) IS WRITTEN TO SUPPORT THE MARKETING OR PROMOTION OF THE TRANSACTIONS OR MATTERS ADDRESSED BY THIS DISCLOSURE STATEMENT. EACH TAXPAYER SHOULD SEEK ADVICE BASED ON THE TAXPAYER'S PARTICULAR CIRCUMSTANCES FROM AN INDEPENDENT TAX ADVISOR.

### A. Certain United States Federal Income Tax Consequences to the Debtor.

#### 1. Cancellation of Debt and Reduction of Tax Attribute

In general, absent an exception, a debtor will realize and recognize cancellation of debt income ("CODI") upon satisfaction of its outstanding indebtedness for total consideration less than the amount of such indebtedness. The amount of CODI, in general, is the excess of (a) the adjusted issue price of the indebtedness satisfied, over (b) the sum of (x) the amount of Cash paid, (y) the issue price of any new indebtedness of the taxpayer issued and (z) the fair market

value of any new consideration (including New Common Stock or Cash) given in satisfaction of such indebtedness at the time of the exchange.

Pursuant to Section 108 of the Internal Revenue Code, a debtor is not required to include CODI in gross income if the debtor is under the jurisdiction of a court in a case under chapter 11 of the Bankruptcy Code and the discharge of debt occurs pursuant to that proceeding. Instead, as a consequence of such exclusion, a debtor must reduce its tax attributes by the amount of CODI that it excluded from gross income. In general, tax attributes are reduced in the following order: (a) NOLs; (b) general business credit carryovers; (c) minimum tax credit carryovers; (d) capital loss carryovers; (e) tax basis in assets (but not below the amount of liabilities to which the debtor remains subject); (f) passive activity loss and credit carryovers; and (g) foreign tax credits.

Because the Plan provides that Holders of certain Claims will receive New Common Stock in the Reorganized Debtor, the amount of CODI, and accordingly the amount of tax attributes of the Debtor required to be reduced, will depend on the fair market value of the New Common Stock. The amount of such CODI is therefore uncertain. It is expected, however, that the Debtor will recognize a substantial amount of CODI as a result of consummation of the Plan, and that this CODI will result in a reduction in the NOL carryforwards of the Reorganized Debtor.

### 2. Limitation of NOL Carryforwards and Other Tax Attributes.

Even after taking into account a reduction in its NOLs as a result of CODI, Holdco anticipates the Reorganized Debtor may have tax attributes (in particular, significant capital losses) at emergence. The amount of such tax attributes that will be available to the Reorganized Debtor at emergence is based on a number of factors and is impossible to calculate at this time. Some of the factors that will impact the amount of available tax attributes include: (a) the amount of tax losses incurred by the Debtor in 2011; (b) the fair market value of the New Common Stock; and (c) the amount of CODI that has not been included in gross income by the Debtor as a result of the above-described rules in connection with consummation of the Plan. Any capital loss carryovers that are available will be subject to the limitations on the use of capital losses, generally, only against future capital gains rather than ordinary income.

Under Section 382 of the Internal Revenue Code, if a corporation undergoes an "ownership change," the amount of its Pre-Change Losses, which include capital losses, that may be utilized to offset future taxable income generally is subject to an annual limitation. As discussed in greater detail herein, the Debtor anticipates that the issuance of the New Common Stock pursuant to the Plan will result in an "ownership change" of the Reorganized Debtor for these purposes, and that the Debtor's use of its Pre-Change Losses (which are anticipated to include substantial built-in losses) will be subject to limitation unless an exception to the general rules of Sections 382 and 383 of the Internal Revenue Code applies.

a) General Section 382 Annual Limitation.

In general, the annual Section 382 Limitation on the use of Pre-Change Losses in any "post-change year" is equal to the product of (a) the fair market value of the stock of the corporation immediately before the "ownership change" (with certain adjustments) multiplied by

84

(b) the "long-term tax-exempt rate" in effect for the month in which the "ownership change" occurs (approximately 4.3% for the month of July 2011). The Section 382 Limitation may be increased to the extent that the Debtor recognizes certain built-in gains in its assets during the five-year period following the ownership change, or is treated as recognizing built-in gains pursuant to the safe harbors provided in IRS Notice 2003-65. Any unused limitation may be carried forward, thereby increasing the annual limitation in the subsequent taxable year. As discussed below, however, special rules may apply in the case of a corporation which experiences an ownership change as the result of a bankruptcy proceeding.

The issuance under the Plan of the New Common Stock, along with the cancellation of existing Debtor Equity Interests through the Plan, is expected to cause an ownership change with respect to the Debtor on the Effective Date. As a result, unless an exception applies, Sections 382 and 383 of the Internal Revenue Code will apply to limit the Debtor's use of any remaining Pre-Change Losses after the Effective Date. This limitation is independent of, and in addition to, the reduction of tax attributes described in the preceding section resulting from the exclusion of CODI.

b) Special Bankruptcy Exceptions.

The 382(1)(5) Exception to the foregoing annual limitation rules generally applies when so-called "qualified creditors" of a debtor company in chapter 11 receive, in respect of their Claims, at least 50% of the vote and value of the stock of the reorganized debtor (or a controlling corporation if also in chapter 11) pursuant to a confirmed chapter 11 plan. Under the 382(l)(5) Exception, a debtor's Pre-Change Losses are not limited on an  annual basis but, instead, the debtor's NOLs are required to be reduced by the amount of any interest deductions claimed during any taxable year ending during the three-year period preceding the taxable year that includes the effective date of the plan of reorganization, and during the part of the taxable year prior to and including the effective date of the plan of reorganization, in respect of all debt converted into stock in the reorganization. If the 382(l)(5) Exception applies but the debtor undergoes another ownership change within two years after consummation, then the debtor's Pre-Change Losses effectively would be eliminated in their entirety.

Where the 382(l)(5) Exception is not applicable (either because the debtor does not qualify for it or the debtor otherwise elects not to utilize the 382(l)(5) Exception), a second special rule, the 382(1)(6) Exception, will generally apply. When the 382(l)(6) Exception applies, a debtor corporation that undergoes an ownership change generally is permitted to determine the fair market value of its stock after taking into account the increase in value resulting from any surrender or cancellation of creditors' Claims in the bankruptcy. This differs from the ordinary rule that requires the fair market value of a debtor corporation that undergoes an ownership change to be determined before the events giving rise to the change. The 382(l)(6) Exception also differs from the 382(l)(5) Exception in that the debtor corporation is not required to reduce its NOLs by interest deductions in the manner described above, and the debtor may undergo a change of ownership within two years without triggering the elimination of its Pre-Change Losses. Similar rules may apply to capital loss carryovers pursuant to Section 383 and the Treasury Regulations thereunder.

If available, Holdco believes it will be beneficial for it to qualify for, and utilize, the 382(1)(5) Exception. However, as mentioned above, if the Debtor does utilize the 382(l)(5) Exception and another ownership change were to occur within the two-year period after consummation, then the Debtor's Pre-Change Losses would effectively be eliminated. In order to prevent such a subsequent ownership change, it is expected that the Reorganized Debtor's certificate of incorporation will contain restrictions on transfers of the Reorganized Debtor's stock that are intended to prevent such a change.

Whether the Reorganized Debtor will qualify for the 382(l)(5) Exception is uncertain. Qualification under Section 382(l)(5) is a complex determination that depends on a number of different facts and legal conclusions, many of which cannot be known at this time, including the identity of those persons who will own claims against the Debtor that will be exchanged for stock on the Effective Date. If the Reorganized Debtor does not qualify for the 382(l)(5) Exception, the Debtor expects that its use of its NOLs after the Effective Date will be subject to limitation based on the rules discussed above, but taking into account the 382(l)(6) Exception. Regardless of whether the Reorganized Debtor takes advantage of the 382(l)(5) Exception or the 382(l)(6) Exception, the Reorganized Debtor's use of its Pre-Change Losses after the Effective Date may be adversely affected if an "ownership change" within the meaning of Section 382 of the Internal Revenue Code were to occur after the Effective Date.

c)    Alternative Minimum Tax.

In general, an AMT is imposed on a corporation's AMTI at a 20% rate to the extent such tax exceeds the corporation's regular federal income tax for the year. AMTI is generally equal to regular taxable income with certain adjustments. For purposes of computing AMTI, certain tax deductions and other beneficial allowances are modified or eliminated. For example, generally only 90% of a corporation's AMTI may be offset by available alternative tax NOL carryforwards. The effect of these rules could cause the Reorganized Debtor to owe a modest amount of federal income tax on taxable income in future years even though NOL carryforwards and capital loss carryforwards may be available to offset that taxable income.

### B.    Certain United States Federal Income Tax Consequences to the Holders of Allowed Claims.

#### 1.    Consequences to Holders of TOPrS Unsecured Claims

Pursuant to the Plan, and in full satisfaction of its Claim, a Holder of a TOPrS Unsecured Claim, which will be treated as an Allowed Class 2 General Unsecured Claim, will receive New Common Stock or, where the Holder elects the Proceeds Distribution Election, a Pro Rata Distribution of Net Free Cash, which may be evidenced in part (at the Debtor's option) by other series or class of common stock in the Reorganized Debtor.

While not free from doubt, where a Holder elects the Proceeds Distribution Election, and the Debtor does not issue other Common Stock in the Reorganized Debtor to evidence such right, the Holder should recognize capital gain or loss on the exchange, except to the extent that a portion of the Cash received is treated as interest that accrued between the Effective Date and the distribution dates (see "Accrued Interest" below). Any such capital gain or loss would equal the

86

difference between (a) the amount of Cash received (other than Cash treated as interest) and (b) the Holder's tax basis in the surrendered Allowed Class 4 Claim. Such gain or loss should be long-term capital gain (subject to the "market discount" rules described below) or loss if the Holder had a holding period in the Class 4 Claim of more than one year.

Additionally, certain Holders so electing may be eligible to use the installment method to defer recognition of any gain until the distribution dates. It is also plausible that a Holder not eligible for the installment method could defer recognition of any gain or loss by treating the transaction as an "open" transaction for United States federal income tax purposes. The United States federal income tax consequences of an open transaction are uncertain and highly complex. A Holder electing the Proceeds Distribution Election should consult with its tax advisor to determine if it is eligible to use the installment method and/or whether open transaction treatment might be appropriate.

The discussion that follows describes the tax treatment that applies where a Holder either (a) receives New Series A Common Stock or (b) elects the Proceeds Distribution Election and the Debtor issues other Common Stock in the Reorganized Debtor to evidence such right.

Whether a Holder of a TOPrS Unsecured Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock or other series or other series or class of Common Stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the TOPrS Debentures constituting the Allowed Class 2 TOPrS Unsecured Claim surrendered are treated as a "security" for the reorganization provisions of the Internal Revenue Code; (b) such Holder previously included in income any accrued but unpaid interest with respect to the Allowed Class 2 TOPrS Unsecured Claim; (c) such Holder has claimed a bad debt deduction with respect to such Allowed Class 2 TOPrS Unsecured Claim; and (d) such Holder uses the accrual or cash method of accounting for tax purposes.

Whether a debt instrument constitutes a "security" for United States federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. The Plan Proponent anticipates taking the position that the TOPrS Debentures will be treated as "securities" for United States federal income tax purposes.

If the TOPrS Debentures constituting a Holder of a TOPrS Unsecured Claim's surrendered Allowed Class 2 TOPrS Unsecured Claim are treated as "securities" for United States federal income tax purposes, the exchange of such Holder's Allowed Class 2 TOPrS Unsecured Claim for New Series A Common Stock or New Series B Common Stock, which may

be issued in connection with the Proceeds Distribution Election, should be treated as a recapitalization, and therefore a reorganization, under the Internal Revenue Code. In general, this means such a Holder will recognize gain, but not loss, on the exchange. Specifically, such a Holder will recognize (a) capital gain, subject to the "market discount" rules discussed below, to the extent of the lesser of (i) the amount of gain realized from the exchange or (ii) the fair market value of the New Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election received, and (b) ordinary interest income to the extent that the New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election, is treated as received in satisfaction of accrued but untaxed interest on the TOPrS Debentures underlying the TOPrS Unsecured Claim (see discussion of "Accrued Interest" below). In such case, such a Holder's tax basis in the New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election, received should be equal to the tax basis of the TOPrS Debentures constituting the Allowed Class 2 TOPrS Unsecured Claim surrendered therefor (increased by the amount of any gain recognized and decreased by the fair market value of the New Series A Common Stock or New Series B Common Stock, which may be i issued in connection with the Proceeds Distribution Election), and such a Holder's holding period for its New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election, received should include the holding period for the TOPrS Debentures constituting the surrendered Allowed Class 2 TOPrS Unsecured Claim; *provided* that the tax basis of any portion of New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election, that is treated as received in satisfaction of accrued but untaxed interest should equal the amount of such accrued but untaxed interest, and the holding period for any such portion of the New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election, should not include the holding period of the TOPrS Debentures constituting the surrendered Allowed Class 2 TOPrS Unsecured Claim.

If the TOPrS Debentures constituting a Holder of a TOPrS Unsecured Claim's surrendered Allowed Class 2 TOPrS Unsecured Claim is not treated as "securities" for U.S. federal income tax purposes, such a Holder should be treated as exchanging its Allowed Class 2 TOPrS Unsecured Claim for New Common Stock or other series or class of Common Stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election in a fully taxable exchange. A Holder of a TOPrS Unsecured Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the Holder's tax basis in the Allowed Class 2 TOPrS Unsecured Claim surrendered by the Holder in such exchange, and (ii) the fair market value of the New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election, received. Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the TOPrS Debentures constituting the surrendered Allowed Class 2 TOPrS Unsecured Claim were held for more than one year by the Holder. To the extent that a portion of the New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election, received is allocable to accrued but untaxed interest, such a Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below). Such a Holder's tax basis in the New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution

Election, received should equal its fair market value. Such a Holder's holding period for the New Series A Common Stock or New Series B Common Stock, which may be issued in connection with the Proceeds Distribution Election received, on the Effective Date should begin on the day following the Effective Date.

2. **Consequences to Holders of Class 3 Allowed General Unsecured Claims**

Pursuant to the Plan, and in full satisfaction of its Claim, a Holder of an Allowed Class 3 General Unsecured Claim will receive New Common Stock or, where the Holder elects the Proceeds Distribution Election, a Pro Rata Distribution of Residual Net Free Cash, which may be evidenced in part (at the Debtor's option) by other common stock in the Reorganized Debtor.

While not free from doubt, where a Holder elects the Proceeds Distribution Election, and the Debtor does not issue other Common Stock in the Reorganized Debtor to evidence such right, the Holder should recognize capital gain or loss on the exchange, except to the extent that a portion of the Cash received is treated as interest that accrued between the Effective Date and the distribution dates (see "Accrued Interest" below). Any such capital gain or loss would equal the difference between (a) the amount of Cash received (other than Cash treated as interest) and (b) the Holder's tax basis in the surrendered Allowed Class 3 Claim. Such gain or loss should be long-term capital gain (subject to the "market discount" rules described below) or loss if the Holder had a holding period in the Class 3 Claim of more than one year.

Additionally, certain Holders so electing may be eligible to use the installment method to defer recognition of any gain until the distribution dates. It is also plausible that a Holder not eligible for the installment method could defer recognition of any gain or loss by treating the transaction as an "open" transaction for United States federal income tax purposes. The United States federal income tax consequences of an open transaction are uncertain and highly complex. A Holder electing the Proceeds Distribution Election should consult with its tax advisor to determine if it is eligible to use the installment method and/or whether open transaction treatment might be appropriate.

The discussion that follows describes the tax treatment that applies where a Holder of an allowed Class 3 General Unsecured Claim either receives New Common Stock or elects the Proceeds Distribution election and the Debtor issues other common stock in the Reorganized Debtor to evidence such right.

Whether a Holder of an Allowed Class 3 Claim recognizes gain or loss as a result of the exchange of its Claim for New Common Stock or other series or class of common stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election depends on whether (a) the exchange qualifies as a tax-free recapitalization, which in turn depends on whether the debt instrument(s) constituting the Allowed Class 3 Claim surrendered is treated as a "security" for the reorganization provisions of the Internal Revenue Code; (b) such Holder previously included in income any accrued but unpaid interest with respect to the Allowed Class 3 Claim; (c) such Holder has claimed a bad debt deduction with respect to such Allowed Class 3 Claim; and (d) such Holder uses the accrual or cash method of accounting for tax purposes.

89

Whether a debt instrument constitutes a "security" for United States federal income tax purposes is determined based on all the relevant facts and circumstances, but most authorities have held that the length of the term of a debt instrument is an important factor in determining whether such instrument is a security for United States federal income tax purposes. These authorities have indicated that a term of less than five years is evidence that the instrument is not a security, whereas a term of ten years or more is evidence that it is a security. There are numerous other factors that could be taken into account in determining whether a debt instrument is a security, including the security for payment, the creditworthiness of the obligor, the subordination or lack thereof to other creditors, the right to vote or otherwise participate in the management of the obligor, convertibility of the instrument into an equity interest of the obligor, whether payments of interest are fixed, variable or contingent and whether such payments are made on a current basis or accrued. Holdco anticipates the Debtors taking the position that the debt instruments underlying the Allowed Class 3 claims will not be treated as "securities."

If the debt instrument(s) constituting a Holder's surrendered Allowed Class 3 Claim is not treated as a "security" for U. S. federal income tax purposes, such a Holder should be treated as exchanging its Allowed Class 3 Claim for New Common Stock or other series or class of common stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election in a fully taxable exchange. A Holder of an Allowed Class 3 Claim who is subject to this treatment should recognize gain or loss equal to the difference between (i) the Holder's tax basis in the Allowed Class 3 Claim surrendered by the Holder in such exchange, and (ii) the fair market value of the New Common Stock or other series or class of common stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election received. Such gain or loss should be capital gain, subject to the "market discount" rules discussed below, and should be long term capital gain or loss if the debt instrument(s) constituting the surrendered Allowed Class 3 Claim was held for more than one year by the Holder. To the extent that a portion of the New Common Stock or other series or class of common stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election received is allocable to accrued but untaxed interest, such a Holder may recognize ordinary interest income (see discussion of "Accrued Interest" below). Such a Holder's tax basis in the New Common Stock or other series or class of common stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election received should equal its fair market value. Such a Holder's holding period for the New Common Stock or other series or class of common stock in the Reorganized Debtor issued in connection with the Proceeds Distribution Election received on the Effective Date should begin on the day following the Effective Date.

### 3.  Accrued Interest.

To the extent that any amount received by a Holder of a surrendered Allowed Claim under the Plan is attributable to accrued but unpaid interest and such amount has not previously been included in the Holder's gross income, such amount should be taxable to the Holder as ordinary interest income. Conversely, a Holder of a surrendered Allowed Claim may be able to recognize a deductible loss (or, possibly, a write-off against a reserve for worthless debts) to the extent that any accrued interest on the debt instrument(s) constituting such Claim was previously included in the Holder's gross income but was not paid in full by the Debtor. Such loss may be ordinary, but the tax law is unclear on this point.

The extent to which the consideration received by a Holder of a surrendered Allowed Claim will be attributable to accrued interest on the debt instrument(s) constituting the surrendered Allowed Claim is unclear. Certain Treasury Regulations generally treat a payment under a debt instrument first as a payment of accrued and untaxed interest and then as a payment of principal. Application of this rule to a final payment on a debt instrument being discharged at a discount in bankruptcy is unclear. Pursuant to the Plan, distributions in respect of Allowed Claims will be allocated first to the principal amount of such claims (as determined for United States federal income tax purposes) and then, to the extent the consideration exceeds the principal amount of the Claims, to any portion of such Claims for accrued but unpaid interest. However, the provisions of the Plan are not binding on the IRS nor a court with respect to the appropriate tax treatment for creditors.

**HOLDERS SHOULD CONSULT THEIR OWN TAX ADVISORS CONCERNING THE ALLOCATION OF CONSIDERATION RECEIVED IN SATISFACTION OF THEIR CLAIMS AND THE FEDERAL INCOME TAX TREATMENT OF ACCRUED BUT UNPAID INTEREST.**

### 4. Market Discount.

Under the "market discount" provisions of sections 1276 through 1278 of the Internal Revenue Code, some or all of the gain realized by a Holder who exchanges the debt instrument(s) constituting its Allowed Claim for other property on the Effective Date may be treated as ordinary income (instead of capital gain), to the extent of the amount of "market discount" on the debt instrument(s) constituting the surrendered Allowed Claim.

In general, a debt instrument is considered to have been acquired with "market discount" if its Holder's adjusted tax basis in the debt instrument is less than (a) the sum of all remaining payments to be made on the debt instrument, excluding "qualified stated interest" or (b) in the case of a debt instrument issued with "original issue discount," its adjusted issue price, by at least a *de minimis* amount (equal to 0.25% of the sum of all remaining payments to be made on the debt instrument, excluding qualified stated interest, multiplied by the number of remaining whole years to maturity).

Any gain recognized by a Holder on the exchange of the debt instrument(s) constituting its Allowed Claim that had been acquired with "market discount" should be treated as ordinary income to the extent of the "market discount" that accrued thereon while such debts were considered to be held by the Holder (unless the Holder elected to include "market discount" in income as it accrued).

### 5. Consequences to Holders of New Common Stock.

a) Dividends on New Common Stock.

Any distributions made on account of the New Common Stock will constitute dividends for United States federal income tax purposes to the extent of the current or accumulated earnings and profits of Reorganized Debtor as determined under United States federal income tax principles. To the extent that a Holder receives distributions that would otherwise constitute

91

dividends for United States federal income tax purposes but that exceed such current and accumulated earnings and profits, such distributions will be treated first as a non-taxable return of capital reducing the Holder's basis in its shares. Any such distributions in excess of the Holder's basis in its shares (determined on a share-by-share basis) generally will be treated as capital gain. Subject to certain exceptions, dividends received by noncorporate Holders prior to 2013 will be taxed under current law at a maximum rate of 15%, provided that certain holding period requirements and other requirements are met.

Dividends paid to Holders that are corporations generally will be eligible for the dividends-received deduction so long as there are sufficient earnings and profits. However, the dividends-received deduction is only available if certain holding period requirements are satisfied. The length of time that a shareholder has held its stock is reduced for any period during which the shareholder's risk of loss with respect to the stock is diminished by reason of the existence of certain options, contracts to sell, short sales or similar transactions. In addition, to the extent that a corporation incurs indebtedness that is directly attributable to an investment in the stock on which the dividend is paid, all or a portion of the dividends received deduction may be disallowed.

        b)     Sale, Redemption or Repurchase of New Common Stock.

Unless a non-recognition provision applies, subject to the "market discount" rules discussed above, Holders generally will recognize capital gain or loss upon the sale, redemption or other taxable disposition of New Common Stock.

        c)     Medicare Tax

Certain Holders that are individuals, estates or trusts are required to pay an additional 3.8% tax on, among other things, gains from the sale or other disposition of capital assets for taxable years beginning after December 31, 2012. Holders that are individuals, estates or trusts should consult their tax advisors regarding the effect, if any, of this tax provision on their ownership and disposition of New Common Stock.

      **6.**     **Information Reporting and Backup Withholding.**

The Reorganized Debtor will withhold all amounts required by law to be withheld from payments of interest and dividends. The Reorganized Debtor will comply with all applicable reporting requirements of the Internal Revenue Code. In general, information reporting requirements may apply to distributions or payments under the Plan. Additionally, under the backup withholding rules, a Holder of a Claim may be subject to backup withholding (currently at a rate of 28%) with respect to distributions or payments made pursuant to the Plan unless that Holder complies with the applicable requirements of the backup withholding rules and: (a) comes within certain exempt categories (which generally include corporations) and, when required, demonstrates that fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the Holder is not subject to backup withholding because of a failure to report all dividend and interest income. Backup withholding is not an additional tax but is, instead, an advance payment

that may be refunded to the extent it results in an overpayment of tax; *provided*, *however*, that the required information is provided to the IRS.

In addition, from an information reporting perspective, the Treasury Regulations generally require disclosure by a taxpayer on its United States federal income tax return of certain types of transactions in which the taxpayer participated, including, among other types of transactions, certain transactions that result in the taxpayer's claiming a loss in excess of specified thresholds. Holders are urged to consult their tax advisors regarding these regulations and whether the transactions contemplated by the Plan would be subject to these regulations and require disclosure on the Holders' tax returns.

**THE UNITED STATES FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN ARE COMPLEX. THE FOREGOING SUMMARY DOES NOT DISCUSS ALL ASPECTS OF UNITED STATES FEDERAL INCOME TAXATION THAT MAY BE RELEVANT TO A PARTICULAR HOLDER OF A CLAIM OR EQUITY INTEREST IN LIGHT OF SUCH HOLDER'S CIRCUMSTANCES AND INCOME TAX SITUATION. ALL HOLDERS OF EQUITY INTERESTS IN OR CLAIMS AGAINST THE DEBTOR SHOULD CONSULT WITH THEIR TAX ADVISORS AS TO THE PARTICULAR TAX CONSEQUENCES TO THEM OF THE TRANSACTION CONTEMPLATED BY THE RESTRUCTURING, INCLUDING THE APPLICABILITY AND EFFECT OF ANY STATE, LOCAL, ESTATE, GIFT, FOREIGN OR OTHER TAX LAWS, AND OF ANY CHANGE IN APPLICABLE TAX LAWS.**

## XI.    Voting Procedures

On _____, 2013, the Bankruptcy Court entered an Order approving the adequacy of this Disclosure Statement and approving procedures for the solicitation of votes to accept or reject the Plan. In addition to approving the Solicitation Procedures, the Disclosure Statement Order established certain dates and deadlines, including the date for the Confirmation Hearing, the deadline for parties to object to confirmation, the Voting Record Date, and the Voting Deadline. The Disclosure Statement Order also approved the forms of Ballots, the letter from the Plan Proponent to the Holders of Claims in Voting Classes and certain confirmation-related notices. The Disclosure Statement Order and the Solicitation Procedures should be read in conjunction with this Article X.

### A.    Confirmation Generally

The Bankruptcy Court may confirm the Plan only if it determines that the Plan complies with the requirements of chapter 11 of the Bankruptcy Code. One of these requirements is that the Bankruptcy Court find, among other things, that the Plan has been accepted by the requisite votes of all Classes of Impaired Claims unless approval will be sought under section 1129(b) of the Bankruptcy Code despite the non-acceptance by one or more such Classes. The process by which the Plan Proponent solicits votes to accept or reject the Plan will be governed by the Disclosure Statement Order and the Solicitation Procedures.

The following is a brief and general summary of the Solicitation Procedures. Holders of Claims and Equity Interests are encouraged to review the Disclosure Statement Order, the

93

Solicitation Procedures, the relevant provisions of the Bankruptcy Code, and to consult their own advisors. To the extent of any inconsistency between the summary below and (i) the Disclosure Statement Order or (ii) the Solicitation Procedures, the Disclosure Statement Order and the Solicitation Procedures shall govern.

### B. Who Can Vote

In general, a holder of a claim or equity interest may vote to accept or to reject a plan if (i) no party in interest has objected to such claim or interest and (ii) the claim or equity interest is impaired by the plan but the plan does not make distributions on account of such claim or interest. If the holder of an impaired claim or interest will not receive any distribution under the plan in respect of such claim or interest, the Bankruptcy Code deems such holder to have rejected the plan in respect of such claim or interest. If a claim or an interest is not impaired, the Bankruptcy Code deems that the holder of such claim or interest has accepted the plan and the plan proponent need not solicit such holder's vote.

Pursuant to section 1124 of the Bankruptcy Code, a class of claims or interests is deemed to be "impaired" under a plan unless the plan leaves unaltered the legal, equitable, and contractual rights to which such claim or interest entitles the holder thereof or, notwithstanding any legal right to an accelerated payment of such claim or interest, the plan cures all existing defaults (other than defaults resulting from the occurrence of events of bankruptcy), reinstates the maturity of such claim or interest as it existed before the default, compensates the holder of such claim or interest for any damages incurred as a result of reasonable reliance on the holder's legal right to an accelerated payment, and does not otherwise alter the legal, equitable, or contractual rights to which such claim or interest entitles the holder thereof.

A vote may be disregarded if the Bankruptcy Court determines, pursuant to section 1126(e) of the Bankruptcy Code, that it was not solicited or procured in good faith or in accordance with the provisions of the Bankruptcy Code. The Solicitation Procedures also set forth assumptions and procedures for tabulating Ballots.

### C. Classes Impaired Under the Plan

(i)  Unimpaired Classes of Claims. Classes 1 and 5 are Unimpaired under the Plan and are conclusively presumed to have accepted the Plan under section 1126(f) of the Bankruptcy Code. Thus, Holders in such Classes will not be solicited to vote to accept or to reject the Plan. Rather, acceptances or rejections of the Plan are being solicited only from those who hold Claims in an Impaired Class whose members will receive a distribution under the Plan. Pursuant to the Solicitation Procedures, these parties will receive a notice, substantially in the form attached as an exhibit to the Disclosure Statement Order, notifying them of their non-voting status.

(ii)  Voting Impaired Classes of Claims. Classes 2, 3, and 4 are Impaired under the Plan and are entitled to vote to accept or reject the Plan.

94

(iii) <u>Non-Voting Impaired Classes of Claims and Equity Interests</u>. Class 6 is wholly Impaired under the Plan and is conclusively presumed to have rejected the Plan under section 1126(g) of the Bankruptcy Code. Thus, Holders in such Class will not be solicited to vote to accept or to reject the Plan. Rather, acceptances or rejections of the Plan are being solicited only from those who hold Claims in an Impaired Class whose members will receive a distribution under the Plan. Pursuant to the Solicitation Procedures, these parties will receive a notice, substantially in the form attached as an exhibit to the Disclosure Statement Order, notifying them of their non-voting status.

**D.      Temporary Allowance of Disputed Claims for Voting Purposes**

The Solicitation Procedures generally provide that Holders of Disputed Claims will not be entitled to vote unless a Resolution Event occurs; *provided, however*, that if the Claim is objected to on a reduce-and-allow basis, such Holder shall receive a Ballot and be entitled to vote such Claim in the reduced amount contained in such objection. No later than two (2) Business Days after a Resolution Event, the Plan Proponent shall distribute a Ballot and a pre-addressed, postage pre-paid envelope to the relevant Holder of such a Disputed Claim, which must be returned to the Plan Proponent by no later than the Voting Deadline.

If the Holder of a Claim receives a Solicitation Package, but the Plan Proponent objects to such Claim after the Voting Record Date, the Plan Proponent's notice of objection will inform such Holder of the rules applicable to Disputed Claims, and the procedures for temporary allowance for voting purposes.

Each Holder of a Disputed Claim will receive a notice notifying such Holder of the Solicitation Procedures applicable to Disputed Claims.

**E.      Voting**

The Plan Proponent will facilitate the solicitation process. The Plan Proponent will answer questions regarding the procedures and requirements for voting to accept or reject the Plan and for objecting to the Plan, provide additional copies of all materials, and oversee the voting tabulation. The Plan Proponent will also process and tabulate Ballots for each Class entitled to vote to accept or reject the Plan.

BALLOTS CAST BY HOLDERS OF CLAIMS IN CLASSES ENTITLED TO VOTE MUST BE RECEIVED BY THE PLAN PROPONENT BY THE VOTING DEADLINE, WHETHER BY FIRST CLASS MAIL, OVERNIGHT COURIER, OR PERSONAL DELIVERY. THE ADDRESS FOR BALLOTS RETURNABLE TO THE PLAN PROPONENT, OTHER THAN BALLOTS SENT VIA OVERNIGHT MAIL OR BY HAND DELIVERY, IS: HoldCo Advisors, L.P. c/o Brown Legal Advisors, LLC, Attn: Daniel R. Brown, 1253 W. Foster Ave., Suite 3E, Chicago, IL 60640.

FOR ANSWERS TO ANY QUESTIONS REGARDING SOLICITATION PROCEDURES, PARTIES MAY CALL DANIEL R. BROWN, COUNSEL TO THE PLAN PROPONENT AT (773) 527-0585.

To obtain an additional copy of the Plan, this Disclosure Statement, the Plan Supplement, or other Solicitation Package materials (except Ballots), please refer to the docket for this case, available at the Court's website, http://www.waeb.uscourts.gov/ or request a copy from the Plan Proponent (including Ballots), either by calling Daniel R. Brown at (773) 527-0585 or by writing to Holdco Advisors, L.P., c/o Brown Legal Advisors, Attn: Daniel R. Brown, 1253 W. Foster Ave., Suite 3E, Chicago, IL 60640.

## XII.    Plan Supplement

The Plan Supplement will be filed with the Bankruptcy Court prior to the Voting Deadline. The Plan Proponent reserves the right to modify and supplement the Plan Supplement through and including the Effective Date.

## XIII.   Conclusion And Recommendation

The Plan Proponent believes that the Plan is in the best interests of all Holders of Claims. The Plan Proponent urges all Holders of Claims entitled to vote to accept the Plan and to evidence such acceptance by returning their Ballots, as applicable, so they will be received by the Plan Proponent by the Voting Deadline.

96

Dated: June 11, 2013

Respectfully submitted,

**HOLDCO ADVISORS, L.P.** as manager
for Financials Restructuring Partners II,
Ltd.

BY: VM MANAGEMENT COMPANY,
LLC, as its general partner

By: _____
Michael Zaitzeff
Member

DATED this 11th day of June 2013

_/s/ Bruce K. Medeiros_
Bruce K. Medeiros, WSBA No. 16380
Davidson Backman Medeiros PLLC
1550 Bank of America Financial Center
601 West Riverside Avenue
Spokane, Washington 99201
(509) 624-4600

_/s/ Daniel R. Brown_
Daniel R. Brown (Admitted _pro hac vice_)
Brown Legal Advisors, LLC
1253 W. Foster Ave., Suite 3E
Chicago, IL 60640
(773) 527-0585

97

## EXHIBIT A

**The Plan**